ORAL ARGUMENT NOT YET SCHEDULED
No. 23-5129

# In The United States Court Of Appeals
# For The District Of Columbia Circuit

-----------------------------------------------------------------

ALPINE SECURITIES CORPORATION,
*Plaintiff-Appellant*,

SCOTTSDALE CAPITAL ADVISORS CORPORATION
*Plaintiff*,

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,
*Defendant-Appellee*,

UNITED STATES OF AMERICA,
*Intervenor for Defendant-Appellee.*

-----------------------------------------------------------------

## OPENING BRIEF OF PLAINTIFF-APPELLANT

-----------------------------------------------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA No. 1:23-cv-1506-BAH

-----------------------------------------------------------------

Kenneth G. Turkel
David A. Hayes
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL 33602
Phone: (813) 834-9191
kturkel@tcb-law.com

Maranda E. Fritz
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231
maranda@fritzpc.com

David H. Thompson
Brian W. Barnes
Athanasia O. Livas
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiff-Appellant Alpine Securities Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1)(A), undersigned counsel certifies:

Plaintiff-Appellant is Alpine Securities Corporation. Although not a party to the pending preliminary injunction appeal, the other Plaintiff in this case is Scottsdale Capital Advisors Corporation. Defendant-Appellee is the Financial Industry Regulatory Authority, Inc. Intervenor-Defendant-Appellee is the United States of America. No amici yet appeared below or have appeared before this Court. The law firms that have participated in this matter include: Cooper & Kirk PLLC, law firm for Plaintiffs; Turkel Cuva Barrios, P.A., law firm for Plaintiffs; Maranda E. Fritz PC, law firm for Plaintiffs; Gibson, Dunn & Crutcher LLP, law firm for Defendant FINRA.

This case has not previously been before this Court save for this Court's resolution of Alpine's motion for an injunction pending appeal in this case, No. 23-5129. Counsel for Plaintiff-Appellant is unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

The ruling under review is the district court's denial of Plaintiff-Appellant's renewed motion for a preliminary injunction. Order, Doc. 87; Mem. Op., Doc. 88.

Dated: August 28, 2023

s/David H. Thompson
David H. Thompson

*Counsel for Plaintiff-Appellant*
*Alpine Securities Corporation*

i

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW,
AND RELATED CASES ................................................................................i

TABLE OF AUTHORITIES ..............................................................................iv

GLOSSARY OF ABBREVIATIONS ....................................................................1

JURISDICTIONAL STATEMENT .....................................................................1

STATEMENT OF THE ISSUES .........................................................................1

INTRODUCTION .............................................................................................2

STATEMENT OF THE CASE ............................................................................5

SUMMARY OF ARGUMENT ..........................................................................12

STANDARD OF REVIEW ...............................................................................14

ARGUMENT .................................................................................................15

I.     FINRA's Expedited Proceeding Is Government Action Subject to
       Constitutional Constraints.................................................................15

  A. FINRA's Expedited Proceeding Is An Exercise of Executive Power
     Subject to Constitutional Constraints.............................................16

  B. Precedent Establishes that the Expedited Proceeding Is Government
     Action Subject to the Constitution..................................................22

  C. FINRA's Modern Expansion, Which Permits Novel Exercises of
     Federal Power, Is Itself Constitutionally Suspect. ..........................27

  D. The Immunity to which FINRA Claims It Is Entitled Further
     Demonstrates that the Expedited Proceeding Is Government Action. .........30

  E. FINRA's Claim of Unanimous Precedent In Its Favor Is False,
     and Its Cited Cases Are Unhelpful..................................................32

II.    If FINRA Is Not Acting As the Government In the Expedited Proceeding,
       Its Enforcement of the Federal Securities Laws Violates the Private
       Non-Delegation Doctrine.................................................................38

III.   FINRA's Structure, Procedures, and Exercises of Federal Power
       Violate the Constitution. ...................................................................42

       A. FINRA's Multilevel Protection from Presidential Removal Violates
          Article II. ......................................................................................42

       B. FINRA's Structure Violates the Appointments Clause. ...............44

IV.    The Remaining Equitable Factors Overwhelmingly
       Favor an Injunction. ..........................................................................47

       A. Alpine Would Be Irreparably Harmed Absent an Injunction
          While FINRA Would Not Be Harmed By Permitting Alpine's
          Constitutional Claims to Be Adjudicated. ....................................47

       B. The Public Interest Supports an Injunction .................................50

CONCLUSION .............................................................................................53

CERTIFICATE OF COMPLIANCE ...........................................................54

CERTIFICATE OF SERVICE .....................................................................55

# TABLE OF AUTHORITIES

**Case**                                                                                    **Page**

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018) .............................................14, 15

*Ass'n of Am. R.R. v. U.S. Dep't of Transp.*,
    721 F.3d 666 (D.C. Cir. 2013) ............................................38, 39

*Ass'n of Am. R.R. v. U.S. Dep't of Transp.*,
    821 F.3d 19 (2016).............................................................38, 41

*Axon Enter., Inc. v. FTC*, 143 S. Ct. 890 (2023)........................7, 10

*Birkelbach v. S.E.C.*, 751 F.3d 472 (7th Cir. 2014)..................6, 17, 24

*Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995)..................21, 23, 24, 36

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*,
    531 U.S. 288 (2001) .......................................................16, 33, 34

*Bowsher v. Synar*, 78 U.S. 714 (1986)...........................................4

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ...........................................14, 15

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................14

*Credit Suisse First Boston Corp. v. Grunwald*,
    400 F.3d 1119 (9th Cir. 2005).......................................24, 28, 37

*Crimmins v. Am. Stock Exch., Inc.*,
    346 F. Supp. 1256 (S.D.N.Y. 1972).........................................26

*D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*,
    279 F.3d 155 (2d Cir. 2002)....................................................34

*Desiderio v. NASD, Inc.*, 191 F.3d 198 (2d Cir. 1999) ................34, 36

*Domestic Sec., Inc. v. SEC*, 333 F.3d 239 (D.C. Cir. 2003) ................17

*Duffield v. Robertson Stephens & Co.*,
    144 F.3d 1182 (9th Cir. 1998).......................28, 29, 34, 35, 36

*Edmond v. United States*, 520 U.S. 651 (1997)...............................44

---

* Authorities upon which Plaintiff-Appellant chiefly relies are marked with asterisks.

iv

*Ex parte Virginia*, 100 U.S. 339 (1879)..............................................................46

*First Jersey Sec., Inc. v. Bergen,* 605 F.2d 690 (3d Cir. 1979)............................35

*Free Enterprise Fund v. PCAOB,*
    537 F.3d 667 (D.C. Cir. 2008) ..........................................................51, 52

*\*Free Enterprise Fund v. PCAOB,*
    561 U.S. 477 (2010).....................12, 17, 20, 21, 33, 42, 43, 44, 46, 52, 53

*Freytag v. Comm'r of Internal Revenue,*
    501 U.S. 868 (1991)...........................................................................21, 46

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013)...............................................50

*In re NASD*, SEC Release No. 37538,
    1996 WL 447193 (Aug. 8, 1996)..........................................................29

*In re Series 7 Broker Qualification Exam Scoring Litig.,*
    548 F.3d 110 (D.C. Cir. 2008) ..............................................18, 24, 25, 31

*Intercontinental Indus., Inc. v. Am. Stock Exch.,*
    452 F.2d 935 (5th Cir. 1971)...................................................................26

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974)..........................................16

*Jones v. SEC,* 115 F.3d 1173 (4th Cir. 1997).....................................................35

*Karsner v. Lothian*, 532 F.3d 876 (D.C. Cir. 2008)............................................34

*Lamprecht v. FCC*, 958 F.2d 382 (D.C. Cir. 1992) .............................................50

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995)..............................19

*Lowe v. NASD Regul., Inc.,* 99-1751 (TFH),
    1999 WL 1680653 (D.D.C. Dec. 14, 1999)..........................................34

*\*Lucia v. SEC*, 138 S. Ct. 2044 (2018)................................................12, 13, 44, 45

*Manhattan Cmty. Access Corp. v. Halleck,*
    139 S. Ct. 1921 (2019)............................................................................16

*Marchiano v. NASD*, 134 F. Supp. 2d 90 (D.D.C. 2001) ....................................34

*Marchiano v. NASD*, 2000 WL 423810,
    CIV. A.00-00331 (HHK), (D.D.C. Feb. 28, 2000)...................................34

*McGinn, Smith & Co., Inc. v. FINRA,*
    786 F. Supp. 2d 139 (D.D.C. 2011)........................................................34

*Mills v. D.C.*, 571 F.3d 1304 (D.C. Cir. 2009)....................................................48

*Mohlman v. FINRA*, 977 F.3d 556 (6th Cir. 2020)..............................................35

*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972)......................................25, 26

*Myers v. United States*, 272 U.S. 52 (1926)........................................................17

*N.Y. Republican State Comm. v. SEC*,
    927 F.3d 499 (D.C. Cir. 2019) ...................................................................36

*\*NASD v. SEC*, 431 F.3d 803 (D.C. Cir. 2005)................6, 18, 22, 24, 34, 37, 45

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
    53 F.4th 869 (5th Cir. 2022)......................................................................38

*\*NB ex rel. Peacock v. D.C.*, 794 F.3d 31 (D.C. Cir. 2015)...............16, 21, 22, 34

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982).....................................................16, 17

*North v. Smarsh, Inc.*, 160 F. Supp. 3d 63 (D.D.C. 2015)...................................34

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) .................38, 39, 40, 41

*PAZ Sec. v. SEC*, 494 F.3d 1059 (D.C. Cir. 2007)...............................................48

*Pub. Invs. Arb. Bar Ass'n v. SEC*, 771 F.3d 1 (D.C. Cir. 2014).....................32, 33

*Rooms v. SEC*, 444 F.3d 1208 (10th Cir. 2006) ...........................................36, 37

*SEC v. Goble*, 2012 WL 1918819 (11th Cir. May 29, 2012)..................................8

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).........................................20, 27

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022)....................................................14

*Springer v. Gov't of Philippine Islands*, 277 U.S. 189 (1928)............................17

*Springsteen-Abbott v. SEC*, 989 F.3d 4 (D.C. Cir. 2021).......................................9

*Turbeville v. FINRA*, 874 F.3d 1268 (11th Cir. 2017) ............................18, 24, 26

*U.S. Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015)....................38, 39

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
    599 U. S. 419 (2023) ..........................................................................47, 52

*Weissman v. NASD*, 500 F.3d 1293 (11th Cir. 2007)................................6, 18, 31

*West v. Atkins*, 487 U.S. 42 (1988).....................................................................25

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008)............................................................15

*Young Habliston v. FINRA Regul., Inc.*, CV 15-2225 (ABJ),
    2017 WL 396580 (D.D.C. Jan. 27, 2017) .................................................34

## Constitutions and Statutes

U.S. CONST. art. II,

    § 1 ............................................................................................16, 42
    § 1, cl. 1...........................................................................18, 21, 22
    § 2, cl. 2...........................................................................21, 22, 44
    § 3 ................................................................................................25, 42

15 U.S.C.

    § 78s(g)(1) .................................................................................26
    § 78s(h)(1) .................................................................................26
    § 78s(h)(4)(B) ..........................................................................44
    § 78o-3(b)(6)............................................................................18

Securities Act Amendment of 1975, Pub. L. No. 94-29, 89 Stat. 97 (1975)..........28

An Act to make certain amendments to sections 4, 13, 14, 15,
    and 15 B of the Sec. and Exch. Act of 1934, Pub. L. No. 98-38,
    97 Stat. 205 (June 6, 1983) ......................................................28

## Other Authorities

Kate Andrias, *The President's Enforcement Power*,
    88 N.Y.U. L. REV. 1031 (Oct. 2013).........................................17

Birdthistle & Henderson, *Becoming a Fifth Branch*,
    99 CORNELL L. REV. 1 (2013) ...............................................28, 29

Benjamin P. Edwards, *Supreme Risk*, 74 FLA. L. REV. 543 (2022)................29, 37

*Enforcement: Who We Are*, FINRA, https://bit.ly/3QYSvL0
    (last visited Aug. 28, 2023)........................................................18

*FINRA v. Scottsdale Capital Advisors*, SEC, Exchange Act Release
    No. 93052 (Sept. 17, 2021), *available at* https://bit.ly/3PdC63U...............48

Hammond, *Double Deference in Administrative Law*,
    116 COLUM. L. REV. 1705 (Nov. 2016)....................................30

Jennifer L. Mascott, *Who Are 'Officers of the United States'?*,
    70 STAN. L. REV. 443 (2018)...................................................47

Dina Mishra, *An Executive Power Non-Delegation Doctrine for the Private
    Administration of Federal Law*, 68 VAND. L. REV. 1509 (2015).................42

*Municipal Securities*, FINRA,
    https://bit.ly/43pOCBY (last visited Aug. 25, 2023)..................24

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, GEO. MASON UNIV. (Mercatus Ctr., Working Paper 2015), *available at* https://bit.ly/3KWlETa...............................................28, 29, 30

*Report Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding the NASD and Nasdaq Market*, Exch. Act Release No. 37,542, SEC (Aug. 8, 1996), https://bit.ly/3NFzPgY .........................29

Stone & Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, 2 COLUM. BUS. L. REV. 453 (1995), *available at* https://bit.ly/3YPdqC6 ..............................................29

Comm'r Mark T. Uyeda, *Statement on Final Rule Regarding Exemption for Certain Exchange Members*, SEC (Aug. 23, 2023), https://bit.ly/3OWxayY .............................................................................6

## GLOSSARY OF ABBREVIATIONS

<u>CFPB</u>: Consumer Financial Protection Bureau

<u>FINRA</u>: Financial Industry Regulatory Authority

<u>NAC</u>: National Adjudicatory Council

<u>NASD</u>: National Association of Securities Dealers

<u>PCAOB</u>: Public Company Accounting Oversight Board

<u>SEC</u>: Securities and Exchange Commission

<u>SRO</u>: Self-Regulatory Organization

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. The district court denied Alpine's renewed motion for a preliminary injunction on June 7, 2023, and Alpine filed its notice of appeal on June 8, 2023. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether FINRA engages in government action subject to constitutional constraints when it enforces the federal securities laws and imposes punishments that carry the force of federal law.

2. Whether, if this Court concludes that FINRA is not engaged in any government action subject to constitutional constraints, FINRA's power to enforce the federal securities laws violates the private non-delegation doctrine.

1

3.  Whether the multi-level protection from presidential removal enjoyed by
    FINRA's Board and Hearing Officers violates Article II.

4.  Whether the method for selecting members of FINRA's Board and FINRA
    Hearing Officers violates the Appointments Clause.

## INTRODUCTION

The Financial Industry Regulatory Authority ("FINRA") is a nominally private corporation that acts as a government enforcement agency. Based on its unusual status as the purportedly "private" enforcer of the federal securities laws, FINRA insists that it can exercise enforcement power derived from the government, mandated by the government, and with immunity reserved for the government, all free from the constitutional obligations applicable to government actors. FINRA is wrong. If this entity wants to wield government power, it must abide by the constraints on government power.

This Court, in granting Alpine an injunction pending appeal, has largely already recognized the straightforward conclusion that FINRA, like the agency from which it derives its authority, must abide by the Constitution. The Court found that Alpine is highly likely to succeed on the merits of its constitutional claims and has satisfied the other factors necessary for injunctive relief. That remains true. The district court erred in concluding to the contrary without the benefit of this Court's later-in-time decision. This Court should reverse.

2

***

This case provides a clear and concerning example of FINRA's sweeping enforcement authority, its audacious willingness to exercise that authority while disclaiming *any* constitutional constraints, and the potential for FINRA to deprive individuals of their property and livelihood unilaterally, before the Securities and Exchange Commission ("SEC") can exercise any meaningful oversight. Here, FINRA employed an expedited procedural mechanism that threatened Alpine with the corporate death penalty—expulsion from the industry. And FINRA sought to shutter Alpine on an expedited timeframe that deprived the courts of adequate time to consider Alpine's important constitutional claims, and without any meaningful review by any supervising body.

This is not an isolated incident. FINRA exercises significant executive power in enforcing the federal securities laws. Over the last decades, FINRA has been transformed: what was created as a voluntary and member-run collaborative association has morphed into an enforcement agency empowered by law in which membership is compelled, external non-industry governance is mandated, and the mission has shifted from cooperative interaction with the industry to aggressive enforcement and imposition of devastating penalties rivaling those imposed by the SEC. FINRA investigates, prosecutes, and imposes severe penalties for alleged violations not only of FINRA's own rules but of the federal securities laws. The SEC

3

has permitted and even encouraged that development, embracing and expanding a "private" enforcement arm and enabling it to engage in aggressive action unburdened by the dictates of the Constitution or democratic accountability.

The federal government has thereby outsourced enforcement of the securities laws to a purportedly private organization that operates unfettered by the constitutional protections that ordinarily constrain the government and protect the People—protections that FINRA has derided in this litigation as "constitutional roadblocks" to its power. FINRA Suppl. Br. in Opp'n to Pl's Renewed Emergency Mot. for Prelim. Inj. and TRO, Doc. 83, at 5 (D.D.C. June 2, 2023) ("FINRA Suppl. Br."). Before the district court, FINRA complained that a ruling for Alpine would "impair the effectiveness and efficiency of the private self-regulation that Congress enshrined in the Exchange Act by subjecting FINRA to the same constitutional (and other legal) requirements . . . as the federal government." *Id.* But the "fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution," for "[c]onvenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) (cleaned up).

FINRA insists that it is simply not subject to the Constitution because it is "private." This question begging, circular reasoning fails to engage with the real

issues in this case, prioritizes labels over substance, and attempts to enshrine a loophole to the Constitution. More than anything, FINRA's focus on labels misses the point. That FINRA is nominally "private" is the *beginning* of the inquiry, not the end.

As to the relevant question before the Court—whether government action exists when a nominally private entity enforces federal law and imposes penalties that carry the force of federal law with authority derived entirely from the government—the answer is clear: FINRA engages in government action. A contrary conclusion would create a roadmap for nullifying many of the Constitution's most important structural provisions by permitting the federal government to transfer its responsibilities to corporate shadow entities empowered with muscular enforcement authority yet unburdened by any of the associated constitutional limitations. The Constitution does not permit this outsourcing of governmental power without the attendant constitutional constraints and protections.

If FINRA is to enforce federal law, it must follow the highest federal law—the Constitution.

## STATEMENT OF THE CASE

FINRA is the sole registered national securities association in the United States. Since 1983, nearly every broker-dealer in the securities industry has been

compelled to join FINRA as a condition of doing business.[1] FINRA performs a variety of "adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws." *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007); *see NASD v. SEC*, 431 F.3d 803, 805–06 (D.C. Cir. 2005). FINRA also has rulemaking authority, and its rules carry the force and status of federal law. *Birkelbach v. SEC*, 751 F.3d 472, 475 n.2 (7th Cir. 2014). FINRA "serves as a quasi-governmental agency, with express statutory authority to adjudicate actions against members who are accused of illegal securities practices and to sanction members found to have violated the Exchange Act or Securities and Exchange Commission [] regulations[.]" *NASD*, 431 F.3d at 804. *See also id.* ("[FINRA] has been delegated governmental power to enforce the legal requirements laid down in the Exchange Act" (cleaned up)).

---

[1] Indeed, just last week the SEC expanded FINRA's authority to extend to an even broader swath of industry actors. *See* Comm'r Mark T. Uyeda, *Statement on Final Rule Regarding Exemption for Certain Exchange Members*, SEC (Aug. 23, 2023), https://bit.ly/3OWxayY ("[T]oday's amendments eliminate the current exemption from the requirement to be a member in a securities association for proprietary trading firms"). Commissioner Uyeda described what has become the "near-universal mandate to join FINRA," *id.*, and warned that "there is a failure of the Commission to consider both statutory and constitutional boundaries as it contemplates rules relevant to the scope and exercise of power by SROs and Associations under the Exchange Act," *id.* Highly relevant to this case, he remarked that: "[m]oving from a status quo in which SROs may fulfill regulatory responsibilities, often through contracting for FINRA's services, to mandatory FINRA membership can shift the facts and circumstances in an unfavorable manner regarding the state actor question." *Id.*

On April 14, 2023, the United States Supreme Court decided *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890 (2023), holding that plaintiffs do not have to circumnavigate an administrative review process for a district court to consider constitutional claims against an administrative agency and its procedures. *Id.* On April 19, 2023, just five days after the *Axon* opinion was handed down, FINRA filed an expedited proceeding against Alpine (the "Expedited Proceeding"), rushing to obtain an order expelling Alpine from the industry and in turn putting Alpine out of business.[2] If FINRA were allowed to expel Alpine through the Expedited Proceeding, the effect would be to destroy Alpine's business. The district court in the Middle District of Florida proceedings aptly questioned: "[W]hy did FINRA within days of *Axon* being decided spin off to an emergency proceeding in the face of an impending PI proceeding in this Court to essentially axe Alpine so that it would not have any ability to defend itself in a District Court case?" App.88.

The likely answer is that FINRA has engaged in a concerted policy effort to target and ultimately eliminate from the market industry actors that focus on stocks with a relatively lower market cap, also known as the microcap markets. App.112,

---

[2] The expedited proceeding, unlike FINRA's disciplinary proceedings, is conducted by a single Hearing Officer whose order of expulsion would become immediately effective without review by FINRA's appellate tribunal, the National Adjudicatory Council, *and* prior to a decision on Alpine's appeal of the underlying order that included the cease and desist provisions.

164, 167, 282. FINRA targets certain types of its members over others in order to effectuate this apparent policy goal.

FINRA's Expedited Proceeding arose out of a complicated tapestry of FINRA procedures. Essentially, in the Expedited Proceeding FINRA claims that Alpine violated a cease-and-desist order contained in an Initial Hearing Panel Decision (the "Initial Decision") from a prior FINRA enforcement proceeding. App.55.[3] Alpine vigorously disputes the Initial Decision and has appealed it to FINRA's in-house appellate tribunal, the National Adjudicatory Council ("NAC"). Under FINRA's rules, the Initial Decision is not final unless and until it is affirmed by the NAC. No NAC decision has been issued, so the underlying FINRA decision on which the Expedited Proceeding is based is not final. While most decisions of FINRA's Hearing Officers do not take effect until reviewed and affirmed by the NAC, the expulsion order that FINRA seeks to impose through the Expedited Proceeding would become effective *immediately* and force the closure of Alpine's business. App.55. As the District Court for the Middle District of Florida recognized in the

---

[3] The allegations in the Expedited Proceeding do not claim that Alpine violated any clear and specific provision of that cease-and-desist order. Rather, FINRA alleges that Alpine engaged in conduct that violated the broad "obey the law" provisions of the order. Numerous courts have expressed skepticism of such broad provisions, finding them to be violative of due process because they do not furnish fair notice. *See, e.g.*, *SEC v. Goble*, 2012 WL 1918819 (11th Cir. May 29, 2012). Thus, FINRA's core claim in the Expedited Proceeding represents another example of FINRA seeking to do that which the SEC cannot.

Order transferring this case to the District of Columbia: "If successful in that Expedited Proceeding, FINRA would essentially sidestep the NAC appeal and terminate Plaintiffs from membership in FINRA, rendering them ineligible to continue to operate in the securities field." Transfer Order, No. 22-cv-2347, Doc. 62 at 5 (M.D. Fla. May 24, 2023).

On May 9, 2023, Alpine filed an emergency motion for preliminary injunction for relief from FINRA's Expedited Proceeding in the Middle District of Florida, where Alpine originally sued.[4] On May 26, 2023, after briefing and a hearing, that district court transferred this case to the District of Columbia.

Two days after the case was transferred, and before any briefing or submission by the parties, the district court denied Alpine's motion for a preliminary injunction "without prejudice." *See* D.D.C. Minute Order of May 26, 2023. In its denial, the district court relied on *Springsteen-Abbott v. SEC*, 989 F.3d 4 (D.C. Cir. 2021), reasoning that because "the administrative process before [FINRA] and the [SEC] will not be exhausted until the SEC has had an opportunity to rule on the result of the FINRA proceeding," Alpine's claims could not prevail. *See* Minute Order. Alpine then filed a motion for reconsideration, Doc. 65 (May 30, 2023), advising the

---

[4] On February 6, 2023, the United States intervened "for the limited purpose of defending the constitutionality of the federal securities laws, including the Securities Exchange Act of 1934, as amended by the Maloney Act of 1938, 15 U.S.C. § 78a et seq." Not. of Intervention, Doc. 28, at 1 (D.D.C. Feb. 6, 2023).

9

district court that the Supreme Court had recently overruled *Springsteen-Abbott* in *Axon*. In that case, the Supreme Court held that a plaintiff asserting constitutional challenges to an agency's structure may seek an injunction of the regulatory proceeding in district court without first exhausting the administrative process. *Axon*, 143 S. Ct. at 897. Alpine also filed a renewed motion for preliminary injunction or, in the alternative, a temporary restraining order. Doc. 66 (D.D.C. May 30, 2023). Between May 30, 2023, and June 2, 2023, the district court ordered briefing, held a hearing, and ordered supplemental briefing on the emergency motion.

Amidst all this, and despite the very recent transfer of this matter to the District of Columbia and Alpine's pending constitutional claims against FINRA, FINRA decided that it would go forward with the Expedited Proceeding against Alpine unless and until a court enjoined it from doing so. FINRA commenced its hearing in the Expedited Proceeding on June 5, 2023, before the district court had ruled on Alpine's renewed preliminary injunction motion.[5]

On June 7, 2023, the district court denied Alpine's renewed preliminary injunction motion, reasoning that Alpine had demonstrated irreparable harm but was

---

[5] The hearing had been estimated to last three to four days, and the single FINRA Hearing Officer could have issued a decision at any point after presentation of evidence was completed, expelling Alpine from the securities industry. That decision would have become immediately effective without review and regardless of the filing of an appeal. As it happened, presentation of the evidence took longer than expected, so the hearing was still ongoing when this Court issued the administrative stay.

not likely to succeed on the merits. A motions panel of this Court disagreed. As the FINRA hearing continued, Alpine appealed and sought an emergency injunction pending appeal from this Court to prevent its destruction. After briefing, the motions panel granted Alpine an injunction pending appeal. App.417–18 (Alpine "has satisfied the stringent requirements for an injunction pending appeal."). That day, the FINRA hearing was suspended. In a concurring statement, Judge Walker explained that Alpine clearly faced irreparable harm absent an injunction, both "because the ongoing FINRA enforcement proceedings would put it out of business" and because under *Axon*, "the resolution of claims by an unconstitutionally structured adjudicator is a 'here-and-now injury' that cannot later be remedied." App.420 (Walker, J., concurring). Judge Walker further explained that Alpine was likely to succeed on the merits of its constitutional claims against FINRA.

After the motions panel issued its order, FINRA took the extraordinary step of moving for en banc reconsideration of the motion panel's order. The Court denied FINRA's motion. Despite this pending appeal and FINRA's attempt to relitigate the motions panel's order before the full Court, FINRA forged ahead in the district court, moving to dismiss Alpine's complaint on June 30, 2023. Doc. 93. The district court rejected FINRA's effort to disregard the pendency of the appeal, granting Alpine's motion (over FINRA's opposition) to hold the district court proceedings in abeyance while this Court resolves the appeal. *See* Minute Order of July 26, 2023. This appeal

11

concerns the district court's denial of Alpine's motion for a preliminary injunction.

## SUMMARY OF ARGUMENT

FINRA exercises core executive power when it enforces federal law against private parties like Alpine. This exercise of executive power constitutes government action subject to the Constitution. This Court's and the Supreme Court's precedents on state action require that conclusion.

Once it becomes clear that FINRA's exercise of federal power is subject to the Constitution, it follows that FINRA's structure and exercise of federal power violates the Constitution in several independent ways.

*Presidential Removal.* In *Free Enterprise Fund v. PCAOB*, the Supreme Court held that the structure of a private, quasi-governmental board violated the separation of powers because its officers enjoyed two separate levels of protection from presidential removal. The board's members could not be removed at will by the principal officer overseeing them, and that principal officer in turn could also not be removed at will by the President. 561 U.S. 477, 482 (2010). FINRA's structure is identical in this respect, and it is unconstitutional under a straightforward application of *Free Enterprise Fund*.

*The Appointments Clause.* FINRA's appointment structure also violates the Constitution's Appointments Clause under clear Supreme Court precedent. In *Lucia v. SEC*, the Court held that SEC ALJs are "Officers of the United States," and thus

12

must be appointed consistent with the Appointments Clause, because they exercise "significant discretion," have "the authority needed to ensure fair and orderly adversarial hearings," and may serve as the "last-word" in an enforcement action. 138 S. Ct. 2044, 2053–55 (2018). All of that is also true of FINRA Hearing Officers.

In response, FINRA has contended that these "constitutional strictures apply only to public officials—not to the private employees of a private company, such as FINRA." FINRA Pet. for Reh'g En Banc, at 8 (July 19, 2023) ("FINRA Pet."). FINRA has thus attempted to shield itself from accountability by invoking the very constitutional problem that Judge Walker recognized in his statement concurring in this Court's grant of an injunction pending appeal: that a constitutional "loophole" could permit a government agency to outsource to a purportedly private entity its own authority with *all the associated power* of the government without *any of the associated constraints*. App.423 (Walker, J., concurring). To FINRA, the Constitution's structural protections depend on whether the actor asserting federal power purports to be "private." Under FINRA's view, every administrative agency could outsource its enforcement authority to a private party unburdened by the "constitutional roadblocks," FINRA Suppl. Br., at 5, of following our highest law. The Constitution neither envisions nor permits a "private" administrative state capable of putting private parties out of business for violations of federal law.

Enforcement of federal law is federal action—no matter the actor's label. Our constitutional structure is not so flimsy as to allow otherwise.

## STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). This Court reviews a district court's "weighing of the four preliminary injunction factors and its ultimate decision [on issuing a preliminary injunction]" for an abuse of discretion. 454 F.3d at 297. However, legal conclusions upon which the district court's analysis relies are reviewed *de novo. See Id.*; *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018).

In determining whether a preliminary injunction should be granted, the court examines whether: "(1) [the appellant] has a likelihood of success on the merits, (2) the balance of equities favors preliminary relief, (3) an injunction is in the public interest, and (4) [appellant] will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022).

This Court has traditionally applied a " 'sliding scale' approach under which 'a strong showing on one factor could make up for a weaker showing on another.' " *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022)

(quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). This Court has not yet decided whether the sliding scale approach was abrogated by the Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). *See Changji Esquel Textile Co. Ltd.*, 40 F.4th at 726 (reserving "the question whether the sliding-scale approach remains valid"); *Archdiocese of Wash. v. WMATA*, 897 F.3d at 334 (same). The sliding scale approach remains the operative test in this Circuit, although Alpine prevails under either approach.

## ARGUMENT

### I.    FINRA's Expedited Proceeding Is Government Action Subject to Constitutional Constraints.

When this Court granted Alpine's motion for an injunction pending appeal, it correctly found Alpine likely to succeed on its claim that FINRA's enforcement of federal law is government action subject to the Constitution. FINRA's enforcement regime qualifies as government action under both constitutional first principles and binding precedent.

At the most fundamental level, the Constitution's text and structure compel the conclusion that FINRA is subject to constitutional constraints. The Vesting Clause of Article II vests the President with the executive power. The core, perhaps classic, exercise of executive power is the enforcement of federal law. FINRA engages in just that—enforcing not only its own rules and the SEC's rules, but also the federal securities laws more broadly, against private parties like Alpine. Because

15

FINRA exercises executive power, it must be subject to the supervision and control of the President, as required by Article II and the Supreme Court's precedents interpreting it.

State action precedent further establishes this point. The multiple ways to demonstrate state action for the violation of constitutional rights are well established. State action is present "when a private party acts as an agent of the government in relevant respects," *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 43 (D.C. Cir. 2015), when "a nominally private entity . . . is entwined with governmental policies," *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 288-89 (2001), or when the government has "so far insinuated itself into a position of interdependence with" a "private" entity "that it [is] a joint participant in the enterprise," *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357–58 (1974). State action also exists "when the government compels the private entity to take a particular action." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). Under any of these standards, FINRA's Expedited Proceeding qualifies as state action.

## A. FINRA's Expedited Proceeding Is An Exercise of Executive Power Subject to Constitutional Constraints.

As a matter of first principles, FINRA engages in the quintessential exercise of executive power: the enforcement of federal law. Article II vests this executive power in the President of the United States. U.S. CONST. art. II, § 1. Article II

16

"establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion[.]" *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982). Accordingly, the President must be able to exercise certain supervisory powers over those who wield executive power.

"[T]he enforcement of federal law" is a core presidential power. 457 U.S. at 750. After all, "it is the President who is charged constitutionally to take Care that the Laws be faithfully executed." *Id.* (internal quotation marks omitted). It is axiomatic that "to enforce [the federal laws] or appoint the agents charged with the duty of such enforcement . . . are executive functions." *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928). *See* Kate Andrias, *The President's Enforcement Power*, 88 N.Y.U. L. REV. 1031, 1036, 1046 (Oct. 2013). "The vesting of the executive power in the President was essentially a grant of the power to *execute* the laws." *Myers v. United States*, 272 U.S. 52, 117 (1926) (emphasis added). As Madison put it, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enterprise Fund*, 561 U.S. at 492 (citing 1 Annals of Cong. 463 (1789)).

FINRA plainly engages in the enforcement of federal law, a core executive power. FINRA is empowered to create its own rules that, once approved by the SEC, carry the force of federal law. *Birkelbach*, 751 F.3d at 475; *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 242 (D.C. Cir. 2003). And FINRA regularly enforces those rules

17

against members of the regulated industry. But FINRA is not only tasked with enforcing its own rules; it serves as a front-line enforcer for *all* violations of the Exchange Act and the SEC's rules and regulations. *NASD*, 431 F.3d at 808. FINRA itself admits that it engages in "vigorous. . . enforcement of FINRA and MSRB rules, and federal securities laws and rules." *Enforcement: Who We Are*, FINRA, https://bit.ly/3QYSvL0 (last visited Aug. 28, 2023). In fact, when a FINRA member violates the Exchange Act, FINRA is *required* to "levy sanctions that *carry the force of federal law*." *Turbeville v. FINRA*, 874 F.3d 1268, 1270–71 (11th Cir. 2017) (emphasis added); *see* 15 U.S.C. § 78o-3(b)(6). All these functions are derivative from, ultimately belong to, and are performed on behalf of the SEC—an independent federal agency. *NASD*, 431 F.3d at 806–07; *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008); *Weissman*, 500 F.3d at 1296. In short, FINRA's enforcement of the federal securities laws includes investigatory and prosecutorial functions, classic powers reserved to the executive branch.

There is no exception to this rule of presidential oversight—in Article II, in the Supreme Court's case law, or in this Court's precedent—for enforcement of federal law by a private party. Quite the opposite—the plain text of the Article II Vesting Clause makes *no* exception for such outsourcing of executive power. "The executive Power *shall* be vested in a President of the United States of America." U.S. CONST. art. II, § 1, cl. 1 (emphasis added). Nor would an exception make sense.

The deep principle of Article II is democratic accountability. The People need someone to blame or praise for federal policy failures and victories, and the President is the person most democratically accountable to the People.

For that reason, among others, the federal government may not "evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995). As Judge Walker put it: "It would be odd if the Constitution *prohibits* Congress from vesting significant executive power in an unappointed and unremovable government administrator but *allows* Congress to vest such power in an unappointed and unremovable private hearing officer." App.422.

Exempting private actors exercising executive power from our constitutional structural protections would have no principled basis. This is not even formalism—it is *labelism*. The relevant question is the nature of the *power* exercised, not whether the body exercising the power happens to be based in a government building in Washington, D.C., or a corporate headquarters down the street. Further, exempting private actors from structural protections would allow both Congress and the Executive to openly subvert the Constitution. Consider, for example, a President who preferred to avoid the hassle of putting his nominees through the confirmation process. Could that President unilaterally select "private" representatives to speak for the United States overseas and thereby evade the

Constitution's requirement that Ambassadors and Consuls be confirmed by the Senate? Would the Appointments Clause truly have nothing to say on the matter simply because these individuals were "private"—that is, not on the federal payroll? What if Congress preferred to work around the limitations on its own power imposed by Article II? Could Congress create a "private" consumer financial protection agency that exercises enforcement power derived from the CFPB, and staff that new "private" agency with a single Director not removable by the President? Would the Supreme Court's pronouncement against that agency structure suddenly lose all its force? *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020). As these examples show, the focus on the "private" label does not get at the heart of the matter. True, FINRA claims it is "private." But when FINRA is executing federal law, that label means nothing.

FINRA has argued that it would be "irrational" for the Constitution's structural limitations to "switch on and off from moment to moment depending on whether a private party's specific conduct qualifies as state action." FINRA Pet. 13. But this objection is foreclosed by the Supreme Court's holding in *Free Enterprise Fund*. There, the Court held unconstitutional the multi-level removal protection afforded to members of the PCAOB. As the Court explained, the PCAOB is "a private 'nonprofit corporation,'" and "Board members and employees are not considered Government 'officers or employees' for statutory

20

purposes." *Free Enter. Fund*, 561 U.S. at 484–85 (brackets omitted). Yet the PCAOB's structure still violated Article II, despite its nominally "private" status. Regardless, there is nothing unusual, much less "irrational," about requiring an entity to comply with the Constitution's structural provisions because some of its activities trigger those provisions. *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 882 (1991) ("The fact that an inferior officer on occasion performs duties that may be performed by an employee not subject to the Appointments Clause does not transform his status under the Constitution."). Moreover, *other* constitutional requirements—such as Due Process, *see Peacock*, 794 F.3d at 42, and the First Amendment, *see Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995)— likewise "switch on and off" depending on whether a party is engaged in state action. There is no reason the Constitution's structural guarantees should be any different. *See Free Enterprise Fund*, 561 U.S. at 491 n.2 ("If the Government's point is that an Appointments Clause or separation-of-powers claim should be treated differently than every other constitutional claim, it offers no reason and cites no authority why that might be so.").

In sum, constitutional first principles compel the conclusion that FINRA's exercise of executive power in the enforcement of federal law is subject to the strictures of Article II, including the requirements for presidential supervision,

appointment, and removal of Officers. U.S. CONST. art. II, § 1, cl. 1; *id.* art. II, § 2, cl. 2.

### B. Precedent Establishes that the Expedited Proceeding Is Government Action Subject to the Constitution.

This Court's precedents further affirm what first principles establish. "The requisite nexus [for government action] generally exists when a private party acts as an *agent* of the government in relevant respects." *Peacock*, 794 F.3d at 43 (emphasis added). Here, FINRA clearly acts as the "agent" of the SEC in the relevant respect— the enforcement of federal securities laws through adjudicative hearings and the imposition of penalties. This Court already held as much in *NASD v. SEC*. The Court described FINRA's predecessor, the National Association of Security Dealers ("NASD") as a "quasi-governmental agency" with "quasi-governmental authority to adjudicate actions against members" and "quasi-governmental power to discipline its members." 431 F.3d at 804–05, 807.

This Court explained that the body's "disciplinary process essentially supplants a disciplinary action that might otherwise start with a hearing before an ALJ." *Id.* at 806. The same is true for the enforcement authority—the "authority to discipline its members for violations of federal securities law is *entirely derivative*." *Id.* (emphasis added). As the Court explained, "[t]he authority it exercises ultimately belongs to the SEC[.]" *Id.* In other words, where FINRA's procedures supplant the SEC and its enforcement authority is entirely derivative of the SEC, FINRA serves

as an agent of the SEC in the context of the enforcement proceeding. This makes sense. The nature of the Expedited Proceeding is no different in substance or in form from enforcement proceedings that routinely occur in a multitude of federal agencies.

This Court's decision in *Blount v. SEC*, provides further support. The Court held there that the Municipal Securities Rulemaking Board (MSRB) engaged in state action. The Court focused on two critical facts of utmost relevance here: (1) the body's power over participation in the industry; and (2) the body's authority to issue rules that members can be expelled from the industry for violating. A "broker or dealer may not engage in interstate trade in municipal securities unless he registers" with the MSRB. 61 F.3d at 941. And "[i]f he violates an MSRB rule, he may be sanctioned by revocation or suspension of his license to deal in municipal securities." *Id.* The Court was clear: "As a government-enforced condition to any participation in a municipal securities career, [the MSRB's action] constitutes *government action of the purest sort*." *Id.* (emphasis added). [6]

*Blount* cannot be distinguished from this case. FINRA controls participation in the industry and violation of its rules can lead to expulsion from the industry. As

---

[6] Below, the United States attempted to distinguish *Blount* because the MSRB was chartered by Congress. But this Court explicitly "put to one side" that the MSRB was created by Congress, 61 F.3d at 941, and instead focused on "[w]hat is critical here": that the rule at issue "operates not as a private compact among brokers and dealers but as *federal law*." *Id.* at 941 (emphasis added).

in *Blount*, FINRA engages in "government action" because it executes "a *government-enforced* condition to any participation in a . . . securities career." *Id.* (emphasis added). This is "government action of the purest sort." *Id.* No less than the MSRB's rules, FINRA's rules—including the rules that Alpine stands accused of violating—have the status of federal law. *See Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1121 (9th Cir. 2005) (holding that rules of FINRA's predecessor preempt conflicting state law); *see also Birkelbach*, 751 F.3d at 475 n.2. When FINRA decides to levy sanctions, those sanctions "carry the force of federal law" as well. *Turbeville*, 874 F.3d at 1270–71.[7]

This Court has been clear about the source of FINRA's power and the SEC's role in the enforcement process. FINRA "has been delegated governmental power . . . to enforce . . . the legal requirements laid down in the Exchange Act," and "[t]he authority [FINRA] exercises in this realm . . . ultimately belongs to the SEC." *NASD*, 431 F.3d at 804, 811. FINRA serves as the SEC's "first-level adjudicator" in the enforcement actions it brings, deploying a disciplinary process that "essentially supplants a disciplinary action that might otherwise start with a hearing before an ALJ." *Id.* at 805–06. In short, FINRA acts "under the aegis of the Exchange Act's delegated authority" when it performs "regulatory, adjudicatory, or prosecutorial

---

[7] Notably, the MSRB does not even enforce its own rules. Instead, the entity charged with enforcing MSRB rules is none other than FINRA. *See Municipal Securities*, FINRA, https://bit.ly/43pOCBY (last visited Aug. 25, 2023).

duties." *In re Series 7 Broker Qualification Scoring Litig.*, 548 F.3d at 114. Binding D.C. Circuit precedent thus compels the conclusion that FINRA enforcement proceedings are government action.

Analogous Supreme Court precedent on the outsourcing of constitutional obligations leads to the same result. *See West v. Atkins*, 487 U.S. 42, 49, 56 (1988) (holding that a prison physician's actions were fairly attributable to the State for purposes of § 1983). In *West*, the Court found state action where "the State bore an affirmative obligation [and] delegated that function to [a private party]." *Id.* at 56. The same is true here. The President has a constitutional obligation to take care that the laws are faithfully executed. U.S. CONST. art. II, § 3. As to the enforcement of the securities laws, the President delegates that responsibility to the SEC, which in turn directed FINRA, as its agent, to perform the SEC's enforcement function. That is government action, and the outsourcing does not absolve the Government of its constitutional obligations.

This case is also analogous to *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 179 (1972). In that case, an individual claimed that because a state liquor board had issued a license to a discriminatory private club, the club's refusal to serve him was state action subject to constitutional requirements. *Id.* at 165. The Supreme Court agreed. Despite recognizing that "Moose Lodge is a private club in the ordinary meaning of that term," it held that the liquor board engaged in government action by

requiring that licensees abide by their internal rules, even where those rules are discriminatory. *Id.* at 171. Important here, the Court cautioned: "There can be no doubt that the label 'private []' can be and has been used to evade both regulations of state and local [] authorities[.]" *Id.* at 177. Here, FINRA is required to enforce its rules and federal law or face SEC sanctions. 15 U.S.C. § 78s(g)(1), (h)(1). Because the SEC requires FINRA to enforce its rules, such enforcement activities by FINRA are state action under *Moose Lodge.*

Finally, courts in other jurisdictions have likewise recognized the intimate entwinement between the SEC and FINRA in the context of enforcement proceedings. *See Turbeville*, 874 F.3d at 1276 (when an SRO like FINRA carries out its functions as the prosecutor in the enforcement of securities laws and implements SEC-approved rules governing disciplinary actions, it acts "under color of federal law as [a] deput[y] of the federal government"); *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971) ("The intimate involvement of the Exchange with the [SEC] brings it within the purview of the Fifth Amendment controls over governmental due process."); *Crimmins v. Am. Stock Exch., Inc.*, 346 F. Supp. 1256, 1259 (S.D.N.Y. 1972) ("When an exchange conducts such proceedings under the self-regulatory power conferred upon it by the 1934 Act, it is engaged in governmental action[.]").

26

Under a straightforward application of both binding and persuasive precedent, the Expedited Proceeding is government action subject to review.

**C. FINRA's Modern Expansion, Which Permits Novel Exercises of Federal Power, Is Itself Constitutionally Suspect.**

Even putting aside FINRA's exercise of core executive power and the binding precedent establishing FINRA as a government actor when it enforces federal law, FINRA's modern evolution itself establishes the body's unconstitutional structure and the importance of ensuring that the exercise of FINRA's power accords with the Constitution's constraints on the government. "Perhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) (cleaned up). That is the case with FINRA for two independent reasons. First, the extent of FINRA's authority and entwinement with the SEC has and continues to expand. As a result, FINRA's modern structure and exercise of power is an outlier in the long history of self-regulation in the securities industry generally. Second, and more fundamentally, FINRA's current structure and power is distinct in the history of private parties exercising power in the name of the government against other private parties.

True, self-regulation in the securities industry "preexisted federal regulation" and dates back centuries. *See* FINRA Petn. At 4. But those quaint days of cooperative self-regulation are long gone. The FINRA of today is dramatically and substantively

27

different than traditional self-regulatory organizations. Modern-day "FINRA is not a self-regulator. Its members are not regulating themselves; they are being regulated by FINRA, just as they are regulated by the SEC." App.29 (citing Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, at 27, GEO. MASON UNIV. (Mercatus Ctr., Working Paper 2015)). FINRA bears almost no resemblance to the self-regulatory organizations of the New Deal era, much less voluntary associations of stockbrokers of the eighteenth and nineteenth centuries. *See generally* Birdthistle & Henderson, *Becoming a Fifth Branch*, 99 CORNELL L. REV. 1, 12–24 (2013).

The extent of FINRA's entwinement with the SEC has expanded greatly over time. It was only in 1975 that Congress placed the self-regulatory organizations' rulemaking authority under the full control of the SEC. *See* Securities Act Amendment of 1975, Pub. L. No. 94-29, 89 Stat. 97 (1975). It was then that Congress required self-regulatory organizations to pre-clear their rules with the SEC and gave the SEC the power to amend those rules. *See Credit Suisse First Boston Corp.*, 400 F.3d at 1130. In 1983, Congress made membership in FINRA's predecessor mandatory for most broker-dealers, *see* An Act to make certain amendments to sections 4, 13, 14, 15, and 15 B of the Sec. and Exch. Act of 1934, Pub. L. No. 98-38, § 3(a), 97 Stat. 205 (June 6, 1983), and the SEC added other membership requirements for natural persons in 1993, *see Duffield v. Robertson Stephens & Co.*,

144 F.3d 1182, 1200 (9th Cir. 1998). In 1996, the SEC was dissatisfied with a "lack of vigor and balance in . . . enforcement activities" by the NASD, FINRA's predecessor. *Report Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding the NASD and Nasdaq Market*, Exch. Act Release No. 37,542, at 39, SEC (Aug. 8, 1996), https://bit.ly/3NFzPgY. The SEC responded by ordering the NASD to change its leadership structure to insulate enforcement decisions from member influence. *In re NASD*, SEC Release No. 37538, 1996 WL 447193 (Aug. 8, 1996). When the NASD merged with the New York Stock Exchange's enforcement arm to form FINRA in 2007, the SEC conditioned its approval on additional changes to the leadership structure that further eroded member influence. *See* Birdthistle & Henderson, *supra*, at 23.

This shift in FINRA's relationship with the government has caught the attention of SEC officials and scholarly commentators. Scholars have recognized that the Exchange Act has "effectively entwined the SEC and its SROs, making it difficult to characterize the SEC's role as purely oversight." Benjamin P. Edwards, *Supreme Risk*, 74 FLA. L. REV. 543, 559 (2022); *see also, e.g.*, Birdthistle & Henderson, *supra*; Stone & Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, 2 COLUM. BUS. L. REV. 453 (1995), *available at* https://bit.ly/3YPdqC6. As SEC Commissioner Hester Peirce put it: "on the strength of a government mandate and carrying out a regulatory

mission using government-like tools, FINRA is difficult to distinguish from its patron agency." Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, at 20, GEO. MASON UNIV (Mercatus Ctr., Working Paper 2015), *available at* https://bit.ly/3KWlETa. Former SEC Commissioner Daniel M. Gallagher expressed similar concerns regarding the lack of member influence over FINRA: "This decrease in the 'self' aspect of FINRA's self-regulatory function has been accompanied by an exponential increase in its regulatory output. As FINRA acts more and more like a deputy SEC, concerns about its accountability grow more pronounced." App.30 (citing Burton, *Reforming FINRA,* Backgrounder No. 3181 at note 55; *see* Hammond, *Double Deference in Administrative Law*, 116 COLUM. L. REV. 1705, 1771 (Nov. 2016)).

For these reasons, history provides no support for FINRA's current structure and exercise of federal power. In fact, history demonstrates that FINRA's modern expansion—an unprecedented exercise of federal power by a nominally private party against other private parties and an unprecedented development in the regulation of the securities industry—is so novel as to raise constitutional suspicions on that basis alone.

### D. The Immunity to which FINRA Claims It Is Entitled Further Demonstrates that the Expedited Proceeding Is Government Action.

FINRA has successfully argued in this Court and many others that it is immune from tort suits arising from its prosecutorial, adjudicatory, and enforcement

conduct. When FINRA is performing a governmental function on behalf of the SEC, it is afforded immunity. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d at 114; *Weissman*, 500 F.3d at 1296 ("Because they perform a variety of vital governmental functions . . . SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions" (cleaned up)). When FINRA is not performing such a function, its right to immunity ceases. *Id.*

Because FINRA is entitled to immunity when it is performing the government function of an enforcement proceeding, it functions as a government actor in that context. Instead, FINRA seeks to have it both ways. FINRA maintains that, on the one hand, it is entitled to immunity when it performs the adjudicatory and prosecutorial governmental functions delegated to it, but, on the other hand, it is a private actor free from constitutional restraints. Accepting FINRA's position would grant FINRA an unprecedented form of immunity which provides *more* protection than that afforded *either* to governmental entities (who may be sued for constitutional violations) and that available to private citizens (who may be sued for private tort claims). The better conclusion is that, when FINRA exercises its adjudicatory powers in an enforcement proceeding, it engages in state action.

**E. FINRA's Claim of Unanimous Precedent In Its Favor Is False, and Its Cited Cases Are Unhelpful.**

FINRA has repeatedly invoked what it has called an "unbroken body of case law" purportedly holding that self-regulatory organizations are not state actors. FINRA has repeated this claim at every stage of this litigation, but it is wrong. FINRA's cases are distinguishable because they do not arise in the context of its exercise of delegated enforcement authority and are not probative of whether FINRA engages in government action in the relevant context of an enforcement proceeding such as the Expedited Proceeding.

FINRA severely overstates its "unbroken line of precedent," as the district court for the Middle District of Florida recognized before this case was transferred to the District of Columbia. *See* App.87 (describing FINRA's characterization as an "overstatement"); *id.* ("there just isn't such an unbroken line of dispositive cases in any circuit"); App.119 ("[t]here is not an unbroken line of authority conclusively determining that FINRA is not a state actor"); App.87 (FINRA's counsel agreeing that: "[a]s far as I'm aware, there is not" a state action precedent "binding *on any court*." (emphasis added)).

1. FINRA's proclamation of an "unbroken line of precedent" at most supports the unremarkable point that FINRA is private. For example, FINRA has cited *Pub. Invs. Arb. Bar Ass'n v. SEC*, 771 F.3d 1, 2 (D.C. Cir. 2014), as part of the "unbroken line" that "establishes that FINRA is a private organization." But that case contains

32

no such holding. In a passing reference, the Court introduces FINRA to the reader as a "private organization that oversees securities arbitrations[.]" 771 F.3d at 2. That is all.

So too with respect to the Supreme Court's passing reference to "private self-regulatory organizations" in *Free Enterprise Fund*, 561 U.S. at 484. This was an offhand description—hardly even dictum, and certainly not a holding. The Court in no way analyzed the issue of whether FINRA or other "self-regulatory organizations" engage in state action when adjudicating alleged violations of federal law and imposing sanctions that carry the force of law. And that—not whether FINRA is "private"—is the relevant issue. Even accepting the Court's passing reference as binding, nothing in *Free Enterprise Fund* suggests that when a putatively "private" entity exercises quintessential governmental powers to make and enforce federal law, or otherwise acts as the government's agent, it is somehow immunized from the Constitution's mandates. The Court's offhand use of the adjective "private" cannot bear the weight that FINRA gives to it.

Even reading such cases for all they are worth, the fact that FINRA is often described as "private" establishes nothing. The whole point of the state action doctrine is that nominally private entities are sometimes subject to constitutional constraints. Naturally, the Supreme Court has repeatedly used the word "private" to describe entities it found to be state actors. *See Brentwood Acad.*, 531 U.S. at 296

33

(collecting examples). To the extent that labels are what matter, the important one is not the label "private" but this Court's repeated description of FINRA's predecessor as "a quasi-governmental agency." *Karsner v. Lothian*, 532 F.3d 876, 880 (D.C. Cir. 2008) (quoting *NASD*, 431 F.3d at 804).

2. Other cases cited by FINRA conduct no state actor analysis. *See, e.g.*, *Young Habliston v. FINRA Regul., Inc.*, CV 15-2225 (ABJ), 2017 WL 396580, at *5 (D.D.C. Jan. 27, 2017); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001); *Marchiano v. NASD*, CIV. A.00-00331 (HHK), 2000 WL 423810, at *2 (D.D.C. Feb. 28, 2000); *North v. Smarsh, Inc.*, 160 F. Supp. 3d 63, 78 (D.D.C. 2015); *Lowe v. NASD Regul., Inc.*, 99-1751 (TFH), 1999 WL 1680653, at *4 (D.D.C. Dec. 14, 1999). Of the cases that do address the relevant issue, each recognizes that a private entity is a state actor if its actions are "fairly attributable" to the government. *See, e.g.*, *McGinn, Smith & Co., Inc. v. FINRA*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011); *Desiderio v. NASD*, 191 F.3d 198, 206 (2d Cir. 1999); *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 162 (2d Cir. 2002); *Duffield*, 144 F.3d at 1201.

Relatedly, many of the cases on which FINRA has relied predate or do not apply the Supreme Court's entwinement standard set forth in *Brentwood* and do not apply this Court's "agent" test for state action, *Peacock*, 794 F.3d at 43. Finally, many of these opinions are also substantively outdated, as they also predate or fail to recognize critical changes in FINRA's role and its entwinement with the SEC.

3. FINRA has also cited out-of-Circuit authority for the proposition that courts have declined to find state action by FINRA or NASD in other contexts. None of these cases is on-point. Most turned on issues besides state action. *See, e.g.*, *Mohlman v. FINRA*, 977 F.3d 556, 560 (6th Cir. 2020) (affirming because "Plaintiff failed to exhaust the available administrative remedies"); *Duffield*, 144 F.3d at 1201 (no state action because the requirement to register with NASD first carried the force of federal law in 1993, after the plaintiff voluntarily registered). And others again contain no state action analysis at all. *See, e.g.*, *Jones*, 115 F.3d at 1183; *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979) (simply noting that NASD is not a "state agency").

In fact, the Ninth Circuit case on which FINRA has relied belongs on Alpine's side of the tally. *See Duffield*, 144 F.3d at 1201. True, *Duffield* found no state action on the facts presented, but it did so only because the plaintiff challenged an NASD arbitration requirement that she agreed to at a time when "no federal statute or regulation required [her] to register with" NASD. *Id.* The SEC had subsequently adopted a regulation mandating registration by natural persons, and the Ninth Circuit made clear that state action would have been present had the plaintiff signed the arbitration agreement after the new regulation went into effect. Quoting this Court's decision in *Blount*, the Ninth Circuit explained that "as a government-mandated 'condition to any participation in a . . . securities career,' the current requirement that

35

new employees register with a national securities exchange 'constitutes government action of the purest sort.'" *Id.* (quoting *Blount*, 61 F.3d at 941).

*Desiderio*, 191 F.3d at 206–07, on which FINRA has relied heavily in this litigation, is the only case that purports to conduct a state-actor analysis, although under totally different circumstances: a Plaintiff consenting to mandatory arbitration. NASD rules established that "all employees are compelled to arbitrate any employment-related dispute." *Id.* at 201. The Second Circuit found no state action in part because "no SEC rule or action that has been called to our attention encourages the NASD to compel arbitration." *Id.* at 207. *Desiderio* is easily distinguishable. Unlike here, the Plaintiff in *Desiderio* merely agreed to arbitrate disputes—there was no enforcement action that carried the force of law. And an individual employee would be free to reject NASD's arbitration provision at the outset. *See id.* at 207 (rejecting argument that arbitration provision created a "contract of adhesion"). A broker dealer already subject to FINRA's powers and threatened to be put out of business has no similar opportunity. Furthermore, to the extent that *Desiderio* could possibly be read more broadly to imply that FINRA's rulemaking and enforcement activities *never* qualify as state action, it conflicts with this Court's decision subjecting a FINRA rule to First Amendment scrutiny in *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499 (D.C. Cir. 2019), as well as the Tenth Circuit's recognition that "[d]ue process requires that an NASD rule give fair

36

warning of prohibited conduct before a person may be disciplined for that conduct,"
*Rooms v. SEC*, 444 F.3d 1208, 1214 (10th Cir. 2006) (McConnell, J.). In any case,
*Desiderio* is distinguishable because it did not involve an enforcement action—a
context in which FINRA's role as a "first-level adjudicator" for the SEC makes its
exercise of executive power and entwinement with the government especially
pronounced. *See NASD*, 431 F.3d at 805.

But to the extent *Desiderio* and subsequent Second Circuit precedent cannot
be distinguished, it is wrong. The Second Circuit issued its decision in *Desiderio*
with no briefing about the SEC's "control" and "plenary supervision" over the
NASD's regulatory activities. *See NASD*, 431 F.3d at 807, 812. As one scholar
explained, "the Second Circuit rendered its *Desiderio* decision without briefing on
the impact of the 1975 amendments to the federal securities laws, which gave the
SEC the ability to edit an SRO's rules at its will. The court also did not consider the
requirements that SROs enforce federal securities laws" and "the way gradual
changes have transformed SROs to more closely resemble de facto arms of the
federal government." *Supra* Edwards, *Supreme Risk*, 74 FLA. L. REV. at 551–52,
594; *see also Credit Suisse First Boston Corp.*, 400 F.3d at 1119, 1129–30
(discussing 1975 "major overhaul of the Exchange Act" that "drastically shifted the
balance of rulemaking power in favor of Commission oversight").

II.     **If FINRA Is Not Acting As the Government In the Expedited Proceeding, Its Enforcement of the Federal Securities Laws Violates the Private Non-Delegation Doctrine.**

In the alternative, if FINRA does not act as the government when it enforces federal securities law, Congress and the SEC have improperly outsourced enforcement of federal law to a private entity.

This Court's seminal private non-delegation decision held that "[f]ederal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013) ("*Amtrak I*"), *vacated and remanded on other grounds*, *U.S. Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015) ("*Amtrak II*").[8] "A cardinal constitutional principle is that federal power can be wielded only by the federal government." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022).

This makes sense. "Surely, if the Vesting Clauses bar the three branches from exchanging power among[st] themselves, those Clauses bar unchecked reassignments of power to a non-federal entity." *Oklahoma v. United States*, 62 F.4th

---

[8] This Court's decision in *Amtrak I* was vacated when the Supreme Court ruled that Amtrak was not a private party in *Amtrak II*, making the private non-delegation doctrine irrelevant. But this Court later independently reaffirmed the *Amtrak I* analysis in *Amtrak III*, so the analysis remains good law. *See Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 821 F.3d 19, 37 (2016) ("*Amtrak III*"). The *Amtrak III* Court explained in no uncertain terms: "Our prior opinion detailed extensively why private entities cannot wield the coercive power of government." 821 F.2d at 37 "[S]eeing as the Supreme Court reversed on other grounds, *we stand by that analysis.*" *Id.* (emphasis added).

221, 228 (6th Cir. 2023). After all, "[w]hen it comes to private entities," exercising governmental powers, there is "not even a fig leaf of constitutional justification." *Amtrak II*, 575 U.S. at 62 (Alito, J., concurring).

This principle has deep roots in the separation of powers and political accountability. As this Court explained: "delegating the government's powers to private parties saps our political system of democratic accountability." *Amtrak I*, 721 F.3d at 675. "This threat is particularly dangerous where both Congress and the Executive can deflect blame for unpopular policies by attributing them to the choices of a private entity." *Id.* The doctrine also has roots in "the Constitution's guarantee of due process," *id.*, as it "ensures that regulations are not dictated by those who are not bound by any official duty, but may instead act for selfish reasons or arbitrarily," *id.* (quotation marks omitted).

As for when private delegation goes too far, the courts of appeals have drawn a distinction between private bodies that "may serve as advisors that propose regulations," *Oklahoma*, 62 F.4th at 229, and "may undertake ministerial functions, such as fee collection," *id.*, versus those that serve as "the principal decisionmaker in the use of federal power . . . or regulate unilaterally," *id.* at 229.

Here, FINRA's Expedited Proceeding, which seeks to close Alpine for good unilaterally and before any SEC review, falls on the unconstitutional side of the line. The Expedited Proceeding is plainly not a ministerial function—it seeks to exercise

39

substantive prosecutorial and enforcement discretion to close a firm. Further, FINRA seeks to do so unilaterally, with the corporate death penalty taking effect before the SEC has any chance for meaningful review. Thus, under the test for impermissible private non-delegation established by the courts of appeals, *Oklahoma*, 62 F.4th at 229, FINRA's exercise of power in the Expedited Proceeding reflects an unconstitutional delegation to a private actor.

True, the Sixth Circuit in *Oklahoma v. United States* remarked in dicta that the self-regulating organizations in the securities industry are thought to pass constitutional muster. But that was not a holding, and the dicta was primarily limited to the delegated power of the self-regulatory organizations to engage in *rulemaking* and other broad policymaking functions. 62 F.4th at 229. The Court's only discussion of enforcement power was to remark that "[a]s to enforcement, the SEC applies fresh review to the SRO's decisions and actions." *Id.* That is not so here, however, as FINRA seeks to take binding, irreversible government action against Alpine *before* the SEC can undertake any "fresh review." *Id.* Furthermore, any SEC review of the outcome of the Expedited Proceeding is plainly inadequate, as there is no suggestion that anyone at the SEC reviewed and approved of FINRA's decision in the first instance to exercise its prosecutorial discretion by going after Alpine.

As explained above, FINRA exercises broad power to enforce compliance with the federal securities laws. And this case itself demonstrates that FINRA's

procedures allow it to force a firm or individual from the industry without any meaningful opportunity for review even by FINRA's own appellate tribunal—much less review by the SEC. If FINRA is truly a private actor, then FINRA's broad, unchecked enforcement authority violates the private non-delegation doctrine. FINRA has responded by pointing to "the SEC's ultimate control over [FINRA's] rules and their enforcement," FINRA Pet. 15 (quoting *Oklahoma*, 62 F.4th at 229), but that argument avoids Scylla only by charting a course straight for Charybdis: for government control over FINRA's enforcement proceedings would clinch FINRA's status as a government actor subject to the Constitution.

Regardless, whether present generally, SEC oversight is plainly not present in this exercise of FINRA's enforcement authority to close a business without any review by the SEC. Here, FINRA attempts to use an expedited procedural mechanism to shutter Alpine's business before the SEC can even review the decision. And make no mistake: FINRA's death sentence against Alpine would go into effect immediately with no SEC involvement whatsoever. Congress is not empowered to delegate such an extreme exercise of federal government authority to a private actor without *any* supervision or meaningful oversight by the government. That plainly violates the private non-delegation doctrine as recognized by this Court. *See Amtrak III*, 821 F.3d at 37.

41

## III.    FINRA's Structure, Procedures, and Exercises of Federal Power Violate the Constitution.

The district court dismissed Alpine's constitutional claims as mere complaints of a "disgruntled member[ ] of FINRA" App.399, 406. But Alpine's serious constitutional claims against FINRA are well in line with the Supreme Court's recent separation of powers decisions. "The Supreme Court's modern Article II jurisprudence—particularly in the last three decades—is consistent with this basic focus on maintaining presidential control with respect to the execution of law in order to preserve the President's Article II power, responsibility, and role." Dina Mishra, *An Executive Power Non-Delegation Doctrine for the Private Administration of Federal Law*, 68 VAND. L. REV. 1509, 1525 (2015).

FINRA officials have attempted to exercise significant executive authority against Alpine. Thus, consistent with the Supreme Court's precedents, FINRA must be subject to the constitutionally required presidential oversight. Because it is not, this Court was right to find, consistent with these precedents, that Alpine is highly likely to succeed on the merits.

### A. FINRA's Multilevel Protection from Presidential Removal Violates Article II.

"The executive Power shall be vested in a President of the United States," and the President "shall take Care that the Laws be faithfully executed." U.S. CONST. art. II, §§ 1, 3; *see also Free Enterprise Fund*, 561 U.S. at 483. The Constitution accounts

42

for principal executive officers to assist in these duties. *See Id*. But for that arrangement to be constitutional, the President must not be restricted in his ability to remove a principal officer who is in turn restricted in his or her ability to remove an inferior officer. *Id.* at 484. That kind of multilevel protection from removal violates Article II. *Id.* "By granting [] executive power without the Executive's oversight, [this arrangement] subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Id.* at 498.

In *Free Enterprise Fund,* the Supreme Court applied these principles to hold the structure of the Public Company Accounting Oversight Board ("PCAOB") unconstitutional. *Id.* The structure of the PCAOB is identical to the structure of FINRA in all relevant respects. Like FINRA, the PCAOB is purportedly a private, nonprofit corporation whose board members were appointed internally and could not be removed by the SEC except for cause. *Id.* at 484–86. And, relevant because both bodies are overseen by the SEC, it is broadly accepted that SEC Commissioners cannot be removed by the President except in limited circumstances. *Id.* at 486, 492. Further, the PCAOB and FINRA both govern an entire industry, are both charged with enforcing securities law and the SEC's rules, and both enforce compliance with federal law through disciplinary proceedings.

In sum, the Supreme Court's holding in *Free Enterprise Fund* applies with full force to FINRA. The SEC cannot remove FINRA Board members, executives, officers, or other officials at will. *See* 15 U.S.C. § 78s(h)(4)(B). Similarly, the President has no authority to remove a FINRA Board member, executive, or officer. Thus, FINRA's Board members, executives, and officers—including Hearing Officers—enjoy the same dual-layer removal protection that the Supreme Court already found to violate the separation of powers.

## B. FINRA's Structure Violates the Appointments Clause.

The Appointments Clause is one of "the significant structural safeguards of the constitutional scheme." *Edmond v. United* States, 520 U.S. 651, 659 (1997). The Appointments Clause applies to "Officers of the United States," U.S. CONST. art. II, § 2, cl. 2, or those who exercise "significant authority pursuant to the laws of the United States." *Free Enter. Fund*, 561 U.S. at 486. The Appointments Clause requires that "inferior Officers" be appointed by the President, the federal courts, or the "Heads of Departments." *Id*. at 487. Neither FINRA's Hearing Officers nor its Board are appointed in conformity with this requirement, and both sets of officials are "Officers of the United States" under Supreme Court precedent.

With respect to FINRA's Hearing Officers, the Supreme Court's holding in *Lucia v. SEC* is directly on point. In *Lucia*, the Court recognized that SEC ALJs are "Officers of the United States" rather than mere employees. 138 S. Ct. at 2055.

44

The Court reasoned that SEC ALJs exercise "significant discretion," have "the authority needed to ensure fair and orderly adversarial hearings," and may serve as the "last-word." *Id.* at 2053–54. All of that is also true of the FINRA Hearing Officer who conducted the Expedited Proceeding before this Court enjoined it. *See* FINRA Rule 9235; FINRA Rule 8210; FINRA Rule 9252; FINRA Rule 9280. Indeed, "FINRA's hearing officers are near carbon copies of those ALJs." App.421 (Walker, J., concurring). This Court has already recognized that "[t]he statutory scheme governing [FINRA] actions parallels the [SEC's] internal adjudicative structures," *NASD*, 431 F.3d at 806, which permits the SEC "to delegate its disciplinary functions to an Administrative Law Judge." *Id.* And the penalty at issue in *Lucia* was even the same one threatened here—"a lifetime bar from the investment industry." *Lucia*, 138 S. Ct. at 2049–50. Plus, this Court has already recognized that a FINRA enforcement proceeding "supplants a disciplinary action that might otherwise start with a hearing before an ALJ" at the SEC. *NASD*, 431 F.3d at 806–07.

If anything, FINRA Hearing Officers are *more* empowered to execute federal law than SEC ALJs. The *Lucia* Court remarked that SEC ALJs may lack "*the nuclear option* of compliance tools[.]" 138 S. Ct. at 2054 (emphasis added). Not so here, where FINRA Hearing Officers can and do execute the nuclear option of "compliance tools": expulsion from the industry and destruction of a firm.

45

That reality together with *Lucia*'s holding that the SEC ALJs are Officers of the United States leaves no doubt that Alpine is likely to succeed on the merits of its Appointments Clause claim regarding FINRA's Hearing Officers.

The members of FINRA's Board are also Officers of the United States. The key precedent on that question is *Free Enterprise Fund*, which treated similarly situated members of the PCAOB as inferior officers even after striking down their insulation from removal by the SEC. 561 U.S. at 510. Given FINRA's position as an agent of the government that creates and enforces federal securities law, FINRA's officials are subject to the Appointments Clause.

Here again, FINRA's officials are not exempt from the Appointments Clause because FINRA is nominally private. That distinction is artificial and contradicts Supreme Court precedent. The Supreme Court has been clear: "*any* appointee exercising significant authority pursuant to the laws of the United States is an Officer of the United States,*" Freytag*, 501 U.S. at 881 (cleaned up), and the Constitution constrains government action "by whatever instruments or in whatever modes that action may be taken," *Ex parte Virginia*, 100 U.S. 339, 346–47 (1879). The key input is the nature of the power exercised, not the label attached to the role. For good reason—the artificial distinction FINRA proposes would allow Congress or the Executive to subvert the Appointments Clause by simply labelling officers as "private."

46

So too, Founding-era evidence is in line with this body of precedent. "In the Founding era, the term 'officer' was commonly understood to encompass *any individual* who had ongoing responsibility for a governmental duty." Jennifer L. Mascott, *Who Are 'Officers of the United States'?*, 70 STAN. L. REV. 443, 450 (2018) (emphasis added); *see id.* at 454 ("If a statute authorizes the federal government to complete a task or exercise a power, the individual who maintains ongoing responsibility for the task or power is an officer.").

Our Constitution's structural guarantees do not depend on whether the person closing your business in the name of the federal government happens to have a government ID. As three Justices have recognized, giving private individuals power to exercise significant authority under the laws of the United States raises serious Article II problems. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 440–41 (2023) (Kavanaugh, J., concurring). Just so here.

## IV.  The Remaining Equitable Factors Overwhelmingly Favor an Injunction.

### A. Alpine Would Be Irreparably Harmed Absent an Injunction While FINRA Would Not Be Harmed By Permitting Alpine's Constitutional Claims to Be Adjudicated.

The district court correctly recognized that Alpine would be irreparably harmed absent an injunction, as this Court likewise recognized in its grant of an injunction pending appeal.

47

Absent a preliminary injunction, Alpine will be irreparably harmed by FINRA's sweeping exercise of government authority and disclaimer of all constitutional constraints in several independent ways. Alpine would be subject to (1) an unconstitutional administrative proceeding; (2) administered by an unconstitutional administrative body; (3) that could result in severe, existential harm: immediate expulsion—"the securities industry equivalent of capital punishment." *PAZ Sec. v. SEC*, 494 F.3d 1059, 1065 (D.C. Cir. 2007). It will make no difference if Alpine ultimately succeeds—as it did in a previous FINRA enforcement action—in having all findings and sanctions of the FINRA Hearing Officer reversed by the SEC. *FINRA v. Scottsdale Capital Advisors*, SEC, Exchange Act Release No. 93052 (Sept. 17, 2021), *available at* https://bit.ly/3PdC63U. By that time, Alpine would be out of business.

Separately, Alpine would also face the very procedural injury that the Supreme Court in *Axon* recognized as establishing per se irreparable harm. As Justice Kagan explained in *Axon*, being subject to an illegitimate proceeding by an illegitimate decision maker constitutes "a here-and-now injury," and "a proceeding that has already happened cannot be undone." *Axon*, 143 S. Ct. at 903–04. "The loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quotation marks omitted). That is precisely what Alpine faces here.

48

FINRA, on the other hand, will not be irreparably harmed by a delay in the Expedited Proceeding. FINRA waited months to initiate the Expedited Proceeding, which revolves around conduct known to FINRA since at least June of 2022. FINRA would suffer no real harm from allowing the courts to consider Alpine's constitutional arguments on the merits before it closes Alpine for good.

Finally, FINRA has in the past invoked its own general need to "discharge its regulatory duties." FINRA Opp'n to Pl's Renewed Emergency Mot. for Prelim. Inj. and TRO, Doc. 70, at 2 (D.D.C. May 30, 2023). The obvious, blanket statement that a regulatory body must exercise regulatory duties does not undermine the public interest in injunctive relief from procedural and real-world harm while constitutional claims are adjudicated. If it did, agency action would rarely or never be enjoined. FINRA makes no effort at demonstrating why the general discharge of its duties requires destroying Alpine's business *now*, before the courts can review Alpine's constitutional claims on the merits. In fact, FINRA's own actions undermine any alleged urgency. FINRA has already delayed this enforcement effort for months. Even if FINRA could show an urgent need to discharge its regulatory duties in this particular fashion and at this particular moment, any regulatory duty comes second to the dictates of the Constitution.

**B. The Public Interest Supports an Injunction.**

The public interest also supports an injunction. First, Alpine has alleged constitutional violations. And the motions panel found Alpine likely to succeed on the merits of those claims. "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Lamprecht v. FCC*, 958 F.2d 382, 390 (D.C. Cir. 1992) ("[A] Commission policy that is unconstitutional would inherently conflict with the public interest.").

FINRA has in the past attempted to undercut this straightforward conclusion by arguing that an injunction would allow Alpine to "victimize its customers." FINRA Pet. at 16. That assertion candidly assumes the truth of the highly contested premise that Alpine is guilty of the misconduct that FINRA has alleged but not yet proven. After all, "the only evidence that Alpine *has* violated the law is FINRA's say so." App.420 (Walker, J., concurring). FINRA assumes the truth of its own unproven claims and urges this Court to do the same. But allegations alone—at least in this country—are not enough to convict. For good reason. Alpine has in the past *succeeded* in disproving FINRA's allegations through SEC review. App.287. But Alpine has received no SEC review here because of the procedural mechanism FINRA deployed to avoid it. That is precisely one of the constitutional problems with the Expedited Proceeding that form the basis of Alpine's case. It is contrary to

50

all sense of process to assume Alpine's alleged wrongdoing based on FINRA's allegations alone. All the more where, as Judge Walker noted, Alpine argues that FINRA is an illegitimate decisionmaker. App.420.

Further, the fact that FINRA itself waited months to even initiate the Expedited Proceeding against Alpine puts the lie to the notion that Alpine's continued operations would constitute an urgent threat to customers if that proceeding is put on hold while Alpine's constitutional claims are fully briefed and addressed in the ordinary course before FINRA destroys Alpine's business.

What is more, nothing in the panel's injunction prevents the SEC from itself bringing an enforcement action against Alpine, if the members of that presidentially appointed body really believe that Alpine's alleged misconduct is of such momentous import that enforcement of the federal securities laws simply cannot wait.

Finally, despite FINRA's repeated parade of horribles, an injunction would neither ring the death knell for "dozens of other self-regulatory organizations" nor permanently disrupt FINRA's role in enforcing the federal securities laws. FINRA Pet. at 17. Alpine's constitutional claims are based on *FINRA*'s unique status, structure, entwinement with the federal government, and role in exercising government power through enforcement actions such as the one against Alpine. Moreover, "as the Supreme Court has repeatedly stressed, the importance of a policy

does not license the Judiciary to ignore or weaken constitutional limits arising out of the separation of powers." *Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 714 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *aff'd in part, rev'd in part, and remanded by* 561 U.S. 477 (2010). Policy considerations did not move the Supreme Court to look past structural constitutional violations in *Free Enterprise Fund* and *Lucia*, and such considerations have no role to play in the constitutional analysis here.

In any case, it is not Alpine but FINRA that asks this Court to adopt a rule of law that would lead to seismic consequences. Blessing FINRA's exercise of federal executive power entirely unbound by the Constitution would provide a blueprint for outsourcing the work of administrative agencies to bypass the key structural protections of the Constitution. This arrangement raises serious Article II and other structural constitutional problems. *See, e.g.*, *United States ex rel. Polansky*, 599 U.S. at 442 (Kavanaugh, J., concurring) (stating that the Court should review the "substantial arguments" about the "Article II issue" of private relators representing the Federal Government). That—not a temporary "constitutional roadblock" to FINRA's exercise of federal power—would be the true seismic shift.

***

Contrary to the constitutional system that FIRNA might *prefer*, the constitutional system we *have* establishes no opportunity for the private outsourcing of government power without the outsourcing of government constraints. If FINRA

wants to "exercise[] power in the people's name," *Free Enterprise Fund*, 561 U.S. at 497, it must do so subject to "Presidential oversight," *id.*, and the other protections against government overreach guaranteed to the People.

This Court was right that Alpine is highly likely to succeed on the merits of its constitutional claims against FINRA, and that Alpine has satisfied the other factors for injunctive relief. And this Court was right, ultimately, to grant Alpine an injunction pending appeal. The district court's contrary judgment denying Alpine injunctive relief should be reversed.

## CONCLUSION

For the foregoing reasons, the district court should be reversed.

Dated: August 28, 2023                    Respectfully submitted,

Kenneth G. Turkel                         */s/David H. Thompson*
E-mail:  kturkel@tcb-law.com              David H. Thompson
David A. Hayes                            Brian W. Barnes
E-mail:  dhayes@tcb-law.com               Athanasia O. Livas
TURKEL CUVA BARRIOS, P.A.                 Cooper & Kirk, PLLC
100 North Tampa Street                    1523 New Hampshire Ave, N.W.
Suite 1900                                Washington, D.C. 20036
Tampa, FL  33602                          Phone: (202) 220-9649
Phone: (813) 834-9191                     dthompson@cooperkirk.com

                                          Maranda E. Fritz
                                          maranda@fritzpc.com
                                          Maranda E. Fritz PC
                                          521 Fifth Avenue 17th Floor
                                          New York, New York 10175
                                          Phone: (646) 584-8231

*Counsel for Plaintiff-Appellant Alpine Securities Corporation*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FED. R. APP. P. 27(d)(2)(A) because this document contains 12,484 words excluding parts of the brief exempted by FED. R. APP. P. 32(f) and Circuit Rule 32(e)(1).

This document complies with the typeface and type style requirements of FED. R. APP. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: August 28, 2023                    s/David H. Thompson
                                          David H. Thompson

                                          *Counsel for Plaintiff-Appellant*
                                          *Alpine Securities Corporation*

## CERTIFICATE OF SERVICE

I certify that on August 28, 2023, I filed the foregoing document via the appellate CM/ECF system of the United States Court of Appeals for the District of Columbia Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 28, 2023

<u>s/David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiff-Appellant*
*Alpine Securities Corporation*