ORAL ARGUMENT NOT YET SCHEDULED

No. 23-5129

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ALPINE SECURITIES CORPORATION,
*Plaintiff-Appellant*,

SCOTTSDALE CAPITAL ADVISORS CORPORATION
*Plaintiff,*
*v.*

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,
*Defendant-Appellee,*

UNITED STATES OF AMERICA,
*Intervenor for Defendant-Appellee.*

On Appeal from the United States District Court for the
District of Columbia (No. 1:23-CV-1506-BAH)

**BRIEF OF THE AMERICAN FREE ENTERPRISE
CHAMBER OF COMMERCE AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

WILLIAM P. BARR
TORRIDON LAW PLLC
2311 Wilson Blvd.
Suite 640
Arlington, VA 22201

SARAH WELCH
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114

NOEL J. FRANCISCO
BRIAN C. RABBITT
ANTHONY J. DICK
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Email: brabbitt@jonesday.com

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28, counsel for the American Free Enterprise Chamber of Commerce certifies as follows:

**A.      Parties**

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this court are listed in the Brief of Plaintiff-Appellant:

1.  The Municipal Securities Rulemaking Board, represented by the law firm MoloLamken LLP, as *amicus curiae*; and

2.  The New Civil Liberties Alliance, representing itself, as *amicus curiae*.

**B.      Rulings Under Review**

References to the rulings at issue appear in the Brief of Plaintiff-Appellant.

**C.      Related Cases**

Related cases are listed in the Brief of Plaintiff-Appellant.

September 5, 2023                        Respectfully submitted,

                                        /s/ Brian C. Rabbitt
                                        BRIAN C. RABBITT
                                        JONES DAY
                                        51 Louisiana Ave. N.W.
                                        Washington, DC  20001
                                        Telephone:  (202) 879-3939
                                        Email:  brabbitt@jonesday.com

                                        *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 29(b), Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the American Free Enterprise Chamber of Commerce makes the following disclosures:

The American Free Enterprise Chamber of Commerce is a 501(c)(6) organization organized under the laws of Wyoming.  It has no parent corporation, and no publicly held company owns ten percent or more of its stock.

/s/ *Brian C. Rabbitt*
BRIAN C. RABBITT

## RULE 29(d) CERTIFICATION

Pursuant to D.C. Cir. R. 29(d), *amicus* certifies that a separate brief is necessary because *amicus*, the American Free Enterprise Chamber of Commerce, has a unique perspective and expertise on issues raised in this appeal, and seeks to address only those issues for which that perspective and expertise are most relevant. *Amicus* believes that a separate brief is required to offer this unique perspective and expertise.


/s/ *Brian C. Rabbitt*
BRIAN C. RABBITT


iii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,  AND RELATED CASES ............i

CORPORATE DISCLOSURE STATEMENT ...................................... ii

RULE 29(d) CERTIFICATION .............................................. iii

TABLE OF AUTHORITIES ..................................................v

GLOSSARY ............................................................x

INTEREST OF *AMICUS CURIAE* ..........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................3

BACKGROUND .........................................................5

ARGUMENT ..........................................................11

I.     FINRA Wields Substantial Executive Power and Therefore Must Be
       Subject to Presidential Control Through Appointment and Removal..........12

       A.     FINRA's CEO, Board Members, and Hearing Officers Are
              "Officers of the United States" Who Are Subject to the
              Appointments Clause. ......................................13

       B.     FINRA's Regulators Must Be Subject to the President's
              Removal Authority. .........................................19

II.    "Private" Regulatory Organizations Cannot Enforce Federal Law
       Without Adequate Presidential Control......................................24

CONCLUSION..........................................................30

CERTIFICATE OF COMPLIANCE..........................................31

CERTIFICATE OF SERVICE .............................................32

iv

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ass'n of Am. R.R. v. Dep't of Transp.*,
   721 F.3d 666 (D.C. Cir. 2013) (*Amtrak I*) ....................................... 25, 26, 28, 30

*Ass'n of Am. R.R. v. Dep't of Transp.*,
   821 F.3d 19 (D.C. Cir. 2016) (*Amtrak III*) ........................................................25

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023) ...............................................................................27, 28

*Barbara v. N.Y. Stock Exch., Inc.*,
   99 F.3d 49 (2d Cir. 1996) ................................................................................18

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ........................................................................................19

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ...........................................................................................16

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021) ....................................................................................21

*Consumers' Research v. Consumer Prod. Safety Comm'n*,
   592 F. Supp. 3d 568 (E.D. Tex. 2022) ...............................................................21

*Edmond v. United States*,
   520 U.S. 651 (1997) ........................................................................................14

*First Jersey Secs., Inc. v. Bergen*,
   605 F.2d 690 (3d Cir. 1979) ............................................................................27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ..............................................................12, 15, 17, 22, 23

---

* Authorities on which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Freytag v. Commissioner*,
    501 U.S. 868 (1991)..............................................................................13, 14, 17

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935).........................................................................................20

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995).........................................................................................15

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018)..........................................................................14, 16, 17

*Morrison v. Olson*,
    487 U.S. 654 (1988).........................................................................................20

*Myers v. United States*,
    272 U.S. 52 (1926)...........................................................................................19

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*,
    737 F.2d 1095 (D.C. Cir. 1984).......................................................................29

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982).........................................................................................16

*Oklahoma v. United States*,
    62 F.4th 221 (6th Cir. 2023) ...............................................25, 26, 27, 28, 29

*Pittston Co. v. United States*,
    368 F.3d 385 (4th Cir. 2004) ....................................................................25, 26

*R.H. Johnson & Co. v. SEC*,
    198 F.2d 690 (2d Cir. 1952) ............................................................................27

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    140 S. Ct. 2183 (2020)...........................................................12, 19, 20, 21, 22

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sorrell v. SEC*,
679 F.2d 1323 (9th Cir. 1982) ..............................................27

*Springer v. Gov't of Philippine Islands*,
277 U.S. 189 (1928)...............................................................16

*Standard Inv. Chartered, Inc. v. NASD*,
637 F.3d 112 (2d Cir. 2011) ..................................................18

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940)..........................................................25, 27

*Texas v. Comm'r of Internal Revenue*,
142 S. Ct. 1308 (2022)...........................................................29

*Todd & Co., Inc. v. SEC*,
557 F.2d 1008 (3d Cir. 1977) ................................................27

*U.S. Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015) (*Amtrak II*) .......................................3, 24

*United States v. Frame*,
885 F.2d 1119 (3d Cir. 1989) ................................................25

**STATUTES**

15 U.S.C.
§ 70o-3(b)........................................... 6, 7, 15, 16, 17, 20, 21
§ 78o(a)(1), (b)(1) ..................................................5, 9, 17
§ 78s(b)(1), (b)(2)(C) .................................................8
§ 78s(h)(4).......................................................... 9, 23
§ 78s(c), (d), (e) ........................................................8

**OTHER AUTHORITIES**

* U.S. Const. Article II ........................ 3, 4, 11, 13, 14, 15, 19, 22, 23, 24

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

2023 FINRA Industry Snapshot, *available at* https://www.finra.org/
sites/default/files/2023-04/2023-industry-snapshot.pdf ....................................10

FINRA 2022 Annual Budget Summary, *available at*
https://www.finra.org/sites/default/files/2022-05/FINRA-2022-
Annual-Budget-Summary.pdf.............................................................................10

FINRA, *About FINRA*, https://www.finra.org/about (last visited
September 5, 2023) ..............................................................................................5

FINRA, *By-Laws of the Corporation*, *available at*
https://tinyurl.com/4ttdbzcb............................................................7, 8, 9, 10, 14

FINRA, *Office of Hearing Officers*, https://www.finra.org/rules-
guidance/adjudication-decisions/office-hearing-officers-oho/about
(last visited September 5, 2023) ........................................................................14

FINRA, *Statistics*, https://www.finra.org/media-center/statistics#key
(last visited September 5, 2023) .....................................................................7, 21

FINRA Rule 8210 .....................................................................................................6, 16

FINRA Rule 8310 ...........................................................................................................6

FINRA Rules 9110–9291 .......................................................................................17, 21

FINRA Rule 9211 ....................................................................................................6, 16

FINRA Rule 9213 ...........................................................................................................6

FINRA Rule 9311 ...........................................................................................................7

FINRA Rule 9351 ...........................................................................................................7

FINRA Sanctions Guidelines (Sept. 29, 2022), https://www.finra.org/
sites/default/files/Sanctions_Guidelines.pdf..................................................20, 21

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All* (2015), *available at* https://tinyurl.com/3tkxhv5h................................................................5, 6

Press Release, SEC, *SEC Announces Enforcement Results for FY22* (Nov. 15, 2022), https://www.sec.gov/news/press-release/2022-206 .................7

S. Rep. No. 75-1455 (1938) ......................................................................18

*Self-Regulatory Organizations*, 72 Fed. Reg. 42,169, 42,169 (Aug. 1, 2007) .......................................................................................................5

U.S. Securities and Exchange Commission Fiscal Year 2024 Congressional Budget Justification, *available at* https://www.sec.gov/files/fy-2024-congressional-budget-justification_final-3-10.pdf ...........................................10

## GLOSSARY

**AmFree:**      The American Free Enterprise Chamber of Commerce

**CPSC:**        The U.S. Consumer Product Safety Commission

**FINRA:**       The Financial Industry Regulatory Authority

**FTC:**         The U.S. Federal Trade Commission

**PCAOB:**       Public Company Accounting Oversight Board

**SEC:**         The U.S. Securities and Exchange Commission

**SRO:**         Self-Regulatory Organization

## INTEREST OF *AMICUS CURIAE*[1]

Formed in 2022, the American Free Enterprise Chamber of Commerce ("AmFree") is a 501(c)(6) organization that represents hard-working entrepreneurs and businesses across all sectors to serve as the voice for pro-business and free market values. AmFree conducts research and develops policy initiatives designed to support free, fair, and open markets that spur economic growth.

For decades, AmFree's members—and American businesses more broadly— have been saddled with overly burdensome regulations and harmed by the insatiable expansion of the federal regulatory state. This relentless regulatory advance has had a particularly pernicious effect on the U.S. financial services sector, undermining the ability of firms to provide market access to ordinary Americans and threatening the status of the U.S.'s world-leading financial markets. In response, AmFree launched the Center for Legal Action ("CLA") to address these issues in court. Led by two-time former U.S. Attorney General William P. Barr, the CLA's mission is to return power to the people and their elected representatives.

Central to that aim is ensuring that government agencies—and especially putatively "private" entities masquerading as government agencies—remain

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel, or any person, other than the *amicus curiae*, its members, or its counsel contributed money intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

1

properly accountable to elected officials and, ultimately, the people of the United States. To that end, the CLA files amicus briefs in important regulatory and constitutional cases to support reining in the administrative state and promoting constitutional accountability. Curtailing such bureaucratic overreach, and ensuring officials remain properly accountable to the political branches, is imperative for the growth, prosperity, and competitiveness of the American economy and financial markets.

2

## INTRODUCTION AND SUMMARY OF ARGUMENT

The U.S. government has given the Financial Industry Regulatory Authority (FINRA or Authority) an effective monopoly over securities brokers and dealers, allowing it to exercise substantial regulatory authority over major components of the U.S. financial system.  As its name implies, the significant governmental powers the Authority wields are quintessentially executive in nature.  It has the authority to issue binding rules; to investigate, prosecute, and adjudicate alleged violations of those rules and federal laws; and to impose serious sanctions on members—including, as relevant here, effective exclusion from the financial industry.

Despite exercising such sweeping executive powers, FINRA claims broad immunity from any of the Constitution's structural limitations designed to ensure government actors remain accountable to political officials and, ultimately, to the people.  Its leadership and hearing officers are not appointed by the President, a court, or agency head, in clear contravention of Article II's Appointment's Clause.  And they may be removed only through a byzantine process that has the effect of providing them with multiple layers of for-cause protection, which the Supreme Court has found inconsistent with the President's authority to control subordinate officials exercising executive authority.  In our system of government, "[l]iberty requires accountability." *U.S. Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 56 (2015) (Alito, J. concurring) (*Amtrak II*).  FINRA has essentially none.

3

FINRA cannot sidestep these constitutional defects by claiming, as it has before this Court, that it is a purely private body immune from the constraints of the President's removal power and the Appointments Clause. The private non-delegation doctrine on which FINRA relies serves the same constitutional purposes as the President's appointment and removal powers. It ensures that executive authority is wielded only by officers subject to political control and accountability. And because FINRA wields an astonishing amount of executive power without adequate control or accountability, it violates the Constitution no matter which analysis the Court applies.

FINRA thus seeks shelter in what would be, effectively, a Constitution-free twilight zone—private enough to avoid Article II's structural appointment-and-removal safeguards, but public enough to garner immunity from private suit and sidestep non-delegation concerns. And it does so all while maintaining a remarkable degree of operational independence in its enforcement of the federal securities laws that effectively prevents any meaningful supervision or control from the elected President or those accountable to him. Put simply, the Constitution cannot and does not tolerate such an unaccountable arrangement. FINRA's structure is unconstitutional.

## BACKGROUND

Although nominally a private entity, FINRA exercises substantial governmental authority over the U.S. financial system through rulemaking, enforcement, and adjudications of alleged violations of rules, federal laws, and regulations by brokers and dealers—each a quintessentially executive function typically performed by the U.S. government.

**A.**    FINRA describes itself as "a government-authorized not-for-profit organization that oversees U.S. broker-dealers." FINRA, *About FINRA*, https://www.finra.org/about (last visited September 5, 2023). Under U.S. law, FINRA membership is effectively mandatory for all brokers and dealers. The Securities Exchange Act of 1934 requires that brokers and dealers join a "registered securities association." 15 U.S.C. § 78o(a)(1), (b)(1). Since 2007, FINRA has been the only such association. *See Self-Regulatory Organizations*, 72 Fed. Reg. 42,169, 42,169 (Aug. 1, 2007) (approving consolidation of predecessor entities); *see also* Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All* at 10–12 (2015), *available at* https://tinyurl.com/3tkxhv5h (summarizing history of consolidation). Thus, absent minor exceptions not relevant here, all broker-dealers must become and remain FINRA members in order to operate.

By virtue of its government-mandated monopoly, FINRA exercises substantial regulatory authority. In effect, it operates as a putatively private U.S.

5

Securities and Exchange Commission (SEC) for brokers and dealers. As relevant here, FINRA may promulgate rules that "cover all aspects of the securities business." Peirce *supra* at 13; *see also* 15 U.S.C. § 78o-3(b). It may also conduct examinations of member firms and investigate violations of and "enforce compliance" with its own rules, the provisions of the Securities Exchange Act, the SEC's implementing regulations, and even the rules of other self-regulatory organizations (SRO). 15 U.S.C. § 78o-3(b)(2), (7).

Like the SEC, FINRA has its own "Department of Enforcement," which may initiate investigations if its staff "believe[] that any FINRA member or associated person" violates "any rule, regulation, or statutory provision, including the federal securities laws and the regulations." *See* FINRA Rule 9211(a)(1). As part of its coercive investigatory power, FINRA may "require" regulated companies to "provide information orally, in writing, or electronically," or to "testify at a location specified by FINRA staff, under oath or affirmation administered by a court reporter or a notary." FINRA Rule 8210(a). Following investigation, FINRA's Enforcement staff may bring charges in in-house tribunals. After a hearing that may include testimony, evidence, and argument, a FINRA "hearing panel" led by an appointed "Hearing Officer" may issue written decisions and impose monetary fines on members, suspend their operations, or expel them from FINRA altogether. 15 U.S.C. § 78o-3(b)(7); FINRA Rules 8310(a), 9213. Decisions can be appealed to

6

FINRA's in-house appellate tribunal and, eventually, to FINRA's Board of Governors and the SEC.  FINRA Rules 9311, 9351.

The activities of FINRA's enforcement program rival those of most government agencies, including the SEC.  In 2022, for example, the Authority reported bringing 743 new disciplinary proceedings, barring or suspending 555 individuals, imposing $54.5 million in fines, ordering $26.2 million in restitution, and suspending or expelling 10 firms.  *See* FINRA, *Statistics*, https://www.finra.org/media-center/statistics#key (last visited September 5, 2023). By comparison, the SEC's Division of Enforcement brought 760 enforcement actions in fiscal year 2022.  Press Release, SEC, *SEC Announces Enforcement Results for FY22* (Nov. 15, 2022), https://www.sec.gov/news/press-release/2022-206.  Because membership in FINRA is required by statute to operate as a broker-dealer, expulsion from the organization is akin to expulsion from the industry.

**B.**  FINRA is organized under a Board of Governors, which holds "all powers necessary for the management and administration of [its] affairs."  FINRA, *By-Laws of the Corporation* art. VII § 1(a), *available at* https://tinyurl.com/4ttdbzcb.   Its bylaws authorize the Board to engage in rulemaking for its membership.  *See id.* They also permit it to appoint a Chief Executive Officer (CEO), who is "responsible for the management and administration of its affairs."  *Id.* art. VIII § 1.  The CEO supervises both FINRA's Head of Enforcement (who prosecutes all disciplinary

7

proceedings) and its Office of Hearing Officers (which presides over all disciplinary hearings).

FINRA is a "self-regulating" organization in name only. Under its bylaws, FINRA's Board must contain a combination of "Industry Governors," who are elected by its membership and must be regulated parties, and "Public Governors," who are appointed by the Board itself, and who must have no "material business relationship with a broker or dealer." *See* By-Laws, art. I, para tt; art. VII § 4(a). The bylaws further provide that the "number of Public Governors [must] exceed the number of Industry Governors." *Id.* art. VII § 4(a). For those reasons, the Board is controlled by board members who are not broker-dealers—a characteristic that distinguishes it from other SROs.

**C.** The SEC has only limited authority over FINRA's operations. For example, the agency may block proposed changes to FINRA's rules in the interest of ensuring consistency with the Securities Exchange Act and its implementing regulations. *See* 15 U.S.C. § 78s(b)(1), (b)(2)(C). The agency may amend FINRA's existing rules after notice and comment. *See id.* § 78s(c). And the SEC may review, modify, and remand each of FINRA's "final disciplinary sanctions[s]," including expulsion. *See id.* § 78s(d), (e). But the SEC lacks authority to direct FINRA's investigations, to initiate or prohibit new FINRA disciplinary proceedings, or to exercise control over disciplinary proceedings already in progress.

8

Of crucial importance here, the SEC's limited authority over FINRA's enforcement activities means FINRA has effectively untrammeled power to shut down broker-dealer operations without the SEC's prior review or approval. As noted above, federal law requires that brokers and dealers be members of a "registered securities association." 15 U.S.C. § 78o(a)(1), (b)(1). And since FINRA is the only such association, it can terminate a broker-dealer's right to operate by unilaterally expelling it from FINRA for an alleged violation. FINRA's expulsion decisions are effective immediately with no prior authorization by the SEC. And although the SEC can later review and reverse an expulsion decision, that occurs only *after* the company has been shut down. *See* Appellant Br. 7-8, 10 n.5.

The SEC also has extremely limited control over the Board's membership. The agency plays no role in appointing the Board's Governors. *See By-Laws* art. VII § 5 (noting that Public Governors are appointed by the Board), art. I para,. Z, dd, xx (noting that Industry Governors are appointed by FINRA's membership). And while the SEC has formal power to remove a Governor or other FINRA "officer," the standard is exceedingly high—it requires that he or she "willfully violated" an applicable law or regulation, "willfully abused his authority," or "failed to enforce compliance" with an applicable law or regulation "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4). The SEC may make that finding only "after notice and [an] opportunity for [a] hearing." *Id.* And because the Board must

9

contain between 16 and 25 members, *see By-Laws* art. VII § 4, the requirement of an individualized hearing is a separate barrier to materially changing the Board's composition.  These same provisions cabin the SEC's control over FINRA's Hearing Officers.  *See* Order, Case No. 23-5129 at 6 (Walker, J. concurring) (App.422).

    **D.**  FINRA operates at an enormous scale.  In 2022, it reported overseeing nearly 3,400 firms with more than 150,000 offices and over 620,000 registered representatives.  *See* 2023 FINRA Industry Snapshot, *available at* https://www.finra.org/sites/default/files/2023-04/2023-industry-snapshot.pdf.  The Authority itself had almost 4,000 employees and budgeted expenditures of $1.277 billion.  *See* FINRA 2022 Annual Budget Summary, *available at* https://www.finra.org/sites/default/files/2022-05/FINRA-2022-Annual-Budget-Summary.pdf.  By comparison, the SEC had 4,547 full-time employees in fiscal year 2022 and has requested approximately $2.4 billion in appropriations for fiscal year 2024.  U.S. Securities and Exchange Commission Fiscal Year 2024 Congressional Budget Justification, *available at* https://www.sec.gov/files/fy-2024-congressional-budget-justification_final-3-10.pdf.  FINRA thus has a comparable number of employees to the SEC and operates with more than half the agency's annual budget.

**ARGUMENT**

FINRA's structure as an effectively autonomous, quasi-private, quasi-governmental regulator of the U.S. financial system violates Article II of the Constitution for at least two independent reasons.

First, because FINRA exercises substantial executive authority pursuant to federal law, it is subject to the constraints of both the Appointments Clause and the President's removal power. Since FINRA's key officers are not appointed in accordance with the Appointments Clause, and since they cannot be removed at will by the President (or even any of his subordinates), the agency is unconstitutionally insulated from political control.

Second, even if FINRA could somehow be considered a private organization immune from the requirements of either the Appointments Clause or the President's removal power, its activities would still be unconstitutional under the private non-delegation doctrine. Under that doctrine, a private actor may not itself wield executive power, but can act only as an "aid" subject to the close supervision and control of a properly accountable government agency. But FINRA is subject to no such close supervision or control. Accordingly, it would violate Article II even if it were a purely private entity, which it is not.

11

## I.    FINRA Wields Substantial Executive Power and Therefore Must Be Subject to Presidential Control Through Appointment and Removal.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, §§ 1, 3). Since it "would be impossible for one man to perform" all of the duties of the Executive Branch, including the enforcement of all federal laws, the Constitution "assumes" the President will carry out his obligations through subordinates. *Id.* at 2197 (cleaned up). Because these subordinates "must remain accountable to the President, whose authority they wield," the President's executive power necessarily extends to "'appointing, overseeing, and controlling those who execute the laws.'" *Id.* (quoting 1 Annals of Cong. 463 (1789)).

The power to control executive subordinates, in turn, "includes the ability to remove" them. *Id.* Otherwise, the President would have no way to ensure that they obey his commands. In that situation, the President "could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 2191. "Such diffusion of authority 'would greatly diminish the intended and necessary responsibility of the chief magistrate himself.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 514 (2010) (quoting The Federalist No. 70, at 478).

12

FINRA is replete with individuals who exercise substantial executive authority under the laws of the United States. Each is therefore an "officer" of the United States who must be appointed in accordance with the Constitution's Appointments Clause and properly subject to the President's removal authority. Because they are not, FINRA's structure violates the Constitution.

## A. FINRA's CEO, Board Members, and Hearing Officers Are "Officers of the United States" Who Are Subject to the Appointments Clause.

"The 'manipulation of official appointments'" was among the "revolutionary generation's greatest grievances." *Freytag v. Commissioner*, 501 U.S. 868, 883 (1991) (quoting Gordon S. Wood, *The Creation of the American Republic*, 1776-1787, at 79 (1969)). Consequently, "[t]hose who framed our Constitution . . . carefully husband[ed] the appointment power to limit its diffusion." *Id.* "The Framers understood . . . that by limiting the appointment power, they could ensure that those who wield[] it [a]re accountable to political force and the will of the people." *Id.* at 884.

The Appointments Clause requires all "Officers of the United States" to be appointed in a specific manner. U.S. Const. art. II, § 2, cl. 2. With respect to "principal" officers, that means they must be nominated by the President and confirmed by the Senate; "inferior" officers, in turn, must be appointed by the

President, a court, or certain heads of executive departments who are themselves directly accountable to the President. *See id.*; *Freytag*, 501 U.S. at 886.

None of FINRA's employees—including its CEO, its Governors, or its Hearing Officers—are appointed in accordance with the Appointments Clause. Governors who serve on its Board are elected by FINRA's membership or, in the case of Public Governors, appointed by the Board itself. *See* Bylaws, Art. VII, § 13. Similarly, FINRA's CEO—who has broad and general responsibility for supervising the "management and administration" of its operations—is appointed by the Board. *See* Bylaws, Art. VIII, § 1. And FINRA's Hearing Officers are employees of the Authority who report directly to FINRA's CEO. *See* FINRA, *Office of Hearing Officers*, https://www.finra.org/rules-guidance/adjudication-decisions/office-hearing-officers-oho/about (last visited September 5, 2023). Accordingly, if FINRA's Board members, CEO, and Hearing Officers qualify as "Officers of the United States," then their methods of selection and appointment indisputably contravene the Constitution's Appointments Clause.

As the Supreme Court has explained, "Officers of the United States" subject to the Appointments Clause are those who occupy "continuing" positions in which they exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 138 S. Ct. 2044, 2051–2053 (2018); *see also Edmond v. United States*, 520 U.S. 651, 662 (1997) ("The exercise of 'significant authority pursuant to the laws of

14

the United States' marks . . . the line between officer and nonofficer"). A person's status as an officer subject to the Appointments Clause thus turns on his actual *function* and *authority* rather than the mere *label* that Congress may choose to give him, or that he has chosen to give himself. After all, the government may not "evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995).

In *Free Enterprise Fund*, for example, the Supreme Court held that members of the Public Company Accounting Oversight Board (PCAOB) were Officers of the United States even though the board was technically "a private 'nonprofit corporation,' and Board members" were "not considered Government 'officer[s] or employee[s]' for statutory purposes." 561 U.S. at 484, 510. What mattered was that they "exercis[ed] significant authority pursuant to the laws of the United States," not that they technically worked for a private "corporation" that paid them "salaries far above the standard Government pay scale." *Id*.

Like the members of the PCAOB's board in *Free Enterprise Fund*, FINRA's CEO, Governors, and Hearing Officers are likewise "Officers of the United States" because they exercise significant authority pursuant to the laws of the United States in several different respects.

*First*, FINRA "enforce[s] compliance" with the provisions of the Securities Exchange Act and the SEC's implementing regulations, as well as FINRA's own

15

regulations and the regulations of other SROs (which have the force and effect of federal law). 15 U.S.C. § 78o-3(b)(2). Much like SEC attorneys, FINRA staff—acting under the supervision of its CEO and Board—are authorized to commence investigations for violations of FINRA's rules, the SEC's regulations, and the federal securities laws, including by compelling the production of documents or sworn testimony. *See* FINRA Rule 8210(a). They may also bring charges against broker-dealers and their associated persons, and prosecute cases in FINRA's in-house tribunals. *See* FINRA Rule 9211. "[T]he enforcement of federal law" is a core executive power. *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982). Indeed, it is axiomatic that "to enforce [the federal laws] or appoint the agents charged with the duty of such enforcement . . . are executive functions." *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928).

*Second*, FINRA may not only investigate, commence, and prosecute specific enforcement actions, it may also promulgate rules for all brokers and dealers that have the force and effect of law, determine which of those rules (and other provisions) to prioritize for enforcement, and (more often than not) choose the terms on which they will resolve enforcement cases brought by their staff. *Lucia*, 138 S. Ct. at 2047. In these respects, FINRA's CEO and Governors function much like heads of an independent agency such as the SEC. *See Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (holding FEC Commissioners are "at the very least" inferior officers);

16

*see also Free Enter. Fund*, 561 U.S. at 484 (holding that members of the PCAOB are inferior officers even though "Congress created the Board as a private 'nonprofit corporation,' and Board members and employees are not considered Government "officer[s] or employee[s]" for statutory purposes.").

*Third*, FINRA's CEO and Governors supervise and hear appeals from Hearing Officers who perform functions materially identical to the ALJs deemed to be officers in *Lucia* and the special trial judges deemed officers in *Freytag v. Commissioner*, 501 U.S. 868 (1991)—*i.e.*, taking testimony, conducting trials, ruling on the admissibility of evidence, deciding motions, and issuing decisions that have the force of law.  *See Lucia*, 138 S. Ct. at 2052; *see also* FINRA Rules 9110–9291 (setting forth procedures for FINRA disciplinary hearings).

*Fourth*, FINRA's broad authority to perform these executive functions comes directly from federal law.  *See* 15 U.S.C. § 78o(a)(1), (b)(1) (requiring that brokers and dealers join an SRO).  In fact, federal law *requires* FINRA to perform those functions as a condition of being an SRO.  *Id*. § 78o-3(b)(2).  And FINRA's mandatory functions include enforcing not only its own rules but also the federal securities laws, which is a core executive function.[2]  *See id*.

---

[2] The history of the Maloney Act, which amended the Securities Exchange Act to provide much of the authority FINRA now wields, confirms that Congress believed SROs such as FINRA would be exercising executive power.  In its report analyzing the Maloney Act, the Senate Committee on Banking and Currency

17

*Finally*, if there were any doubt as to the status of FINRA and its employees, it is put to rest by the fact that they "are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011). That immunity extends to holding "disciplinary proceedings against exchange members," enforcing "security rules and regulations," and providing "general regulatory oversight over exchange members." *Id*. at 116 (citations omitted). These protections parallel those conferred on federal employees who exercise similar functions. *See Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 58-59 (2d Cir. 1996). FINRA enjoys this immunity because its functions are "intimately intertwined with the regulatory powers delegated to [FINRA] by the SEC." *Standard Inv.*, 637 F.3d at 116.

---

explained that one of the bill's principal purposes was to "strengthen the direct regulatory powers over the . . . markets" provided by the Securities Exchange Act and to "provide for certain additional direct powers which are desirable in the public interest." S. Rep. No. 75-1455, at 1 (1938). These powers would "not enlarge the objectives or the outline of regulatory functions initially set forth in" the Securities Exchange Act, but rather would "fill[] in and implement[] the original outline in order to make possible the realization of the original objectives." *Id*. at 4. The Committee's report further explained that it considered the Maloney Act's expansion of SROs' authority to be an "alternative program[]" to "a pronounced expansion of the organization of the [SEC.]" *Id*. at 3-4.

18

### B.    FINRA's Regulators Must Be Subject to the President's Removal Authority.

Due to the Article II imperative that the President remain in control of "the executive power," the President's authority to remove those who wield executive authority is "the rule, not the exception." *Seila Law*, 140 S. Ct. at 2206. After all, "[o]nce an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (internal quotation marks omitted). This explains why Article II gives the President not only the power to appoint officers but also "the general administrative control of those executing the laws," which requires the "power of removing those for whom he cannot continue to be responsible." *Myers v. United States*, 272 U.S. 52, 117, 164 (1926). If anything the removal power is even more important and extensive than the appointment power—although the appointment power applies only to "Officers of the United States," the removal power extends to all of those who play a significant role in "executing the laws." *Id*.

Although the Supreme Court has recognized "two" "exceptions" to the removal power, they are narrowly limited. *Seila Law,* 140 S. Ct. at 2199. First, *Humphrey's Executor* recognized an exception for the heads of "multimember expert agencies that do not wield substantial executive power." *Id.* at 2199-2200;

19

*see Humphrey's Executor v. United States*, 295 U.S. 602, 628 (1935) (explaining the officers "exercise[d] no part of the executive power"). Second, *Morrison v. Olson*, 487 U.S. 654 (1988), recognized an exception for "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2200. These two exceptions mark "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* (internal quotation marks omitted).

FINRA does not fit within either exception. First, FINRA does not fit within the narrow *Humphrey's Executor* exception because it exercises "substantial executive power." *Id.* at 2199-2200. Most notably, FINRA has robust "enforcement authority," including the power not only to compel document production and sworn testimony but also to impose significant monetary fines, which is "a quintessentially executive power not considered in *Humphrey's Executor*." *Id.* at 2200. Federal law authorizes FINRA to punish broker-dealers for violations of its rules or federal securities laws through "expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction." 15 U.S.C. § 70o-3(b)(2), (7). FINRA's guidelines for sanctions include six-figure fines or even expulsion for violations such as failing to send a customer a written confirmation before completing a transaction, or failing to "observe high standards of commercial honor." FINRA Rule 2010;

20

FINRA Sanctions Guidelines 25-26 (Sept. 29, 2022), https://www.finra.org/sites/ default/files/Sanctions_Guidelines.pdf.  FINRA vigorously exercises that authority. Last year alone, FINRA barred or suspended 555 individuals, imposed $54.5 million in fines, ordered $26.2 million in restitution, and suspended or expelled 10 firms, effectively prohibiting them from operating as going concerns.  *See* FINRA, *Statistics*, https://www.finra.org/media-center/statistics#key (last visited September 5, 2023).

In addition, FINRA makes rules and regulations that have the force and effect of law for virtually all broker dealers in the country.  *See* 15 U.S.C. § 78o-3(b). FINRA also has authority to engage in high-stakes adjudications in trial-like proceedings.  FINRA Rules 9110–9291.  Such administrative adjudications and rulemakings "must be" considered exercises of executive power.  *Seila Law*, 140 S. Ct. at 2198 n.2; *see also Collins v. Yellen*, 141 S. Ct. 1761, 1785-86 (2021) (an entity "empowered to issue a 'regulation or order' . . . clearly exercises executive power.").

When an agency wields such core executive powers, it must be subject to presidential removal regardless of whether it takes a "single member" or "multi-member" form.  *See Consumers' Research v. Consumer Prod. Safety Comm'n*, 592 F. Supp. 3d 568, 581 (E.D. Tex. 2022) (holding that the *Humphrey's Executor* exception does not apply to the multi-member CPSC), appeal pending, No. 22-40328 (5th Cir.) (oral argument held March 6, 2023).  Unlike the multi-member FTC as it

21

existed at the time of *Humphrey's Executor* in 1935, an agency like FINRA that wields such extensive executive authority cannot remotely be described as "a mere legislative or judicial aid" that "exercise[s] 'no part of the executive power.'" *Seila Law*, 140 S. Ct. at 2198, 2200.  Thus, *Humphrey's Executor* cannot save FINRA.

Second, the *Morrison* exception does not apply either because, even if FINRA could be characterized as consisting solely of "inferior" officers, it does not have only "limited duties and no policymaking or administrative authority." *Id*. at 2200. To the contrary, as explained above, FINRA has expansive regulatory duties over the entire broker-dealer industry, and wields vast policymaking and administrative authority.  It can make rules with the force and effect of law, set enforcement priorities, bring enforcement actions, preside over and adjudicate cases, and even decide to exclude companies like Alpine from the securities industry altogether. Under Article II, no regulatory body can exercise such far-reaching executive authority completely untethered from the presidential accountability and control afforded by the removal power.

Finally, even if the Constitution somehow allowed FINRA be subject to a *single* layer of removal protection, it would not allow the *double* layer of removal protection that FINRA's Governors and Hearing Officers enjoy.  In *Free Enterprise Fund*, the Supreme Court struck down the removal restrictions on the PCAOB's board because its members could be removed only "for good cause shown" by the

22

SEC, which the Court assumed to be an independent agency whose Commissioners were, in turn, protected by their own "good cause" removal restrictions. 561 U.S. at 486-87. The same is true here. The SEC is likewise the only entity that can remove FINRA Governors, while FINRA's Hearing Officers can be removed only by its Governors or the SEC. *See* 15 U.S.C. § 78s(h)(4). And the Commission's removal authority is limited in the same way. The SEC can remove these officials only if they have "willfully violated" an applicable law or regulation, "willfully abused [their] authority," or "failed to enforce compliance" with an applicable law or regulation "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). Accordingly, this case involves the same unconstitutional attempt to "shelter the bureaucracy behind two layers of good-cause tenure," that the Supreme Court considered, and rejected, in *Free Enterprise Fund*, 561 U.S. at 497.

*    *    *

FINRA's officials thus exercise substantial executive authority under the laws of the United States and are therefore "officers" who must be appointed in accordance with the Appointments Clause and properly subject to removal. Because they are not, FINRA's structure violates the Constitution.

23

## II. "Private" Regulatory Organizations Cannot Enforce Federal Law Without Adequate Presidential Control.

For the reasons above, Article II does not allow the delegation of significant executive authority to private actors who are not subject to the checks provided by the Appointments Clause and the President's removal power. "Those who exercise the power of Government are set apart from ordinary citizens. Because they exercise greater power, they are subject to special restraints." *Amtrak II*, 575 U.S. at 58 (Alito, J., concurring). Accordingly, since FINRA wields executive power without the accountability provided by the appointment and removal powers, it is unconstitutional for that reason alone. As Judge Walker noted, "it would be odd if the Constitution prohibits Congress from vesting significant executive power in an unappointed and unremovable government administrator but allows Congress to vest such power in an unappointed and unremovable private hearing officer." App.422.

Even if FINRA were a purely private body not subject to the Constitution's appointment and removal rules, it would still be unconstitutional under the private non-delegation doctrine. To the extent private actors may be involved in the exercise of executive power at all, they may act only as aids who are subject to the close supervision and control of government officers who are themselves appointed and removable by the President. As this case illustrates, however, FINRA's sweeping executive powers are not subject to any such supervision or control.

24

"Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013) (*Amtrak I*); *see Ass'n of Am. R.R. v. Dep't of Transp.*, 821 F.3d 19, 37 (D.C. Cir. 2016) (*Amtrak III*) ("stand[ing] by" the analysis in *Amtrak I*). "[I]f a private entity creates the law or retains full discretion over any regulations," that "is an unconstitutional exercise of federal power." *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023). "Congress may formalize the role of private parties in proposing regulations so long as that role is merely 'as an aid' to a government agency." *Amtrak I*, 721 F.3d at 671 (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)). Thus, an arrangement suffices if the private entity "function[s] subordinately to" the agency and the agency "has authority and surveillance over the activities" of the private entity. *Adkins*, 310 U.S. at 399.

In other words, an unaccountable private entity must be subject to strict supervision and "pervasive oversight and control" by an accountable public entity. *Oklahoma*, 62 F.4th at 231 (internal quotation marks omitted). Private entities may serve in "*ministerial* or *advisory* roles," but Congress and agencies "may not give these entities governmental power over others." *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004); *see Amtrak I*, 721 F.3d at 671 n.5; *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989). A private entity "may not be the principal decisionmaker in the use of federal power." *Oklahoma*, 62 F.4th at 229.

As explained above, FINRA exercises substantial federal power over others. *See supra* at 15-18, 20-22.  The SEC, however, lacks the critical degree of control over FINRA and its exercise of that power, as this case plainly illustrates.

First, the SEC lacks meaningful control over FINRA's expedited proceedings like the one against Alpine here.  If FINRA concludes that Alpine should be expelled from its membership—a sanction aptly described as the "corporate death penalty"—it can implement that sanction immediately.  *See* Appellant Br. 7-8, 10 n.5.  FINRA's decision is effectively final and irreversible.  Any SEC review, perhaps years down the road, will be cold comfort to Alpine, which will have long since gone out of business and lost its employees and clients.  Appellant Br. 48.  When a private entity can take such drastic regulatory action, and it cannot be meaningfully reviewed or altered by any government actor accountable to the President, the private actor effectively "retains full discretion" to exercise regulatory power.  *Oklahoma*, 62 F.4th at 229.  In such cases, the private actor is in no sense serving as a permissible "aid" to a public agency, because unilaterally deciding to shut down a company is no ministerial or advisory act.  *Amtrak I*, 721 F.3d at 671; *Pittston Co.*, 368 F.3d at 395.  It is a raw exercise of government power.

Second, even outside the context of expedited proceedings, the SEC lacks adequate control over FINRA's enforcement authority more broadly.  The SEC cannot control FINRA's decision to commence an investigation, to compel

26

document production or sworn testimony, to initiate an enforcement proceeding, or to cease an existing prosecution, or influence ongoing adjudications—all of which can have significant negative consequences for FINRA's members.  Perhaps the SEC might have that sort of control if it could remove FINRA's Governors or Hearing Officers at will, or directly order FINRA to drop or modify an ongoing enforcement investigation, proceeding, or adjudication.  But no such mechanism exists. FINRA's unreviewable latitude in significant components of its enforcement activities thus precludes any argument that FINRA truly "function[s] subordinately to" the SEC or is subject to its "pervasive oversight and control."  *Oklahoma*, 62 F.4th at 231; *Adkins*, 310 U.S. at 399.

To be sure, courts have sometimes concluded that FINRA or its predecessors were sufficiently supervised to survive challenges on private non-delegation grounds. *See R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *Todd & Co., Inc. v. SEC*, 557 F.2d 1008, 1012-13 (3d Cir. 1977); *First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982).  But none of those cases considered an as-applied challenge to an "expedited" FINRA proceeding like the one at issue here, where FINRA seeks to shutter a regulated entity with no effective control by the SEC.  Moreover, all of those cases preceded the Supreme Court's recent holding that suffering adjudication before an improperly structured agency is a "here-and-now injury" that "is impossible to

27

remedy once the proceeding is over." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023). As that decision now makes clear, the SEC's theoretical ability to weigh in at some point in the future is not enough when a party is suffering an ongoing constitutional violation. Finally, none of those cases considered challenges on constitutional appointment and removal requirements, which FINRA must satisfy regardless of whether it comports with the private non-delegation doctrine. *Cf. Oklahoma*, 62 F.4th at 229 (declining to address unbriefed and "complex separation of powers questions" about whether a structure that survives a private non-delegation challenge is constitutionally adequate). Put simply, the Supreme Court's jurisprudence in those areas has evolved materially since the cases FINRA cites were decided.

Other cases have merely alluded to FINRA in dicta as an apparently permissible example of private delegation. *See Oklahoma*, 62 F.4th at 229; *Amtrak I*, 721 F.3d at 671 n.5. Those purely observational remarks did not consider the situation here. Indeed, they are based on the assumption—conclusively rebutted by FINRA's expedited proceedings—that the SEC possesses "ultimate control over" FINRA's enforcement activities, *Oklahoma*, 62 F.4th at 229, and that FINRA's functions are "purely advisory or ministerial," *Amtrak I*, 721 F.3d at 671 n.5. FINRA is no minor lackey when it wields effectively unreviewable power to execute the corporate death penalty.

\*    \*    \*

Ultimately, the private nondelegation doctrine, just like the structural constitutional requirements for appointment and removal of officers of the United States, serves to ensure that the executive power is wielded only by the President or subordinates who are subject to his supervision and control. "To ensure the Government remains accountable to the public, it cannot delegate regulatory authority to a private entity." *Texas v. Comm'r of Internal Revenue*, 142 S. Ct. 1308, 1309 (2022) (Alito, J., concurring) (internal quotation marks omitted). "Those who govern the People must be accountable to the People." *Oklahoma*, 62 F.4th at 228. The risk that delegation will destroy political accountability "is doubled in degree in the context of a transfer of authority from Congress to an agency and then from agency to private individuals," to say nothing of the effect of insulating the power with two layers of for-cause removal protections. *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1143 n.41 (D.C. Cir. 1984).

In arguing to the contrary, FINRA seeks to carve out for itself what is effectively a Constitution-free twilight zone—private enough to avoid the Constitution's structural appointment-and-removal safeguards, but public enough to garner immunity from private suit and avoid any non-delegation concerns, all while maintaining a degree of operational independence that prevents any meaningful supervision or control from the elected President or those accountable to him. The

29

Constitution cannot tolerate such an arrangement.  Congress may not "reap the benefits of delegating regulatory authority while absolving the federal government of all responsibility for its exercise.  The federal government cannot have its cake and eat it too."  *Amtrak I*, 721 F.3d at 676.

## CONCLUSION

For the foregoing reasons, the decision below should be reversed.


September 5, 2023                                  Respectfully submitted,


                                                   /s Brian C. Rabbitt
WILLIAM P. BARR                                    NOEL J. FRANCISCO
TORRIDON LAW PLLC                                  BRIAN C. RABBITT
2311 Wilson Blvd.                                  ANTHONY J. DICK
Suite 640                                          JONES DAY
Arlington, VA 22201                                51 Louisiana Ave. N.W.
                                                   Washington, DC  20001
SARAH WELCH                                        Telephone:  (202) 879-3939
JONES DAY                                          Email: brabbitt@jonesday.com
901 Lakeside Ave.
Cleveland, OH 44114                                *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 6,466 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), as counted using the word-count function on Microsoft Word software.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

September 5, 2023                    /s/ Brian C. Rabbitt
                                     BRIAN C. RABBITT
                                     *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 5th day of September, 2023, I electronically filed the original of the foregoing document with the clerk of this Court by using the CM/ECF system, which will serve the counsel for all parties at their designated electronic mail addresses.

September 5, 2023

/s/ Brian C. Rabbitt
BRIAN C. RABBITT
*Counsel for Amicus Curiae*