**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 23-5129**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ALPINE SECURITIES CORPORATION,

*Plaintiff-Appellant*,

*v.*

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,

*Defendant-Appellee*,

UNITED STATES OF AMERICA,

*Intervenor For Defendant-Appellee*.

On Appeal From The United States District Court For The District Of Columbia
Case No. 1:23-cv-01506-BAH, District Judge Beryl A. Howell

# BRIEF FOR DEFENDANT-APPELLEE

Amir C. Tayrani
Alex Gesch
Max E. Schulman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 887-3692
ATayrani@gibsondunn.com

*Counsel for Defendant-Appellee Financial Industry Regulatory Authority, Inc.*

October 27, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Defendant-Appellee submits this Certificate as to Parties, Rulings, and Related Cases:

### A. Parties

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Plaintiff-Appellant:

The Municipal Securities Rulemaking Board appeared as *amicus curiae* in support of neither party.

The American Free Enterprise Chamber of Commerce and New Civil Liberties Alliance appeared as *amici curiae* in support of Plaintiff-Appellant.

### B. Rulings Under Review

References to the rulings at issue appear in the Brief for Plaintiff-Appellant.

### C. Related Cases

This case has not previously been before this Court, except for a motions panel's resolution of Alpine Securities Corporation's motion for an injunction pending appeal in this case, No. 23-5129. Counsel for Defendant-Appellee is aware of two other related cases within the meaning of Circuit Rule 28(a)(1)(C), which raise substantially similar issues and are currently pending before this Court or the district court: *Kim v. Financial Industry Regulatory Authority, Inc.*, No. 1:23-cv-

2420 (D.D.C.), *appeal filed*, No. 23-7136 (D.C. Cir.), and *Lebental v. Financial Industry Regulatory Authority, Inc.*, No. 1:23-cv-3119 (D.D.C.).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Defendant-Appellee Financial Industry Regulatory Authority, Inc. states that it is a not-for-profit, non-stock Delaware corporation, and no publicly held company has a 10% or greater ownership in it.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENT ..................................................... iii

TABLE OF AUTHORITIES ...........................................................................vi

GLOSSARY ..................................................................................................... xvii

INTRODUCTION ..........................................................................................1

STATEMENT OF ISSUES ............................................................................5

STATEMENT OF THE CASE........................................................................5

A. The Securities Industry's Tradition Of Self-Regulation.............5

B. The Exchange Act's Preservation Of Self-Regulation ...............6

C. FINRA...............................................................................................9

D. Alpine.............................................................................................11

STANDARD OF REVIEW .........................................................................17

SUMMARY OF ARGUMENT ....................................................................18

ARGUMENT ..................................................................................................21

I. ALPINE HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS ................21

A. FINRA Is A Private Entity Not Subject To Constitutional Appointment And Removal Requirements...............................21

1. FINRA Is Not Part Of The Government Under *Lebron* .....................................................................................22

2. FINRA's Expedited Proceeding Is Not State Action ......................................................................................39

B. There Is No Private Nondelegation Violation ..........................50

II. THE REMAINING REQUIREMENTS WEIGH HEAVILY AGAINST A PRELIMINARY INJUNCTION ....................55

CONCLUSION ....................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014)....................18

*Abdullah v. Obama*,
753 F.3d 193 (D.C. Cir. 2014)....................17, 18

*All. for Fair Bd. Recruitment v. SEC*,
__ F.4th __, 2023 WL 6862856 (5th Cir. Oct. 18, 2023)....................34, 44, 47, 52

*Alpine Sec. Corp. v. FINRA*,
2021 WL 4060943 (D. Utah Sept. 7, 2021)....................12

*Am. Mfrs. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999)....................45

*Archdiocese v. Wash. Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018)....................55

*Ark. Dairy Co-op Ass'n v. USDA*,
573 F.3d 815 (D.C. Cir. 2009)....................18, 55

*Aslin v. FINRA*,
704 F.3d 475 (7th Cir. 2013)....................52

*Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*,
721 F.3d 666 (D.C. Cir. 2013)....................3, 4, 31, 38, 52, 53

*Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*,
821 F.3d 19 (D.C. Cir. 2016)....................30, 31, 38, 50

*Axon Enter. Inc. v. FTC*,
598 U.S. 175 (2023)....................16

*Belton v. Hatch*,
109 N.Y. 593 (1888)....................43

*Bernstein v. Lind-Waldock & Co.*,
738 F.2d 179 (7th Cir. 1984) ....................6

*Blount v. SEC*,
61 F.3d 938 (D.C. Cir. 1995)....................46, 47

*Blum v. Yaretsky*,
457 U.S. 991 (1982)....................40

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)....................43, 44

*Burnap v. United States*,
252 U.S. 512 (1920)....................30

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961)....................44, 45

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022)....................17

*Cherokee Nation v. S. Kan. Ry. Co.*,
135 U.S. 641 (1890)....................26

*Cody v. SEC*,
693 F.3d 251 (1st Cir. 2012)....................47

*Crimmins v. Am. Stock Exch., Inc.*,
346 F. Supp. 1256 (S.D.N.Y. 1972) ....................45

*Currin v. Wallace*,
306 U.S. 1 (1939)....................51, 53

*D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*,
279 F.3d 155 (2d Cir. 2002) ....................39, 40

*Dep't of Transp. v. Ass'n of Am. R.R.s*,
575 U.S. 43 (2015)....................28, 29, 31

*Desiderio v. NASD*,
191 F.3d 198 (2d Cir. 1999) ....................33, 35, 39

*Domestic Sec., Inc. v. SEC*,
333 F.3d 239 (D.C. Cir. 2003)....................41

*Duffield v. Robertson Stephens & Co.*,
144 F.3d 1182 (9th Cir. 1998)....................39

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019)....................49

*Epstein v. SEC*,
416 F. App'x 142 (3d Cir. 2010)....................40

*Fiero v. FINRA*,
660 F.3d 569 (2d Cir. 2011)....................11, 42

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
140 S. Ct. 1649 (2020)....................36, 37

*First Jersey Sec., Inc. v. Bergen*,
605 F.2d 690....................40, 52

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010).................... 22, 29, 32, 33, 35, 36, 43

*Garcia v. San Antonio Metro. Transit Auth.*,
469 U.S. 528 (1985)....................37

*Herron v. Fannie Mae*,
861 F.3d 160 (D.C. Cir. 2017)....................29, 32, 34

*Humphrey's Ex'r v. United States*,
295 U.S. 602 (1935)....................22

*Hurry v. FINRA*,
2018 WL 3545205 (D. Ariz. Mar. 29, 2018)....................12

*Hurry v. FINRA*,
782 F. App'x 600 (9th Cir. 2019)....................12

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
452 F.2d 935 (5th Cir. 1971)....................44, 45

*Jones v. SEC*,
115 F.3d 1173 (4th Cir. 1997) .....40

*Kerpen v. Metro. Wash. Airports Auth.*,
907 F.3d 152 (4th Cir. 2018) .....31

*Kim v. FINRA*,
2023 WL 6538544 (D.D.C. Oct. 6, 2023) ..... 5, 20, 35, 39, 40, 51, 56

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995)..... 18, 19, 22, 28, 29, 30, 31, 32, 33, 34, 35, 38

*Lewis v. Casey*,
518 U.S. 343 (1996).....41

*Lucia v. SEC*,
138 S. Ct. 2044 (2018).....23, 27, 36

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982).....39

*Luxton v. N. River Bridge Co.*,
153 U.S. 525 (1894).....26

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019)..... 39, 40, 42, 45, 47, 50, 55

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .....25

*McCune v. SEC*,
672 F. App'x 865 (10th Cir. 2016).....47

*McGinn, Smith & Co. v. FINRA*,
786 F. Supp. 2d 139 (D.D.C. 2011).....40, 45, 46

*Mohlman v. FINRA*,
2020 WL 905269 (S.D. Ohio Feb. 25, 2020) .....34, 48

*Mohlman v. FINRA*,
977 F.3d 556 (6th Cir. 2020) .....34

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972)....................................................................47, 48

*Myers v. United States*,
272 U.S. 52 (1926)........................................................................43

*N.Y. Republican State Comm. v. SEC*,
927 F.3d 499 (D.C. Cir. 2019)........................................................47

*NASD v. SEC*,
431 F.3d 803 (D.C. Cir. 2005)........................................................46

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ........................................................51, 53

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
2023 WL 3293298 (N.D. Tex. May 4, 2023) ....................................35

*NB ex rel. Peacock v. District of Columbia*,
794 F.3d 31 (D.C. Cir. 2015).......................................................37, 46

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)......................................................................43

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)......................................................................25

*North v. Smarsh, Inc.*,
160 F. Supp. 3d 63 (D.D.C. 2015)...................................................40

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023) .......................................................52, 53

*Osborn v. Bank of U.S.*,
22 U.S. (9 Wheat.) 738 (1824) .......................................................25

*Pee Pee Pop Tr. v. FINRA*,
2019 WL 4723788 (D. Nev. Sept. 26, 2019).....................................12

*PennEast Pipeline Co. v. New Jersey*,
141 S. Ct. 2244 (2021)...............................................................25, 26

*Perpetual Sec., Inc. v. Tang*,
290 F.3d 132 (2d Cir. 2002) ....................................................................34

*R.H. Johnson & Co. v. SEC*,
198 F.2d 690 (2d. Cir. 1952) ...................................................................52

*Rayburn v. Hogue*,
241 F.3d 1341 (11th Cir. 2001) ...............................................................48

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) (en banc) ...................................................32

*Rooms v. SEC*,
444 F.3d 1208 (10th Cir. 2006) ...............................................................47

*Saad v. SEC*,
873 F.3d 297 (D.C. Cir. 2017)....................................................................6

*Scottsdale Cap. Advisors Corp. v. FINRA*,
844 F.3d 414 (4th Cir. 2016) ...................................................9, 10, 12

*Scottsdale Cap. Advisors Corp. v. FINRA*,
390 F. Supp. 3d 72 (D.D.C. 2019)...........................................................12

*Scottsdale Cap. Advisors Corp. v. FINRA*,
811 F. App'x 667 (D.C. Cir. 2020)...........................................................12

*SEC v. Alpine Sec. Corp.*,
413 F. Supp. 3d 235 (S.D.N.Y. 2019) ...................................................1, 12

*SEC v. Alpine Sec. Corp.*,
982 F.3d 68 (2d Cir. 2020) ...................................................................1, 12

*Seila Law v. CFPB*,
140 S. Ct. 2183 (2020)........................................................................25, 43

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
548 F.3d 110 (D.C. Cir. 2008).............................................................46, 49

*Silver v. NYSE*,
373 U.S. 341 (1963)...................................................................................40

*Sorrell v. SEC*,
679 F.2d 1323 (9th Cir. 1982) ........................................................................52

*Springer v. Gov't of Philippine Islands*,
277 U.S. 189 (1928)..........................................................................................43

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940)..................................................................20, 51, 52, 53, 54

*Tenacre Found. v. INS*,
78 F.3d 693 (D.C. Cir. 1996)...........................................................................17

*Turbeville v. FINRA*,
874 F.3d 1268 (11th Cir. 2017) ......................................................................44

*United States v. Dorcely*,
454 F.3d 366 (D.C. Cir. 2006).........................................................................33

*United States v. Germaine*,
99 U.S. 508 (1879)............................................................................................36

*United States v. Hartwell*,
73 U.S. (6 Wall.) 385 (1868) ...........................................................................27

*United States v. NASD*,
422 U.S. 694 (1975)..........................................................................................52

*United States v. Rock Royal Co-op.*,
307 U.S. 533 (1939)..........................................................................................51

*United States v. Solomon*,
509 F.2d 863 (2d Cir. 1975) ...................................................33, 42, 46, 49, 50

*United States v. Vaello Madero*,
596 U.S. 159 (2022)..........................................................................................28

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)..........................................................................................43

*United States ex rel. Stone v. Rockwell Int'l Corp.*,
282 F.3d 787 (10th Cir. 2002) .........................................................................32

*West v. Atkins*,
487 U.S. 42 (1988) .......... 43

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 55

*Yates v. United States*,
574 U.S. 528 (2015) .......... 22

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .......... 22, 30, 36

**Statutes**

5 Stat. 117 (1836) .......... 27

15 U.S.C. § 78c(a)(3)(B) .......... 11

15 U.S.C. § 78f(b)(5) .......... 7

15 U.S.C. § 78o-3(b)(2) .......... 10

15 U.S.C. § 78o-3(b)(4) .......... 7

15 U.S.C. § 78o-3(b)(6) .......... 2, 7, 56

15 U.S.C. § 78o-3(b)(7) .......... 10

15 U.S.C. § 78o-3(b)(8) .......... 10

15 U.S.C. § 78o(a)(1) .......... 7

15 U.S.C. § 78o(b)(1) .......... 7

15 U.S.C. § 78s(a) .......... 7

15 U.S.C. § 78s(b) .......... 7

15 U.S.C. § 78s(b)(1) .......... 10, 52

15 U.S.C. § 78s(b)(2) .......... 10

15 U.S.C. § 78s(c) .......... 10, 52

15 U.S.C. § 78s(d)(1) .......... 53

15 U.S.C. § 78s(d)(2) .......... 10, 11, 53

15 U.S.C. § 78s(g)(1)(A) .......... 7, 49

15 U.S.C. § 78s(g)(1)(B) .......... 7, 49

15 U.S.C. § 78s(g)(1)(C) .......... 7, 49

15 U.S.C. § 78u(b) .......... 11

15 U.S.C. § 78u(d) .......... 11

15 U.S.C. § 78u(e) .......... 11

15 U.S.C. § 78y(a)(1) .......... 10, 11

15 U.S.C. § 1711(f)(1) .......... 43

28 U.S.C. § 1404(a) .......... 16

Act of Feb. 25, 1791, ch. 10, 1 Stat. 191 .......... 23

Act of Mar. 3, 1809, 2 Stat. 539 .......... 26

An Act to Promote the Progress of Useful Arts; and to Repeal the Act Heretofore Made for that Purpose, 1 Stat. 318 (1793) .......... 26

Pub. L. No. 98-38, 97 Stat. 205 (1983) .......... 8

**Rules**

FINRA Rule 9261 .......... 10

FINRA Rule 9311 .......... 10

FINRA Rule 9311(b) .......... 14

FINRA Rule 9370(a) .......... 13

FINRA Rule 9556(h) .......... 14

FINRA Rule 9559(r) .......... 14, 54

**Other Authorities**

17 C.F.R. § 201.401(d) .....13, 14, 54

4 Fed. Reg. 3564 (Aug. 9, 1939).....9

*In re Alpine Sec. Corp.*,
Exchange Act Release No. 86719, 2019 WL 3933691 (Aug. 20, 2019) .....54, 56

Aditya Bamzai, *Tenure of Office and the Treasury*,
87 Geo. Wash. L. Rev. 1299 (2019).....24, 25

*Federalist No. 76* (Hamilton) (C. Rossiter ed. 1961) .....23

FINRA Board of Governors.....10

FINRA By-Laws, Art. VI, § 1 .....10

H.R. Doc. No. 88-95 (1963) .....8

H.R. Rep. No. 98-106, 98th Cong., 1st Sess. (1983).....9

*The History of NYSE* .....5

Jennifer L. Mascott, *Private Delegation Outside of Executive Supervision*, 45 Harv. J.L. & Pub. Pol'y 837 (2022).....26, 27

Jennifer L. Mascott, *Who Are 'Officers of the United States'?*
70 Stan. L. Rev. 443 (2018).....23, 24

Gillian E. Metzger, *The Constitutional Duty to Supervise*,
124 Yale L.J. 1836 (2015) .....23

Donna M. Nagy, *Playing Peekaboo with Constitutional Law*,
80 Notre Dame L. Rev. 975 (2005) .....9

Order Approving Proposed Rule Change To Amend The By-Laws Of NASD, 72 Fed. Reg. 42,169 (Aug. 1, 2007) .....9

*Report on a National Bank* (Dec. 13, 1790), *in* 1 *Reports of the Secretary of the Treasury* 54 (1837).....24

William C. Robinson, *The Law of Patents* (1890).....27

S. Rep. No. 94-75 (1975) ....................................................................................8

S. Rep. No. 1455, 75th Cong., 3d Sess. (1938) ..........................................................8

SEC Concept Release Concerning Self-Regulation,
Release No. 34-50700, 69 Fed. Reg. 71,256, (Dec. 8, 2004)...........................5, 9

SEC, Self-Regulatory Organization Rulemaking .......................................................7

Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws*, 62 N.C. L. Rev. 475 (1984) ............5

Howard C. Westwood & Edward G. Howard, *Self Government in the Securities Business* L. & Contemp. Probs. 518 (1952) ........................................6

Xerox, Corporate Governance Guidelines (as amended July 20, 2023) .................38

## GLOSSARY

| | |
|---|---|
| Exchange Act | Securities Exchange Act of 1934 |
| FINRA | Financial Industry Regulatory Authority, Inc. |
| NASD | National Association of Securities Dealers, Inc. |
| PCAOB | Public Company Accounting Oversight Board |
| SEC | United States Securities and Exchange Commission |

## INTRODUCTION

Congress has repeatedly reaffirmed the securities industry's centuries-old system of private self-regulation, which has kept American markets safe, stable, and prosperous. Acting under the supervision of federal officials, private self-regulatory organizations oversee many aspects of the U.S. financial industry and capital markets, including the brokerage industry and securities and derivatives markets. The Financial Industry Regulatory Authority, Inc. ("FINRA")—a private not-for-profit corporation that acts as the first-line regulator for broker-dealers under the comprehensive oversight of the Securities and Exchange Commission ("SEC")—is one of nearly 50 securities self-regulatory organizations. This suit poses an existential threat not only to FINRA, but also to Congress's time-tested approach of using private entities to assist in fulfilling important regulatory responsibilities and public functions—an approach that dates to the Founding.

Alpine Securities Corporation ("Alpine") is a broker-dealer member of FINRA with a long disciplinary history that includes substantial civil penalties imposed for "egregious" "illegal conduct on a massive scale." *SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020). In 2019, FINRA discovered that Alpine had stolen more than $54 million from its customers' accounts by exacting unwarranted fees and converting customers' securities without authorization. Pursuant to its statutory responsibility to "protect

investors and the public interest," 15 U.S.C. § 78o-3(b)(6), FINRA initiated a disciplinary proceeding that culminated in a FINRA hearing panel's entry of a cease-and-desist order barring Alpine from continuing to violate FINRA's rules. When FINRA learned that Alpine had nevertheless continued its transgressions and violated the cease-and-desist order—some 35,000 times—FINRA initiated an expedited proceeding before a hearing officer to expel Alpine from FINRA membership. Alpine then sought to enjoin that proceeding, claiming that the Constitution's appointment and removal requirements apply to FINRA—a private corporation that the government did not create and does not control—or alternatively that FINRA's self-regulatory responsibilities violate the private nondelegation doctrine. Recognizing the claims' lack of merit and their potentially "seismic" implications, App.405, the district court denied preliminary-injunctive relief.

That ruling was correct. Alpine has no likelihood of success on its appointment and removal claims, as FINRA is not part of the federal government, and its board members and employees therefore are not "Officers of the United States." Constitutional text, history, and precedent establish that these structural constitutional requirements apply only to the federal government itself and nominally private companies (e.g., Amtrak) that are actually part of the government, not to private corporations like FINRA that were not created by the government and are not controlled by a government-appointed board. A deeply rooted historical

tradition that dates to the Founding and spans fields ranging from eminent domain to patent law confirms that Congress may delegate certain aspects of governmental authority to private entities without subjecting those entities to the structural requirements of Article II.

Alpine seeks to extend the Constitution's appointment and removal requirements to private companies engaged in state action, but it cannot point to a single case—from *any* court—holding that a private company must have a presidentially appointed and removable board whenever some aspect of its conduct constitutes state action. That proposition is as nonsensical as it is unprecedented. In any event, FINRA's expedited proceeding against Alpine—which targets violations of a FINRA cease-and-desist order that rests on violations of FINRA's rules and thus does *not* involve the "enforcement of federal law," Alpine Br. 15, 25—is not state action under any of the Supreme Court's tests.

The inapplicability of the Constitution's appointment and removal requirements to employees of a private company does not create a constitutional "loophole." Alpine Br. 5. The private nondelegation doctrine imposes meaningful constraints on Congress's ability to delegate executive power to the private sector. *See Ass'n of Am. R.R.s v. U.S. Dep't of Transp.* (*Amtrak I*), 721 F.3d 666, 670-74 (D.C. Cir. 2013). Although delegations of federal power to private companies that do not function subordinately to the government can be unconstitutional in some

cases, FINRA's rulemaking and disciplinary powers are subject to extensive SEC oversight, and thus satisfy the private nondelegation doctrine. *Id.*

Endorsing Alpine's novel attempts to expand the Constitution's structural requirements and nondelegation constraints would have far-reaching jurisprudential and practical consequences. Alpine's theory threatens to cripple not just FINRA, but also dozens of other self-regulatory organizations that oversee the capital markets and other aspects of the American economy—as well as a host of other longstanding congressional practices. Because the SEC lacks the resources to assume frontline regulatory responsibility over the securities industry—which is one of the primary reasons why Congress has preserved the self-regulatory model—investors would be left exposed to deception, overreaching, and outright theft by unscrupulous industry members.

The remaining equitable factors thus weigh heavily against injunctive relief. Because Alpine is unlikely to prevail on its constitutional claims, it cannot show irreparable harm. And as the district court found, the balance of equities and the public interest strongly favor permitting FINRA to continue acting to protect investors from Alpine's ongoing depredations and staving off the onslaught of copycat challenges that would inevitably follow a decision in Alpine's favor.

This Court should affirm.

## STATEMENT OF ISSUES

Whether the district court abused its discretion in denying a preliminary injunction, where Alpine failed to show a likelihood of prevailing on its claims that FINRA's structure violates either the Constitution's appointment and removal requirements or the private nondelegation doctrine, and where the equities strongly favor permitting FINRA to carry out its critical regulatory responsibilities.

## STATEMENT OF THE CASE

### A. The Securities Industry's Tradition Of Self-Regulation

"Self-regulation in the securities industry is nearly as old as the federal government." Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws*, 62 N.C. L. Rev. 475, 480 (1984). The first American self-regulatory organization was the Philadelphia Stock Exchange, founded in 1790. *Id.* Nearly as old, the New York Stock Exchange "traces its origins to the Buttonwood Agreement signed by 24 stockbrokers on May 17, 1792," which responded to "the first financial panic in the young nation" by "set[ting] rules" to "ensure that deals were conducted between trusted parties." *The History of NYSE*, bit.ly/3F5UyG1; *see also* SEC Concept Release Concerning Self-Regulation, Release No. 34-50700, 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004) (recounting self-regulation's "long tradition in the U.S. securities markets"); *Kim v. FINRA*, 2023 WL 6538544, at *2-4 (D.D.C. Oct. 6, 2023) (same).

For most of the nation's history, securities exchanges and other self-regulatory organizations disciplined their members with little or no government oversight. Well into the twentieth century, courts "unanimously t[ook] the attitude that exchange members, as parties to a voluntary contract with the exchange, must abide by their agreement," consistently "upholding suspensions or expulsions of stock exchange members for infractions of exchange rules." Howard C. Westwood & Edward G. Howard, *Self Government in the Securities Business*, 17 L. & Contemp. Probs. 518, 519-21 (1952).

### B. The Exchange Act's Preservation Of Self-Regulation

When Congress adopted the modern securities laws in the 1930s, it preserved and built upon the self-regulatory framework that "preexisted federal regulation." *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984). Under the Securities Exchange Act of 1934 ("Exchange Act"), private self-regulatory organizations continue to exercise a primary supervisory role over their members, subject to comprehensive SEC oversight. *See Saad v. SEC*, 873 F.3d 297, 299-300 (D.C. Cir. 2017).

Currently, nearly 50 self-regulatory organizations are registered under the Exchange Act. A national securities association is one type of self-regulatory organization. The Exchange Act requires anyone seeking to sell securities to join an association of broker-dealers registered as a national securities association or to

associate themselves with a member. *See* 15 U.S.C. § 78o(a)(1), (b)(1). FINRA is the only registered national securities association, and, like its predecessor the National Association of Securities Dealers, Inc. ("NASD"), serves as the frontline regulator for its broker-dealer members. *Id.* § 78o-3(b)(4). Other categories of self-regulatory organizations include national securities exchanges like the New York Stock Exchange and The Nasdaq Stock Market and registered clearing agencies like The Depository Trust Company and The Options Clearing Corporation. *Id.* § 78s(g)(1)(A), (B), (C) (emphasis added); *see also* SEC, Self-Regulatory Organization Rulemaking (identifying dozens of self-regulatory organizations overseen by the SEC), https://www.sec.gov/rules/sro.shtml.

The Exchange Act imposes extensive obligations on self-regulatory organizations. For example, every national securities exchange and national securities association must register with the SEC, submit its proposed rule changes to the SEC, and "enforce compliance" with the Exchange Act and "its own rules" by its members, persons associated with its members, or its participants. 15 U.S.C. § 78s(a), (b), (g)(1)(A), (B); *see id.* § 78s(g)(1)(C) (clearing agency must "enforce compliance" with "its own rules"). And the rules of national securities exchanges and national securities associations must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade," and "to protect investors and the public interest." *Id.* §§ 78f(b)(5), 78o-3(b)(6).

This framework—refined over nine decades—reflects Congress's consistent preference for private self-regulation of the securities industry over direct governmental regulation, which would threaten "a pronounced expansion of the organization of the Securities and Exchange Commission," with all the attendant "evils of bureaucracy." S. Rep. No. 1455, 75th Cong., 3d Sess. 3-4 (1938). Self-regulation enforces "'ethical standards beyond those any law can establish,'" "'effectively reach[ing]'" areas that "'self-government alone'" can monitor. H.R. Doc. No. 88-95, pt. 4, at 694-95 (1963). Moreover, unlike federal regulators, self-regulatory organizations are directly accountable to their members—especially where members are empowered to select and serve on the organization's board—who "can bring to bear on the problems of regulation a degree of expertness, and in many circumstances expedition, not to be expected of a necessarily more remote governmental agency." *Id.* at 693.

Congress has repeatedly sought to "preserve[] and strengthen[]" the "self-regulatory" model. S. Rep. No. 94-75, at 23 (1975). For example, in 1983, Congress eliminated an alternative program of direct SEC regulation—called the "SEC only" program—for broker-dealers who were not members of a national securities association. *See* Pub. L. No. 98-38, § 3, 97 Stat. 205, 206-07 (1983). Congress believed that "self-regulation for all broker-dealers is preferable to direct regulation by the Commission for several reasons," including that "any attempt" to place direct

SEC regulation "on a par with that provided by the NASD would require significant expenditures by the Commission for additional staff and administrative costs." H.R. Rep. No. 98-106, 98th Cong., 1st Sess. 6-7 (1983). In a retrospective assessment of the program, SEC staff concluded that "'the resources necessary for the Commission to assume [self-regulatory organization] functions directly and effectively are not realistically attainable.'" SEC Concept Release, 69 Fed. Reg. at 71,267 (quoting Market 2000 Report, at VI-6).

### C. FINRA

FINRA oversees member securities firms and individuals associated with those firms. *See Scottsdale Cap. Advisors Corp. v. FINRA*, 844 F.3d 414, 417-18 (4th Cir. 2016). A not-for-profit Delaware corporation, App.18 ¶ 31, FINRA was formed in 2007, when its predecessor, the NASD, consolidated its regulation and enforcement functions with the similar functions of the New York Stock Exchange, *see* Order Approving Proposed Rule Change To Amend The By-Laws Of NASD, 72 Fed. Reg. 42,169 (Aug. 1, 2007).[1]

FINRA is a private corporation. "FINRA's Board is selected by FINRA's members," not the government, and includes ten member representatives. App.25

[1] The NASD "owes its origins to a trade group founded in 1912," Donna M. Nagy, *Playing Peekaboo with Constitutional Law*, 80 Notre Dame L. Rev. 975, 1023-24 (2005), and was approved by the SEC in 1939 as the first national securities association, *see* 4 Fed. Reg. 3564 (Aug. 9, 1939).

¶ 58; *see also* FINRA Board of Governors, bit.ly/3FmyxTr. FINRA receives no state or federal funding; it is funded by member fees and "fines, penalties, and sanctions levied against its members." App.21 ¶ 41; *see also* FINRA By-Laws, Art. VI, § 1, bit.ly/41MMgN5.

FINRA exercises its regulatory authority in accordance with the Exchange Act's requirements and under the SEC's close supervision. For example, the SEC reviews rules proposed by FINRA, approves those rules if "consistent with the requirements of [the Exchange Act]," 15 U.S.C. § 78s(b)(1), (2), and can "abrogate, add to, or delete from" those rules, *id.* § 78s(c). In addition, the SEC ensures that FINRA "enforce[s] compliance" with the Exchange Act and FINRA's rules and that it "appropriately discipline[s]" its members and associated persons for violations, pursuant to rules that "provide a fair procedure for the disciplin[ary]" proceeding. *Id.* § 78o-3(b)(2), (7), (8).

Consistent with FINRA's obligation to provide fair disciplinary procedures, its SEC-approved rules provide for multiple layers of administrative and judicial review. *See Scottsdale*, 844 F.3d at 418; 15 U.S.C. §§ 78s(d)(2), 78y(a)(1). FINRA's disciplinary proceedings generally include, among other procedural safeguards, an evidentiary hearing, FINRA Rule 9261; an appeal to FINRA's National Adjudicatory Council, FINRA Rule 9311; a *de novo* appeal to the SEC, 15

U.S.C. § 78s(d)(2); and a right to review in a designated U.S. Court of Appeals, *id.* § 78y(a)(1).

FINRA's disciplinary authority is also subject to other limitations. For example, FINRA has no subpoena power to secure testimony or documents from uncooperative parties or witnesses. *See* App.405 n.8. In addition, FINRA "lacks the authority" to "bring court actions to collect disciplinary fines it has imposed," *Fiero v. FINRA*, 660 F.3d 569, 571 (2d Cir. 2011), or to file its own enforcement proceedings in federal court. By contrast, the SEC has broad statutory power to "subpoena witnesses," 15 U.S.C. § 78u(b), to secure injunctions to compel compliance with SEC orders, *id.* § 78u(e), and to bring enforcement actions in federal court, *id.* § 78u(d).

**D. Alpine**

Alpine is a broker-dealer member of FINRA. App.18 ¶ 29. Like all broker-dealers, when Alpine joined FINRA it agreed to obey FINRA's rules. 15 U.S.C. § 78c(a)(3)(B). Despite that commitment, FINRA has disciplined Alpine multiple times for rule infractions. *See* BrokerCheck Report: Alpine Sec. Corp. at 15-100, bit.ly/3hjvcLU.[2]

---

[2] FINRA has also repeatedly disciplined Alpine's co-plaintiff Scottsdale Capital Advisors Corporation, another broker-dealer FINRA member. *See* App.18 ¶ 28; BrokerCheck Report: Scottsdale Cap. Advisors Corp. at 34-36, bit.ly/3UpZpaK. Alpine and Scottsdale are two of "a large number of businesses" owned and operated

Alpine and its affiliated businesses are also repeat federal-court litigants against FINRA (which they have now sued seven times since 2014) and the SEC (which they have sued once and been sued by twice). In every suit to reach a final decision, the courts have ruled for FINRA (or the SEC) and against Alpine (or its affiliates). These decisions include a 2019 opinion finding that Alpine engaged in "egregious" "illegal conduct on a massive" and "extraordinary scale" by failing to submit reports required under the Bank Secrecy Act, and imposing a $12 million penalty. *SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 245-47 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020).[3]

**1.** ***Underlying FINRA proceedings.*** This case arises from a 2019 disciplinary proceeding brought by FINRA's Department of Enforcement, alleging

---

by John Hurry that specialize in the penny-stock (or microcap) market. *Hurry v. FINRA*, 2018 WL 3545205, at *1 (D. Ariz. Mar. 29, 2018), *aff'd*, 782 F. App'x 600 (9th Cir. 2019); *see also* App.31-32, 39-40 ¶¶ 87, 116.

[3] *See also Hurry*, 782 F. App'x 600 (affirming judgment for FINRA); *Scottsdale*, 844 F.3d at 424 (affirming dismissal of Scottsdale's complaint); *Scottsdale Cap. Advisors Corp. v. FINRA*, 390 F. Supp. 3d 72, 75 (D.D.C. 2019) (dismissing Scottsdale's complaint), *aff'd*, 811 F. App'x 667 (D.C. Cir. 2020); *Pee Pee Pop Tr. v. FINRA*, 2019 WL 4723788 (D. Nev. Sept. 26, 2019) (dismissing affiliated company's complaint); *Alpine Sec. Corp. v. FINRA*, 2021 WL 4060943 (D. Utah Sept. 7, 2021) (dismissing Alpine's complaint); Order, *SCAP 9, LLC v. FINRA*, No. 3:22-cv-380, D.E. 21 (D. Nev. Mar. 30, 2023) (dismissing complaint); *see also* Minutes of Proceedings, *SEC v. Alpine Sec. Corp.*, No. 2:22-cv-1279, D.E. 39 (D. Nev. Aug. 15, 2023) (denying Alpine's motion to dismiss); *Scottsdale Cap. Advisors Corp. v. SEC*, No. 2:18-cv-504 (D. Utah) (SEC's motion to dismiss pending).

that Alpine violated FINRA's rules by stealing more than $54.5 million from its customers through excessive fees and the unauthorized conversion of customer securities. *See* App.208. FINRA did not allege a violation of the federal securities laws.

In March 2022, following an evidentiary hearing, a FINRA hearing panel comprising an industry member and a FINRA hearing officer found that Alpine had violated FINRA rules by engaging in "intentional and egregious" misconduct: Alpine "converted and misused customer funds and securities, engaged in unauthorized trading," charged unreasonable fees, and "made an unauthorized capital withdrawal." App.163, 240.[4] Citing a "high[] likel[ihood]" of future violations, the panel found that "expulsion is an appropriate sanction and the only alternative for protecting the investing public." App.240. It also imposed a permanent cease-and-desist order to prevent further harm. App.246-47. Alpine appealed to FINRA's National Adjudicatory Council. App.252. Once a final decision has been issued, Alpine could appeal any adverse decision to the SEC and seek an immediate stay. *See* FINRA Rule 9370(a); 17 C.F.R. § 201.401(d).

Although the panel's expulsion order was automatically stayed pending Alpine's appeal to the National Adjudicatory Council, its cease-and-desist order

[4] A second industry member withdrew after serving on the panel through the fourth day of the hearing. App.167 n.4.

remained in force. FINRA Rule 9311(b). FINRA's Department of Enforcement received customer reports that Alpine was violating the order, prompting a multi-month investigation involving more than a dozen document requests and interviews of eight Alpine employees. The investigation revealed that Alpine had violated the cease-and-desist order—more than 35,000 times—by charging customers millions of dollars in unreasonable and excessive fees and commissions. *See* App.250-51. Thus, in April 2023, FINRA's Department of Enforcement initiated an expedited proceeding pursuant to FINRA Rule 9556(h) to accelerate Alpine's expulsion from FINRA membership, halt Alpine's ongoing misconduct, and obtain restitution for Alpine's customers. *See* App.249. As before, the complaint alleged no violations of the federal securities laws.[5]

If the expedited proceeding results in an order adverse to Alpine, including an expulsion order, Alpine may appeal to, and seek an immediate stay from, the SEC. *See* FINRA Rule 9559(r); 17 C.F.R. § 201.401(d).

[5] Alpine claims that FINRA has not alleged violations of any specific provision of the cease-and-desist order, but that is false. Alpine Br. 8 n.3. For example, FINRA has alleged in the expedited proceeding that Alpine violated Section 3 of the cease-and-desist order by continuing to charge a prohibited "1% per day illiquidity and volatility fee" that Alpine simply "re-branded" as the "Alpine Capital Allocation Charge." App.257-59; *see* App.260-61 (alleging that, contrary to the cease-and-desist order prohibiting Alpine from charging a "'2.5% market-making and/or execution fee,'" "in 5,598 instances, Alpine has charged its introduced customers a 'market-making' fee, generally 2.5% of trade principal").

**2.** ***This Litigation.*** In October 2022—during FINRA's investigation that later culminated in the expedited proceeding—Alpine and Scottsdale Capital Advisors Corporation filed this suit in the Middle District of Florida. Dist. Ct. D.E. 1. The United States intervened to defend the constitutionality of the challenged statutory provisions. Dist. Ct. D.E. 28.

Alpine's operative Second Amended Complaint is a "sweeping" challenge to FINRA's alleged "'unconstitutional operation and structure.'" App.398 (quoting App.13 ¶ 1). Alpine alleges violations of (1) the "separation of powers" (a label that Alpine uses as shorthand for the Constitution's removal requirements), (2) the Appointments Clause, and (3) the nondelegation doctrine. App.46-49 ¶¶ 141-61. According to Alpine, "FINRA's *very existence* . . . violates the Constitution," and it seeks a declaration that FINRA "is presently constituted and operating in a manner that violates the Constitution." App.45, 52 ¶ 138, Prayer for Relief (emphasis added).[6]

In May 2023, Alpine filed an emergency motion for a preliminary injunction to prevent FINRA from moving ahead with the expedited disciplinary proceeding. Dist. Ct. D.E. 45. Following briefing and a hearing, the district court transferred the

---

[6] Alpine also alleged claims under the First, Fifth, and Seventh Amendments, App.49-52 ¶¶ 162-80, which the district court rejected in denying a preliminary injunction, App.400-11, and are not at issue in this appeal.

case to the District Court for the District of Columbia under 28 U.S.C. § 1404(a). Dist. Ct. D.E. 62. Alpine then renewed its motion for a preliminary injunction. Dist. Ct. D.E. 66.

After a hearing, the district court denied Alpine's motion. App.400. The court concluded that plaintiffs' "multitude of critiques of FINRA" as "disgruntled members . . . fall far short of amounting to likely sustainable constitutional challenges to the structure and processes of FINRA." App.399-400.

Specifically, the court ruled that (1) "the facts of FINRA's creation, operation, and oversight structure do not indicate state actor status," and (2) Alpine is "unlikely to succeed" in establishing that FINRA's disciplinary proceedings are a "'traditional [and] exclusive public function'" sufficient to constitute state action, as "the role of regulating industry members has always fallen to" private entities. App.399, 402 & n.6. Those rulings foreclosed Alpine's claims under the Constitution's appointment and removal requirements. App.407. The court further ruled, consistent with the conclusions of "every court to consider the issue," that Alpine's "private nondelegation doctrine claim is unlikely to succeed on the merits." App.408-09.

Although the court stated that the irreparable harm factor "tips in Alpine's favor"—because "being subjected to an adjudicatory process that a plaintiff claims is constitutionally flawed is 'impossible to remedy once the proceeding is over,'" App.413, 415 (quoting *Axon Enter. Inc. v. FTC*, 598 U.S. 175, 191 (2023))—it

concluded that "the balance of equities and public interest disfavor any injunctive relief" given the "overwhelming interest" in "protecting the public from the harms caused by broker-dealers engaging in securities violations," App.415.

Alpine appealed, asking this Court to enjoin the expedited FINRA proceeding pending appeal. A divided motions panel granted Alpine's motion in an unpublished order, concluding that Alpine had met the requirements for an injunction pending appeal. App.417-18. The majority did not explain its reasoning, but Judge Walker wrote a solo concurrence expressing his tentative view "[a]t this early stage" of the litigation that there "may be a constitutional problem" with FINRA's structure, while stressing that he "d[id] not rule out the possibility that further briefing and argument might convince me that my current view is unfounded." App.420, 423. Judge Garcia dissented without opinion. App.417 n.**. The Court denied reconsideration en banc. Order, Doc. 2013570 (Aug. 22, 2023).

## STANDARD OF REVIEW

This Court's "'review of district court decisions to grant or deny preliminary relief is conducted under the extremely deferential clear error or abuse of discretion standard.'" *Tenacre Found. v. INS*, 78 F.3d 693, 696 (D.C. Cir. 1996); *accord*, *e.g.*, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). "A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Abdullah v. Obama*, 753

F.3d 193, 197 (D.C. Cir. 2014) (internal quotation marks omitted). "'A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Id.* Because the first factor is the "most important," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014), when a plaintiff has "shown no likelihood of success on the merits," "this [C]ourt need not proceed to review the other three preliminary injunction factors" to affirm, *Ark. Dairy Co-op Ass'n v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009).

**SUMMARY OF ARGUMENT**

The Court should affirm the district court's denial of a preliminary injunction.

I. The district court correctly concluded that Alpine is unlikely to succeed on the merits of its claims. The Constitution's appointment and removal requirements apply only to government officials and to employees of nominally private companies that, under *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 378 (1995), are actually *part* of the government. That conclusion is confirmed by the text and original understanding of Article II, Supreme Court precedent, and Congress's longstanding historical practice, dating to the Founding, of delegating governmental responsibilities to private corporations without requiring presidential appointment and removal of the corporations' directors.

FINRA falls squarely within that historical tradition. Because FINRA is a private company that is not part of the government under *Lebron*, its board members and employees are not "Officers of the United States" subject to presidential appointment and removal. Alpine cannot identify *any* case from *any* court applying the Constitution's structural requirements to a private company that, unlike Amtrak, was not created by the government and controlled by a government-appointed board.

Alpine does not even attempt to satisfy *Lebron*. Instead, it asserts that private companies become subject to the Constitution's structural requirements whenever *any* aspect of their operations constitutes state action. But that position is both legally unsupported and practically unworkable. It would mean either that private companies must have two boards—one privately appointed and removable to govern their private operations, the other presidentially appointed and removable to govern their operations that constitute state action—or that private companies' privately appointed and removable boards are entirely displaced whenever *anything* the company does is state action. That expansive view of the Constitution's appointment and removal requirements would overturn a host of settled practices dating to the Founding and work a remarkable federal intrusion into private enterprise and individual liberty.

Regardless, FINRA is not engaged in state action when it carries out its self-regulatory responsibilities. As centuries of self-regulation in the securities industry

confirm, those responsibilities have traditionally been *private*, not *governmental*. Moreover, Alpine's attempt to cast the FINRA expedited proceeding as enforcing federal law ignores that the proceeding involves Alpine's violations of a *FINRA* cease-and-desist order barring further violations of *FINRA* rules—not violations of any statute.

Article II's inapplicability to FINRA does not create a constitutional "loophole." Congress's power to delegate federal responsibilities to private companies is cabined by the private nondelegation doctrine, which requires that private parties carrying out delegated federal authority "function subordinately" to the federal government. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). That standard is easily met here: FINRA performs its self-regulatory responsibilities under the comprehensive oversight of the SEC, which has authority to review, approve, and modify FINRA rules, and also to stay and undertake *de novo* review of FINRA discipline, including any expedited decision expelling Alpine from FINRA.

In sum, Alpine's arguments would eviscerate the self-regulatory framework that has served investors so well for centuries, replace private oversight with federal regulation, and inject the Constitution into broad swaths of the private economy. The Court should reject those arguments and their profoundly destabilizing consequences.

II. The remaining factors weigh heavily against a preliminary injunction. Because Alpine is not likely to succeed on the merits, it cannot make the requisite showing of irreparable harm. And the balance of equities and public interest strongly favor preserving FINRA's ability to protect investors and the securities markets, particularly against recidivists like Alpine. A contrary ruling would paralyze FINRA and leave investors susceptible to fraud, abuse, and theft.

## ARGUMENT

### I. ALPINE HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS.

The district court correctly concluded that Alpine's "sweeping" claims "fall far short of amounting to likely sustainable constitutional challenges to the structure and processes of FINRA." App.398-99.

#### A. FINRA Is A Private Entity Not Subject To Constitutional Appointment And Removal Requirements.

The appointment and removal requirements of Article II apply only to the United States government, not private companies. Alpine does not contest FINRA's private status, but argues that FINRA is nevertheless subject to Article II because it is supposedly engaged in state action when carrying out its delegated self-regulatory responsibilities. But even if FINRA's expedited disciplinary proceeding amounted to state action—it does not—a private party engaged in state action does not become subject to the Constitution's structural requirements.

### 1. FINRA Is Not Part Of The Government Under *Lebron*.

Constitutional text, original understanding, historical practice, and precedent all foreclose the notion that the Constitution's appointment and removal requirements apply to private parties that exercise delegated federal authority.

#### a. *Lebron* Provides The Governing Standard.

The Appointments Clause provides that the President "shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all *other* Officers of the United States" who hold principal offices "established by Law." U.S. Const. art. II, § 2, cl. 2 (emphasis added). The first four listed examples are all plainly federal government officials, which confirms that the final catchall phrase must likewise refer to officials employed by the federal government. *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("we rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words'"). And the President's removal power—implicit in Article II and the separation of powers—is similarly limited to "executive officers," whom the President is "empower[ed] . . . to keep . . . accountable[] by removing them." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010); *see also Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935) ("an executive officer restricted to the performance of

executive functions" is "inherently subject to the exclusive and illimitable power of removal").

Founding-era sources and scholarship analyzing the Constitution's original meaning confirm that "'Officers of the United States'" refers only to "federal civil officials with responsibility for an ongoing statutory duty." *Lucia v. SEC*, 138 S. Ct. 2044, 2056 (2018) (Thomas, J., concurring) (citing Jennifer L. Mascott, *Who Are 'Officers of the United States'?* 70 Stan. L. Rev. 443, 564 (2018) ("Mascott")); *see also Federalist No. 76*, at 455 (Hamilton) (C. Rossiter ed. 1961) ("It is not easy to conceive a plan better calculated than this to promote a judicious choice of men for filling the offices *of the Union*") (emphasis added). The Founding-era "evidence suggests that 'of the United States' in the Appointments Clause . . . is a descriptive phrase indicating that the officers are *federal*, and not state or *private*, actors." Mascott, *supra*, at 471 (emphases added).

This reading is borne out by historical practice. When the first Congress constituted the Bank of the United States, *see* Act of Feb. 25, 1791, ch. 10, 1 Stat. 191, "numerous individuals involved with its operation"—including its directors—"were not appointed in accordance with Article II's requirements," Mascott, *supra*, at 531, even though the Bank exercised delegated federal powers to maintain the national currency, *see* Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 Yale L.J. 1836, 1883 (2015) (discussing Congress's historically "widespread

delegation of responsibility to nongovernmental actors, such as the . . . reliance on the Bank of the United States to control the money supply").

Hamilton insisted that the federal government *not* have directors (or vote for directors) on the Bank's board, lest it be tempted to "continually corrode the vitals of [its] credit," risking "calamitous abuse." *Report on a National Bank* (Dec. 13, 1790), *in* 1 *Reports of the Secretary of the Treasury* 54, 71 (1837). "To attach full confidence to an institution of this nature," he explained, "it appears to be an essential ingredient in its structure that it shall be under a *private*, not a public direction, under the guidance of *individual interest*, not of *public policy*." *Id*. at 70-71. And although Washington, Hamilton, Madison, Jefferson, and Randolph all considered the Bank's constitutionality—and all but Washington made statements on it—*none* raised concerns about the appointment or removal of Bank officers. *See* Aditya Bamzai, *Tenure of Office and the Treasury*, 87 Geo. Wash. L. Rev. 1299, 1342 (2019). The most "probable explanation" is that they, like "Congress[,] saw the bank" as a "nongovernmental entity" that was not subject to Article II. Mascott, *supra*, at 531.

Similarly, Chief Justice Marshall stated for the Court regarding the Second Bank of the United States—which had only five of its twenty-five directors appointed by the President, *see* Bamzai, *supra*, at 1343—that "[i]t will not be contended, that the directors, or other officers of the Bank, are officers of

government." *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 866-67 (1824). The Bank's officials were not federal officers even though the Bank was "an instrument of the government for fiscal purposes." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 396 (1819).

The Bank of the United States therefore "stands as good evidence that the delegation of certain functions by the federal government to nominally private—though heavily regulated—entities does not necessarily violate the separation of powers." Bamzai, *supra*, at 1384. The Supreme Court has explained in closely related contexts that "[t]he First Congress's recognition" of a practice's validity "'provides contemporaneous and weighty evidence of the Constitution's meaning,'" *Seila Law v. CFPB*, 140 S. Ct. 2183, 2197 (2020), as does a "'long settled and established practice'" endorsed by later Congresses. *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (brackets omitted); *see also id.* at 525 ("this Court has treated practice as an important interpretive factor . . . even when that practice began after the founding era"). Both exist here.

Early Congresses also regularly delegated federal powers to private parties in other areas without subjecting those parties to the Constitution's appointment and removal requirements. *Contra* Alpine Br. 15-16. For example, "as long as the eminent domain power has been exercised by the United States, it has also been delegated to private parties." *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244,

2255 (2021); *see*, *e.g.*, Act of Mar. 3, 1809, 2 Stat. 539 (granting a private turnpike corporation eminent-domain authority). The Supreme Court has long "approved of that practice," holding that it "ma[kes] no difference" if property is "condemned by a private delegatee." *PennEast*, 141 S. Ct. at 2257; *see also*, *e.g.*, *Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 657-58 (1890) (approving Congress's delegation to a private railroad "to appropriate private property for the purposes of a right of way, upon making just compensation to the owner"). Yet private parties exercising "sovereign powers" of eminent domain, *Luxton v. N. River Bridge Co.*, 153 U.S. 525, 529-30 (1894), have never been subject to the Constitution's appointment and removal requirements.

Similarly, early Congresses delegated patent-approval powers to private parties. Under the 1793 Patent Act, patent-interference claims were arbitrated by "three persons"—one "appointed by the Secretary of State," the others by the competing applicants. An Act to Promote the Progress of Useful Arts; and to Repeal the Act Heretofore Made for that Purpose, 1 Stat. 318, 322-23 (1793). "The arbitrators were not selected in a fashion permissible under the Appointments Clause for either principal or inferior officers"; nor were they required to take an oath, "further indicating that Congress did not consider the arbitrators to be serving as governmental actors." Jennifer L. Mascott, *Private Delegation Outside of Executive Supervision*, 45 Harv. J.L. & Pub. Pol'y 837, 887-88 (2022) ("Mascott, *Private*

*Delegation*"). And in 1836, Congress "authorized boards of private, hired experts to issue determinations—irreversible within the Executive Branch—capable of reversing initial findings by the Commissioner of Patents." *Id.* at 880; *see also* 5 Stat. 117, 120 (1836). Thus, although granting patents is an aspect of "inherent sovereignty," 1 William C. Robinson, *The Law of Patents* § 45, at 68 (1890), Congress delegated that power to private "experts"—not appointed by the President or another governmental official—who issued "final patent adjudicative determinations for the Executive Branch." Mascott, *Private Delegation*, *supra*, at 880.

Consistent with the constitutional text, original understanding, and historical practice, the Supreme Court has applied the Constitution's appointment and removal requirements *only* to "'Officers of the United States,' *a class of government officials*" employed by the federal government. *Lucia*, 138 S. Ct. at 2049 (emphasis added); *see United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868) ("An office is a public station, or employment, conferred by the appointment of government," and "embraces the idea of tenure, duration, emolument, and duties"). It has never applied those structural requirements to the employees of private companies that carry out responsibilities that might otherwise be performed by federal officials. After all, courts are "'not free to disregard those aspects of the constitutional design'" that "'apply . . . only to the federal government'" and extend them to private

parties. *United States v. Vaello Madero*, 596 U.S. 159, 171 (2022) (Thomas, J., concurring).

Contrary to Alpine's suggestions, Alpine Br. 5, 14, it is undisputed that *labels* are "not dispositive" of an entity's "status as a governmental entity for purposes of separation-of-powers analysis." *Dep't of Transp. v. Ass'n of Am. R.R.s* (*Amtrak II*), 575 U.S. 43, 51 (2015). Courts must instead undertake an "independent inquiry into [the entity's] status under the Constitution," based on "practical reality," *id.* at 51, 55, to determine "whether it is *in fact* a private entity," *Lebron*, 513 U.S. at 382. And in exceptional cases, nominally private entities may actually constitute the "Government itself" and thus be subject to the Constitution's structural requirements. *Id.* at 378.

In *Lebron*, Amtrak, "though nominally a private corporation," was actually "part of the Government" for constitutional purposes because Congress created it to ensure the availability of passenger-rail service and the President and Secretary of Transportation appointed eight of its nine directors. 513 U.S. at 383-86, 400. This Court has distilled *Lebron*'s holding into a "three-part standard" for determining who is "a government actor for constitutional purposes": a nominally private corporation is actually "'part of the Government'" when "'[(1)] the Government creates [the] corporation by special law, [(2)] for the furtherance of governmental objectives, and [(3)] retains for itself permanent authority to appoint a majority of

the directors of that corporation.'" *Herron v. Fannie Mae*, 861 F.3d 160, 167-68 (D.C. Cir. 2017) (alterations in original). Applying that standard, the Court concluded that Fannie Mae is not a government actor because, unlike Amtrak, it satisfies only "the first two *Lebron* criteria." *Id.* at 167-69.

The Supreme Court has made clear that *Lebron* supplies the operative test for determining whether the Constitution's appointment and removal requirements apply to private companies. In *Free Enterprise Fund*, the Court applied the Constitution's removal requirements to the PCAOB, a nominally private, "Government-created" entity whose members are appointed by the SEC, because "[t]he parties agree[d] that the Board is 'part of the Government' for constitutional purposes" under *Lebron* and that "its members are 'Officers of the United States.'" 561 U.S. at 485-86 (quoting *Lebron*, 513 U.S. at 397); *see also Amtrak II*, 575 U.S. at 55 (identifying potential Appointments Clause issue to be addressed on remand given Amtrak's status as "a governmental entity, *not a private one*," under *Lebron*) (emphasis added). But neither the Supreme Court nor *any other* court has ever sustained an appointment or removal challenge to an entity that qualified as private under *Lebron*. And for good reason: *Lebron* distinguishes "Officers of the United States"—who are subject to the Constitution's appointment and removal requirements—from officers of a private company—who are not.

*Lebron*'s government-creation element also ensures compliance with the text of the Appointments Clause, which applies only to those whose offices are "established by Law." U.S. Const. art. II, § 2, cl. 2. Because Congress created both Amtrak and the PCAOB, board members of both entities hold offices "established by Law." *See Burnap v. United States*, 252 U.S. 512, 516-17 (1920) ("Whether the incumbent is an officer or an employee is determined by the manner in which *Congress* has specifically provided for the creation of the several positions") (emphasis added). The same cannot be said of FINRA, a genuinely private corporation created with no federal involvement.

This Court's decision on remand in *Association of American Railroads v. U.S. Department of Transportation* (*Amtrak III*), 821 F.3d 19 (D.C. Cir. 2016), confirms that the Constitution's appointment and removal requirements are inapplicable to private actors. There, the Court considered the constitutionality of a Surface Transportation Board-appointed arbitrator empowered to resolve disputes if Amtrak and the Federal Railroad Administration could not agree on the content of federal regulations. *Id.* at 36. The statutory provision made no "mention whether the appointed arbitrator is a private individual or public official." *Id.* Either way, the arbitrator provision was unconstitutional—but the source of the constitutional violation depended on the arbitrator's public or private status. If the arbitrator was private, then the provision violated the private nondelegation doctrine under the

Court's earlier ruling that private parties "cannot wield the coercive power of government" unless they are functioning subordinately to the federal government. *See id.* at 37 (citing *Amtrak I*, 721 F.3d at 670-74). By contrast, "assuming" that the arbitrator was "a 'governmental arbitrator,'" the appointment was "nonetheless unconstitutional" under the Appointments Clause. *Id.* at 37-39; *see also Amtrak II*, 575 U.S. at 63 (Alito, J., concurring) ("the appointment of a *public* arbitrator here would raise serious questions under the Appointments Clause") (emphasis added).

Other circuits likewise restrict application of Article II to officials employed by the federal government. For example, the Fourth Circuit rejected an Appointments Clause challenge to the Metropolitan Washington Airports Authority because the Authority—an interstate-compact entity that the federal government neither created nor controls—is "not a federal instrumentality" under *Lebron*. *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 158 (4th Cir. 2018). The plaintiffs' "failure to meet the threshold of establishing [the Metropolitan Washington Airports Authority] as a federal entity" was "fatal," because "the Appointments Clause . . . appl[ies] to federal entities—'Officers of the United States'"—and "ha[s] little relevance when, as here, the entity in question is not a federal one." *Id.* at 160. Similarly, multiple circuits have rejected Appointments Clause challenges to private individuals wielding federal power because "Supreme Court precedent has established that the constitutional definition of an 'officer'

encompasses, at a minimum, a continuing and formalized relationship of employment *with the United States Government*." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc) (emphasis added); *see also*, *e.g.*, *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002) (similar).

**b. FINRA Is A Private Entity Under *Lebron*.**

Because FINRA is not part of the federal government under *Lebron*, Article II does not apply to its personnel. FINRA was not created by Congress; it was privately incorporated when the NASD and New York Stock Exchange—both private entities themselves—merged their enforcement functions. *Supra* at 9 & n.1. And the government has never had the power to appoint FINRA officials, let alone "'permanent authority to appoint a majority of the directors.'" *Herron*, 861 F.3d at 167; *see also supra* at 9-10. Thus, as the district court recognized, *every* court to consider the question has held that "FINRA is a private entity wholly separate from the SEC and any other government agency." App.404 & n.7 (collecting cases).

The Supreme Court all but resolved this issue in *Free Enterprise Fund*, which expressly invoked *Lebron* in distinguishing "*private* self-regulatory organizations in the securities industry" from the PCAOB, which, "[u]nlike the self-regulatory organizations," is a "*Government-created, Government-appointed* entity." 561 U.S. at 484-85 (emphases added); *see also id.* at 486-87 (again discussing "private" self-

regulatory organizations). Such "'carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.'" *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006).

*Free Enterprise Fund*'s language is no "offhand description." Alpine Br. 33. Alpine suggests that the Court's use of "the adjective 'private'" referred only to self-regulatory organizations' nominal *label*, *id.*, but the PCAOB is also nominally "a private 'nonprofit corporation,'" *Free Enter. Fund*, 561 U.S. at 484. The Court's contrast between "private" self-regulatory organizations and the PCAOB, while expressly invoking the *Lebron* factors, *id.* at 484-85, 487, plainly indicates that a self-regulatory organization "is *in fact* a private entity," *Lebron*, 513 U.S. at 382.

Other courts have reached the same conclusion about FINRA's status. For example, the Second Circuit held that FINRA's predecessor the "NASD is a private actor" because "[i]ts creation was not mandated by statute, nor does the government appoint its members or serve on any NASD board or committee." *Desiderio v. NASD*, 191 F.3d 198, 206 (2d Cir. 1999) (citing *United States v. Solomon*, 509 F.2d 863, 867 (2d Cir. 1975) (Friendly, J.) (holding that the New York Stock Exchange is not the "government" for constitutional purposes)). Reaffirming *Desiderio*, the Second Circuit later explained that the NASD "is clearly distinguishable" from Amtrak because—unlike the NASD—Amtrak "was created by the government 'by special law for the furtherance of government objectives,' and the government

'retain[ed] for itself permanent authority to appoint a majority of the directors of' Amtrak." *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 138 (2d Cir. 2002). Other courts unanimously agree: "Courts have held without exception that FINRA is a private entity and not a state actor." *Mohlman v. FINRA*, 2020 WL 905269, at *6 (S.D. Ohio Feb. 25, 2020) (collecting cases), *aff'd*, 977 F.3d 556 (6th Cir. 2020); *see also All. for Fair Bd. Recruitment v. SEC*, __ F.4th __, 2023 WL 6862856, at *4 & n.6 (5th Cir. Oct. 18, 2023) (collecting "decades of case law across circuits" holding that self-regulatory organizations "are private entities, not state actors").

### c. Alpine's State-Action Arguments Are Irrelevant.

Alpine does not dispute that FINRA is a private corporation. Nor does it argue that FINRA meets *any* (let alone all) of the stringent *Lebron* criteria required to treat a nominally private entity as a government actor. Alpine makes only the more limited claim that "FINRA's Expedited Proceeding qualifies as *state action*." Alpine Br. 16 (emphasis added). But *Lebron* and its progeny expressly distinguish between those two inquiries, explaining that although "actions of private entities can sometimes be regarded as governmental action for constitutional purposes," there is a "*prior* question" whether the challenged body, such as Amtrak, is "itself a federal entity." 513 U.S. at 378-79, 381; *see, e.g.*, *Herron*, 861 F.3d at 167 (distinguishing the "state action doctrine" from whether "Fannie Mae 'is not a private entity but

Government itself'") (quoting *Lebron*, 513 U.S. at 378); *Desiderio*, 191 F.3d at 206 (rejecting the arguments under separate headings).

Because Article II's requirements apply only to government officials, the only relevant inquiry here is the threshold question whether FINRA is "itself a federal entity." *Lebron*, 513 U.S. at 379. And because FINRA is *not* part of the government under *Lebron*, it is not subject to Article II. *See Kim*, 2023 WL 6538544, at *8 (denying motion to enjoin FINRA disciplinary proceeding based on alleged appointment and removal violations because "*Lebron*'s three-factor test shows that FINRA is likely not a state actor"); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 2023 WL 3293298, at *10-15 (N.D. Tex. May 4, 2023) (rejecting application of appointment and removal requirements to a self-regulatory organization under *Lebron* because "private entities are not subject to the constitutional requirements governing appointment and removal of officers").

Alpine nevertheless contends that the Constitution's appointment and removal requirements "'switch on and off'" depending on whether FINRA's "specific conduct qualifies as state action," such as when it allegedly acts as "the 'agent' of the SEC" in carrying out its self-regulatory responsibilities. Alpine Br. 20, 22. But even setting aside that FINRA is not a government agent, *see infra* at 45-48, the Supreme Court has rejected both elements of Alpine's argument: "One 'may be an agent'" of the government "'without thereby becoming its office[r],'" *Free Enter.*

*Fund*, 561 U.S. at 506 n.9 (quoting *United States v. Germaine*, 99 U.S. 508, 509 (1879)), and persons with only "'occasional or temporary'" federal duties do not qualify as federal officers, *Lucia*, 138 S. Ct. at 2051 (quoting *Germaine*, 99 U.S. at 511-12).[7]

Lacking any precedential support, Alpine argues that "[t]here is no reason the Constitution's structural guarantees should be any different" from its protections for individual rights, which apply to private companies when they are engaged in state action. Alpine Br. 21. But the reason is obvious: The Constitution's appointment and removal requirements, unlike the Bill of Rights, apply only to "Officers of the United States," U.S. Const. art. II, § 2, cl. 2—i.e., officials *of the federal government*. *See supra* at 21-32. Indeed, the Appointments Clause does not even apply to "'nine-tenths of the persons rendering service to the government,'" *Free Enter. Fund*, 561 U.S. at 506 n.9 (quoting *Germaine*, 99 U.S. at 509)—including "the broad swath of 'lesser functionaries' in the Government's workforce," *Lucia*, 138 S. Ct. at 2051, and territorial officers with "primarily local duties," *Fin. Oversight & Mgmt. Bd. for*

[7] Nothing in *Free Enterprise Fund* "foreclose[s]" the latter point. Alpine Br. 20. The parties there agreed that the PCAOB, although nominally private, was part of the government, so the Court never addressed the state-action inquiry. *See supra* at 29. The Court's footnote addressing implied rights of action to enforce constitutional provisions (Alpine Br. 21 (citing 561 U.S. at 491 n.2)) is irrelevant.

*Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1655 (2020)—and there is accordingly no reason it should apply to FINRA's private employees.

Alpine's reliance on state-action principles to determine the reach of the Constitution's appointment and removal requirements would also have bizarre, far-reaching, and troubling practical consequences. Private companies enlisted to serve limited public purposes would be required to completely restructure themselves, maintaining both privately appointed and removable boards governing their private conduct and separate presidentially appointed and removable boards governing their state action. The Constitution should not be read to impose a hybrid governance structure that is "unsound in principle and unworkable in practice." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985).

Alpine suggests that these difficulties can be avoided by treating an individual who is an officer of the United States for *some* purposes as an officer of the United States for *all* purposes. *See* Alpine Br. 21. But that would only exacerbate the problems: Whenever *any* aspect of a private company's operations—say, Xerox's administration of a federal benefits program—amounted to state action, the company would become subject to the Constitution's appointment and removal requirements in *all* its operations, even though most of them were entirely private (such as Xerox's production of copy machines). *See NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 42 (D.C. Cir. 2015) (holding that Xerox's determination of eligibility for

Medicaid was state action). The resulting federal intrusion into the private sector would be staggering. But that is not remotely how the state-action doctrine works. Companies that serve limited public objectives may operate as a private company under a board and officers who are not appointed or removable by the President. *E.g.*, Xerox, Corporate Governance Guidelines (as amended July 20, 2023), xerox.bz/3PZnpBZ.

The concern that limiting the Constitution's appointment and removal requirements to government officials would create a "constitutional 'loophole'" is equally unfounded. Alpine Br. 13; *see* App.423 (Walker, J., concurring). Private parties that exercise delegated governmental authority remain subject to the private nondelegation doctrine, *Amtrak III*, 821 F.3d at 37, which requires those parties to "function subordinately" to a governmental body. *See infra* at 50-54. That doctrine imposes meaningful constraints on Congress's ability to delegate governmental power to private parties. *See Amtrak I*, 721 F.3d at 670-74 (finding private nondelegation violation on the assumption that Amtrak was a private entity); *Amtrak III*, 821 F.3d at 37 (finding private nondelegation violation in the event that an arbitrator was a private individual). Nor is there "tension" between the *Lebron* analysis and the private nondelegation doctrine. Rather, "the level of oversight required to satisfy the nondelegation doctrine is different, both quantitatively and qualitatively, from the level of permanent control required to make a nominally

private corporation a state actor. FINRA's structure and work strikes the necessary balance." *Kim*, 2023 WL 6538544, at *12.

In short, the Court should reject Alpine's legally unprecedented and practically unworkable understanding of the Constitution's appointment and removal requirements.

### 2. FINRA's Expedited Proceeding Is Not State Action.

Alpine's appointment and removal theory also fails for the separate and independent reason that FINRA's expedited disciplinary proceeding is not state action.

The conduct of a private company such as FINRA amounts to state action only where "fairly attributable to" the government. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). But as numerous courts have held, Alpine cannot identify any of those "few limited circumstances," *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019), when it comes to FINRA's self-regulatory activities. *E.g.*, *Desiderio*, 191 F.3d at 206-07; *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1200-02 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003) (en banc); *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 156-57, 162 (2d Cir. 2002);

*McGinn, Smith & Co. v. FINRA*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011); *Kim*, 2023 WL 6538544, at *10.[8]

**a.** ***Traditional, Exclusive Governmental Function.*** A private company's conduct may sometimes be considered state action where it carries out an "'exclusive'" public function, *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982)—one that the government "traditionally *and* exclusively performed," *Halleck*, 139 S. Ct. at 1929. But regulation of the securities industry has historically been a *private* function undertaken by *private* entities—not the government. *See supra* at 5-6; *see also Silver v. NYSE*, 373 U.S. 341, 349-52 (1963) (describing the "traditional process of self-regulation"). As Alpine concedes, "self-regulation in the securities industry 'preexisted federal regulation' and dates back centuries." Alpine Br. 27. And Congress and the SEC have repeatedly reaffirmed this choice. *See supra* at 6-9.

In response, Alpine attempts to reframe the regulatory conduct here as "enforcement of federal law," Alpine Br. 15, 25, but that framing is untenable.

---

[8] Alpine is plainly wrong when it states (at 32) that none of the cases rejecting state-action challenges involved FINRA's "delegated enforcement authority." *E.g.*, *Epstein v. SEC*, 416 F. App'x 142, 146, 148 (3d Cir. 2010) (arising from "disciplinary action taken by FINRA"); *D.L. Cromwell*, 279 F.3d at 156-57, 162 (investigatory NASD interviews); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 692 & 699 n.5 (3d Cir. 1979) (NASD "disciplinary hearing"); *Jones v. SEC*, 115 F.3d 1173, 1182-83 (4th Cir. 1997) ("NASD disciplinary action"); *McGinn*, 786 F. Supp. 2d at 147 (FINRA disciplinary proceeding); *North v. Smarsh, Inc.*, 160 F. Supp. 3d 63, 70 (D.D.C. 2015) (same).

*First*, the proceeding that Alpine seeks to enjoin does not involve FINRA's enforcement of the Exchange Act or any other "federal securities law[]." *Contra*, *e.g.*, Alpine Br. 1-3. FINRA's Department of Enforcement initiated that proceeding based on Alpine's violation of a FINRA cease-and-desist order, App.250, which in turn was based solely on Alpine's violation of FINRA's rules, App.163-67. Thus, *this* appeal concerns only the kind of private rule violations that self-regulatory organizations have adjudicated with respect to their members for centuries. And because "standing is not dispensed in gross," but rather must be established on a claim-by-claim basis, *Lewis v. Casey*, 518 U.S. 343, 358-59 n.6 (1996), Alpine, having not been subjected to enforcement of the Exchange Act, cannot point to such enforcement as a basis for preliminary-injunctive relief. Indeed, Alpine elsewhere acknowledges that the Court must focus on FINRA's "specific conduct" at issue. Alpine Br. 20.[9]

[9] Despite acknowledging the distinction between FINRA's "own rules" and "the federal securities laws," Alpine Br. 3, Alpine blurs that distinction by claiming that out-of-circuit cases described FINRA's rules as having the "force" or "status of federal law," *id.* at 6, 17, 24. Alpine also cites (at 17) a decision of this Court that simply describes the SEC's approval of rules by "private" self-regulatory organizations, without commenting on their legal force or status. *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 241-42 (D.C. Cir. 2003). None of these cases held that FINRA is enforcing "federal law" when it brings disciplinary proceedings, or imposes sanctions, based on violations of its own rules.

*Second*, even if FINRA's role in addressing Exchange Act violations in *other* cases were relevant here, simply recasting FINRA's self-regulatory responsibilities as the "enforcement of federal law" cannot change the fact that private self-regulatory organizations have been the frontline regulators of the securities industry since the Founding. *See Halleck*, 139 S. Ct. at 1930-31 (rejecting a similar attempt to "circumvent" state-action precedent by "widen[ing] the lens" and framing the "relevant function" in overly "general[]" terms). To be sure, in the 1930s, Congress imposed a federal overlay on that private regulatory framework, but self-regulatory organizations' "'traditional process of self-regulation' was not displaced." *Solomon*, 509 F.2d at 869.

*Third*, FINRA's enforcement capabilities are constitutionally distinct from those of the SEC and other prosecutorial bodies on which Alpine relies. For example, unlike the SEC—which can seek judicial relief to compel compliance with its administrative orders and file enforcement actions in federal court—FINRA can seek to discipline members only in its own private proceedings. *See supra* at 10-11. And if it imposes a disciplinary fine, FINRA "lacks the authority to bring court actions to collect." *Fiero*, 660 F.3d at 571. Thus, the most that FINRA can do to enforce compliance is to threaten to suspend or expel violators as members—something self-regulatory organizations have done for centuries. *See Belton v.*

*Hatch*, 109 N.Y. 593, 596 (1888) (rejecting challenge to expulsion of New York Stock Exchange member).[10]

Because the SEC alone retains the sovereign power to enforce the Exchange Act by bringing actions for judicially enforceable relief, FINRA is constitutionally distinguishable from the government actors that Alpine identifies as supposed analogues. *Cf. Nixon v. Fitzgerald*, 457 U.S. 731 (1982) (the President); *Myers v. United States*, 272 U.S. 52 (1926) (same); *Springer v. Gov't of Philippine Islands*, 277 U.S. 189 (1928) (the Philippine territorial government); *Seila Law*, 140 S. Ct. 2183 (the Consumer Financial Protection Bureau); *Free Enter. Fund*, 561 U.S. 477 (the PCAOB, which has the power to sue in federal court, 15 U.S.C. § 1711(f)(1)).[11]

**b.** ***Pervasive Entwinement.*** Nor is FINRA so "pervasive[ly] entwin[ed]" with the government that its self-regulatory activities may be treated as state action. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001); *contra* Alpine Br. 16, 26-30. FINRA bears no resemblance to the "nominally

[10] Several Justices have questioned the constitutionality of *qui tam* relators "represent[ing] the United States' interest in civil litigation." *E.g.*, *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting). But even if their view were ultimately to prevail, it would only underscore why FINRA personnel—who lack that power—are not "Officers of the United States."

[11] Alpine also cites *West v. Atkins*, 487 U.S. 42 (1988), *see* Alpine Br. 25, which is plainly distinguishable because it involves the traditional governmental function of incarceration.

private" school athletic association in *Brentwood*. As the Court there emphasized, (1) 84% of the association's members were public schools represented by public officials acting in their official capacities, (2) state board of education members served on the association's board, and (3) the association's employees were eligible for the state's retirement system. *See Brentwood*, 531 U.S. at 299-300. By contrast, public officials have no involvement in or control over FINRA's directors, and FINRA's personnel are hired, employed, and paid by a private entity. *See supra* at 9-11.

Alpine acknowledges "the Supreme Court's entwinement standard set forth in *Brentwood*." Alpine Br. 34. But rather than explain how FINRA satisfies it, Alpine relies on cases that did not even involve constitutional claims, let alone the *Brentwood* test. *See Turbeville v. FINRA*, 874 F.3d 1268, 1273-76 (11th Cir. 2017) (plaintiff's claims "'arose under'" the Exchange Act).

Nor can Alpine draw support from the discussion of state action in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), *see* Alpine Br. 26, which the Fifth Circuit has authoritatively dismissed as "dicta." *All. for Fair Bd. Recruitment*, 2023 WL 6862856, at *5. In addition, as the Fifth Circuit explained, that dicta relied on "'the vague'" state-action test in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), which "no longer reflects the governing standard" and has been "'refined'" and curtailed by subsequent Supreme

Court precedent. *Id.* (quoting *Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 57 (1999)). Similarly unavailing is Alpine's reliance on *Crimmins v. American Stock Exchange, Inc.*, 346 F. Supp. 1256 (S.D.N.Y. 1972), which cited *Intercontinental Industries*' dicta, but ultimately rejected a due-process claim because the exchange's procedures afforded sufficient process. *Id.* at 1259-61.

**c.** ***Government Compulsion.*** Alpine's "government agent" state-action argument also fails because Alpine cannot establish an agency relationship between FINRA and the SEC. Alpine Br. 22-26. Private conduct may be attributed to the government when "the government compels the private entity to take a particular action," and thus makes the private entity its agent. *Halleck*, 139 S. Ct. at 1928. But as the district court explained, FINRA "alone determines which cases to investigate and when to file a complaint, and any decision that FINRA makes is not binding on the SEC in any subsequent review." App.403. Indeed, Alpine admits (at 40)—and its *amici* agree—that "there is no suggestion that anyone at the SEC reviewed and approved of FINRA's decision in the first instance to exercise its prosecutorial discretion by going after Alpine." *See also* NCLA Br. 13 ("FINRA decides which brokers and firms" to investigate); AFECOC Br. 8 ("the SEC lacks authority to direct FINRA's investigations"). Not surprisingly, other courts have consistently rejected similar state-action challenges to FINRA and the NASD. *See McGinn*, 786 F. Supp. 2d at 147 (rejecting government-compulsion argument because the plaintiffs failed

to "establish that FINRA was acting on [the SEC's] behalf"); *see also Solomon*, 509 F.2d at 869 (the Exchange Act did not "create an agency relationship" with the New York Stock Exchange).

Alpine identifies no case holding that FINRA is a government agent acting under SEC compulsion. It relies primarily on *Peacock*, Alpine Br. 22, but there it was undisputed that "Xerox acted as the District's agent" in taking the particular challenged actions to administer Medicaid, 794 F.3d at 43—unlike here, where FINRA acted on its own initiative. Alpine also mischaracterizes *NASD v. SEC*, 431 F.3d 803 (D.C. Cir. 2005), as having "held" that FINRA "acts as the 'agent' of the SEC in the relevant respect." Alpine Br. 22. The Court there did not address a constitutional claim, and the background passages that Alpine cites merely summarize the NASD's role in the Exchange Act framework. *NASD*, 431 F.3d at 805. Similarly, Alpine identifies *In re Series 7 Broker Qualification Exam Scoring Litigation*, 548 F.3d 110 (D.C. Cir. 2008), as "[b]inding D.C. Circuit precedent" on this point, Alpine Br. 25, but that case did not address a constitutional claim either—only the distinct question of self-regulatory immunity, *see infra* at 48-49.

Alpine also invokes distinguishable cases involving government action *by the SEC*. Alpine Br. 21, 23-24, 35-36. In *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995), for example, the plaintiff "challenge[d] the SEC's order approving" a rule promulgated by the Municipal Securities Rulemaking Board. *Id.* at 940. Thus,

although the opinion referred briefly to the "rule" as government action for First Amendment purposes, in context, it clearly meant the SEC's "approval" of that rule. *Id.* at 942; *see also N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 510 (D.C. Cir. 2019) (applying First Amendment scrutiny to "an action by the SEC" to approve a rule). Here, by contrast, Alpine asks this Court to decide only whether FINRA's "Expedited Proceeding" against Alpine "qualifies as state action." Alpine Br. 16. Its failure to acknowledge these crucial factual distinctions ignores the requirement that state-action compulsion inquiries focus on the "particular action" at issue. *Halleck*, 139 S. Ct. at 1928.[12]

Alpine also mischaracterizes (at 25-26) *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 165 (1972), which involved a challenge to a state liquor board's issuance of a license to a discriminatory private club. Contrary to Alpine's account, the Court held that "the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board does *not* sufficiently implicate the State in the discriminatory

---

[12] Alpine also incorrectly suggests that the Tenth Circuit found state action by the NASD in *Rooms v. SEC*, 444 F.3d 1208 (10th Cir. 2006). *See* Alpine Br. 36-37. The issue there was whether "the *SEC* violated [the plaintiff's] due process rights"—not the NASD. *Rooms*, 444 F.3d at 1210 (emphasis added). The court's passing reference to "[d]ue process," *id.* at 1214, was at most dicta, as the First and Fifth Circuits have concluded, *Cody v. SEC*, 693 F.3d 251, 257 n.2 (1st Cir. 2012); *All. for Fair Bd. Recruitment*, 2023 WL 6862856, at *5 n.8. A more recent Tenth Circuit opinion confirms that *Rooms* did not decide the state-actor issue. *See McCune v. SEC*, 672 F. App'x 865, 870 (10th Cir. 2016) (declining to "resolve whether constitutional mandates apply" to FINRA).

guest policies of Moose Lodge to make the latter 'state action' within the ambit of the Equal Protection Clause." *Id.* at 177 (emphasis added). The only exception was a state regulation requiring private clubs to adhere to their own by-laws, which amounted to an unconstitutional state mandate that the club enforce its by-laws' racial restrictions. *Id.* at 177-79. The Court invalidated that regulation but left the club's underlying policy untouched. *Id.* at 179. Thus, *Moose Lodge* underscores the key distinction between action by a governmental regulator (here, the SEC) and action by a private regulated entity (here, FINRA).

**d.** The state-action analysis is not altered by FINRA's so-called "[m]odern [e]xpansion" (which is actually nearly 50 years old). *See* Alpine Br. 27-30. Alpine does not cite a single amendment to the Exchange Act altering the fundamental features that have led numerous courts to conclude—including in opinions rendered decades after the 1975 Exchange Act amendments—that FINRA is not engaged in state action when it conducts self-regulatory disciplinary proceedings. *See Mohlman*, 2020 WL 905269, at *6 (collecting cases).

FINRA's entitlement to immunity when performing self-regulatory functions does not change the state-action analysis. *Contra* Alpine Br. 30-31; *see Rayburn v. Hogue*, 241 F.3d 1341, 1348-49 (11th Cir. 2001) (extending governmental "immunity" to private parties is too "nebulous" a connection to establish state action). The standard for affording regulatory immunity turns on whether the self-

regulatory organization is "act[ing] under the aegis of the Exchange Act's delegated authority." *In re Series 7*, 548 F.3d at 114. That standard is analytically distinct from the standards that govern whether a private entity's regulatory conduct amounts to state action. *See supra* at 39-48.

Nor can Alpine's state-action arguments be confined to "*FINRA*'s unique status" and "role in exercising government power through enforcement actions." Alpine Br. 51. The Exchange Act requires "[*e*]*very* self-regulatory organization" to "enforce compliance" with "its own rules." 15 U.S.C. § 78s(g)(1)(A), (B), (C) (emphasis added); *see supra* at 6-7 (the SEC oversees nearly 50 other self-regulatory organizations). And the Exchange Act framework is only "one of many instances where government relies on self-policing by private organizations" for critical enforcement responsibilities. *Solomon*, 509 F.2d at 869-70 (collecting other examples); *see also*, *e.g.*, *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 886 (7th Cir. 2019) (discussing the parallel framework of self-regulatory organizations supervised by the Commodity Futures Trading Commission). As Judge Friendly explained in refusing to apply constitutional requirements to a self-regulatory organization, there is "no principled basis whereby acceptance of" such "argument[s] could be confined to" this specific context without also threatening "a complete breakdown in the regulation of many areas of business." *Solomon*, 509 F.2d at 869-70.

Finally, Judge Walker's tentative motions panel concurrence does not support a contrary conclusion. He suggested that FINRA may be engaged in state action—and that its officers may therefore be subject to the Appointments Clause—because "FINRA hearing officers execute government laws subject to a government plan, with little to no room for private control." App.422 (citing *Halleck*, 139 S. Ct. at 1928). But since employees of private companies engaged in state action are not "Officers of the United States," they are not subject to the Constitution's appointment and removal requirements. *See supra* at 21-39. Moreover, this appeal does not involve the "execut[ion]" of "government laws"—only FINRA rules. And finally, FINRA's disciplinary decisions are not controlled by the SEC; it is FINRA alone that decides whom to initiate enforcement actions against, the charges to bring, and the sanctions to seek. *See supra* at 45-46.

**B. There Is No Private Nondelegation Violation.**

Because FINRA is a private company and its board members and employees are not "Officers of the United States," the private nondelegation doctrine provides the relevant standard for assessing the constitutionality of the self-regulatory powers that FINRA is exercising against Alpine. *See Amtrak III*, 821 F.3d at 37-39. And as the district court recognized, that alternative claim is squarely foreclosed by Supreme Court precedent defining the contours of the private nondelegation doctrine

as well as the uniform body of court of appeals decisions rejecting nondelegation challenges to FINRA. App.407-09.

The Supreme Court has long held that Congress may give a private company some role in a regulatory program, provided it "function[s] subordinately" to, and is under the "authority and surveillance" of, a governmental body. *Adkins*, 310 U.S. at 399. In *Adkins*, for example, Congress did not unconstitutionally "delegate[] its legislative authority to the [coal] industry" in authorizing industry boards to propose regulations subject to a government agency's "approv[al]," because the agency's ultimate "authority" over those regulations meant that "law-making [was] not entrusted to the industry." *Id.* at 388, 399; *see also Currin v. Wallace*, 306 U.S. 1, 14-16 (1939) (upholding statute requiring industry members to ratify the government's regulations before they took effect); *United States v. Rock Royal Co-op.*, 307 U.S. 533, 577-78 (1939) (similar).

Applying this precedent, every other court of appeals to consider the issue has "uniformly" concluded that the SEC-FINRA model does not violate the private nondelegation doctrine. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 877 (5th Cir. 2022); *see also Kim*, 2023 WL 6538544, at *11-12 (collecting cases and concluding that a private nondelegation claim against FINRA "is unlikely to succeed on the merits"). "In case after case, courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their

enforcement makes the [self-regulatory organizations] permissible aides and advisors." *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (citing, *inter alia*, *Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d. Cir. 1952)); *see also All. for Fair Bd. Recruitment*, 2023 WL 6862856, at *7 (rejecting private nondelegation challenge to Nasdaq).

This Court, discussing several of those cases, has correctly explained that they "resemble *Adkins*" because the private self-regulatory organizations at issue did not "stand on equal footing with a government agency." *Amtrak I*, 721 F.3d at 672 n.5. Moreover, as the Supreme Court itself has stated, the Exchange Act "authorizes the SEC to exercise a significant oversight function over the rules and activities of the registered associations." *United States v. NASD*, 422 U.S. 694, 701 n.6 (1975). Specifically, the SEC "must approve" FINRA's rules and "may abrogate, add to, and delete from all FINRA rules as it deems necessary." *Aslin v. FINRA*, 704 F.3d 475, 476 (7th Cir. 2013) (citing 15 U.S.C. § 78s(b)(1), (c)); *see Amtrak I*, 721 F.3d at 671 (delegation is permissible where the government "retains the discretion to 'approve[], disapprove[], or modif[y]'" proposed regulations). Furthermore, FINRA must notify the SEC of any final disciplinary action, which is subject to *de novo* review by the Commission acting *sua sponte* or in response to a petition from the aggrieved party. *See* 15 U.S.C. § 78s(d)(1)-(2). Thus, the Exchange Act ensures

that FINRA's enforcement activities are appropriately "subordinate to" the SEC for nondelegation purposes, *Nat'l Horsemen's*, 53 F.4th at 887-88—while still preserving the discretion for FINRA "alone [to] determine[] which cases to investigate and when to file a complaint," App.403.

Alpine never mentions *Adkins*—or any of the other Supreme Court decisions sustaining delegations to private entities against nondelegation challenges. It does acknowledge *Amtrak I* as "[t]his Court's seminal private non-delegation decision," Alpine Br. 38, but fails to engage with the portions of that opinion that distinguish the SEC-FINRA model. *Amtrak I*, 721 F.3d at 672 n.5. And Alpine's Fifth and Sixth Circuit cases *approved* of that longstanding model. Alpine Br. 38-40 (citing *Nat'l Horsemen's*, 53 F.4th 869; *Oklahoma*, 62 F.4th 221).[13]

Faced with that overwhelming body of precedent, Alpine accuses FINRA of exercising "unchecked" authority, Alpine Br. 41—without addressing the Exchange Act provisions that provide comprehensive SEC oversight of FINRA's actions.

[13] Judge Walker's motions-panel concurrence acknowledged *Adkins* in passing, but deemed it distinguishable because FINRA's hearing officers "do not just make recommendations—they enforce securities laws and decide parties' rights." App.423. But the expedited proceeding at issue here involves only the enforcement of a FINRA cease-and-desist order premised on Alpine's violation of FINRA's rules. *See supra* at 12-14. In any event, nothing in the Supreme Court's nondelegation jurisprudence limits private parties to the role of making recommendations, *see, e.g.*, *Currin*, 306 U.S. at 14-16, which is precisely why every court to consider the issue has concluded that the SEC-FINRA model satisfies the private nondelegation doctrine.

Alpine also mischaracterizes that statutory framework, claiming that FINRA can expel Alpine without SEC review. *Id.* In reality, Alpine can appeal any adverse ruling in the expedited proceeding, including an expulsion order, to the SEC and can seek an immediate stay from the agency, *see* FINRA Rule 9559(r); 17 C.F.R. § 201.401(d)—as it has successfully done in response to a prior adverse FINRA decision, *see In re Alpine Sec. Corp.*, Exchange Act Release No. 86719, 2019 WL 3933691 (Aug. 20, 2019) (granting interim stay).

The SEC's power to stay any sanction imposed by FINRA and to undertake *de novo* review of the findings underlying that sanction makes clear—as every court to consider the issue has held—that FINRA "function[s] subordinately" to the SEC. *Adkins*, 310 U.S. at 399.

* * *

If successful, Alpine's sweeping constitutional assault on FINRA would inflict a host of unsupported and damaging consequences: It would eviscerate the self-regulatory model that has efficiently and effectively protected investors and the markets for centuries, replace private corporate governance and self-regulation with government control, severely overburden the finite regulatory resources of the SEC, and expand the concept of state action—and, with it, other constitutional requirements beyond just appointment and removal—to vast swaths of private conduct, "significantly endanger[ing] individual liberty and private enterprise."

*Halleck*, 139 S. Ct. at 1932. The district court foresaw these "seismic" effects and correctly rejected Alpine's unprecedented arguments. App.405. This Court should do the same.

## II. THE REMAINING REQUIREMENTS WEIGH HEAVILY AGAINST A PRELIMINARY INJUNCTION.

Because Alpine lacks a likelihood of prevailing on the merits, "this [C]ourt need not proceed to review the other three preliminary injunction factors" to affirm. *Ark. Dairy*, 573 F.3d at 832. But regardless, Alpine has failed to satisfy the other factors.

Alpine's inability to establish a likelihood of success on its claims means it will not suffer any constitutional harm (irreparable or otherwise) from participating in FINRA's expedited proceeding. App.400; *see*, *e.g.*, *Archdiocese v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("the deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely"). But even if the first two factors somehow tipped in Alpine's favor, the Court should still deny a preliminary injunction. As the district court correctly found, the balance of equities and public interest weigh heavily against awarding the "extraordinary remedy" of preliminary-injunctive relief. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, 32 (2008) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *see* App.400, 415.

Awarding injunctive relief would impair FINRA's critical statutory responsibility to "protect investors and the public interest," 15 U.S.C. § 78o-3(b)(6), by preventing FINRA from moving forward with its disciplinary proceeding against Alpine and by enabling Alpine—which has already stolen tens of millions of dollars from its customers—to continue to exact massively outsized fees and commissions from vulnerable investors in the penny-stock market.

Moreover, Alpine's customers are not the only ones who would face the risk of continued victimization. The Court's approval of an injunction would invite every other respondent in a FINRA disciplinary proceeding—as well as every subject of any of the more than 1,000 pending FINRA investigations—immediately to seek injunctive relief in federal court. Similar constitutional claims have already been raised by several disciplinary-proceeding respondents, including the plaintiff in *Kim v. FINRA*, who moved (unsuccessfully) for a temporary restraining order and preliminary injunction based on arguments virtually identical to Alpine's. *See* 2023 WL 6538544, at *6 (explaining that the plaintiff's "claims overlap with those in *Alpine*"); *see also Lebental v. FINRA*, No. 1:23-cv-3119 (D.D.C. filed Oct. 18, 2023) (similar *Alpine*-based suit). *Kim* involves a garden-variety non-expedited proceeding in which FINRA is not seeking to permanently bar the respondent from the industry, and thus underscores the wider implications of this Court's ruling. Indeed, a ruling in Alpine's favor would inevitably generate a flood of copycat

litigation in this and other courts, paralyzing FINRA's frontline enforcement functions, overwhelming the SEC's limited resources, and leaving investors susceptible to fraud, deceit, and theft.

Because the pernicious consequences that would flow from an injunction—both for Alpine's customers and for vulnerable investors throughout the securities markets—are fundamentally incompatible with the public-interest considerations that inform this Court's equitable discretion, this Court should reject Alpine's request for injunctive relief.

## CONCLUSION

The Court should affirm the district court's denial of a preliminary injunction.

Dated: October 27, 2023

Respectfully submitted,

*/s/ Amir C. Tayrani*
Amir C. Tayrani
Alex Gesch
Max E. Schulman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 887-3692
ATayrani@gibsondunn.com
AGesch@gibsondunn.com
MSchulman@gibsondunn.com

*Counsel for Defendant-Appellee Financial Industry Regulatory Authority, Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because the brief contains 12,992 words, as determined by the word-count function of Microsoft Word 2019, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2. This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

Dated: October 27, 2023

Respectfully submitted,

*/s/ Amir C. Tayrani*

Amir C. Tayrani
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 887-3692
atayrani@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2023, I caused a true and correct copy of this brief to be electronically filed through the Court's CM/ECF system, which will send a notice of filing to all registered users.

Dated: October 27, 2023

Respectfully submitted,

*/s/ Amir C. Tayrani*

Amir C. Tayrani
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 887-3692
atayrani@gibsondunn.com