**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5129**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ALPINE SECURITIES CORPORATION,

Plaintiff-Appellant,

SCOTTSDALE CAPITAL ADVISORS CORPORATION,

Plaintiff-Appellee,

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,

Defendant-Appellee,

UNITED STATES OF AMERICA,

Intervenor Defendant-Appellee.

---

On Appeal from the United States District Court
for the District of Columbia

---

# BRIEF FOR INTERVENOR UNITED STATES OF AMERICA

---

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
MARK B. STERN
JOSEPH F. BUSA
COURTNEY L. DIXON
*Attorneys, Appellate Staff*
*Civil Division,*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Alpine Securities Corporation was a plaintiff in district court and is the appellant here. Scottsdale Capital Advisors Corporation was a plaintiff in district court and is an appellee here. Financial Industry Regulatory Authority, Inc. was a defendant in district court and is an appellee here. The United States of America was an intervenor for defendant in district court and is an appellee here.

There were no amici in district court. At the time of filing, the following had filed amicus briefs in this Court: the Municipal Securities Rulemaking Board, supporting neither party; the New Civil Liberties Alliance, supporting appellant; and the American Free Enterprise Chamber of Commerce, supporting appellant.

### B. Rulings Under Review

Plaintiff-appellant Alpine seeks review of the June 7, 2023 Order and Memorandum Opinion in *Scottsdale Capital Advisors Corp. v. Financial Industry Regulatory Authority, Inc.*, -- F. Supp. 3d --, 2023

WL 3864557 (D.D.C.) (No. 23-cv-1506) (Howell, J.). The Order is reproduced at pages 385 to 386 of the Joint Appendix (JA). The Memorandum Opinion is reproduced at JA 387 to 416.

### C. Related Cases

This case has not previously been before this Court, save for the motion panel's resolution of the motion for an injunction pending appeal. *See* JA417. Counsel for the government is unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C). A notice of appeal was recently filed with this Court in a different case, *Kim v. Financial Industry Regulatory Authority, Inc.*, No. 23-7136, that involves a different plaintiff and similar legal issues.

*/s/ Joseph F. Busa*
Joseph F. Busa
Counsel for Intervenor-Appellee
United States of America

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .......... iii

TABLE OF AUTHORITIES .......... v

GLOSSARY .......... xii

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 4

STATEMENT OF THE ISSUES .......... 4

PERTINENT STATUTES AND REGULATIONS .......... 5

STATEMENT OF THE CASE .......... 5

A. Statutory Background .......... 5

1. Self-Regulation In The Securities Industry .......... 5

2. Government Supervision Of Self-Regulation: The Securities Exchange Act Of 1934 And The Maloney Act Of 1938 .......... 7

3. Current Statutory Framework .......... 11

B. Facts And Prior Proceedings .......... 17

SUMMARY OF ARGUMENT .......... 24

STANDARD OF REVIEW .......... 28

ARGUMENT .......... 28

Alpine Is Unlikely To Prevail On The Merits .......... 28

A. The SEC's Supervision Of FINRA, A Private Corporation, Satisfies Private-Nondelegation Principles. .......... 28

1. A private entity can properly play a role under a federal statute if it functions subordinately to a public agency. .......... 28

2. The Exchange Act subordinates FINRA's traditional self-regulatory activities to SEC supervision. .......... 30

3. Alpine fails to address nondelegation caselaw and fails to recognize that the SEC can review any FINRA disciplinary decision. .......... 34

B. Standards Governing The Appointment And Removal Of Federal Officials Do Not Guide The Private-Nondelegation Inquiry. .......... 40

1. FINRA is not part of the government, and its private executives are not subject to Article II appointment and removal. .......... 41

2. Alpine misunderstands FINRA's role and incorrectly equates industry self-discipline with regulation by a public agency. .......... 52

3. The state-action doctrine has no bearing on the delegation analysis. .......... 62

CONCLUSION .......... 69

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abdullah v. Obama*,
753 F.3d 193 (D.C. Cir. 2014) .......... 28

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) .......... 39

*Alliance for Fair Bd. Recruitment v. SEC*,
-- F.4th --, 2023 WL 6862856 (5th Cir. Oct. 18, 2023) .......... 48, 64

*Application of Alpine Sec. Corp. & Scottsdale Capital Advisors Corp. for Review of Action Taken by FINRA, Exchange Act Release No. 86719*,
2019 WL 3933691 (Aug. 20, 2019) .......... 38-39, 39

*Application of Alpine Sec. Corp. for Review of Action Taken by FINRA, Exchange Act Release No. 97347*,
2023 WL 3038922 (Apr. 21, 2023) .......... 39

*Application of Scottsdale Capital Advisors Corp. for Review of Action Taken by FINRA, Exchange Act Release No. 93052*,
2021 WL 4242630 (Sept. 27, 2021) .......... 15

*Association of Am. R.Rs. v. U.S. Dep't of Transp.*:
721 F.3d 666 (D.C. Cir. 2013), *vacated and remanded on other grounds*, 575 U.S. 43 (2015) .......... 30, 34, 35
821 F.3d 19 (D.C. Cir. 2016) .......... 30, 49
896 F.3d 539 (D.C. Cir. 2018) .......... 30

*Belton v. Hatch*,
17 N.E. 225 (N.Y. 1888) .......... 7

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) .......... 28, 29

*Cody v. SEC*,
693 F.3d 251 (1st Cir. 2012) .......... 18

*Currin v. Wallace*,
306 U.S. 1 (1939) ........................................................................ 59

*Department of Transp. v. Association of Am. R.Rs.*,
575 U.S. 43 (2015) .................................................... 27, 45, 49, 65

*Fiero v. FINRA*,
660 F.3d 569 (2d Cir. 2011) ................................................ 16, 58

*Financial Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
140 S. Ct. 1649 (2020) ................................ 26, 43, 45, 50, 55, 56, 61

*First Jersey Sec., Inc. v. Bergen*,
605 F.2d 690 (3d Cir. 1979) ..................................................... 33

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*:
561 U.S. 477 (2010) ............................................ 42, 44, 45, 46, 47
537 F.3d 667 (D.C. Cir. 2008) ................................................... 48

*Freytag v. Commissioner*,
501 U.S. 868 (1991) ..................................................... 42-43, 43

*Herron v. Fannie Mae*,
861 F.3d 160 (D.C. Cir. 2017) ............................................ 46, 65

*Jones v. SEC*,
115 F.3d 1173 (4th Cir. 1997) ............................................ 61, 62

*Kerpen v. Metropolitan Washington Airport Auth.*,
907 F.3d 152 (4th Cir. 2018) ..................................................... 48

*Lebron v. National R.R. Passenger Corp.*,
513 U.S. 374 (1995) ............................................ 3, 27, 45, 51, 65

*Lucia v. SEC*,
138 S. Ct. 2044 (2018) ............................................. 44, 53, 54, 55

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*,
414 U.S. 117 (1973) ...................................................... 8, 31, 57

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972) ........................................................................ 64

*Myers v. United States*,
272 U.S. 52 (1926) .................................................................. 43, 44

*National Ass'n of Sec. Dealers, Inc. v. SEC*,
431 F.3d 803 (D.C. Cir. 2005) ........................................ 15, 37, 59, 60

*National Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ........................................................ 33, 36

*NB ex rel. Peacock v. District of Columbia*,
794 F.3d 31 (D.C. Cir. 2015) ........................................................ 63, 66

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023), *cert. pet. filed*
(Oct. 17, 2023) (No. 23-402) ................................ 28, 32, 33, 36, 40, 42

*R.H. Johnson & Co. v. SEC*,
198 F.2d 690 (2d Cir. 1952) ......................................................... 33, 60

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
140 S. Ct. 2183 (2020) ................................................................. 44, 61

*Silver v. New York Stock Exch.*,
373 U.S. 341 (1963) ......................................................................... 7, 8

*Sorrell v. SEC*,
679 F.2d 1323 (9th Cir. 1982) ............................................................ 33

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) ......................................... 1, 24, 25, 29, 30, 33, 36

*Susquehanna Int'l Grp., LLP v. SEC*,
866 F.3d 442 (D.C. Cir. 2017) ............................................................ 13

*Thomas Cusack Co. v. City of Chicago*,
242 U.S. 526 (1917) .............................................................................. 36

*Todd & Co. v. SEC*,
557 F.2d 1008 (3d Cir. 1977) ............................................................. 33

*United States v. Arthrex, Inc.*,
141 S. Ct. 1970 (2021) ............................................................ 26, 43, 44

*United States v. National Ass'n of Sec. Dealers, Inc.*,
422 U.S. 694 (1975) .......... 9, 31, 32

*United States v. Solomon*,
509 F.2d 863 (2d Cir. 1975) .......... 63, 64

**U.S. Constitution:**

Art. II, § 2, cl. 2 .......... 43, 44

**Statutes:**

Act of June 6, 1983,
Pub. L. No. 98-38, § 3, 97 Stat. 205, 206 .......... 11

Maloney Act of 1938,
Pub. L. No. 75-719, 52 Stat. 1070 .......... 9

Securities Acts Amendments of 1975,
Pub. L. No. 94-29, 89 Stat. 97 .......... 11

15 U.S.C. § 78b .......... 58

15 U.S.C. § 78f(b)(5)-(6) .......... 12

15 U.S.C. § 78f(b)(7) .......... 14

15 U.S.C. § 78f(d) .......... 14

15 U.S.C. § 78f(d)(1) .......... 14

15 U.S.C. § 78o(a)(1) .......... 11, 59

15 U.S.C. § 78o(b)(1)(B) .......... 11, 59

15 U.S.C. § 78o-3(b) .......... 32

15 U.S.C. § 78o-3(b)(6) .......... 59

15 U.S.C. § 78o-3(b)(6)-(7) .......... 12

15 U.S.C. § 78o-3(b)(8) .......... 14

15 U.S.C. § 78o-3(h) .......... 14

15 U.S.C. § 78o-3(h)(1) .......... 14

15 U.S.C. § 78s .......... 12, 51

15 U.S.C. § 78s(b)(1) .......... 12, 13, 31, 32

15 U.S.C. § 78s(b)(2)(A)(i)(II) .......... 13

15 U.S.C. § 78s(b)(2)(C) .......... 31

15 U.S.C. § 78s(b)(2)(C)(i) .......... 13

15 U.S.C. § 78s(c) .......... 13, 31, 32, 40

15 U.S.C. § 78s(d) .......... 58

15 U.S.C. § 78s(d)(1) .......... 14

15 U.S.C. § 78s(d)(2) .......... 14, 24, 37, 38

15 U.S.C. § 78s(e) .......... 32

15 U.S.C. § 78s(e)(1) .......... 15

15 U.S.C. § 78s(e)(1)(A) .......... 15, 58

15 U.S.C. § 78s(e)(2) .......... 15, 16, 58

15 U.S.C. § 78s(h)(1) .......... 12, 32

15 U.S.C. § 78s(h)(2) .......... 17

15 U.S.C. § 78s(h)(4) .......... 12

15 U.S.C. § 78u .......... 16

15 U.S.C. § 78u(a)(1) .......... 16

15 U.S.C. § 78u(d)(1) .......... 17

15 U.S.C. § 78u(d)(5) .......... 17
15 U.S.C. § 78u(d)(7) .......... 17
15 U.S.C. § 78u(f) .......... 16
15 U.S.C. § 78y(a)(1) .......... 16
15 U.S.C. § 7211(a) .......... 47
15 U.S.C. § 7211(e)(4) .......... 47
28 U.S.C. § 1292(a)(1) .......... 4
28 U.S.C. § 1331 .......... 4
28 U.S.C. § 2403(a) .......... 21

**Regulations:**

17 C.F.R. § 201.401(a) .......... 38
17 C.F.R. § 201.401(d) .......... 14, 24, 37-38
17 C.F.R. § 201.401(d)(2) .......... 38
17 C.F.R. § 201.401(d)(3) .......... 38
17 C.F.R. § 201.420(a)(1) .......... 14
17 C.F.R. § 201.421(b) .......... 15
17 C.F.R. § 201.452 .......... 15
17 C.F.R. § 240.19d-1(c)(1) .......... 14, 19, 20
17 C.F.R. § 240.19d-2 .......... 14, 19, 20, 24, 37-38
17 C.F.R. § 240.19d-3 .......... 14, 19, 20

**Legislative Materials:**

1 Annals of Cong. 518 (James Madison) .......... 42, 44

NASD for Special Subcomm. on Legis. Oversight of H. Comm. on Interstate and Foreign Com., 85th Cong., *History of National Association of Securities Dealers, Inc.* (Subcomm. Print 1959), https://congressional.proquest.com/congressional/docview/t21.d22.cmp-1959-fch-0001 .................................................. 10

**Other Authorities:**

Stuart Banner, *The Origin of the New York Stock Exchange, 1791-1860*, 27 J. Legal Stud. 113 (1998)..............................6

*Concept Release Concerning Self-Regulation*, 69 Fed. Reg. 71,256 (Dec. 8, 2004) ................................................ 9, 11

FINRA, FINRA By-Laws art. VII, § 13 (2007), https://perma.cc/EZ8L-5GJ2.................................................................51

FINRA, *FINRA Rules*, https://www.finra.org/rules-guidance/rulebooks/finra-rules (last visited Oct. 26, 2023) ............................................... 17, 18, 19, 20

Historical Society of Pennsylvania, *Collection 3070*, *Philadelphia Stock Exchange Papers*, *1746-2005* (2006), https://perma.cc/KJU3-6JJY.................................................................5

*Order Approving Proposed Rule Change To Amend the By-Laws of NASD*, 72 Fed. Reg. 42,169 (Aug. 1, 2007) .................................................. 10

SEC Historical Society, *The Institution of Experience: Self-Regulatory Organizations in the Securities Industry*, *1792-2010*, https://perma.cc/B7FV-N98H.............................................6

Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation*, 62 N.C. L. Rev. 475, 480 (1984) ...........................................................5

The Federalist No. 51 (James Madison) ...............................................42

## GLOSSARY

| | |
|---|---|
| FINRA | Financial Industry Regulatory Ass'n, Inc. |
| JA | Joint Appendix |
| NASD | National Ass'n of Securities Dealers, Inc. |
| SEC | Securities and Exchange Commission |

## INTRODUCTION

Since the founding of this country, securities professionals have established private organizations to create rules for themselves and to discipline members for violating those rules. Since the Great Depression, such self-regulatory organizations have continued to oversee their private members subject to the oversight of the Securities and Exchange Commission (SEC), which ensures that industry self-regulation comports with statutory requirements designed to protect the public.

For nearly as long as this system of SEC-supervised self-regulation has existed, the Supreme Court has made clear that a private entity may play an important role in a federal statutory scheme if the private entity "function[s] subordinately" to a public agency with "authority and surveillance" over it. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). This Court and the other courts of appeals have applied the Supreme Court's guidance in a range of contexts. And every court of appeals to address the question has recognized that the SEC's supervision of the securities industry's private, self-regulatory organizations, including the Financial Industry

Regulatory Authority, Inc., (FINRA), is entirely consistent with the Constitution.

Alpine makes little effort to address the controlling nondelegation analysis, citing neither *Adkins* nor the decisions applying its teachings to the self-regulatory organizations that are subordinate to SEC oversight. Insofar as Alpine addresses nondelegation principles at all, it mistakenly asserts that the SEC could not meaningfully review a disciplinary sanction expelling Alpine from membership in FINRA. Alpine is fully aware that it could seek a stay from the SEC of such a disciplinary sanction pending plenary SEC review. Indeed, Alpine sought and obtained such a stay in the recent past, and there is no reason it could not seek to do so again. In this respect, as in every other, the internal disciplinary procedures of the self-regulatory organizations are subordinate to plenary SEC supervision.

Rather than grapple with well-established private-nondelegation principles, Alpine instead invokes inapposite doctrines. First, it seeks to analogize FINRA hearing officers to the SEC's administrative law judges, urging that the FINRA hearing officers, like the administrative law judges, must be appointed consistent with the Appointments Clause

and removable consistent with Article II requirements. But those structural requirements do not address private delegation to entities that are not part of the government, and they do not supplant a century of precedent regarding the role that private entities may play under federal statutes. Article II's appointment and removal requirements instead address the separate question of the allocation of authority within the federal government over Officers of the United States. FINRA is not "part of the government" under the applicable test from *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), because it was not created by the government and its leaders are not chosen by the government. *Id.* at 399. The structural constitutional requirements that apply to the government thus do not apply to FINRA.

Alpine fails to recognize that FINRA's private hearing officers engage in the kind of traditional, self-regulatory activities that similar private associations have undertaken for centuries. In carrying out those traditional functions in the first instance, FINRA hearing officers do not exercise the kind of power the SEC Commissioners exercise in making the governmental determinations that are then subject to judicial review. Alpine highlights the error of its analysis by relying on

the state-action doctrine under which specific actions by a private entity can be attributed to the government. That doctrine has never governed the circumstances under which a private entity may play a role under a federal statute, and it has nothing to say about the scope of structural constitutional requirements that apply only to the government itself.

Because Alpine has no likelihood of success on the merits of its constitutional claims, this Court should affirm the district court's denial of Alpine's motion for a preliminary injunction.

## STATEMENT OF JURISDICTION

Alpine invoked the district court's federal question jurisdiction under 28 U.S.C. § 1331. JA16. The district court denied Alpine's motion for a preliminary injunction on June 7, 2023. JA385. Alpine filed a timely notice of appeal on June 8, 2023. JA11. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether FINRA, the private self-regulatory securities organization at issue here, functions subordinately to the SEC consonant with principles governing delegation of authority to private entities.

2. Whether the Appointments Clause and the removal requirements of Article II apply outside the federal government to a private entity that is properly subordinated to the SEC.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory Background

#### 1. Self-Regulation In The Securities Industry

"Self-regulation in the securities industry is nearly as old as the federal government." Marianne K. Smythe, *Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation*, 62 N.C. L. Rev. 475, 480 (1984). Since the early 1790s, securities professionals have organized among themselves and have agreed to be governed by a self-imposed set of industry rules. The first known such agreement led to the founding of the Philadelphia Board of Brokers in 1790, later renamed the Philadelphia Stock Exchange. Historical Society of Pennsylvania, *Collection 3070*, *Philadelphia Stock Exchange Papers*, *1746-2005*, at 1-3 (2006), https://perma.cc/KJU3-6JJY.

Precursors to the New York Stock Exchange were founded shortly thereafter. In 1791, a group of New York securities brokers "agreed to be governed by a set of 14 rules," including "a nongovernmental method of enforcing contracts" under which "brokers defaulting on contracts were to be barred from participating in any transactions thereafter." Stuart Banner, *The Origin of the New York Stock Exchange, 1791-1860*, 27 J. Legal Stud. 113, 114-15 (1998). The next year, in 1792, New York brokers reportedly met under a buttonwood tree on Wall Street and pledged to deal with each other on specified terms. SEC Historical Society, *The Institution of Experience: Self-Regulatory Organizations in the Securities Industry, 1792-2010*, https://perma.cc/B7FV-N98H. In 1817, members of that group, and others, formed the New York Stock and Exchange Board, later renamed the New York Stock Exchange. *Id.* Members of the Exchange agreed to a constitution that established a set of "seventeen rules that governed trading" and provided for internal disciplinary proceedings and sanctions ranging "from fines to suspension and expulsion" from the Exchange. *Id.*

For well over a century after these organizations were created, securities exchanges throughout the country operated as private

"business club[s]" supervising the conduct of their own members. *Belton v. Hatch*, 17 N.E. 225, 226 (N.Y. 1888). The constitution of the New York Stock Exchange, for example, sought to protect its members' business interests by imposing restraints on "reckless or dishonest methods." *Id.* at 227. The Exchange's constitution lodged "the powers of [self-]government" in "a [self-]governing committee, whose decision, after the trial of a member for offenses under its laws, [wa]s final." *Id.*

#### 2. Government Supervision Of Self-Regulation: The Securities Exchange Act Of 1934 And The Maloney Act Of 1938

In the first decades of the twentieth century, securities exchanges "became a more and more important element in our Nation's economic and financial system," and their "ungoverned self-regulation" became "more and more obviously inadequate, with acceleratingly grave consequences." *Silver v. New York Stock Exch.*, 373 U.S. 341, 351 (1963). The stock market crash of 1929, and the Great Depression that followed, convinced Congress that the manner in which the exchanges supervised the conduct of their own members in trading securities was "affected with a public interest in the same degree as any other great utility." *Id.* at 350 (quotation marks omitted). "The need for statutory

regulation" thus became apparent. *Id.* at 349. But "the task was deemed to be of such magnitude that Government simply could not regulate effectively every aspect of the industry" directly. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 128 n.9 (1973).

"Thus arose the federally mandated duty of self-policing by exchanges." *Silver*, 373 U.S. at 352. Congress determined that a system of "[s]upervised self-regulation" would preserve "the traditional private governance of exchanges" while allowing "the Government to monitor exchange business in the public interest." *Ware*, 414 U.S. at 127-28. To that end, the Securities and Exchange Act of 1934 established the Securities and Exchange Commission, required all national stock exchanges "to be registered by the Commission," and granted the SEC power to supervise exchange self-regulation by creating and amending the rules of the exchanges to protect the public. *Id.* at 128-30. Congress thus left with the private exchanges the "initiative and responsibility for" establishing their own rules and disciplining their own members, but, critically, the exchanges would be "subject to appropriate federal regulatory supervision or action." *Id.* at 130-31 (quotation marks omitted).

In the Maloney Act of 1938, Pub. L. No. 75-719, 52 Stat. 1070, Congress extended federally supervised self-regulation to the over-the-counter market, also known as the off-exchange market. Like the exchanges before them, off-exchange securities dealers had already formed their own private, self-regulatory organizations years before the Maloney Act. *Concept Release Concerning Self-Regulation*, 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004). Those private, self-regulatory organizations, such as the Investment Bankers Conference, "promulgated industry best practices" that members agreed to follow. *Id.* As with the exchanges, however, concerns arose about the effectiveness of pure self-regulation of the over-the-counter market. *Id.*

The Maloney Act amended the Exchange Act to provide for registration with the SEC of "national securities associations" of over-the-counter brokers and dealers. *United States v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 701 n.6 (1975). In doing so, the Maloney Act placed the manner in which the private, self-regulatory national securities associations would oversee their members under the "pervasive supervisory authority [of] the SEC" in order to protect "the public interest." *Id.* at 732-33.

In 1939, following the passage of the Maloney Act, the Investment Bankers Conference—the leading nationwide group of securities dealers, which predated the Act—renamed itself the National Association of Securities Dealers, Inc., often referred to as NASD. NASD for Special Subcomm. on Legis. Oversight of H. Comm. on Interstate and Foreign Com., 85th Cong., *History of National Association of Securities Dealers, Inc.* 3 (Subcomm. Print 1959), https://congressional.proquest.com/congressional/docview/t21.d22.cmp-1959-fch-0001. NASD registered with the SEC as a national securities association for off-exchange securities transactions under the Act. *Id.*

In 2007, NASD and the New York Stock Exchange consolidated their member oversight functions and formed a single, renamed self-regulatory organization, the Financial Industry Regulatory Authority, Inc., or FINRA. *Order Approving Proposed Rule Change To Amend the By-Laws of NASD*, 72 Fed. Reg. 42,169, 42,170 (Aug. 1, 2007).

As the securities industry has evolved and as new challenges have emerged, Congress has amended the securities laws on several occasions, generally in order to give the SEC greater power to supervise the self-regulatory organizations. *See, e.g.*, Securities Acts Amendments

of 1975, Pub. L. No. 94-29, 89 Stat. 97; Act of June 6, 1983, Pub. L. No. 98-38, § 3, 97 Stat. 205, 206. At the same time, however, Congress has chosen to "preserve[] and strengthen[]" the Exchange Act's basic framework of government-supervised self-regulation in order to harness the benefits of that scheme, which Congress has determined to be "distinctly preferable" to a "purely governmental approach." *Concept Release*, 69 Fed. Reg. at 71,257-58 (quotation marks omitted).

### 3. Current Statutory Framework

By statute, any person who wishes to effect securities transactions must register with the SEC and become a member of a self-regulatory organization that is registered with the SEC: either a registered national securities exchange or, for over-the-counter transactions conducted off-exchange, a registered national securities association. 15 U.S.C. § 78o(a)(1), (b)(1)(B).

In order to register as a "national securities exchange" or a "national securities association," the exchange or association's rules must, among other things, be "designed to prevent fraudulent and manipulative acts and practices" and to "promote just and equitable principles of trade," and must provide for "appropriate[] discipline[]" of

its broker-dealer members when those members violate the association's rules or the federal securities laws. 15 U.S.C. §§ 78f(b)(5)-(6) (exchanges), 78o-3(b)(6)-(7) (securities associations). The SEC may suspend a self-regulatory organization's registration, or limit its activities, if the organization violates or is unable to comply with applicable statutory provisions or rules. *Id.* § 78s(h)(1). The SEC may also "remove from office or censure any … officer or director of such self-regulatory organization" if the organization's officer has willfully violated the securities statutes or regulations or the rules of the self-regulatory organization. *Id.* § 78s(h)(4).

Each self-regulatory organization that is registered with the SEC, whether an exchange or securities association, is subject to SEC supervision of the organization's rules and disciplinary processes. *See* 15 U.S.C. § 78s. The securities statutes provide two related mechanisms for SEC supervision of self-regulatory organizations' rules: SEC review of proposed rules, and the SEC's own independent rulemaking. Self-regulatory organizations must file with the SEC "copies of any proposed rule or any proposed rule change." *Id.* § 78s(b)(1). In general, no such proposal may "take effect unless approved" or "permitted" by the SEC.

*Id.* The SEC provides notice to the public of the organization's proposal and takes public comment on the proposal. *Id.* The SEC then determines whether to approve or disapprove the proposal. *Id.* § 78s(b)(2)(A)(i)(II). The SEC may approve a proposal only if the SEC finds, in its own judgment, that the proposal "is consistent with the" Exchange Act and SEC regulations issued under the Act. *Id.* § 78s(b)(2)(C)(i); *see Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 446-47 (D.C. Cir. 2017).

In addition to reviewing the self-regulatory organizations' proposed rules, the SEC also has independent rulemaking authority. *See* 15 U.S.C. 78s(c). Proceeding through notice-and-comment procedures, the SEC may "abrogate, add to, and delete from" any rule of a self-regulatory organization as the SEC "deems necessary or appropriate" in order to ensure "the fair administration of the self-regulatory organization," "to conform its rules to" the Exchange Act or the SEC's rules, or "otherwise in furtherance of the purposes of" the Exchange Act. *Id.*

Self-regulatory organizations' disciplinary functions are also governed by the Exchange Act's requirements and the organizations'

own set of internal rules that have been approved by the SEC. 15 U.S.C. §§ 78f(b)(7) & (d) (exchanges), 78o-3(b)(8) & (h) (securities associations). The Exchange Act requires that self-regulatory organizations "provide a fair procedure" in any internal disciplinary proceeding, *id.* §§ 78f(b)(7), 78o-3(b)(8), and specifies that if a self-regulatory organization seeks to discipline a member for violating the rules, the organization must "bring specific charges, notify such member or person of, and give him an opportunity to defend against, such charges, and keep a record," *id.* §§ 78f(d)(1), 78o-3(h)(1).

Following an internal disciplinary process, a self-regulatory organization must notify the SEC of "any final disciplinary sanction" against a member. 15 U.S.C. § 78s(d)(1); 17 C.F.R. § 240.19d-1(c)(1). The SEC will review the self-regulatory organization's disciplinary decision on application by an aggrieved person and may do so as well "on its own motion." 15 U.S.C. § 78s(d)(2); 17 C.F.R. §§ 201.420(a)(1), 240.19d-3. The SEC may stay the disciplinary sanction pending Commission review, whether on its own initiative or by application from the person aggrieved. 15 U.S.C. § 78s(d)(2); 17 C.F.R. §§ 201.401(d), 240.19d-2.

The SEC independently determines whether the aggrieved person engaged in the conduct that was the basis for the disciplinary sanction, whether that conduct violated the relevant rules, and whether the application of those rules to the aggrieved person is consistent with the purposes of the Exchange Act. 15 U.S.C. § 78s(e)(1)(A); *see, e.g.*, *Application of Scottsdale Capital Advisors Corp. for Review of Action Taken by FINRA*, Exchange Act Release No. 93052, 2021 WL 4242630, at *7 (Sept. 27, 2021). In conducting that independent review, the SEC may consider any matter that it deems material, whether or not raised by the parties, and it may allow the submission of evidence not presented before the self-regulatory organization. 15 U.S.C. § 78s(e)(1); 17 C.F.R. §§ 201.421(b), 201.452.

The SEC may "affirm," "modify," or "set aside" the self-regulatory organization's disciplinary sanction, 15 U.S.C. § 78s(e)(1), as the SEC "deems appropriate," *NASD v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2005). The SEC's power to modify a disciplinary sanction includes the power to "cancel, reduce, or require the remission" of any sanction that, in the SEC's view, is "excessive." 15 U.S.C. § 78s(e)(2). In considering what action to take with respect to a disciplinary sanction, the statute

requires the SEC to take "due regard for the public interest and the protection of investors" and to guard against "any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." *Id.*

A person aggrieved by the SEC's final order regarding the self-regulatory organization's internal disciplinary decision may seek judicial review in the appropriate court of appeals. 15 U.S.C. § 78y(a)(1). Self-regulatory organizations cannot go to court to seek enforcement of an internal disciplinary sanction, regardless of whether the sanction was reviewed by the SEC and the courts. *Fiero v. FINRA*, 660 F.3d 569, 575 (2d Cir. 2011).

In addition to supervising the manner in which self-regulatory organizations discipline their own members, the SEC may also directly initiate its own proceedings against broker-dealers. 15 U.S.C. § 78u. The SEC may investigate a broker-dealer's violation of the securities statutes or SEC regulations, or the rules of any self-regulatory organization that the SEC has reviewed and approved or permitted. *Id.* § 78u(a)(1). And, if the SEC determines that doing so is "necessary or appropriate in the public interest," *id.* § 78u(f), the SEC may bring an

action in district court seeking an injunction against such violations, disgorgement, and other equitable relief, *id.* § 78u(d)(1), (5), (7). The SEC may also suspend or expel any member of a registered exchange or securities association. *Id.* § 78s(h)(2).

### B. Facts And Prior Proceedings

**1. a.** FINRA is a "Delaware not-for-profit corporation" registered with the SEC as a self-regulatory organization. JA18. Under the SEC's supervision, FINRA has established rules for its broker-dealer members. *See generally* FINRA, *FINRA Rules*, https://www.finra.org/rules-guidance/rulebooks/finra-rules (last visited Oct. 26, 2023) (FINRA Rules). Among other things, FINRA's rules: (i) require that all members "observe high standards of commercial honor and just and equitable principles of trade"; (ii) prohibit members from making "improper use of a customer's securities or funds"; and (iii) require that all charges, prices, and commissions shall be "fair" and "reasonable." FINRA Rules 2010, 2121, 2122, 2150.

**b.** Plaintiff Alpine Securities Corp. is a securities broker-dealer and a member of FINRA. JA18. In 2022, an internal FINRA disciplinary panel "comprised of those experienced in the industry,"

*Cody v. SEC*, 693 F.3d 251, 258 (1st Cir. 2012); *see* FINRA Rule 9231(b), determined that Alpine had engaged in "intentional and egregious" misconduct in violation of FINRA rules, JA240, including by "improperly taking customer funds and securities," "misappropriating customer positions," "moving customer securities from customer accounts to the firm's proprietary accounts," "selling hundreds of customers' positions to itself for one penny per position," and charging customers "unreasonable" fees, JA245 (finding violations of FINRA Rules 2010, 2121, 2122, 2150, and 4110(c)).

Noting that "the violations in this case are amongst the most egregious in the securities industry," JA241, the disciplinary panel determined that, if the panel's decision were to become the final disciplinary decision of FINRA, Alpine would be expelled from FINRA membership and required to pay restitution, JA241-43. Emphasizing the "significant" "risk of future violations," the disciplinary panel further required Alpine to "cease and desist" from engaging in certain conduct that violated FINRA's rules. JA244; *see* JA246-48.

Alpine sought further review with FINRA's internal disciplinary review body, JA252, *see* FINRA Rule 9311, and that review is pending

as of the date of this filing. The request for further review automatically stayed many of the disciplinary sanctions ordered by the panel, such as expulsion and restitution, but it did not stay the effect of the cease-and-desist order. *See* FINRA Rules 9268(e), (f), 9311(b). Under FINRA's rules, the cease-and-desist order, once issued by the disciplinary panel, "constitute[d] final and immediately effective disciplinary sanctions imposed by FINRA." FINRA Rule 9870. The sanction was thus subject to immediate SEC review, and the SEC could, in its discretion, stay the sanction pending review. FINRA Rule 9870; 17 C.F.R. §§ 240.19d-1(c)(1), 240.19d-2, 240.19d-3. Alpine did not seek SEC review of that final cease-and-desist sanction or request that SEC stay that sanction pending review.

While further FINRA review of the initial disciplinary decision was ongoing, FINRA discovered that Alpine was continuing to engage in the conduct that was the basis for the unstayed cease-and-desist sanction. JA251. FINRA initiated a new, expedited disciplinary process that applies to those who "fail[] to comply" with a "permanent cease and desist order," FINRA Rule 9556(h), seeking restitution for the ongoing violations and an order expelling Alpine from FINRA membership,

JA265. Under FINRA's rules, a disciplinary hearing officer would hear that application on an expedited timeframe and issue a decision. That decision would "constitute final FINRA action," FINRA Rule 9559(o)(5), unless FINRA's internal review body chose to review the hearing officer's decision, in which case the review body's decision would "constitute final FINRA action," FINRA Rule 9559(q)(4). Either way, the SEC would be able to review—and, in its discretion, stay pending review—any final disciplinary action resulting from the expedited proceeding, including any order expelling Alpine from membership in FINRA. FINRA Rule 9559(r); 17 C.F.R. §§ 240.19d-1(c)(1), 240.19d-2, 240.19d-3.

**2. a.** While that FINRA proceeding was pending, Alpine filed this action against FINRA in federal district court, challenging what Alpine contends is "the unconstitutional operation and structure of FINRA." JA13. As relevant here, Alpine presented two "alternative" claims, Br. 38: (1) The Exchange Act violates the private-nondelegation doctrine by assigning FINRA, a private entity, a role under the Exchange Act without making FINRA subordinate to the government; and (2) FINRA's executives and directors must be appointed and removable

as if they were part of the government in a manner that complies with the Appointments Clause and Article II. *See* Br. 12-13, 38-53. The United States intervened to defend the constitutionality of the challenged federal securities laws. JA4; 28 U.S.C. § 2403(a).[1]

**b.** Alpine moved for a preliminary injunction to prevent FINRA from continuing its expedited disciplinary proceeding against Alpine for violation of the cease-and-desist order. JA395. The district court denied preliminary relief, concluding that Alpine had "fall[en] far short" of establishing a likelihood of success on any of its claims and that the balance of the equities tipped heavily against the extraordinary relief Alpine sought. JA399.

The district court explained that the Supreme Court and this Court have established that Congress may properly involve private entities in a statutory scheme so long as the government "exercises authority and surveillance over the private actor and law-making remains in the hands of the agency." JA408 (cleaned up). The securities statutes satisfy that standard because FINRA "is subordinate to the

[1] Alpine's complaint also raised First, Fifth, and Seventh Amendment claims, JA49-52, but Alpine does not discuss those claims in its opening brief.

SEC's ultimate control and oversight." JA408. The court emphasized that the SEC can approve, disapprove, or modify FINRA's rules and that FINRA's disciplinary decisions are "subject to *de novo* and *sua sponte* review by the SEC." JA408. The court thus concurred with the judgment of "every court to consider the issue" and held that the Exchange Act comports with the private-nondelegation doctrine. JA408-09 (collecting cases).

The district court also rejected Alpine's Article II appointment and removal claims. The court recognized that FINRA is a "private organization incorporated under the laws of Delaware," that FINRA was not created by Congress or the SEC, and that "[n]o government entity … plays any role in the selection of its board members or officers, and those individuals are in no way characterized as governmental officers." JA402-03. The court thus held that FINRA's private corporate officers and directors are officers of FINRA, not Officers of the United States subject to Article II appointment and removal. JA407.

**3.** Alpine appealed the denial of its request for a preliminary injunction to this Court and sought an injunction pending appeal. A divided motions panel issued a per curiam, unpublished order

summarily granting the motion and enjoining FINRA "from continuing the expedited enforcement proceeding against [Alpine] pending further order of the court." JA417. Judge Garcia indicated that he would have denied the motion. JA417.

Judge Walker issued a statement concurring in the order. JA419-23. He expressed the preliminary view at that "early stage" of the proceedings that Alpine had "raised a serious argument" that people deciding disciplinary matters within FINRA are Officers of the United States subject to Article II appointment and removal requirements. JA420-21. Judge Walker recognized that FINRA's disciplinary decisionmakers are in fact employees of a "private corporation," but he expressed his tentative view that that "[p]robably" did not "make a difference" because FINRA's disciplinary activities are "controlled by the government." JA422. Judge Walker explained his view, based on the limited briefing at the motions stage, that "[a]nyone who wields significant executive power must be an Officer of the United States." JA420 (cleaned up). He noted, however, that "further briefing and argument might convince me that my current view is unfounded." JA420 (quotation marks omitted).

## SUMMARY OF ARGUMENT

It has been established for nearly a century that a private entity may play an important role in a statutory scheme if it "function[s] subordinately" to a public agency with "authority and surveillance" over it. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). FINRA conducts its traditional self-regulatory functions subordinate to the SEC consistent with constitutional requirements, as every court of appeals to have addressed the issue has correctly concluded.

Alpine makes virtually no attempt to address governing nondelegation principles, citing neither *Adkins* nor the decisions applying *Adkins* to the self-regulatory organizations that are subject to SEC oversight. To the extent that Alpine makes a nondelegation argument, it incorrectly asserts that FINRA could "unilaterally" expel Alpine from membership "before the SEC has any chance for meaningful review." Br. 40. Any final disciplinary sanction expelling Alpine from FINRA will be subject to the SEC's plenary review and can be stayed by the SEC pending such review. 15 U.S.C. § 78s(d)(2); 17 C.F.R. §§ 201.401(d), 240.19d-2. Indeed, just a few years ago, the SEC

stayed a previous suspension order against Alpine itself, pending the Commission's plenary review.

Rather than engage with applicable principles, Alpine instead attempts to rely on inapposite doctrines that, if transplanted to this context, would effectively nullify the private-nondelegation doctrine. Alpine urges that FINRA hearing officers exercise authority over FINRA's disciplinary proceedings that is analogous to the Commission's administrative law judges' authority over SEC proceedings; because SEC administrative law judges are inferior officers, Alpine argues, the authority exercised by FINRA's hearing officers over FINRA proceedings can be exercised only by a properly appointed federal officer.

That argument is wrong in all respects. A private entity may carry out certain responsibilities in a federal statutory scheme—even significant responsibilities—where, as here, the private entity "function[s] subordinately" to a public agency. *Adkins*, 310 U.S. at 399. And because FINRA is subordinate to the Commission in all relevant respects, the role of a FINRA hearing officer in considering disciplinary actions against FINRA members cannot be equated with that of the

Commissioners or the SEC administrative law judges who are subject to the Constitution's structural requirements.

The Appointments Clause and the removal requirements of Article II address the allocation of authority and accountability within the government. In addressing the manner of appointing and removing "Officers of the United States," these requirements advance the "great principle of unity and responsibility in the Executive department." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021) (quoting 1 Annals of Cong. 518 (1789) (Joseph Gales ed. 1834) (statement of James Madison)). But these structural Article II requirements "say[] nothing" about the method of hiring or firing "some *other* type of officer" that is not an officer "*of the United States*." *Financial Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658 (2020) (emphasis added). These requirements thus do not govern how private corporate officers that are not part of the federal government can be hired or fired by their private employers.

FINRA is not part of the government and is not subject to structural constitutional constraints on that basis. In certain narrow circumstances, not present here, when a corporation is created by the

government and has its officers selected by the government, the corporation is "part of the Government" for constitutional purposes. *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995). A corporation that is part of the government is not subject to the private-nondelegation doctrine because it is the government, not a private entity. *See Department of Transp. v. Association of Am. R.Rs.,* 575 U.S. 43, 55 (2015). A governmental corporation is, instead, subject to the same structural constitutional requirements of appointment and removal that apply to the rest of the government. *See id*. at 46, 55-56. Because FINRA was not created by the government and its officers are not selected by the government, it is not part of the government. Alpine omits any mention of this governing test and makes no argument that FINRA is actually part of the government under *Lebron*.

Further highlighting the extent to which it has departed from the controlling analysis, Alpine invokes the state-action doctrine under which, in rare circumstances, a specific action by a private entity may be attributed to the federal government. Even when that doctrine is applicable, which it is not here, no court has ever suggested that the private entity at issue, whose action is attributable to the government

for a certain purpose, must then also become part of the government itself by having its private corporate officers replaced by government appointees responsible to the President.

## STANDARD OF REVIEW

In reviewing the denial of a preliminary injunction, this Court reviews de novo the questions of law relevant to a plaintiff's likelihood of success on the merits. *Abdullah v. Obama*, 753 F.3d 193, 197-98 (D.C. Cir. 2014).

## ARGUMENT

### ALPINE IS UNLIKELY TO PREVAIL ON THE MERITS.

#### A. The SEC's Supervision Of FINRA, A Private Corporation, Satisfies Private-Nondelegation Principles.

##### 1. A private entity can properly play a role under a federal statute if it functions subordinately to a public agency.

For nearly 100 years, the Supreme Court and the courts of appeals have recognized that "a private entity may aid a public federal entity that retains authority" over it. *Oklahoma v. United States*, 62 F.4th 221, 228-29 (6th Cir. 2023), *cert. pet. filed* (Oct. 17, 2023) (No. 23-402). The Supreme Court first applied these principles to the federal government in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). There,

the Court held unlawful a federal statute that allowed the producers of two-thirds of the coal in any given district to set wages and hours for all the producers in that district, unconstrained by review by any public agency. *Id.* at 281-84.

In response, Congress enacted a new statute under which local boards consisting of private coal producers chosen by the producers in a district would be organized under the Bituminous Coal Code and would "operate as an aid to the [National Bituminous Coal] Commission but subject to its pervasive surveillance and authority." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). The Coal Commission was "empowered to fix minimum prices" following a procedure in which the private boards would "propose minimum prices," which "may be approved, disapproved, or modified by the [Coal] Commission." *Id.* Addressing the new law, the Supreme Court held the statute "unquestionably valid" because "members of the [private boards] function subordinately to the [governmental] Commission." *Id.* at 399. The Commission, "not the [private boards], determines the prices" and "has authority and surveillance over the activities" of the private boards. *Id.*

This Court has similarly explained, in a series of opinions addressing authority vested jointly in Amtrak and the Federal Railroad Administration, that "a private party" cannot "stand on equal footing with a government agency" in helping to administer a statute. *Association of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 n.5 (D.C. Cir. 2013), *vacated and remanded on other grounds*, 575 U.S. 43 (2015). But a private entity may, consistent with the Constitution, "function subordinately" to a public agency, *id.* at 674 (quoting *Adkins*, 310 U.S. at 399), in a manner that allows the public agency to "hold the line against overreaching," *Association of Am. R.Rs. v. U.S. Dep't of Transp.*, 821 F.3d 19, 34 n.4 (D.C. Cir. 2016). The public agency must be empowered to provide a "check" against private self-interest and "protect the 'public good.'" *Association of Am. R.Rs. v. U.S. Dep't of Transp.*, 896 F.3d 539, 545 (D.C. Cir. 2018).

**2. The Exchange Act subordinates FINRA's traditional self-regulatory activities to SEC supervision.**

Like the private coal boards in *Adkins*, FINRA "function[s] subordinately" to a public agency, the SEC, which exercises "authority and surveillance" over that private entity. *Adkins*, 310 U.S. at 399. In

the Exchange Act, Congress did not displace the longstanding historical "tradition[]" in the securities industry of private associations establishing and enforcing their own rules. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127-28 (1973). Congress instead gave the SEC "pervasive supervisory authority" over specified activities of FINRA, the exchanges, and the other self-regulatory organizations in order to protect "the public interest." *United States v. NASD*, 422 U.S. 694, 732-33 (1975).

Thus, although FINRA may "propose[] rule[s]" to govern its members, in general, "[n]o proposed rule" may "take effect unless" it has been approved by the SEC after public notice and comment. 15 U.S.C. § 78s(b)(1). The SEC generally may approve a proposed FINRA rule only if the SEC finds, in its own judgment, that the proposed rule is "consistent with the requirements of" the Exchange Act and SEC regulations. *Id.* § 78s(b)(2)(C). The SEC may also initiate its own rulemaking to "abrogate, add to, and delete from" any FINRA rule as the SEC "deems necessary" to further the purposes of the statute. *Id.* § 78s(c). The SEC also ensures that FINRA complies with the statutory requirements to be registered as a self-regulatory organization and may

suspend its registration or limit its activities if appropriate. *Id.* §§ 78s(h)(1), 78o-3(b).

The SEC also exercises supervisory authority over FINRA's internal disciplinary decisions. FINRA's rules addressing the manner in which it investigates and disciplines its members for violating the rules are—like all other FINRA rules—subject to the SEC's approval and amendment. *See* 15 U.S.C. § 78s(b)(1), (c). And any final determination by FINRA to discipline a member is subject to the SEC's plenary review. *See id.* § 78s(e).

The SEC thus "oversees both [FINRA's] rulemaking and [its] enforcement," *Oklahoma*, 62 F.4th at 229, using its "pervasive supervisory authority," *NASD*, 422 U.S. at 733. For these reasons, every court to consider the question has rejected private-nondelegation challenges to this statutory scheme. Applying *Adkins*, the courts have uniformly recognized that Congress did not "unconstitutionally delegate[] power" to private self-regulatory organizations (there, FINRA's predecessor, NASD) because the SEC has the power "to approve or disapprove [its] Rules" and to "review … any disciplinary action" after initial adjudication by the self-regulatory organization.

*R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *see also, e.g.*, *Todd & Co. v. SEC*, 557 F.2d 1008, 1012-13 (3d Cir. 1977) (same); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979) (same); *Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982) (same).

As the Sixth Circuit explained in the course of upholding a statutory scheme involving self-regulation in the horseracing industry, which was modeled on the provisions of the securities statutes at issue here, "[i]n case after case," courts of appeals have rejected challenges to the SEC-FINRA relationship, concluding that private self-regulatory organizations are "permissible aides and advisors" to the SEC. *Oklahoma*, 62 F.4th at 229. And as the Fifth Circuit observed in reviewing the horseracing scheme, "although FINRA plays an important role in formulating securities industry rules, its role is ultimately 'in aid of' the SEC, which has the final word." *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 887 (5th Cir. 2022) (quoting *Adkins*, 310 U.S. at 388).

This Court has not yet had occasion to review the issue presented here, but it has analyzed and endorsed the opinions of the courts of appeals that uniformly hold that the relationship between FINRA and

the SEC satisfies private-nondelegation principles. For example, in the Amtrak litigation discussed above, the Court's first opinion assumed that Amtrak was not a governmental entity. On that premise, the Court concluded that a statutory procedure for promulgating certain rules for railroads gave power to Amtrak without adequate government supervision, in violation of the private-nondelegation doctrine. In the course of so holding, this Court distinguished the court of appeals cases upholding the SEC-FINRA relationship, on which the government had relied. *Association of Am. R.Rs.*, 721 F.3d at 671 n.5. This Court explained that the SEC-FINRA cases "resemble *Adkins*" in light of the SEC's supervisory powers and "[i]n none of these cases did a private party stand on equal footing with a government agency." *Id.*

### 3. Alpine fails to address nondelegation caselaw and fails to recognize that the SEC can review any FINRA disciplinary decision.

Alpine is thus very much mistaken when it insists that "[t]he Constitution does not permit" the functions performed by FINRA to be done by a "purportedly private organization." Br. 4-5; *see also* Br. 13 (asserting that the government cannot "outsource to a purportedly private entity"). A private organization may perform such functions

where, as here, a public agency's authority and supervision over the private organization falls within the parameters established by the Supreme Court and the courts of appeals—parameters that Alpine largely fails to acknowledge or address.

Alpine argues that "outsourcing," Br. 5, the functions performed by FINRA to a "private party," Br. 18, undermines "democratic accountability" in the government, Br. 3-4, 19, 39, and for that reason must be prohibited by "constitutional first principles," Br. 15, 21. But the private-nondelegation doctrine addresses precisely that concern and ensures democratic accountability, as it has for nearly 100 years.

As this Court has recognized when applying the private-nondelegation doctrine, "delegating the government's powers to private parties" without adequate governmental supervision "saps our political system of democratic accountability" by allowing the government to "deflect blame for unpopular policies by attributing them to the choices of a private entity." *Association of Am. R.Rs.*, 721 F.3d at 675. The Supreme Court has thus crafted the private-nondelegation doctrine in such a manner as to "set its face against giving public power to private

bodies" that are "not accountable to the people." *Black*, 53 F.4th at 872-73, 880.

The private-nondelegation doctrine ensures democratic accountability by requiring that private entities that play a role in a federal statutory scheme "function subordinately" to a public agency with "authority and surveillance" over them. *Adkins*, 310 U.S. at 399. As the Supreme Court has explained, the doctrine safeguards the "public interest" by ensuring that the last word in a statutory scheme "is not entrusted to the industry" but rather is placed "in the hands of [Congress's] administrative representative." *Id*. at 396, 399. The doctrine ensures that statutes do not "g[i]ve to" the decision of private entities "the effect of law." *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 531 (1917). In this way, the doctrine protects "representative government" by precluding Congress from "transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable." *Oklahoma*, 62 F.4th at 228.

Alpine does not dispute that, under *Adkins* (which it fails to cite), a private entity can play an important role in a federal statutory scheme so long as the private entity functions subordinately to a public

agency. Insofar as Alpine addresses the private-nondelegation doctrine at all, it asserts that FINRA may "unilaterally" expel Alpine from membership without "any chance for meaningful [SEC] review." Br. 39-40. Alpine is mistaken.

As this Court has explained, the Exchange Act "provides the Commission with plenary review powers" over disciplinary sanctions. *NASD v. SEC*, 431 F.3d 803, 806 (D.C. Cir. 2005). The SEC may initiate such review either "on its own motion" or on petition by an aggrieved party. 15 U.S.C. § 78s(d)(2). In conducting that review, the SEC is empowered to consider additional evidence and arguments not presented before FINRA, may "fully revisit[] the issue of liability," and may affirm, set aside, or reduce FINRA's decision "as it deems appropriate." *NASD v. SEC*, 431 F.3d at 806.

The securities statutes and regulations make clear that there is no basis for Alpine's argument that FINRA could expel Alpine from membership "*before* the SEC can undertake any fresh review." Br. 40 (quotation marks omitted). An aggrieved party seeking SEC review of a final disciplinary sanction may request that the SEC stay any final sanction pending its review. 15 U.S.C. § 78s(d)(2); 17 C.F.R.

§§ 201.401(d), 240.19d-2. The SEC is also empowered to stay any sanction on its own initiative, even if the aggrieved party has not sought a stay. 17 C.F.R. § 201.401(a). The SEC may issue a stay "summarily," without any need to notify FINRA or provide an opportunity for FINRA to contest the issuance of the stay. 15 U.S.C. § 78s(d)(2); 17 C.F.R. § 201.401(d)(2). Using that authority, the SEC may also issue an interim stay while it considers a stay request. Even if the SEC chooses to permit briefing on the issue of a stay rather than issue a stay summarily, the impact of a sanction is minimized by an SEC rule specifying that "the consideration of and decision on the motion for a stay shall be expedited in every way," and any opposition must be filed "within two days of service of the motion" to stay, unless the SEC specifies otherwise. 17 C.F.R. § 201.401(d)(3).

Indeed, Alpine itself has previously sought—and obtained—an SEC stay of suspension from FINRA membership. Following a determination by FINRA that Alpine should be suspended from membership in 2019, Alpine "sought relief from FINRA's decision … the day after it was issued." *Application of Alpine Sec. Corp. & Scottsdale Capital Advisors Corp. for Review of Action Taken by FINRA*, Exchange

Act Release No. 86719, 2019 WL 3933691, at *1 (Aug. 20, 2019). Without waiting for FINRA's response to Alpine's stay request, the SEC determined that it was "appropriate to issue an interim stay to preserve the status quo to allow for consideration of [Alpine's] stay motion." *Id.*

Alpine's brief on appeal fails to acknowledge that the SEC has given it the precise relief in the recent past that it now incorrectly asserts would be unavailable if the FINRA disciplinary proceeding at issue here were to continue and reach a conclusion unfavorable to Alpine. *See also Application of Alpine Sec. Corp. for Review of Action Taken by FINRA*, Exchange Act Release No. 97347, 2023 WL 3038922, at *2 (Apr. 21, 2023) (explaining in another proceeding that Alpine "could have sought an interim stay—as it has done in other proceedings—to preserve the status quo while the Commission considered its stay motion and application for review" but that Alpine "did not do so").[2]

---

[2] Alpine also appears to assert that the private-nondelegation doctrine requires the SEC to pre-authorize all FINRA disciplinary proceedings before they even begin. Br. 40. That single-sentence assertion, made without elaboration or citation, is forfeited. *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019). It also fails on the merits. Every court that has upheld the SEC-FINRA relationship has done so

*Continued on next page.*

### B. Standards Governing The Appointment And Removal Of Federal Officials Do Not Guide The Private-Nondelegation Inquiry.

Alpine makes no serious attempt to argue that the Maloney Act fails to pass muster under the private-nondelegation standards established by the Supreme Court and the courts of appeals. Indeed, it cites neither *Adkins* nor the courts of appeals decisions rejecting private-nondelegation challenges to FINRA.

Alpine nevertheless urges that FINRA should be subject to structural constitutional requirements applicable to the government itself for three primary reasons. First, Alpine urges that FINRA's hearing officers exercise significant authority over FINRA disciplinary proceedings that can only be exercised by a properly appointed officer of the federal government. Second, it argues that FINRA's self-disciplinary proceedings are governmental in nature and carry the force

---

because the SEC reviews final disciplinary sanctions. *See supra* pp. 32-33. The Constitution does not require government approval before a private organization can decide for itself whether to even try to discipline a member. In any event, the statute empowers the SEC to create rules for FINRA as the SEC deems appropriate. 15 U.S.C. § 78s(c). It thereby "gives the [SEC] the tools to step in" and disallow any disciplinary activity at the outset, if the SEC so desires. *Oklahoma*, 62 F.4th at 231.

of law. Third, it argues that the actions of FINRA's hearing officers are attributable to the SEC under the state-action doctrine. Alpine misunderstands the nature of these doctrines and their interaction with the principles under which private entities that are not part of the federal government may function subordinately to public agencies.

#### 1. FINRA is not part of the government, and its private executives are not subject to Article II appointment and removal.

Alpine argues that the Court should apply constitutional requirements concerning the appointment and removal of federal governmental officers to private corporate officers that perform traditional self-regulatory functions subordinate to the government, consistent with the private-nondelegation principles. That argument misperceives the scope and purpose of Article II appointment and removal requirements, which preserve lines of authority and accountability within governmental entities. These structural constitutional principles have no application to private entities that are not part of the government, whose accountability to the government is ensured by the private-nondelegation doctrine. Alpine's argument would effectively nullify the private-nondelegation doctrine, the premise

of which is that *private* entities may permissibly "aid a public federal entity that retains authority over the implementation of federal law." *Oklahoma*, 62 F.4th at 228-29.

**a.** The Appointments Clause and Article II's removal requirement do not address delegation to private entities that are not part of the government. Rather, as the Supreme Court has explained, these structural constitutional requirements ensure popular "control on the government" by "preserv[ing]" a "chain of dependence" in which "'the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 498, 501 (2010) (first quoting The Federalist No. 51, at 349 (James Madison) and then quoting 1 Annals of Cong. 518 (James Madison)). Article II thus "makes a single President responsible for the actions of the Executive Branch," *id.* at 496-97 (quotation marks omitted), and ensures that "the Executive Branch" does not "slip from the Executive's control," *id.* at 499.

"[T]he separation-of-powers concept embedded in the Appointments Clause" is thus "structural and political." *Freytag v.*

*Commissioner*, 501 U.S. 868, 878 (1991). The Clause "limits the universe of eligible recipients of the power to appoint" Officers of the United States to a discrete group of defined people within the government. *Id*. at 880; *see* U.S. Const. art. II, § 2, cl. 2. Doing so "helps to ensure that those who wield[]" the appointments power are "accountable to political force and the will of the people": "[t]he blame of a bad nomination would fall upon the president singly and absolutely, while [t]he censure of rejecting a good one would lie entirely at the door of the senate." *Financial Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020) (last alteration in original) (quotation marks omitted). The "lines of accountability demanded by the Appointments Clause" thereby ensure that "the President is ultimately responsible" for "[t]he activities of executive officers." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1982 (2021).

The President's Article II removal authority works toward the same end. The power of removing "executive officers" is generally "incident to the power of appointment." *Myers v. United States*, 272 U.S. 52, 119 (1926). "[T]hose in charge of and responsible for administering functions of government, who select their executive subordinates, need

in meeting their responsibility to have the power to remove those whom they appoint." *Id.* Just as the President's "selection of administrative officers is essential to the execution of the laws by him, so must be his power of removing those for whom he cannot continue to be responsible." *Id.* at 117. Preventing the diffusion of the removal power thus prevents the "diffusion of accountability" within the government by preserving a "clear and effective chain of command." *Free Enter. Fund*, 561 U.S. at 497-98.

These structural constitutional requirements create clear lines of accountability within the government by regulating the appointment and removal of "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. As the Supreme Court has explained, these structural provisions are concerned with the President's "executive subordinates," *Myers*, 272 U.S. at 117, "officers of … an agency," *Free Enter. Fund*, 561 U.S. at 497, "the Government's workforce," *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018), "governmental structures," *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2207 (2020), and the "great principle of unity and responsibility in the Executive department," *Arthrex*, 141 S. Ct. at 1979 (quoting 1 Annals of Cong. 518). By the same token, as the

Supreme Court has explained, these structural Article II requirements "say[] nothing" about the method of hiring or firing "some *other* type of officer" that is not an officer "*of the United States*." *Aurelius*, 140 S. Ct. at 1658 (emphasis added).

**b.** FINRA is not "part of the Government." *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995). Its private corporate officers are thus not subject to the structural constitutional requirements of Article II appointment and removal. *See Department of Transp. v. Association of Am. R.Rs.,* 575 U.S. 43, 55 (2015); *Free Enter. Fund*, 561 U.S. at 485-86.

**i.** The Supreme Court set forth the test for determining whether a corporation is part of the government in *Lebron*. There, the Court held that Amtrak, although a corporation, was "part of the Government for purposes of the First Amendment." *Lebron*, 513 U.S. at 399. The Court explained that this was so because the federal government "create[d]" Amtrak "by special law" and "retain[ed] for itself permanent authority to appoint a majority of the directors of that corporation." *Id.*

This Court has held that "*Lebron* sets forth a three-part standard" and that all three parts of the test must be established for a corporation

to be "part of the government for constitutional purposes." *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017). A corporation is "part of the Government" when: "(1) the Government creates the corporation by special law, (2) for the furtherance of governmental objectives, and (3) retains for itself permanent authority to appoint a majority of the directors of that corporation." *Id.* (cleaned up). Otherwise, a corporation is a private entity, not part of the government.

This test draws the line between government entities and private enterprises not only for purposes of First Amendment claims, as in *Lebron* itself, but also more generally for the structural constitutional claims at issue here. The Supreme Court's decision in *Free Enterprise Fund*, 561 U.S. 477, accordingly applied the *Lebron* analysis in considering the status of the Public Company Accounting Oversight Board for purposes of Article II's removal requirements. The Court recognized that the accounting board was "modeled on" the "private self-regulatory organizations in the securities industry," such as FINRA and the New York Stock Exchange, that "investigate and discipline their own members subject to Commission oversight." *Id.* at 484. But the Court stressed that there was a critical difference between the

Board and these other entities: "[u]nlike the self-regulatory organizations," the Supreme Court emphasized, the accounting Board "is a Government-created, Government-appointed entity." *Id.* at 485; *see* 15 U.S.C. § 7211(a), (e)(4) (establishing by statute the "Public Company Accounting Oversight Board," prescribing its functions, and providing for the SEC to appoint its members).

On that basis, and citing *Lebron*, the Supreme Court in *Free Enterprise Fund* accepted the parties' shared view that the accounting Board is "part of the Government for constitutional purposes," and thus that its "members are Officers of the United States" to whom Article II's removal requirements apply. 561 U.S. at 485-86 (quotation marks omitted). The Supreme Court described the Board as "an agency" and part of "the Executive Branch." *Id.* at 497 (quotation marks omitted). And it distinguished the government-created, government-appointed Board from "private organizations like the New York Stock Exchange" and other "private bodies" that are assigned subordinate roles in federal regulatory schemes and are not part of the government. *Id.* at 503.

The Supreme Court's analysis, in this respect, echoed that of then-Judge Kavanaugh, dissenting from this Court's resolution of *Free*

*Enterprise Fund* prior to Supreme Court review. Judge Kavanaugh's dissent cited *Lebron* for the proposition that, while the removal requirements do not apply to "a *private* organization," they do apply to "an Executive Branch entity" such as the Board. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 713 n.28 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

The Fourth Circuit applied the same analysis in the course of rejecting an Appointments Clause challenge to a metropolitan airport authority. "Applying the standard from *Lebron*," the court held that the authority was not a "federal entity" because it was not "created by the federal government" and its board did not consist of "federal government appointees." *Kerpen v. Metropolitan Washington Airport Auth.*, 907 F.3d 152, 158-59 (4th Cir. 2018). And, applying *Lebron* and *Free Enterprise Fund,* the Fifth Circuit reached the same conclusion in rejecting contentions that Nasdaq, a private exchange supervised by the SEC under the Exchange Act, is a government entity. *Alliance for Fair Bd. Recruitment v. SEC*, -- F.4th --, 2023 WL 6862856, at *6 (5th Cir. Oct. 18, 2023).

The Supreme Court applied the same principles in *Department of Transportation*, 575 U.S. 43, to determine which doctrine—private nondelegation or the Appointments Clause—applied to Amtrak. In that case, this Court had taken Amtrak to be a *private* entity for purposes of a private-nondelegation claim and determined that a particular provision of a statute was unconstitutional under that doctrine. *Id.* at 50. Reversing, the Supreme Court explained that *Lebron* governed whether "Amtrak is a governmental entity" or "a private one" for "purposes of determining the constitutional issues presented in this case." *Id.* at 55. Because Amtrak was part of the government under *Lebron*, the Supreme Court explained, it was not subject to the private-nondelegation doctrine. *Id.* And precisely because Amtrak was a "governmental entity," the Court recognized that questions arose "implicating the Constitution's structural separation of powers and the Appointments Clause," which the Court directed this Court to address on remand. *Id.* at 46; *see Association of Am. R.Rs.*, 821 F.3d at 37 (explaining on remand that an arbitrator who was also given authority under the scheme was "*[e]ither* … a private individual" subject to the

private-nondelegation doctrine "*or*" a "public official" potentially subject to "the Appointments Clause" (emphasis added)).

The Supreme Court further confirmed in *Aurelius* that *Lebron* supplies the line between government-created, government-appointed entities that are part of the government and private corporations that are not part of the government. There the Supreme Court held that the members of a Puerto Rican financial oversight board were not subject to the Appointments Clause because they were not officers "of the United States." *Aurelius*, 140 S. Ct. at 1658. The Court explained that *Lebron* provided the threshold test for determining whether an organization is a "governmental or a private entity" for purposes of the Clause. *Id.* at 1663. And the Court recognized that the oversight board was "a Government entity" under *Lebron* because Congress "create[d] the Board" and its members were federal "appointee[s]." *Id.* at 1663-64. But the Court concluded that the board members were nonetheless not subject to the Appointments Clause because of another threshold issue (not relevant here): they were governmental officers of a territorial government with primarily local responsibilities rather than officers of the federal government. *Id.*

**ii.** Under these precedents, FINRA is a private corporation, not part of the government, and its private corporate officers are not subject to Article II appointment and removal.

The federal government did not create FINRA. "FINRA is a private organization incorporated under the laws of Delaware; neither an act of Congress nor the SEC created FINRA." JA402; *see supra* pp. 9-10 (recounting the history of the incorporation, by private incorporators, of FINRA and its predecessors). And the government has no power to appoint any of FINRA's directors or other corporate officers. *See* 15 U.S.C. § 78s; FINRA, FINRA By-Laws art. VII, § 13 (2007), https://perma.cc/EZ8L-5GJ2 (FINRA by-law providing that its board is elected by its private members). For that reason, FINRA is not "part of the Government" under *Lebron*. 513 U.S. at 399. Indeed, Alpine, which cites *Lebron*, does not dispute that conclusion.

As a private corporation that performs traditional self-regulatory functions subject to the SEC's authority and supervision, FINRA is subject to (and satisfies) the private-nondelegation doctrine. *See supra* Part A. By the same token, because FINRA is not part of the government it is not subject to the structural constitutional

requirements of appointment and removal, under *Department of Transportation* and *Free Enterprise Fund*.

#### 2. Alpine misunderstands FINRA's role and incorrectly equates industry self-discipline with regulation by a public agency.

Alpine urges that distinguishing between the government and private entities in the application of these structural constitutional provisions is "not even formalism—it is *labelism*." Br. 19. But the important differences between the government and private entities, and the separate doctrines that apply to each, is not a question of labels. As explained above, Alpine misunderstands the fundamental differences in the scope and purpose of nondelegation principles (which ensure accountability of private entities to the government) and structural Appointments Clause and removal requirements (which ensure clear lines of authority within governmental entities). And Alpine fails to recognize that the private officials of a private self-regulatory entity that functions subordinately to the SEC do not wield the type of governmental power exercised by the SEC and its governmental officers.

**a.** Alpine urges that the functions that a FINRA hearing officer performs within FINRA's internal disciplinary proceedings are analogous to those performed by the SEC itself and its administrative law judges, who must be appointed consistent with the Appointments Clause. From this premise, Alpine infers that allowing FINRA hearing officers to perform those internal self-disciplinary functions must be impermissible unless those FINRA hearing officers are appointed and removable as if they were governmental officers. That attempt to analogize the role of FINRA hearing officers to SEC administrative law judges is mistaken.

The Supreme Court in *Lucia* explained that in "distinguishing between officers and employees" of the federal government, the Court has asked whether an individual occupies "a 'continuing' position established by law" and whether the individual exercises "significant authority pursuant to the laws of the United States." 138 S. Ct. at 2051 (quotation marks omitted). Applying that framework to SEC administrative law judges, the Court in *Lucia* held that they were "Officers of the United States" within the meaning of the Appointments Clause in light of their continuing appointment "to a position created by

statute" and the significant authority they exercised in SEC administrative proceedings that would not exist but for public law. *Id.* at 2052-54.

Alpine urges (Br. 44-46) that, because FINRA's hearing officers perform "significant" functions within the framework of FINRA's internal disciplinary proceedings, they must also be "Officers of the United States" under *Lucia.* In his concurrence in the motion panel's decision granting an injunction pending appeal, Judge Walker also expressed the tentative view that FINRA hearing officers must be appointed consistent with the Appointments Clause because they "exercise[] significant authority." JA421 (quoting *Lucia*, 138 S. Ct. at 2051).

That argument disregards a necessary premise of the Supreme Court's analysis in *Lucia*: that the SEC administrative law judges at issue were government officials. For those within "the Government's workforce" and to whom the Appointments Clause could therefore potentially apply, such as SEC's administrative law judges, the degree of authority a government official possesses is relevant to deciding whether the government official is an "Officer of the United States" or a

"lesser functionar[y] in the Government's workforce." *Lucia*, 138 S. Ct. at 2051 (quotation marks omitted). The only question before the Supreme Court in *Lucia* was thus whether the scope of the SEC administrative law judges' authority mandated that they be appointed by a head of Department. *Id.* The test for determining who within the federal government must wield the power to appoint other governmental officials is a question distinct from the issues addressed by the private-nondelegation doctrine.

Alpine's argument to the contrary fails to address the Supreme Court's decision in *Aurelius*, 140 S. Ct. 1649. There, the Supreme Court rejected the contention that *Lucia*'s significant-authority test, if satisfied, is sufficient to determine the applicability of the Appointments Clause. The plaintiffs in *Aurelius* argued that the members of the Puerto Rican oversight board "exercise[d] significant authority" pursuant to a federal statute, and the Court recognized that "no one doubts the[] significance" of the oversight board's authority. *Id.* at 1663 (quotation marks omitted). "But we cannot stop there," the Court concluded, because the oversight board's "significant authority" was not the "critical legal test" for whether the Appointments Clause

could apply in the first place in that case. *Id.* (quotation marks omitted). The Court explained that the structural constitutional requirement of Article II appointment applies only to officers of the federal government, not officers of a territorial government with primarily local responsibilities under federal law. *Id.* By the same token, regardless of how significant FINRA hearing officers may be in overseeing FINRA's internal self-regulatory proceedings, they are not subject to the structural constitutional constraints of Article II appointment and removal because FINRA is a private self-regulatory organization subject to SEC oversight, not part of the government.

**b.** That doctrinal conclusion—that SEC Commissioners and administrative law judges are Officers of the United States subject to the Appointments Clause and FINRA's private hearing officers are not—reflects the important differences between the roles they fill and the authority they exercise. FINRA hearing officers conduct initial proceedings regarding the discipline of FINRA members. FINRA's role in conducting that kind of traditional self-regulation is distinct from the SEC's review of, and final authority over, disciplinary sanctions to

ensure that industry self-regulation protects both broker-dealers and the public interest.

As explained above, *see supra* pp. 5-7, private communities of securities brokers and dealers have been creating rules to govern the conduct of their members, and have been conducting proceedings to discipline their members for rule violations by revoking their membership, since the founding of this country. In enacting the Exchange Act and the Maloney Act, Congress chose to preserve "the traditional private governance of exchanges" and securities associations, subject to SEC oversight. *Ware*, 414 U.S. at 127-28.

The securities statutes did not transform self-regulatory organizations into "mini SEC[s]." JA142 (Alpine argument in district court). Self-regulatory organizations continue to perform many of the same self-regulatory functions that they undertook prior to the enactment of the securities statutes. Those statutes shifted final authority from the self-regulatory organizations to the SEC. The securities statutes, for example, removed from the self-regulatory organizations the power they previously had, before the advent of SEC supervision, to seek to use private contractual remedies to give effect to

disciplinary decisions. *See Fiero v. FINRA*, 660 F.3d 569, 575 (2d Cir. 2011).

Most significantly, as discussed above, a FINRA member that is aggrieved by a FINRA disciplinary sanction can seek review of that sanction before the SEC. 15 U.S.C. § 78s(d). In undertaking that review, the SEC exercises its regulatory authority over both the member and the self-regulatory organization itself. *Supervised* self-regulation thus ensures that final decisions by a private entity regarding a private member's conduct are made by the government agency to ensure compliance with statutory requirements. The SEC thus ensures that the conduct of the self-regulatory organization is not narrowly self-serving and that it serves the "national public interest" in "the maintenance of fair and honest markets." *Id.* § 78b. The SEC is directed, by statute, to review disciplinary sanctions with "due regard for the public interest and the protection of investors," *id.* § 78s(e)(2), and to determine whether the sanctions are "consistent with the purposes of" the securities statutes in protecting the public interest, *id.* § 78s(e)(1)(A); *see also id.* § 78s(e)(2) (directing the Commission to ensure that any sanction not be "excessive" or impose any undue

"burden on competition"). In this respect, the SEC's review of disciplinary sanctions parallels its role in ensuring that FINRA's rules "protect investors and the public interest." *Id.* § 78o-3(b)(6).

The consequences of a final SEC determination that a member of a self-regulatory organization should be expelled, following initial self-regulatory proceedings, are, of course, significant. Those consequences are the result of Congress's determination that a broker-dealer must be registered with the SEC and a registered national securities association to effectuate securities transactions in the off-exchange market. 15 U.S.C. § 78o(a)(1), (b)(1)(B); *see Currin v. Wallace*, 306 U.S. 1, 16 (1939) (holding that Congress may "exercise[] its legislative authority … in prescribing the conditions of [the] application" of the law). And, at the same that that Congress required membership in a self-regulatory organization, Congress also ensured that the final decision regarding membership in such an organization would be made not by the self-regulatory organization itself but by the SEC, after full review and with regard to the rights of both broker-dealers and the public interest.

This Court's opinion in *NASD v. SEC*, 431 F.3d 803, on which Alpine mistakenly seeks to rely (Br. 22), reviewed this long history of

self-regulation and stressed the extent of SEC control over the self-regulatory organization. The Court explained that "[e]ven in 1938 … Congress made it plain that NASD's disciplinary functions were subject to the plenary supervision of the SEC." *NASD v. SEC*, 431 F.3d at 807 (citing *R.H. Johnson,* 198 F.2d at 695 (rejecting private-nondelegation challenge)). And "[e]very subsequent statutory iteration of this authority specified that adjudications conducted by self-regulatory organizations like NASD are subject to plenary review by the SEC." *Id.* The Court's reference to NASD's "quasi-governmental" power "derivative" of the SEC's power, *id.* at 811, occurs in the context of that discussion stressing the absence of final NASD authority and the plenary nature of the SEC's review. The Court in *NASD v. SEC* did not address the question presented here.

Alpine notes (Br. 28-29) that, over time, Congress has given the SEC greater tools with which to supervise the self-regulatory organizations. That assertion does not advance Alpine's contention that the self-regulatory organizations wield unsupervised authority. Congress, by providing the SEC with additional tools, has further ensured the subordination of the self-regulatory organizations to the

government. Congress has not, however, erased the foundation of supervised self-regulation: FINRA engages in traditional self-regulatory activities, and the SEC has the final word over discipline in order to protect broker-dealers and the public interest.

The tradition of self-regulation, especially in the securities industry, is itself constitutionally significant. The Supreme Court emphasized in *Aurelius* that Congress's "[l]ongstanding practice" of providing for territorial officers without subjecting those officers to constitutional appointment procedures "supports the inference" that the Appointments Clause does not apply to such officers. 140 S. Ct. at 1658-60. Congress's decision to preserve the longstanding tradition of self-regulation in the securities industry, without providing for governmental appointment and removal of the officers of self-regulatory organizations, has a similarly strong "foothold in history or tradition," *Seila Law*, 140 S. Ct. at 2202, and similarly supports the inference that the Appointments Clause does not apply to such private individuals engaging in traditional self-regulation.

In sum, FINRA is "a professional association charged with regulating itself." *Jones v. SEC*, 115 F.3d 1173, 1182 (4th Cir. 1997). It

is the SEC, and not FINRA, that is a "policing agency that reviews [FINRA] action and executes, in the public interest, the securities laws of the United States." *Id.* The Exchange Act and the Maloney Act permitted the self-regulatory organizations to continue to oversee the conduct of their members. But these statutes subjected both the self-regulatory organizations and their members to overarching federal authority. The Commissioners exercising that authority—not the employees of the private entity subordinate to the SEC—are subject to the Constitution's structural requirements.

#### 3. The state-action doctrine has no bearing on the delegation analysis.

Finally, Alpine conflates the question whether an entity is part of the government, and thus subject to structural constitutional requirements, with the separate question whether specific actions of a private entity should be ascribed to the government under the state-action doctrine for limited constitutional purposes. Alpine's attempt to apply the state-action doctrine to FINRA is both (a) incorrect on its terms, and (b) irrelevant to the issues before the Court.

**a.** The state-action doctrine allows courts, in rare cases, to attribute to the government the action of a private entity that is *not*

part of the government. As this Court has explained, the state-action requirement is met where "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself," such as "when a private party acts as an agent of the government in relevant respects." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015) (quotation marks omitted). Applying that standard, this Court has held, for example, that Xerox's actions as an agent of the District of Columbia in administering a Medicaid prescription drug benefit program were attributable to the government and thus subject to the due process clause. *Id.* at 43-44.

FINRA's self-regulatory functions are not state action attributable to the federal government. As the district court correctly explained, FINRA's "functions do not amount to the organization's entwinement with the SEC" in any way that would make FINRA's private actions be deemed that of the state. JA404. Judge Friendly reached the same conclusion in *United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975), holding that the New York Stock Exchange's investigation into one of its own members was not state action to which the privilege against

self-incrimination would attach. That self-regulatory organization's investigation "was in pursuance of [the Exchange's] own interests and obligations, not as an agent of the SEC," even though that investigation could carry "consequent liability to civil and criminal enforcement proceedings by the Government." *Id.* at 869. And the Fifth Circuit recently held the same regarding Nasdaq in a case seeking to challenge that exchange's listing requirements on equal-protection grounds. *Alliance for Fair Bd. Recruitment*, 2023 WL 6862856, at *4. Nasdaq, the Court held, is a "private entity" and, like the other self-regulatory organizations supervised in the public interest by the SEC, it "does not become a state actor merely by virtue of being regulated." *Id.* The same is true of FINRA and its self-disciplinary proceedings.

**b.** More importantly, however, the state-action doctrine has no bearing on any issue before this Court. The state-action cases cited by Alpine involved instances in which particular actions of private entities constituted violations of individual rights attributable to the government. *See, e.g.*, *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972) (addressing "discriminatory conduct"). None involve the

provisions of the Constitution governing the internal structure of the government itself. And for good reason.

State action—in which the "private action" of a "private entity" can "be deemed that of the state" for certain limited purposes—is different from whether an entity is, in reality, part of the "Government itself" under *Lebron*. 513 U.S. at 378; *see Herron*, 861 F.3d at 167 (distinguishing between those two questions). A determination that an organization like Amtrak is genuinely "part of the Government" means not only that it is subject to the First Amendment, *Lebron*, 513 U.S. at 399, but also, more generally, to "the Constitution's structural separation of powers and the Appointments Clause," *Department of Transp*., 575 U.S. at 46.

It is thus irrelevant whether FINRA's actions as a private, self-regulatory organization might be thought to be attributable to the government in any particular context for a particular constitutional purpose—whether the due process clause or any other individual right. Under *Lebron*, FINRA is not part of the government itself. For that reason, FINRA is not subject to the structural constitutional requirements that apply to the government.

Alpine appears to contend that if FINRA, or any other entity, were deemed to be a state actor for purposes of an alleged violation of due process or the freedom of speech, it would also be deemed part of the government for all other constitutional purposes. Alpine identifies no precedent supporting that proposition, and we are aware of none. If Alpine were correct, then the previously private officers of a private entity deemed to have engaged in state action would be required to become federal officials potentially subject to government appointment and removal. Yet the decisions of the Supreme Court and this Court make clear that, under the state-action doctrine, the actions of *nongovernmental* entities can sometimes be attributed to the government, and that state-action decisions are context-specific and necessarily limited in scope. *See, e.g.*, *Peacock*, 794 F.3d at 43 (Xerox determined to engage in state action for certain purposes when administering part of a Medicaid program).

Alpine ignores the impact its proposed analysis would have on the many private contractors whose work is essential to the operation of the government. For example, a private corporation operating a detention facility for a federal agency might, based on the particular facts of a

hypothetical case, be subject to a suit seeking injunctive relief to protect the individual constitutional rights of those detained in the private facility. Such a state-action determination would not mean that the private corporation would now have to become part of the government itself and that its corporate officers must be appointed and removed by the government in the same manner as any other government official under Article II.

In sum, the longstanding tradition of self-regulation in the securities industry does not violate the Constitution. FINRA's private officers and directors are not part of the government, whether or not FINRA's actions could be attributable to the government under the state-action doctrine in some specific context. Recognizing the inapplicability of the state-action doctrine, and instead applying the private-nondelegation doctrine and the structural constitutional requirements, each within their appropriate spheres, does not create a constitutional "loophole." Br. 5. It ensures that the public's interest in accountability is doubly protected.

The private-nondelegation doctrine ensures that the SEC has the tools necessary to supervise FINRA's self-regulatory conduct to protect

the public interest. And the structural constitutional requirements of appointment and removal ensure that the officers of the SEC, in carrying out their supervision of FINRA, remain fully accountable to the President and the people. The securities statutes regulate the self-regulatory organizations, ensuring that they provide broker-dealers like Alpine with fair self-disciplinary proceedings. And they shift final authority over self-regulatory rules and discipline from the self-regulatory organizations to the SEC, subject to review in the courts of appeals. The SEC and the courts of appeals have not hesitated to apply the securities statutes to ensure the fair application of self-discipline in the securities industry subject to governmental oversight. The nearly hundred-year experience under those statutes confirms that this statutory structure is a paradigm of how a private entity may play a role under a statute, consistent with the Constitution, because the entity functions subordinately to the government.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed and the injunction pending appeal should be dissolved.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARK B. STERN
***/s/ Joseph F. Busa***
JOSEPH F. BUSA
COURTNEY L. DIXON
*Attorneys, Appellate Staff*
*Civil Division,*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*Joseph.F.Busa@usdoj.gov*

October 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,693 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joseph F. Busa*
Joseph F. Busa
Counsel for Intervenor-Appellee
United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Joseph F. Busa*
Joseph F. Busa
Counsel for Intervenor-Appellee
United States of America

# ADDENDUM

# TABLE OF CONTENTS

15 U.S.C. § 78s(d) & (e) ........................................ A1

17 C.F.R. § 201.401 ........................................ A3

**15 U.S.C. § 78s. Registration, responsibilities, and oversight of self-regulatory organizations**

…

(d) Notice of disciplinary action taken by self-regulatory organization against a member or participant; review of action by appropriate regulatory agency; procedure

(1) If any self-regulatory organization imposes any final disciplinary sanction on any member thereof or participant therein, denies membership or participation to any applicant, or prohibits or limits any person in respect to access to services offered by such organization or member thereof or if any self-regulatory organization (other than a registered clearing agency) imposes any final disciplinary sanction on any person associated with a member or bars any person from becoming associated with a member, the self-regulatory organization shall promptly file notice thereof with the appropriate regulatory agency for the self-regulatory organization and (if other than the appropriate regulatory agency for the self-regulatory organization) the appropriate regulatory agency for such member, participant, applicant, or other person. The notice shall be in such form and contain such information as the appropriate regulatory agency for the self-regulatory organization, by rule, may prescribe as necessary or appropriate in furtherance of the purposes of this chapter.

(2) Any action with respect to which a self-regulatory organization is required by paragraph (1) of this subsection to file notice shall be subject to review by the appropriate regulatory agency for such member, participant, applicant, or other person, on its own motion, or upon application by any person aggrieved thereby filed within thirty days after the date such notice was filed with such appropriate regulatory agency and received by such aggrieved person, or within such longer period as such appropriate regulatory agency may determine. Application to such appropriate regulatory agency for review, or the institution of review by such appropriate regulatory agency on its own motion, shall not operate as a stay of such action unless such appropriate regulatory agency otherwise orders, summarily or after notice and opportunity for hearing on the

question of a stay (which hearing may consist solely of the submission of affidavits or presentation of oral arguments). Each appropriate regulatory agency shall establish for appropriate cases an expedited procedure for consideration and determination of the question of a stay.

(3) The provisions of this subsection shall apply to an exchange registered pursuant to section 78f(g) of this title or a national securities association registered pursuant to section 78o–3(k) of this title only to the extent that such exchange or association imposes any final disciplinary sanction for—

(A) a violation of the Federal securities laws or the rules and regulations thereunder; or

(B) a violation of a rule of such exchange or association, as to which a proposed change would be required to be filed under this section, except that, to the extent that the exchange or association rule violation relates to any account, agreement, contract, or transaction, this subsection shall apply only to the extent such violation involves a security futures product.

(e) Disposition of review; cancellation, reduction, or remission of sanction

(1) In any proceeding to review a final disciplinary sanction imposed by a self-regulatory organization on a member thereof or participant therein or a person associated with such a member, after notice and opportunity for hearing (which hearing may consist solely of consideration of the record before the self-regulatory organization and opportunity for the presentation of supporting reasons to affirm, modify, or set aside the sanction)—

(A) if the appropriate regulatory agency for such member, participant, or person associated with a member finds that such member, participant, or person associated with a member has engaged in such acts or practices, or has omitted such acts, as the self-regulatory organization has found him to have engaged in or omitted, that such acts or practices, or omissions to act, are in violation of such provisions of this chapter, the rules or regulations thereunder, the rules of the self-regulatory organization, or, in the case of a registered securities association,

the rules of the Municipal Securities Rulemaking Board as have been specified in the determination of the self-regulatory organization, and that such provisions are, and were applied in a manner, consistent with the purposes of this chapter, such appropriate regulatory agency, by order, shall so declare and, as appropriate, affirm the sanction imposed by the self-regulatory organization, modify the sanction in accordance with paragraph (2) of this subsection, or remand to the self-regulatory organization for further proceedings; or

(B) if such appropriate regulatory agency does not make any such finding it shall, by order, set aside the sanction imposed by the self-regulatory organization and, if appropriate, remand to the self-regulatory organization for further proceedings.

(2) If the appropriate regulatory agency for a member, participant, or person associated with a member, having due regard for the public interest and the protection of investors, finds after a proceeding in accordance with paragraph (1) of this subsection that a sanction imposed by a self-regulatory organization upon such member, participant, or person associated with a member imposes any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter or is excessive or oppressive, the appropriate regulatory agency may cancel, reduce, or require the remission of such sanction.

…

**17 C.F.R. § 201.401. Consideration of stays**

(a) Procedure. A request for a stay shall be made by written motion, filed pursuant to § 201.154, and served on all parties pursuant to § 201.150. The motion shall state the reasons for the relief requested and the facts relied upon, and, if the facts are subject to dispute, the motion shall be supported by affidavits or other sworn statements or copies thereof. Portions of the record relevant to the relief sought, if available to the movant, shall be filed with the motion. The Commission may issue a stay based on such motion or on its own motion.

(b) Scope of relief. The Commission may grant a stay in whole or in part, and may condition relief under this section upon such terms, or upon the implementation of such procedures, as it deems appropriate.

(c) Stay of a Commission order. A motion for a stay of a Commission order may be made by any person aggrieved thereby who would be entitled to review in a federal court of appeals. A motion seeking to stay the effectiveness of a Commission order pending judicial review may be made to the Commission at any time during which the Commission retains jurisdiction over the proceeding.

(d) Stay of an action by a self-regulatory organization—

(1) Availability. A motion for a stay of an action by a self-regulatory organization for which the Commission is the appropriate regulatory agency, for which action review may be sought pursuant to § 201.420, may be made by any person aggrieved thereby at the time an application for review is filed in accordance with § 201.420 or thereafter.

(2) Summary entry. A stay may be entered summarily, without notice and opportunity for hearing.

(3) Expedited consideration. Where the action complained of has already taken effect and the motion for stay is filed within 10 days of the effectiveness of the action, or where the action complained of, will, by its terms, take effect within five days of the filing of the motion for stay, the consideration of and decision on the motion for a stay shall be expedited in every way, consistent with the Commission's other responsibilities. Where consideration will be expedited, persons opposing the motion for a stay may file a statement in opposition within two days of service of the motion unless the Commission, by written order, shall specify a different period.

…