ORAL ARGUMENT NOT YET SCHEDULED
NO. 23-5129

# In The United States Court Of Appeals For The District Of Columbia Circuit

------------------------------ --------------------------------

ALPINE SECURITIES CORPORATION,
*Plaintiff-Appellant*,

SCOTTSDALE CAPITAL ADVISORS CORPORATION,
*Plaintiff*,

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,
*Defendant-Appellee*,

UNITED STATES OF AMERICA,
*Intervenor for Defendant-Appellee*.

---------------------------------------------------------------

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

---------------------------------------------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 1:23-cv-1506-BAH

---------------------------------------------------------------

Kenneth G. Turkel
David A. Hayes
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL 33602
Phone: (813) 834-9191
kturkel@tcb-law.com

Maranda E. Fritz
MARANDA E. FRITZ PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231
maranda@fritzpc.com

David H. Thompson
Brian W. Barnes
Athanasia O. Livas
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
Phone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiff-Appellant Alpine Securities Corporation*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 1

ARGUMENT ..... 3

I. Alpine Is Likely to Succeed on the Merits of its Article II Appointments and Removal Claims ..... 3

A. FINRA Exercises Executive Power When It Enforces Its Rules, Which Operate as Federal Law ..... 3

B. The Private Non-Delegation Doctrine Does Not Displace Other Structural Constitutional Protections When a Private Party Exercises Significant Executive Power ..... 6

1. The Text and Structure of the Constitution Leave No Room for a Private Delegation Exception to Article II's Appointment and Removal Requirements ..... 7

2. Precedent Forecloses FINRA's Argument for a Private Delegation Exception to Article II's Appointment and Removal Requirements ..... 10

C. Historical Examples of Private Actors Aiding the Government Do Not Support FINRA's Unprecedented Exercise of Executive Power ..... 16

D. To the Extent FINRA's Policy and Convenience Concerns Are Relevant, They Are Overstated ..... 20

II. Alpine Is Likely to Prevail on its Claim that FINRA Violates the Private Nondelegation Doctrine ..... 23

III. The Remaining Equitable Factors Support an Injunction ..... 27

CONCLUSION ..... 28

*Authorities upon which the brief chiefly relies are marked with asterisk.

## TABLE OF AUTHORITIES

**Cases** **Page**

*Alliance for Fair Board Recruitment v. SEC*,
85 F.4th 226 (5th Cir. 2023) ....................13

*Ass'n of Am. R.Rs. v. Dep't of Transp.*,
821 F.3d 19 (D.C. Cir. 2016)....................15

**Ass'n of Am. R.Rs. v. Dep't of Transp.*,
721 F.3d 666 (D.C. Cir. 2013)....................25

*Axon Enterprise v. FTC*,
598 U.S. 175 (2023)....................27

*Birkelbach v. SEC*,
751 F.3d 472 (7th Cir. 2014) ....................3

*Blount v. SEC*,
61 F.3d 938 (D.C. Cir. 1995)....................3

*Bowsher v. Synar*,
478 U.S. 714 (1986)....................21

*Brentwood Acad. v. Tenn. Secondary Sch. Athl. Ass'n*,
531 U.S. 288, 296 (2001) ....................6

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)....................7, 8

*Collins v. Yellen*,
141 S.Ct. 1761 (2021)....................10, 11

**Department of Transportation v. Ass'n of American Railroads*,
575 U.S. 43 (2015)....................7, 8, 15, 23, 25

*Edmond v. United States*,
520 U.S. 651 (1997)....................12

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
140 S.Ct. 1649 (2020)....................12, 13

**Free Enterprise Fund v. PCAOB*,
561 U.S. 477 (2010)....................11, 12, 14, 22, 23

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)....................27

*Herron v. Fannie Mae*,
861 F.3d 160 (D.C. Cir. 2017)....................................................................15

*Kerpen v. Metropolitan Washington Airports Authority*,
907 F.3d 152 (4th Cir. 2018) ......................................................................13

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995).....................................................................................14

**Lucia v. SEC*,
138 S. Ct. 2044 (2018).................................................................................21

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S.Ct. 1921 (2019)...................................................................................16

*McDaniel v. Wells Fargo Invs., LLC*,
717 F.3d 668 (9th Cir. 2013) .........................................................................3

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ........................................................................25

**NB ex rel. Peacock v. D.C.*,
794 F.3d 31 (D.C. Cir. 2015)..........................................................................5

*NLRB v. Noel Canning*,
573 U.S. 513 (2014).....................................................................................20

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023) ........................................................................25

*Ortiz v. United States*,
138 S.Ct. 2165 (2018)...................................................................................11

*Osborn v. Bank of United States*,
22 U.S. 738 (1824).......................................................................................17

*PAZ Sec., Inc. v. SEC*,
494 F.3d 1059 (D.C. Cir. 2007)...................................................................27

*PennEast Pipeline Co. v. New Jersey*,
141 S.Ct. 2244 (2021)...................................................................................18

*Printz v. United States*,
521 U.S. 898 (1997).......................................................................................8

*Seila Law v. CFPB*,
140 S.Ct. 2183 (2020)...........................................................................17, 18

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940).....................................................................................25

*United States v. Ackerman*,
831 F.3d 1292 (10th Cir. 2016) ........................................4, 7

*United States v. Arthrex, Inc.*,
141 S.Ct. 1970 (2021)........................................18

*Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*,
539 F.3d 1159 (9th Cir. 2008) ........................................3

**Constitutional Provisions, Rules, and Statutes**

*U.S. CONST. art. II, § 2, cl. 2 ........................................9

15 U.S.C.
§ 78s(b) ........................................3
§ 78s(b)(2)(E) ........................................3
§ 78u(a)(1) ........................................3

**Other Authorities**

Aditya Bamzai, *Tenure of Office and the Treasury*,
87 GEO. WASH. L. REV. 1299 (2019)........................................17

Defs.' Mot. to Dismiss, *Florida v. Cardona*,
No. 23-cv-61188 (S.D. Fla. Sept. 15, 2023), Doc. 11 ........................................23, 24

FINRA's Mot. to Dismiss, *Empire Fin. Grp., Inc. v. FINRA*,
No. 9:08-cv-80534-KLR (S.D. Fla. May 21, 2008), Doc. 2 ........................................4

FINRA Regulatory Notice 16-25,
2016 WL 4060371 (July 22, 2016)........................................4

*In the Matter of Dep't of Enf't v. Charles Schwab & Co.*,
2014 WL 1665738 (FINRA Bd. Apr. 24, 2014) ........................................4

James Fallows Tierney, *Reconsidering Securities Industries Bars,* 24 STAN. J.L. BUS. & FIN. (forthcoming 2024), https://bit.ly/49DPcQf........................................26

Jennifer L. Mascott, *Private Delegation Outside of Executive Supervision*,
45 HARV. J.L. & PUB. POL'Y 837 (2022) ........................................18, 19

Restatement (Third) of Agency § 1.01 (2006)........................................5

*Officers of the United States Within the Meaning of the Appointments Clause,
31 Op. O.L.C. 73 (2007)........................................9, 10, 11, 18

## GLOSSARY OF ABBREVIATIONS

FINRA: Financial Industry Regulatory Authority

FHFA: Federal Housing Finance Agency

CFPB: Consumer Financial Protection Bureau

NAC: National Adjudicatory Council

OLC: Office of Legal Counsel

PCAOB: Public Company Accounting Oversight Board

SEC: Securities and Exchange Commission

SRO: Self-Regulatory Organization

## INTRODUCTION AND SUMMARY OF ARGUMENT

FINRA and its army of amici not only concede but embrace the fact that FINRA wields enormous power over all participants in the securities industry while operating in ways that violate the constitutional constraints that unquestionably apply to the government agency from which FINRA derives its power. FINRA believes that the government can transfer its power to a private entity and thereby strip away critical constitutional safeguards that otherwise apply to the exercise of such power. FINRA is wrong.

In support of its position, FINRA makes arguments that are contrary to its own pronouncements and couples that with high volume *ipse dixit* claims of catastrophic consequences. It claims that it does not enforce federal law even though it has repeatedly said otherwise in other contexts. It insists that its enforcement activities play a valuable and important role in protecting the public from wrongdoing even as it deprives market participants of the constitutional protections that ordinarily apply to enforcement of federal law. Perhaps more importantly, while proclaiming that it would be eviscerated if it had to adhere to the Constitution, FINRA provides to this Court no actual evidence or example of any constitutional provision with which it could not comply.

Under our Constitution, authority to execute the laws cannot come without accountability. This Court got it right in granting Alpine an injunction pending

appeal: If FINRA seeks to exercise federal executive power, it must be bound by the constraints on that power. A governmental agency cannot, as it receives and delegates governmental power, strip away the protections that are inextricably interwoven with that same power.

Nor does the applicability of the private non-delegation doctrine suspend all other constitutional constraints. No court has ever held that a delegation of power to a private entity excuses the entity from compliance with other structural aspects of the Constitution, and to recognize such a rule would create a loophole in Article II. Further, in this action, Alpine has properly alleged a violation of the private nondelegation doctrine, and the arguments of FINRA and the United States only underscore the impropriety of a delegation that exempts a nominally private entity from adherence to fundamental constraints on the exercise of governmental power.

FINRA's policy points, inapposite historical examples, and mischaracterizations of precedent cannot carry the weight of what FINRA asks this Court to do: relegate the Constitution's structural protections to second-class status. Nothing would justify that result, but FINRA and the United States' unsupported hyperbolic claims do not even come close.

## ARGUMENT

### I. Alpine Is Likely to Succeed on the Merits of its Article II Appointments and Removal Claims.

#### A. FINRA Exercises Executive Power When It Enforces Its Rules, Which Operate as Federal Law.

FINRA argues that it need not abide by the Constitution because it is not enforcing federal law in the expedited proceeding. According to FINRA, it is seeking to enforce its own rules, which it says are not federal law. *See* FINRA Br. 41. But FINRA routinely and successfully asserts the opposite and this Court has confirmed that FINRA's rules "operate[]…as federal law," *see Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995).

Several of this Court's sister circuits have recognized that FINRA rules carry the force of law. *See, e.g.*, *Birkelbach v. SEC*, 751 F.3d 472, 475 & n.2 (7th Cir. 2014); *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 673 (9th Cir. 2013); *see also* 15 U.S.C. § 78s(b). Indeed, FINRA's rules are so well established as federal law that they *preempt* contrary state law. *See Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1168 (9th Cir. 2008). The SEC can "aid in the enforcement" of FINRA's rules—something that would make little sense if FINRA rules were not law. 15 U.S.C. § 78u(a)(1). FINRA rules even carry the trappings of federal law; the SEC is directed by statute to publish FINRA's rule changes in the Federal Register. *See* 15 U.S.C. § 78s(b)(2)(E).

Were there any doubt, the Court can take FINRA's word for it. FINRA has repeatedly claimed in litigation, enforcement proceedings, and public guidance that its rules are federal law. *See, e.g.*, *In the Matter of Dep't of Enf. v. Charles Schwab & Co.*, 2014 WL 1665738, at *16 (FINRA Bd. Apr. 24, 2014) ("FINRA rules have the force and effect of a federal regulation."); FINRA's Mot. to Dismiss at 4, *Empire Fin. Grp. v. FINRA*, No. 9:08-cv-80534-KLR (S.D. Fla. May 21, 2008), Doc. 2 ("Once approved by the SEC, FINRA rules enjoy the status of federal law."); *see also* FINRA Regulatory Notice 16-25, 2016 WL 4060371, at *3 (July 22, 2016) ("FINRA's rules…have the force of federal law. FINRA rules are not mere contracts that member firms and associated persons can modify.").

The Expedited Proceeding is a clear exercise of federal Executive Power—no different in substance or legal effect than the SEC promulgating a rule and then enforcing it in an administrative proceeding before an ALJ. *See United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016) (Gorsuch, J.) (observing that "when an actor is endowed with law enforcement powers beyond those enjoyed by private citizens, courts have traditionally found the exercise of the public police power engaged"). How else would FINRA be capable of permanently banning a business from its industry? FINRA offers no answer.

This Court's state action precedents strongly reinforce the conclusion that FINRA exercises Executive Power when it enforces its rules. FINRA advocates for

strained and narrow interpretations of the state action authority. According to FINRA, if governmental power is conferred on a private entity, but certain circumstances are not present, that private entity is free to exercise governmental power without regard for constitutional mandates or protections. That is not, nor should it be, the law. Rather, the state action doctrine is broader than that, and has developed to avoid such technical escape hatches. Authorities look to the power being wielded and, as Judge Walker recognized in concurrence, ensure that the recipient of governmental power is not permitted to do that which could not be done by the delegator of power. For example, in *NB ex rel. Peacock v. D.C.*, the Court established that state action is present "when a private party acts as an agent of the government in relevant respects[.]" 794 F.3d 31, 43 (D.C. Cir. 2015). Applying that test, FINRA states that state action only exists where "the government compels the private entity to take a particular action." FINRA Br. 45 (cleaned up). But that is not how agency works. Agency does not require that the principal compel every action. Agency only requires that a principal "manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). FINRA does not meaningfully dispute that those conditions are met.

FINRA's state action cases, by contrast, establish nothing more than the proposition that FINRA is often described as "private." But the whole point of the state action doctrine is that nominally private entities are sometimes subject to constitutional constraints. Naturally, the Supreme Court has repeatedly used the word "private" to describe entities it found to be state actors. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (collecting examples). Nominally "private" entities must be treated as the government for constitutional purposes when, as here, they are entwined with a federal agency and delegated power to enforce federal law. *Id.*

### B. The Private Non-Delegation Doctrine Does Not Displace Other Structural Constitutional Protections When a Private Party Exercises Significant Executive Power.

FINRA and the United States argue that the private nondelegation doctrine occupies the field of constitutional protection when a private body exercises significant executive authority. Although all agree that "[t]he private nondelegation doctrine imposes meaningful constraints on Congress's ability to delegate executive power to the private sector," FINRA Br. 3, FINRA and the United States are wrong that the private nondelegation constraint displaces Article II's other structural constraints.

### 1. The Text and Structure of the Constitution Leave No Room for a Private Delegation Exception to Article II's Appointment and Removal Requirements.

FINRA and the United States utterly fail to engage with the central insight of Judge Walker's concurrence, which is that the Constitution cannot require *less* accountability when Executive Power is delegated outside the Executive Branch than it does when the government itself exercises Executive Power. Under FINRA and the United States' framework, the Government can delegate to private parties authority to do that which it cannot constitutionally do itself. FINRA and the United States do not say what could possibly justify such a bizarre rule of constitutional law, which runs headlong into the bedrock principle of law that "prevent[s] agents from exercising powers their principals do not possess and so cannot delegate." *Ackerman*, 831 F.3d at 1300.

Instead of engaging with this core conceptual flaw in their theory, FINRA and the United States point to the private nondelegation doctrine as the panacea for all constitutional woes related to FINRA's exercise of Executive Power. But the private nondelegation doctrine is not a substitute for honoring Article II's appointments and removal requirements. After all, the powers of presidential supervision are not Congress's to give away. Rather, the private nondelegation doctrine is an *additional* layer of protection against the "most obnoxious form" of delegations, *Carter v. Carter Coal Co.*, 298 U.S. 238, 310 (1936)—delegations of government power that

lack even a "fig leaf" of constitutional justification, *Dep't of Transp. v. Ass'n of American Railroads* ("*Amtrak II*"), 575 U.S. 43, 62 (2015) (Alito, J., concurring). Although the prohibition on delegating Executive Power to private parties is necessary to prevent Congress from "shatter[ing]" the "unity in the…Executive," *see Printz v. United States*, 521 U.S. 898, 922-23 (1997), that prohibition is not a substitute for the presidential supervision that Article II otherwise requires where significant exercises of Executive Power are concerned.

Defendants ultimately try to avoid certain structural constitutional protections by pointing to their alleged compliance with *other* protections. But this is not how the Constitution works. When the government takes property without just compensation, it is no defense to say that the government followed procedures that complied with the Fifth Amendment's Due Process Clause. The structural provisions of the Constitution, no less than the Bill of Rights, are designed to protect liberty. FINRA's new theory is little more than a thinly veiled bid to relegate the Constitution's structural provisions to second-class status in the constitutional hierarchy.

The theory is also completely unmoored from constitutional text. Article II vests the "Executive Power"—all of it—in a President of the United States. It is beyond cavil that Article II's vesting clause requires that the President be able to supervise the exercise of Executive Power *within* the Executive Branch, and

Defendants point to nothing in the constitutional text that would justify suspending that requirement when Executive Power is delegated outside the Executive Branch.

FINRA further fails to identify a basis in the Constitution's text for finding a private delegation exception to the Appointments Clause. FINRA invokes the *ejusdem generis* canon, reasoning that because the enumerated officers in the Appointments Clause *are* government officials, the "final catch-all phrase" of "all other Officers" must be read to exclude non-government officials. FINRA Br. 22. Even accepting that the Appointments Clause could be limited in such an oblique way, FINRA's argument by implication is defeated by the text. The Clause covers: "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States." U.S. Const. art. II, § 2, cl. 2. If FINRA were right that the enumerated examples impliedly exclude all private officers from the catch-all phrase, there would be no need whatsoever for the Clause to specify "*public* Ministers and Consuls." *Id.* (emphasis added). Thus, FINRA's reading would render a term of the Appointments Clause superfluous. Further, Founding-Era evidence establishes that the Appointments Clause was not implicitly limited to exclude private actors exercising government power. President Washington himself "protested upon learning that a private citizen had been participating in treaty negotiations." Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 92, 2007 WL 1405458 (2007) ("2007 OLC Op.").

It also bears emphasis that the position of the United States in this litigation directly contradicts the considered views of the Office of Legal Counsel. As OLC has explained, *any* "position to which is delegated by legal authority a portion of the sovereign powers of the federal government and that is 'continuing' is a federal office subject to the Constitution's Appointments Clause." 2007 OLC Op. at 73. Delegated sovereign "powers primarily involve binding the Government or third parties for the benefit of the public, such as by administering, executing, or authoritatively interpreting the laws"—exactly what FINRA is seeking to do in the expedited proceeding against Alpine. *Id.* at 77. This rule applies to all positions, "however labeled." *Id.* at 73. "[F]ederal employment is not necessary for the Appointments Clause to apply," and "the applicability of the [Appointments] Clause does not depend on whether Congress has formally and directly created an 'office.' " *Id.* at 78.

#### 2. Precedent Forecloses FINRA's Argument for a Private Delegation Exception to Article II's Appointment and Removal Requirements.

a. Defendants' proposed private delegation exception to Article II's appointments and removal requirements is also at odds with recent Supreme Court precedent. In *Collins v. Yellen*, the Court rejected an argument that "when [FHFA] steps into the shoes of a regulated entity as its conservator or receiver, it takes on the status of a private party and thus does not wield executive power." 141 S. Ct. 1761,

1785 (2021). The Court did not recognize any private delegation *exception* to presidential removal and did not apply the *Lebron* test as a threshold barrier. The Court only analyzed whether FHFA exercised Executive Power when acting as conservator—concluding that "FHFA clearly exercises executive power." *Id.* at 1786. No less than FHFA, "[i]n deciding what it must do, what it cannot do, and the standards that govern its work, [FINRA] must interpret" federal law, and "interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Id.* at 1785 (cleaned up). After *Collins*, what matters in a removal case is "the *nature* of the power" exercised, not the nominally public or private status of the body exercising it. *See Ortiz v. United States*, 138 S. Ct. 2165, 2188 (2018) (Thomas, J., concurring).

While ignoring *Collins*, FINRA and the United States rely on cases that use descriptors like the phrase "executive officers" when discussing Article II's appointments and removal requirements. FINRA Br. 22; U.S. Br. 43. But that begs the question. Alpine's argument is that FINRA officials fall within the definition of executive officers when they exercise Executive Power. The key inquiry is not whether the person formally works in the Executive Branch but whether he or she exercises significant executive authority. *See* 2007 OLC Op. 73-74, 115.

The footnote about non-officers in *Free Enterprise Fund* likewise does not help FINRA. The Court explained that "one may be an agent or employee working

for the government and paid by it, as nine-tenths of the persons rendering service to the government undoubtedly are, without thereby becoming its officer." 561 U.S. 477, 506 n.9 (2010) (cleaned up). Alpine does not disagree—there are many non-officers who formally work for the government. If anything, this language drives home Alpine's point that the officer inquiry is about *degree* of government power, not artificial labels or titles. *See Edmond v. United States*, 520 U.S. 651, 662 (1997) ("The exercise of significant authority pursuant to the laws of the United States marks…the line between officer and nonofficer." (cleaned up)).

The Supreme Court's decision in *Aurelius* is not the death knell for Alpine's appointment and removal claims that the United States thinks it is. *See Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S.Ct. 1649, 1654-55 (2020). In fact, *Aurelius* strongly supports Alpine's claims. The Supreme Court resisted reading any carve-outs into the Appointments Clause, unambiguously ruling that "the Appointments Clause governs the appointments of all officers of the United States, including those located in Puerto Rico." *Id.*; *see also id.* at 1656 ("[W]e believe the Appointments Clause restricts the appointment of all officers of the United States[.]"). The question was merely whether those who exercise primarily *local* duties should be considered officers of the United States, which the Court answered in the negative. *Id.* at 1656-57. As to the exercise of *federal* power, the Court was clear: The Constitution's "structural constraints, designed in part to ensure

political accountability, apply to *all exercises of federal power*[.]" *Id.* (emphasis added).

Nor do cases from other Circuits support FINRA's position. *Kerpen v. Metropolitan Washington Airports Authority* is not on point. 907 F.3d 152, 160 (4th Cir. 2018). The court there rejected an Appointments Clause claim as to the Metropolitan Washington Airports Authority because it was local, not because it was private. The court's basis for decision was a federalism principle, not a private-public distinction. *Id.* In *Alliance for Fair Board Recruitment v. SEC*, the court explicitly distinguished the enforcement context, noting that Alpine's case "involves a wholly separate issue—an expedited enforcement action adjudicated by FINRA." 85 F.4th 226, 241 n.6 (5th Cir. 2023). To the extent any non-binding precedent *has* assumed that a private party can exercise significant Executive Power without abiding by Article II's appointment and removal requirements, this Court should not follow that assumption.

b. FINRA and the United States also assert that *Lebron* and its progeny foreclose Article II appointments and removal claims against nominally private bodies that the government does not permanently control. As an initial matter, FINRA and the United States do not suggest that the *Lebron* test displaces the state action doctrine to supply the exclusive test for deciding whether a putatively private entity is required to honor the enumerated rights in the Constitution. There is no

reason why the *Lebron* standard should operate differently where structural constitutional claims are concerned.

Furthermore, the *Lebron* test is a poor fit for Article II claims like those at issue here. The thrust of Alpine's appointments and removal claims is that FINRA is exercising significant Executive Power without the required degree of accountability. Yet FINRA and the United States would have the Court transform this constitutional vice into a virtue and affirm the district court precisely *because* FINRA exercises Executive Power free from "the direction and control of federal governmental appointees." *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 398 (1995). That approach turns Article II's accountability-promoting requirements on their head.

FINRA cites *Free Enterprise Fund* as having made *Lebron* the exclusive test, when the Court was just describing the view of the parties: "Despite the provisions specifying that Board members are not Government officials for statutory purposes, *the parties agree* that the Board is 'part of the Government' for constitutional purposes." 561 U.S. at 485–86 (citing *Lebron*, 513 U.S. at 397). Moreover, even if one accepts this description of the parties' position as binding precedent, at most it shows that an entity that satisfies the *Lebron* test is subject to Article II's appointments and removal requirements. This does nothing to support the converse proposition that FINRA seeks to establish: that entities that *do not* satisfy the *Lebron*

test need not follow the structural constitutional rules that ordinarily apply to those who exercise significant Executive Power.

FINRA similarly mischaracterizes this Court's description of the parties' arguments in *Amtrak III*. *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 821 F.3d 19,t 36–37 (D.C. Cir. 2016) ("[I]n the freight operators' view…[e]ither the arbitrator is a private individual and the clause unlawfully deputizes a private person to issue binding regulations, or she is a public official and her appointment…violates the Appointments Clause."). The Court did not accept this dichotomy because it did not need to. Giving *any* regulatory power to private individuals is unconstitutional: "We needn't concern ourselves much here with the amici's arguments concerning the propriety of giving regulatory power to private individuals. Our prior opinion detailed extensively why private entities cannot wield the coercive power of government[.]" *Id.*[1]

Finally, this Court's decision in *Herron v. Fannie Mae* is not remotely on point. 861 F.3d 160, 167 (D.C. Cir. 2017). That case concerned a *Bivens* claim, not

[1] Contrary to FINRA's assertion, Justice Alito did not imply in *Amtrak II* that if an actor is private under *Lebron*, the Appointments Clause does not apply. He did not reach that question because he would find *any* regulatory delegation to private parties unconstitutional, regardless of any appointments or removal structure. *See Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) ("Private entities are not vested…with the executive Power…. [Thus, given] even the *possibility* of a private arbitrator, the Constitution is violated." (cleaned up)).

any claim under Article II. It therefore has nothing to say about whether an entity that is not the government under *Lebron* may exercise significant Executive Power without complying with Article II's appointments and removal requirements.

### C. Historical Examples of Private Actors Aiding the Government Do Not Support FINRA's Unprecedented Exercise of Executive Power.

FINRA and the United States invoke the long history of self-regulatory organizations—broadly defined—to support FINRA's current exercise of Executive Power. But as Alpine has explained, much has changed since the days when gentlemen sat together under a buttonwood tree on Wall Street. *See* U.S. Br. 6.[2] The FINRA of today is a shadow SEC, with all the powers and trappings of a federal enforcement agency. That is markedly different than the cooperative self-regulation of a bygone era. (As Alpine explained in its opening brief, membership in FINRA's predecessor was only made mandatory for broker-dealers in 1983. *See* Alpine Opening Br. 28. FINRA, the United States, and their amici ignore this point in their historical retellings.).

---

[2] FINRA cites *Halleck* for the proposition that Alpine cannot "widen the lens" to define FINRA's exercise of power. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921, 1930 (2019). The Court in *Halleck* was analyzing whether the relevant body engaged in "a traditional, exclusive public function." *Id.* Thus, defining the "public function" at the right level of factual generality was important. Here, the Supreme Court's Article II precedents supply the relevant test: "significant authority pursuant to the laws of the United States." *Free Enter. Fund*, 561 U.S. at 486. FINRA's enforcement of federal law against private parties provides the right lens for that analysis.

FINRA and the United States also point to a handful of historical examples of private parties aiding the government. Each of these examples is easily distinguishable and serves to highlight how different FINRA's exercise of independent power is here. First, the Supreme Court made clear in *Osborn v. Bank of United States* that the private actors associated with the Bank of the United States were mere "contractors." 22 U.S. 738, 866 (1824). The *Osborn* Court resisted any notion that the private corporation could exercise governmental power: "The mere creation of a corporation, does not confer political power or political character." *Id.* at 772-73. Even putting the Supreme Court's statements aside, the Bank of the United States provides a poor analogy to FINRA's exercise of power. Unlike FINRA, the Bank did not enforce federal law. And the Founders did not believe the Bank "performed sufficiently sovereign functions to render them 'Officers of the United States.'" Aditya Bamzai, *Tenure of Office and the Treasury*, 87 GEO. WASH. L. REV. 1299, 1342-43 (2019); *see also id.* at 1354 ("To modern eyes, the Bank of the United States' currency-making functions might seem quintessentially sovereign. But that modern sensibility was by no means the orthodoxy at the time of the First and Second Banks' establishment in the early 19th Century."). Finally, FINRA wrongly relies on the dog that didn't bark, asserting that no Founders seriously questioned the Bank's status. Yet the Bank's status and power has been

sharply contested throughout history. *See Seila Law v. CFPB*, 140 S.Ct. 2183, 2231-32 (2020) (Kagan, J., concurring in judgment and dissenting in part).

FINRA's second example, the eminent domain power, is distinct because the government had to *preauthorize* action taken by the private party. *See PennEast Pipeline Co. v. New Jersey*, 141 S.Ct. 2244, 2252, 2256-57 (2021). And the private eminent domain power was far more operational—things like the building of bridges—than FINRA's exercise of enforcement judgment. *See id.* at 2256.

Finally, the role of early patent arbitrators was technical and limited. *See* Jennifer L. Mascott, *Private Delegation Outside of Executive Supervision*, 45 HARV. J.L. & PUB. POL'Y 837, 863 (2022) ("Mascott") (private patent aides made "factbound determinations"). Indeed, the Supreme Court itself has already recognized that such people would likely *not* have been officers. *See United States v. Arthrex, Inc.*, 141 S.Ct. 1970, 1985 (2021) ("[T]hese ad hoc positions may not have even constituted offices.").

The United States also invokes the wide use of federal contractors in the government. U.S. Br. 66-67. The federal contractor argument is a straw man. While OLC has recognized that some unusual federal contractors do qualify as Officers of the United States, *see* 2007 OLC Op. 113-15, most are not officers because they do not occupy a "continuing" position that "transcends each unique officeholder." *See*

Mascott at 847 (collecting cases). That long-settled rule is entirely consistent with Alpine's arguments.

The United States' example is still useful, though, for the contrast it illuminates. In the case of a federal contractor operating an immigration detention facility, a private corporation supervises the day-to-day operation in accordance with its contract. But imagine a world in which that private detention corporation could make its own immigration rules that carried the force of federal law. Imagine the private corporation could then decide when and against whom to enforce those rules, initiate removal proceedings against those it dislikes, and ultimately decide to detain or even deport those people *before* any government agency could pass judgment or exercise review. Despite uncovering many historical examples of private parties working with the federal government, the United States and FINRA provide no examples of *that* kind of outsourcing of government force over private parties. Nor could they.[3]

Even if FINRA and the United States could muster an analogous historical example, that would not absolve FINRA's unconstitutional exercise of federal

[3] The private prison example is also useful for illustrating why the United States is wrong that Alpine would "nullify" the private non-delegation doctrine. U.S. Br. 25. Lower-level federal facility supervisors would likely not be officers of the United States. Yet if the supervising agency gave facility workers complete discretion over how to detain people, that would pose private non-delegation issues. Thus, a private non-delegation problem can exist even where there is no Article II appointment or removal problem.

power. True, the Supreme Court has at times held that "[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions"—but specifically for "regulating the relationship between" the coequal branches. *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014). This is because the encroached-upon branch is sometimes deemed to have "acquiesced" in the continued encroachment. *Id.* (cleaned up). No similar principle applies to a long-running constitutional violation by a private body, and individuals do not "acquiesce" in a continuing constitutional violation. Alpine certainly has not.

### D. To the Extent FINRA's Policy and Convenience Concerns Are Relevant, They Are Overstated.

Much of FINRA's brief focuses on policy points, arguing that Alpine's constitutional arguments could have "far-reaching…practical consequences." FINRA Br. 4. FINRA spills much ink on its own supposed benefits to the public, Alpine's alleged threat to the public, and the public policy consequences of bringing FINRA within the bounds of the Constitution. These assertions are both overstated and irrelevant.

If FINRA's sky-is-falling policy arguments sound familiar, it is because they have been made in every major case about the Constitution's structure in recent memory. Despite the Supreme Court's repeated recognition of structural protections, the CFPB, SEC, FHFA, and PCAOB all survived their encounters with Article II. In one stark example, President Biden fired the FHFA Director the *same day* the

Supreme Court recognized his power to do so in *Collins v. Yellen*; yet the FHFA continues to operate. The SEC continues to operate despite the Supreme Court's holding that its ALJs are Officers subject to the Appointments Clause. *See Lucia v. SEC*, 138 S. Ct. 2044, 2053–55 (2018). FINRA will surely find a way to do the same. While changes to agency structure might pose an existential threat to the unaccountable exercise of power by *current leadership*, they do not pose an existential threat to the body itself or a legitimate regulatory mission.[4] The Supreme Court has rejected overblown policy arguments, and this Court should too.

Regardless, it is no answer to an unconstitutional exercise of government power to say that the body exercising that power reaches good policy outcomes. "The fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government…will not save it if it is contrary to the Constitution." *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) (quoting *INS v. Chadha*, 462 U.S. 919, 944 (1983)). "Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government[.]" *Id.* (cleaned up).

Nor is it an answer to an unconstitutional exercise of government power to say that the person on the receiving end deserved it. The injury is to the public and to our constitutional system, not only to the party being targeted with

[4] So too, many of the policy-oriented arguments of FINRA's self-interested amici implicate whether *current* leadership at various organizations can remain in power.

unconstitutional government force. Anyway, FINRA continues to assume the truth of its own unproven and vigorously contested allegations against Alpine.

That Alpine has fought back against FINRA also has no bearing on the constitutional analysis. True, FINRA and Alpine are not fast friends. FINRA has made a concerted policy effort, through the exercise of its enforcement powers, to extinguish the microcap industry. Alpine has resisted that effort and remains one of the last surviving firms to have done so. Sometimes Alpine has prevailed in the disputes; sometimes it has not, as FINRA notes in overheated terms, *see* FINRA Br. 12 (citing *SEC v. Alpine*, 413 F.Supp.3d 235, 245-47 (S.D.N.Y. 2019) (discussing Alpine's failure to file certain reports)).

As to whether FINRA is a force for public good, many would dispute that claim. *See* Alpine Opening Br. 30-31 (collecting commentary). But even if FINRA does serve the public "so well" as it asserts, FINRA Br. 20, why can't FINRA continue its good works while following the constitutional requirements of Article II? Why is the threat "existential?" *Id.* at 1. FINRA never explains.

Finally, FINRA is wrong to assert that every private body "enlisted to serve limited public purposes" would be subject to Article II's appointment and removal requirements if Alpine prevails. *Id.* at 37. The Supreme Court's tests already bake in protection for those who serve limited functions; only those who exercise

"*significant*" authority are officers of the United States. *Free Enter. Fund*, 561 U.S. at 486 (emphasis added).

## II. Alpine Is Likely to Prevail on its Claim that FINRA Violates the Private Nondelegation Doctrine.

Alpine is also highly likely to succeed on the merits of its private nondelegation claim. As a threshold matter, to the extent the Court accepts FINRA's new argument that the private nondelegation doctrine displaces Article II's other requirements when Executive Power is exercised by a private party, the Court should hold that delegations of significant executive authority to private parties are per se unconstitutional. *See Amtrak II*, 575 U.S. at 62 (Alito, J., concurring). Any other approach would create a constitutional loophole of exactly the sort that Judge Walker warned about in his concurrence.

But even under an approach that merely asks if FINRA is subordinate to the SEC, this entity runs afoul of the private nondelegation doctrine. FINRA, a private body, has been delegated the government's enforcement power, and seeks to exercise it over Alpine without sufficient (or any) meaningful governmental supervision before its power takes effect.[5] FINRA can permanently expel a firm in

[5] The United States does not appear to dispute that FINRA's rules and enforcement sanctions carry the force of law, and it recently acknowledged in litigation that delegations have been "consistently [] held unlawful where they conferred upon private parties the power to make decisions carrying the force of law." Defs.' Mot. to Dismiss at 12, *Florida v. Cardona*, No. 23-cv-61188, Doc. 11 (S.D. Fla. Sept. 15, 2023).

the name of federal government power *before* the federal government has a chance to weigh in or evaluate that exercise of power. In other words, FINRA's enforcement of federal law is self-executing. This case provides a perfect example. Here, FINRA sought relentlessly to expel Alpine from the securities industry before a court could evaluate Alpine's constitutional claims and would have been able to do so *before any SEC involvement or review* had this Court not granted Alpine injunctive relief.

FINRA and the United States principally respond that no private non-delegation problem exists because the SEC can review FINRA's expulsion of Alpine after the fact. The United States in particular relies on the fact that the SEC could stay FINRA's expulsion order. That misses the point.

First, FINRA and the United States misunderstand the nature of a private non-delegation injury. The chance of after-the-fact review does not change the reality that FINRA can unilaterally close a business in the name of the federal government. It is FINRA, not the SEC, that swings the ax.

Second, even if Alpine succeeded in convincing the SEC to reverse FINRA (as the United States notes Alpine has done before), experience demonstrates that even a temporary closure of the firm inflicts serious real-world harm. As Alpine has explained, its successful SEC review took several days, and Alpine's customers were driven away when they could not purchase securities. Alpine Mot. Reply at 11 n.3 (June 20, 2023).

FINRA's alleged "uniform body of court of appeals decisions rejecting nondelegation challenges to FINRA" is overstated. FINRA Br. 50-51. Most of FINRA's quoted passages from non-binding precedent involve broad generalizations made in dicta, where a court just flagged the SEC-FINRA relationship as an example without any analysis. *See, e.g.*, *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 876-77 (5th Cir. 2022); *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023). None of these cases involved an as-applied challenge to an enforcement proceeding.

Applying the actual holdings of FINRA's cases to the facts here, it cannot be said that FINRA acts as an "aide[]" or "advisor[]" to the SEC when FINRA imposes a self-executing penalty for the violation of a FINRA rule. *Oklahoma*, 62 F.4th at 229. Nor can it be said that FINRA "serve[s] in purely advisory or ministerial functions," a requirement for a constitutional private delegation. *Ass'n of Am. R.Rs. v. Dep't of Transp.* ("*Amtrak I*"), 721 F.3d 666, 671 n.5 (D.C. Cir. 2013), *vacated and remanded*, 575 U.S. 43 (2015).[6]

More broadly, FINRA and the United States downplay the extent of FINRA's power, noting that FINRA lacks subpoena power and cannot sue to enforce its

[6] The United States criticizes Alpine for not citing *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940). *Adkins* may be helpful as doctrinal background, but *Amtrak I* is more relevant. Regardless, *Amtrak I* applied *Adkins*, so the criticism is baseless. Even applying *Adkins* independently of *Amtrak I*, Alpine prevails because FINRA does not function "subordinately" to SEC. *Id.*

penalties. In reality, FINRA's information collection powers are far broader and more punitive than ordinary subpoena power. Under FINRA Rule 8210(a), FINRA asserts boundless access to "books, records, and accounts" of member firms, and may "require a member, person associated with a member, or any other person subject to FINRA's jurisdiction to provide information . . . and to testify at a location specified by FINRA staff, under oath or affirmation[.]" FINRA does not need subpoena power or judicial enforcement because it simply closes the businesses of those who disobey its diktats. *See* James Fallows Tierney, *Reconsidering Securities Industries Bars*, 24 STAN. J.L. BUS. & FIN. (forthcoming 2024) (manuscript at 17), https://bit.ly/49DPcQf; *id.* ("In recent years upwards of 85% of FINRA bars have involved what we might consider brokers flouting FINRA's regulatory authority."); *id.* at 34 (because "FINRA lacks the authority to subpoena and to go to court to enforce sanctions," it "police[s] its membership through exclusion."). FINRA acknowledges this, lamenting: "[T]he most that FINRA can do to enforce compliance is to threaten to suspend or expel violators as members[.]" FINRA Br. 42. That is no paltry power. That FINRA resorts to *summary imposition of the corporate death penalty* rather than presenting its case in court makes FINRA's exercise of federal power worse, not better. FINRA has the strongest enforcement tool in its arsenal, and it uses it with impunity—including unilaterally and prior to SEC review or involvement.

## III. The Remaining Equitable Factors Support an Injunction.

FINRA has clearly established the remaining equitable factors. The district court correctly recognized that Alpine would be irreparably harmed absent an injunction, as this Court also recognized. Absent a preliminary injunction, Alpine will face immediate expulsion from the industry—"the securities industry equivalent of capital punishment." *PAZ Sec. v. SEC*, 494 F.3d 1059, 1065 (D.C. Cir. 2007). Alpine also faces the independent procedural injury that the Supreme Court in *Axon Enterprise v. FTC* recognized as establishing per se irreparable harm: being subject to an illegitimate proceeding by an illegitimate decision maker—"a here-and-now injury" that "cannot be undone." 598 U.S. 175, 191 (2023) (cleaned up).

The public interest also supports an injunction. Alpine has argued that FINRA routinely violates core structural guarantees of the U.S. Constitution, and the motions panel found Alpine likely to succeed on the merits of those claims. "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). To the extent this case might encourage others subject to FINRA's unconstitutional exercise of Executive Power to likewise bring constitutional claims, *see* FINRA Br. 56-57, that is a feature of constitutional protection, not a bug. And as discussed above, FINRA's policy concerns are overstated. FINRA can surely continue any legitimate regulatory efforts while abiding by our constitutional structure.

To wield the power of federal law, FINRA must follow the highest law and the most important constraint on federal power—the Constitution. This Court rightly recognized that when it granted Alpine an injunction pending appeal, and nothing has changed.

## CONCLUSION

For the foregoing reasons, the district court should be reversed.

Date: November 17, 2023

Respectfully submitted,

Kenneth G. Turkel
David A. Hayes
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street
Suite 1900
Tampa, FL 33602
Phone: (813) 834-9191
kturkel@tcb-law.com
dhayes@tcb-law.com

*/s/David H. Thompson*
David H. Thompson
Brian W. Barnes
Athanasia O. Livas
Cooper & Kirk, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
Phone: (202) 220-9649
dthompson@cooperkirk.com

Maranda E. Fritz
MARANDA E. FRITZ PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231
maranda@fritzpc.com

*Counsel for Plaintiff-Appellant Alpine Securities Corporation*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FED. R. APP. P. 32(a)(7) because this document contains 6,486 words excluding parts of the brief exempted by FED. R. APP. P. 32(f) and Circuit Rule 32(e)(1).

This document complies with the typeface and type style requirements of FED. R. APP. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Date: November 17, 2023

s/David H. Thompson
David H. Thompson

*Counsel for Plaintiff-Appellant*
*Alpine Securities Corporation*

**CERTIFICATE OF SERVICE**

I certify that on November 17, 2023, I filed the foregoing document via the appellate CM/ECF system of the United States Court of Appeals for the District of Columbia Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: November 17, 2023

s/David H. Thompson
David H. Thompson

*Counsel for Plaintiff-Appellant*
*Alpine Securities Corporation*