ORAL ARGUMENT NOT YET SCHEDULED

No. 23-5129

# In The United States Court Of Appeals
# For The District Of Columbia Circuit

-------------------------------- ❃ --------------------------------

ALPINE SECURITIES CORPORATION,

*Plaintiff-Appellant*,

SCOTTSDALE CAPITAL ADVISORS CORPORATION

*Plaintiff*,

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,

*Defendants-Appellee*

UNITED STATES OF AMERICA,

*Intervenor for Defendant-Appellee*.

-------------------------------- ❃ --------------------------------

**EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL**

-------------------------------- ❃ --------------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA No. 1:23-cv-0506-BAH

-------------------------------- ❃ --------------------------------

Kenneth G. Turkel
David A. Hayes
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Phone: (813) 834-9191
kturkel@tcb-law.com

Maranda E. Fritz
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231
maranda@fritzpc.com

David H. Thompson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES............................................................................. iii

INTRODUCTION ........................................................................................... 1

BACKGROUND............................................................................................. 3

ARGUMENT.................................................................................................. 5

I.      The Court Should Enjoin FINRA's Expedited Proceeding Pending Resolution of Alpine's Preliminary Injunction Appeal.................................................................... 5

      A.      Alpine Has a Strong Likelihood of Success on the Merits. ........................... 6

            1.      The Expedited Proceeding Is State Action......................................... 6

                  i.      This Court's Precedents Establish that the Expedited Proceeding Is State Action. ..................................................... 7

                  ii.     In Conducting the Expedited Proceeding, FINRA Is Intimately Entwined with the Federal Government. ............... 9

                  iii.    The Immunity to which FINRA Claims It Is Entitled Further Demonstrates that the Expedited Proceeding Is State Action. ....................................................................... 10

                  iv.     The State Actor Cases Upon which FINRA Relies Are Inapposite. ........................................................................... 11

            2.      FINRA's Structure Violates the Separation of Powers. .................... 13

            3.      FINRA's Structure Violates the Appointments Clause..................... 14

            4.      If the Expedited Proceeding Is Not State Action, FINRA's Enforcement Powers Violate the Private Nondelegation Doctrine.....15

      B.      The Remaining Factors Overwhelmingly Favor an Injunction....................15

CONCLUSION ............................................................................................17

CERTIFICATE OF COMPLIANCE ..............................................................19

CERTIFICATE OF SERVICE .......................................................................20

ADDENDUM

APPENDIX

## TABLE OF AUTHORITIES

**Cases**                                                                                 **Page**

*Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676 (5th Cir. 1985)................................ 9

*Axon Enter., Inc. v. FTC,* 143 S. Ct. 890 (2023) ......................................3, 5, 16, 17

*Birkelbach v. SEC*, 751 F.3d 472 (7th Cir. 2014) ..............................................3, 9

*Blount v. S.E.C.*, 61 F.3d 938 (D.C. Cir. 1995) ...........................................7, 8, 9

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
    531 U.S. 288 (2001) ........................................................................... 7

*Business Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990) .................................. 8

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ......................................................15

*Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194 (5th Cir. 2021) .......................17

*Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119 (9th Cir. 2005)..........................9, 13

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009)......................................5, 6

*Desiderio v. NASD*, 191 F.3d 198 (2d Cir. 1999) ....................................................12

*DOT v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015) ......................................................15

*Free Enter. Fund v. PCOAB.*, 561 U.S. 477 (2010) ...................................... 2, 13, 15

*Free Enterprise Fund v. PCAOB*, 537 F.3d 667 (D.C. Cir. 2008)............................................16

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
    548 F.3d 110 (D.C. Cir. 2008) ..................................................................11

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
    452 F.2d 935 (5th Cir. 1971)......................................................................10

*Jackson v. Metro. Edison Co.,* 419 U.S. 345 (1974) ............................................. 7

*Lucia v. SEC*, 138 S. Ct. 2044 (2018) .............................................................2, 14

*Marsh v. Alabama*, 326 U.S. 501 (1946) ............................................................ 7

*Mills v. D.C.*, 571 F.3d 1304 (D.C. Cir. 2009) ......................................................16

*N.Y. Republican State Comm. v. SEC*, 927 F.3d 499 (D.C. Cir. 2019)....................................12

*NASD v. SEC*, 431 F.3d 803 (D.C. Cir. 2005)....................................................3, 7, 8, 10, 14

*National Ass'n of Securities Dealers, Inc. v. SEC*,
    431 F.3d 803 (D.C. Cir. 2005) .................................................................. 9

*NB ex rel. Peacock v. D.C.*, 794 F.3d 31 (D.C. Cir. 2015)............................................6, 7, 12

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................... 6

*PAZ Sec. v. SEC*, 494 F.3d 1059 (D.C. Cir. 2007)...............................................15, 16

*Rooms v. SEC*, 444 F.3d 1208 (10th Cir. 2006)....................................................12

*Schmidt v. Lessard*, 414 U.S. 473 (1974) ............................................................... 3

*Seila Law v. CFPB*, 140 S. Ct. 2183 (2020) ........................................................ 2

*Simms v. D.C.*, 872 F. Supp. 2d 90 (D.D.C. 2012) ............................................. 16

*Springsteen-Abbott v. SEC*, 989 F.3d 4 (D.C. Cir. 2021) ..............................4, 5

*Turbeville v. Fin. Indus. Regul. Auth.*, 874 F.3d 1268 (11th Cir. 2017) .............9, 10

*Weissman v. NASD*, 500 F.3d 1293 (11th Cir. 2007) ................................. 3, 10, 11

## Constitutions, Statutes, and Rules

U.S. CONST. art. II
    § 1 .................................................................................................13
    § 3 .................................................................................................13
    § 2, cl. 2 .......................................................................................14

15 U.S.C.
    § 78o-3(b)(6) ................................................................................ 9
    § 78s(h)(4)(B) ..............................................................................13

FINRA Rule 9235 ....................................................................................14

## Other Authorities

Birdthistle & Henderson, *Becoming a Fifth Branch*, 99 CORNELL L. REV. 1 (2013) ...............10

*Department of Enforcement v. Alpine Securities Corporation,* FINRA Proceeding No. 2019061232603 ................................................................................. 4

Edwards, *Supreme Risk*, 74 FLA. L. REV. 543 (2022) ................................. 10, 12, 13

*Financial Industry Regulatory Authority v. Scottsdale Capital Advisors*, SEC, Exchange Act Release No. 93052 (Sept. 17, 2021) ................................16

*Municipal Securities*, FINRA, https://bit.ly/43pOCBY ...................................... 9

Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, MERCATUS CTR. GEO. MASON UNIV. (Working Paper 2015) ..................................10

Stone & Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, 2 COLUMBIA BUS. L. REV. 453 (1995) .........................10

## INTRODUCTION

The Financial Industry Regulatory Authority ("FINRA") is a self-declared private agency that regulates the securities industry with the full force of federal law but that eschews any obligation to follow the Constitution. In an audacious exercise of that authority, FINRA has employed an expedited procedural mechanism—the Expedited Proceeding—against a firm that had the temerity to challenge FINRA. It seeks through that proceeding to impose the corporate death penalty: immediate expulsion of Alpine Securities Corporation from the industry. FINRA is rushing Alpine to the guillotine undeterred by Alpine's pending constitutional claims challenging FINRA's structure and authority. And all this unfolds on an emergency timeframe of FINRA's own making, depriving the courts of adequate time to consider Alpine's important constitutional claims. Alpine seeks an injunction pending appeal so that FINRA cannot forestall Alpine's credible constitutional claims by destroying Alpine's business. In the absence of such an injunction, Alpine could be put out of business at the conclusion of a hearing that is expected to last five days and on track to finish on Friday, June 9, 2023.

Alpine is highly likely to succeed on the merits of its constitutional claims. This Court's precedents establish that the Expedited Proceeding is state action. Although FINRA claims to be a private entity unbound by *any* constitutional requirements in *any* context, this Court has already held that a private body, when acting as an "agent" of the government, engages in state action. This Court has also recognized that FINRA's predecessor agency, the National Association of Security Dealers ("NASD"), exercised governmental power by enforcing federal law to expel actors from the industry. Despite FINRA's obligation to follow the Constitution in enforcing federal law, FINRA (i) maintains a structure and operates in a

1

manner that violates the Separation of Powers, *see Free Enter. Fund v. PCOAB.*, 561 U.S. 477 (2010); *Seila Law v. CFPB*, 140 S. Ct. 2183 (2020); and (ii) appoints and deploys unconstitutional hearing officers, *see Lucia v. SEC*, 138 S. Ct. 2044 (2018)—all while disclaiming any obligation to afford procedural due process.

Absent relief from this Court, Alpine will be irreparably harmed as FINRA advances in its effort to shutter Alpine's business through a $4 million fine and the corporate equivalent of capital punishment. Alpine also faces a separate constitutional injury, as FINRA will have executed its punishment before any meaningful review by the SEC, FINRA's supervisory agency. FINRA, meanwhile, will face no harm, as it has already waited nearly a year to bring the Expedited Proceeding, and any urgency is entirely manufactured. The public interest, in line with the preservation of constitutional rights, also supports injunctive relief.

Alpine respectfully requests that this Court enjoin FINRA from further pursuing the Expedited Proceeding pending appeal of the district court's preliminary injunction ruling. To prevent FINRA from closing Alpine's business while this motion is pending, Alpine further requests that the Court administratively enjoin the Expedited Proceeding while this Court considers the merits of this motion.[1]

---

[1] Alpine respectfully requests that the Court consider this emergency motion on an expedited basis. The Expedited Proceeding began on the morning of June 5, 2023, and FINRA's Hearing Officer could order Alpine to immediately shut down at the hearing's conclusion or any time thereafter. Alpine has informed the Clerk of Court and opposing counsel of this emergency motion. In accordance with Federal Rule of Appellate Procedure 8(a), Alpine has not first sought an injunction pending appeal from the district court because doing so would have been impracticable given the time pressure created by FINRA's decision to move forward with the Expedited Proceeding even while Alpine seeks relief from the federal courts. For the same reason, this motion could not have been filed seven days before action by this Court was required.

## BACKGROUND

FINRA is the sole registered national securities association in the United States. Alpine and nearly every other broker-dealer in the securities industry is obligated to join FINRA as a condition of doing business. FINRA performs a variety of important functions: "adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws." *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007); *see NASD v. SEC*, 431 F.3d 803, 805-06 (D.C. Cir. 2005). FINRA also has rulemaking authority, and its rules carry the force and status of federal law. *Birkelbach v. SEC*, 751 F.3d 472, 475 n.2 (7th Cir. 2014).

On April 14, 2023, the United States Supreme Court decided *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890 (2023), holding that plaintiffs do not have to circumnavigate an administrative review process for a district court to consider constitutional claims against an administrative agency and its procedures. *Id.* On April 19, 2023, just five days after the *Axon* opinion was published, FINRA filed the Expedited Proceeding against Alpine, rushing to obtain an order expelling Alpine from the industry. FINRA alleges that Alpine violated a cease-and-desist order it issued in March 2022 concerning the fees Alpine charges its customers. FINRA has known about the specific conduct at issue in the Expedited Proceeding since at least June 2022. Alpine vigorously disputes FINRA's allegations (and the district court's apparent reliance on those allegations below) as both a factual and legal matter. In addition to a variety of defenses, Alpine maintains that the provisions of the March 2022 cease-and-desist order— a vague "obey-the-law injunction"—it stands accused of violating did not provide the minimum amount of notice that the Due Process Clause requires. *Cf. Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam).

The cease-and-desist order arose out of an Initial Hearing Panel Decision (the "Initial Decision") from a prior FINRA enforcement proceeding.[2] Decl. of Maranda Fritz, Doc. 46, ¶¶ 3-4 (D.D.C. May 9, 2023). Alpine appealed the Initial Decision to FINRA's in-house appellate tribunal, the National Adjudicatory Council ("NAC"). Under FINRA's rules, the Initial Decision is not final unless and until it is affirmed by the NAC. No NAC decision has been issued, so the underlying FINRA decision on which the Expedited Proceeding is based is not final.[3] The expulsion order that FINRA seeks to impose through the Expedited Proceeding would become effective immediately upon issuance—which could be as soon as the hearing ends—and force the closure of its business. *Id.* ¶ 7.

On May 9, 2023, Alpine filed an emergency motion for preliminary injunction for relief from the Expedited Proceeding in the Middle District of Florida, where Plaintiffs originally sued. On May 26, 2023, after briefing and a hearing, the district court transferred this case to the District of Columbia.

Two days after the case was transferred, and before any briefing or submission by the parties, the district court denied Alpine's motion for preliminary injunction "without prejudice." *See* Minute Order of May 26, 2023. In its denial, the district court relied on *Springsteen-Abbott v. SEC*, 989 F.3d 4 (D.C. Cir. 2021), reasoning that because "the administrative process before [FINRA] and the [SEC] will not be exhausted until the SEC has had an opportunity to rule on the result of the FINRA proceeding," Alpine's claims could

---

[2] *See Department of Enforcement v. Alpine Securities Corporation,* FINRA Proceeding No. 2019061232603.

[3] As the Middle District of Florida recognized in this case, "[i]f successful in that Expedited Proceeding, FINRA would essentially sidestep the NAC appeal and terminate Plaintiffs from membership in FINRA, rendering them ineligible to continue to operate in the securities field." Transfer Order, No. 22-cv-2347, Doc. 62 at 5 (M.D. Fla. May 24, 2023).

not prevail. *Id.* Alpine then filed a motion for reconsideration, Doc. 65, notifying the district court that the Supreme Court had recently overruled *Springsteen-Abbott* in *Axon*, which held that a plaintiff asserting constitutional challenges to an agency's structure may seek an injunction of the regulatory proceeding in district court without first exhausting the administrative process. *Axon*, 143 S. Ct. at 897. Alpine also filed a renewed motion for preliminary injunction or temporary restraining order. Doc. 66. Between May 30, 2023, and June 2, 2023, the district court ordered briefing, held a hearing, and ordered supplemental briefing on the emergency motion. The district court ultimately denied Alpine's preliminary injunction motion on June 7, 2023. *See* Mem. Op., 1:23-cv-01506-BAH, Doc. 88 (D.D.C. June 7, 2023) ("Op.").

Amidst all this and the pending status of Alpine's constitutional claims, FINRA proceeded with the Expedited Hearing on June 5, 2023. That hearing is ongoing as this emergency motion is filed. Once the evidence is presented by FINRA to its Hearing Officer, a decision from the Hearing Officer could come down at any moment, at which point Alpine could be expelled from the securities industry and immediately forced to close its doors. The only step that Alpine could take at that point would be to file an application with the SEC seeking authorization to reopen the firm. But given the dramatic impact even a temporary closure would have on Alpine's business and the time that the SEC requires to consider such applications, the damage will have already been done. Alpine seeks an injunction from this Court to stop that from happening.

## ARGUMENT

I.    **The Court Should Enjoin FINRA's Expedited Proceeding Pending Resolution of Alpine's Preliminary Injunction Appeal.**

Alpine has satisfied the standard for an injunction pending appeal and certainly this

Court's "sliding scale" standard. *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). Alpine is highly likely to succeed on the merits and will be irreparably harmed absent relief. FINRA, meanwhile, will face no harm from a delay in the Expedited Proceeding, which concerns alleged misconduct that FINRA has known about since at least last June. And the public interest supports an injunction while Alpine's constitutional claims are adjudicated. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

### A.    Alpine Has a Strong Likelihood of Success on the Merits.

Alpine is highly likely to succeed on the merits of its constitutional claims. This Court's precedents establish that FINRA's Expedited Proceeding constitutes state action. As a state actor *in that context*, FINRA must follow the Constitution *in that context*. Yet FINRA maintains an enforcement structure that violates the Separation of Powers and the Appointments Clause. Alternatively, if FINRA were somehow not a state actor, then it is a private entity that exercises governmental power in violation of the private nondelegation doctrine.

### 1.    The Expedited Proceeding Is State Action.

According to FINRA, it "is a private company, not a government actor subject to constitutional scrutiny." FINRA Motion to Dismiss, Doc. 51, at 16 (May 12, 2023) (Dkt. 51). Whatever FINRA's status generally, FINRA clearly engages in state action in the context of an adjudicative hearing to enforce federal securities law and impose penalties for violations of the law.

This Court distilled a test for determining when an allegedly private body engages in state action: "The requisite nexus [for state action] generally exists when a private party acts as an *agent* of the government in relevant respects." *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 43 (D.C. Cir. 2015) (emphasis added). A government charter is not a requirement to demonstrate

state action. *See Blount v. S.E.C.*, 61 F.3d 938, 941 (D.C. Cir. 1995) (stating that it would "put[] to one side" the effect of a government charter because what was "critical" was the entity's enforcement of "federal law"). The Supreme Court has provided additional standards. A private party may be considered a state actor when "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise." *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 357-58 (1974). Or "when it is entwined with governmental policies or when government is entwined in its management or control." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 288-89 (2001). State action is also present when a private party performs a "public function" of the sort traditionally performed only by the government. *Marsh v. Alabama*, 326 U.S. 501, 506 (1946).

The *only* state action issue squarely presented by Alpine's motion concerns the status of the Expedited Proceeding *in particular*. Whether FINRA must be treated as a state actor in other contexts is not before the Court. Alpine asks only that the Court enjoin an Expedited Proceeding that could put it out of business as soon as the Hearing Officer issues a ruling. Whatever FINRA's status in other contexts, FINRA is undoubtedly a state actor when it adjudicates and enforces federal securities laws and imposes sanctions that carry the force of law.

### i.     This Court's Precedents Establish that the Expedited Proceeding Is State Action.

"The requisite nexus [for state action] generally exists when a private party acts as an *agent* of the government in relevant respects." *Peacock*, 794 F.3d at 43 (emphasis added). Here, FINRA clearly acts as the "agent" of the SEC in the relevant respect—the enforcement of federal securities laws through adjudicative hearings and the imposition of penalties.

This Court  said as much in *National Ass'n of Securities Dealers, Inc. v. SEC*, 431 F.3d 803

(D.C. Cir. 2005). There, the Court described FINRA's predecessor, the NASD, as a "quasi-governmental agency" with "quasi-governmental authority to adjudicate actions against members" and "quasi-governmental power to discipline its members." *Id.* at 804-05, 807. The Court explained that the body's "disciplinary process essentially *supplants* a disciplinary action that might otherwise start with a hearing before an ALJ." *Id.* at 806 (emphasis added). What is more, FINRA's "authority to discipline its members for violations of federal securities law is *entirely derivative*" and "ultimately belongs to the SEC." *Id.* (emphasis added); *see Business Roundtable v. SEC*, 905 F.2d 406, 414 (D.C. Cir. 1990) (SROs such as FINRA "regulate members with delegated governmental authority"). FINRA clearly serves as an agent of the SEC in an enforcement proceeding in which its power is *entirely derivative* of the SEC and uses procedures that supplant the SEC. This makes good sense. The nature of the Expedited Proceeding is no different in substance from enforcement proceedings that routinely occur in a multitude of federal agencies—a traditional public function.

This Court's decision in *Blount* provides further support. In that case, the Court held that a rule issued by the Municipal Securities Rulemaking Board (MSRB) was state action. The Court focused on two aspects of the law that underscored the existence of state action: (1) a broker-dealer "may not engage in interstate trade in municipal securities unless he registers" under the Exchange Act; and (2) a broker-dealer who "violates an MSRB rule . . . may be sanctioned by revocation or suspension" of his registration. *Blount*, 61 F.3d at 941. Likewise here, Alpine must maintain Exchange Act registration to deal in securities, and in the Expedited Proceeding it faces revocation of its registration for alleged violations of FINRA rules.

This Court described the MSRB rule in *Blount* as "government action of the purest sort" because it was "a *government-enforced* condition to any participation in a municipal securities career." *Id.* (emphasis added). Notably, the MSRB does not enforce its own rules. Instead, the entity charged with enforcing MSRB rules is FINRA. *See Municipal Securities*, FINRA, https://bit.ly/43pOCBY.

In *Blount*, as in this case, "[w]hat is critical" is that the underlying rule at issue "operates not as a private compact among brokers and dealers but as *federal law*." *Id.* at 941 (emphasis added). No less than the MSRB's rules, FINRA's rules—including the rules that Alpine stands accused of violating—have the status of federal law. *See Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1121 (9th Cir. 2005) (holding that rules of FINRA's predecessor preempt conflicting state law); *see also Birkelbach*, 751 F.3d at 475 n.2. When FINRA decides to levy sanctions, those sanctions "carry the force of federal law." *Turbeville v. Fin. Indus. Regul. Auth.*, 874 F.3d 1268, 1271 (11th Cir. 2017). That is state action.

### ii.    In Conducting the Expedited Proceeding, FINRA Is Intimately Entwined with the Federal Government.

FINRA is not just tasked with enforcing its own rules; it serves as a front-line adjudicator for violations of the Exchange Act and the SEC's rules and regulations. *NASD*, 431 F.3d at 808. In fact, when a FINRA member violates the Exchange Act, FINRA is *required* to levy sanctions. *Turbeville,* 874 F.3d at 1271; *see* 15 U.S.C. § 78o-3(b)(6). FINRA's enforcement function exists only because it is delegated from the SEC; its power is derivative from, performed on behalf of, and ultimately controlled by the SEC. The SEC has "pervasive oversight authority" over FINRA's disciplinary proceedings, and when FINRA performs this function it is subject to "control by the SEC on an ongoing basis." *Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676, 680, 690 (5th Cir. 1985). As this Court has already recognized, FINRA

has "no authority to regulate independently of the SEC's control." *NASD*, 431 F.3d at 807 (quoting S. Rep. No. 94-75, at 23 (1975)); *see also Weissman*, 500 F.3d at 1296.

Courts in other jurisdictions have recognized the intimate entwinement between the SEC and FINRA in the context of enforcement proceedings. *Turbeville*, 874 F.3d at 1276 (when an SRO such as FINRA carries out its functions as the prosecutor in the enforcement of securities laws and implements SEC-approved rules governing disciplinary actions, it "act[s] under color of federal law as [a] deput[y] of the federal government"); *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971) ("The intimate involvement of the Exchange with the [SEC] brings it within the purview of the Fifth Amendment controls over governmental due process.").[4] Given FINRA's vast adjudicatory and prosecutorial authority to enforce federal law, the Expedited Proceeding is state action—an adjudicative enforcement hearing that carries the force of law and the possibility of severe, existential sanctions.

### iii.    The Immunity to which FINRA Claims It Is Entitled Further Demonstrates that the Expedited Proceeding Is State Action.

FINRA has claimed that it is immune from tort suits arising from its prosecutorial, adjudicatory, and enforcement conduct. When FINRA is performing a governmental

---

[4] Scholars have recognized more broadly that amendments to the federal securities laws and the SEC's practices in recent years have "effectively entwined the SEC and its SROs, making it difficult to characterize the SEC's role as purely oversight." Edwards, *Supreme Risk*, 74 FLA. L. REV. 543, 559 (2022); *see also, e.g.*, Birdthistle & Henderson, *Becoming a Fifth Branch*, 99 CORNELL L. REV. 1 (2013); Stone & Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, 2 COLUMBIA BUS. L. REV. 453 (1995). As SEC Commissioner Hester Pierce put it: "on the strength of a government mandate and carrying out a regulatory mission using government-like tools, FINRA is difficult to distinguish from its patron agency." Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*, at 20, MERCATUS CTR. GEO. MASON UNIV. (Working Paper 2015).

function on behalf of the SEC, it is afforded immunity. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008); *Weissman*, 500 F.3d at 1296 ("Because they perform a variety of vital governmental functions . . . SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions" (cleaned up)). When FINRA is not performing such a function, its right to immunity ceases.

Because FINRA is entitled to immunity when it is performing the government function of an enforcement proceeding, it functions as a government actor in that context. FINRA refutes this notion and instead seeks to have it both ways. FINRA maintains that, on the one hand, it is entitled to immunity when it performs the adjudicatory and prosecutorial governmental functions delegated to it, but, on the other hand, it is a private actor free from constitutional restraints. Accepting FINRA's position would grant FINRA an unprecedented form of immunity which provides *more* protection than that afforded *either* to governmental entities (who may be sued for constitutional violations) and that available to private citizens (who may be sued for private tort claims). The better conclusion is that, when FINRA exercises its adjudicatory powers in an enforcement proceeding, it engages in state action.

### iv.   The State Actor Cases Upon which FINRA Relies Are Inapposite.

FINRA may direct the Court to non-binding precedent in which some courts have stated that FINRA is a private entity. These cases are largely inapposite, since they did not arise in the context of FINRA's exercise of delegated enforcement authority and are not probative of whether FINRA engages in state action in the relevant context of an adjudicatory

11

enforcement proceeding.

Indeed, the cases on which FINRA has relied focus on narrow questions entirely unrelated to whether a FINRA proceeding to enforce federal law and impose sanctions is state action. For example, in *Desiderio v. NASD*, 191 F.3d 198 (2d Cir. 1999), a securities broker argued that the mandatory arbitration provision in Form U-4 violated her constitutional rights. 191 F.3d at 200. The court concluded that there was no SEC rule or action that encouraged the NASD to compel arbitration, thus the *particular conduct* was not "fairly attributable" to the state. *Id.* That narrow conclusion is simply not applicable here. Furthermore, to the extent that *Desiderio* is read more broadly to imply that FINRA's rulemaking and enforcement activities *never* qualify as state action, it conflicts with this Court's decision subjecting a FINRA rule to First Amendment scrutiny in *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499 (D.C. Cir. 2019), as well as the Tenth Circuit's recognition that "[d]ue process requires that an NASD rule give fair warning of prohibited conduct before a person may be disciplined for that conduct," *Rooms v. SEC*, 444 F.3d 1208, 1214 (10th Cir. 2006) (McConnell, J.).

Further, many of the cases on which FINRA has relied predate or do not apply the Supreme Court's entwinement standard set forth in *Brentwood* and of course do not apply this Court's "agent" test for state action, *Peacock*, 794 F.3d at 43. Many of these opinions are also substantively outdated, as they also predate critical changes in FINRA's role and its entwinement with the SEC. As one scholar explained, "the Second Circuit rendered its *Desiderio* decision without briefing on the impact of the 1975 amendments to the federal securities laws, which gave the SEC the ability to edit an SRO's rules at its will. The court also did not consider the requirements that SROs enforce federal securities laws" and "the

12

way gradual changes have transformed SROs to more closely resemble de facto arms of the federal government." Edwards, *Supreme Risk*, *supra*, at 594; *see also Credit Suisse First Boston Corp.*, 400 F.3d at 1119, 1129-30 (discussing 1975 "major overhaul of the Exchange Act" that "drastically shifted the balance of rulemaking power in favor of Commission oversight").[5]

### 2.     FINRA's Structure Violates the Separation of Powers.

The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," and that the President "shall take Care that the Laws be faithfully executed." U.S. CONST. art. II, §§ 1, 3. The Constitution accounts for principal executive officers to assist in these duties. *See Free Enterprise Fund,* 561 U.S. at 483. For that arrangement to comply with the Constitution, though, the President must not be restricted in his ability to remove a principal officer who is in turn restricted in his or her ability to remove an inferior officer. *Id.* at 484. That kind of multilevel protection from removal violates Article II. *Id.*

In *Free Enterprise Fund,* the Supreme Court held that the structure of the PCAOB board, which was similar to FINRA, was unconstitutional. *Id.* That FINRA's structure is unconstitutional  follows inexorably from *Free Enterprise Fund*. The SEC cannot remove FINRA Board members, executives, officers, or other officials at will. *See* 15 U.S.C. § 78s(h)(4)(B). Similarly, the President has no authority to remove a FINRA Board member, executive, or officer. Thus, FINRA's Board members, executives, and officers—including

---

[5] Below, FINRA invoked a passing reference to "private self-regulatory organizations" in *Free Enterprise Fund*, 561 U.S. at 484. This was an offhand description, not a holding. The Court in no way analyzed the issue of whether FINRA or other "self-regulatory organizations" engage in state action when adjudicating alleged violations of federal law and imposing sanctions that carry the force of law. And that—not whether FINRA is "private"— is critical. Nothing in *Free Enterprise Fund* suggests that when a putatively "private" entity exercises quintessential governmental powers to make and enforce law, or otherwise acts as the government's agent, it is somehow immunized from the Constitution's mandates.

Hearing Officers—enjoy the same dual-layer removal protection that PCAOB board had prior to the Supreme Court finding it violated the Separation of Powers.

### 3. FINRA's Structure Violates the Appointments Clause.

The Appointments Clause requires that "inferior Officers" be appointed by the President, the federal courts, or the "Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. Neither FINRA's Hearing Officers nor its Board are appointed in conformity with this requirement, and both sets of officials are "Officers of the United States" under Supreme Court precedent.

With respect to FINRA's Hearing Officers, the Supreme Court's holding in *Lucia v. SEC* is directly on point. There, the Court recognized that SEC ALJs are "Officers of the United States" rather than mere employees. 138 S. Ct. at 2055. The Court reasoned that SEC ALJs exercise "significant discretion," have "the authority needed to ensure fair and orderly adversarial hearings," and may serve as the "last-word." *Id.* at 2053-54. All of that is also true of the FINRA Hearing Officer who is presiding over the Expedited Proceeding. *See* FINRA Rule 9235. If anything, FINRA Hearing Officers are *more* empowered to execute federal law than SEC ALJs. The *Lucia* Court remarked that SEC ALJs may lack "the nuclear option of compliance tools[.]" *Id.* Not so here, where FINRA Hearing Officers can and do execute the nuclear option: expulsion from the industry. This Court has already recognized that a FINRA enforcement proceeding "supplants a disciplinary action that might otherwise start with a hearing before an ALJ" at the SEC. *NASD,* 431 F.3d at 806-07. That reality together with *Lucia*'s holding that the SEC ALJs are Officers of the United States leaves no doubt that Alpine is likely to succeed on the merits of its Appointments Clause claim regarding FINRA's Hearing Officers.

The members of FINRA's Board are also Officers of the United States. The key precedent for the FINRA Board is *Free Enterprise Fund*, which treated similarly situated members of the PCAOB as inferior officers even after striking down their insulation from removal by the SEC. 561 U.S. at 510. As an agent of the government that creates and enforces federal securities law, FINRA's officials are subject to the Appointments Clause.

### 4.  If the Expedited Proceeding Is Not State Action, FINRA's Enforcement Powers Violate the Private Nondelegation Doctrine.

If the Court concludes that FINRA is a purely private entity, then Congress and the SEC have improperly outsourced enforcement of federal securities law to a private entity. *DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 61 (2015) (Alito, concurring) ("Congress cannot delegate regulatory authority to a private entity."); *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

FINRA enjoys broad power to enforce compliance with securities laws. While these functions are subject to SEC oversight, the facts here show that FINRA can evade that oversight. Indeed, FINRA has created a procedural mechanism where it can expel an entity from the securities industry without any opportunity for review. There is no ability for the SEC to stay the corporate death penalty. If FINRA is truly a private actor, then FINRA's broad, unchecked enforcement authority violates the private nondelegation doctrine.

### B.  The Remaining Factors Overwhelmingly Favor an Injunction.

Absent an injunction pending appeal, as the district court recognized, Alpine will be irreparably harmed by FINRA's sweeping exercise of government authority and disclaimer of all constitutional constraints. Op. at 25-28. Put simply, Alpine will be subject to an unconstitutional administrative proceeding that could result in immediate expulsion—"the securities industry equivalent of capital punishment." *PAZ Sec. v. SEC*, 494 F.3d 1059, 1065

15

(D.C. Cir. 2007). There is no question that Alpine will be irreparably harmed absent relief to preserve the status quo. It will make no difference if Alpine ultimately succeeds—as it did previously—in having all findings and sanctions of the Hearing Officer reversed by the SEC.[6] By that time, Alpine will be out of business.

What is worse, Alpine faces expulsion from the industry without any decision by the SEC on *either* Alpine's appeal from the underlying decision *or* an appeal from the decision in this new Expedited Proceeding. As Justice Kagan explained in *Axon*, being subject to an illegitimate proceeding by an illegitimate decision maker constitutes "a here-and-now injury," and "a proceeding that has already happened cannot be undone." *Axon*, 143 S. Ct. at 903-04. "The loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quotation marks omitted). The public interest supports Alpine for the same reason: "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. D.C.*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012).

The district court, in both its discussion of the public interest and the merits, appeared to be concerned about policy. Op. at 19-20 (citing "policy considerations" for why FINRA should not be treated as a state actor); *id.* at 29. "But as the Supreme Court has repeatedly stressed, the importance of a policy does not license the Judiciary to ignore or weaken constitutional limits arising out of the separation of powers." *Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 714 (D.C. Cir. 2008) (Kavanaugh, J., dissenting). And the district court's concerns were misplaced for at least three reasons. First, the narrow request of *this* injunction

---

[6] *Financial Industry Regulatory Authority v. Scottsdale Capital Advisors*, SEC, Exchange Act Release No. 93052 (Sept. 17, 2021).

would be to enjoin *this* Expedited Hearing, just as the Fifth Circuit enjoined the underlying (and allegedly unconstitutional) ALJ hearing in *Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 198 (5th Cir. 2021) (en banc), *aff'd Axon*, 143 S. Ct. at 900. Federal enforcement of the securities laws has continued apace since the Fifth Circuit issued that injunction in 2019. Second, nothing in Alpine's motion or underlying complaint would prevent *the SEC* from bringing an enforcement action against Alpine to the extent that members of that presidentially appointed body believe that Alpine violated the federal securities laws. Third, FINRA itself will not be harmed, as it waited months to initiate the Expedited Proceeding. FINRA would suffer no real injury from allowing this Court to consider Alpine's constitutional arguments before it closes Alpine for good.

## CONCLUSION

This Court should enjoin FINRA from further pursuing the Expedited Proceeding or rendering a decision pending the outcome of Alpine's appeal. If prompt entry of that relief is not possible, the Court should immediately administratively enjoin FINRA from further pursuing the Expedited Proceeding or rendering a decision to allow consideration of this motion before Alpine suffers further irreparable and potentially catastrophic harm.

Dated: June 8, 2023

Respectfully submitted,

Kenneth G. Turkel
E-mail:  kturkel@tcb-law.com
David A. Hayes
E-mail:  dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.    and
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Phone: (813) 834-9191

*/s/    David H. Thompson*
David H. Thompson
Brian W. Barnes
Cooper & Kirk, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
Phone: (202) 220-9649
dthompson@cooperkirk.com
bbarnes@cooperkirk.com

Maranda E. Fritz
maranda@fritzpc.com
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231

*Counsel for Movant Alpine Securities Corporation*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FED. R. APP. P. 27(d)(2)(A) because this document contains 5,191 words excluding parts of the brief exempted by FED. R. APP. P. 32(f) and Circuit Rule 32(e)(1).

This document complies with the typeface and type style requirements of FED. R. APP. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman Font.

Dated: June 8, 2023                         s/David H. Thompson
                                            David H. Thompson
                                            *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that on June 8, 2023, I filed the foregoing document via the appellate CM/ECF system of the United States Court of Appeals for the District of Columbia Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 8, 2023                    s/David H. Thompson
                                       David H. Thompson
                                       *Counsel for Plaintiff-Appellant*

# ADDENDUM

ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, | |
| Plaintiff-Appellant, | |
| SCOTTSDALE CAPITAL ADVISORS CORPORATION, | Case No. 23-5129 |
| Plaintiff, | |
| v. | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC., | |
| Defendant-Appellee, | |
| UNITED STATES OF AMERICA | |
| Intervenor for Defendant-Appellee. | |

## <u>CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Plaintiff-Appellant is Alpine Securities Corporation. Although not a party to the pending preliminary injunction appeal, the other Plaintiff in this case is Scottsdale

Capital Advisors Corporation. Defendant-Appellee is the Financial Industry Regulatory Authority, Inc. Intervenor-Defendant-Appellee is the United States of America.

The law firms to have participated in this matter include: Cooper & Kirk PLLC, law firm for Plaintiffs; Turkel Cuva Barrios, P.A., law firm for Plaintiffs; Maranda E. Fritz PC, law firm for Plaintiffs; Gibson, Dunn & Crutcher LLP, law firm for Defendant FINRA.

## B. Rulings Under Review

The ruling under review is the Order, Doc. 87, and the Memorandum Opinion, Doc. 88 (June 7, 2023). *Scottsdale Capital Advisors Corporation, et al. v. Financial Industry Regulatory Authority, Inc., et al.,* No. 1:23-cv-01506 (D.D.C.) (Beryl A. Howell, J.).

## C. Related Cases

This case has not previously been before this Court. Counsel for Plaintiff-Appellant are unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## D. Corporate Disclosure Statement

Pursuant to FRAP 26.1 and Circuit Rule 26.1, Plaintiff-Appellant Alpine Securities Corporation and Plaintiff-Appellee Scottsdale Capital Advisors Corporation are registered broker dealers. Alpine is a broker dealer with its principal

office in Salt Lake City, Utah. Alpine's parent company is SCA Clearing, LLC. No

publicly held corporation owns 10% or more of Alpine's stock. Scottsdale Capital

Advisors Corporation is a broker dealer that has a principal office in Scottsdale,

Arizona. Scottsdale's sole equity shareholder is a holding company, Scottsdale

Capital Advisors Holding LLC. No publicly held corporation owns 10% or more of

Scottsdale's stock.

s/David H. Thompson
David H. Thompson
*Counsel for Plaintiff-Appellant*

ORAL ARGUMENT NOT YET SCHEDULED
No. 23-5129

# In The United States Court Of Appeals
# For The District Of Columbia Circuit

-------------------------------- ✳ --------------------------------

ALPINE SECURITIES CORPORATION,
*Plaintiff-Appellant*,

SCOTTSDALE CAPITAL ADVISORS CORPORATION
*Plaintiff*,

v.

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,
*Defendants-Appellee*

UNITED STATES OF AMERICA,
*Intervenor for Defendant-Appellee*.

-------------------------------- ✳ --------------------------------

**APPENDIX TO PLAINTIFF-APPELLANTS' EMERGENCY MOTION
FOR INJUNCTION PENDING APPEAL**

-------------------------------- ✳ --------------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA No. 1:23-cv-0506-BAH

-------------------------------- ✳ --------------------------------

Kenneth G. Turkel
David A. Hayes
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL 33602
Phone: (813) 834-9191
kturkel@tcb-law.com

Maranda E. Fritz
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231
maranda@fritzpc.com

David H. Thompson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiff-Appellant*

# INDEX OF APPENDIX

**Page**

District Court Docket Sheet, No. 1:23-cv-106 (D.D.C.)............................App.1

Notice of Appeal, Doc. 89 (June 8, 2023).................................................App.12

Memorandum Opinion, Doc. 88 (June 7, 2023) ......................................App.14

Order, Doc. 87 (June 7, 2023)...................................................................App.44

Second Amended Complaint, Doc. 43 (Apr. 28, 2023)..........................App.46

Exhibit to Emergency Motion for Preliminary Injunction,
    Proposed Order, Doc. 45-1 (May 9, 2023)....................................App.87

Declaration of Maranda E. Fritz,
    Doc. 46 (May 9, 2023) ..............................................................App.112

Motion Hearing Transcript,
    *Scottsdale Cap. Fin. Advisors v. FINRA*, 8:22-CV-2347-MSS-TGW,
    Doc. 64 (M.D. Fla.) (May 22, 2023) .........................................App.114

Order, Doc. 62 (May 24, 2023) ............................................................App.221

D.D.C. Hearing Transcript (June 1, 2023) ..........................................App.237

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:23–cv–01506–BAH

| | |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION et al v. FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.<br>Assigned to: Judge Beryl A. Howell<br> Case in other court:  Florida Middle, 8:22–cv–02347<br>Cause: 28:2201 Constitutionality of State Statute(s) | Date Filed: 05/25/2023<br>Jury Demand: None<br>Nature of Suit: 440 Civil Rights: Other<br>Jurisdiction: Federal Question |

**Plaintiff**

**SCOTTSDALE CAPITAL ADVISORS CORPORATION**

represented by **David Henry Thompson**
COOPER & KIRK, PLLC
1523 New Hampshire Ave, NW
Washington, DC 20036
(202) 220–9600
Fax: (202) 220–9601
Email: dthompson@cooperkirk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Turkel**
TURKEL CUVA BARRIOS, P.A.
100 N. Tampa Street
Suite 1900
Tampa, FL 33602
813–834–9191
Fax: 813–443–2193
Email: kturkel@tcb–law.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian W. Barnes**
COOPER & KIRK, PLLC
1523 New Hampshire Ave, NW
Washington, DC 20036
202–220–9600
Fax: 202–220–9601
Email: bbarnes@cooperkirk.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Hayes**
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street
Suite 1900
Tampa, FL 33602
813–834–9191
Fax: 813–443–2193
Email: dhayes@tcb–law.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ALPINE SECURITIES CORPORATION**

represented by **David Henry Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Turkel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian W. Barnes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Hayes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**FINANCIAL INDUSTRY**
**REGULATORY AUTHORITY, INC.**

represented by **Amir Cameron Tayrani**
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Suite 300
Washington, DC 20036–5306
202–887–3692
Fax: 202–530–9645
Email: atayrani@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex Gesch**
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
202–887–3776
Email: agesch@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**UNITED STATES OF AMERICA**

represented by **Stephen M. Pezzi**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 305–8576
Fax: (202) 616–8470
Email: stephen.pezzi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
DOJ–CIV
Federal Programs Branch, Civil Division
1100 L Street NW
Washington, DC 20005
(202) 880–0282
Email: christine.l.coogle@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/12/2022 | 1 | COMPLAINT against Financial Industry Regulatory Authority, Inc. (Filing fee $402 receipt number AFLMDC−20083596) filed by Scottsdale Capital Advisors Corporation, Alpine Securities Corporation. (Attachments: # 1 Civil Cover Sheet)(Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/12/2022) |
| 10/13/2022 | 2 | NEW CASE ASSIGNED to Judge Mary S. Scriven and Magistrate Judge Thomas G. Wilson. New case number: 8:22−cv−2347−MSS−TGW. (SJB) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/13/2022) |
| 10/13/2022 | 3 | NOTICE to counsel of Local Rule 2.02(a), which requires designation of one lead counsel who – unless the party changes the designation – remains lead counsel throughout the action. File a **Notice of Lead Counsel Designation** to identify lead counsel. (Signed by Deputy Clerk). (LD) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/13/2022) |
| 10/13/2022 | 4 | **STANDING ORDER regarding discovery motions. Signed by Magistrate Judge Thomas G. Wilson on 10/13/2022. (ABC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/13/2022) |
| 10/18/2022 | 5 | PROPOSED summons to be issued by Alpine Securities Corporation, Scottsdale Capital Advisors Corporation. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/18/2022) |
| 10/19/2022 | 6 | SUMMONS issued as to Financial Industry Regulatory Authority, Inc. (LD) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/19/2022) |
| 10/24/2022 | 7 | RETURN of service executed on 10/20/2022 by Scottsdale Capital Advisors Corporation, Alpine Securities Corporation as to Financial Industry Regulatory Authority, Inc.. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/24/2022) |
| 10/26/2022 | 8 | NOTICE of Lead Counsel Designation by Kenneth George Turkel on behalf of Alpine Securities Corporation, Scottsdale Capital Advisors Corporation. Lead Counsel: Kenneth G. Turkel. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/26/2022) |
| 10/31/2022 | 9 | NOTICE of Lead Counsel Designation by Ryan Carlton Stewart on behalf of Financial Industry Regulatory Authority, Inc.. Lead Counsel: Ryan C. Stewart. (Stewart, Ryan) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/31/2022) |
| 10/31/2022 | 10 | CORPORATE Disclosure Statement by Financial Industry Regulatory Authority, Inc.. (Stewart, Ryan) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/31/2022) |
| 10/31/2022 | 11 | Unopposed MOTION for Extension of Time to File To Respond to Plaintiffs' Complaint by Financial Industry Regulatory Authority, Inc.. (Stewart, Ryan) [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/31/2022) |
| 10/31/2022 | 12 | Unopposed MOTION for Amir Tayrani to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC−20149242 for $150 by Financial Industry Regulatory Authority, Inc.. (Attachments: # 1 Exhibit A – Declaration of Amir Tayrani)(Stewart, Ryan) Motions referred to Magistrate Judge Thomas G. Wilson. [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/31/2022) |
| 10/31/2022 | 13 | Unopposed MOTION for Alex Gesch to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC−20149223 for $150 by Financial Industry Regulatory Authority, Inc.. (Attachments: # 1 Affidavit A – Declaration of Alex Gesch)(Stewart, Ryan) Motions referred to Magistrate Judge Thomas G. Wilson. [Transferred from Florida Middle on 5/26/2023.] (Entered: 10/31/2022) |
| 11/01/2022 | 14 | **ENDORSED ORDER GRANTING 11 Defendant's Unopposed Motion for Enlargement of Time to Respond to Plaintiff's Complaint and Incorporated Memorandum of Law. Defendant shall have up to and including December 12, 2022, to file an answer or otherwise respond to Plaintiff's Complaint. Signed by Judge Mary S. Scriven on 11/1/2022. (MTP)** [Transferred from Florida Middle on |

| | | |
|---|---|---|
| | | 5/26/2023.] (Entered: 11/01/2022) |
| 11/01/2022 | 15 | **ORDER granting 12 Motion to Appear Pro Hac Vice. Signed by Magistrate Judge Thomas G. Wilson on 11/1/2022. (ABC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 11/02/2022) |
| 11/02/2022 | 16 | **ORDER denying without prejudice 13 Motion to Appear Pro Hac Vice. Signed by Magistrate Judge Thomas G. Wilson on 11/2/2022. (ABC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 11/03/2022) |
| 12/06/2022 | 17 | NOTICE by United States of America *of Acknowledgment of Constitutional Challenge* (Pezzi, Stephen) [Transferred from Florida Middle on 5/26/2023.] (Entered: 12/06/2022) |
| 12/06/2022 | 18 | Joint MOTION for Extension of Time to File Case Management Report by Financial Industry Regulatory Authority, Inc.. (Stewart, Ryan) [Transferred from Florida Middle on 5/26/2023.] (Entered: 12/06/2022) |
| 12/07/2022 | 19 | **ENDORSED ORDER GRANTING 18 Joint Motion for Enlargement of Time to File Case Management Report. The Parties shall have fourteen (14) days after the Court rules on Defendant's forthcoming motion to dismiss to submit a case management report, if one remains necessary after the Court's ruling. Signed by Judge Mary S. Scriven on 12/7/2022. (MTP)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 12/07/2022) |
| 12/12/2022 | 20 | NOTICE of Lead Counsel Designation by Amir C. Tayrani on behalf of Financial Industry Regulatory Authority, Inc.. Lead Counsel: Amir C. Tayrani. (Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 12/12/2022) |
| 12/12/2022 | 21 | MOTION to Dismiss Plaintiff's Complaint by Financial Industry Regulatory Authority, Inc.. (Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 12/12/2022) |
| 12/12/2022 | 22 | REQUEST for oral argument re 21 MOTION to Dismiss Plaintiff's Complaint by Financial Industry Regulatory Authority, Inc.. (Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 12/12/2022) |
| 12/19/2022 | 23 | Unopposed MOTION for Extension of Time to File Response/Reply as to 21 MOTION to Dismiss Plaintiff's Complaint by All Plaintiffs. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 12/19/2022) |
| 12/19/2022 | 24 | **ENDORSED ORDER GRANTING 23 Unopposed Motion for Extension of Time to Respond to Motion to Dismiss. Plaintiffs shall have up to and including January 30, 2023 to file a response to Defendant's Motion to Dismiss or otherwise file an Amended Complaint. Signed by Judge Mary S. Scriven on 12/19/2022. (MTP)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 12/19/2022) |
| 01/30/2023 | 25 | Unopposed MOTION for Extension of Time to File Response/Reply as to 21 MOTION to Dismiss Plaintiff's Complaint by All Plaintiffs. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 01/30/2023) |
| 01/30/2023 | 26 | **ENDORSED ORDER GRANTING 25 Plaintiffs' Unopposed Motion for Extension of Time to Respond to Motion to Dismiss. Plaintiffs shall have up to and including February 3, 2023 to answer or otherwise respond to Defendant's Motion to Dismiss. Signed by Judge William F. Jung on 1/30/2023. (EOJ)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 01/30/2023) |
| 02/03/2023 | 27 | AMENDED COMPLAINT against Financial Industry Regulatory Authority, Inc. filed by Scottsdale Capital Advisors Corporation, Alpine Securities Corporation.(Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 02/03/2023) |
| 02/06/2023 | 28 | NOTICE by United States of America *of Intervention* (Pezzi, Stephen) [Transferred from Florida Middle on 5/26/2023.] (Entered: 02/06/2023) |
| 02/06/2023 | 29 | NOTICE of Appearance by Stephen Michael Pezzi on behalf of United States of America (Pezzi, Stephen) [Transferred from Florida Middle on 5/26/2023.] (Entered: 02/06/2023) |

| 02/06/2023 | 30 | NOTICE of Lead Counsel Designation by Stephen Michael Pezzi on behalf of United States of America. Lead Counsel: Stephen M. Pezzi. (Pezzi, Stephen) [Transferred from Florida Middle on 5/26/2023.] (Entered: 02/06/2023) |
|---|---|---|
| 02/06/2023 | 31 | NOTICE of Appearance by Christine L. Coogle on behalf of United States of America (Coogle, Christine) [Transferred from Florida Middle on 5/26/2023.] (Entered: 02/06/2023) |
| 02/09/2023 | 32 | **ENDORSED ORDER DENYING AS MOOT 21 Defendant's Motion to Dismiss Plaintiffs' Complaint. In light of Plaintiffs' having filed an Amended Complaint as a matter of course, Defendant's motion is denied as moot. Defendant shall be free to reassert any of the challenges raised therein to the extent that they remain viable against the Amended Complaint. Signed by Judge William F. Jung on 2/9/2023. (KBC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 02/09/2023) |
| 02/15/2023 | 33 | Joint MOTION for Extension of Time to File BRIEFING IN RESPONSE TO PLAINTIFFS' AMENDED COMPLAINT by Financial Industry Regulatory Authority, Inc.. (Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 02/15/2023) |
| 02/16/2023 | 34 | **ENDORSED ORDER granting 33 the Parties' Joint Motion for Enlargement of Time to respond to Plaintiffs' Amended Complaint. Defendant Financial Industry Regulatory Authority, Inc. ("FINRA") shall have up to and including March 10, 2023 to file its anticipated motion to dismiss the Amended Complaint. The United States of America shall have up to and including March 29, 2023 to file a memorandum in regard to the constitutionality of the challenged statutes. Plaintiffs shall have up to and including April 28, 2023 to file a response to FINRA's motion to dismiss and to the United States' memorandum in regard to the constitutionality of the challenged statutes. The Parties shall file their case management report within fourteen (14) days after the Court rules on the motion to dismiss, if the Court's Order does not resolve the case in full. Signed by Judge Mary S. Scriven on 2/16/2023. (KBC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 02/16/2023) |
| 03/10/2023 | 35 | MOTION to Dismiss Plaintiffs' Amended Complaint by Financial Industry Regulatory Authority, Inc.. (Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 03/10/2023) |
| 03/10/2023 | 36 | REQUEST for oral argument re 35 MOTION to Dismiss Plaintiffs' Amended Complaint by Financial Industry Regulatory Authority, Inc.. (Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 03/10/2023) |
| 03/29/2023 | 37 | MEMORANDUM in support re 28 Notice (Other) *Memorandum of Law in Defense of the Challenged Provisions of the Federal Securities Laws* filed by United States of America. (Pezzi, Stephen) [Transferred from Florida Middle on 5/26/2023.] (Entered: 03/29/2023) |
| 04/25/2023 | 38 | Unopposed MOTION for Miscellaneous Relief, specifically Motion to file Single Brief *in Response to Defendant's Motion to Dismiss and Intervenor's Memorandum of Law* by All Plaintiffs. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 04/25/2023) |
| 04/26/2023 | 39 | **ENDORSED ORDER GRANTING 38 the Plaintiffs' Unopposed Motion to File a Single [Memorandum] in Response to Defendant's Motion to Dismiss and Intervenor's Memorandum of Law. On or before April 28, 2023, Plaintiffs may file a single memorandum, not to exceed 40 pages, in response to Defendant's Motion to Dismiss Plaintiffs' Complaint and the United States of America's Memorandum of Law in Defense of the Challenged Provisions of the Federal Securities Laws. Signed by Judge Mary S. Scriven on 4/26/2023. (KBC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 04/26/2023) |
| 04/27/2023 | 40 | Time Sensitive MOTION to Amend 27 Amended Complaint *for Leave to File Second Amended Complaint* by All Plaintiffs. (Attachments: # 1 Exhibit A)(Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 04/27/2023) |
| 04/27/2023 | 41 | Time Sensitive MOTION for Extension of Time to File Response/Reply as to 37 Memorandum in support *(United States of America's Memorandum of Law in Defense* |

|  |  | *of the Challenged Provisions of the Federal Securities Laws) and (21) Defendant's Motion to Dismiss Plaintiffs' Complaint* by All Plaintiffs. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 04/27/2023) |
|---|---|---|
| 04/28/2023 | 42 | **ENDORSED ORDER GRANTING 40 Plaintiffs' Time–Sensitive Motion For Leave to File Second Amended Complaint and DENYING as moot 41 Plaintiffs' Time–Sensitive Motion for Extension of Time to Respond to Motion to Dismiss and to the United States of America's Memorandum of Law. Plaintiffs' Second Amended Complaint (Dkt. 40–1) shall be deemed filed as of the date of this Order. The Clerk is DIRECTED to separately docket Plaintiffs' Second Amended Complaint. (Dkt. 40–1) Signed by Judge Mary S. Scriven on 4/28/2023. (KBC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 04/28/2023) |
| 04/28/2023 | 43 | SECOND AMENDED COMPLAINT against Financial Industry Regulatory Authority, Inc. filed by Scottsdale Capital Advisors Corporation, Alpine Securities Corporation.(LD) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/01/2023) |
| 05/03/2023 | 44 | Unopposed MOTION for Maranda E. Fritz to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–20795502 for $150 by Alpine Securities Corporation, Scottsdale Capital Advisors Corporation. (Attachments: # 1 Exhibit)(Turkel, Kenneth) Motions referred to Magistrate Judge Thomas G. Wilson. [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/03/2023) |
| 05/09/2023 | 45 | Emergency MOTION for Preliminary Injunction by Alpine Securities Corporation. (Attachments: # 1 Exhibit 1)(Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/09/2023) |
| 05/09/2023 | 46 | DECLARATION of Maranda E. Fritz re 45 Emergency MOTION for Preliminary Injunction by Alpine Securities Corporation. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/09/2023) |
| 05/09/2023 | 47 | CERTIFICATE of interested persons and corporate disclosure statement by Alpine Securities Corporation, Scottsdale Capital Advisors Corporation identifying Other Affiliate Scottsdale Capital Advisors Holdings, LLC, Other Affiliate SCA Clearing, LLC for Scottsdale Capital Advisors Corporation. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/09/2023) |
| 05/09/2023 | 49 | **ORDER granting 44 Motion to Appear Pro Hac Vice. Signed by Magistrate Judge Thomas G. Wilson on 5/9/2023. (ABC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/10/2023) |
| 05/10/2023 | 48 | **ORDER Setting Hearing on Plaintiffs' Motion for Preliminary Injunction on Monday, May 22, 2023 in the Sam Gibbons United States Courthouse, Tampa, Florida, Courtroom 7A at 1:30 PM before United States District Judge Mary S. Scriven. The Court has set aside three (3) hours for this hearing. Defendant is DIRECTED to file a response to Plaintiff's motion and any supporting affidavits or other papers on which it intends to rely, no later than Monday, May 15, 2023. See Order for details. Signed by Judge Mary S. Scriven on 5/10/2023. (KBC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/10/2023) |
| 05/12/2023 | 50 | **ENDORSED ORDER DENYING AS MOOT 35 Defendant Financial Industry Regulatory Authority, Inc.'s Motion to Dismiss Plaintiffs' Amended Complaint. In light of Plaintiffs' having filed a Second Amended Complaint with the Court's leave, Defendant's motion is denied as moot. Defendant shall be free to reassert any of the challenges raised therein to the extent that they remain viable against the Second Amended Complaint. Signed by Judge Mary S. Scriven on 5/12/2023. (KBC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/12/2023) |
| 05/12/2023 | 51 | MOTION to Dismiss Plaintiffs' Second Amended Complaint by Financial Industry Regulatory Authority, Inc.. (Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/12/2023) |
| 05/15/2023 | 52 | Unopposed MOTION for Alex Gesch to appear pro hac vice by Financial Industry Regulatory Authority, Inc.. (Attachments: # 1 Affidavit)(Stewart, Ryan) Motions referred to Magistrate Judge Thomas G. Wilson. [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/15/2023) |

| 05/15/2023 | 53 | RESPONSE in Opposition re 45 Emergency MOTION for Preliminary Injunction filed by Financial Industry Regulatory Authority, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/15/2023) |
|---|---|---|
| 05/15/2023 | 54 | **ENDORSED ORDER DIRECTING REPLY to 53 Defendant FINRA's Response in Opposition to Plaintiffs' Emergency Motion for Preliminary Injunction. On or before Thursday, May 18, 2023 at 5:00 p.m., Plaintiffs shall file a reply, not to exceed fifteen (15) pages, addressing the issue of the Court's in personam jurisdiction over Defendant FINRA and the issue of venue. Plaintiffs are free to respond to any other issues in their reply within the fifteen (15) page limit. Signed by Judge Mary S. Scriven on 5/15/2023. (KBC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/15/2023) |
| 05/15/2023 | 55 | MEMORANDUM in support re 28 Notice (Other) *Second Memorandum of Law in Defense of the Challenged Provisions of the Federal Securities Laws* filed by United States of America. (Pezzi, Stephen) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/15/2023) |
| 05/18/2023 | 56 | NOTICE by United States of America re 48 Order Setting Hearing (Pezzi, Stephen) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/18/2023) |
| 05/18/2023 | 57 | NOTICE by Financial Industry Regulatory Authority, Inc. re 48 Order Setting Hearing (Tayrani, Amir) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/18/2023) |
| 05/18/2023 | 58 | Exhibit List *for May 22, 2023 Hearing on Plaintiffs' Motion for Preliminary Injunction* by Alpine Securities Corporation, Scottsdale Capital Advisors Corporation. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/18/2023) |
| 05/18/2023 | 59 | REPLY to Response to Motion re 45 Emergency MOTION for Preliminary Injunction filed by Alpine Securities Corporation. (Turkel, Kenneth) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/18/2023) |
| 05/18/2023 | 60 | **ORDER granting 52 Motion to Appear Pro Hac Vice. Signed by Magistrate Judge Thomas G. Wilson on 5/18/2023. (ABC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/22/2023) |
| 05/22/2023 | 61 | Minute Entry. In Person Proceedings held before Judge Mary S. Scriven: PRELIMINARY INJUNCTION MOTION HEARING held on 5/22/2023 re: 45 Emergency MOTION for Preliminary Injunction filed by Alpine Securities Corporation. Court Reporter: David Collier (KAC) [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/22/2023) |
| 05/24/2023 | 62 | **ORDER. Pursuant to 28 U.S.C. § 1404(a), this case shall be TRANSFERRED to the United States District Court for the District of Columbia for all further proceedings. The CLERK is DIRECTED to transfer this matter to the United States District Court for the District of Columbia. The CLERK is further DIRECTED to close the case and terminate any pending motions. See Order for details. Signed by Judge Mary S. Scriven on 5/24/2023. (KBC)** [Transferred from Florida Middle on 5/26/2023.] (Entered: 05/24/2023) |
| 05/26/2023 | 63 | Case transferred in from District of Florida Middle; Case Number 8:22–cv–02347. Original file ,transfer order and docket sheet received. (Entered: 05/26/2023) |
| 05/26/2023 | | MINUTE ORDER (paperless) DENYING, without prejudice, plaintiffs' 45 Emergency Motion for Preliminary Injunction and defendants' 51 Motion to Dismiss Plaintiffs' Second Amended Complaint and DIRECTING the parties to submit, by 2:00 PM on Tuesday, May 30, 2023, a proposed schedule for further briefing in this case. This case has been pending since October 2022 and now, over seven months later, has landed today on this Court's docket via a transfer from the Middle District of Florida with an emergency motion for a preliminary injunction to stop a proceeding scheduled to occur in five days as well as a motion to dismiss—–neither of which is resolved. Furthermore, all existing briefing on the pending motions cite primarily to nonbinding cases in the Fifth and Eleventh Circuits. Finally, plaintiffs' ability to satisfy the required factors for preliminary injunctive relief appears to be strained, given that the administrative process before the Financial Industry Regulatory Authority ("FINRA") and the Securities and Exchange Commission ("SEC") will not be exhausted until the SEC has |

| | | |
|---|---|---|
| | | had an opportunity to rule on the result of the FINRA proceeding. *See Springsteen–Abbott v. SEC*, 989 F.3d 4, 7–8 (D.C. Cir. 2021) (dismissing a petition for review of FINRA's constitutionality "for a simple reason: Congress has prohibited us from considering issues not raised before the SEC"). Signed by Judge Beryl A. Howell on May 26, 2023. (lcbah2) (Entered: 05/26/2023) |
| 05/26/2023 | | Set/Reset Deadlines: Proposed schedule for further briefing due by 2:00 PM on 5/30/2023 (ztg) (Entered: 05/26/2023) |
| 05/29/2023 | 64 | NOTICE of Appearance by David Henry Thompson on behalf of ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION (Thompson, David) (Entered: 05/29/2023) |
| 05/30/2023 | 65 | MOTION for Reconsideration re Order on Motion for Preliminary Injunction,,,,,,, Order on Motion to Dismiss,,,,,,, by ALPINE SECURITIES CORPORATION. (Thompson, David) (Entered: 05/30/2023) |
| 05/30/2023 | 66 | Emergency MOTION for Temporary Restraining Order *and* MOTION for Preliminary Injunction by ALPINE SECURITIES CORPORATION. (Attachments: # 1 Text of Proposed Order, # 2 LCvR 65.1 Certificate)(Thompson, David). Added MOTION for Preliminary Injunction on 6/2/2023 (zed). (Entered: 05/30/2023) |
| 05/30/2023 | | MINUTE ORDER (paperless) DIRECTING 1) defendants to file any response to plaintiffs' 65 Motion for Reconsideration of Minute Order Denying Emergency Preliminary Injunction Motion and 66 Renewed Emergency Motion for Preliminary Injunction and Temporary Restraining Order by 5 p.m. today, May 30, 2023, and 2) plaintiffs to file any reply by 9 p.m. today, May 30, 2023. Signed by Judge Beryl A. Howell on May 30, 2023. (lcbah2) (Entered: 05/30/2023) |
| 05/30/2023 | | Set/Reset Deadlines: Defendants' response to 65 Motion for Reconsideration of Minute Order Denying Emergency Preliminary Injunction Motion and 66 Renewed Emergency Motion for Preliminary Injunction and Temporary Restraining Order due by 5:00 PM today, 5/30/2023; plaintiffs' reply due by 9:00 PM today, 5/30/2023. (ztg) (Entered: 05/30/2023) |
| 05/30/2023 | 67 | Joint MOTION for Briefing Schedule by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Thompson, David) (Entered: 05/30/2023) |
| 05/30/2023 | | MINUTE ORDER (paperless) GRANTING the parties' 67 Joint Motion Proposing Motion to Dismiss Briefing Schedule, and ISSUING the following SCHEDULING ORDER: (1) By June 30, 2023, defendant FINRA shall file any motion to dismiss; (2) By July 14, 2023, defendant–intervenor the United States shall file any memorandum of law in defense of the challenged provisions of the federal securities laws; (3) By August 4, 2023, plaintiffs shall file any response to defendants' motion and memoranda; and (4) By August 18, 2023, defendant FINRA shall file any reply in support of its motion. Signed by Judge Beryl A. Howell on May 30, 2023. (lcbah2) (Entered: 05/30/2023) |
| 05/30/2023 | | Set/Reset Deadlines: Defendant FINRA's motion to dismiss, if any, due by 6/30/2023; defendant–intervenor the United States' memorandum of law in defense of the challenged provisions of the federal securities laws due by 7/14/2023; plaintiffs' response to defendants' motion and memoranda due by 8/4/2023; defendant FINRA's reply, if any, in support of its motion due by 8/18/2023. (ztg) (Entered: 05/30/2023) |
| 05/30/2023 | 68 | MEMORANDUM by UNITED STATES OF AMERICA. (Pezzi, Stephen) (Entered: 05/30/2023) |
| 05/30/2023 | 69 | Memorandum in opposition to re 65 Motion for Reconsideration filed by FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.. (Tayrani, Amir) (Entered: |

| | | 05/30/2023) |
|---|---|---|
| 05/30/2023 | 70 | Memorandum in opposition to re 66 Motion for TRO filed by FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Tayrani, Amir) (Entered: 05/30/2023) |
| 05/30/2023 | 71 | REPLY to opposition to motion re 65 MOTION for Reconsideration re Order on Motion for Preliminary Injunction,,,,,,, Order on Motion to Dismiss,,,,,, filed by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Thompson, David) (Entered: 05/30/2023) |
| 05/30/2023 | 72 | REPLY to opposition to motion re 66 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Attachments: # 1 Exhibit 1 – 2023–05–22 Scottsdale v. FINRA Rough Transcript)(Thompson, David) (Entered: 05/30/2023) |
| 05/31/2023 | | NOTICE OF HEARING re 66 Emergency MOTION for Temporary Restraining Order and Preliminary Injunction. The parties shall take notice that a Motion Hearing is scheduled for today, May 31, 2023, at 1:30 PM in Courtroom 26A– IN PERSON before Judge Beryl A. Howell. (ztg) (Entered: 05/31/2023) |
| 05/31/2023 | 73 | Joint MOTION to Reschedule Preliminary Injunction Hearing by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Thompson, David) (Entered: 05/31/2023) |
| 05/31/2023 | | MINUTE ORDER granting 73 Joint Motion to Reschedule Preliminary Injunction Hearing. Upon consideration of the joint motion, it is hereby ORDERED that the Motion Hearing currently scheduled for May 31, 2023, shall be RESCHEDULED for June 1, 2023, at 2:00 PM in Courtroom 26A– In Person before Judge Beryl A. Howell. Signed by Judge Beryl A. Howell on 5/31/2023. (ztg) (Entered: 05/31/2023) |
| 05/31/2023 | 74 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Brian W. Barnes, Filing fee $ 100, receipt number ADCDC–10104845. Fee Status: Fee Paid. by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Attachments: # 1 Affidavit Declaration of Brian W. Barnes, # 2 Exhibit Brian W. Barnes Certificate of Good Standing DC, # 3 Text of Proposed Order)(Thompson, David) (Entered: 05/31/2023) |
| 05/31/2023 | 75 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kenneth Turkel, Filing fee $ 100, receipt number ADCDC–10106569. Fee Status: Fee Paid. by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Attachments: # 1 Affidavit Declaration of Kenneth Turkel, # 2 Exhibit Kenneth Turkel Certificate of Good Standing Florida, # 3 Text of Proposed Order)(Thompson, David) (Entered: 05/31/2023) |
| 05/31/2023 | 76 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– David Hayes, Filing fee $ 100, receipt number ADCDC–10106613. Fee Status: Fee Paid. by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Attachments: # 1 Affidavit Declaration of David Hayes, # 2 Exhibit David Hayes Certificate of Good Standing Florida, # 3 Text of Proposed Order)(Thompson, David) (Entered: 05/31/2023) |
| 05/31/2023 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 74 Motion for Admission of Attorney Brian W. Barnes *Pro Hac Vice*, 75 Motion for Admission of Attorney Kenneth Turkel *Pro Hac Vice*, and 76 Motion for Admission of Attorney David Hayes *Pro Hac Vice*. Brian W. Barnes, Kenneth Turkel, and David Hayes may enter appearances *pro hac vice* for the purpose of representing plaintiffs in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on May 31, 2023. (lcbah2) (Entered: 05/31/2023) |
| 05/31/2023 | 77 | NOTICE of Appearance by Brian W. Barnes on behalf of ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION (Barnes, Brian) (Entered: 05/31/2023) |
| 06/01/2023 | 78 | NOTICE of Appearance by Kenneth Turkel on behalf of All Plaintiffs (Turkel, Kenneth) (Entered: 06/01/2023) |

| 06/01/2023 | 79 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Maranda E. Fritz, Filing fee $ 100, receipt number ADCDC–10107615. Fee Status: Fee Paid. by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Attachments: # 1 Affidavit Declaration of Maranda E. Fritz, # 2 Exhibit Maranda E. Fritz Certificate of Good Standing New York, # 3 Text of Proposed Order)(Thompson, David) (Entered: 06/01/2023) |
| --- | --- | --- |
| 06/01/2023 | 80 | NOTICE of Appearance by David Hayes on behalf of All Plaintiffs (Hayes, David) (Entered: 06/01/2023) |
| 06/01/2023 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 79 Motion for Admission of Attorney *Pro Hac Vice*. Maranda E. Fritz may enter an appearance *pro hac vice* for the purpose of representing plaintiffs in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on June 1, 2023. (lcbah2) (Entered: 06/01/2023) |
| 06/01/2023 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 6/1/2023 re 66 Emergency MOTION for Temporary Restraining Order filed by ALPINE SECURITIES CORPORATION. (Court Reporter Elizabeth Saint–Loth.) (ztg) (Entered: 06/01/2023) |
| 06/01/2023 | | MINUTE ORDER (paperless) DIRECTING parties to submit, by 5 PM on June 2, 2023, supplemental briefs on the following: (1) the consequences should FINRA be considered a state actor, including the specific impact on FINRA, on similarly organized entities, the Securities and Exchange Commission, including the functions and ability of these entities to initiate and resolve enforcement actions, and (2) as to plaintiffs' First Amendment claim, (a) the validity of plaintiffs' claim, absent any allegation regarding "expressive purpose" to support their challenge to mandatory FINRA membership, and (b) the public interest supporting the federal government's mandate, *see* 15 U.S.C. &sect 78o(a)(1), (b)(1). Any response shall be due by 9 PM tomorrow, June 2, 2023. Signed by Judge Beryl A. Howell on June 1, 2023. (lcbah2) (Entered: 06/01/2023) |
| 06/01/2023 | 81 | STANDING ORDER. Signed by Judge Beryl A. Howell on June 2, 2023. (lcbah2) (Entered: 06/01/2023) |
| 06/02/2023 | 82 | SUPPLEMENTAL MEMORANDUM to *in response to the Court's June 1, 2023 Minute Order* filed by UNITED STATES OF AMERICA. (Pezzi, Stephen) (Entered: 06/02/2023) |
| 06/02/2023 | 83 | SUPPLEMENTAL MEMORANDUM to *in response to the Court's June 1, 2023 Minute Order* filed by FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.. (Tayrani, Amir) (Entered: 06/02/2023) |
| 06/02/2023 | 84 | SUPPLEMENTAL MEMORANDUM to *in response to the Court's June 1, 2023 Minute Order* filed by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Thompson, David) (Entered: 06/02/2023) |
| 06/02/2023 | 85 | SUPPLEMENTAL MEMORANDUM to re 66 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* MOTION for Preliminary Injunction filed by ALPINE SECURITIES CORPORATION, SCOTTSDALE CAPITAL ADVISORS CORPORATION. (Thompson, David) (Entered: 06/02/2023) |
| 06/02/2023 | 86 | RESPONSE to re 84 Supplemental Memorandum *in response to the Court's June 1, 2023 Minute Order* filed by FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.. (Tayrani, Amir) Modified docket event/text on 6/5/2023 (zed). (Entered: 06/02/2023) |
| 06/07/2023 | 87 | ORDER GRANTING plaintiff Alpine Securities Corporation's 65 Motion for Reconsideration of Minute Order Denying Emergency Preliminary Injunction Motion and DENYING plaintiff Alpine Securities Corporation's 66 Renewed Emergency Motion for Preliminary Injunction and Temporary Restraining Order. See Order for further details. Signed by Judge Beryl A. Howell on June 7, 2023. (lcbah2) (Entered: 06/07/2023) |
| 06/07/2023 | 88 | MEMORANDUM OPINION regarding plaintiff Alpine Securities Corporation's 65 Motion for Reconsideration of Minute Order Denying Emergency Preliminary |

| | | |
|---|---|---|
| | | Injunction Motion and plaintiff Alpine Securities Corporation's <u>66</u> Renewed Emergency Motion for Preliminary Injunction and Temporary Restraining Order. Signed by Judge Beryl A. Howell on June 7, 2023. (lcbah2) (Entered: 06/07/2023) |
| 06/08/2023 | <u>89</u> | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>88</u> Memorandum & Opinion, <u>87</u> Order on Motion for Reconsideration,, Order on Motion for TRO,, Order on Motion for Preliminary Injunction, by ALPINE SECURITIES CORPORATION. Filing fee $ 505, receipt number ADCDC–10124985. Fee Status: Fee Paid. Parties have been notified. (Thompson, David) (Entered: 06/08/2023) |
| 06/08/2023 | <u>90</u> | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re <u>89</u> Notice of Appeal to DC Circuit Court. (zed) (Entered: 06/08/2023) |

App.11

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

     Plaintiffs,

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

     Defendant,

UNITED STATES OF AMERICA,

     Intervenor Defendant.

          Case No.: 1:23-cv-1506-BAH

_____

**NOTICE OF APPEAL**

     Notice is hereby given this 8th day of June, 2023, that Plaintiff Alpine Securities Corporation appeals to the United States Court of Appeals for the District of Columbia Circuit from: (1) the district court's order and memorandum opinion denying Plaintiff's Renewed Emergency Motion for Preliminary Injunction (ECF 87 and 88) entered on June 7, 2023.

Dated: June 8, 2023                  Respectfully submitted,

*/s/David H. Thompson*
David H. Thompson
Brian W. Barnes*
Cooper & Kirk, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
Phone: (202) 220-9649
dthompson@cooperkirk.com
bbarnes@cooperkirk.com

Kenneth G. Turkel*
David A. Hayes*
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Phone: (813) 834-9191
dhayes@tcb-law.com
kturkel@tcb-law.com

Maranda E. Fritz*
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231
maranda@fritzpc.com

*Attorneys for Plaintiff*

*Admitted pro hac vice*

App.13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION and ALPINE SECURITIES CORPORATION, | Civil Action No. 23-1506 (BAH) |
| Plaintiffs, | Judge Beryl A. Howell |
| v. | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC., | |
| Defendant, | |
| UNITED STATES OF AMERICA, | |
| Intervenor Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Scottsdale Capital Advisors Corporation ("SCA") and Alpine Securities

Corporation ("Alpine") originally filed suit in the Middle District of Florida asserting several

constitutional challenges to the operation and structure of the Financial Industry Regulatory

Authority, Inc. ("FINRA"), a private corporation responsible for regulating broker-dealers in the

securities industry.  As litigation proceeded in that case, FINRA expedited an enforcement action

against Alpine, alleging that this company committed thousands of violations of a permanent

FINRA order to cease-and-desist certain conduct, which conduct required Alpine's immediate

expulsion from FINRA's membership and thus the securities industry.  Alpine coins that

punishment "the corporate death penalty" given that such expulsion would necessitate a

complete closure of Alpine's business and operations.  Pls.' Second Am. Compl. ("SAC") ¶¶ 10,

129, ECF No. 43.

Weeks before the expedited enforcement action's scheduled hearing before FINRA, Alpine sought an emergency preliminary injunction from the district court in the Middle District of Florida, seeking to halt the expedited enforcement proceeding pending resolution of Alpine's constitutional challenges.  After briefing and oral argument on the motion, however, the case was transferred to this Court for resolution—only two business days before the FINRA hearing.  The day before the scheduled hearing, Alpine then renewed its emergency motion seeking a preliminary injunction or temporary restraining order ("TRO").  Alpine also seeks reconsideration of an earlier order of this Court denying its original emergency motion as filed in the Middle District of Florida.

Upon consideration of Alpine's two pending motions, extensive briefing, oral argument, and the entire record herein, Alpine's motion for reconsideration is granted and its emergency motion for a preliminary injunction or TRO is denied.

# I.    BACKGROUND

The factual background and procedural history of this case is briefly recounted below.

## A.    Legal Landscape

The Securities Exchange Act of 1934 ("the Exchange Act"), as amended in 1938, created a complex statutory regime "of cooperative self-regulation" of so-called over-the-counter securities markets.  *See United States v. NASD*, 422 U.S. 694, 700 n.6 (1975).  That scheme permits private entities, known as self-regulatory organizations ("SROs"), to perform a supervisory role over the securities industry, subject to oversight from the Securities and Exchange Commission ("SEC" or "the Commission").  *See* 15 U.S.C. § 78s (describing the SEC's oversight role over SROs).  Brokers and dealers transacting in the securities industry may not do so without registering with the SEC and joining a national securities association.  *See id.* §

78o(a)(1), (b)(1).  The only national securities association currently registered with the SEC is

defendant FINRA.  *See id.* § 78o-3 (describing the requirement for registration of a national

securities association).

### 1.      *FINRA's Corporate Structure*

FINRA is a Delaware not-for-profit corporation and SEC-registered national securities

association that conducts business in the District of Columbia.  *See* SAC ¶¶ 30–31.  Following its

formation from a 2007 consolidation between its predecessor, the National Association of

Securities Dealers ("NASD"), and the enforcement arm of the New York Stock Exchange

("NYSE"), *id.* ¶ 40; *see also* Order Approving Proposed Rule Change to Amend the By-Laws of

NASD, 72 Fed. Reg. 42,169 (Aug. 1, 2007), FINRA is governed by a board of twenty-two

members, comprised of industry and non-industry members and FINRA's chief executive officer

("CEO"), which board oversees the organization's management and administration, *see* SAC ¶

42–43.  Board members are selected by FINRA's members and are removable only by a majority

vote of FINRA's board or, "in very limited and specific circumstances, the SEC," and thus no

Board member or the CEO is appointed by the SEC, the U.S. President, Congress, or any other

governmental body.  *Id.* ¶¶ 57–58; *see also* 72 Fed. Reg. at 42,170–72.[1]  At the next level of

management, FINRA executives are appointed and removed by the board, *see* SAC ¶ 59, with no

involvement by the SEC or any other government official or body.  FINRA's funding is derived

"almost exclusively" through membership fees as well as fines, penalties, and sanctions, *id.* ¶ 52,

with its budget set "without any constraint or legislative cap" because FINRA receives no

government funding, *id.* ¶ 51.  *See also* FINRA By-Laws art. VI § 1 (Power of the Corporation

---

[1]      More specifically, the SEC may "remove from office or censure" a FINRA officer or director upon a finding that the individual in question "has willfully violated [applicable statutory provisions], the rules or regulations thereunder, or the rules of [FINRA], willfully abused his authority, or without reasonable justification or excuse has failed to enforce compliance" with securities laws.  15 U.S.C. § 78s(h)(4).

to Fix and Levy Assessments), https://www.finra.org/rules-guidance/rulebooks/corporate-organization/power-corporation-fix-and-levy-assessments [https://perma.cc/PB84-KUXL].  Part of that budget includes salaries for FINRA's executives, as determined by the organization itself.  *See id.* ¶ 53.

### 2. FINRA's Rules

FINRA's supervisory duties over its membership—including roughly 3,400 brokerage firms, 150,000 branch offices, and 610,000 individual registered securities representatives—is varied.  *See id.* ¶ 41.  While FINRA promulgates its own rules and standards and enforces compliance with those rules through administering sanctions and barring individuals from FINRA membership, *see id.* ¶ 50, this supervisory authority is subject to the SEC's oversight and control, *Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017).  For instance, the SEC may limit FINRA's operations or registration if FINRA violates a statute or SEC regulation.  *See* 15 U.S.C. § 78s(h)(1).  Suspension or revocation of that registration is subject to the SEC's opinion that such action "is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]."  *Id.*  The SEC also reviews and approves rules proposed by FINRA, *see id.* § 78s(b)–(c), with SEC approval a prerequisite for the majority of such rules, *see id.* § 78s(b)(1).[2]  At any time and as "deem[ed] necessary or

---

[2]      The Exchange Act permits three avenues for promulgation of a FINRA rule without the SEC's express approval: (i) a rule designated by FINRA "as . . . constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing [FINRA] rule[;] . . . establishing or changing a due, fee, or other charge imposed by [FINRA;] . . . [or] concerned solely with the administration of [FINRA] or other matters[,]" 15 U.S.C. § 78s(b)(3)(A); (ii) a rule that "appears to the Commission . . . is necessary for the protection of investors, the maintenance of fair and orderly markets, or the safeguarding of securities or funds[,]" *id.* § 78s(b)(3)(B); and (iii) a rule on which the SEC does not act within a specified time are "deemed to have been approved[,]" *id.* § 78s(b)(2)(D).  In either of the first two scenarios, within 60 days of the proposed rule's filing, the SEC "summarily may temporarily suspend the change in the rules . . . if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter."  *Id.* § 78s(b)(3)(C).  In such an instance, the SEC shall hold proceedings to determine whether the proposed rule shall be approved.  *See id.*

appropriate[,]" the SEC may also "abrogate, add to, and delete from" any FINRA rule "to insure

the fair administration of the self-regulatory organization, to conform its rules to requirements of

[the Exchange Act] and the rules and regulations thereunder applicable to such organization, or

otherwise in furtherance of the purposes of [the Act]." *Id.* § 78s(c).

### 3. FINRA's Enforcement Regime

Enforcement proceedings result from FINRA's investigation into alleged misconduct by

its members, and such investigations are done at FINRA's discretion, without any influence from

the SEC or other branch of government. *See* SAC ¶ 55; *see also* 15 U.S.C. § 78o-3(b)(8).  In

fact, "[i]nvolvement by SEC commissioners in this onerous and impactful process occurs only

when—and if—a target of an investigation survives the investigation, prosecution, and internal

appeal process." SAC ¶ 55.  FINRA takes enforcement action against individuals or entities that

violate a FINRA rule, SEC regulation, or statutory provision. *See* 15 U.S.C. § 78o-3(b)(7).

Enforcement proceedings begin with FINRA filing a complaint against a targeted entity,

providing notice to that entity of the specific charges. *See* FINRA Rule 9211 (Aug. 3, 2018),

https://www.finra.org/rules-guidance/rulebooks/finra-rules/9211 [https://perma.cc/3RM6-F9MF]

(Authorization of Complaint).  A FINRA hearing panel then conducts an evidentiary hearing, in

which the entity may present arguments over multiple days. *See* 15 U.S.C. § 78o-3(h)(1); *see*

*also id.* § 78o-3(b)(8) (requiring registered national securities associations to employ fair

disciplinary procedures); FINRA Rule 9231 (June 4, 2020), https://www.finra.org/rules-

guidance/rulebooks/finra-rules/9231 [https://perma.cc/SVL6-8HZ2] (Appointment by the Chief

Hearing Officer of Hearing Panel or Extended Hearing Panel or Replacement Hearing Officer).

The panel then issues a statement of decision with findings. *See* 15 U.S.C. § 78o-3(h)(1)(A)–

(C); *see also* FINRA Rule 9268 (Nov. 2, 2015), https://www.finra.org/rules-

guidance/rulebooks/finra-rules/9268 [https://perma.cc/72SL-T7UW] (Decision of Hearing Panel

or Extended Hearing Panel).

       An aggrieved party may appeal that decision to FINRA's National Adjudicatory Council

("NAC"), which "may affirm, dismiss, modify, or reverse with respect to each finding."  FINRA

Rule 9348 (Nov. 2, 2015), https://www.finra.org/rules-guidance/rulebooks/finra-rules/9348

[https://perma.cc/PWN9-TWS6] (Powers of the National Adjudicatory Council on Review).  The

NAC may also review the panel decision *sua sponte*.  *See* FINRA Rule 9312 (Apr. 15, 2021),

https://www.finra.org/rules-guidance/rulebooks/finra-rules/9312 [https://perma.cc/74ZK-Q75W]

(Review Proceeding Initiated by Adjudicatory Council).  Such an appeal operates as a stay of the

panel's decision pending NAC's decision.  *See* FINRA Rule 9311 (Apr. 15, 2021),

https://www.finra.org/rules-guidance/rulebooks/finra-rules/9311 [https://perma.cc/BQ58-TCQT]

(Appeal by Any Party; Cross-Appeal).  A NAC decision may then be appealed to the SEC, *see*

15 U.S.C. § 78s(d)(2), which conducts *de novo* review and may consider evidence not previously

considered by FINRA, *see* Commission Rule of Practice 452, 17 C.F.R. § 201.452.

       Final decisions by the SEC are subject to review by a federal appellate court with the

filing of a petition by an aggrieved party, *see* 15 U.S.C. § 78y, but FINRA itself may not seek

judicial review of an SEC decision contrary to a FINRA ruling, *see generally NASD v. SEC*, 431

F.3d 803, 812 (D.C. Cir. 2005).

       **B.      FINRA's Enforcement Action Against Plaintiff**

       Plaintiffs are broker-dealers and registered FINRA members, both owned by the same

parent holding company.  *See* SAC ¶¶ 28–29; Transcript of Hearing (June 1, 2023) ("Hr'g Tr.")

at 9:17–23.[3]  As early as 2019, FINRA received complaints from customers of Alpine alleging

---

[3]        Neither plaintiff is a stranger to FINRA enforcement proceedings.  *See, e.g.*, FINRA's Opp'n to Pl.'s
Renewed Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's TRO Opp'n") at 3, ECF

that the firm charged a significant monthly account fee.  *See* FINRA's Opp'n to Pl.'s Renewed

Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's TRO Opp'n"), Ex.

A, March 22, 2022 Extended Hearing Panel Decision, *Dep't of Enf't v. Alpine Sec. Corp.*,

FINRA Disciplinary Proceeding No. 2019061232601 ("March 2022 Panel Decision") at 2, ECF

No. 70-1.  On March 22, 2022, a FINRA hearing panel found that Alpine "converted and

misused customer funds and securities, engaged in unauthorized trading, charged and paid

customers unfair prices in securities transactions, charged customers unreasonable and

discriminatory fees, and made an unauthorized capital withdrawal."  March 2022 Panel Decision

at 1.  For Alpine's violations, the panel ordered Alpine's expulsion from FINRA's membership,

payment of restitution in an amount exceeding $4 million, and a "permanent cease and desist

order."  *Id.*  Alpine then appealed that panel decision to the NAC, which appeal had the effect of

staying the expulsion and restitution sanctions but the "permanent cease and desist order" took

immediate effect, in accordance with the explicit use of this term in the panel decision and

governing FINRA rules.  *See* FINRA's TRO Opp'n at 3–4; *see also* FINRA Rule 9311(b) ("Any

such appeal, however, will not stay a decision, or that part of a decision, that imposes a

permanent cease and desist order.").

    During the pendency of the NAC appeal, FINRA discovered that Alpine failed to comply

with the permanent cease-and-desist order that had not been stayed pending Alpine's appeal to

the NAC.  *See* FINRA's TRO Opp'n at 4.  After a months' long investigation, FINRA

determined that Alpine violated the cease-and-desist order "more than 35,000 times by charging

---

No. 70 ("Alpine is a broker-dealer member of FINRA . . . and has been disciplined multiple times for violating
FINRA rules.").  For example, in the complaint, plaintiffs mention an effort by FINRA to SCA "for supposed
violations of Section 5 of the Securities Act."  SAC ¶ 115.  FINRA's investigation into SCA began in March 2015
and concluded in September 2021 when the SEC set aside FINRA's findings and the NAC's affirmance that SCA
violated the charged statutes.  *See id.* ¶¶ 116–119; *see also In the Matter of the Application of Scottsdale Capital
Advisors Corp.*, Release No. 93052, 2021 WL 4242630, at *9 (S.E.C. Sept. 17, 2021).

customers millions of dollars in unreasonable, unfair, and unlawful fees and commissions." *Id.*

Notably, Alpine does not contest that position, but rather counters that its actions were not

improper. *See* SAC ¶ 127. As a result, on April 19, 2023, FINRA initiated an expedited

enforcement proceeding ("Enforcement Proceeding") to expel Alpine from FINRA membership

and stop its continued improper conduct, a punishment characterized by plaintiffs as "the

corporate death penalty." *See* FINRA's TRO Opp'n at 4; SAC ¶¶ 126–129. The Enforcement

Proceeding was scheduled for May 31, 2023. *See* Alpine's Renewed Emergency Mot. for a

Preliminary Injunction & Temporary Restraining Order ("Pl.'s TRO Mot.") at 2, ECF No. 66.

At a hearing before this Court, held on June 1, 2023, Alpine disclosed that the FINRA hearing

officer postponed the Enforcement Proceeding until June 5, 2023, pending resolution of Alpine's

motion for equitable relief, described below. *See* Hr'g Tr. at 7:13–16.

### C.  Procedural History in Federal Court

Plaintiffs filed their initial complaint in the Middle District of Florida on October 12,

2022, *see* Compl., ECF No. 1, then amended that complaint on February 3, 2023, *see* First Am.

Compl., ECF No. 27. The government intervened on February 6, 2023, *see* Notice of

Intervention by the United States of America, ECF No. 28, shortly before FINRA moved to

dismiss the first amended complaint on March 10, 2023, with the government's support, *see*

FINRA's Mot. Dismiss Pls.' Am. Compl., ECF No. 35; Gov't's Mem. of Law in Defense of the

Challenged Provisions of the Federal Securities Law, ECF No. 37. Before FINRA's dismissal

motion was fully briefed, the Supreme Court issued *Axon Enterprise Inc. v. FTC*, 143 S. Ct. 890

(2023), which plaintiffs now claim is relevant to the relief they seek in their complaint.

Five days after *Axon*'s issuance, FINRA initiated the Enforcement Proceeding against

Alpine on April 19, 2023. *See* SAC ¶ 126. Plaintiffs quickly filed the operative second amended

complaint on April 28, 2023, in response to *Axon*, *see* SAC, and then approximately a week later, Alpine filed an emergency motion for a preliminary injunction on May 9, 2023, seeking to halt the Enforcement Proceeding then scheduled for May 31, 2023, *see* Pl.'s Emergency Mot. for Preliminary Injunction, ECF No. 45.  The assigned Judge in the Middle District of Florida held a three-hour hearing on the motion on May 22, 2023, *see* Min. Entry (May 22, 2023), and, two days later, ordered the transfer of this case to this Court, *see* Order, ECF No. 62.  That transfer took effect at approximately noon on Friday, May 26, 2023—two business days before the scheduled Enforcement Proceeding.  *See* Case Transfer, ECF No. 63.

Upon being assigned this case, this Court denied, without prejudice, Alpine's emergency motion for preliminary injunction and FINRA's motion to dismiss because the materials filed relied on out-of-circuit, nonbinding case law mostly from the Fifth and Eleventh Circuits that was unfit for consideration of such extraordinary equitable relief on a truncated timeline.  *See* Min. Order (May 26, 2023).[4]  The parties were directed to propose a briefing schedule by the next business day, Tuesday, May 30, 2023.  *See* Min. Order (May 26, 2023).  On May 30, 2023, Alpine moved for reconsideration of the Order denying, without prejudice, its emergency preliminary injunction motion, ECF No. 65, as well as renewed its emergency motion for a preliminary injunction and temporary restraining order, ECF No. 66, prompting entry of a highly expedited briefing schedule, *see* Min. Order (May 30, 2023), for briefing to be completed by 9 p.m. on May 30, 2023, *see* Gov't's Third Mem. in Defense of the Challenged Provisions of the Federal Securities Laws ("Gov't's Opp'n"), ECF No. 68; FINRA's Opp'n to Pl.'s Mot. for Reconsideration ("FINRA's Reconsideration Opp'n"), ECF No. 69; FINRA's Opp'n to Pl.'s Renewed Mot. for Preliminary Injunction & Temporary Restraining Order ("FINRA's TRO

---

[4]        The Court also signaled to the parties that exhaustion before the SEC may not have been met in this case according to the D.C. Circuit's ruling in *Springsteen-Abbott v. SEC*, 989 F.3d 4, 7–8 (D.C. Cir. 2021).

Opp'n"), ECF No. 70; Pl.'s Reply in Supp. of Mot. for Reconsideration ("Pl.'s Reconsideration

Reply"), ECF No. 71; Pl.'s Reply in Supp. of Renewed Emergency Mot. for Preliminary

Injunction & Temporary Restraining Order ("Pl.'s TRO Reply"), ECF No. 72, and a hearing

scheduled for May 31, 2023, which, at the parties' request, was postponed until June 1, 2023, *see*

Min. Order (May 31, 2023), Min. Entry (June 1, 2023).

At the hearing, the parties were directed to submit any supplemental briefs regarding the

consequences should FINRA be deemed a state actor, as plaintiffs urged, and the validity of

plaintiffs' First Amendment claim.  *See* Min. Order (June 1, 2023).  Following submission of

those memoranda, *see* Gov't's Supp. Br. in Resp. to the Court's June 1, 2023 Min. Order

("Gov't's Supp. Br."), ECF No. 82; FINRA's Supp. Br. in Opp'n to Pl.'s Renewed Emergency

Mot. for Preliminary Injunction and Temporary Restraining Order ("FINRA's Supp. Br."), ECF

No. 83; Pl.'s Supp. Br. in Supp. of Renewed Emergency Mot. for Preliminary Injunction and

Temporary Restraining Order ("Pl.'s Supp. Br."), ECF No. 84; Pl.'s Supp. Resp. Br. in Supp. of

Renewed Emergency Mot. for Preliminary Injunction and Temporary Restraining Order ("Pl.'s

Supp. Reply"), ECF No. 85; FINRA's Resp. to Supp. Br. of Alpine ("FINRA's Supp. Reply"),

ECF No. 86, plaintiff's motions are now ripe for consideration.

## II.   LEGAL STANDARD

A temporary restraining order ("TRO") "is an extraordinary remedy that should be

granted only when the party seeking the relief, by a clear showing, carries the burden of

persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  An application for a TRO is

analyzed using the same factors applicable to a request for preliminary injunctive relief.  *See,*

*e.g., Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying the preliminary

injunction standard to a district court decision denying a motion for TRO and preliminary

injunction).  Preliminary injunctive relief is similarly "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)).

A plaintiff seeking preliminary injunctive relief must establish the following four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022) (quoting *Winter*, 555 U.S. at 20); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  The balance of equities and the public interest factors "merge" when the government is the opposing party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).   When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted).[5]

---

[5]        The D.C. Circuit has in the past used a so-called "sliding scale" approach to evaluating the four preliminary injunction and TRO factors such that, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  While acknowledging that this approach is, at a minimum, in tension with current Supreme Court jurisprudence requiring a persuasive showing on all four factors, the D.C. Circuit has not resolved the continuing viability of the sliding-scale approach.  *See, e.g.*, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (reserving "the question whether the sliding-scale approach remains valid"); *cf. Davis*, 571 F.3d at 1295–96 (Kavanaugh , J., concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf v. Geren*, 553 U.S. 674 (2008)).

Preliminary injunctive relief and TROs are not remedies "awarded as of right," but "[a]s

a matter of equitable discretion, a preliminary injunction does not [even] follow as a matter of

course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*,

138 S. Ct. 1942, 1943–44 (2018).  Rather, a court must be persuaded as to all four factors.

Moreover, "a party requesting a preliminary injunction must generally show reasonable

diligence." *Id.* at 1944.

## III.   DISCUSSION

While the focus of the pending motion for injunctive relief is to stall the pending

Enforcement Proceeding against Alpine, plaintiffs' complaint is far more sweeping to challenge

the "unconstitutional operation and structure of FINRA."  SAC ¶ 1; *accord id.* at 33.

Specifically, plaintiffs lodge six claims against FINRA: (1) that "FINRA's wide-ranging exercise

of executive power is immune from Presidential supervision or control[,]" namely that FINRA's

board "are afforded multi-level protection from removal thus impeding the President's ability to

oversee the officers executing the laws of the United States in violation of the Constitution's

separations of powers[,]" *id.* ¶¶ 141–151 (Count I); (2) that FINRA's board members are

"officers of the United States whose appointments must comply with the Appointments Clause

of the United States Constitution" and presently do not, *id.* ¶¶ 152–157 (Count II); (3) that the

Exchange Act "improperly and unconstitutionally delegates legislative power to [FINRA]

outside the Legislative Branch," regardless of whether this entity functions as a state actor or

private entity, *id.* ¶¶ 158–161 (Count III); (4) that the Exchange Act's requirement that firms

"join FINRA violates Plaintiffs' First Amendment right not to associate[,]" *id.* ¶¶ 162–171

(Count IV); (5) that "FINRA's disciplinary proceedings are biased, secretive, and fail to

implement rules that maintain the integrity [of] the proceedings," in violation of the Due Process

Clause of the Fifth Amendment, *id.* ¶¶ 172–176 (Count V); and (6) that "broker-dealers are not afforded the right to a trial by jury" during FINRA proceedings, in violation of the Seventh Amendment, *id.* ¶¶ 177–180 (Count VI).

Upon review of multiple papers filed by all parties and consideration of the arguments presented at the June 1, 2023, hearing before this Court, plaintiff's motion for reconsideration is granted. As refiled, plaintiff's motion for preliminary injunction and TRO properly cites binding law of this Circuit and correctly queues the issues for this Court's consideration.

Alpine has, however, failed to show a likelihood of success on the merits of plaintiffs' claims because FINRA is likely not a state actor, obviating all but one of plaintiffs' constitutional claims, and their surviving First Amendment claim likely lacks merit. Plaintiffs also likely do not assert a viable nondelegation doctrine claim. In reality, plaintiffs offer a multitude of critiques of FINRA throughout their complaint as disgruntled members of FINRA; however, those criticisms fall far short of amounting to likely sustainable constitutional challenges to the structure and processes of FINRA.

While, if expelled from FINRA, Alpine is sure to suffer from the forced closure of its business, such irreparable harm was of Alpine's own making by apparently viewing the permanent cease-and-desist order issued as part of the March 2022 Panel Decision as stayed pending appeal. *See* SAC ¶¶ 8–10 (acknowledging that the Enforcement Proceeding is "based on Alpine's alleged failure to comply with an order contained in an Initial Hearing Panel Decision that was issued in a prior lengthy FINRA action," but arguing "[h]owever, [such] Decision does not become final or effective unless and until it is affirmed by FINRA's appellate tribunal, the [NAC]. And that has not occurred . . . and no [NAC] decision has issued"). Ignoring the immediate effectiveness of a permanent cease-and-desist order, due to operation of

an explicit FINRA rule, *see* March 2022 Panel Decision (using term "permanent cease and desist order"); FINRA Rule 9311(b), is notable context in assessing the irreparable harm claimed by Alpine.  Further, given Alpine's unlikelihood of success in urging novel constitutional attacks on FINRA's structure and operations, reliance on the "here-and-now injury" of being subject to the Enforcement Proceeding, as defined by *Axon*, simply is insufficient to justify the extraordinary equitable relief requested.  This conclusion is confirmed in assessing the balance of equities, which falls heavily in defendants' favor because the harm of permitting Alpine to continue its allegedly knowing violation of FINRA rules to the detriment of its customers, the securities industry, and the public must be given great weight.

Having failed on all factors for injunctive relief, as detailed below, Alpine's motion is denied.

### A.    Likelihood of Success on the Merits

Plaintiffs' separation of powers, Appointments Clause, Fifth Amendment, and Seventh Amendment claims are unlikely to succeed because FINRA is most likely not a state actor.  That aside, as either a public or private entity, FINRA's structure and processes also likely do not violate the private nondelegation doctrine.  Finally, plaintiffs' First Amendment claim is likely to fail because a compelling interest supports the Exchange Act's FINRA membership mandate and supersedes plaintiffs' right to expressive association.  Thus, plaintiffs' claims are unlikely to succeed on the merits.

#### 1.    *FINRA Is Not a State Actor*

"As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'"  *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 936

(1982) (quoting *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 156 (1978)).  That said, the Supreme

Court has held, "many times, that actions of private entities can sometimes be regarded as

governmental action for constitutional purposes."  *Lebron v. Nat'l R.R. Passenger Corp.*, 513

U.S. 374, 378 (1995) (collecting cases).

Whether an entity is a state actor is largely a "fact-bound inquiry."  *Lugar*, 457 U.S. at

939.  While the Supreme Court "has articulated a number of different factors or tests in different

contexts" to determine state action, *id.*, some key considerations remain consistent.  *Cf.*

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("From the

range of circumstances that could point toward the State behind an individual face, no one fact

can function as a necessary condition across the board for finding state action; nor is any set of

circumstances absolutely sufficient[.]").  A court must consider if "there is such a close nexus

between the State and the challenged action that seemingly private behavior may be fairly treated

as that of the State itself."  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C.

Cir. 2015) (quoting *Brentwood*, 531 U.S. at 295); *accord Jackson v. Metro. Edison Co.*, 419 U.S.

345, 351 (1974) ("[T]he inquiry must be whether there is a sufficiently close nexus between the

State and the challenged action of the regulated entity so that the action of the latter may be fairly

treated as that of the State itself.").

Determining a sufficient nexus involves assessing, among other things, the government's

"exercise of 'coercive power,'" *Brentwood*, 531 U.S. at 296 (quoting *Blum v. Yaretsky*, 457 U.S.

991, 1004 (1982)), which has been described variously as the government's provision of

"significant encouragement, either overt or covert," *id.* (quoting *Blum*, 457 U.S. at 1004), and the

degree of government control over the entity, *id.* (citing *Pennsylvania v. Bd. of Dirs. of City*

*Trusts of Phila.*, 353 U.S. 230, 231 (1957)), as well as the private entity's "willful" participation

in a joint activity with the government, *id.* (quoting *Lugar*, 457 U.S. at 941), including the extent

to which a public function is delegated to a private entity, *id.*, and how "entwined with

governmental policies" the private entity is or the degree to which the government is "'entwined

in [the private entity's] management or control,'" *id.* (quoting *Evans v. Newton*, 382 U.S. 296,

299, 301 (1966)).  An earlier Supreme Court decision also relied on two considerations for state

action: (1) whether the private entity acted pursuant to "some right or privilege created by the

State or by a rule of conduct imposed by the state or by a person for whom the State is

responsible" and (2) whether the actor is "a person who may fairly be said to be a state actor" or

state official, an individual working with a state official, or an individual whose "conduct is

otherwise chargeable to the State."  *Lugar*, 457 U.S. at 937.[6]

Employing all these considerations to the facts at hand, plaintiff has not proven the

likelihood that FINRA is a state actor.  First, the facts of FINRA's creation, operation, and

oversight structure do not indicate state actor status.  FINRA is a private organization

incorporated under the laws of Delaware; neither an act of Congress nor the SEC created

FINRA.  *Cf. Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995) (holding that the Municipal

Securities Rulemaking Board was a state actor because, *inter alia*, it was "created by an act of

Congress"); *Lugar*, 457 U.S. 941–42 (holding that respondents acted "under color of state law"

in depriving petitioner of his property pursuant to state law and joint participation with state

---

[6]      Although plaintiff invokes the state action doctrine, plaintiff's argument at the hearing seemed to blend into
the public function test, positing that the focus of whether a private entity is a state actor depends on the entity's
specific role at any particular time.  *See* Hr'g Tr. at 26:23–27:10.  That line of argument is equally unlikely to
succeed according to the Supreme Court's test in *Manhattan Community Access Corp. v. Halleck*, in which the
Court held that, "to qualify as a traditional, exclusive public function within the meaning of our state-action
precedents, the government must have traditionally *and* exclusively performed the function."  139 S. Ct. 1921, 1929
(2019) (emphasis in original).  Nowhere does plaintiff argue that FINRA's adjudicatory role in enforcing its own
rules as an SRO is a traditional or exclusive public function.  On the contrary, plaintiffs' complaint notes that
FINRA is the successor of both the NASD and NYSE, two private entities, and that the role of regulating industry
members has always fallen to those entities, as an initial matter, rather than the SEC.  *See* SAC ¶¶ 36–40.

officials in such deprivation).  No government entity funds FINRA nor plays any role in the selection of its board members or officers, and those individuals are in no way characterized as governmental officers.  *Cf. Brentwood*, 531 U.S. at 298–302 (finding that the school athletic association was a state actor because, *inter alia*, state board members sat on the association's governing bodies and public-school officials participated in the state retirement system, such that public institutions and public school officials were sufficiently entwined in the association).  FINRA is self-governing; it creates its own rules and standards, including the setting of salaries of its officers and penalty amounts unilaterally.  *Cf. Lebron*, 513 U.S. at 394–99 (finding that Amtrak was a state actor because it had the same objectives as the government, was created by the government, and functioned under the government's control such that "the corporation is part of the Government").

FINRA also aims to perform functions that are neither contemplated nor shared by the SEC, including, to name a few, administering broker qualifications examinations, *see Turbeville*, 874 F.3d at 1271, "conduct[ing] inspections of brokers and dealers," and enforcing compliance with professional industry standards as well as FINRA's own rules and regulations, SAC ¶ 49.  In FINRA's adjudicative capacity, this SRO alone determines which cases to investigate and when to file a complaint, and any decision that FINRA makes is not binding on the SEC in any subsequent review by this federal agency.  In fact, any review by the SEC is *de novo* and the agency may consider evidence not previously considered by FINRA or the NAC.  *Cf. Peacock*, 794 F.3d at 43 (holding that Xerox is a state actor when performing as an agent of, and thus acting on behalf, of the District of Columbia to determine individuals' eligibility for prescription drug coverage under Medicaid).  In essence, FINRA is an independent body that assists the SEC by funneling referrals to the federal enforcement agency, using rules and procedures approved by

the SEC as sufficient to make the assistance helpful.  *See Graman v. NASD*, No. 97-cv-1556 (JR), 1998 WL 294022, at *2 (D.D.C. Apr. 27, 1998) (employing the same reasoning to hold that FINRA is not a state actor).  Such FINRA functions do not amount to the organization's entwinement with the SEC.

Second, plaintiff concedes that no court has yet to hold that FINRA is a state actor.  *See* Hr'g Tr. 24:15–23 (The Court: "I haven't found any case that's held that FINRA is a state actor or any case that's found either the New York Stock Exchange, which is another SRO, or NASD, the predecessor to FINRA, was a state actor.  Are there any such cases?"  Plaintiff's Counsel: "There is not, to my knowledge, such a case.").  Rather, a multitude of courts nationwide have held the contrary—that FINRA is a private entity wholly separate from the SEC or any other government agency.[7]

The D.C. Circuit is notably not among those courts to have opined on this question. Consequently, both parties attempt to read between the lines of existing Circuit precedent discussing FINRA and its predecessor NASD as controlling, if not persuasive, authority in considering this question.  *Compare* Gov't's TRO Opp'n at 1 (citing *Saad v. SEC*, 980 F.3d 103, 104 (D.C. Cir. 2020) (referring to FINRA as "a private self-regulatory organization")) *and id.* at 16 (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484–86 (2010)

---

[7]       *See, e.g., Desiderio v. NASD*, 191 F.3d 198, 206–07 (2d Cir. 1999) ("The NASD is a private actor, not a state actor."); *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 162 (2d Cir. 2002) (holding the same); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979) ("Congress preferred self-regulation by a private body over direct involvement of a governmental agency"); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997) ("NASD is a private party and not a governmental agent"); *Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010) ("Epstein cannot bring a constitutional due process claim against the NASD, because '[t]he NASD is a private actor, not a state actor.'" (citation omitted)); *see also Graman*, 1998 WL 294022, at *3 ("Every court that has considered the question has concluded that NASD is not a governmental actor."); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001) ("The court is aware of no case—and Marchiano has presented none—in which NASD Defendants were found to be state actors either because of their regulatory responsibilities or because of any alleged collusion with criminal prosecutors.  In fact, every court that has addressed those issues has rejected Marchiano's arguments.").

(contrasting defendant, a state actor, with "private self-regulatory organizations" in the securities space, such as FINRA)), *and* FINRA's TRO Opp'n at 8 (citing *Free Enterprise*, 561 U.S. at 484–86), *with* Pl.'s TRO Mot. at 9 (citing *NASD v. SEC*, 431 F.3d 803, 804–05, 807 (D.C. Cir. 2005) (referring to NASD as a "quasi-governmental agency" with "quasi-governmental authority to adjudicate actions against members" and "quasi-governmental power to discipline its members")).  That exercise, while not fruitless, is also neither particularly helpful nor binding—the D.C. Circuit has not provided clear direction and has most recently passed on the opportunity to do so.  *See Springsteen-Abbott v. SEC*, 989 F.3d 4, 7 (D.C. Cir. 2021) (referring only to the "premise that FINRA is a state actor" as "contested").

Third, policy considerations militate strongly against accepting Alpine's invitation to make the first judicial determination that FINRA is a state actor.  If FINRA were deemed a state actor, the ramifications would be significant and far-reaching—or in FINRA's words, would cause a "seismic shift in state action jurisprudence." Hr'g Tr. at 73:23–74:9.[8]  Not only would Alpine be free to continue conduct FINRA previously found harmful to Alpine's customers absent an immediate enforcement action, *see* FINRA's Supp. Br. at 2–3, a finding that FINRA is a state actor would undermine Congress's express intent to establish a private, self-regulatory system in the securities industry, *see id.* at 3–4; Gov't's Supp. Br. at 3.  Relatedly, FINRA would

---

[8]    To elaborate, FINRA posited that finding this entity to be a state actor would amount not only to a departure from the "unanimous consensus" to the contrary, FINRA's Supp. Br. at 2, but also would jeopardize investor safety and market stability.  For instance, subjecting SROs to federal constitutional requirements would impact "a vast range of industries, from railroads and airlines to utilities and hospitals[]" *id.* at 3–4, and would "impos[e] unwarranted constitutional roadblocks on [FINRA's] oversight of its broker-dealer members," potentially including a Fifth Amendment privilege not to testify despite FINRA's lack of subpoena power, *id.* at 5.  Treating FINRA as a state actor would also "upend the well-functioning status quo" between FINRA and the SEC by shifting duties from the former to the latter.  *Id.* at 6.  "[D]ozens of other SROs responsible for carrying out enforcement functions and other regulatory responsibilities" would also be subject to constitutional requirements as state actors. *Id.*  Finally, risking the stability of the current SRO structure in the securities industry "could create the risk of significant liquidity or credit problems among financial institutions or markets and thereby threaten the stability of the U.S. financial system." *Id.* at 7–8.

be exposed to constitutional and administrative challenges from which Congress specifically

sought to insulate FINRA, *see* FINRA's Supp. Br. at 5; Gov't's Supp. Br. at 2, as recognized by

the Supreme Court, *see Free Enterprise*, 561 U.S. at 484–86 (finding the Public Company

Accounting Oversight Board ("PCAOB") to be a state actor and distinguishing this body from

SROs in the securities industry, citing that the PCOAB is created by statute, its leadership is

government-appointed, and it has "expansive powers to govern an entire industry").  Finally,

such a finding could significantly impact the SEC's oversight role of FINRA, which is far more

active in regulating aspects of the securities industry that the SEC currently does not touch,

resulting in a potentially dramatic increase to the SEC's workload.  *See* FINRA's Supp. Br. at 6;

Gov't's Supp. Br. at 4.  Although plaintiff attempts to paint the relief it *now* requests as narrow,

*see* Pl.'s Supp. Br. at 1–2, the operative complaint states otherwise and asks for a significant

remedy that would declare "that FINRA is a state actor obligated to respect the rights guaranteed

under the United States Constitution," SAC, Prayer for Relief ¶ 1, and "that FINRA is presently

constituted and operating in a manner that violates the Constitution," *id.* ¶ 2.

In vigorously urging that FINRA be deemed a state actor, plaintiffs make one thing

crystal clear: plaintiffs are disgruntled members of FINRA.  *See, e.g.*, SAC ¶¶ 64–73 (criticizing

the selection and operation of FINRA's board), 74–83 (disparaging FINRA's independence and

supposed lack of industry representation on the board), 87 (accusing FINRA of taking retaliatory

action against members of the microcap market such as plaintiffs), 100–110 (lodging complaints

about FINRA's fee structure, budget, and board-approved executive salaries), 129 (asserting that

the Enforcement Proceeding is FINRA's attempt "to obtain the corporate death penalty" against

Alpine.  Unfortunately for plaintiffs, however, their present challenge is not an effective way to

file—let alone remedy—their grievances against FINRA.  For instance, the relief they request

would not cure all the deficiencies enumerated in their complaint.  Declaring FINRA to be a state

actor would not necessarily result in restructuring FINRA's board, its executive compensation

structure, or its allegedly retaliatory motives against the microcap industry.  SCA attempted to

assert some of these claims against FINRA in 2019, but the district court dismissed the suit for

lack of subject matter jurisdiction, and the D.C. Circuit affirmed that judgment after finding that

SCA's breach of contract claim required administrative exhaustion prior to judicial review.  *See*

*Scottsdale Cap. Advisors Corp. v. FINRA*, 811 F. App'x 667, 668–69 (D.C. Cir. 2020) (Mem.).

Plaintiffs may not now try to repackage those grievances as constitutional claims to obtain

judicial review under the Supreme Court's recent *Axon* decision.

 Since FINRA is unlikely to be a state actor, plaintiff's separation of powers, Appointment

Clause, Fifth Amendment, and Seventh Amendment claims are also likely foreclosed.

  **2.**  ***FINRA Does Not Violate the Private Nondelegation Doctrine***

 Pleaded in the alternative, plaintiffs next argue that the Exchange Act "improperly and

unconstitutionally delegates legislative power to an entity outside the Legislative Branch."  SAC

¶ 160.  Alpine's motion for injunctive relief then focuses on FINRA's alleged violation of the

private nondelegation doctrine, arguing that "Congress and the SEC have managed to delegate

and outsource enforcement of federal securities law to a private entity that can ignore

fundamental constitutional rights."  Pl.'s TRO Mot. at 20.  Defendants counter that no such

violation is present because "FINRA functions subordinately" to the SEC, which maintains

"authority and surveillance over FINRA's activities."  Gov't's Opp'n at 8 (citation omitted);

*accord* FINRA's TRO Opp'n at 11–13.  Defendants are again likely correct.

 "Federal agencies may not subdelegate their 'decision-making authority . . . to outside

entities—private or sovereign—absent affirmative evidence of authority to do so.'"  *Louisiana*

*Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 696 (D.C. Cir. 2017) (*quoting U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004)).  Aside from explicit statutory authority, an agency delegation to a private entity is valid if the agency exercises "authority and surveillance" over the private actor and "law-making remain[s] in the hands of the agency and [is] 'not entrusted to the industry.'"  *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 896 F.3d 539, 546 (D.C. Cir. 2018) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)).

Congress intended that SROs, like FINRA, would fulfill a supervisory role over the securities industry.  *See* 15 U.S.C. § 78o-3(b) (listing requirements of a broker-dealer association for the SEC to characterize the organization as a national securities association).  Yet SROs' authority is subordinate to the SEC's ultimate control and oversight.  The SEC may suspend or revoke FINRA's registration if "necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]."  15 U.S.C. § 78s(h)(1).  While FINRA promulgates its own rules and standards for professional conduct, those rules are reviewed and approved by the SEC with very limited exceptions.  *See Turbeville*, 874 F.3d at 1270 (describing the SEC's oversight duties); 15 U.S.C. § 78s(b)–(c).  The SEC at any time may "abrogate, add to, and delete from" any FINRA rule.  *Id.* § 78s(c).

Although FINRA may take the first step in investigating and disciplining an entity for violation of its rules, an SEC regulation, or a statutory provision, *id.* § 78o-3(b)(7), any adjudication by FINRA is subject to *de novo* and *sua sponte* review by the SEC, *id.* § 78s(d)(2); Commission Rule of Practice 452, 17 C.F.R. § 201.452.  Such structure has resulted in a finding that federal securities laws do not amount to an unconstitutional delegation by every court to consider the issue.  *See, e.g.*, *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *First Jersey Secs., Inc. v. Bergen*, 605

F.2d 690, 697 (3d Cir. 1979); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977); *R.H. Johnson v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952).  This Court sees no reason to depart from those findings and as such holds that plaintiffs' private nondelegation doctrine claim is unlikely to succeed on the merits.[9]

### 3.      *Plaintiffs' First Amendment Claim Lacks Merit*

Finally, plaintiffs challenge broker-dealers' "forced" association with FINRA "in order to engage in their chosen profession."  SAC ¶ 164.  Defendants argue that the Exchange Act's requirement that registered broker-dealers join FINRA "does not alone implicate any First Amendment right" and that, because "[p]laintiffs do not assert any 'expressive purpose[]' for which they wish to avoid association with FINRA," plaintiffs' First Amendment claim must fail. Gov't's Opp'n at 19; *accord* FINRA's TRO Opp'n at 13–14.  Again, defendants' arguments have a substantial likelihood of prevailing.

Certainly, the First Amendment's protection of freedom of speech also extends to protect "[t]he right to eschew association for expressive purposes."  *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018); *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate.").  Freedom of expressive association, however, is not absolute.  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  Rather, the Supreme Court has held that a regulation may

---

[9]      Plaintiffs' complaint alludes to a public nondelegation claim as well.  *See* SAC ¶ 161 ("This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity.").  Although that line of argument was not pursued in plaintiff's motion for injunctive relief, assuming, *arguendo*, that FINRA qualifies as a state actor, no unconstitutional public delegation of unfettered policy-making and enforcement authority is likely displayed because, in describing the duties of SROs, Congress delineated specific objectives that SROs should strive to accomplish, providing an "intelligible principle" under the public nondelegation doctrine.  *See Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 401 (D.C. Cir. 2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)); *see also* 15 U.S.C. § 78o-3(b)(6) (describing the goals of an SRO's rules to include, *inter alia*, "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . [and] to protect investors and the public interest").

override that right when it "serve[s] compelling state interests, unrelated to the suppression of

ideas, that cannot be achieved through means significantly less restrictive of associational

freedoms." *Id.* (quoting *Roberts*, 468 U.S. at 623).[10]

FINRA articulates a significantly compelling interest embodied in the Exchange Act to

justify mandatory FINRA membership.  In permitting securities industry regulation through

SROs, Congress intended those entities to "prevent fraudulent and manipulative acts and

practices, [] promote just and equitable principles of trade, [] foster cooperation and

coordination" among all industry players, "remove impediments to and perfect the mechanism of

a free and open market and a national market system, and, in general, to protect investors and the

public interest."  15 U.S.C. § 78o-3(b)(6).

Mandatory FINRA membership functions accordingly to ensure that broker-dealers

transacting in the securities space all adhere to the same set of professional and industry

standards to protect both actual and prospective securities purchasers.  *See* Gov't's Supp. Br. at 6

(citing *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994)).  For instance, FINRA sets

"recordkeeping and reporting obligations, fiduciary duties, and special antifraud rules[,]" Gov't's

Supp. Br. at 7 (quoting *In re Registration Requirements for Foreign Broker-Dealers*, Exchange

Act Release No. 34-27017, 1989 WL 1097092, at *3–4 (July 11, 1989)), as well as conducts

professional training to assure industry participants that those transacting in the space are

"financially capable" of doing so in accordance with regulatory standards and in pursuit of fair

and transparent treatment of customers.  Gov't's Supp. Br. at 7 (citing SEC, *Persons Deemed*

---

[10]     The Supreme Court's specific test proceeds as follows.  After determining that the group engages in "expressive association," *Boy Scouts*, 530 U.S. at 648–50, whether forced inclusion "would significantly affect [the association's] ability to advocate public or private viewpoints," *id.* at 650–53, and whether inclusion of a member would significantly burden the association's expression, *id.* at 653–56, a court must then consider whether the restraint "runs afoul" of the expressive association by comparing the burden on expressive association with the state's interest in intruding into that right, *id.* at 656–59.  Although the parties dispute resolution of each consideration, the last factor, as articulated above, *see id.* at 648, is dispositive of this dispute.

*Not to Be Brokers*, Exchange Act Release No. 22172, 1985 WL 634795, at *2 (June 27, 1985)).

By joining FINRA, members agree to bind themselves to standards and be held accountable if

their conduct falls short—all to the benefit of free-flowing and functioning financial markets and

fair treatment towards customers.  Since the compelling interest in statutorily mandated FINRA

membership so outweighs any expressive association right, plaintiffs again are unlikely to

succeed on their First Amendment claim.[11]

In sum, none of plaintiffs' claims in their operative complaint are likely to succeed on the

merits, resulting in this factor weighing against a preliminary injunction or a TRO.

**B.      Irreparable Harm**

On the second factor, Alpine argues that resolution of the pending Enforcement

Proceeding may include "the corporate death penalty" of expulsion from the industry, Pl.'s TRO

Mot. at 1; *accord* SAC ¶¶ 10, 129, and, further, that "subjection to an illegitimate proceeding, led

by an illegitimate decision maker constitutes 'a here-and-now injury'" supporting a finding of

irreparable harm, Pl.'s TRO Mot. at 22 (citing *Axon*, 143 S. Ct. at 903).  FINRA counters that

any harm imposed on Alpine from the Enforcement Proceeding is "overstated" because the

outcome of the proceeding would not occur for many days, possibly months, and that such a

decision could then be appealed to the SEC and stayed.  *See* FINRA's TRO Opp'n at 15 (citing

applicable FINRA rules on appeals of FINRA decisions).  Here, the Supreme Court's *Axon*

decision tips this factor in Alpine's favor.

---

[11]      Insofar as plaintiffs frame their First Amendment claim as a challenge to mandatory funding of FINRA, *see*
SAC ¶ 165, that claim, too, is unlikely to succeed on the merits.  While plaintiffs strongly criticize FINRA's
funding, budget, expenditures, and executive compensation structures, such budgetary considerations and setting
competitive executive salaries are part and parcel of a corporation's duties and so plaintiffs have not shown that
FINRA uses any of its funding to engage in activity that is not germane to its purpose, rendering these complaints,
no matter how meritorious, irrelevant to their First Amendment claim.  *See Keller v. State Bar of Cal.*, 496 U.S. 1,
13–14 (1990).

At the outset, Alpine bluntly states that FINRA's Enforcement Proceeding subjects it to potential expulsion from the industry, an existential threat to its business that would force the company to cease operations, and so the proceeding must be delayed.  *See* Pl.'s TRO Mot. at 22–23.  Yet, Alpine faces precisely the same expulsion penalty under the March 2022 Panel Decision currently on review by the NAC.  *See generally* March 2022 Panel Decision.  Enjoining the NAC review process, however, is not the focus of the injunctive relief Alpine now seeks, despite the fact that expulsion may be inevitable if the March 2022 Panel Decision is upheld.  That consequence does not arise from any lack of due process afforded to Alpine at the original enforcement proceeding leading to the March 2022 Panel Decision now on appeal to the NAC, nor from the ongoing Enforcement Proceeding, nor even from plaintiffs' asserted constitutional claims.  Rather, that consequence appears to be the result of Alpine's failure to comply with FINRA's permanent cease-and-desist order issued as part of the March 2022 Panel Decision.  In the face of that decision, which took immediate effect on March 22, 2022, Alpine is suspected of flouting FINRA's directive to cease harmful conduct by failing to comply with FINRA's permanent cease-and-desist order.  *See* FINRA's TRO Opp'n, Ex. B, Pet. for a Hearing & the Imposition of Sanctions – Preliminary Statement ("Pet. for Enforcement Proceeding") ¶¶ 1–2, ECF No. 70-2 ("FINRA's Department of Enforcement requests a hearing . . . and the imposition of sanctions against Respondent Alpine . . . for violating a March 22, 2022 Permanent Cease and Desist Order . . . .  Alpine disregarded the terms of the [Order], which was intended to prevent the firm from harming customers through ongoing acts of misconduct.").  In allegedly defying the permanent cease-and-desist order—by FINRA's count, more than 35,000 times—FINRA decided that, due to Alpine's chronic recidivism, this SRO had little choice but to take expedited steps to expel the company from the industry even while Alpine's appeal of the March 2022

Panel Decision is pending, a decision, as noted, that also recommended expulsion.  *See* Pet. for

Enforcement Proceeding ¶¶ 5–6.

In context, Alpine now seeks to employ extraordinary equitable relief to halt FINRA's

continuing enforcement of its own orders, under the cloak of several asserted constitutional

claims so that this Court can save Alpine from harm allegedly due to its own defiance of those

orders.  Granting the requested TRO and consequently delaying the Enforcement Proceeding

would thus sanction Alpine's alleged noncompliant conduct with FINRA's permanent cease-and-

desist order.  Such a ruling would encourage violators to race to district court with constitutional

claims to delay or halt enforcement proceedings, providing a direct mechanism to subvert

FINRA's enforcement of its own orders designed to protect the securities industry.  Nonetheless,

the irreparable harm factor focuses on the harm to the *plaintiff* seeking the relief, though the

source of that harm is noteworthy in weighing these equitable factors.

On that point, Alpine invokes *Axon* to argue that its assertion of constitutional claims

against FINRA and its adjudicatory process subjects the company to a "here-and-now injury"

and automatically triggers a finding of irreparable harm.  *See* Pl.'s TRO Mot. at 22–23 (quoting

*Axon*, 143 S. Ct. at 903).  Indeed, the Supreme Court expressed the view that being subjected to

an adjudicatory process that a plaintiff claims is constitutionally flawed is "impossible to remedy

once the proceeding is over" and a "grievance [for which] the court of appeals can do nothing:

[a] proceeding that has already happened cannot be undone."  *Axon*, 143 S. Ct. at 903–04.

Alpine is right that this strong language in *Axon* must be viewed as a consideration relevant to

irreparable harm, *see* Hr'g Tr. at 63:7–13 (Alpine agreeing that the "here-and-now injury"

language in *Axon* is the Supreme Court "putting its thumb on the scale among the preliminary

injunctive factors for irreparable harm"), and neither FINRA nor the government, as intervenor-

defendant, present much argument against this view, *see, e.g.*, Hr'g Tr. at 78:13–80:11 (FINRA arguing only that *Axon* does not alter the preliminary injunction analysis); *id.* at 89:4–90:6 (referencing the government's choice not to take a position on certain preliminary injunction factors before stating that nothing in *Axon* displaces the preliminary injunction factors). Consequently, under the Supreme Court's explicit language, the nature of the constitutional claims asserted here, no matter their unlikelihood of success, suffice to show irreparable harm to Alpine, even though any such harm may stem directly from Alpine's noncompliant actions.[12]

### C.   Balance of Equities and the Public Interest

Finally, the parties contest where other interests lie. Alpine argues that, FINRA "waited years to assert [its] claims [against Alpine] and would suffer no prejudice" from a delay in the Enforcement Proceeding and that the public has an interest in "assuring that Alpine is not subject to unconstitutional treatment at the hands of FINRA." Pl.'s TRO Mot. at 23 (footnote omitted).

---

[12]     Although not argued by the parties, *Axon*'s extraordinary language in addressing the "problem . . . stemming from the interaction between the alleged injury and the timing of review," *id.* at 903, raises the question of whether the Supreme Court's comparison of a challenge to the constitutionality of an adjudicative body to the collateral order doctrine, is intended to ensure that constitutional claims must be given threshold consideration in district court, *see Axon*, 143 S. Ct. at 904–06, warranting an automatic stay of the challenged adjudication until resolution of the constitutional issues. Under that reading of *Axon*, which invokes the collateral order doctrine to propose that a constitutional challenge must be decided first similarly to consideration of "immunity doctrines," *id.* at 904–05, whether any of the preliminary-injunctive factors are met would become beside the point. On this point, *Axon* applies that reasoning to the facts before the Supreme Court, adding that "certain rights 'not to stand trial' or face other legal processes . . . are 'effectively lost' if review is deferred until after trial. . . . So too here." *Id.* at 904 (internal citations omitted). The Supreme Court's recent vacatur of a D.C. Circuit decision, which required a constitutional challenge to the Federal Energy Regulatory Commission ("FERC") to be exhausted before the agency, pursuant to the applicable statutory review scheme, signals that intention to broaden the collateral order doctrine. *See Bohon v. FERC*, No. 22-566, 2023 WL 3046112 (Apr. 24, 2023) (Mem.), *vacating*, 37 F.4th 663 (D.C. Cir. 2022). The specter, then, of dual-tracked proceedings—one before federal district court and another before a federal agency or adjudicatory body—raises the further question of what procedural mechanism is proper for managing the interaction between those proceedings. One option is expedited briefing of dispositive motions before the federal district court to resolve the merits of the constitutional challenge quickly, only halting the adjudicatory body's proceeding on a short-term basis. *See, e.g.*, *Sidak v. U.S. Int'l Trade Comm'n*, No. 23-cv-325 (TNM), 2023 WL 3275635, at *4 n.3, *5–7, *13 (D.D.C. May 5, 2023) (in resolving the expedited motion for summary judgment, in this "unusual" case, carefully applying *Axon* to hold that plaintiff's Appointments Clause challenge to International Trade Commission Administrative Law Judges was ripe for review because, among other things, plaintiff was not a party to the underlying agency enforcement action and "had no obligation (nor opportunity) to earlier raise this claim in federal court"). All that said, because Alpine has not invoked *Axon* beyond the considerations of irreparable harm relevant to its pending motion for equitable relief, this case is no occasion to opine on these lingering questions.

Conversely, FINRA argues that "[a] preliminary injunction would impair FINRA's pursuit of its regulatory mandate and undermine the public interest by barring FINRA" from enforcing its orders, including those against Alpine.  FINRA's TRO Opp'n at 16.  FINRA is correct.

FINRA has an interest in protecting the public from the harms caused by broker-dealers engaging in securities violations.  This is the very mission of this SRO.  That overwhelming interest is especially important in FINRA's case of conducting expedited enforcement actions to halt the imminent risk to the public presented by bad actors potentially resulting in millions of dollars lost from customers, like those that initiated FINRA's investigation against Alpine in 2019.  *See* March 2022 Panel Decision at 2 ("Enforcement's investigation of Alpine Securities began when some of Alpine Securities' customers complained to FINRA about, among other things, the firm's $5,000 monthly account fee.").  The risk of harm to the public from an alleged bad actor openly and repeatedly flouting a remedial cease-and-desist order issued by a FINRA panel, allegedly thousands of times, at the expense of customers, is significant and concrete compared to Alpine's interest in asserting constitutional claims against FINRA that have an unlikelihood of success for the reasons already summarized.  As such, the balance of equities and public interest disfavor any injunctive relief.

* * *

In considering the four factors in total, while irreparable harm tips in Alpine's favor, the other factors strongly weigh against granting plaintiff's request for equitable relief and so such relief is inappropriate here.

## IV.   CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Reconsideration of Minute Order Denying Emergency Preliminary Injunction Motion is granted and plaintiffs' Renewed

Emergency Motion for Preliminary Injunction and Temporary Restraining Order is denied.  An

Order consistent with this Memorandum Opinion will be entered contemporaneously.

    Date:  June 7, 2023

                                                    _____
                                                    BERYL A. HOWELL
                                                    District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTTSDALE CAPITAL ADVISORS CORPORATION and ALPINE SECURITIES CORPORATION, | Civil Action No. 23-1506 (BAH) |
| Plaintiffs, | Judge Beryl A. Howell |
| v. | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC., | |
| Defendant, | |
| UNITED STATES OF AMERICA, | |
| Intervenor Defendant. | |

### ORDER

Upon consideration of plaintiff Alpine Securities Corporation's Motion for Reconsideration of Minute Order Denying Emergency Preliminary Injunction Motion, ECF No. 65, plaintiff Alpine Securities Corporation's Renewed Emergency Motion for Preliminary Injunction and Temporary Restraining Order, ECF No. 66, the memoranda submitted in support and opposition of both motions, the exhibits attached thereto, the arguments presented at the hearing on June 1, 2023, the supplemental post-hearing briefing, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiff's Motion for Reconsideration of Minute Order Denying Emergency Preliminary Injunction Motion, ECF No. 65, is GRANTED; and it is further

**ORDERED** that plaintiff's Renewed Emergency Motion for Preliminary Injunction and Temporary Restraining Order, ECF No. 66, is DENIED.

**SO ORDERED.**

Date: June 7, 2023

_____
BERYL A. HOWELL
District Judge

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

        Plaintiffs,

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

        Defendant.

_____/

Case No.: 8:22-cv-2347-MSS-TGW

**SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, Scottsdale Capital Advisors Corporation ("SCA") and Alpine

Securities Corporation ("Alpine") (collectively, "Plaintiffs"), sue Financial Industry

Regulatory Authority, Inc. ("FINRA") and allege as follows:

**INTRODUCTION**

1.    In this action, Plaintiffs challenge the unconstitutional operation and

structure of FINRA.

2.    Despite purporting to be a private corporation and self-regulatory

organization, FINRA wields massive governmental power and authority over the

securities broker-dealer industry and the financial markets while simultaneously

denying that it has any obligation to exercise its power in accordance with the United

States Constitution.

3.      Based on its characteristics and conduct, and notwithstanding FINRA's purported status as a private corporation, FINRA is a governmental entity and state actor subject to the limits of the Constitution.

4.      FINRA's current structure and operations contravene the separation of powers, violate the Appointments Clause, and constitute an impermissible delegation of powers. Because it purports to be a private entity, FINRA is unaccountable to the President of the United States, lacks transparency, and operates in contravention of the authority under which it was formed. Moreover, FINRA utilizes in-house tribunals in a manner contrary to Article III and the Fifth and Seventh Amendments, thereby depriving entities and individuals of property without due process of law.

5.      These constitutional violations are compounded by the fact that, although the legislation providing for the establishment of self-regulatory organizations ("SRO") expressly envisioned multiple and voluntary associations, Congress decades later dictated that membership is mandatory. So now, to participate as a broker or dealer in this country, a firm or individual is required to join FINRA and thereby sacrifice essential constitutional rights. As a result, any firm or individual can be stripped of their livelihood and property without adherence to due process of law.

6.      Since the filing of the initial complaint in this action, FINRA has taken apparently retaliatory action against not just one but both of these Plaintiffs.

7.     Most recently, on April 19, 2023, FINRA filed a new proceeding against Alpine (the "New Alpine Proceeding"). The New Alpine Proceeding vividly illustrates the fundamental unfairness of FINRA's purported proceedings and tribunals.

8.     In the New Alpine Proceeding,  FINRA seeks to impose severe sanctions against Alpine based on Alpine's alleged failure to comply with an order contained in an Initial Hearing Panel Decision that was issued in a prior lengthy FINRA action.

9.     However, an Initial Hearing Panel Decision does not become final or effective unless and until it is affirmed by FINRA's appellate tribunal, the National Adjudicatory Council ("NAC"). And that has not occurred.

10.     Alpine appealed the Initial Hearing Panel Decision and argued its appeal six months ago but no decision has issued. Nonetheless, through the New Alpine Proceeding, FINRA is attempting to obtain the corporate death penalty—expulsion of the firm from the industry—through machinations that deprive Alpine of *any appellate review*.

11.     A decision in the New Alpine Proceeding would issue on an expedited basis and would become effective immediately, regardless of whether the Initial Hearing Panel Decision has been affirmed and regardless of whether Alpine appeals any decision in the New Alpine Proceeding. Thus, FINRA has manufactured a procedure by which it can obtain the closure of the firm through a decision issued on an expedited basis by a single Hearing Officer employed and paid by FINRA even while the underlying decision remains on appeal.

## JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201, and 15 U.S.C. §78aa.

13.    FINRA is prosecuting the New Alpine Proceeding via remote video and not restricted to any specific venue or situs.

14.    Pursuant to *Axon Enterprise Inc. v. FTC*, 143 S.Ct. 890 (2023) and 15 U.S.C. §78aa, the constitutional attack on FINRA places it in the same place as the Securities and Exchange Commission ("SEC"). Thus, personal jurisdiction and venue are appropriate in this Court or in any other district Court in the United States.

15.    Further, this Court has personal jurisdiction over FINRA pursuant to section 48.193, Florida Statutes because FINRA operates, conducts, engages in, and carries on business in the state, has an office in this state, is registered to do business and has a registered agent in this state, was served with process in this state, and is engaged in substantial and not isolated activity within this state.

16.    FINRA—and its predecessor entity—have been registered to do business, have maintained an office and/or registered agent, and have engaged in business in the state of Florida for more than 25 years.

17.    FINRA regulates numerous broker-dealer firms, capital acquisition broker firms, and funding portals that are located in the state of Florida.

18.    FINRA leases real property in the state of Florida and maintains offices in this state.

19.     FINRA's operations include 19 offices, 69 hearing venues, and 3600 employees throughout the country. This vast operation is divided and managed by primary offices in just four regions, one of which—FINRA's Southeast Region Office—is located in Florida. The remaining regional offices are located in major metropolitan cities: Chicago, Los Angeles, and New York.

20.     The Southeast Region Office is responsible for overseeing and operating a significant portion of FINRA's business, including at least 18 FINRA hearing venues in the southeastern United States, including multiple locations in the state of Florida. FINRA also maintains dispute resolution service offices throughout the state.

21.     FINRA employs multiple individuals that reside in Florida and work from the Southeast Regional Office and from FINRA's other Florida offices.

22.     FINRA's operations include administering and overseeing FINRA disputes, a significant percentage of where based in Florida. In 2022 alone, there were close to 500 FINRA cases in Florida, many of which were presided over by arbitrators that live in Florida and were administered with the assistance of FINRA employees who live and work in this state.

23.     FINRA recruits, pays, trains, and oversees arbitrators and mediators who live in Florida and preside over FINRA arbitrations and mediations.

24.     FINRA offers compliance seminars out of its Florida offices. As described on FINRA's website: "[d]esigned for compliance and legal professionals at FINRA member firms, these events offer an opportunity to hear about current

regulatory issues while engaging in a direct dialogue with FINRA District Office staff."

25.     FINRA's Board of Governors (the "Board" or "FINRA's Board") has held meetings in Florida, during which they discussed FINRA's finances, technology and capital initiatives, and rulemaking items.

26.     Based on the foregoing, FINRA is engaged in substantial and not isolated activity in this state sufficient for this Court to confer personal jurisdiction.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

28.     SCA is a broker dealer that has a principal office in Scottsdale, Arizona, as well as an office in the Middle District of Florida. SCA is a registered member of and is regulated by FINRA.

29.     Alpine is a broker dealer with its principal office in Salt Lake City, Utah. Alpine is a registered member of and is regulated by FINRA.

30.     FINRA is a national securities association registered with the SEC pursuant to 15 U.S.C. § 78s and is authorized thereunder to enforce the Securities Exchange Act of 1934 (the "Exchange Act"), the SEC's rules and regulations thereunder, and its own rules (all of which are enforceable only by virtue of the SEC's approval of such rules).

31.     FINRA is a Delaware not-for-profit corporation with its principal place of business located at 1735 K Street NW, Washington D.C. FINRA maintains offices and conducts business throughout the United States, including, as alleged above, in

the State of Florida and in this District. Notwithstanding, FINRA is an agency and/or establishment and/or instrumentality of the United States.

32.   Plaintiffs have standing to assert these claims because they are regulated parties, have experienced the direct impact of FINRA's unconstitutional operations, and have suffered and will continue to suffer injury and damage as a result of its actions.

33.   The claims asserted in this case challenge the constitutionality of FINRA's structure and operations. As such, Plaintiffs' claims are collateral to any administrative proceeding involving Plaintiffs, any administrative review process, and the administrative review structure set forth in the Section 15A of the Exchange Act. The claims asserting constitutional violations are beyond the expertise of FINRA and are appropriately before this Court.

## GENERAL ALLEGATIONS

### I.   The history of FINRA

34.   In 1934, Congress enacted the Exchange Act which required securities firms to register with the SEC if they were a broker or dealer and effected transactions other than on a national securities exchange.

35.   In 1938, Congress passed the Maloney Act adding a new section 15A to the Exchange Act that authorized associations of brokers or dealers meeting certain statutory requirements to register with the SEC as a "national securities association." The Maloney Act's voluntary national securities associations were to be the over-the-

counter ("OTC") market counterparts to the regulatory arms of the exchanges (i.e., self-regulatory organizations).

36.     As the SEC explained shortly after the Maloney Act's passage, the act embodied "the principle of conferring upon regulatory groups from business a primary responsibility for enforcing high standards of business conduct upon their members . . . [by setting] up a system of regulation in the over-the-counter markets through the formation of voluntary associations of investment bankers, dealers and brokers doing business in these markets under appropriate Governmental supervision." SEC, *Fourth Annual Report of the Securities and Exchange Commission: Fiscal Year Ended June 30, 1938* (Washington, D.C., SEC 1938), at 33. Thus, the purpose and intent of the legislation was to rely on "voluntary associations" comprised of those who possess the knowledge and practical experience borne of "doing business in these markets."

37.     A year later, the National Association of Securities Dealers ("NASD") became the first and only registered national securities association. Because no other associations had registered with the SEC, the NASD was the only SRO with "responsibility for enforcing … a system of regulation" for brokers and dealers in the OTC markets.

38.     In 1983, Congress *mandated* that broker-dealers wishing to conduct business in the OTC markets register with the NASD and become subject to the NASD's regulatory powers. Membership was no longer "voluntary."

39.     In addition to the NASD, the New York Stock Exchange ("NYSE") played a significant role as a SRO enforcing securities laws and implementing a regulatory framework through its own rules.

40.     In 2007, the SEC approved a plan that merged the member regulation operations of the NASD and the NYSE. The NASD absorbed the regulatory arm of the NYSE and changed its name to FINRA. Since then, virtually all participants in the securities industry in this country have been required to "join" FINRA and to maintain that membership in order to conduct their business.

## II.     Overview of FINRA's structure and operations

41.     FINRA's day-to-day operations involve overseeing virtually every aspect of and participant in the securities industry. FINRA regulates approximately 3,400 brokerage firms, 150,000 branch offices, and more than 610,000 individual registered securities representatives. Nearly all of FINRA's revenue is derived from its regulatory activities in the form of fees, fines, penalties, and sanctions levied against its members.

42.     FINRA is governed by its Board which is responsible for overseeing the management and administration of FINRA's operations and affairs.

43.     FINRA's Board is comprised of 22 members, less than half of which are "industry governors"—i.e. those that operate within the industry. The remaining Board members are comprised of "public governors"—those who have no material business in the industry—and FINRA's CEO.

44.    FINRA's day-to-day operations are managed by FINRA's executives who are appointed by FINRA's Board.

45.    As part of its purported regulation of broker-dealers, FINRA is responsible for adopting and implementing rules and procedures to discipline its members. To do this, FINRA employs an in-house judicial construct to adjudicate the charges leveled against broker-dealers by FINRA's staff.

46.    FINRA's disciplinary proceedings are managed by the Office of Hearing Officers led by the Chief Hearing Officer who is appointed by FINRA's CEO.

47.    In turn, the Chief Hearing Officer appoints a panel of hearing officers who conduct disciplinary proceedings, issue decisions, and assess fines and sanctions. These hearing officers possess power and authority beyond that of a mere employee or functionary and exercise significant duties and discretion, akin to that of federal trial judges.

48.    Hearing officers' decisions, like those of Administrative Law Judges of the Securities and Exchange Commission, may become final and effective without any further consideration or review.

## III.    FINRA wields expansive and unchecked power in violation of the separation of powers.

49.    FINRA purports to be a private, government-authorized entity responsible for overseeing broker-dealers. In reality, FINRA acts as an extension of the federal government wielding expansive governmental police power, including the power to "enforce compliance" with the Exchange Act and other federal securities

laws, to regulate the conduct of its members through rulemaking and adjudication, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Exchange Act, FINRA's rules, professional standards, and the securities laws

50.     For example, FINRA has the power and discretion to promulgate rules and standards and the ability to enforce compliance with those rules and standards by levying fines on its members and barring its members from the industry.

51.     FINRA also possesses and deploys improperly and unconstitutionally delegated legislative power, including, but not limited to, its broad power to enact law, its authority to set its own budget without any constraint or legislative cap, and its authority to fund that budget through the imposition of a levy on all persons wishing to conduct business in the OTC markets and, indirectly, on those investors that wish to participate in those markets.

52.     Indeed, FINRA's operations are funded almost exclusively from fees, fines, penalties, and sanctions. In 2021, for example, FINRA extracted more than $100 million in fines from its members, most of whom capitulate to FINRA's allegations and penalties precisely because of the enormous and unchecked power that it wields, including, without limitation, its unchecked power to enforce the rules, standards, and laws it enacts or expands in violation of the Constitution as alleged above in paragraphs 42 through 44 and below in paragraphs 48 through 56.

53.     FINRA has the authority to use the amounts that it collects to set its own salaries and is incentivized to increase the amounts of penalties it imposes, expending those funds *inter alia* on exorbitant salaries of more than $3,000,000.00 per year to its Chief Executive Officer and over $1,000,000.00 per year to its Chief Financial Officer, Chief Legal Officer, Head of Member Supervision and Chief of Exams.

54.     In total, FINRA claimed over $1.3 billion in "operating revenue" in 2021, with total net income exceeding $218 million. Over 60% of its operating revenue—more than $800 million—was used for compensation and benefits for FINRA employees.

55.     FINRA also deploys its broad powers to impose burdensome, arbitrary, and ill-defined standards that it requires its members to follow, and it enforces those standards in discriminatory and unfair manner, without consultation with or supervision by any duly appointed constitutional officer. FINRA determines who it will investigate, the tools that it will deploy, and the appropriateness of its unfettered and continuous demands for documents and testimony. FINRA holds this power regardless of whether disciplinary charges will be filed, what evidence will be admitted and considered, or what sanctions will be imposed. Involvement by SEC commissioners in this onerous and impactful process occurs only when—and if—a target of an investigation survives the investigation, prosecution, and internal appeal process.

56.     Despite FINRA's vast enforcement and regulatory power, FINRA's powers are largely unchecked.

57.     FINRA, its Board, and its executives and officers are immune from the supervision and control of the President. FINRA's Board and its executives and officers are not appointed or removable by the President or by the head of any Executive Branch department answerable to the President.

58.     FINRA's Board is selected by FINRA's members and can only be removed by a majority vote of FINRA's Board or, in very limited and specific circumstances, the SEC.

59.     FINRA's executives and officers are appointed and can only be removed by the Board.

60.     The SEC provides the only check to FINRA's power; however, the SEC may only remove members of the FINRA Board if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce compliance" with applicable laws and regulations "without reasonable justification or excuse."

61.     And the SEC commissioners cannot be removed by the President except for in limited circumstances.

62.     Thus, because the President cannot remove SEC commissioners without cause, and because the SEC cannot remove FINRA Board members without cause, the Board and its appointed executives and officers are unconstitutionally insulated from Presidential control and oversight.

63.     FINRA's acquisition and deployment of core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's

ability to perform his constitutional duties and prerogatives. As a result, the operation of FINRA, as well as its implementation of responsibilities delegated to it by the SEC and the Maloney Act, violates the separation of powers.

## IV.   FINRA's hierarchy and its in-house tribunals violate the Appointments Clause.

64.   Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board exercises significant authority pursuant to the laws of the United States, FINRA's Board members are officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution.

65.   The Appointments Clause provides in relevant part that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

66.   By virtue of the discretion, duties, functions, and independence of the FINRA Board, members of the FINRA Board are principal officers whose appointments must be made by the President with the advice and consent of the Senate as is required in relation to other government agencies. Accordingly, the selection of the FINRA Board by its membership violates the Appointments Clause.

67.     In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's membership is not a department within the meaning of the Clause, the appointment of the FINRA Board violates the Appointments Clause.

68.     Similarly, FINRA employs executives and officers to operate FINRA and carry-out its essential functions. By virtue of their discretion, duties, functions, and independence, FINRA's executives and officers are principal officers, or alternatively, inferior officers subject to the Appointments Clause.

69.     FINRA also utilizes an in-house judicial construct to adjudicate charges leveled against FINRA members by FINRA's staff. Those who officiate over disciplinary proceedings, officers from FINRA's Office of Hearing Officers, possess power and authority beyond that of a mere employee or functionary and exercise significant duties and discretion, akin to that of federal trial judges.

70.     These hearing officers do not abide by even the most basic procedures and rules that are designed to ensure the fairness of judicial proceedings, and their actions are subject to review by yet another component of the FINRA structure, its own National Adjudicatory Council.

71.     Hearing officers render decisions that can result not only in substantial penalties but also in the closure of an entire firm or the barring of an individual, impacting the property and livelihood of FINRA members.

72.   Hearing officers' decisions, like those of Administrative Law Judges of the SEC, may become final and effective without any further consideration or review.

73.   FINRA hearing officers are therefore "officers of the United States" within the meaning of the Appointments Clause, not mere employees. However, FINRA's hearing officers are chosen by FINRA staff and are not appointed in the manner prescribed by the Appointments Clause. Their actions and decisions are therefore unconstitutional and invalid.

**V.    FINRA no longer functions as a "self" regulatory organization.**

74.   15 U.S.C. § 78o-3(b)(4) requires the rules of a registered securities association to "assure a fair representation of its members in the selection of its directors and administration of its affairs."

75.   FINRA's rules do not assure a fair representation of its members in the selection of its directors and administration of its affairs because the rules require the majority of FINRA's Board, as well as critical committees of FINRA and the NAC, *not* to be associated with its members.

76.   The initial SRO and FINRA's predecessor, the NASD, had structure, purpose, authority, and powers focused on self-regulating its *voluntary* members within the narrow rules of conduct established by the SRO.  In sharp contrast, FINRA has transformed into a "for-profit" behemoth controlled by non-members that is incentivized to and does exercise its power in a manner that maximizes its profits while avoiding accountability to its members or to the executive branch.

77.     FINRA's members have no control over FINRA's operations, have no authority to approve or disapprove of FINRA rule proposals or interpretations, and play no role in the administration of the disciplinary process. Moreover, FINRA has sole discretion in deciding which matters to investigate and prosecute.

78.     FINRA's bylaws have been changed to require that the number of public governors must exceed the number of industry governors and critical committees of FINRA must now be comprised of a majority of non-industry representatives.

79.     Thus, despite being a "self" regulatory organization, FINRA is not controlled by the industry and is inappropriately referred to as an SRO. *See* David R. Burton, *Reforming FINRA*, Backgrounder No. 3181 at 2, Heritage Foundation, Feb. 1, 2017; McLaughlin, *Is FINRA Constitutional?*, 43 Sec. Reg. and L. Rep. 681 (Mar. 28 2011) ("far from being 'members' of FINRA comparable to the former owners of seats in the NYSE and their associates, securities firms are today the functional equivalent of regulated entities with little or no input into FINRA's regulatory policy or corporate governance").

80.     As observed by SEC Commissioner Hester Peirce, "FINRA is not a self-regulator. Its members are not regulating themselves; they are being regulated by FINRA, just as they are regulated by the SEC." Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University at 27 (Jan. 2015).

81.     FINRA's transformation from a true self-regulatory organization into what it has become today has been characterized by—and is particularly unseemly

because of—its aggressive posturing to avoid accountability to its membership, the SEC, Congress or the courts. As SEC Commissioner Pierce emphasized, the member firms over which "FINRA exerts meaningful control … given the statutory requirement for membership" have only a limited ability to influence FINRA:

> Broker-dealers in the United States are regulated by the Financial Industry Regulatory Authority (FINRA). Although commonly perceived to be a self-regulator, FINRA is not accountable to the industry in the way a self-regulator would be. Nor is it accountable to the public, Congress, the president, or the courts. FINRA's structure and monopoly status shield it from close oversight.  Consequently, an important part of the securities markets is under the control of a regulator with limited accountability.

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University, Abstract (Jan. 2015).

82.    Former SEC Commissioner Daniel M. Gallagher expressed similar concerns regarding FINRA's lack of influence from its members in combination with its efforts to compete with the SEC in terms of prosecutorial activity:

> This decrease in the "self" aspect of FINRA's self-regulatory function has been accompanied by an exponential increase in its regulatory output. As FINRA acts more and more like a deputy SEC, concerns about its accountability grow more pronounced.

Burton, *Reforming FINRA*, Backgrounder No. 3181 at note 55; *see* Hammond, *Double Deference in Administrative Law,* 116 Columbia L. Rev. 1705, 1771 (November 2016) ("the combination of oversight agencies' deference to SROs and judicial deference to oversight agencies undermines both the constitutional and regulatory legitimacy of SROs").

83.    As such, it is clear that FINRA is not controlled by the industry and cannot be properly characterized as a "self" regulator. FINRA has been transformed into an agency that is no longer regulated by its members, contrary to its enabling provisions, and that lacks statutory authority for its actions.

## VI.    FINRA is a state actor but denies the obligation to adhere to the Constitution.

84.    While wielding expansive and unchecked governmental powers, FINRA simultaneously eschews any obligation to comply with the Constitution and afford its members the basic protections designed to prevent overzealous government action.  It claims, for example, that it is not obligated to comply with the Fifth Amendment's guarantee of due process of law or the Seventh Amendment's right to jury trial, and it is not required to abide by the Administrative Procedures Act, the Equal Access to Justice Act, the Hyde Amendment and countless other laws applicable to government regulators.

85.    15 U.S.C. § 78o-3(b)(8) requires the rules of a registered securities association to "provide a fair procedure for the disciplining of members and persons associated with members…." However, FINRA's rules provide no such procedure.

86.    In fact, FINRA's rules do not even provide its members and associated persons with basic components of due process of law.

87.    FINRA exercises its sweeping and coercive powers in a discriminatory manner designed to disadvantage market participants who operate in sectors of the

markets that FINRA disfavors, particularly those like Plaintiffs whose business focuses on the microcap market.

88.     FINRA wields massive power in the securities industry and pursues actions based on delegated authority from the SEC and yet, insists that it is not subject to governmental obligations like due process of law. Its position impacts and skews the entire breadth of its enforcement activity.

89.     FINRA does not apply the most basic rules of evidence in its proceedings and so, for example, paid FINRA employees are permitted to recount to a hearing panel layer upon layer of hearsay testimony regarding conversations supposedly had with investors and other regulators.

90.     Those who preside over FINRA's enforcement actions are employees of and paid by FINRA or its affiliated entities and the proceedings fail to provide for any right to a trial by a jury in violation of the Seventh Amendment, even where the allegations sound in fraud or other claims for which a jury trial is afforded under the law. Its disciplinary proceedings are conducted by its Office of Hearing Officers so those hearing officers are subject to the inherent pressure and conflict of interest that flows from being employed by one of the two litigants.

91.     Further, FINRA assigns those hearing officers to matters in ways that not only are completely opaque but also fail even to comply with the few protections that are afforded to a respondent under FINRA's own rules.

92.     FINRA also fails to recognize a Fifth Amendment privilege in its proceedings, forcing individuals to answer questions during FINRA proceedings by

threatening to bar them from the industry, i.e., deprive them of their livelihood, thereby creating an untenable and illegal scenario in which one constitutional right must be sacrificed to preserve one's livelihood.

93.    And FINRA's purported review process, which again relies on review by individuals paid by FINRA, is so insubstantial that the SEC passed a rule requiring firms to book adverse FINRA awards as a liability despite the pendency of an appeal because the "grounds for revision on appeal are very limited." *See* NASD Notice to Members 00-63.

94.    FINRA holds seemingly unfettered power over market participants, yet it fails to abide by the basic constraints and protections that serve to limit agency action and preserve the critical and constitutional rights of those subject to its authority.

95.    As noted in connection with FINRA's efforts to further expand its authority:

> FINRA's status as a nongovernmental regulator, however, enables it to avoid the scrutiny and procedural requirements to which a government agency performing the same tasks would be subject. Before FINRA succeeds in further expanding its regulatory footprint by taking on additional responsibilities, policymakers should revisit the long-debated questions about whether self-regulation works in its current manifestation and, if not, what should be done about it. One option would be to acknowledge that FINRA looks a lot like the SEC and accordingly fold FINRA into the SEC. Alternatively, FINRA could be remade into an organization that is run by the industry it regulates. In other words, FINRA could become a true self-regulator. Competing SROs might emerge to tailor regulation to a particular group of firms, such as smaller broker-dealers. Another option would be to enhance FINRA's public disclosure and procedural obligations. Procedural requirements should include a clear requirement to conduct and

document economic analysis and greater procedural protections in connection with disciplinary actions.

Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University, at 27-28 (Jan. 2015) (footnotes omitted).

96.   Worse yet, FINRA has achieved this result all the while it enforces federal securities laws and punishes broker-dealers for alleged violations of those laws by, among other things, stripping broker-dealers of their ability to conduct any business.

97.   FINRA's denial of any obligation to adhere to the Constitution, based on the idea that it is not a "state actor," is further undermined by its claim that it is entitled to the *benefits* of governmental immunity.

> Like Schrodinger's cat, simultaneously dead and alive, FINRA is, under current rulings, both a state actor (for purposes of barring liability and for tax purposes) and, generally, not a state actor (for purposes of absolving it of due process and other requirements and for liability purposes).

Burton, *Reforming FINRA*, Backgrounder No. 3181 at 3; *see also* Marianne K. Smythe, "Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation," 62 N.C.L. Rev. 475, 483 1984; *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010); McLaughlin, *Is FINRA Constitutional?*, 43 Sec. Reg. and L. Rep. 681 (Mar. 28 2011); *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers*, 637 F.3d 112, 114–15 (2d Cir. 2011), cert. denied, 132 S. Ct. 1093 (2012); Richard L. Stone & Michael A. Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal*

*Law*, 1995 Colum. Bus. L. R. 453. For a discussion of immunity as it has been applied

in the SRO context, see Rohit A. Nafday, *From Sense to Nonsense and Back Again: SRO*

*Immunity, Doctrinal Bait-and-Switch, and a Call for Coherence*, 77 U. Chi. L. Rev. 847,

847-85 (2010); Roberta S. Karmel, *Should Securities Industry Self-Regulatory Organizations*

*Be Considered Government Agencies?*, 14 Stan. J.L. Bus. & Fin. 151, 156 (2008) ("The

problem of a delegation by a [government] agency, which is itself exercising statutorily

delegated powers, to a private standard setting body like FINRA [for example] further

confounds the question of whether the private body either is exercising delegated

governmental power or is, indeed, a government entity. Yet, such privatization of

governmental functions has become increasingly common." (citing, John J. Dilulio,

Jr., *Response Government by Proxy: A Faithful Overview*, 116 Harv. L. Rev. 1271 (2002));

Jody Freeman, *The Private Role in Public Governance*, 75 N.Y.U. L. Rev. 543 (2000);

Gillian E. Metzger, *Privatization as Delegation*, 103 Colum. L. Rev. 1367 (2003); Steven

J. Schwartz, *Private Ordering*, 97 Nw. U. L. Rev. 319 (2002)); Burton, *Reforming FINRA*,

Backgrounder No. 3181 at 2 ("While it serves a governmental function and has

coercive power, including the ability to completely bar firms and individuals from the

marketplace, it is not subject to any of the normal transparency, regulatory review or

due process protections normally associated with government.")

98.    In combination, FINRA's positions lead to a pernicious and destructive

result: FINRA is not a regulator who must provide due process protections, but it is

also supposedly not a private actor who may be sued for damages. It is unaccountable

and immune at every turn.

99.     Where, as here, Congress has sought to outsource governmental powers

to (purportedly) private actors who are supposedly not bound by the Constitution,

current Supreme Court justices have found the approach impermissible, stating that

the Government must remain accountable to the public and "cannot delegate

regulatory authority to a private entity." *Texas v. Comm'r of Internal Revenue*, <u>142 S.Ct.</u>

<u>1308</u> (2022) (Alito, J., joined by Thomas, J. and Gorsuch J.)

## VII.   Broker-dealers, like Plaintiffs, are forced to join FINRA and subject themselves to violations of their rights und the First, Fifth and Seventh Amendments.

100.     As described above, FINRA has expansive, unchecked, and

unconstitutional regulatory and enforcement powers. However, broker-dealers within

the securities industry have no choice but to suffer under FINRA's oversight.

101.     The First Amendment of the United States Constitution protects the

freedom of association as well as the freedom not to associate. However, for virtually

all broker-dealers within the securities industry, association with FINRA is not

optional.

102.     By statute, brokers and dealers are required to register with a registered

self-regulatory organization to operate their businesses. FINRA is the sole self-

regulatory organization registered with the SEC. As a result, broker-dealers are forced

to join FINRA and maintain that membership to participate in the securities industry.

103.     There are significant personal liberty and property implications through

this forced association. Broker-dealers are forced to succumb to FINRA's regulations

and procedures and subject themselves to FINRA's enforcement staff, in-house

tribunals, and adjudicatory procedures that deprive broker-dealers of constitutional protections guaranteed by the First, Fifth and Seventh Amendments to the Constitution.

104.   Not only must a broker-dealer forego constitutional protections when it joins FINRA, it must also fund the organization. Membership with FINRA is costly. FINRA's operations—which generate revenues over $1.3 billion—are derived almost exclusively through obligatory fees, fines, and penalties assessed against FINRA members.

105.   FINRA then uses these funds in a manner that benefits FINRA, and those securities firms that are aligned with and supportive of FINRA's agenda, including its bias against the microcap sector and its desire to strangle that market and participants in it.

106.   In fact, over $1 billion of FINRA's revenues are dedicated to compensation and benefits for FINRA staff and professional and contract services purportedly necessary to finance FINRA's increasingly aggressive operations.

107.   The employee costs include executive salaries that are exorbitant and grossly disproportionate to the salaries of other executives for non-profit organizations. Notably, FINRA's President and CEO is paid over 10 times more than the CEO of the SEC.

108.   Even more astounding is that, on at least one instance when FINRA has suffered investment losses, it has simply increased membership dues and assessments against its members to recoup these losses.

109.   By virtue of their forced association with FINRA, FINRA members are forced to support and fund FINRA including the excessive salaries of its executives, its unfair and biased enforcement process, and its unconstitutional use of its power.

110.   In short, broker-dealers in the securities industry are forced to join, fund, and support an organization with which they may not agree, that they may not want to be a part of, and that deprives such broker-dealers of certain constitutionally protected rights, all in violation of the First Amendment.

## VIII.  By virtue of FINRA's unconstitutional hierarchy and structure, FINRA members and investors have been and will continue to be harmed.

111.   FINRA's failure to abide by fundamental constraints on the delegation and exercise of governmental authority has caused and will continue to cause profound injury to participants in the securities industry, to the markets, and to the investors that FINRA claims to protect.

112.   FINRA's unconstitutional leadership has caused and/or permitted a disintegration of FINRA's self-regulatory status and an escalation of aggressive, arbitrary, and discriminatory actions against certain of its members, resulting in damage to and closure of firms and harm to investors. Under FINRA's unlawful governance, it has targeted and badgered individuals and entities operating in the microcap markets like Plaintiffs to the point where it is choking off one of the few methods of financing for start-up and developing companies. Its investigative and enforcement actions, while purportedly justified by FINRA's claim that it is protecting investors, actually defy the fundamental view that disclosure is the cornerstone of

securities regulation; instead, it assumes that investors are naïfs, incapable of assessing and understanding the risk and potential reward associated with the microcap markets. FINRA is thereby depriving investors of the ability to make their own investment decisions.

## IX.    FINRA stifles competition, harms consumers and has caused and will continue to cause injury to Plaintiffs.

113.    FINRA is required to act in a manner that is not discriminatory and that does not impose any undue burden on competition.

114.    Yet, FINRA's actions in relation to Plaintiffs have been especially prolific, discriminatory, and detrimental to competition, and the events surrounding those proceedings illustrate the skewed and broken enforcement process that exists within FINRA.

115.    For example, beginning in May 2015, FINRA sought to sanction SCA for supposed violations of Section 5 of the Securities Act of 1933 (the "1933 Act"). Its determined enforcement efforts lasted over five years and included an affirmance by FINRA's NAC, before the matter reached the SEC, in September 2021.

116.    In a remarkable rebuke of the approaches used by FINRA and by the NAC to procure and then to affirm the findings of violations, the SEC set aside all findings of violations and all sanctions as against all defendants. With respect to John Hurry, the indirect owner of SCA, the SEC found that the NAC, in the appeal, developed and relied on a new theory of liability that was "untethered from any alleged violation of Section 5." *In the Matter of the Application of Scottsdale Capital Advisors Corp.,*

*et al.*, Exchange Act Release No. 93052, 2021 WL 4242630 at *9. The NAC thereby "*deprived [Mr. Hurry] of a fair opportunity* to rebut the theory under which he was held liable." *Id.* (emphasis added).

117.    Perhaps more concerning, the SEC found that FINRA relied on incorrect legal standards in its assertions of violations of Section 5 and that "the NAC incorrectly applied these legal standards" that should govern the application of that provision. *Id.* at *12. The NAC thereby "failed to discharge its duty to fairly and accurately explain the basis for the finding that Scottsdale committed a violation." *Id.* at *13.

118.    The SEC also concluded that FINRA's findings of supervisory violations by SCA representatives was unsupported by the record evidence and error. The SEC noted, for example, that "the NAC decision states, and FINRA maintains before the Commission" that there was certain testimony relating to Respondent Tim DeBlasi. *Id.* at *14. But there was not; "the evidence shows that another official at the firm" had responsibility for Section 5 compliance. *Id.* at 15.

119.    And finally, while FINRA argued and the NAC found that respondents "failed to supervise properly the firm's microcap liquidation business" (*Id.* at *15), the SEC held that there was extensive testimony concerning the firm's due diligence process and its analysis, confirming that the firm had "a process reasonably designed to ascertain whether an exemption was available." *Id.* at 16. Because FINRA failed to establish that "supervision of the due diligence process was unreasonable," the Commission also set aside findings of claimed violations of Rule 3010. *Id.* at *17.

120.    FINRA, as it pursues disciplinary proceedings, fails to provide due process of law, a neutral arbiter or a right to jury guaranteed by the Seventh Amendment, even where the charges sound in fraud.  And FINRA ignores and fails to apply the few protections that are afforded to respondents in their membership agreement, successfully arguing that members cannot enforce the provisions of the membership agreement or FINRA's own rules.

121.    Plaintiffs' experiences are just examples of how FINRA's unjustified actions have and will continue to result in damage and injury to Plaintiffs and other FINRA members including increased regulatory, compliance and legal costs, substantial loss of business and revenue, reputational damage, and millions of dollars in attorneys' fees. While Plaintiffs have the resources to bear these costs, FINRA's increasingly onerous compliance requirements have driven many small broker-dealers out of business.

122.    FINRA's actions have dramatically ratcheted up the regulatory, compliance, and legal costs associated with operation of a member firm. As a result, member firms are prevented from running their businesses in accordance with critical basic economic principles applicable to pricing and commerce, while the individual rights of market participants are affected as well.

123.    FINRA's failure to adhere to the same constitutional principles and requisites as any other governmental entity is more than just a matter of principle and adherence to law. It is negatively impacting the markets, burdening competition and impinging on the rights of investors and market participants. It has enabled FINRA to

improperly exercise its sweeping authority to constrain and control the operation of securities firms, without regard for fundamental principles of free enterprise, the rights of private parties to enter into contracts, or the prohibition against deprivation of property without due process of law. It has enabled FINRA to create onerous and often ambiguous rules and standards that increase costs for industry members that are often passed on to investors.

## X.   FINRA retaliates through new proceedings against both Plaintiffs.

124.   Since the filing of the initial Complaint in this action, FINRA has taken apparently retaliatory action against not just one but both of these Plaintiffs. On February 24, 2023, FINRA advised SCA, through a "Wells Notice," that FINRA's Department of Enforcement ("DOE") intended to recommend a disciplinary proceeding based on alleged failures in its anti-money laundering program during a period beginning October 2019, years earlier (hereinafter referred to as "the new FINRA SCA proceeding"). SCA has since submitted a response to that Wells Notice and the matter remains pending.

125.   Notably, FINRA previously pursued a lengthy case against SCA in which it leveled similar allegations of failures to monitor and identify certain "red flags." After five years of litigation, the SEC reversed all sanctions against SCA and its associated persons based on findings that FINRA and its tribunals had applied an incorrect standard and had engaged in improper tactics.

126.   On April 19, 2023, FINRA commenced an expedited disciplinary proceeding against Alpine (defined *supra* as the "New Alpine Proceeding") based on

conduct of which FINRA has been aware and of which has been the subject of litigation with FINRA for at least the past four years (defined *supra* as "the New Alpine Proceeding").

127.    The New Alpine Proceeding alleges that Alpine violated an order issued as part of an Initial Hearing Panel Decision in March 2022 (the "Underlying Case"). However, the conduct at issue in the New Alpine Proceeding was actually part of the evidence adduced at a hearing that commenced in February 2020, and yet was not included in the specific prohibitions that FINRA had sought in the resulting cease and desist order.   Nonetheless, years later, FINRA now claims that the conduct was improper.

128.    Further, the New Alpine Proceeding vividly illustrates the fundamental unfairness of FINRA's purported proceedings and tribunals. In the Underlying Case, the Initial Hearing Panel Decision does not become final or effective unless and until it is affirmed by FINRA's appellate tribunal, the NAC.   And that has not occurred Alpine appealed from the decision and argued its appeal six months ago but no decision has issued.

129.    Nonetheless, through the New Alpine Proceeding, FINRA is attempting to obtain the corporate death penalty, expulsion of the firm from the industry, through machinations that deprive Alpine of any appellate review.

130.    A decision in the New Alpine Proceeding would issue on an expedited basis and would become effective immediately, regardless of whether Alpine appeals the decision.   Thus, FINRA has found a way to seek and obtain the closure of the

Alpine through a decision issued on an expedited basis by a single FINRA Hearing Officer employed and paid by FINRA even while the underlying decision remains on appeal.

131.   The single FINRA Hearing Officer that is being asked to expel the firm on an expedited basis is not only a FINRA employee but also is improperly insulated from supervision by the President and his actions therefore violate Article III of the Constitution.

132.   FINRA's combination of prosecutorial and adjudicative functions – with FINRA serving as prosecutor, judge, jury and executioner – renders its enforcement actions unconstitutional.

133.   Plaintiffs have a right not to be subjected to unfair and unconstitutional governmental authority including having expulsion ordered on an expedited basis by a single FINRA Hearing Officer who is appointed without adherence to the Constitution and is employed and paid by FINRA.

134.   Plaintiffs will be irreparably harmed if FINRA is able to continue to pursue its expedited effort to close Alpine through its unconstitutional structure and proceedings.

135.   Plaintiff will not have an opportunity to obtain meaningful judicial review of FINRA's actions.

## XI.    A declaration from this Court is the only remedy available to check FINRA's powers.

136.    Despite its characterization as a "self-regulatory" organization, FINRA is anything but. Indeed, FINRA's members are incapable of exerting any meaningful control of or change to the entity, and FINRA's articles and bylaws—requiring that the majority of its Board be comprised of non-industry members—ensure that it will remain that way.

137.    Nevertheless, this "self-regulatory" organization has expansive power to regulate the entire broker-dealer securities industry subjecting each person and entity in that industry, including Plaintiffs, to FINRA's rules, regulations, obligations, requirements, fines, fees, and enforcement actions.

138.    FINRA's very existence and its exercise of unbridled and unchecked powers violates the Constitution. FINRA's members are powerless to effectuate change within the organization. Thus, the Court is the only forum that affords the opportunity for relief.

139.    All conditions precedent to the bringing and maintenance of this action and the granting of the relief requested have occurred, have been performed, or have been waived.

140.    Plaintiffs have obtained undersigned counsel to represent them in this action and are obligated to pay their attorneys a reasonable fee for the services rendered.

## COUNT I
**(Violation of the Separation of Powers)**

141.   Plaintiffs reallege paragraphs 1 through 140.

142.   The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

143.   Recognizing the impossibility of one person performing all business of the government, the Constitution provides for principal executive officers to assist in these duties.

144.   The President is empowered to keep such principal officers accountable by removing them from office, if necessary.

145.   As set forth above, FINRA exercises wide-ranging executive power, including the power to "enforce compliance" with the Exchange Act and the securities laws, to enact wide-ranging rules and regulations, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Act, the rules of FINRA, professional standards, and the securities laws.

146.   FINRA's wide-ranging exercise of executive power is immune from Presidential supervision or control.

147.   FINRA's Board is not appointed or removable by the President; rather, its members are selected by and can only be removed by a vote of other Board members.

148.   FINRA's executives and officers are also not appointed or removable by the President; rather they are appointed by and can only be removed by the Board.

149.   The SEC is charged with overseeing FINRA, but FINRA's Board, executives, and officers are insulated from the SEC's control. The SEC cannot remove FINRA Board members at will. Instead, the SEC may remove FINRA's Board members only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

150.   The SEC commissioners cannot be removed by the President except for in limited circumstances.

151.   As a result, FINRA's Board members, along with its executives and officers, are afforded multi-level protection from removal thus impeding the President's ability to oversee the officers executing the laws of the United States in violation of the Constitution's separation of powers.

## COUNT II
### (Violation of the Appointments Clause of the U.S. Constitution)

152.   Plaintiffs reallege paragraphs 1 through 140.

153.    FINRA is a public entity and/or an agency and/or an instrumentality of the United States subject to the constraints imposed on the federal government by the Constitution.

154.    Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board exercises significant authority pursuant to the laws of the United States and are therefore officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution.

155.    The Appointments Clause provides in relevant part that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

156.    By virtue of their wide-ranging discretion, duties, functions and independence, members of the Board and FINRA's executives and officers are principal officers whose appointments must be made by the President by and with the advice and consent of the Senate. Accordingly, the selection of the FINRA Board by its membership, and the Board's corresponding selection of executives and officers, violates the Appointments Clause.

157.   In the alternative, the members of the FINRA Board and FINRA's executives and officers are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA is not a department within the meaning of the Clause, the appointment of the FINRA Board and FINRA's executives and officers violates the Appointments Clause.

### COUNT III
### (Unconstitutional Delegation)

158.   Plaintiffs reallege paragraphs 1 through 140.

159.   The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

160.   By virtue of the grant of wide-ranging authority the SEC delegated to the FINRA Board, the Act improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch.

161.   This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity.

### COUNT IV
### (Violation of the First Amendment)

162.   Plaintiffs reallege paragraphs 1 through 140.

163.   The First Amendment of the United States Constitution protects the freedom not to associate.

164.   Notwithstanding this protection, broker-dealers in the securities are forced to associate with FINRA in order to engage in their chosen profession.

165.   As a result, broker-dealers in the securities industry are forced to support and fund FINRA, including FINRA's excessive and unnecessary executive and staff salaries, its unfair and biased enforcement process, and its unconstitutional use of its power.

166.   The excessive compensation FINRA pays to its executives and staff is funded by dues, fees, fines, and penalties assessed against FINRA members.

167.   FINRA's payment of excessive executive and staff compensation is not germane to FINRA's stated purpose..

168.   In addition, by virtue of the forced membership in FINRA, securities industry participants including broker-dealers are forced to relinquish critical rights guaranteed under the Fifth and Seventh Amendment of the United States Constitution.

169.   The obligation for broker-dealers to join FINRA—as the only self-regulatory organization for the securities industry—is contrary to the legislation establishing "voluntary associations" and does not serve a compelling, significant, or legitimate governmental interest.

170.   Even if such obligation did serve some sufficient governmental interest, it is neither narrowly tailored nor the least restrictive means to serve that purpose.

171.   As such, the obligation to join FINRA violates Plaintiffs' First Amendment right not to associate.

## COUNT V
### (Violation of the Fifth Amendment)

172.    Plaintiffs reallege paragraphs 1 through 140.

173.    Due Process of Law requires a fair trial in a fair and unbiased tribunal.

174.    15 U.S.C. § 78o-3(b)(8) requires the rules of a registered securities association to "provide a fair procedure for the disciplining of members and persons associated with members…." However, FINRA's rules provide no such procedure.

175.    As described above, FINRA's disciplinary proceedings are biased, secretive, and fail to implement rules that maintain the integrity the proceedings.

176.    By prosecuting broker-dealers, like Plaintiffs, in such a manner, FINRA is violating the Due Process Clause of the Fifth Amendment to the United States Constitution.

## COUNT VI
### (Violation of the Seventh Amendment)

177.    Plaintiffs reallege paragraphs 1 through 140.

178.    FINRA prosecutes broker-dealers, like Plaintiffs, in a wide variety of cases including those sounding in fraud and those in which FINRA seeks to impose severe penalties.

179.    Nonetheless, broker-dealers are not afforded the right to a trial by jury as guaranteed by the Seventh Amendment.

180.    Broker-dealers who wish to participate in the securities industry and engage in their chosen profession are forced to join FINRA and compelled to subject

themselves to FINRA's rules and disciplinary procedures, including foregoing protections derived from the Seventh Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA is a state actor obligated to respect the rights guaranteed under the United States Constitution;

2.    An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA is presently constituted and operating in a manner that violates the Constitution;

3.    An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA's disciplinary proceedings are unlawful and unconstitutional, specifically including, but not limited to, the New Alpine Proceeding;

4.    An order and judgment enjoining FINRA from maintaining its unconstitutional governance and continuing its unlawful and unconstitutional operation, specifically including, but not limited to, prosecuting the New Alpine Proceeding;

5.    An order and judgment enjoining FINRA from continuing its unlawful and unconstitutional disciplinary proceedings, specifically including, but not limited to, the New Alpine Proceeding;

6.    Costs and attorneys' fees pursuant to any applicable statute or authority; and

7.    Such further relief as this Court deems just and appropriate.

                           */s/ Kenneth G. Turkel*
                           Kenneth G. Turkel – FBN 867233
                           E-mail:  kturkel@tcb-law.com
                           David A. Hayes – FBN 096657
                           E-mail:  dhayes@tcb-law.com
                           TURKEL CUVA BARRIOS, P.A.
                           100 North Tampa Street, Suite 1900
                           Tampa, FL  33602
                           Phone: (813) 834-9191
                           Fax: (813) 443-2193

                           Maranda E. Fritz*
                           maranda@fritzpc.com
                           Maranda E. Fritz PC
                           521 Fifth Avenue 17th Floor
                           New York, New York 10175
                           Phone: (646) 584-8231

                           *Pro hac vice application forthcoming

                           *Attorneys for Plaintiffs*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

        Plaintiffs,

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

        Defendant.

UNITED STATES OF AMERICA,

        Intervenor Defendant.

_____/

Case No.: 8:22-cv-2347-MSS-TGW

**ORDER GRANTING PLAINTIFF'S
EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

This cause came before the Court on Alpine Securities Corporation's ("Alpine")

Emergency Motion for Preliminary Injunction (the "Motion for Preliminary

Injunction"). [Doc. 45]. Alpine requests that this Court enter an injunction enjoining

Defendant, Financial Industry Regulatory Authority, Inc. ("FINRA"), from

continuing its enforcement proceeding against Alpine in *Department of Enforcement v.*

*Alpine Securities Corporation,* Proceeding No. 201961232603 pending resolution of

Plaintiffs' claims challenging the constitutionality of FINRA's structure and

operations. After careful consideration of the Motion for Preliminary Injunction and

Defendant's response, the Court grants Alpine's Motion for Preliminary Injunction.

I.     **Background**

On February 3, 2023, Plaintiffs filed their First Amended Complaint challenging the constitutionality of FINRA's structure and operations. Doc. 27. On April 14, 2023, while Plaintiffs' case was pending, the United States Supreme Court issued its opinion in *Axon Enter., Inc. v. FTC,* 143 S.Ct. 890 (2023) resolving a circuit split regarding whether a district court has jurisdiction to consider motions to enjoin administrative enforcement actions when the Respondent has asserted constitutional claims challenging the structure of the agency. The Supreme Court affirmed the decision of the Fifth Circuit Court of Appeals and held that plaintiffs do not have to circumnavigate the protracted administrative review process to have a district court consider claims challenging the constitutionality of an administrative agency and its procedures *Id.*

On April 19, 2023, five days after the *Axon* opinion was published, FINRA filed a new enforcement proceeding against Alpine (the "Expedited Proceeding") seeking to impose a $4 million fine and to expel Alpine from the securities industry. *See* Declaration of Maranda Fritz [Doc. 46] ("Fritz Declaration"), ¶ 4. FINRA implemented its expedited procedures for the Expedited Proceeding and a final hearing is scheduled for May 31, 2023. *Id.* at ¶ 5. An expulsion order against Alpine resulting from the Expedited Hearing would become effective immediately and force Alpine to close its business. *Id.* at ¶ 7.

Based on the Supreme Court's opinion in *Axon,* Plaintiffs sought and were granted leave to file a Second Amended Complaint that added allegations regarding

the Expedited Proceeding. *See* Doc. 42. The Second Amended Complaint includes the same constitutional challenges to FINRA's operation and structure as in the Amended Complaint. *See* Doc. 43. Alpine then filed its Motion for Preliminary Injunction asking this Court to enjoin the Enforcement Proceeding, which Alpine attacks as unconstitutional, pending resolution Alpine's claims in this case.

## II.   Legal Standard

This Court has the power to issue a preliminary injunction "upon a showing that (1) Plaintiff has a substantial likelihood of succeeding on the merits; (2) Plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant; and (4) granting the injunction would not disserve the public interest." *Everest Nat'l Ins. Co. v. Rockhill Ins. Co.,* 2016 WL 8914545, at *5 (M.D. Fla. Oct. 5, 2016). The purpose of a preliminary injunction is to protect a party from irreparable injury and to preserve the status quo until the court renders a decision on the merits. *Café 207, Inc. v. St. Johns County*, 989 F.2d 1136, 1137 (11th Cir. 1993). And, as the Supreme Court in *Axon* recently emphasized, subjecting one to an unconstitutional proceeding is a "here-and-now" irreparable injury. *See Axon,* 143 S.Ct. at 903-904.

## III.   Legal Analysis

### A.   Plaintiffs have a substantial likelihood of success on their claims.

"To demonstrate a substantial likelihood of success on the merits, [the movant] must make a showing of likely or probable, but not certain, success at trial, on one or

more claims." *Se. Mech. Serv., Inc. v. Brody*, 2008 WL 4613046, at *10 (M.D. Fla. Oct. 15, 2008).  Plaintiffs need not establish the likelihood of success on all claims; doing so for one claim is enough. *Seacoast Banking Corp. of Fla. v. Diemer,* 2020 WL 1674309 at n. 1 (M.D. Fla. Jan. 17, 2020). The applicable authority, including recent and emerging Supreme Court authority, demonstrates that Plaintiffs are likely to succeed on at least one of their claims.

### 1.    FINRA is a state actor.

Prior to considering Plaintiffs' constitutional claims, the Court first considers FINRA's argument that it "is a private company, not a government actor subject to constitutional scrutiny."  Doc. 35, p. 17. However, FINRA's contention is unresolved in this jurisdiction: the Eleventh Circuit has expressly recognized that it had "not yet determined whether FINRA is a government actor subject to the [Due Process] Clause's requirements" and acknowledged a circuit split.[1] *Busacca v. S.E.C.*, 449 Fed.Appx. 886, 890 (11th Cir. 2011).  Squarely presented to this Court, therefore, is a fundamental issue that impacts those in the securities industry in dramatic fashion every day: whether critical governmental functions, including enforcement of the federal securities laws, be outsourced to a purportedly private entity that need not abide by the Constitution.[2]

---

[1] In support of the circuit split, *Busacca* cites *D'Alessio v. S.E.C.*, 380 F.3d 112, 120 n. 12 (2d Cir. 2004) (noting that NASD "is not a state actor subject to due process requirements") and *Rooms v. S.E.C.*, 444 F.3d 1208, 1214 (10th Cir. 2006) (finding that due process requirements apply to the NASD).

[2] See, e.g. William I. Friedman, *The Fourteenth Amendment's Public/private Distinction Among Securities Regulators in the U.S. Marketplace-Revisited*, 23 Ann. Rev. Banking & Fin. L. 727, 758 (2004); Roberta S. Karmel, *Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies?*, 14 Stanford Journal of Law, Business & Finance 151, 154 (2008).

If FINRA is not deemed a state actor, then it may carry out the governmental function of enforcing federal law without regard for a person's or entity's constitutional rights. In fact, FINRA could compel compliance with federal law by intentionally violating the constitutional rights of its members including core private rights such as the right to property.[3]  Neither law nor logic support that troubling result.

### i.   FINRA is intimately entwined with the federal government.

The applicable principles and analysis are well established. "[A]ctions of private entities can sometimes be regarded as governmental action for constitutional purposes." *Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374, 378 (1995). A private party may be considered a state actor when "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise (nexus/joint action test)." *Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (citations and quotations omitted). A private actor's actions may also constitute state action "when it is entwined with governmental policies or when government is entwined in its management or control." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001). To charge a private party with state action under the nexus/joint action test, "the governmental body and private party must be intertwined in a 'symbiotic relationship.'" *Rayburn*, 241 F.3d at 1348 (citations and quotations omitted). "For example, the Eleventh Circuit has held

---

[3] One scholar's deeply concerning example: "an SRO may bring an enforcement action for a violation of a federal law and coerce compliance by threatening to forever bar a person from their profession for any refusal to cooperate." Benjamin P. Edwards, *Supreme Risk,* 74 Fla. L. Rev. 543, 594 (2022).

that the nexus/joint action test is satisfied where the state contractually requires a private actor to take certain actions, such that the private actor is acting in accordance with the governmental directive and is effectively the surrogate for the state." *Woods v. Valentino*, 511 F. Supp. 2d 1263, 1273 (M.D. Fla. 2007) (citations omitted).

The close nexus, intimate entwinement, and interdependence between FINRA and the federal government is indisputable. As the Eleventh Circuit has recognized, FINRA "performs a variety of vital governmental functions" including "adjudicatory, regulatory, and prosecutorial functions." *Gallagher v. Fin. Indus. Regulatory Auth., Inc.*, 2022 WL 1815594, at *2 (11th Cir. June 3, 2022) (quoting *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007)). In fact, numerous courts—including the Eleventh Circuit—have characterized FINRA as a "quasi-governmental agency." *See, e.g. Gallagher,* 2022 WL 1815594 at * 2; *Nat'l Ass'n of Securities Dealers v. S.E.C.,* 431 F.3d 803, 804 (D.C. Cir. 2005). Courts in other jurisdictions have expressly recognized the intimate entwinement between the SEC and FINRA's predecessor, the National Association of Security Dealers (the "NASD"). *See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers*, 637 F.3d 112, 116–17 (2d Cir. 2011) ("[t]he statutory and regulatory framework highlights to us the extent to which an SRO's bylaws are ***intimately intertwined*** with the regulatory powers delegated to SROs by the SEC." (emphasis added)).

The Eleventh Circuit in *Turbeville v. Financial Industry Regulatory Authority* underscored the entwinement and interdependence between FINRA and the SEC,

stating that the Exchange Act "vests [FINRA] with a prominent role in the administration and enforcement of federal securities law." 874 F.3d 1268, 1271 (11th Cir. 2017). In fact, when a FINRA member violates the Exchange Act, FINRA is *required* to "levy sanctions that ***carry the force of federal law.*" *Id.* (emphasis added). To carry out these tasks, the Exchange Act vests FINRA with "a variety of adjudicatory, regulatory, and prosecutorial functions" that are derivative from, ultimately belong to, and are performed on behalf of the SEC. *Weissman*, 500 F.3d at 1296; *see Gallagher*, 2022 WL 1815594, at *2; *Nat'l Ass'n of Sec. Dealers, Inc.*, 431 F.3d at 806–07.

Further demonstrating the entwinement between FINRA and the federal government is FINRA's ability to create rules that "[o]nce approved by the SEC, . . . have the status of federal law." *Empire Fin. Group, Inc. v. Fin. Indus. Regulatory Auth., Inc.*, 2009 WL 10644856, at *2 (S.D. Fla. Jan. 15, 2009). In addition, the SEC has the power to "abrogate, add to, and delete from" FINRA's rules. *Id.* at *2. As a result, the SEC can craft FINRA's rules in a manner that injects the SEC's policy and agenda without abiding by its own rulemaking process.

Scholars and commenters have concluded that, over time, the Exchange Act has "effectively entwined the SEC and its SROs, making it difficult to characterize the SEC's role as purely oversight."[4] As succinctly stated by current SEC Commissioner Pierce, "on the strength of a government mandate and carrying out a regulatory

---

[4] Edwards, *Supreme Risk*, *supra*; *see also, e.g.*, William A. Birdthistle and M. Todd Henderson, *Becoming a Fifth Branch*, 99 Cornell L. Rev. 1 (2013); Richard L. Stone and Michael A. Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, No. 2:453 Columbia Bus. L. Rev. 453 (1995).

mission using government-like tools, FINRA is difficult to distinguish from its patron agency."[5]

By granting FINRA vast governmental authority to create and enforce federal law, the federal government put itself into a position of interdependence with FINRA and created a symbiotic relationship. *See Rayburn,* 241 F.3d at 1348. At minimum, there is substantial entwinement between FINRA and the government such that FINRA's actions can be fairly attributable to the government. *See Brentwood,* 531 U.S. at 296. Accordingly, FINRA is appropriately characterized as a state actor subject to the Constitution.

### ii.   The case law in this Circuit further supports a finding that FINRA is a state actor.

Over a decade ago, in *Busacca,* the Eleventh Circuit recognized that it had "not yet determined whether FINRA is a government actor." 449 Fed.Appx. at 890. More recently, the Eleventh Circuit concluded that, when FINRA carries out its functions as the prosecutor in the enforcement of securities laws and implements SEC-approved rules governing disciplinary actions, *"SROs [like FINRA] act under color of federal law as deputies of the federal government." Turbeville,* 874 F.3d at 1276 (emphasis added).[6]

---

[5]Hester Pierce, The Financial Industry Regulatory Authority: Not Self-Regulation After All (Mercatus Ctr., Working Paper 2015).
[6] *See also Crimmins v. Am. Stock Exch., Inc.*, 346 F. Supp. 1256, 1259 (S.D.N.Y. 1972) ("When an exchange conducts such proceedings under the self-regulatory power conferred upon it by the 1934 Act, it is engaged in governmental action, federal in character . . . .").

The conclusion that FINRA is a state actor accords with a binding Fifth Circuit opinion.[7] In *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971), the court rejected the American Stock Exchange's (the "Exchange") argument that it was not required to adhere to due process because the Exchange was not a governmental agency. The court concluded that "[t]he intimate involvement of the Exchange with the [SEC] brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.* In support of its finding of "intimate involvement" the court explained that the Exchange must register with the SEC, its rules must be submitted to the SEC and are subject to alteration or supplementation by the SEC, its members are closely regulated by the SEC, a security may not be delisted without application to the SEC, and the Exchange may be suspended or its registration withdrawn by the SEC. *Id.* at n. 9.

The "intimate involvement" between the Exchange and the SEC identified in *Intercontinental* has continued in the interaction between FINRA and the SEC. FINRA must register with the SEC, its rules must be submitted to the SEC for approval, its rules are subject to alteration or supplementation by the SEC, FINRA's members are closely regulated by the SEC, and FINRA may be suspended or have its registration withdrawn by the SEC. The decision in *Intercontinental* confirms the "intimate

---

[7] Fifth Circuit opinions handed down prior to September 31, 1981 are binding on the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981).

involvement" between FINRA and the SEC, triggering FINRA's obligation to abide by constitutional restraints.[8]

FINRA has directed the Court to the various cases from other jurisdictions where courts have stated that FINRA is a private entity and not subject to constitutional restrictions. However, none of these cases are binding on this Court. Further, many of the cases cited by FINRA rely solely on prior decisions—particularly the decades old decision in *Desiderio v. NASD, Inc.,* 191 F.3d 198 (2d Cir. 1999)—without conducting any analysis or applying the Supreme Court's entwinement test guidance provided in *Brentwood*. Further, *Desiderio* is outdated; the opinion predates critical changes in FINRA's role and its entwinement with the SEC, and the court failed to consider evolving aspects of FINRA's activities.[9]

Moreover, *Desiderio* and other cases on which FINRA has relied focus on narrow and discrete questions related to an administrative proceeding or a FINRA rule, not whether FINRA's operations and structure are unconstitutional. For example, in *Desiderio*, a securities broker argued that the mandatory arbitration provision in Form U-4 violated her constitutional rights. 191 F.3d at 200. The court recognized that "private entities may be held to constitutional standards if their actions

---

[8]As acknowledged in *Busacca,* the Tenth Circuit has also recognized that due process requirements apply to the NASD. *See Rooms,* 444 F.3d at 1214.

[9]As one scholar explained, "the Second Circuit rendered its *Desiderio* decision without briefing on the impact of the 1975 amendments to the federal securities laws which gave the SEC the ability to edit an SRO's rules at its will. The court also did not consider the requirements that SRO enforce federal securities laws" and "the way gradual changes have transformed SROs to more closely resemble de facto arms of the government."  Edwards, *Supreme Risk, supra,* at 594.  Further, "older precedents declaring SROs to be private actors may carry less force today after significant amendments to federal law increasing government control over and entanglements with SROs." *Id.* at 593.

are 'fairly attributable' to the state," and considered whether there was a close nexus between the state and the *specific conduct* of which the plaintiff complained. *Id.* at 206-207. The court concluded that there was no SEC rule or action that encouraged the NASD to compel arbitration, thus the particular conduct was not "fairly attributable" to the state. *Id.* Here, however, Plaintiffs are challenging FINRA's adjudicatory and prosecutorial actions that are vital governmental functions mandated by federal law. *See Gallagher,* 2022 WL 1815594 at * 2. Thus, the narrow conclusion in *Desiderio* is not applicable to this case.

### iii.   The immunity to which FINRA claims it is entitled further demonstrates that FINRA is a state actor.

FINRA has repeatedly claimed, and courts have recognized, that FINRA is immune from private tort lawsuits arising from FINRA's prosecutorial, adjudicatory, and enforcement conduct. Entitlement to such immunity derives from the fact—and exists only when—FINRA is performing a governmental function. *See Gallagher*, 2022 WL 1815594, at *2 ("Because they perform a variety of vital governmental functions, but lack the sovereign immunity that governmental agencies enjoy, SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions" (citations and quotations omitted)). Indeed, "[a]bsolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function." *Weissman*, 500 F.3d at 1297. It is "[o]nly when an SRO is acting under the aegis of the Exchange Act's delegated authority does it enjoy [the] privilege" of immunity. *Id.*

Because FINRA is only entitled to immunity when it is performing a government function, the only logical conclusion is that it must adhere to constitutional restraints when performing such functions. But FINRA has managed to have it both ways. FINRA maintains that, on the one hand, it is entitled to immunity when it performs the regulatory, adjudicatory, or prosecutorial governmental functions delegated to it under the Exchange Act, but, on the other hand, it is a private actor not subject to constitutional restraints. Accepting FINRA's position would grant FINRA an unprecedented form of immunity which provides *more* protection than that afforded *either* to governmental entities (who may be sued for constitutional violations) and that available to private citizens (who may be sued for private tort claims).

In short, when SROs, like FINRA, are carrying out a federal mandate "they are 'state actors' and the weight of judicial authority has so recognized in affording the same privileges [*i.e.*, absolute immunity] as their SEC counterparts. It is illogical, illegal and unfair for the SROs to decline to afford respondents in their disciplinary proceedings the same constitutional protections they claim for themselves." Peloso and Indek, "A Question of Fairness," *New York Law Journal,* June 21, 2001

## 2. This Court has personal jurisdiction over FINRA.

"When a preliminary injunction is challenged on the basis of jurisdiction, a plaintiff need only establish a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999) (citations and quotations omitted).

Here, personal jurisdiction is appropriate pursuant to 15 U.S.C. §78aa, 28 U.S.C.
§ 1391(e), and Florida's long-arm statute.

Rule 4(k)(1)(C) provides, "[s]erving a summons or filing a waiver of service
establishes personal jurisdiction over a defendant ... when authorized by a federal
statute." Section 1391(e)(2) provides for nationwide service of process for claims
against an agency of the United States. 28 U.S.C. § 1391(e)(2). Similarly, Section
78aa(a) of the Exchange Act provides for nationwide service of process for claims
arising under such section. 15 U.S.C. § 78aa; *SEC v. MintBroker Int'l, Ltd.,* 2022 WL
4204383 at *2 (S.D. Fla. Jan 12, 2022). The statutory authorization of nationwide
service of process coupled with Rule 4 allows for personal jurisdiction predicated upon
the defendant's contacts with the United States. *See Mintbroker,* 2022 WL 4204383.

Here, Plaintiffs' claims against FINRA "arose under" 15 U.S.C. §78aa. *See
Turbeville*, 874 F.3d at 1273 (finding a plaintiff's tort claims against FINRA "arose
under" 15 U.S.C. § 78aa). Plaintiffs have also alleged and argued that FINRA acts as
an agent and/or is an establishment of the United States. Further, it is indisputable
that FINRA has extensive contacts with the United States and with Florida, and that
it was served with process in Florida via its registered agent. As such, FINRA is a
subject to nationwide service of process and personal jurisdiction under both 28 U.S.C.
§ 1391(e)(2) and 15 U.S.C. § 78aa(a).

This Court also has jurisdiction over FINRA pursuant to Florida's long-arm
statute. In relevant part, Section 48.193(2), governs general jurisdiction and states that
a nonresident defendant "who is engaged in substantial and not isolated activity within

this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." Section 48.193(1)(a) provides that a nonresident defendant is subject to personal jurisdiction in Florida for any cause of action arising from "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state."

Here, Plaintiffs have alleged a litany of facts demonstrating that FINRA is engaged in substantial and not isolated activity in Florida, and that it operates and conducts a business in this state. FINRA has been registered to do business, has maintained an office and a registered agent, and has conducted business in the state of Florida for more than 25 years. Doc. 43, ¶ 16. FINRA's southeast regional office— just one of four such offices—is located in Florida. *Id.* at ¶ 19. FINRA maintains many other offices and hearing venues throughout the state, regulates thousands of individuals and entities in the state, and employs multiple individuals that reside and work in Florida. *Id.* at ¶¶ 20-21. FINRA also administers and adjudicates FINRA disputes in Florida, including over 500 such disputes in 2022 alone. *Id.* at ¶ 22. These allegations are sufficient to show that FINRA carries on business and is engaged in substantial and not isolated activity in this state.

Further, Plaintiffs' claims concern FINRA's unconstitutional operation and structure, including operations that occur in this state. Plaintiffs' claims, therefore, "relate to" FINRA's conduct in this state. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022); *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct.

1017, 1026-27 (2021). And it is indisputable that FINRA has purposefully availed itself of the privilege of conducting business activity in this state. As such, the Court has personal jurisdiction over FINRA pursuant to Florida's long-arm statute.

### 3.    Plaintiffs have standing to assert their claims.

To establish Article III standing, a plaintiff must allege that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). Just weeks ago, the Supreme Court concluded that a person suffers a "here-and-now injury" by being subjected to unconstitutional agency authority and decision-making process. *Axon,* 143 S.Ct. 890, 903; *see also Seila Law*, 140 S.Ct. at 2196. Indeed, "'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat. Bank of Big Spring v. Lew,* 795 F.3d 48 (D.C. Cir. 2015) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-62 (1992)).

Here, Plaintiffs are challenging the "unconstitutional operation and structure of FINRA." Doc. 43, ¶ 1. Plaintiffs are FINRA members and are regulated by FINRA. *Id.* at ¶¶ 28-29. Subjecting Plaintiffs to the very regulation that they challenge as unconstitutional is sufficient to establish Plaintiffs' standing. *See Axon,* 143 S.Ct. 890, 903; *State Nat. Bank,* 795 F.3d at 54; *Lujan,* 504 U.S. at 561-62.

    **4.**    **Plaintiffs are likely to succeed on one or more of their claims.**

    **i.**    **Separation of Powers.**

The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," and that "he shall take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3; *see also Free Enterprise Fund,* 561 U.S. at 483. These provisions vest all executive power, including the power to enforce the law, in the President of the United States. Because it would be impossible for one person to perform all executive business of the government, the Constitution also provides for principal executive officers to assist in these duties. *Free Enterprise Fund,* 561 U.S. at 483. For such appointments to comply with the Constitution, however, the President must not be restricted in his ability to remove a principal officer, who is in turn restricted in his or her ability to remove an inferior officer. *Id.* at 484. Such multilevel protection from removal violates Article II. *Id.*

In *Free Enterprise Fund,* the Supreme Court evaluated the constitutionality of the PCAOB board which is similar to FINRA's. *Id.* PCAOB and FINRA both govern an entire industry, they are both charged with enforcing securities law, the SEC's rules, and their own rules, and they both can enforce compliance with federal laws through sanctions and disciplinary proceedings. Like FINRA, PCAOB is purportedly a private, nonprofit corporation whose board members were appointed internally and could not be removed by the SEC except for good cause shown. *Id.* at 484-486.

The Supreme Court found this structure and the tenured protections provided to the PCAOB board to be unconstitutional. The Court concluded that "the individual

members of the Board—like the officers and directors of the self-regulatory organizations—are substantially insulated from the Commission's control." *Id.* at 486. Likewise, SEC Commissioners cannot be removed by the President except in limited circumstances. As such, the PCAOB Board violated the separation of powers because it was insulated from Presidential oversight by dual-for-cause protection. *Id.* at 492

The Supreme Court's decision in *Free Enterprise Fund* applies with equal force to FINRA. FINRA is insulated from the President's and the SEC's supervision or control. The SEC cannot remove FINRA Board members, executives, officers, or other officials at will. *See* 15 U.S.C. §78s(h)(4)(B). Similarly, the President has no authority to remove a FINRA Board member, executive or officer. And, as explained in *Free Enterprise Fund,* the President cannot remove SEC Commissioners—those tasked with overseeing FINRA—except for cause. *Free Enterprise Fund,* 561 U.S. at 486. As a result, FINRA's Board members, executives, and officers, are enshrined in the same dual-layer protection that the Supreme Court has already held violates the Separation of Powers. Accordingly, Plaintiffs are likely to prevail on their Separation of Powers claim.

### ii.   Violation of the Appointments Clause.

The Appointments Clause provides that the President shall nominate and appoint "officers of the United States." U.S. Const. art. II, § 2, cl. 2. However, "Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments."

*Id.* The clause protects the President's right to lead the executive branch and serves the separation of powers by preventing "Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint." *Freytag v. C.I.R.*, 501 U.S. 868, 880 (1991).

Here, FINRA possesses and exercises significant authority pursuant to the laws of the United States. FINRA's Board, its executives, and its Hearing Officers are principal officers whose appointments must be in accordance with the Appointments Clause. *See Lucia,* 138 S.Ct. 2044. However, it is indisputable that FINRA's Board, and Hearing Officers are chosen and appointed by FINRA itself. That structure fails to comply with the Appointments Clause.

### iii.   Violations of the Fifth and Seventh Amendment.

FINRA's procedures violate the Fifth Amendment and Seventh Amendment by, among other things, failing to provide due process of law, failing to adhere to protections against self-incrimination, and failing to recognize a right to a jury trial in which claims are akin to common law fraud.

As argued above, the concerns with FINRA's proceedings are exemplified in the Expedited Proceeding. FINRA's effort to use the Expedited Proceeding, before the NAC has reviewed the Initial Decision, not only subverts Alpine's right to review but also will deprive Alpine of due process of law. By way of example:

- FINRA commenced the Expedited Proceeding even though the allegedly "unreasonable" fees at issue were known to FINRA and were discussed and considered by the Hearing Panel in the prior proceeding. While FINRA sought and obtained orders in that

matter barring the imposition of certain fees, it neither sought nor obtained an order barring Alpine from charging the fees that FINRA now claims are unreasonable.[10]  Instead, after Alpine filed this case challenging FINRA's constitutionality, FINRA proceeded to lodge additional claims based on evidence of the same conduct that was presented in that prior case.

- While FINRA ordinarily appoints panels consisting of one FINRA Hearing Officer and two non-FINRA panelists, this proceeding will be conducted by a sole FINRA Hearing Officer. *See* FINRA Rule 9559(d).

- In the Expedited Proceeding, FINRA is claiming violations of "obey the law" provisions of the order, which implicates authority in this jurisdiction limiting the extent to which the SEC can obtain and enforce such orders.[11] Because that authority is based on violations of Federal Rule of Civil Procedure 65(d)(1) and procedural due process, FINRA will likely insist that it can disregard that law.

- In addition, the decision by the single Hearing Officer in the expedited proceeding, including an order expelling Alpine, will become *immediately* effective without any review. FINRA Rule 9559(c)(1).

### iv.    Violation of the First Amendment.

The First Amendment recognizes a freedom to associate with particular groups as well as a freedom not to associate. *See Mulhall v. Unite Here Local 355,* 618 F.3d 1279, 1287 (11th Cir. 2010). Indeed, Courts have concluded that "[t]he very act of the state compelling an employee or an attorney to belong to or pay fees to a union or bar association implicates that person's First Amendment right not to associate." *Romero*

---

[10] See Fritz Declaration at ¶ 6.  The order did include a prohibition on a market making/execution fee but did so in the context of the aggregate of fees that Alpine charged to its own direct customers.  It did not bar Alpine from collecting a market making fee, just like any other market maker, when it executes trades for an introducing broker.

[11] See, e.g., *SEC v. Goble*, 2012 WL 1918819 (11th Cir. May 29, 2012).

*v. Colegio De Abogados De Puerto Rico,* 204 F.3d 291, 301 (1st Cir. 2000). This forced association and forced financial contribution is only permissible if there is a strong public interest that justifies the governmental intrusion. *Id.* Where association is compelled or financial support required for activities wholly unrelated to the public interest, there may be no justification for intruding upon a party's First Amendment associational interests. *Id.* "Simply stated, that an individual may be compelled to associate and financially contribute for some purposes does not mean she may be compelled to associate and financially contribute for all purposes." *Id.*

To participate in the securities industry, broker-dealers are obligated to join and pay fees to a registered national securities association. *See Turbeville* 874 F.3d at 1270-71. Because FINRA is the only such organization, broker-dealers are forced to become FINRA members. "When federal law compels membership in an SRO, the SRO achieves the functional power to regulate the entire industry." Edwards, *Supreme Risk*, *supra*, at 594. At the time it was implemented, the rationale for this compelled membership consisted of a confluence of concerning considerations. A House Congressional Report recognized that an SRO can do what the SEC could not because it would not have to abide by the Constitution. *See* H.R. Rep. 98-106 (1983); Edwards, *Supreme Risk*, *supra*, at 558 ("An SRO, ostensibly a private organization, may not be bound by constitutional requirements, allowing it to enforce vague and undefined rules" such as FINRA Rule 2010). The legislation was also justified by its proponents because it would save money by relieving the SEC of the need to oversee those members of the industry that had opted not to join FINRA. *Id.*; H.R. Rep. 98-106

(1983). As a result, industry members have since been required to forego the fundamental rights discussed above to participate in the securities industry.

The purported justifications for FINRA's governmental intrusion are grossly outweighed by the significant personal liberty and property implications created by FINRA. Broker-dealers are not only forced to be a part of the organization, but they are also required to subject themselves to FINRA's enforcement staff and in-house tribunals and give up the safeguards and protections guaranteed by the Fifth and Seventh Amendments. Moreover, FINRA members are obligated to fund FINRA's operations. FINRA's operations generated over $1.3 billion in revenue—almost all of which is derived through obligatory fees, fines, and penalties assessed against FINRA members. *See* FINRA's 2021 Financial Annual Report.[12] FINRA uses the funds in a manner that benefits FINRA. In fact, over $1 billion of FINRA's revenues are dedicated to compensation and benefits for FINRA staff and professional and contract services. *Id.* It is apparent from FINRA's expenditures that a significant portion of the financial support it extracts from its members is wholly unrelated to the public interest that FINRA purportedly serves.

In short, the very act of the government compelling Plaintiffs to belong to FINRA implicates and violates Plaintiffs' First Amendment right not to associate. *See Romero,* 204 F.3d at 301; *Mulhall,* 618 F.3d at 1287. Plaintiffs are therefore likely to succeed on their claims for violations of the First Amendment.

---

[12] https://www.finra.org/sites/default/files/2022-06/2021-FINRA-Financial-Annual-Report.pdf

**B.      Alpine will suffer irreparable harm absent an injunction.**

There is no doubt that Alpine will suffer irreparable harm absent an injunction because it will be subject to an unconstitutional administrative proceeding administered by an unconstitutional administrative agency. As Justice Kagan made clear in *Axon*, subjection to an illegitimate proceeding, led by an illegitimate decision maker constitutes "a here-and-now injury." *Axon,* 143 S.Ct. at 903. Justice Kagan's rationale is bolstered by the well-established principle "that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Gayle v. Meade,* 614 F.Supp.3d 1175, 1205 (S.D. Fla. 2020); *Snipes v. Scott*, 2019 WL 163352, at *5 (N.D. Fla. Jan. 10, 2019) ("When an alleged deprivation of a constitutional right is involved ... most courts hold that no further showing of irreparable injury is necessary").

The threat of irreparable harm is even more significant in this case given the imminency of FINRA's actions and the potential resulting harm to Alpine. The hearing in the Expedited Proceeding is scheduled for May 31, 2023, and an adverse ruling against Alpine would take effect immediately. Under these circumstances, the threat of irreparable harm to Alpine if the injunction is not issued is clear.

**C.      FINRA will not suffer any harm if an injunction is issued and the public interest favors injunctive relief.**

Here, there is a significant public interest in assuring that Alpine is not subject to unconstitutional treatment at the hands of FINRA. As the Eleventh Circuit has emphasized, "the public interest is served when constitutional rights are protected."

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). Indeed, the "vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *Colonel Fin. Mgmt. Officer v. Austin*, 2022 WL 3643512, at *18 (M.D. Fla. Aug. 18, 2022) (quotations omitted).

That public interest in upholding constitutional rights and the substantial harm to Alpine is juxtaposed against the absence of harm that an injunction would cause FINRA. An adverse ruling in the Expedited Proceeding against Alpine could destroy the company and harm Alpine's customers. FINRA, on the other hand, waited years to assert these claims and would suffer no prejudice from allowing this Court to consider Alpine's constitutional arguments.

### D.    The bond requirement is waived.

The amount of security required by Rule 65(c) "is a matter within the discretion of the trial court, and the court may elect to require no security at all." *BellSouth Telecomms. v. MCImetro Access Transmission Servs.*, 425 F. 3d 964, 971 (11th Cir. 2005). "[W]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Honeyfund.com, Inc. v. DeSantis*, 2022 WL 3486962, at *15 (N.D. Fla. Aug. 18, 2022) (citations omitted). Given the constitutional rights at issue and the unique circumstances of this case, waiving the bond is appropriate. *See id.*

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1.      Plaintiff, Alpine Securities Corporation's, Motion for Preliminary Injunction [Doc. 45] is **GRANTED**.

2.      Defendant, Financial Industry Regulatory Authority, Inc., and those in active concert or participation with it, are restrained and enjoined from continuing or further prosecuting the enforcement proceeding, *Department of Enforcement v. Alpine Securities Corporation,* Proceeding No. 201961232603, against Alpine until Alpine's claims in this case are resolved or until further order from this Court.

**DONE AND ORDERED** in Tampa, Florida this _____ day of May 2023.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

*Copies furnished to:*
Counsel of record

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

                                                  Case No.: 8:22-cv-2347-MSS-TGW

      Plaintiffs,

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

      Defendant.

UNITED STATES OF AMERICA,

      Intervenor Defendant.

_____/

## **DECLARATION OF MARANDA E. FRITZ**

I, Maranda E. Fritz, under penalty of perjury, hereby declare as follows:

1.     My name is Maranda E. Fritz.  I am over the age of 21, and I am competent to testify to the matters set forth in this Declaration.

2.     I am an attorney for Alpine Securities Corporation ("Alpine"), and I am counsel of record in the Expedited Proceeding (as defined below).

3.     On April 19, 2023, FINRA filed a new enforcement proceeding against Alpine, *Department of Enforcement v. Alpine Securities Corporation,* Proceeding No. 2019061232603 (the "Expedited Proceeding").

4.     In the Expedited Proceeding, FINRA seeks to impose a $4 million fine and expel Alpine from the industry.

5.     The Expedited Proceeding is being prosecuted on an accelerated timeline. The hearing was originally set twelve days after the proceeding was initiated, but Alpine obtained an adjournment and the hearing is now scheduled for May 31, 2023.

6.     The allegedly "unreasonable" fees at issue in the Expedited Proceeding were known to FINRA and were discussed and considered by the Hearing Panel in a prior FINRA proceeding. In that prior proceeding, FINRA sought and obtained orders barring the imposition of certain fees, but it neither sought nor obtained an order barring Alpine from charging the fees that FINRA now claims are unreasonable.

7.     An expulsion order against Alpine resulting from the Expedited Hearing would become effective immediately and would force Alpine to close its business.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 9, 2023.

*/s/ Maranda E. Fritz*

```
 1                  P R O C E E D I N G S

 2                  – – – oOo – – –

 3          THE COURT:  Good afternoon.  Call the case.

 4          COURTROOM DEPUTY:  Court calls Case Number

 5   8:22-CV-2347-MSS-TGW, Scottsdale Capital Advisors Corporation,

 6   et al. versus Financial Industry Regulatory Authority, Inc. and

 7   versus United States as an intervenor defendant.

 8                  Counsel, please state your appearances for the

 9   record, starting with counsel for the plaintiff.

10          MR. TURKEL:  Yes.  May it please the Court,

11   Your Honor.  Ken Turkel, and my partner Dave Hayes, Turkel Cuva

12   Barrios, and along with us our co-counsel Maranda Fritz,

13   pro hac vice.

14          THE COURT:  Good afternoon.

15          MR. TAYRANI:  Good afternoon, Your Honor.

16   Amir Tayrani from Gibson, Dunn & Crutcher for defendant FINRA,

17   and I'm here with my co-counsel Alex Gesch, also from Gibson

18   Dunn & Crutcher.

19          THE COURT:  Good afternoon.

20          MR. PEZZI:  Good afternoon, Your Honor.

21   Stephen Pezzi from the Department of Justice on behalf of the

22   United States, and with me is my colleague, Christine Coogle,

23   also from the Department of Justice.

24          THE COURT:  Good afternoon.

25                  All right.  Counsel, you all have taken me back to
```

1  first year law school with notions of substantial justice and
2  fair play and all of that to address this question of personal
3  jurisdiction, which I guess is what you all consider to be the
4  first question the Court should address in the context of this
5  case, but I have another first question and it is why this case
6  is not barred by res judicata.
7          So I would ask Alpine's counsel -- Mr. Turkel, are
8  you going to lead the argument?
9          MR. TURKEL:  Your Honor, I was going to ask for an
10 accommodation.  I was going to handle the personal jurisdiction
11 aspect and ask the Court if she would allow Ms. Fritz to handle
12 substantive, injunctive issues and/or res judicata issues, as
13 that has come up.
14         THE COURT:  Well, let me hear on the res judicata
15 question first, because it looks to me like Alpine filed the
16 lawsuit in Utah and lost in 2021, and among the things that
17 was -- that were raised there was the due process consideration
18 of the function of FINRA, and so it would appear to me that
19 these arguments about FINRA either were raised or could have
20 been raised in the context of that suit, and the District Judge
21 dismissed the suit and no appeal was taken.  So if somebody
22 would like to explain to me the difference in that suit and
23 this suit and why this suit wouldn't be foreclosed by that
24 suit, and in the process tell me why we are in Florida to begin
25 with as it relates to Alpine.

App.115

```
 1              So whoever wants to take that can start.
 2              MR. TURKEL:  I'll defer to you on the res judicata.
 3              MS. FRITZ:  Okay.  Do you want to talk about Florida?
 4              MR. TURKEL:  Yeah, I think.
 5              I don't know, Judge, whether you'd rather here about
 6    the res judicata first, or --
 7              THE COURT:  I want to hear about res judicata and why
 8    Alpine has filed this lawsuit in Florida.
 9              MS. FRITZ:  All right.  Good morning, Your Honor.
10    Thank you so much for your time.
11              The case that existed in Utah did not present the
12    issues that are presented here.  These issues that are
13    presented here in terms of separation of power --
14              THE COURT:  Take the microphone at the dais, at the
15    podium.
16              MS. FRITZ:  Thank you.
17              The issues that are raised here in terms of
18    separation of powers, Appointments Clause, Fifth Amendment and
19    Seventh Amendment, were not raised in the Utah case.
20              THE COURT:  That begs the question why not.
21              MS. FRITZ:  Because these issues were not, shall we
22    say, presentable to the Utah Court.
23              THE COURT:  Why?
24              MS. FRITZ:  Because *Axon* changed the law.
25              THE COURT:  Well, you filed here before *Axon* was
```

App.116

1   decided.

2            MS. FRITZ:  Yes.

3            THE COURT:  You then filed a Second Amended Complaint

4   adding the benefit of *Axon*.

5            MS. FRITZ:  Right.  But in the Utah case it flowed

6   from a proceeding, and therefore, again, we lost that case even

7   though the reasoning of *Axon* might have led to a different

8   result, so we lost that proceeding.  The Utah case as it now

9   pends relates only to one issue.

10           THE COURT:  The Utah case is closed.  Is there an

11  appeal pending that I'm not aware of?

12           MS. FRITZ:  There is still a claim that is

13  unresolved, which is the Administrative Procedure Act, so

14  that -- that's a very different case.

15           THE COURT:  Well, you know the difference between

16  collateral estoppel and res judicata.

17           MS. FRITZ:  Yes.

18           THE COURT:  And it's not just the claims that were

19  brought but it's the claims that could have been brought.

20           MS. FRITZ:  Absolutely.

21           THE COURT:  And there wouldn't have been anything

22  that would have prevented Alpine from bringing this exact same

23  lawsuit or the claims in it alongside its due process claims in

24  the Utah case, and then if it lost it could have appealed to,

25  what is that, the Eighth Circuit?

 1           MS. FRITZ:  Tenth.

 2           THE COURT:  Tenth Circuit.  It could have appealed to

 3      the Tenth Circuit and made the same arguments that the *Axon*

 4      plaintiffs raised and said the District Court is wrong, and it

 5      probably would have lost, and then it would have taken it to

 6      the U.S. Supreme Court and made the same *Axon* arguments, and

 7      perhaps with a different now Supreme Court audience have won,

 8      but you don't get to wait and see if someone else is going to

 9      pursue a successful outcome and then piggyback on that to bring

10      a new lawsuit.

11           MS. FRITZ:  Your Honor, the law in this area has been

12      developing over the course of the last few years.  I'm sure

13      Your Honor is aware of that.  From the PCAOB case to the CF --

14      to the Consumer Finance Protection Bureau, to *Seila Law*, to the

15      *Lucia* case, and so as this law has developed, those issues now

16      are credible proper issues that we can bring.  That has not

17      been the case, and --

18           THE COURT:  But that's not how res judicata works.

19      The way that it works is you bring all of your claims, you have

20      to get creative, you have to find a way to argue around

21      existing law that would maybe prohibit the claim, in your

22      principal lawsuit.  You bring all of your claims and then you

23      say, Judge, respectfully we are requesting a consideration of a

24      change in law, if you have a claim bound up in the same facts

25      and circumstances as a claim that you have here, and if you

App.118

```
 1   lose, as you probably would have, then you appeal, and if you
 2   lose then you appeal again, and then hope that you become the
 3   engine of change, and you didn't, you stopped, and your appeals
 4   rights, I assume, since the decision was final in September of
 5   2021 that the appeals time has run, and now instead of having
 6   filed an appeal there, you come over to Florida, which begs a
 7   question why Florida.
 8           MS. FRITZ:  This case is being brought in Florida in
 9   part because Scottsdale does have an office here, and in part
10   because we've been working very closely with counsel here for a
11   very long time on these issues.
12           There is certainly, in our view, no impediment to
13   bringing it in Florida given the -- given the breadth of
14   FINRA's actions here.
15           THE COURT:  What has FINRA done to Alpine here?
16           MS. FRITZ:  Specifically to Alpine here in Florida,
17   our argument is that's not the standard, that the -- that sort
18   of arising from conduct in the State is not the issue that we
19   think the Court should --
20           THE COURT:  The answer is nothing?
21           MS. FRITZ:  Pardon me.
22           THE COURT:  The answer is nothing?
23           MS. FRITZ:  Oh.  To Alpine in this state?
24           THE COURT:  Or is Mr. Turkel going to answer that
25   question.
```

 1              MS. FRITZ:  Yes.

 2              MR. TURKEL:  That would be more in my bailiwick,

 3    Your Honor, if I may.

 4              MS. FRITZ:  I just wanted to make one other point.

 5              The res judicata issue was obviously not raised by

 6    our adversary, for good reason, because of the narrowness of

 7    that particular case and the fact that these claims were not

 8    claims that were brought or arguably could have been brought in

 9    that case.  This is the case in which we sought to present

10    these issues to a court based on the developing law over the

11    last few years.

12              THE COURT:  Mr. Turkel?

13              MR. TURKEL:  Yes, Your Honor.  May it please the

14    Court and Counsel.

15              Judge, there was a sense, I think, of square peg,

16    round hole in the conventional long-arm analysis that was being

17    employed by defense in this case, and as I went through it and

18    we argued, Your Honor, with good reason.

19              We have cited as a predicate -- when you asked us to

20    brief long-arm in more detail, we filed a reply that set forth

21    much more detail than we had raised the issue in our initial

22    motion with respect to what basis there was for personal

23    jurisdiction, to essentially answer your question, Judge, why

24    Florida, and we cited to 15 U.S.C. 78aa, which is in the

25    Exchange Act, and it is a statute which provides, when a

1  plaintiff's case arises under a Federal statute that provides

2  for nationwide service of process, that statute may serve as

3  the basis for personal jurisdiction over defendant.

4         Judge, the traditional notions of fair play and

5  justice are somewhat out the door when your jurisdiction is

6  going to be based on 78a or Section 27, as it's also referred

7  to, because what you're talking about -- if the conduct at

8  issue, the conduct, not necessarily defendant, but the conduct

9  at issue --

10        THE COURT:  What's the conduct?

11        MR. TURKEL:  The conduct, Your Honor, is

12  Constitutional violations that are predicated on violations of

13  the Exchange Act.

14        THE COURT:  What's the Constitutional violation of

15  Alpine?  Because we're here not on a motion to dismiss

16  necessarily, we're here on the preliminary injunction motion,

17  and so we are talking total Alpine and not Scottsdale.  So what

18  is the Constitutional violation against Alpine, and then does

19  it arise under the Constitution or is it arising under the

20  statute?  Because you kind of pick and choose, when you want to

21  get into the long-arm jurisdiction avoidance, the statute, and

22  when you want to explain why this is more global in analysis

23  you lean over to your Constitutional claim.  So which is it and

24  how has Alpine been injured arising under the Exchange Act?

25        MR. TURKEL:  Judge, the Constitutional violation is

1    similar to the analysis in the *Tubreville* case, the Eleventh

2    Circuit case we cited, which I think was a Judge Moody case.

3              The Constitutional violations -- just like in that

4    case, they brought State tort claims, and then the Court looked

5    behind the State tort claims to determine whether those claims

6    arose under the Act, and that's the entire analysis, right?

7    They call it defamation, they call it abuse of process, but

8    really what they're alleging is a litany of violations,

9    omissions or constructions of how the Exchange Act enabled the

10    ultimate tort claims that were brought.

11              Judge Moody was affirmed, finding that it arose under

12    the Act because looking behind the name of the claims you saw

13    violations or necessary implications of the Act for the Court

14    to make its finding.  And, Judge, it's the exact same thing

15    here, and I'm not trying to be evasive, but it's really both.

16    We're bringing Constitutional claims, due process claims,

17    Appointments Clause claims, but it's not like we just come in

18    and say, Judge, they violated the Appointments Clause, they

19    violated the Due Process Clause, right?  We say they violated

20    them because both in their formation and how they employed the

21    powers they've been given under the Act, the power to make

22    their own rules, only subject to SEC approval, however --

23              THE COURT:  Do you contend that every time a Federal

24    statute has to be constructed in order to consider a

25    Constitutional claim that the claim therefore arises under that

App.122

1    Federal statute?

2         MR. TURKEL:  No.  I'm not contending that at all,

3    Judge.  I'm contending that the Eleventh Circuit in *Tubreville*,

4    in finding that those claims arose under the Act, because that

5    was also a case that was brought under the same personal

6    jurisdiction statute as we're using, and the Eleventh Circuit

7    found that in order to determine Tubreville's claims that

8    FINRA's regulatory investigation and disclosure of that

9    investigation on a regulatory database were outside its

10   authority and in violation of FINRA rules and regulations, the

11   Court must necessarily interpret FINRA's rules and regulations,

12   and because those rules and regulations are promulgated

13   according to the Exchange Act's mandates, their interpretation

14   unavoidably involves answering Federal questions.

15        Judge, it's the exact same thing, and there's no way

16   to rule on these Constitutional claims without interpreting --

17   going back to FINRA's formation as a mandatory SRO, which is

18   enabled by the Act.  Its existence comes from the Act.  Its

19   rules have to be approved by the SEC pursuant to the Act.

20        Our contention in this case is that in the discharge

21   of these vast powers hat this purportedly private company has

22   been afforded, that they are walking all over the

23   Constitutional rights of their members.

24        When you ask me what suffering has Alpine done,

25   Judge, the -- the aggregate of the enforcement position that

 1   they have taken against Alpine -- and I believe -- I think the

 2   expedited proceeding -- is that Scottsdale or Alpine?  Alpine?

 3            MS. FRITZ:  Alpine.

 4            MR. TURKEL:  Yeah.  It was almost ironic, Your Honor,

 5   because *Axon* comes out -- and I can assure the Court, we

 6   weren't angling for *Axon*.  If we get a chance to brief the

 7   res judicata, Judge, because they didn't raise it, we can

 8   explain it in more perhaps concise and authoritative terms

 9   exactly why the arguments couldn't be raised in the context of

10   those particular proceedings; but, Judge, from a bigger picture

11   perspective, the Supreme Court comes out with a landmark case

12   that clarifies *Thunder Basin* in a way that tells us you don't

13   have to get put out of business before you can raise a claim in

14   a Federal District Court attacking the Constitutionality of an

15   administrative agency, or in this case an agency that's been

16   called quasi Governmental by courts and by FINRA itself, that

17   you can bring a native action in District Court to have a

18   District Court Judge look at these issues without some ensuing

19   enforcement action that is basically choked you out so you

20   can't exist, and at times even fund these things, Judge.

21            THE COURT:  And how did that happen in Florida?

22            MR. TURKEL:  Judge, if you look at 78a and we look at

23   *Tubreville* and the other cases that interpret jurisdiction,

24   long-arm status, under 78aa, Section 27, it's not a

25   relationship --

```
 1          THE COURT:  Well, let's assume I don't agree with you
 2   that this claim arises under the Exchange Act, since I think
 3   you have already said this action is ancillary to the Exchange
 4   Act and that this is a Constitutional claim, and that I have to
 5   construe this under the long-arm statute.  Tell me, if you can,
 6   how any aspect of the injury done to Alpine or the allegations
 7   against FINRA arise out of, relate to, or are in connexity with
 8   the State of Florida.
 9          MR. TURKEL:  Judge, I think it's a -- in some
10   respects -- how do I put this?  I think that's why it's
11   square peg/round hole, but what I would say is this:  FINRA
12   operates -- what they call it, Your Honor, under 78, just to
13   use context, I'm not avoiding your question, but is a
14   relationship with the United States in general, minimal
15   contacts with the United States.  I don't know of any other
16   private company that maintains ongoing activity in every state
17   that is essentially serving as an arbiter of fact law, a
18   regulatory agency and enforcement agency.
19          THE COURT:  Why didn't you bring it in Utah, bring
20   this action in Utah?
21          MR. TURKEL:  Judge, Utah was actually a forum we
22   looked at first, and then we looked at the fact that neither
23   Ms. Fritz nor I was licensed there, and we saw this, Judge, as
24   a case we could bring anywhere in the United States under
25   Section 27.
```

```
 1              And, Judge, you know, I would direct the Court -- and
 2     I think we've included this in our briefing, but if you look at
 3     paragraphs 85 through 90, 57 through 60, 102, and then
 4     throughout our Complaint, I don't think it's possible to rule
 5     on the Constitutional questions without interpreting or
 6     applying the Act.  Tubreville, Judge, that's a very broad
 7     standard, the arising under test.  By the Eleventh Circuit it's
 8     not a narrow standard, and, you know, you have to have -- the
 9     Constitutional injury, for lack of a better word, Judge, is
10     defined by whatever provision the United States Constitution,
11     whether the Fifth Amendment, the First Amendment, the various
12     claims we brought, and other things like the Separation of
13     Powers and Appointments Clause arguments, you can't just come
14     to court and say they violate the Constitution because they
15     violate the Constitution.  In this case what we're saying is
16     from their formative inception by the Act --
17              THE COURT:  I understand the argument that you
18     believe FINRA is wrong -- is unconstitutionally constituted,
19     and you are dragging hard on the tailwinds of Axon for that
20     argument, and I get that, I understand the argument, it's very
21     persuasive at first blush, but you have to make that argument
22     in a forum in which the defendant is held to be responsive, and
23     the argument that FINRA is at home everywhere is not consistent
24     with law, it's not consistent with the Florida long-arm
25     statute, at least insofar as I've seen argued, and I am trying
```

1    to understand then how you contend it is other than in reliance

2    on the Exchange Act, which this isn't a statutory claim; and if

3    it is a statutory claim, it certainly could have been brought

4    in Utah, where you first started, and if it isn't, then you

5    have to meet the requirements not only of the arising out of in

6    the general sense that's needed for due process concerns, but

7    you have to -- you have to satisfy one of the prongs of the

8    Florida long-arm statute.  And I think you can establish that

9    FINRA does substantial business in the State of Florida, I

10   don't think there's a question about that, but I don't see how

11   this action relates to that substantial activity as it relates

12   to Alpine, which I haven't heard alleged is trying to do

13   business in Florida, does business in Florida, ever did

14   business in Florida or was injured in Florida.  I don't hear

15   any of that as a factual argument.

16            MR. TURKEL:  Judge, I'll address that.  One thing

17   I want to correct the Court on to a degree is we're not on the

18   wings or the tail of *Axon* on the jurisdictional issue.  That's

19   a *Tubreville* issue, Judge.  That's an Eleventh Circuit -- the

20   *Tubreville* case, and the *MintBroker International* case we

21   cited, Judge Bloom wrote this last January applying *Tubreville*

22   and the Section 27, 78aa jurisdiction in a case down in the

23   Southern District, Judge, in an opinion that I think would be

24   very constructive, because it does -- it does -- we're not

25   looking to *Axon* for that, Judge.  We think --

1          THE COURT:  Well, I am not talking about *Axon* for the

2     purpose of jurisdiction.

3          MR. TURKEL:  Okay.

4          THE COURT:  I'm talking about *Axon* for the purpose of

5     pursuing a Constitutional claim in District Court.

6          MR. TURKEL:  Right.  And, Judge, as to the long-arm

7     aspect of it, we have other bases too.  We have the statutory

8     basis under 28 U.S.C. 1391, which is FINRA is a State,

9     you know, agency, it's another process statute in which if the

10    party qualifies as a state actor, state agency, then you're

11    going to have personal jurisdiction anywhere, again, this

12    broader relationship, minimum contacts with the United States

13    in whole.

14         THE COURT:  And that requires a court essentially to

15    get to the substance of this lawsuit; is that right?

16         MR. TURKEL:  Judge, yeah, I think -- I don't know the

17    standards match up exactly, but they're close enough,

18    Your Honor, that, yes, you'd be ruling on the state actor issue

19    one way or the other.  I don't think it would be genuine of me

20    to say otherwise.

21         And under the long-arm, Your Honor, obviously you get

22    first jurisdiction over parties who operate or carry on

23    business, and in the *Kapila* case that just came out of the

24    Second District that I think made its way into our papers, it

25    was a '23 opinion out of the Second DCA, also found the term

App.128

1  "arising from" is broad, it does not mean proximately caused by

2  but only requires a direct affiliation, nexus or substantial

3  connection to exist between the basis for the claim and the

4  business activity.

5         THE COURT:  That is the question I'm asking you.

6         MR. TURKEL:  Right.

7         THE COURT:  That little question right there.

8         What is the relationship between the business

9  activity that FINRA, I assume, has to admit it engages in

10  in the State of Florida and the litigation that is being

11  brought by Alpine in this lawsuit?

12         MR. TURKEL:  Right.  And there were no countervailing

13  affidavits filed, and we've alleged that FINRA maintains

14  offices here, conducts hearings here, regulates the securities

15  business here.  Alpine does businesses in the State of Florida.

16  I tried a case for Alpine in this district last year against an

17  ex-employee.

18         The connexity requirement -- not last year, '21, in

19  front of Judge Covington, but it was a trade secret case for

20  Alpine and Scottsdale, both plaintiffs here in the Middle

21  District.

22         Judge, we've alleged Alpine does business everywhere,

23  they're a broker-dealer, and, you know, do I have connexity to

24  the claims here, the Constitutional claims?  Judge, I don't

25  know how else to put this, and ultimately speaking, Your Honor,

```
 1    if the path the Court is going to go down is not sort of buying
 2    the broader powers of FINRA being connexity everywhere, I don't
 3    know that I can do better.  This isn't a case where, let's say,
 4    I have a specific FINRA enforcement action or a specific FINRA
 5    activity against Alpine in the Middle District that necessarily
 6    says, okay, they breached the contract, they committed a tort,
 7    we're going to sue them for that, and we can sue them in
 8    Florida because they're everywhere.  And, Judge --
 9              THE COURT:  Or they injured Alpine in some other
10    Constitutional way in the State of Florida, like Alpine can't
11    carry on business or it can't do whatever it wants to do.
12              MR. TURKEL:  Judge, that begs the question, the
13    expedited proceeding they brought, we don't know where it's
14    being brought.  They file it, there's no situs, they file it,
15    the hearings to date in most of these cases Ms. Fritz has had
16    have been remote.
17              This is a company, Your Honor, that acts like they
18    are a United States agency that can do whatever they want
19    wherever they want whenever they want, and the pervasiveness
20    Judge -- and this really begs the question, Your Honor, the
21    pervasiveness of their conduct, as we've alleged in our
22    Complaint, affects everything if you're a regulated member,
23    everywhere you are, and that's why I say that a conventional
24    long-arm argument, Judge, is really a square peg in a round
25    hole.
```

1           And, Judge, I would tell you -- and I've argued in

2    front of you for years, I respect you enough to know when your

3    mind seems to be in a certain place, but I would go back and

4    look at *Tubreville* and the MintBreaker case -- MintBroker,

5    I'm sorry, and some of these other cases, because even where

6    they're dismissing the substance of the case, Judge, they are

7    finding FINRA -- under 78aa, Section 27, they are finding

8    Exchange Act issues at the most threshold, Judge, levels.

9           For instance, FINRA itself in a case *Flowers versus*

10   *Wells Fargo,* 2012 Westlaw 208882, it's a North Carolina case

11   from 2012, FINRA argues that Section 78a -- the case arose

12   under it because the Court could not decide the merits of the

13   claims without analyzing FINRA's role as a securities regulator

14   under the Exchange Act, the mere existence that they're a

15   regulator that exists pursuant to the Act.

16          THE COURT:  What kind of claim was being asserted

17   there?

18          MR. TURKEL:  In the *Flowers* case?

19          THE COURT:  Yes, sir.

20          MR. TURKEL:  Judge, I don't know, but they made the

21   same argument in the *Tubreville* case, in their briefing, Judge,

22   and we pulled their briefing.  They've taken this position that

23   the threshold application -- and, Judge, I have a copy of the

24   *Tubreville* brief, I believe, because I want to read to you what

25   they said in there, and it's -- I did have a copy of it, Judge,

1  and then somehow between my table and this -- here it is right

2  here.

3          All right, Judge.  In their brief filed in 2016 in

4  the *Tubreville* case here in the Middle District, Your Honor,

5  docket 12 of -- document 12 of that case, they argue --

6          THE COURT:  "They" meaning FINRA?

7          MR. TURKEL:  This is FINRA.  This is reading from

8  FINRA's opposition of Plaintiff's motion to remand.  They bring

9  state tort claims, they get removed up here, they move to

10 remand back to State Court claim or bring a state abuse of

11 process, defamation.  *Tubreville* disingenuously argues that

12 Federal subject matter jurisdiction is lacking because the

13 Complaint is grounded exclusively under State law.  *Tubreville*

14 is wrong.  Any claim that *Tubreville* could assert against FINRA

15 necessarily arises from FINRA's duties under the Exchange Act

16 and is therefore subject to exclusive Federal jurisdiction

17 under 28 U.S.C. 1331 and 15 U.S.C. 78aa.

18          Judge, when you look at these cases, including the

19 ones where they made this argument, if you have to refer to the

20 Exchange Act for any component of our claim, that "arises from"

21 language kicks in, it is broad, Your Honor, and it is broad

22 enough that when we allege that one of the threshold

23 Constitutional violations derives from the fact that they were

24 created as a mandatory SRO under the Exchange Act, Judge, with

25 all due respect, that fits the bill right there, and, Judge, it

1  makes sense, because arguing long-arm contacts and traditional

2  notions of fair play and justice, to go back to where you

3  started, first year law school, the whole premise of long-arm,

4  Judge, is that we don't hail someone into a court in a

5  jurisdiction where they have no expectation that they could be

6  hailed, they have no reasonable expectation, it's unfair, it

7  offends traditional notions.

8         That's an impossible argument to make in the context

9  of a quasi Governmental agency that has nationwide traction and

10  can do whatever it wants in any state, subject only to mild SEC

11  oversight, where they impose gigantic million -- multimillion

12  dollar fees and charge membership fees under a mandatory

13  membership granting that came from the Exchange Act.  If you

14  want to be in this industry, you do not have a choice, you have

15  to join this company.  It doesn't sound like a private company

16  to me, Judge.  What it sounds like is a company --

17         THE COURT:  The Florida Bar is different than them?

18         MR. TURKEL:  It's funny you say that because when

19  I was preparing for this hearing, just having done a stint on

20  the Board of Governors, which I would ask for those two years

21  back if I could get them, they -- the Florida Bar, I think,

22  Judge, is different.  We have direct Supreme Court oversight.

23         In other words, if the Florida Bar brings a grievance

24  proceeding against a lawyer and tries that proceeding and a

25  referee rules on that proceeding, the Florida Bar can take

App.133

1   whatever position it wants, the referee's penalty was too much,

2   it was too little, let's disbar him or her, let's not, the

3   Supreme Court has direct overview, as I'm sure you know, direct

4   to a court.  I don't have to jump through three administrative

5   levels which preclude me from bringing any number of arguments

6   that I could otherwise bring into court, such as Constitutional

7   arguments.  And the Supreme Court, and I've seen it -- God

8   knows I've seen it the last five years or so, essentially does

9   whatever they want with the Florida Bar's autonomy.  The

10  Florida Bar exists as a self-regulating organization.

11         THE COURT:  Well, Alpine argues in its brief,

12  I believe, that that oversight by the SEC allowed it to obtain

13  a reversal of a FINRA -- what you call FINRA overreach in the

14  context of a regulatory challenge, and the determinations of

15  FINRA were overturned by the SEC.  And then Alpine got in the

16  crosshairs of FINRA again, and that was litigated through the

17  courts and through the FINRA process, and at the point at which

18  Alpine lost again, the matter was on appeal to the SEC before

19  *Axon* was decided, and now it is now on an expedited review,

20  which I will address with FINRA in a minute.  And despite our

21  long history of having litigation together, I don't think you

22  can read my mind.  My view is this is a complicated issue and

23  I would like to hear from FINRA on both the res judicata

24  question and the personal jurisdiction question.

25         MR. TURKEL:  Judge, I didn't mean to imply I could

1    read your mind, and I apologize if I took too much liberties

2    there, but to answer that last part of this, Judge, which is

3    this idea that you have to go from a FINRA hearing --

4    for instance, again, this expedited proceeding to me begs a

5    question.  A single arbitrator sets a hearing to put us out of

6    the industry in 14 days, we move for an extension and get a

7    whopping 30 while this is up on appeal, and FINRA decides that

8    they don't have to follow their own rule, that when there's an

9    appeal the judgment is not yet final, they do a clever little

10   workaround to try and enforce part of the order, okay, or as

11   they say in their brief, 35,000 violations, which begs the

12   question where were they at violation number 5, 500, 5,000.

13          A year later, coincidentally five days after a

14   landmark Supreme Court case comes out, all of a sudden now

15   they're going to jump on the back of a judgment they got a year

16   ago?  This is the kind of stuff they can do, Judge.  And here

17   is the problem, and I will leave after this, but I felt that

18   your last statement kind of begged this discussion.

19          You go to FINRA.  You lose.  You appeal to the NAC.

20   You lose.  You have to wait for that, it doesn't happen

21   overnight.  Then you have to appeal to the SEC.  You lose.

22          THE COURT:  Does a cease and desist order become

23   immediately into effect?  That was one of the contentions that

24   FINRA suggested, which in some ways would undermine their claim

25   that their process affords due process, but is there a cease

1  and desist that remains in effect for the entire time?

2        MR. TURKEL:  Judge, I will -- to a degree -- I can

3  answer that in part and defer to Ms. Fritz, because she's

4  actually in that case, but my understanding is they knew of

5  whatever the basis was for a violation of the cease and desist

6  in July of '22.

7        THE COURT:  But my question is was a cease and desist

8  order entered, notwithstanding the pendency of the appeal.

9        MR. TURKEL:  It was -- it was entered as part,

10  I believe, of that final order --

11        MS. FRITZ:  Yes.

12        MR. TURKEL:  -- but, Judge, the dispute there is sort

13  of in the realm of these "obey the law" kind of amorphous what

14  does it mean to cease and desist, and you've got --

15        THE COURT:  So cease and desist the behavior, not

16  cease and desist functioning as a broker.

17        MR. TURKEL:  I think, again, I'd have to defer

18  because I'm not as intimately familiar and she'll give you a

19  much better answer, Judge, but I believe that's correct,

20  I think, in the broader sense of things.

21        THE COURT:  Yes, ma'am.

22        MS. FRITZ:  The way that the procedure works, the

23  decision of a hearing panel is not final or effective unless

24  and until it's affirmed by FINRA's own appellate tribunal, the

25  NAC, except to the extent that it includes a cease and desist,

1  that then becomes immediately effective even while the appeal

2  is pending.

3       The issue that we have now that we're being hit with

4  is that cease and desist order that was issued in March of 2022

5  listed specific fees and charges that Alpine was not allowed to

6  impose.  Alpine has not imposed those.  A year later they're

7  now coming back based on an obey the law provision, a generic

8  provision that's in the same order, and arguing, oh, those

9  other fees that we also talked about during that hearing but

10  were not included in the injunction, those are unreasonable

11  also.  It's on that basis that we're facing closure.

12       THE COURT:  So the cease and desist order has to do

13  with a general obey the law requirement that they are claiming

14  was violated?

15       MS. FRITZ:  Even though the order had --

16       THE COURT:  Yes or no?

17       MS. FRITZ:  Yes.  Now they are relying on the

18  obey the law because there's no specific language.

19       THE COURT:  And the specific language you believe is

20  not the source of the 35,000 violations?

21       MS. FRITZ:  That's correct.

22       THE COURT:  All right.  Thank you.

23       MR. TURKEL:  So, Judge, just to sum up --

24       THE COURT:  I'll hear you in rebuttal.

25       MR. TURKEL:  Yes.  Okay.  Thank you, Judge.

1          THE COURT:  The plaintiff is correct that FINRA did

2    not raise the res judicata question, but in the course of

3    looking at your footnote that included all of the seven prior

4    cases that you said they had lost on these issues, the Utah

5    case stood out as one that would appear to have been the place

6    to raise these Constitutional claims, and they were not raised,

7    and the Court was considering looking at what other state would

8    be the appropriate state to bring these claims, because

9    I presume FINRA acknowledges it can be sued somewhere.

10         So tell me -- if you do not contend res judicata bars

11   this claim, I'll dispense with that consideration, and if you

12   do why, and then turn to your jurisdictional argument.

13         MR. TAYRANI:  Thank you for raising that issue,

14   Your Honor.

15         There are a number of procedural problems with this

16   case, but, with respect, we don't believe that res judicata is

17   one of them, and the reason is that the Utah case ended in a

18   dismissal for lack of subject matter jurisdiction, and in the

19   absence of a final judgment on the merits, that decision does

20   not have res judicata effect and does not bar Alpine from

21   proceeding in this action.

22         THE COURT:  And why do you think Alpine did not bring

23   its Constitutional claims in Utah, where it has its principal

24   place of business?

25         MR. TAYRANI:  That is something that we have been

1   wondering throughout the course of this litigation, Your Honor,

2   why we are here in Florida.  The Middle District has no

3   reasonable, no apparent connection to this litigation.  The

4   place, the natural place to bring this litigation would be

5   where FINRA is subject to general personal jurisdiction, which

6   would be either in the District of Columbia, where it is

7   headquartered, or in Delaware, where it is incorporated.

8          THE COURT:  Well, there's no requirement that a

9   plaintiff bring an action only where there is general

10   jurisdiction, it can bring it under the long-arm statute, and

11   I would assume you would agree that FINRA carries on

12   substantial business in the State of Florida, such that at

13   least that provision of the long-arm statute would be

14   implicated?

15         MR. TAYRANI:  We agree, Your Honor, that FINRA

16   carries on business in the State of Florida, it has an office

17   in the Southern District of Florida, in Boca Raton, but the

18   problem from a personal jurisdiction standpoint is that there

19   is no connection, there's no relation between FINRA's Florida

20   contacts and the Constitutional claims that Alpine is bringing

21   here today.

22         THE COURT:  Well, where would one bring

23   Constitutional claims if one is a broker, say, in the State of

24   Florida or wishes to be one and they are subject to what they

25   believe to be an unconstitutional regulatory structure and that

App.139

1  is causing them angst or limiting their ability to function

2  freely, all of the things one sues for under a Constitutional

3  claim?

4          MR. TAYRANI:  So certainly the two jurisdictions in

5  which general personal jurisdiction would be present would be

6  available, but also the specific personal jurisdiction inquiry

7  in that setting with a Florida plaintiff who can allege Florida

8  injury would be a much closer question.  That set of

9  circumstances would be similar to the *Ford versus Montana*

10 jurisdiction district decision that is cited in the reply brief

11 filed by Alpine on personal jurisdiction.  There the Court

12 found that Ford was subject to specific personal jurisdiction

13 in Montana, where there was a monitor plaintiff claiming a

14 Montana injury from a Ford vehicle that was manufactured out of

15 state.

16         The problem for Alpine here is that it is not a

17 Florida resident and it is not alleging a Florida injury, so

18 other than the jurisdictions in which general jurisdiction

19 would be present, the logical place to bring this action would

20 be in Utah, where Alpine is headquartered, where it could

21 allege that it is suffering a injury in that jurisdiction.

22         THE COURT:  Does FINRA carry on substantial business

23 in Utah?

24         THE DEFENDANT:  Less so than in Florida, Your Honor,

25 but we do carry on business in all 50 states.  There is not a

 1   FINRA regional office in Utah, but FINRA regulates
 2   broker-dealers in all 50 states, including in Utah.
 3           I'd like to address the Section 27 issue under the
 4   Exchange Act.
 5           The arguments that Alpine is pressing here under
 6   Section 27 is exactly the arguments that Merrill Lynch advanced
 7   in *Merrill Lynch versus Manning*, the 2016 decision in which the
 8   Supreme Court authoritatively construed jurisdiction under
 9   Section 27.  What the Supreme Court held there is that it is
10   not sufficient for there to be, quote, incidental assertions,
11   unquote, of violations of the Exchange Act or violations of
12   implementing regulations in order to create jurisdiction under
13   Section 27.  There either needs to be a cause of action that
14   was created by the Exchange Act, or there need to be claims
15   that necessarily depend on a showing that the defendant
16   violated the Exchange Act or its implementing regulations.
17           That means that Alpine would need to demonstrate here
18   that the only way it could prevail is by establishing that
19   FINRA has violated the Exchange Act or has violated its
20   implementing regulations, and that's certainly not the case.
21   Alpine could prevail on its Constitutional claims without
22   demonstrating a violation of the Exchange Act and without
23   demonstrating a violation of FINRA's rules.  That's what
24   distinguishes this case from the *Tubreville* case that was
25   mentioned earlier.

1          In that Eleventh Circuit case there was jurisdiction

2     under Section 27 of the Exchange Act because the only way that

3     the plaintiff could prevail on its State law defamation claim

4     was to demonstrate that FINRA had violated its own rules.  The

5     Court explained, quote, *Tubreville*'s claims cannot be decided

6     without adjudging FINRA's adherence to its internal rules in

7     investigating *Tubreville*, unquote, and that is very different

8     from this case, where the plaintiff is advancing Constitutional

9     claims that do not depend on a showing of a violation of the

10    Exchange Act or its implementing regulations.

11          So for those reasons there is no personal

12    jurisdiction under Section 27 of the Exchange Act, there is no

13    personal jurisdiction under Florida's long-arm statute, and it

14    would violate due process to exercise personal jurisdiction

15    over FINRA here because the claims do not arise out of and they

16    do not relate to FINRA's contacts with this jurisdiction.

17          THE COURT:  And what of FINRA's quality as a state

18    actor or quasi state actor and its being subject to

19    jurisdiction in that capacity?

20          MR. TAYRANI:  I recognize that there is an overlap

21    between the jurisdictional inquiry and the state actor inquiry

22    to the extent that Alpine is arguing that there is nationwide

23    service of process available under 28 U.S. Code 1391(e)(2).

24    There is no personal jurisdiction available under that

25    provision because there is an unbroken long line of precedent

1  establishing that FINRA is not a state actor, but in order to

2  assess jurisdiction under that provision I do concede that the

3  Court should take into account the ultimate answer to the

4  question of whether FINRA is a state actor.  Because FINRA is

5  not a state actor, jurisdiction is not available under that

6  provision.

7        THE COURT:  I looked at your long line -- long

8  unbroken line of cases, and I cannot find a single binding

9  Circuit Court decision that so holds post a reconfiguration of

10  FINRA in 2007 that I see reliance on, they're either circuit

11  cases that are unreported or circuit cases explaining why other

12  circuits haven't decided it, or in the case of the Eleventh

13  Circuit confirming the Eleventh Circuit has not decided it, and

14  if it's so clear, why isn't there decisive post-2007 authority

15  and why are the Circuit Courts avoiding deciding what is

16  evident?

17        MR. TAYRANI:  Well, I don't believe they're avoiding

18  the issue.  You're correct that the Eleventh Circuit has not

19  squarely decided it, but the Eleventh Circuit has repeatedly

20  described FINRA as a private company and as a private

21  self-regulatory organization, including in the *Tubreville* case,

22  as well as in the *Gallagher* case, which is a 2022 decision also

23  cited in our briefs, and in the *Wiseman* en banc case, the

24  en banc court referred to private self-regulatory

25  organizations.

App.143

1          THE COURT:  But everywhere the Eleventh Circuit says
2   something slightly different, FINRA says that it misspoke or
3   overspoke or wasn't really being precise, and the Eleventh
4   Circuit in, what is it, *Buscara,* specifically said we haven't
5   decided the issue.  And so even though in dicta in other cases
6   they may be describing FINRA as a private sector entity, when
7   called upon to respond specific to the -- specifically to the
8   question, it said "we haven't decided," and so I don't see a
9   case.  A Second Circuit is unreported, and its unreported
10  decisions are not binding, and I don't see -- I see lots of
11  District Court cases that appear to be following the dicta in
12  the Circuits and in prior reported decisions of the NASD before
13  the reconfiguration of FINRA, but what of the case law since
14  2007?

15          MR. TAYRANI:  Your Honor, I acknowledge that the
16  Eleventh Circuit does not have a controlling decision on this
17  issue.  With respect to post-2007 case law, there is no
18  meaningful distinction between NASD and FINRA for purposes of
19  this state actor inquiry.  It's also highly probative that the
20  U.S. Supreme Court in *Free Enterprise Fund versus PCAOB*
21  contrasted private self-regulatory organizations, and that's a
22  quote, with the PCAOB, which was deemed to be a state actor
23  because it was Government-appointed and Government-controlled.

24          So you're right, Your Honor, that there is not a
25  decision that controls this Court's resolution of the issue,

1    but there is an overwhelming weight of highly persuasive
2    authority, including from the U.S. Supreme Court, that makes
3    clear that FINRA has none of the hallmarks of a state actor
4    because it was not created by the Government and because it is
5    not controlled by the Government through a Board of Directors
6    appointed by the President.  Those --
7             THE COURT:  So it's a little bit of an overstatement
8    to say that there is an unbroken line of cases that decide or
9    determine that FINRA is not a state actor, because there just
10   isn't such an unbroken line of dispositive cases in any
11   circuit.
12            MR. TAYRANI:  With respect, Your Honor, I would stand
13   by our characterization of an unbroken line of authority,
14   because --
15            THE COURT:  Tell me one case, one binding circuit
16   case that so holds, since 2007.
17            MR. TAYRANI:  There is not a decision that is binding
18   on this Court.
19            THE COURT:  Binding on any Court.
20            MR. TAYRANI:  As far as I'm aware, there is not, and
21   I will certainly take Your Honor at her word that there is not
22   a Circuit Court decision that is published on this issue after
23   2007.
24            THE COURT:  And do you think that the dicta and the
25   tenor of *Axon* gives FINRA some anxiety about what the Supreme

App.145

1    Court thinks about regulatory agencies previously thought to be

2    sacrosanct in their Constitution?

3              MR. TAYRANI:  Absolutely not, Your Honor, because

4    FINRA is not a state actor.

5              THE COURT:  And so why did FINRA within days of *Axon*

6    being decided spin off to an emergency proceeding in the face

7    of an impending PI proceeding in this Court to essentially axe

8    Alpine so that it would not have any ability to defend itself

9    in a District Court case?

10             MR. TAYRANI:  Your Honor, FINRA has a statutory

11   mandate under the Exchange Act to protect investors and the

12   public interest, and it has repeatedly acted to further that

13   mandate by taking regulatory action against Alpine to protect

14   Alpine's customers from victimization by --

15             THE COURT:  And how long was that appeal pending

16   before it took the emergency process up, between the final

17   decision -- I assume it would be the decision in the Utah case,

18   until it pursued the action post-*Axon*?  How long had it been?

19             MR. TAYRANI:  Well, I think the relevant decision is

20   the March 2022 cease and desist order that was issued by a

21   FINRA hearing panel.

22             THE COURT:  So even farther back than September

23   decision.  I guess September was September 2021.

24             MR. TAYRANI:  Correct, Your Honor.  That was the

25   District of Utah decision.  In March of 2022 the FINRA hearing

App.146

1  panel issued the cease and desist order that Alpine is accused

2  of violating here.  So there is a one year gap.  The

3  expectation though --

4       THE COURT:  So what happened in the one year gap that

5  caused the decision of FINRA to pursue this emergency process

6  that isn't explained by something going on in the Supreme

7  Court?  What happened?

8       MR. TAYRANI:  Your Honor, I can't speak to why the

9  FINRA enforcement officials made the decision to proceed when

10  they did except to underscore that the allegations in the -- in

11  the proceeding that's going to move forward on May the 31st, in

12  the absence of a preliminary injunction, are extremely serious,

13  that Alpine on 35,000 occasions has violated the controlling

14  cease and desist order by charging its customers unfair,

15  unreasonable and unlawful fees.

16       I would submit to you that their decision, the

17  enforcement officials' decision to move forward had absolutely

18  nothing to do with concern about whether in litigation FINRA

19  would be deemed to be a state actor, because we are confident

20  that under the standards set forth by the Supreme Court and

21  applied by Circuit Courts and District Courts throughout the

22  country, that FINRA is not a state actor.  There are no indicia

23  of state action with respect to FINRA, and --

24       THE COURT:  Is Ms. Fritz correct that the cease and

25  desist order listed certain very specific things Alpine could

1  not do and that the expedited proceeding doesn't have to do

2  with those specifically listed things but has to do with the

3  general obey the law provisions?

4         MR. TAYRANI:  She's half right, Your Honor.  So the

5  2022 cease and desist order prohibits Alpine from charging some

6  specific fees, and also broadly bars Alpine from charging

7  unreasonable and unfair fees.  Some of the fees that Alpine is

8  continuing to charge its customers are the exact same fees with

9  different names that it was barred from charging in the

10 March 2022 order.  Others are new fees.  So it is a combination

11 of prior fees with a new name to conceal the practice and new

12 fees that are unfair and unreasonable and continuing to

13 victimize Alpine's customers.

14         THE COURT:  And where is that action pending, the

15 emergency appeal?

16         MR. TAYRANI:  So it is a remote proceeding,

17 Your Honor.  Alpine can participate from wherever it chooses.

18 There is a FINRA hearing officer who will be able to

19 participate from wherever he or she chooses, as well as FINRA

20 staff, who are likely located in the District of Columbia area.

21 There is no allegation by plaintiff that any of the relevant

22 participants in the hearing are in Florida.

23         THE COURT:  Are they?

24         MR. TAYRANI:  As far as I'm aware, Your Honor, no.

25         THE COURT:  And it's not being managed by the

App.148

1   Southeast Regional Office of FINRA?

2         MR. TAYRANI:  It is not, Your Honor.  And there is

3   certainly no allegation to the contrary in Plaintiff's

4   Complaint or in Alpine's papers.

5         With respect to the state action issue, Your Honor,

6   just to underscore one point, if this Court were to break with

7   the cases that have concluded that FINRA or NASD are not state

8   actors, it would be Federalizing and Constitutionalizing large

9   swaths of the private economy, because FINRA has the same

10  relationship with the Federal Government as other closely

11  regulated entities, and the U.S. Supreme Court has made clear

12  that merely being regulated, merely having a regulator and

13  overseer relationship with the Federal Government is not

14  sufficient to create state action.  If it were, large swaths of

15  our economy would be made up of state actors.  That's why the

16  Supreme Court has made clear that regulation is not sufficient

17  to create state action.

18        THE COURT:  And in order for the Court to assess that

19  part of personal jurisdiction as a source of personal

20  jurisdiction, it essentially has to decide this case; would you

21  agree?

22        MR. TAYRANI:  I agree that to determine whether there

23  is personal jurisdiction under Section 1391(e)(2) this Court

24  does need to look at whether FINRA is a state actor, yes.

25  But I would also submit that the answer is clear that the

App.149

1   Supreme Court's decision in *Lebron*, which points to whether an
2   entity is created by the Government or controlled by the
3   Government, makes clear that FINRA, which was created out of
4   NASD and NYSE's regulatory arm, not by the Government, is not a
5   state actor and that FINRA is not controlled by the Government.
6   Unlike Amtrak in the *Lebron* case, where the President appointed
7   six of the nine Board members, FINRA has a Board that is
8   composed of private individuals who are appointed by FINRA's
9   membership.  And all of this is undisputed.  All of these facts
10  which make clear that FINRA is not a state actor are found in
11  the Complaint.  The Complaint alleges that FINRA is funded by
12  membership fees, not by the Federal Government, the Complaint
13  alleges that FINRA was created out of NASD, and the Complaint
14  alleges that FINRA's Board and its officers are appointed by
15  its members, not by the Federal Government.  Those three
16  factors point to one inexorable conclusion, which is that FINRA
17  is not a state actor.
18           THE COURT:  But those same allegations are in the
19  Complaint because they serve as the plaintiffs' basis for
20  believing that FINRA is unconstitutionally constituted because
21  of those facts, and so what the plaintiff is trying to do is
22  find a venue and a place of jurisdiction to test whether that
23  Constitution of FINRA comports with the Constitution.  And it's
24  sort of a tails I win, heads you lose argument that FINRA is
25  making.  You're not going to get us into the Federal Court

App.150

1   anyplace perhaps except Washington and Delaware, and if you get
2   us there you will still lose because we're not a state actor,
3   and so your Constitutional claims will fail for the same reason
4   your jurisdictional claims fail.
5        MR. TAYRANI:  I don't disagree with that
6   characterization, Your Honor.  Plaintiffs claims fail on the
7   merits, and in this particular jurisdiction the fact that the
8   claims fail on the merits also means that there is no personal
9   jurisdiction.  If Alpine refiled in the District of Columbia,
10  I would be making these same arguments about state action and
11  I would be equally confident that we are correct in those
12  arguments, but I would be making them urging the Court to
13  dismiss on 12(b)(6) grounds rather than on personal
14  jurisdiction or absence of venue grounds.
15       THE COURT:  So why is D.O.J. sitting behind you?
16       MR. TAYRANI:  Well, I'll let my colleagues speak to
17  that directly, but I think what they are concerned about
18  is that some of these arguments advanced by Alpine, if this
19  Court were to reach the merits, implicate the Constitutionality
20  provisions of the Exchange Act.
21       The one claim here that does not stand or fall on
22  state action is the First Amendment claim.  That claim by
23  Alpine is a challenge to a Congressional statute that requires
24  broker-dealers to join a national securities association.
25  FINRA is the only national securities association, so there is

1    a statute that Alpine is arguing violates the First Amendment.

2    That is state action.  Now, that claim fails as a matter of law

3    because Alpine has not identified a Constitutionally-protected

4    associational interest here.

5         Alpine does not have a First Amendment right to

6    refrain from joining FINRA, just as a lawyer does not have a

7    First Amendment right to refrain from joining the State

8    Bar Association.  If FINRA were engaging in ideological or

9    political activity that were not germane to its regulatory

10   purposes then that would raise First Amendment issues under the

11   Supreme Court's decision in *Keller versus State Bar.*

12        THE COURT:  And why doesn't that claim arise under

13   the Exchange Act?

14        MR. TAYRANI:  It doesn't arise under the Exchange

15   Act, Your Honor, because it is not created by the Exchange Act

16   and it does not depend on showing that FINRA is violating the

17   Exchange Act.

18        Alpine could prevail on its First Amendment claim

19   without showing any violation of that underlying statute.

20   In fact, Alpine is challenging the statute and arguing that

21   it's unconstitutional rather than arguing that FINRA is somehow

22   violating the Exchange Act.  If FINRA were violating the

23   Exchange Act and that were a necessary showing for Alpine to

24   prevail on its First Amendment claim then that would give rise

25   to Section 27 jurisdiction, but that is the opposite of what

App.152

1    Alpine is arguing here.

2             THE COURT:  Thank you.

3             MR. TAYRANI:  Thank you.

4             THE COURT:  Does the Government wish to add anything?

5             MR. PEZZI:  Good afternoon, Your Honor.  I'll be very

6    brief.

7             THE COURT:  State your name again for the record.

8             MR. PEZZI:  Yes, Your Honor.  Stephen Pezzi from the

9    Department of Justice for United States as intervenor.  I'll be

10   very brief unless Your Honor has questions.

11            The United States intervened in this matter for the

12   limited purpose of defending the Constitutionality of the

13   Federal securities laws and the provisions that were challenged

14   in Plaintiffs' Complaint and invoked our rights under 28 U.S.C.

15   2403(a) to do so.  The United States thus has taken a position

16   on the merits of Plaintiffs' claims in this Court, has not

17   taken a position on the threshold questions of personal

18   jurisdiction and venue, and don't intend to do so today.

19            So the United States would urge the Court to first

20   consider those threshold questions of personal jurisdiction and

21   venue, which might obviate the need to reach the merits at all,

22   and of course were the Courts to reach the merits at any point

23   in this proceeding, the United States' view is that all of the

24   statutory provisions referenced in Plaintiffs' Complaint comply

25   with the Constitution, and I'm happy to address that subject

 1   today, Your Honor, or answer any questions that Your Honor has.

 2           THE COURT:  Thank you.

 3           Mr. Turkel, any rebuttal on the jurisdictional

 4   questions?

 5           MR. TURKEL:  Yes, Judge.  Not very much.

 6           Mr. Pezzi on behalf of D.O.J. just essentially quoted

 7   what we quoted in our papers, and that is D.O.J.'s presence

 8   here, the Government's presence here is to determine -- or to

 9   defend -- let me get the words right.  Yeah.  To defend the

10   Constitutionality of the Federal securities laws, including the

11   Exchange Act, and has filed a brief in defense of the

12   challenged provisions of the Federal securities laws.

13           Judge, I went back through the Complaint just to

14   doublecheck the number of provisions that reference the

15   interrelationship between our Constitutional claim and the

16   Exchange Act, the Federal securities laws, Judge, and they're

17   so necessarily intertwined that I couldn't sit here and cite

18   you to provisions.  Everything we're alleging comes from the

19   fundamental basis of FINRA's power that's derived from the

20   Exchange Act, and those are the very laws the Government is

21   here to keep an eye on and protect, Judge, and once we get

22   there and you realize there's a -- in the analysis process we

23   realized that the analytical process will depend on whether the

24   violations are abandonment or abuses of these rules that FINRA

25   has drafted for itself which are subject to SEC review under

1  the Exchange Act, whether this enabling power that it was given

2  to make everybody become a member of this private business,

3  that does over a billion in revenue and uses 800 million of it

4  to compensate its officers, there's no way to analyze the

5  Constitutionality of its existence and discharge of its duties

6  and obligations without analyzing the Exchange Act's

7  application.

8          What's interesting, Judge, and I think you recognized

9  this, they play it both ways.  I mean, they play it one way if

10  they want the case to stay in Federal Court and not in State

11  Court, so they want Federal question jurisdiction.

12  For instance, reading again, you know, from their brief, which

13  is -- you know, and Westlaw in the *Flowers* case, FINRA argues

14  in their opposition -- or their brief in support of subject

15  matter jurisdiction, using and arising from tests, or the same

16  test that's applied to whether Section 27 applies

17  jurisdictionally on personal jurisdiction, they argue:

18  Mr. Flowers asked this Court to determine whether FINRA can

19  appropriately act as an independent self-regulatory

20  organization.  Then they cite to five paragraphs in the

21  Complaint.

22          He challenges FINRA's entire framework for

23  arbitration, both in its methods for the selection of

24  arbitrators and the rules promulgated for arbitration.

25  Mr. Flowers also contends that FINRA rules violate due process

App.155

1  rights of the plaintiff as provided by the North Carolina and
2  U.S. Constitutions.  These claims and allegations against FINRA
3  raise questions of Federal law under 28 U.S.C. Section 1331.
4  In addition, challenges to FINRA's regulatory acts, including
5  enforcement of its own rules, are reserved exclusively for
6  Federal jurisdiction under 18 U.S.C. Section 78aa, the enabling
7  basis for personal jurisdiction.

8          When you pull back and look at it, Judge, the concept
9  that's talked about in *Tubreville*, *Manning* doesn't hurt the
10  analysis, the facts are not really applicable, and it doesn't
11  say anything inconsistent with the pronouncements of law that
12  you see in cases like *Tubreville* or this *MintBroker* case down
13  in the Southern District, which I know is a trial court case
14  but Judge Bloom wrote a really good opinion there synthesizing
15  all of this.  But this idea, Judge, this concept that this
16  company that claims it's private envelops all of our states and
17  can do what they do in any state by appointment of SEC rule
18  begs for the idea that a minimum contacts analysis is
19  predicated on standard concepts of connexity and so forth
20  doesn't apply.  What does apply is the statute that enables
21  them to be what they are and therefore subjects them to
22  nationwide service and analyzes it, to use the Court's language
23  from the standpoint of minimum contacts with the United States
24  on whole, and the Courts are not narrow in their interpretation
25  of "arising under."  And FINRA has availed themself of this

```
 1   when it makes sense, Judge, to keep a case in Federal Court and
 2   they don't want to be defending a state court tort claim in
 3   North Carolina.
 4            Judge, I'll speak briefly on the state actor part,
 5   absent any questions on jurisdiction.
 6            The SEC provides the only --
 7            THE COURT:  Let me ask you one question before you
 8   move to that.
 9            MR. TURKEL:  Yes, Your Honor.
10            THE COURT:  If it is determined that FINRA is acting
11   completely consistent with its authority and rules and
12   regulations under the Exchange Act, does the plaintiff still
13   contend that its behavior is unconstitutional?
14            MR. TURKEL:  That's an interesting question.  I'm
15   trying to think before I just viscerally respond to it.
16            THE COURT:  It's not a trick question, it's a
17   question that asks if there's no real challenge to whether
18   FINRA is behaving completely consistently with its authority
19   under the Exchange Act but that the challenge is that its
20   authority under the Exchange Act violates the Constitution,
21   then I would have to look at the Exchange Act and see what all
22   authorities it's given under the Exchange Act, but I wouldn't
23   necessarily have to determine that FINRA is violating the
24   Exchange Act in order to consider the Constitutional claims.
25            MR. TURKEL:  Yeah.  I think -- I mean, the word I'm
```

1    getting hung up on is "violate," because, Judge, what this is
2    is -- and it's a similar argument made in some of these cases,
3    like *Flowers,* for instance, right?  They start with the
4    enabling legislation taking what used to be a non-mandatory SRO
5    and turning it into a mandatory SRO under the guidance of SEC.
6              I would -- I would beg to differ with Counsel.  The
7    Florida Bar does not have an enforcement -- a Governmental
8    enforcement agency with vast powers, including criminal power,
9    overseeing it and providing it an imprimatur to its existence.
10   FINRA exists under the SEC, which as we allege in paragraph
11   I think 60 --
12             THE COURT:  Can you answer my question?
13             MR. TURKEL:  So the answer is, no, it wouldn't be
14   predicated, Judge, solely on finding necessarily a violation of
15   the Exchange Act.  What it would be predicated on is reviewing
16   how it's discharged the powers and duties it's been given under
17   the Exchange Act and then seeing whether that flies in the face
18   of standard concepts of the United States and Florida
19   Constitutions and/or the United States Constitution in this
20   case, Judge, in the sense that it's been granted power, and the
21   breadth of that power, given the limited nature of the
22   oversight provided, could create an unconstitutional entity
23   without necessarily violating something.  I'm kind of using
24   semantics to a degree.  But I don't think there's any way to
25   assess whether it's violating the U.S. Constitution without

1  looking at the application of the Exchange Act to FINRA's
2  creation and its ongoing existence.

3              And, Judge, some of it may be omissive.
4  For instance, the lack of proper oversight, the lack of ongoing
5  Government oversight to what they keep telling me is a private
6  company.  There's no private company I know of -- if you're in
7  a manufacturing business, the EPA regulates you, they tell you
8  what to do.  Nobody tells these guys what to do.  They do what
9  they want, subject to a very limited -- as we allege in 60 and
10 61 -- SEC check as to whether they've willfully violated
11 applicable regs and regulations.

12             THE COURT:  But isn't it accurate to say that *Axon*
13 recognized a sort of split between a claim that arises under
14 the Exchange Act which is bound by the regulations of the
15 Exchange Act and claims that are collateral to that, purely
16 Constitutional claims, and if you are at once claiming a purely
17 Constitutional violation and simultaneously claiming a claim
18 that arises under the Exchange Act as the source of
19 jurisdiction, aren't you defeating the jurisdictional exception
20 that I assume over time will become a narrow exception of *Axon*?

21             MR. TURKEL:  Judge, I think the key language as it
22 relates to jurisdiction is "arising under" and how broadly it's
23 been interpreted, because I think in every situation where a
24 Court has been confronted with the argument I'm making, they
25 have gone on the side of finding personal jurisdiction under

App.159

1   Section 27, and there's -- I can't really remember when it
2   hasn't in a similar factual context.
3       A lot of times what they end up finding is a
4   different ruling on the merits, like *Tubreville*, but in
5   *Tubreville* the language is clear that by having to interpret
6   the Act to get to the claims, in that case state court tort
7   claims, that it arises under, it's just not a very high
8   standard, Judge.  It's a broadly interpreted phrase that has
9   been broadly interpreted in this circuit over and over again.
10      Judge, I wanted to mention -- and I think ultimately,
11  Judge, it does end up dovetailing with the concept of state
12  actor in the other statute that we cite, which is whether it's
13  acting as a state agency, which is our second personal
14  jurisdiction argument.
15      And, Judge, we've cited it, but to quote from the
16  *Gallagher* case, which was an Eleventh Circuit opinion last June
17  in 2022, at 2022 Westlaw 1815594, asterisk 2, star 2, FINRA
18  performs a variety of vital Government functions, including,
19  and I quote, adjudicatory, regulatory and prosecutorial
20  functions.
21      They've been characterized by the Gallagher court, by
22  the Eleventh Circuit last year, as well as the D.C. Circuit in
23  NASD versus SEC at 431 F.3d 803, as a quasi-Governmental
24  agency.  The Second Circuit, notwithstanding its differences
25  with some of these other circuits, has recognized the

1   entwinement between the statutory and regulatory framework and,

2   to the extent that the SRO's bylaws are intimately intertwined

3   with the regulatory powers delegated by the SEC, they're

4   vested, according to *Tubreville*, with the prominent rules of

5   the administration and enforcement of securities laws, which

6   would explain why our Government is here intervening.  They

7   carry the force -- their sanctions carry the force of Federal

8   law, that's *Tubreville* at page 1271, and their rules after

9   approval by the SEC have the status of Federal law, that's the

10  *Empire* case out of the Southern District of Florida, we've

11  cited it in our papers, it's a Westlaw cite from 2009.

12          Judge, I think, pulling back to a degree from this,

13  there's certainly heavy lifting here in the sense that, as the

14  Court recognized, you don't see these binding circuit opinions

15  and you don't see this fact pattern very often, and when you

16  see it it's usually ancillary to a specific enforcement action

17  or something like that, but there's certainly a step to be

18  taken here, Judge, and we knew it when we filed it, we knew we

19  would be asking whoever got the case to take that step, but

20  Judge, this is -- this is an entity that is existing in a

21  gigantic industry in this country, doing unchecked things

22  vis-à-vis enforcement and prosecuting and targeting companies,

23  and they do it with very little, if any, oversight at all.

24  It's a failure in the system.

25          And I will tell you this, Judge.  When I was a young

```
1   lawyer and did customer/broker disputes, this was a very
2   different entity, they dealt with customers fighting
3   stockbrokers over churning and suitability, but as the industry
4   has corrected, this company is acting like a little SEC, doing
5   Wells investigations and, you know, brandishing its power with
6   a Board that's making hundreds of millions of dollars in comp,
7   and it's just not a private company.  It's a private company
8   that's got enough Government protection to keep people from
9   suing it.
10          THE COURT:  And what did it do in Florida?
11          MR. TURKEL:  Judge, its very -- its very existence
12   here in the state regulates my clients, and it happens
13   everywhere.
14          THE COURT:  Your clients don't reside here.
15          MR. TURKEL:  Judge --
16          THE COURT:  Your clients reside in Utah and Arizona.
17          MR. TURKEL:  Scottsdale has an office in the Middle
18   District.  Alpine clears only through Scottsdale.  Anything
19   that happens to Scottsdale -- Scottsdale gets put out of
20   business, it's the only clearing entity for Alpine, then Alpine
21   is out of the business.
22          THE COURT:  Does Alpine have an office in Florida?
23          MR. TURKEL:  No, but Alpine has had employees in
24   Florida.  I tried a case against one of them 18 months ago, so
25   it certainly had --
```

1          THE COURT:  Those employees worked in Florida?

2          MR. TURKEL:  It had an employee, a CEO, that I got a

3   judgment against in front of Judge Covington that worked here,

4   yeah, in Tampa.

5          THE COURT:  And what was he doing?

6          MR. TURKEL:  He was the CEO of the company and then

7   he sold a bunch of trade secrets and we sued him.

8          THE COURT:  He was CEO of an Alpine company or his

9   own company?

10         MR. TURKEL:  No.  No.  Alpine.

11         THE COURT:  What was the name of the company?

12         MR. TURKEL:  He was an individual, Chris Frankel.

13         THE COURT:  And he was at the time you sued him a

14  disgruntled former CEO of Alpine?

15         MR. TURKEL:  Yes, that's --

16         THE COURT:  He was not an Alpine employee in suit

17  against Alpine at that time?

18         MR. TURKEL:  I sued him under employment agreements.

19  I sued him under his restrictive covenants.

20         THE COURT:  Under breached employment agreements,

21  Mr. Turkel, not existing ones.

22         MR. TURKEL:  No.  Executory ongoing obligations that

23  didn't terminate when he chose to quit.  I mean, they were

24  viable post-employment like most restrictive covenants.

25         THE COURT:  Any other employees other than that

App.163

1   person?

2           MR. TURKEL:  Yeah, I believe so, Judge.  They never

3   were mentioned in that trial, but --

4           THE COURT:  Is any of this in an allegation in the

5   Complaint or an affidavit associated with a challenge to

6   personal jurisdiction?

7           MR. TURKEL:  No, I think that in the Complaint we

8   plead essentially our broad sort of services being, you know,

9   rendered all over the nation.  I don't think that I could make

10  a claim -- I mean, I could make a claim that anything FINRA has

11  governed has -- you know, based on our Constitutional arguments

12  is hurting us, but Scottsdale was, you know, a plaintiff in

13  that case too.

14          THE COURT:  Is it your contention that FINRA is

15  subject to personal jurisdiction pretty much anywhere in the

16  country because of its regulatory authority throughout the

17  country?

18          MR. TURKEL:  That is my contention, or, to use the

19  Court's language, that it maintains contacts with the

20  United States, and that's the inquiry, that's what the Courts

21  have found, if jurisdiction is enabled through Section 27.

22          THE COURT:  But if jurisdiction is enabled through

23  the long-arm statute and there are other long-arm statutes

24  similar to Florida's, your contention would be it was subject

25  to jurisdiction everywhere?

App.164

1          MR. TURKEL:  Yeah.  I mean, I think that if you do

2     any business in the State of Florida or in any state in which

3     FINRA is regulating conduct, that based on the Constitutional

4     claims we brought the injury exists as a day-to-day byproduct

5     of how they enforce their rules and all the other things that

6     we've alleged in the Complaint.

7          Their very existence, Judge, is what we're attacking,

8     among other things, but -- and so I don't see how I could argue

9     anything other than by doing what they do they're violating the

10    Constitution of the United States and nobody is calling them

11    out on it.  There's nobody there to call them out on it other

12    than private plaintiffs.

13         THE COURT:  All right.

14         Anything else anyone wants to add on the

15    jurisdictional question?

16         MR. TURKEL:  No, Judge, other than I think, and I've

17    discussed it, the intertwining of the state actor with the

18    second statutory basis, because I think those are our two best

19    bases for personal jurisdiction.

20         THE COURT:  All right.

21         MR. TURKEL:  If you don't have any other questions of

22    me, Your Honor, then I'm done, and thank you for your time.

23         THE COURT:  Anything from FINRA?

24         MR. TAYRANI:  Your Honor, just a quick few points.

25         I think I heard Mr. Turkel concede that there is no

App.165

1   jurisdiction here under Section 27 of the Exchange Act, when in
2   response to your question he said that this case is not
3   predicated on a violation of the Exchange Act and that his
4   client could still prevail without showing a violation of the
5   Exchange Act.  That means under the Supreme Court's decision in
6   *Manning* there is no jurisdiction under Section 27.
7           Alpine's reliance on FINRA's brief in the *Flowers*
8   case is completely misplaced.  That brief was filed before the
9   Supreme Court's decision in *Manning,* when there was
10  Ninth Circuit authority that endorsed a broader view of
11  jurisdiction under Section 27.  The view of jurisdiction that
12  Alpine is advocating here today, which is that anytime a court
13  had to interpret the Exchange Act, that was sufficient for
14  purposes of Section 27 jurisdiction, the Supreme Court in
15  *Manning* expressly disapproved that precedent on which FINRA
16  reasonably relied before the *Manning* decision, and in
17  disapproving that precedent made clear that the expansive view
18  of Section 27 that Alpine is advocating here today is not
19  present and is incorrect.
20          Thank you, Your Honor.
21          THE COURT:  Thank you.
22          MR. TURKEL:  Judge, if I may, I just want to make
23  sure that I wasn't misunderstood about the violations issue.
24  That isn't what I was saying.  If it sounded like that, I
25  didn't mean for it to sound like that.

1       What I meant was it wasn't just violations, it was
2   broader than that.  In other words, it needed interpretation at
3   a number of levels.  We allege direct violations in paragraphs
4   85 and 174 of the Exchange Act.  What I meant was it wasn't
5   exclusively predicated on just violations, there was abuses and
6   omissions and other things that required interpretation of the
7   Exchange Act.  So if I was understood differently, I didn't
8   mean it that way.

9       THE COURT:  So paragraph 85 says that 15 U.S.C. 78o
10  through 3(b)(8) requires the rules of a registered securities
11  association to provide a fair procedure for the disciplining of
12  members and persons associated with members.  However, FINRA
13  provides no such procedure.

14      And then 175 -- I'm sorry, 174, similarly -- well, it
15  alleges the same fact, the absence of a fair procedure for the
16  disciplining of members and persons associated with members.

17      These or this is the claim that you say arises under
18  the Exchange Act?  It's only -- it's the same claim, just
19  alleged twice.

20      MR. TURKEL:  That's what we allege, I think what
21  I would call direct violation of the Exchange Act.  I think if
22  we were to read through the Second Amended Complaint, you would
23  find perhaps no citation but similar tone and contention.
24  Paragraphs 85 through 90, regarding FINRA's disciplinary
25  structure and procedures.  Paragraphs 57 through 90, regarding

1  the limited oversight that derives from the Act and only allows

2  the SEC to remove FINRA Board members in very narrow

3  circumstances.  Paragraph 102, where broker-dealers must join

4  FINRA pursuant to a provision of the Act.  And then, Judge, the

5  allegations in between are essentially weaving some of these

6  baseline provisions of the Act through FINRA's conduct and then

7  ultimately the Constitution.

8      THE COURT:  If Alpine was denied some right

9  associated with those allegations, in association with the

10  disciplinary proceedings that have been brought against it,

11  then presumably it can challenge that process in its underlying

12  disciplinary action and then through to the SEC and then

13  through to the Appeals Court, and doesn't have to rely on the

14  sore of independent Constitutional jurisdiction that one might

15  claim *Axon* might provide for a pure Constitutional claim; isn't

16  that right?

17      MR. TURKEL:  I think that dovetails more so into the

18  due process argument, Your Honor.

19      MS. FRITZ:  Your Honor, if I could just respond to

20  that and talk a little about what Alpine is facing next week

21  absent relief from the Court.

22      If this -- bear in mind this proceeding that would go

23  forward.

24      THE COURT:  Well, can you answer my question first

25  and then delve into that?

App.168

1          MS. FRITZ:  Alpine does not have any way to avoid

2     closure.  There is no mechanism.  Because this expedited

3     proceeding allows for the decision of a single hearing officer

4     to become immediately effective, Alpine cannot avoid closure.

5     The only steps that it can take involve an appeal to the

6     commission seeking a stay.  Those procedures in front of the

7     commission take a lot of time, they do not respond quickly, and

8     so Alpine will be closed based on one single FINRA employee's

9     decision without the underlying decision having been resolved

10    on appeal, without any right to appeal from that decision in a

11    meaningful way, and without the ability to get to the

12    commission in a meaningful way to prevent what would be the

13    destruction of the firm.

14          I just want to emphasize a couple of other things

15    that we're up against next week.

16          THE COURT:  With respect to that contention, let's

17    say the single arbitrator decided against Alpine on whatever

18    record was offered up by FINRA, and then you attempted to take

19    your appeal and it was delayed and you suffered the immediacy

20    of the termination at that time, is there an avenue from that

21    appellate reviewer by the SEC to an appellate court?

22          MS. FRITZ:  Again, we would not have the ability to

23    prevent the closure.  And so if the SEC were to deny a stay, we

24    could then go on to a Circuit Court again trying to get a stay,

25    but, Your Honor, by that time this business will have been

1    effectively destroyed.

2            And I want to emphasize, because Your Honor quite

3    understandably is looking at the connection to Florida, when

4    Alpine -- if Alpine is closed down, Scottsdale Capital, which

5    has its office here in Florida, will also be shut down.  It has

6    no other firm through which it can clear its securities

7    transactions.

8            THE COURT:  Why is that?  Just how it's designed?

9            MS. FRITZ:  They are affiliated firms, but it has

10   a lot more to do with a topic that's dealt with in the

11   Complaint.

12           The regulators over the last many years have been

13   focusing very, very stringently on the Micro-Cap market and

14   have actually put out of business many of the firms that

15   participate in that market.  There are very few left that are

16   willing to deal with the regulatory scrutiny and the risk

17   associated with the Micro-Cap market, and so Scottsdale will

18   also have to close down if Alpine is shut down.

19           Now, I would like to give the Court an example of

20   what we'll be up against.  Not only will it be an expedited

21   proceeding, not only has there been limited time to prepare,

22   not only is there only one jurist, a FINRA employee, usually

23   there are two industry panelists that would hear a FINRA

24   disciplinary proceeding.  Not this one.  Just one FINRA hearing

25   officer employee.  But beyond that, it's a strange thing to be

1    in front of -- in a FINRA proceeding, because they do not

2    follow the Rules of Evidence, and so they have already advised

3    me that they may call a couple of customers next week at the

4    hearing or they may not, they may just have one of their

5    employees testify about what that customer told them, and this

6    has happened to me before in FINRA proceedings.  It is

7    incredibly frustrating, Your Honor.

8          But perhaps worse than that, when I go in front of

9    the hearing officer, I'll be talking about whether or not FINRA

10   has proved up a violation of the obey the law injunction, and

11   the case law in this circuit and other circuits is so clear

12   about the dangers associated with obey the law injunctions, the

13   issues with enforceability, and they -- those decisions base

14   the -- basically finding that obey the law injunctions are not

15   valid, they base that on both Federal Rules of Civil Procedure

16   65 and due process, and when I raise these issues with the

17   hearing officer next week, if it goes as it usually does, he

18   will tell me they don't have to follow that law, they don't

19   have to abide by due process of law, and they can therefore

20   ignore all the decisions that, if the SEC brought me into this

21   courtroom and made the same allegations, would not --

22          THE COURT:  Isn't that pretty much true of all

23   arbitrations that people have to participate in, that the rules

24   are lax and the Rules of Evidence don't necessarily apply and

25   evidentiary rulings aren't the same and hearsay is relaxed?

App.171

1          MS. FRITZ:  And in arbitrations there may be -- there

2     may be good reason for that.  I'm not talking about an

3     arbitration.  These are FINRA disciplinary proceedings at the

4     end of which they will shut down a business.  It could not be

5     more serious.  They are -- and the Complaint talks about the

6     fact FINRA has become a deputy SEC, it is now an aggressive

7     enforcer, it did not used to be, and so as it developed more as

8     an enforcer, the problems with the fact that there are not due

9     process considerations has become more and more acute.

10          It is a painful process, Judge, to know that your

11    business can be shut down --

12          THE COURT:  With so much at stake, as you are urging

13    the Court to believe, wouldn't it have made more sense for

14    Alpine to sue FINRA in a place over which there was clear

15    jurisdiction, such as in Washington, D.C., where there wouldn't

16    have been a dispute about the Court's in persona jurisdiction

17    over FINRA, or in Utah, where there would be less dispute about

18    probably the application of the long-arm statute as it relates

19    to Alpine?  Because I'm not here dealing with at this moment

20    your sister company.

21          MS. FRITZ:  Scottsdale.

22          THE COURT:  Scottsdale.

23          MS. FRITZ:  First of all, Your Honor, if we had sued

24    in Utah, let's remember what FINRA's position is, it can only

25    be sued -- it only resides in Delaware or D.C., so do I think

App.172

1   they would have acceded to jurisdiction there?  No, I don't
2   think so.  And do they want to maintain the benefit of
3   litigating in the D.C. circuit?  Yes, they do.  The issue for
4   Your Honor is is that what we are really forced to do?  Do we
5   have no other choice?
6           THE COURT:  We aren't forced to do that if we are a
7   Florida citizen, but if we are a Utah citizen seeking relief in
8   a Florida court, you have to tell me what authority I have to
9   assert authority over FINRA based upon an injury that most
10  likely didn't happen in the State of Florida, and for a future
11  injury that might happen in some unknown place, which is a
12  little bit disconcerting.  We don't know where in the world
13  this agent is sitting.  And I understand the dire concerns, and
14  that's why the Court held an emergency hearing in advance of
15  this hearing to occur on the 30th.
16          MS. FRITZ:  Your Honor, I can tell you that
17  Scottsdale is a plaintiff here.  Scottsdale will suffer.
18          THE COURT:  Scottsdale hasn't filed a TRO.
19          MS. FRITZ:  But on the issue of whether there's a
20  reason to be here, separate and apart from what Alpine is
21  currently facing, on the issue of whether we have an injury
22  here in Florida, we really do.
23          Alpine's closure will prevent Scottsdale from being
24  able to conduct business, and so is there a -- is there a
25  reason for this Court to exercise jurisdiction?  I think

1  Mr. Turkel has done a fine job of saying this arises under the

2  securities laws and therefore, yes.  And is there a reason that

3  this jurisdiction should hear and consider an issue like this

4  and not just the D.C. circuit?  Yes, there is.

5           THE COURT:  And what's that reason?

6           MS. FRITZ:  This circuit has developed over the last

7  few years case law that really emphasizes, properly emphasizes

8  that these kinds of agencies and their counterparts really do

9  have to comply with Constitutional requirements.  I know FINRA

10 doesn't want to be in this jurisdiction, likely because of

11 that, but we feel that we have properly brought the case here

12 and can be heard here.  And the D.C. circuit, which is where

13 they would like to be, isn't the place where we are required,

14 forced, whatever, to litigate these issues that impact

15 everybody in Florida, impact Scottsdale, which is a Florida

16 resident, and impact Alpine.

17           THE COURT:  Thank you.

18           Do you have something to add?

19           MR. TAYRANI:  Thank you, Your Honor.  Three quick

20 points.

21           With respect to the provisions of the Complaint that

22 Your Honor was reading that allege in passing violations of the

23 Exchange Act, those are exactly the type of incidental

24 assertions of Exchange Act violations that the Supreme Court in

25 Manning made clear are not sufficient for jurisdiction under

1  Section 27 of the Exchange Act.  I would direct the Court to
2  page 1568 of the Manning opinion, this is 136 Supreme Court
3  quarter at 1568 and I'm quoting here, the Court says consider,
4  for example, a simple state law action for breach of contract
5  in which the plaintiff allegations for atmospheric reasons that
6  the defendant's conduct also violated the Exchange Act, or
7  still less, that the defendant is a bad actor who arranged that
8  statute on another occasion.  On Merrill Lynch's view,
9  Section 27 would cover that suit.  Indeed Merrill Lynch points
10 to just such incidental assertions as the basis for Federal
11 jurisdiction here, but that hypothetical suit is brought to
12 enforce state contact law, not the Exchange Act.  Close quote.
13       This is a suit that's brought to enforce the U.S.
14 Constitution, not to enforce the Exchange Act or its
15 implementing regulations.  There therefore is no jurisdiction
16 under Section 27.
17       With respect to the procedures in the upcoming
18 May 31st hearing, all of the procedures that FINRA will deploy,
19 including the evidentiary rules that will apply, are pursuant
20 to rules that FINRA has submitted to the SEC and that the SEC
21 has approved.
22       The regulated communicate had the opportunity to
23 challenge those rules to the extent that it disagreed with the
24 Exchange Act and the exchange commission's approval of those
25 rules and Alpine would have the opportunity to challenge the

1    application of those rules in the upcoming hearing before the

2    SEC and in an eventually petition for review to a court of

3    appeals.

4         If Alpine disagrees with those Rules of Evidence,

5    believes that they are inconsistent with the Exchange Act,

6    those are arguments that it can raise before the SEC on review

7    and before the D.C. circuit or another Circuit Court after the

8    SEC's rule is -- review is complete.

9         And, finally, with respect to the contention that an

10   expulsion order directed at Alpine would preclude Scottsdale

11   from doing business in the State of Florida, that is not an

12   allegation that's found in the Complaint.  That's not an

13   allegation that is supported by evidence in the record.

14        Alpine had the ability in its Complaint, in exhibits

15   to the Complaint, in the hearing here today, where the Court

16   invited witnesses, to build a record on personal jurisdiction

17   and demonstrate why this case belongs in this Court, and it

18   declined that opportunity, so it can't rely on extra record

19   assertions here today that somehow an expulsion order directed

20   at Alpine would have an effect on Scottsdale.

21        Scottsdale, by the way, is not a Florida resident.

22   Scottsdale is a resident of Arizona.  It has an office in the

23   State of Florida, but it is not a resident of the State of

24   Florida.

25        Thank you.

 1              THE COURT:  Thank you.

 2              All right.  Let me take a brief recess.  I'll be back

 3     in a few minutes.

 4                        - - - - -

 5              (Recess at 3:17 p.m. until 3:44 p.m.)

 6                        - - - - -

 7              THE COURT:  Well, my inclination is to find that

 8     Florida's long-arm statute does not apply to grant jurisdiction

 9     over FINRA as to Alpine's claims and that to the extent that

10     there is any allegation that the Plaintiffs' claims arise under

11     the Exchange Act, any of those claims would not fall within the

12     jurisdiction of the District Court.  As I understand the narrow

13     exception to *Axon* or *Axon*, those claims would still go through

14     the SEC review process, and jurisdiction to consider the

15     Exchange Act type claims on appeal would be an appeal to the

16     Circuit Court.  District Courts would not have jurisdiction, as

17     I understand the law, to consider violations of or failure to

18     comport with the provisions of the Exchange Act.  Leaving then

19     the last question of whether the Court can assert jurisdiction

20     over FINRA because it is a state actor, and that question

21     remains to be considered, and as I understand it, is sort of

22     the principal question in the case itself.

23              There is some wisdom to the Court taking up

24     jurisdiction based upon the allegation and hearing the

25     substantive case at least to some degree, to some level, and

1    making that determination, because there is not an unbroken

2    line of authority conclusively determining that FINRA is not a

3    state actor, and I understand that there is some substantive

4    argument that the parties would like to make on that question,

5    so if somebody would like to be heard, I'll hear the

6    substantive argument on FINRA as state actor.

7              MS. FRITZ:  Thank you.  Thank you very much,

8    Your Honor.

9              What we've laid out in the briefing, Your Honor, is

10   really an application of the test that's set forth in *Lebron*.

11   That test looks to the relationship betwixt and between the SEC

12   and --

13             THE COURT:  Use the microphone.

14             MS. FRITZ:  And FINRA, and we've laid out application

15   of that test in ways that I think demonstrate from any number

16   of different perspectives that when you look at that and

17   conduct that analysis, the Court will end up finding that FINRA

18   is a state actor.

19             We've also cited authority, for example, the

20   *Intercontinental* case from the Fifth Circuit, that talks about

21   the American Stock Exchange and its regulatory body, and that

22   was found to be intertwined with the SEC.

23             So there is clear authority that supports that.  What

24   is -- and we really fall back on the basic idea FINRA is now

25   actively and aggressively enforcing the Federal securities

1   laws.  That did not -- that didn't used to be the case, but we

2   stand here as a perfect example of the fact that they are

3   taking the authority that was originally given and have become

4   far more aggressive in terms of not conducting arbitrations but

5   literally disciplining and going after its members.  And so in

6   every way we think that FINRA fits within that *Lebron* analysis.

7           It is -- it's hard to sit here and listen to FINRA

8   representatives truly saying to this Court that they do not

9   feel that they have to abide by the Constitution.  This really

10  does end up constituting a deprivation of property without due

11  process, given the fact that they are across the country every

12  day taking massive fines, taking people out of the industry,

13  seeking to expel firms like this, doing so because of the

14  authority derived from the SEC, and yet doing so without

15  feeling any need to comply with Constitutional requirements.

16  At the same time, FINRA is very happy to go into court, call

17  itself a Governmental actor, and thereby get the benefit of

18  Governmental immunity.

19          And so these issues and arguments are ripe now for

20  consideration.  I appreciate the Court -- the fact that the

21  Court has clearly looked at some of the prior decisions, and

22  the prior decisions do not contain the analysis, they do not

23  contain an analysis that reflects the development, the changes

24  in FINRA.  And I would point out that folks who are a lot

25  smarter than I am, SEC former commissioners and commentators,

```
 1    as we've laid out in the Complaint, have over recent years
 2    repeatedly emphasized that FINRA is now functioning as a junior
 3    SEC but doing so without the obligations, and the idea that the
 4    SEC can outsource to a private actor this kind of enforcement
 5    authority but that private actor can behave arguably in a sort
 6    of thug-like way because it's not bound by the Constitution,
 7    that situation is not fair, makes no sense and is not
 8    consistent with the analysis in *Lebron*.
 9              Thank you.
10              THE COURT:  Thank you.
11              MR. TAYRANI:  Thank you, Your Honor.
12              Before this Court reaches state action, there's also
13    the question of venue, which has not received a lot of
14    attention here today, but I did want to point out that even if
15    this Court were to assume that FINRA is a state actor, venue
16    would be improper in this district.
17              THE COURT:  Can the Court determine the venue
18    question without determining the jurisdictional question?
19              MR. TAYRANI:  Yes, Your Honor.  The Court can
20    consider venue without deciding personal jurisdiction, and
21    venue, in the event that FINRA were a state actor, would be
22    governed by 1391(e)(1), which is the venue provision for suits
23    against the United States, and it provides that venue lies
24    where the plaintiff resides, and we know that Alpine does not
25    reside in this district; where the defendant resides, and we
```

App.180

1  know that FINRA does not reside in this district; or where the
2  underlying events occurred, and there is no allegation that any
3  of the underlying events giving rise to the cause of action
4  took place in the Middle District of Florida.  So the Court
5  could avoid the State action question by dismissing this case
6  for lack of venue.

7       On state action, Your Honor, I didn't hear any
8  application of the Supreme Court's various state action tests
9  to FINRA.  The *Lebron* case is nothing like the relationship
10 between the SEC and FINRA.  As we discussed earlier today, the
11 Supreme Court in *Lebron* concluded that Amtrak was a state actor
12 because it was created by the Government to further
13 Governmental purposes and because the majority of its
14 Board members were appointed by the President.  FINRA is
15 nothing like that.  FINRA was not formed by the Government, it
16 was formed by the merger of NASD and the enforcement and
17 regulatory arm of the New York Stock Exchange in 2007.

18       THE COURT:  And how was it formed?  It didn't form
19 itself.

20       MR. TAYRANI:  It was formed by these two private
21 entities entering into a merger agreement that was then
22 submitted to the Securities and Exchange Commission for
23 approval pursuant to the Exchange Act provisions that govern
24 self-regulatory organizations.

25       So the formation was approved by the SEC, but it did

1  not occur at the instigation of the Federal Government.

2          The Supreme Court has been very clear that regulation

3  or approval by the Government is not the same thing as state

4  action.  If mere regulation were sufficient, then oil companies

5  and utilities and gas companies would all be state actors,

6  because any number of things they need to do require Government

7  approval.

8          So *Lebron* is nothing like this case.

9          The plaintiff in its briefing points to the pervasive

10 entwinement case from *Brentwood Academy versus Tennessee*

11 *Secondary School Association*.  That case, again, is nothing

12 like the facts here.  The Court found pervasive entwinement

13 there because the athletic association had a membership that

14 was made up of 84 percent public schools, and those public

15 schools selected the Board members.  So 84 percent of the

16 Board members were selected by public schools.  Every

17 Board member was a public school official.  The employees of

18 this athletic association were eligible for the state

19 retirement plan, and the State Board of Education appointed

20 ex officio members of the Board.  That is nothing like FINRA,

21 which is made up of a Board of private individuals appointed by

22 FINRA's private members, it is funded by membership dues that

23 are paid by FINRA's private members, there is no Government

24 involvement in the selection of the Board, in the day-to-day

25 operation of FINRA through its employees.  So, again, the

1  opposite of pervasive entwinement in this case.

2  　　　　Alpine also points to the Fifth Circuit's 50-year-old

3  decision in *Intercontinental Industries*, which had passing

4  dicta about whether the exchange in that case was a state

5  actor, but after that passing dicta the Court went on to make

6  very clear that it was not in fact deciding whether the

7  exchange was a state actor, because it concluded that the

8  exchange's procedures comported with due process, so there was

9  no need for the Court to address the state action question.

10  　　　　No less a luminary of the Bench than Judge Friendly

11  has concluded that *Intercontinental Industries* was dicta when

12  it came to the question of state action.  That's a decision

13  from the Second Circuit that's cited in the D.O.J.'s briefing

14  here.

15  　　　　In addition, the dicta from *Intercontinental*

16  *Industries* isn't even persuasive, because it relies on an

17  outmoded and expansive view of state action that the Supreme

18  Court endorsed 60 years ago in a case called *Burton versus*

19  *Wilmington Parking Authority.*  The Supreme Court itself has

20  made clear in more recent state action cases that *Burton* is

21  limited to its facts and was a vague view of state action that

22  does not carry weight today.

23  　　　　Alpine also points to the fact that FINRA carries out

24  regulatory responsibilities that are delegated to it by

25  Congress through the Exchange Act, but carrying out delegated

1   responsibilities does not make a private actor a state actor.

2   The relevant inquiry is whether the private party is carrying

3   out traditional and exclusive Governmental functions.  If that

4   is the case then there may be state action present, but

5   regulation of the securities industry, regulation of

6   broker-dealers is a traditional private function.

7         As the Government cites in its brief, the tradition

8   of private self-regulation in this industry goes back to the

9   time of the founding, when the New York Stock Exchange was

10  founded and established rules to govern its own members.  There

11  was no --

12        THE COURT:  In what way is FINRA different than the

13  NASD, if at all?  And is there some allegation of fact or some

14  declaration that is filed in your briefing that would support

15  that?

16        MR. TAYRANI:  For state action purposes, Your Honor,

17  FINRA and NASD are indistinguishable.  So NASD's Board was not

18  appointed by the Government, its funding did not come from the

19  Government, NASD was not created by the Government, and the

20  same is the case for FINRA, and that is dispositive when it

21  comes to the state action question.

22        And, again, there are no factual disputes here,

23  Your Honor.  You need only look at the allegations in the

24  Complaint, which set forth all of the salient facts that are

25  needed to resolve the state action issue.

1          The Complaint alleges that FINRA was formed out of
2     NASD, it alleges that FINRA's Board is selected by FINRA's
3     members, and it alleges that FINRA is funded by the private
4     membership of the organization, not by the Federal Government.
5     Those three facts taken together make clear under *Lebron* that
6     FINRA is not a state actor, and make clear under *Brentwood* that
7     there is far from pervasive entwinement here, there is no
8     meaningful entwinement when it comes to the state action
9     inquiry.
10          THE COURT:  So, in answer to my question, they are
11    not different at all or not different in your mind as it
12    relates to the question of being a state actor?
13          MR. TAYRANI:  The latter, Your Honor.  They are
14    different in the sense that FINRA has a broader regulatory
15    mandate.  So regulation of the broker-dealer industry before
16    the foundation of FINRA was divided between NASD and the
17    regulatory arm of the New York Stock Exchange.  They got
18    together in 2007 and decided that they should form a single
19    regulatory body called FINRA, but the indicia of state action
20    or the lack thereof, as is the case here, are the same for NASD
21    and for FINRA, and that's why the cases pre-2007 and post-2007
22    reach the same outcome and why the post-2007 cases rely on the
23    pre-2007 decisions regarding NASD in concluding that FINRA is
24    not a state actor.
25          And, again, I would point the Court to what the

```
 1    Eleventh Circuit has said on this issue.  I acknowledge the
 2    Court has not squarely addressed the question, but the en banc
 3    Eleventh Circuit in *Wiseman* described self-regulatory
 4    organizations as private industries, and the Eleventh Circuit
 5    repeated that in the *Tubreville* case and in later decisions as
 6    well.  The *Gallagher* decision in 2022 was one example of that.
 7            Also, the Supreme Court, as we've discussed earlier,
 8    contrasted private self-regulatory organizations with the
 9    Government-appointed, Government-created PCAOB in the *Free*
10    *Enterprise Fund* case.  So the Supreme Court has indicated very
11    clearly that there is a meaningful state action difference
12    between self-regulatory organizations on one hand and the PCAOB
13    and other Government-created, Government-controlled entities on
14    the other.
15            Finally, I would just respond to my opposing
16    counsel's reference to the fact that FINRA possesses regulatory
17    immunity when it carries out its regulatory functions.
18            The Eleventh Circuit has made clear in the *Rayburn*
19    *versus Hogue* case, which is cited in our briefing, that the
20    fact that a private party enjoys absolute immunity conferred by
21    the law is not the same thing as making that private party a
22    state actor.  *Rayburn versus Hogue* concerned foster parents.
23            THE COURT:  I'm familiar with the case.
24            MR. TAYRANI:  Excuse me?
25            THE COURT:  I'm familiar with the case.
```

1          MR. TAYRANI:  So the Court there concluded that

2    foster parents were not state actor, and it reached that

3    conclusion even though there was a, quote, symbiotic

4    relationship between the State of Georgia and the foster

5    parents in that case, and even though the foster parents were

6    entitled to absolute immunity under state law.

7          So the fact that FINRA possesses absolute immunity

8    when it's carrying out its essential and critical regulatory

9    functions delegated to it under the Exchange Act does not mean

10   that it is a state actor.  The test for regulatory immunity

11   that the Eleventh Circuit has recognized and that other

12   Circuiits have recognized is different from the test for state

13   action.  Regulatory immunity applies where an SRO is carrying

14   out activities that are incident to its regulatory functions,

15   and as we've been discussing, state action applies where an

16   entity is created or controlled by the Federal Government.

17   Those are different inquiries that can yield different results.

18         So for all of those reasons we would urge the Court

19   to follow the decisions that have concluded that FINRA and its

20   predecessor, the NASD, is not a state actor.

21         THE COURT:  Thank you.

22         MR. TAYRANI:  Thank you.

23         MR. PEZZI:  Good afternoon, Your Honor.  Stephen

24   Pezzi from the Department of Justice.

25         I would just like to briefly address some of the

1   issues relating to state action, because they're obviously

2   quite relevant to the merits of several of Plaintiffs' claims.

3          So if the Court were to reject FINRA's personal

4   jurisdiction and venue arguments -- and I agree with counsel

5   for FINRA that either one could be dispositive, without the

6   need to reach the merits -- and to move on to the merits, the

7   Court couldn't enter a preliminary injunction without

8   concluding that Plaintiffs had shown a likelihood of success on

9   the merits on at least one of their claims.

10          Starting with the Appointments Clause claims as well

11   as the removal claims that I think rise and fall with the

12   Appointments Clause claims, the Appointments Clause applies to

13   officers of the United States.

14          THE COURT:  Well, let me ask you this question before

15   you delve into a merits sort of analysis.

16          If the jurisdictional questions are enmeshed with

17   factual questions going to the merits of the case, then isn't

18   there some suggestion in the case law that the Court would hold

19   an evidentiary hearing as to that or would defer ruling on that

20   to determine the jurisdictional questions at trial?

21          MR. PEZZI:  Your Honor, I am careful not to step

22   outside the bounds for which I am here.  I will say that I am

23   not aware of any factual dispute in this case and I'm not aware

24   of Plaintiffs having carried any burden to show on either

25   jurisdiction or the merits.  I don't think there's anything

1    beyond the four corners of the Complaint or Plaintiffs'
2    preliminary injunction motion that this Court needs to resolve.
3            I think it's clear from, again, the precedent that
4    I think all parties here agree is the critical precedent on the
5    question of whether FINRA, although a nonprofit Delaware
6    corporation, whether for some reason it should be treated as a
7    Government entity or part of the Government for Constitutional
8    purposes.  That question is controlled by the Supreme Court's
9    decision in *Lebron*, as, again, I think everyone agrees, and in
10   *Lebron* the two critical facts that the Supreme Court identified
11   were the fact that Amtrak was a Government-created,
12   Government-appointed entity, and so although Congress had
13   nominally designated when Congress created Amtrak as a private
14   entity for purposes of the Constitution in those unusual
15   circumstances, that was not controlling.
16           Those circumstances are not present here.  FINRA was
17   not created by Congress, nor was NASD.  Again, the concept of
18   private self-regulation in the securities industry does date
19   back to the founding era and predates the securities laws
20   themselves by several hundred years.
21           THE COURT:  Do the securities laws give any further
22   authority to FINRA beyond the date on which it was formed by
23   this merger?
24           MR. TAYRANI:  So the statute itself doesn't talk
25   about FINRA itself, it talks about a national securities

App.189

1    association, and it contemplates that one or more national

2    securities associations might register with the SEC to play

3    this role in this broader regulatory scheme.  And currently

4    FINRA is the only national securities association, although

5    FINRA itself doesn't appear in the statute.  But, again, it is

6    a private, non-profit corporation incorporated in Delaware, and

7    the Eleventh Circuit has said that on several occasions.  So

8    absent a very unusual set of circumstances, there is no reason

9    to consider Constitutional constraints like the Appointments

10   Clause, like the removal restrictions inherent in Article II of

11   the Constitution, or any other of the Constitutional claims

12   here, with, again, the exception of the First Amendment claim,

13   which is an actual challenge to the statute itself, and thus

14   I don't understand anyone to be disputing the State action

15   question there.

16          But, again, in addition, there's the Government

17   creation element and the Government appointment element that

18   the Supreme Court identified in *Lebron*.  Neither one of those

19   is present here.

20          The Supreme Court also identified as a critically

21   important fact the fact that Amtrak's shares of I think all of

22   its preferred stock and a majority of its common stock were

23   owned by the Federal Government, it was funded by the Federal

24   Government, its losses were absorbed by the Federal Government,

25   and, again, none of that is true here with respect to FINRA.

1  It not only has no Government employees, let alone officers of
2  the United States, but it is funded entirely through means
3  outside of the Federal Government.
4          And so under Lebron itself it's clear that it would
5  not -- that the Lebron test would not be satisfied by FINRA,
6  and, again, the Supreme Court itself came a very long way
7  towards recognizing that in *Free Enterprise Fund* itself, and so
8  I acknowledge that *Free Enterprise Fund* doesn't have a square
9  holding on the question of FINRA or the other private
10 self-regulatory organizations that it refers to, but I do think
11 it's important to note that the Supreme Court went out of its
12 way in *Free Enterprise Fund* several times to contrast the
13 Government agency that was at issue in that case, and everyone
14 agreed it was a Government agency for Constitutional purposes
15 because it was Government-created and Government-appointed, but
16 the Supreme Court went out of its way to contrast it with
17 private regulatory bodies like the New York Stock Exchange, and
18 it even talked about how there might be different removal --
19 the removal restrictions would operate differently for
20 something like the Public Company Accounting Oversight Board in
21 that case and these private self-regulatory organizations like
22 the New York Stock Exchange.  FINRA and the New York Stock
23 Exchange are identically situated on this issue.
24          And so --
25          THE COURT:  If the issue is so clear, as you would

1    like for me to believe it is, why have all the Circuit Courts

2    declined to answer the question, since it shouldn't even be a

3    question.  Why don't they just say, well, everybody knows FINRA

4    is not a state actor, so that is not something we have to

5    consider here.  Why are they expressly saying we're not

6    resolving this question?  And even when they do resolve it,

7    they come back and say, oh, we didn't mean to resolve it, we're

8    not expressly resolving it.

9           MR. PEZZI:  So, respectfully, Your Honor, I would

10   quibble with the premise a bit.  I mean, I think there are many

11   decisions cited both in FINRA's brief and the Government's

12   brief where there have been square holdings.  Admittedly,

13   they're not Eleventh Circuit or Supreme Court opinions, but

14   square holdings that FINRA --

15          THE COURT:  Which reported binding circuit can you

16   point me to that has expressly held that FINRA is not a state

17   actor?

18          MR. PEZZI:  I think the Second Circuit and --

19          THE COURT:  That's an unreported decision in the

20   Second Circuit.

21          MR. PEZZI:  I think several circuits have stated

22   repeatedly that the Constitutional restraints, like the

23   Fifth Amendment, like the privilege against self-incrimination,

24   do not apply to self-regulatory organizations like FINRA.

25          THE COURT:  My question is:  Cite me one binding

App.192

1  authoritative precedential Circuit Court decision that has held
2  that FINRA is not a state actor.
3          MR. PEZZI:  So I don't have my -- the brief in front
4  of me, Your Honor, but, look, there are many self-regulatory
5  organizations and there have been --
6          THE COURT:  I don't see one cited in your decision.
7  Please don't say "look" in that way to the Court.  I don't see
8  any precedential decision.  I think your colleague has
9  acknowledged that there are none.  And I just don't understand
10  why, if the decision is so patently obvious as the Government
11  and FINRA would like for the Court to believe.
12          MR. PEZZI:  Your Honor --
13          THE COURT:  Just tell me why they might not be
14  deciding it squarely on if it's so clear and indisputable.
15          MR. PEZZI:  Your Honor, I would say that the admitted
16  absence of either a Supreme Court or Eleventh Circuit opinion
17  does not suggest that FINRA is a state actor, and in fact the
18  many opinions cited in both FINRA's brief and the Government's
19  brief suggest strongly to the contrary.  I would say *Lebron* and
20  *Free Enterprise Fund* also very strongly support that
21  proposition.  And I think, again, the history that dates back
22  to the founding era, that even predates the securities laws
23  itself, supports the notion that FINRA is not a state actor.
24          I think this arises in different contexts in
25  different ways, and that's part of the reason that the cases --

App.193

1   I mean, I'm not aware of a direct challenge to the entire

2   structure of FINRA where the only thing the plaintiff was

3   alleging was structural separation of powers claims like the

4   plaintiffs are alleging here, and so that is part of why when

5   Your Honor looks at the precedent that has come out on these

6   issues in other circuits, they're arising in contexts that are

7   slightly different than this one.  But what I can say and what

8   the cases cited in our brief and FINRA's brief do say is that

9   when Court's apply the analysis set forth in *Lebron* and the

10  analysis that predated *Lebron*, it has all come out in the way

11  that we are arguing here.

12          I would point Your Honor, again, to the very recent

13  and absolutely precedential opinions in the Sixth Circuit and

14  the Fifth Circuit about the Horse Racing Integrity and Safety

15  Act, which created a private entity expressly modeled after the

16  SEC/FINRA relationship, and in response to Constitutional

17  challenges that arose in both the Fifth Circuit and the Sixth

18  Circuit both the Fifth Circuit and the Sixth Circuit issued

19  binding precedential opinions on that question.

20          The Fifth Circuit opinion ruled that there was a

21  Constitutional violation because the entity at issue did not

22  look sufficiently like the SEC/FINRA relationship that it

23  understood to be Constitutional, or at least it had raised the

24  question in a different way.  The Sixth Circuit squarely states

25  that the SEC/FINRA model has in case after case been upheld by

1   the Courts as --

2            THE COURT:  What case is that?

3            MR. PEZZI:  That's the *National Horseman and*

4   *Benevolent Association versus Black* in the Fifth Circuit, and

5   it is *Oklahoma versus United States* in the Sixth Circuit.  And

6   then there's an additional District Court opinion in the

7   Northern District of Texas.  All three of these decisions are

8   cited in the Government's brief, and they squarely address the

9   same sorts of questions that we've been addressing here today.

10           Again, the Northern District of Texas opinion and the

11  Sixth Circuit opinion squarely hold that the entity at issue is

12  a private entity, not a part of the Government, and do so by

13  discussing FINRA itself.  The Fifth Circuit opinion --

14           THE COURT:  Was the *Mohlman* case affirmed without

15  opinion or is there an opinion associated with it?

16           MR. PEZZI:  The *Mohlman* case in Ohio was affirmed.

17  I'm not aware of the Sixth Circuit having addressed the issue

18  in a manner that would be worthy of the Court's consideration,

19  and so I think both FINRA and the Government look to the

20  Northern District of Ohio opinion there.  But if Your Honor is

21  interested in a lengthy discussion of these very issues,

22  Judge Hendricks' opinion in the Northern District of Texas from

23  just three weeks ago on remand from the Fifth Circuit in the

24  Horse Racing Integrity and Safety Act context discusses these

25  very issues, discusses these very precedents, and discusses

1    SEC, the SEC/FINRA relationship as a model that has been

2    consistently upheld by the Courts and shows how these sorts of

3    entities can function within the constraints of the

4    Constitution.

5             THE COURT:  Do you have that opinion with you?

6             MR. PEZZI:  I have the citation with me.

7             THE COURT:  I have the citation.  You don't have it

8    with you?

9             Can you put it in the folder, Mr. Collins?  It's

10   cited at 2023 Westlaw 3293298 in the Government's brief.  It's

11   in the -- it's in the --

12            Yes, sir.  You may continue.

13            MR. PEZZI:  Thank you, Your Honor.

14            The last thing I will say, unless Your Honor has any

15   additional questions, which I'm happy to answer, is today's --

16   the preliminary injunction motion that led to the calling of

17   this hearing, it focuses on a subset of Plaintiffs' claims, it

18   does not focus on the non-delegation claims, and so I haven't

19   said much about those claims in particular today.  I do think,

20   to the extent Your Honor is interested in the State action

21   question, it is notable that in all of the cases that have

22   upheld the SEC/FINRA model, or including the NASD/SEC model

23   before it became FINRA itself, in the context of private

24   non-delegation challenges, of which there is one of those

25   challenges in the Complaint, although not the preliminary

1  injunction motion, those cases are entirely predicated on the
2  assumption that FINRA is a private entity, and so the
3  Constitutional question that arises and has arisen in those
4  cases -- and those come, again, from the Second Circuit, the
5  Third Circuit, the Ninth Circuit -- they arise in the context
6  of a plaintiff concerned, like these plaintiffs are in their
7  own Complaint, that Congress has improperly delegated authority
8  to a private entity.

9        And there is a, you know, well-established
10  Constitutional standard that governs those claims, we've
11  briefed it here, it's in the Government's brief if Your Honor
12  wants to refer to it.  We think those standards are satisfied,
13  of course, but the point is that claim only arises in the
14  context of Government delegation of authority to a private
15  entity.  And so I think it would be odd to say, as Plaintiffs
16  do here, that, you know, those decades of precedence upholding
17  the NASD and FINRA in the face of those sorts of challenges
18  were all focused on the wrong question and instead what all of
19  the Courts in those cases should have been asking is, you know,
20  about Constitutional restraints that apply to the Government
21  rather than Constitutional limitations on the ability of the
22  Government to delegate to a private entity.  That is what we
23  have here.  There is authority that has been delegated by
24  Congress and recognized by Congress as part of the Exchange
25  Act, and FINRA plays a role there.  It is a role that is

1   consistent with the Constitution, but it is ultimately a
2   private Delaware nonprofit corporation, in the words of the
3   Eleventh Circuit in *Tubreville*, and that, I think, controls
4   several of the issues that are before Your Honor today.
5           THE COURT:  Thank you.
6           MR. PEZZI:  Thank you.
7           MS. FRITZ:  The words of *Tubreville* also include
8   significant language regarding the Governmental function that
9   FINRA is performing.  Part of the reason why the authorities
10  are not as clear as Your Honor is indicating, why there isn't
11  that kind of clarity, is we're dealing with a situation where
12  FINRA has morphed.  Initially the NASD really was responsible
13  for creating standards of conduct among professionals in the
14  industry.  A proper SRO function, no doubt about it, standards
15  of conduct.  But, Your Honor, I've been doing this for almost
16  40 years, and in that period of time FINRA slowly but certainly
17  now over time has become an enforcer of the Federal securities
18  laws.
19          THE COURT:  And so are you suggesting by that
20  morphing over the years that the standards of *Lebron* should
21  also include some analysis on enforcement authority, not just
22  the nature by which the agency is -- the organization is
23  formed, as suggested in Lebron?
24          MS. FRITZ:  I am.  And my colleague agrees with that,
25  apparently.  He -- a moment ago he said if this were -- if the

1  entity were involved in traditional enforcement of securities
2  laws, that would be different, that could be state action.
3  And, yes, there is a very real issue here.
4       This issue of delegation that was just mentioned
5  really touches on the same issue, can -- and there was an
6  interesting decision last year in the Supreme Court related to
7  a denial of cert in which three of the Justices said the Court
8  very much needs to address the extent to which the Federal
9  Government can effectively outsource Governmental authority to
10  a private entity.  The dangers that exist when that occurs are
11  obvious, they are obvious, and that's the situation in which we
12  find ourselves.
13       THE COURT:  Well, until the Court does so determine,
14  under what authority would I have to step out of the analytical
15  framework that the Court has already employed?
16       MS. FRITZ:  There is within our briefing, I believe,
17  authority that also deals with the issue of --
18       THE COURT:  In your reply or your original moving
19  papers?
20       MS. FRITZ:  I believe in the moving papers, that
21  talks about when there is a delegation of the ability to
22  enforce Federal law, that also factors into the state actor
23  analysis, and that's very, very clearly what we have here, is
24  the -- is the intimate -- intimate entwinement also clear?
25  Yes.  I would cite to, for example, the *Gallagher* decision,

1  where the Court uses exactly that language.

2          THE COURT:  The delegation authority that you're

3  citing are law review articles.  Do you have any case authority

4  for that proposition?

5          MS. FRITZ:  I certainly -- I cannot think of anything

6  offhand.  I would encourage the Court to take a look though at

7  the Complaint, paragraphs 77 through 83.  The concerns that

8  we're talking about today about an agency outsourcing the

9  authority to enforce Federal law and the authority to deprive

10  people of their livelihood and their business, that that being

11  outsourced to an entity that denies the obligation to abide by

12  the Constitution, these concerns have been articulated more and

13  more over the last 15 years as FINRA has embraced and insisted

14  that it is not simply an organization that deals with standards

15  of conduct in the industry, it is an enforcer of the Federal

16  securities laws, and so a lot of these issues --

17          THE COURT:  Has the Government delegated that

18  authority or did these private entities just assume that

19  authority within their own regulatory structure?

20          MS. FRITZ:  FINRA has certainly aggressively taken on

21  that role, whether it has to do with enforcement of Section 5

22  of the Exchange Act, Section 13.  FINRA, even -- even the

23  obligation --

24          THE COURT:  Has the Government enabled it in some way

25  by promulgation of a statute or a regulation or a rule?

App.200

1          MS. FRITZ:  Largely FINRA has taken this authority to
2    itself.
3          THE COURT:  That's a no?
4          MS. FRITZ:  And the SEC has acceded to it.
5          THE COURT:  By regulation or a rule or by
6    acquiescence and nonaction?
7          MS. FRITZ:  By acquiescence and nonaction.
8          And we allege all this in the Complaint.  This
9    transformation creates the mini-SEC.  No question that the SEC
10   could not take these actions to enforce --
11         THE COURT:  These are really interesting law review
12   financial analyst publication policy arguments, but where I am
13   looking for District Court authority to upend Federal law
14   I have to have some legal framework for it, not just a policy
15   disagreement with the way that FINRA operates or way that FINRA
16   has attached itself to regulatory authority.
17         MS. FRITZ:  I appreciate that, Your Honor, and I have
18   to admit there is an article that we've cited called
19   Supreme Risk, 74 Florida Law Review 543, this is a very robust
20   discussion of the fact that existing authority leads to the
21   conclusion that FINRA is a state actor, and there is -- there
22   is so much information in this that really lays out and tracks
23   all the way through recent Supreme Court decisions.  It's not
24   just the commentators, this is predicated on the line of cases.
25         Your Honor made a reference earlier to the fact that

App.201

1   the *Axon* case might cause FINRA some anxiety.  It's not just

2   that case.  It is very clear, the writing is on the wall that

3   this kind -- the idea that an agency can outsource enforcement

4   of the Federal law to an entity that is not bound by the

5   Constitution is concerning at best, and that's the kind of

6   thing that this Court is very eager to address.

7         So I do think that we have cited the cases that

8   demonstrate that FINRA here is a state actor, both in terms of

9   entwinement but also because it is flat-out every day enforcing

10   the Federal securities laws and should not be allowed to do so

11   without adherence to the exact same obligations and

12   requirements that the SEC would have to adhere to were it being

13   done by the SEC.  The SEC should not -- cannot delegate out the

14   enforcement -- the enforcement of securities laws in ways that

15   not even it would be permitted to engage in.

16         The situation that currently exists -- and, again,

17   we've alleged this in the Complaint -- is a product of two

18   things.  First of all, the aggressive changes as FINRA model

19   has become more and more assertive in terms of enforcing the

20   laws, combined with years now of Supreme Court authority where

21   the Court is expressing very real concern about that kind of

22   conduct by an agency.

23         THE COURT:  Do you fear the same -- I think it was

24   described as a broad swath of agencies that would be upended in

25   their functioning by such a ruling as finding that FINRA is a

```
 1   state actor or sufficiently equivalent thereto?

 2          MS. FRITZ:  I don't.  And I don't think was there any

 3   specificity in that sort of assertion.  It was like a parade of

 4   horribles, probably designed to discourage the Court from

 5   delving into this area.  But I can tell you over the last few

 6   years decisions have come down regarding the PCAOB, regarding

 7   Consumer Financial Protection Bureau, regarding the inner

 8   workings of the SEC, and the world did not come to a sudden

 9   halt.  What we do and what needs to happen here, Your Honor, is

10   we simply correct the problem.

11          FINRA goes into courts every day and demands

12   Governmental immunity because it performs Governmental

13   functions.  We're asking for nothing other than --

14          THE COURT:  Does it ask for Government immunity

15   because it serves Governmental functions or does it ask for

16   Governmental immunity because it's afforded Governmental

17   immunity by the statute?

18          MS. FRITZ:  No, the analysis in every one of the

19   cases that we've cited talks about the fact that that immunity

20   can only be conferred where the entity is performing a

21   Governmental function.  So the analysis in those cases is

22   exactly applicable here.

23          All we're asking is where you are getting the benefit

24   of that, you have to take on the obligations associated with

25   it.  It can't be heads they win, tails we lose every time.  And
```

App.203

```
 1   it seems to me it's a pretty small ask, given the power that

 2   they are currently wielding throughout the financial industry.

 3              THE COURT:  All right.

 4              MS. FRITZ:  Thank you.

 5              THE COURT:  Thank you.

 6              And, I'm sorry, I don't believe Alpine has ever

 7   addressed yet whether the better part of wisdom is to find that

 8   the matter should be transferred to the D.C. Circuit rather

 9   than have the question of state actor resolved by the Court.

10   I heard Ms. Fritz say that's where they want to be, but I

11   didn't hear anybody say that's not something the Court is

12   authorized to do.

13              MR. TURKEL:  Judge, may it please the Court, I was

14   going to -- because they briefly addressed venue when opposing

15   counsel came up, I think to a degree it finds us back in the

16   Section 27, 15 U.S.C. 78aa analysis, because if you look at the

17   Dusek versus JPMorgan Chase & Company case, Middle District

18   case from 2015, denying a motion to transfer venue, again,

19   we're in a scenario where the specific mandates of Section 27

20   apply on the personal jurisdiction level, they also apply on

21   the venue level, and in that case we have a scenario where

22   venue was -- or jurisdiction was found.

23              THE COURT:  Well, I'm assuming there is no authority

24   to pursue this other than in a determination of FINRA's state

25   actor status, and you're saying --
```

1          MR. TURKEL:  Right.

2          THE COURT:  -- in that event --

3          MR. TURKEL:  Either -- so 27 -- the Section 27

4    argument is conduct-based, right, it has to do with the conduct

5    alleged and whether it implicates the Exchange Act, and then

6    the 28 U.S.C. 1391(d) is actor-based, which is a state actor or

7    state agency.  Under that scenario and equally speaking, the

8    analysis in 1391 was also dealt with in the *Dusek* case, and

9    that would state that, generally speaking -- we lose the

10   argument, Your Honor, on that point of connexity, we lose that

11   element under the two specific statutes and the specific

12   jurisdiction arguments thereunder, and then it's just simply

13   are they in Florida and transacting business here, essentially,

14   and therefore I would tell you that either under a 27 analysis

15   or a 1391 analysis that it just stays here.

16          It kind of goes to something the Court said earlier,

17   Judge.  Like in your world you can only sue them in Delaware or

18   Washington, D.C., but yet they can bring an action where when

19   you ask them where is that action located, they say, well,

20   nowhere, everywhere, and that's why all these cases that

21   discuss essentially minimum contacts with the United States on

22   whole versus a specific state makes sense, right, because it's

23   a different theory of jurisdiction and venue because there's no

24   argument that they can't reasonably expect to be hailed into

25   any venue.

1          Judge, to a question you asked earlier, I think we

2    can sue them anywhere we want, because that's what happens when

3    you act the way they act with the enabling power they have, and

4    that's why 1391 and Section 27 work the way they do, and they

5    make -- Judge, it's somewhat elegant sense.  It makes sense,

6    right?  How do you put them into a bucket of conventional venue

7    arguments when they literally exist at one period of time doing

8    everything everywhere?  And so I don't think the venue argument

9    is particularly appealing.  I think that if they're acting as a

10   state agency or a state actor, then 1391 will govern.  If the

11   conduct requires this Court to delve into an analysis of the

12   Exchange Act, Section 27 governs, then it all just stays here,

13   Judge.

14          I know it sounds kind of flip that we think we can

15   sue them anywhere, but that's how that statutory scheme works,

16   and it works that way for a good reason, because they exist

17   everywhere, so -- and they transact everywhere.

18          THE COURT:  Thank you.

19          Was Ms. Fritz accurate in her description of the

20   process by which her review to the SEC will occur at a snail's

21   pace, essentially effectively denying Alpine its right to

22   access the Courts for purposes of considering any determination

23   made by the single officer?

24          MR. TAYRANI:  Your Honor, I think Ms. Fritz

25   acknowledged that Alpine would have the right to seek a stay

1    from the SEC, and then if that is denied a stay from an

2    appropriate Court of Appeals, and that would not occur, to use

3    your language, at a snail's pace, just as they've asked this

4    Court for emergency expedited treatment.

5            THE COURT:  Is the stay motion sufficient to stay the

6    action of the officer until the stay determination is made?

7            MR. TAYRANI:  I don't know the answer to that.

8    I think what Alpine could do is something similar to what

9    litigants do in asking for an administrative stay to give a

10   court an opportunity to consider a request for a stay before

11   the action --

12           THE COURT:  I know you can ask for anything you want

13   to ask for.  My question is procedurally how it operates and

14   does it effectively grant access to the Courts or deny access

15   to the Courts because of the manner in which the process

16   unfolds?

17           MR. TAYRANI:  There is nothing in the SEC rules,

18   Your Honor, which I'm aware that contemplates the concept of an

19   administrative stay, but there's nothing in the Federal Rules

20   of Civil Procedure that contemplates it either.

21           THE COURT:  Have you ever seen an administrative stay

22   issued?

23           MR. TAYRANI:  I have not seen an administrative stay

24   from the SEC.  I don't have full knowledge or understanding of

25   all of the SEC's relevant jurisprudence.

1          If I were in Alpine's shoes, what I would do is ask

2     for an administrative stay pending the commission's resolution

3     of their stay request upon fuller consideration.

4          THE COURT:  But you have never heard of them doing

5     that, and so the effective access to the Courts is of concern

6     to the Court if what I am doing is sending Alpine back to FINRA

7     for relief of its appeal and then its access to the Courts on

8     an appeal from that appeal, because if there is effectively no

9     access and no right of access, then it's essentially a nullity.

10         MR. TAYRANI:  Your Honor, I'm not prepared to concede

11    that there is no mechanism for an administrative stay from the

12    SEC.  What I would --

13         THE COURT:  Well, you've already conceded there is no

14    statutory or rule-based access.  You're just saying they might

15    be kind and grant one.

16         MR. TAYRANI:  I'm saying that Alpine could ask for

17    one in the same way that litigants ask Courts of Appeals and

18    the U.S. Supreme Court for administrative stays with

19    regularity.

20         The reason that Alpine is in this position is because

21    Alpine has already been expelled from FINRA membership.  The

22    March 2022 FINRA panel decision expels Alpine based on its long

23    track record of wrongdoing, but that ruling was stayed pursuant

24    to FINRA rules while Alpine pursues its appeal before FINRA and

25    then if it needs to before the SEC, but the cease and desist

App.208

1    order remains in force during the pendency of that appeal, and

2    Alpine has continued to engage in the same conduct that led to

3    the March 2022 expulsion order --

4         THE COURT:  Well, that's your allegation.  If you

5    have already decided that your allegation is a fact, it causes

6    even greater concern about the fairness of the FINRA review

7    process.  That is your allegation, that they have continued to

8    engage in the behavior and so FINRA has instituted an expedited

9    process to get ahead of the appeals process that's currently

10   pending.  It's in the position it's in now because the SEC

11   hasn't resolved its appeal, and it's been over a year, and so

12   it's just sitting there, and so then it files a lawsuit in

13   Federal Court and --

14        MR. TAYRANI:  Your Honor, what I'm suggesting is that

15   Alpine has been afforded substantial process.

16        THE COURT:  And so why don't you just let the process

17   follow itself all the way to the end rather than jumping ahead

18   of the appeals process to expedite a review over the SEC?  What

19   is the reason for that?

20        MR. TAYRANI:  Because FINRA has a statutory mandate

21   to protect investors and the public interest.

22        THE COURT:  Without regard to SEC's oversight of

23   FINRA's oversight of that process.

24        So under the rule, so that I understand it, FINRA

25   exercises its duty to protect the public, and it pursues a

1   claim for all the wrongs that you say Alpine has engaged in,
2   and I'm not saying you're right or wrong, you just do that, and
3   then there's a hearing, and the hearing officer agrees with
4   you, and then Alpine has as its right the right to appeal that
5   decision, it exercises that right, then the SEC sits on it and
6   doesn't do anything, and then Alpine files another lawsuit, and
7   then rather than waiting for that lawsuit to unfold and resolve
8   itself and for the SEC to hurry up and resolve the appeal,
9   there is a process built into the FINRA regulation that allows
10  it to leapfrog the SEC's appeal review and seek immediate
11  expulsion based upon what it believes are the old violations
12  that haven't ceased and/or new violations.
13          MR. TAYRANI:  Yes, Your Honor, that is correct, and
14  those are FINRA rules that were submitted to and approved by
15  the SEC as consistent with the Exchange Act, because the SEC
16  wanted to ensure that FINRA has the tools necessary to protect
17  investors, to protect customers of broker-dealers such as
18  Alpine from ongoing violations and victimization.  That is why
19  there is this expedited review proceeding.
20          THE COURT:  When did FINRA discover the ongoing
21  violations post the appeal?
22          MR. TAYRANI:  I'm not able to speak to that issue,
23  Your Honor.  All I can say is that there have been regulatory
24  contacts between FINRA enforcement staff and Alpine after the
25  March 2022 cease and desist order that were precursors to the

```
 1   initiation of this expedited proceeding in April.

 2           THE COURT:  When was the first such post-March

 3   contact?

 4           MR. TAYRANI:  I believe it was in June.  In June of

 5   2022.

 6           THE COURT:  And then what is the next one, do you

 7   know?

 8           MR. TAYRANI:  So if I may read, Your Honor, this is

 9   from Exhibit B to our opposition to the preliminary injunction

10   motion, and it's the petition for a hearing that FINRA's

11   enforcement staff filed, and it lays out the relevant timeline.

12           Paragraph 15 states that on June the 30th, 2022 FINRA

13   staff served a notice of cancellation on Alpine pursuant to

14   FINRA's rules to cancel the firm's membership with FINRA

15   because of the firm's transfer --

16           THE COURT:  I just want to know the dates.

17           MR. TAYRANI:  So that was June 30th of 2022.

18           THE COURT:  I have just read it.  Never mind.

19           MR. TAYRANI:  So the point I'm trying to make,

20   Your Honor, is that there is a consistent back and forth

21   between the FINRA enforcement staff and Alpine that culminated

22   in the initiation of this expedited proceeding.  This is not

23   something that came out of the blue.  It's not a step that

24   FINRA's enforcement staff takes lightly.

25           THE COURT:  What if the SEC ultimately concludes when
```

App.211

1  it decides to wake up and rule on the appeal that the original

2  decision was improper for some reason, as apparently, according

3  to Alpine, it did the first time?  What happens to the

4  enforcement decision that has been then made to expel Alpine

5  for the reasons that it violated the cease and desist which the

6  SEC has now said never should have been issued?

7       MR. TAYRANI:  So that's a decision that FINRA's

8  enforcement staff would have to make, but the point I would

9  underscore is that Alpine remains under an operative duty to

10 comply with the terms of the cease and desist order, so if the

11 underlying opinion is vacated, that doesn't necessarily mean

12 that Alpine can excuse its failure to comply with the cease and

13 desist order because it has a current extant duty to comply

14 with those obligations, including the obligation not to charge

15 its customers unreasonable, unlawful and unfair fees, and

16 that's what Alpine is accused of violating in the expedited

17 proceeding.

18      THE COURT:  So there would not be any recourse at

19 that point because Alpine would be dissolved, essentially.

20      MR. TAYRANI:  The expedited hearing would not

21 necessarily evaporate or come to an end simply because Alpine

22 prevails in its appeal from the underlying March 2022 opinion,

23 because there are current extant obligations that Alpine must

24 meet during the pendency of that appeal that are imposed by the

25 cease and desist order.

App.212

1        I'm happy to answer further questions, or, if the

2    Court would indulge me, I will clean up a few loose ends for

3    two minutes, if I may.

4            THE COURT:  Yes, sir.

5            MR. TAYRANI:  I wanted to give the Court a citation

6    in response to your question as to whether you could address

7    venue without resolving personal jurisdiction.  As I mentioned,

8    the answer is yes, and there's a Supreme Court decision on

9    point called *Leroy versus Great Western United Corporation*,

10   it's 443 U.S. 173, and the pin cite is 180.

11           THE COURT:  One eight zero?

12           MR. TAYRANI:  One eight zero.

13           THE COURT:  Yes, sir.

14           MR. TAYRANI:  On the question of venue, I think it's

15   important to keep the Section 27 analysis separate from the

16   1391(e)(1) analysis.  If this Court were to conclude that

17   Section 27 does give rise to jurisdiction here, then we would

18   acknowledge that venue is also proper in this district, but for

19   all the reasons we discussed earlier, the Supreme Court's

20   *Manning* decision demonstrates that there is no Section 27

21   jurisdiction.

22           Venue under 1391(e)(1) is relevant if we assume that

23   FINRA is a state actor, and what I was suggesting is that the

24   Court could assume that issue and still dismiss for lack of

25   venue because 1391(e)(1), if FINRA is a Government agency,

App.213

1    would give rise to venue only where the plaintiff resides, the

2    defendant resides, or the underlying events occurred, and none

3    of those three requirements is met here.

4          On state action, opposing counsel mentioned

5    traditional enforcement of the securities laws.  My point in

6    discussing that is that only if a private party is performing a

7    traditional and exclusive Governmental function would that

8    private party become a state actor, and as we've discussed

9    today, enforcement of the securities laws, regulation of the

10   transaction in securities and of the broker-dealer industry is

11   traditionally a private function that dates back to the

12   founding of this country.  There was no SEC until 1934.  So the

13   fact that Congress has delegated regulatory responsibility to

14   FINRA does not mean that it is performing a traditional and

15   exclusive Governmental function and thus does not mean that it

16   is a state actor.

17         Going back to the precedent pre-2007 --

18         THE COURT:  By tying up loose ends I do not mean to

19   permit you to repeat things you've already said, so is there

20   something new you want to say about that?

21         MR. TAYRANI:  Yes, Your Honor.

22         There are no amendments to the Exchange Act governing

23   national securities associations or self-regulatory

24   organizations post-2007 that would in any way call into

25   question the persuasive force and viability of the published

App.214

1   opinions from the Second, Third and Ninth Circuits that

2   concluded that NASD was not a state actor.  The regulatory

3   framework is the same.  The Exchange Act is the same.  And thus

4   the conclusion with respect to FINRA should be the same.

5           THE COURT:  Is the delegation or assumption of

6   authority by the SEC or FINRA respectively different?

7           MR. TAYRANI:  It is no different post-2007 from

8   pre-2007.  There are no amendments to the Exchange --

9           THE COURT:  Not statutory amendments or regulatory

10   amendments, I mean functionally and in actual operation, has

11   the SEC delegated more authority or allowed FINRA to assume

12   more authority?

13           MR. TAYRANI:  No, Your Honor.  Absolutely not.  Not

14   as is relevant to the issues we're discussing today.

15           To be sure, there are FINRA rules that are different

16   from NASD rules, but in terms of what we're talking about

17   today, enforcement and regulation and discipline of

18   broker-dealers, those powers are no different when we're

19   talking about FINRA than when we're talking about NASD.

20           THE COURT:  So the rules that have been promulgated

21   do not expand those rights and authorities?

22           MR. TAYRANI:  They -- they may impose different

23   rights and authorities in some respects on FINRA from NASD.

24           What I want to make clear is that they're not

25   identical, but they are materially the same for purposes of the

1  inquiry before this Court, which is the disciplinary
2  proceedings, the enforcement actions, the regulatory power that
3  is delegated to FINRA is no different in kind and no more
4  closer to state action than were the powers that NASD was
5  exercising.
6         So for all of those reasons, Your Honor, FINRA is not
7  a state actor and this Court should dismiss on one of any
8  number of reasons, including the absence of personal
9  jurisdiction, the absence of venue, and the failure of Alpine's
10 claims on the merits, all of which mean that Alpine does not
11 have a likelihood of success on the merits.
12        THE COURT:  On the venue issue, does the case you
13 cited counsel to dismiss or to transfer or either?
14        MR. TAYRANI:  I don't know, Your Honor, whether it
15 speaks to transfer.  The transfer statutes authorize you to
16 transfer in the interests of justice, that's the operative
17 standard.  We would submit that there is no reason to transfer
18 rather than dismiss.  It's in the interests of justice to
19 transfer where a plaintiff would be unable to refile,
20 for example, due to the expiration of the statute of
21 limitations.  That's not the case here.  Alpine is free to
22 refile in a jurisdiction that is appropriate.  There's no need
23 for this Court to make that decision for Alpine as to where
24 this case and these allegations should continue, if they
25 continue at all.

1          THE COURT:  And in regard to the Utah case, which

2     both parties seem to concede does not implicate res judicata,

3     it was dismissed with prejudice.  Do you just believe that was

4     in error?

5          MR. TAYRANI:  If it was a subject matter jurisdiction

6     dismissal, which I understand it to be, then it should not have

7     been a dismissal with prejudice.  A jurisdictional dismissal is

8     necessarily without prejudice.

9          THE COURT:  All right.

10          MR. TAYRANI:  And I would also note on res judicata,

11     Your Honor, that would not obviate the need to address personal

12     jurisdiction and venue, because it is a 12(b)(6) defense.

13          THE COURT:  Right.

14          MR. TAYRANI:  Thank you.

15          THE COURT:  Anything else?

16          MS. FRITZ:  Very briefly, Your Honor.  Thank you.

17          THE COURT:  Two minutes.

18          MS. FRITZ:  This issue of whether FINRA has developed

19     and changed, whether it is more of a state actor today than it

20     used to be, is in our Complaint.  We have alleged that that's

21     exactly what happened.  We've cited to commentators, including

22     former SEC commissioners, who have expressed concern about

23     exactly that.  This is an issue that needs to be aired, I would

24     argue.

25          Earlier the Court made mention of the possibility of

App.217

```
 1   an evidentiary hearing to consider -- so that the Court fully
 2   appreciates the relationship between FINRA and the SEC and what
 3   it is that FINRA does every day.  I would really encourage
 4   Your Honor to consider that, because this is an issue that has
 5   been alleged, it's an issue that has caused great concern among
 6   courts and commentators, and we would welcome the Court taking
 7   a hard look at what the true activities, conduct, relationship
 8   of FINRA is before deciding whether it's a state actor.
 9            THE COURT:  Thank you.
10            That can't be accomplished before May the 30th.
11            MS. FRITZ:  And we would ask that in the interim the
12   Court stay those proceedings so that these proceedings that are
13   considering these issues can go forward.
14            THE COURT:  What authority do I have to do that
15   beyond a temporarily restraining order, which requires all of
16   the standards that you know apply?
17            MS. FRITZ:  We think that we've satisfied those
18   standards.  We think the irreparable harm is clear.  There is a
19   likelihood of success.  We think jurisdiction exists.  All
20   we're asking is that the Court stay that proceeding so that
21   Alpine can survive long enough to litigate this case.
22            THE COURT:  Thank you.
23            All right.  The Court is going to take the matter
24   under advisement and issue a determination on the record that
25   has been presented here today, and we will do so forthwith.
```

1        Anything further?

2        We are dismissed.

3        MS. FRITZ:  Thank you.

4                    - - - - -

5           (Proceedings concluded at 4:58 p.m.)

6                    - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4   proceedings taken in a motion hearing in the United States

5   District Court is a true and accurate transcript of the

6   proceedings taken by me in machine shorthand and transcribed by

7   computer under my supervision, this the 31st day of May, 2023.

8

9

10                                  /S/ DAVID J. COLLIER

11

12                              DAVID J. COLLIER

13                              OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,**

      **Plaintiffs,**

**v.**                                              **Case No: 8: 22-cv-2347-MSS-TGW**

**FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.**

      **Defendant,**

**UNITED STATES OF AMERICA,**

      **Defendant-Intervenor**

_____

## <u>ORDER</u>

**THIS CAUSE** comes before the Court for consideration of Plaintiff Alpine Securities Corporation's ("Alpine") Emergency Motion for Preliminary Injunction ("Motion"), (Dkt. 45), the Response in Opposition thereto filed by Defendant Financial Industry Regulatory Authority, Inc. ("FINRA") (Dkt. 53), and the Reply to the Response in Opposition filed by Plaintiff Alpine. (Dkt. 59) On May 22, 2023, the Court held a hearing on the Motion. Upon consideration of the arguments made at the hearing, all relevant filings, case law, and being otherwise fully advised, the Court

hereby **TRANSFERS** this matter to the United States District Court for the District of Columbia.

## I.    BACKGROUND

Plaintiff Alpine is a broker-dealer. (Dkt. 43 at ¶ 28) Alpine's principal office is in Salt Lake City, Utah. (Id.) Alpine is also a registered member of and is regulated by Defendant FINRA. (Id.) Co-Plaintiff Scottsdale Capital Advisors ("SCA") is also a broker-dealer with its principal office in Scottsdale, AZ, and an office in the Middle District of Florida. (Dkt. 43 at ¶ 28) SCA is a registered member of and is regulated by FINRA. [1] (Id.) FINRA is a national securities association registered with the Securities Exchange Commission ("SEC") pursuant to Section 27 of the Securities Exchange Act. ("Exchange Act") (Id. at ¶ 30); see 15 U.S.C. § 78s. FINRA is a Delaware not-for-profit corporation with its principal place of business in Washington, D.C. (Id. at ¶ 31) FINRA is authorized under the Exchange Act to enforce provisions of the Exchange Act, the SEC's rules and regulations, and its own rules. (Id.) FINRA maintains offices and conducts business throughout the United States, including in the State of Florida. (Id. at ¶ 31)

On October 12, 2022, Plaintiffs Alpine and SCA filed a Complaint against FINRA, alleging that the structure and operation of FINRA violated the Constitution. (Dkt. 1) Thereafter, Plaintiffs filed an Amended Complaint on February 3, 2023, in response to Defendant FINRA's Motion to Dismiss. (Dkt. 27) On April 28, 2023, the

---

[1] Unlike Alpine, SCA is not seeking a preliminary injunction against FINRA.

App.222

Court granted Plaintiffs leave to file a Second Amended Complaint in light of a recent Supreme Court decision, <u>Axon Enterprise Inc. v. FTC</u>, 143 S. Ct. 890 (2023), which Plaintiffs alleged made it clear that this Court, a district court, had subject matter jurisdiction to hear their constitutional claims against FINRA. (Dkt. 43 at 4)

In the Second Amended Complaint, Plaintiffs reiterate their challenge to the constitutionality of FINRA and seek a declaration from the Court to "check FINRA's powers." (Dkt. 43) Specifically, Plaintiffs allege that FINRA claims to be a private corporation and self-regulatory organization ("SRO"), not subject to the limits of the Constitution, but it nevertheless wields massive governmental power and authority over the securities broker-dealer industry and the financial markets. (<u>Id.</u> at 1) Plaintiffs allege that FINRA's operation and its implementation of responsibilities delegated to it by the SEC and the Maloney Act violate the separation of powers; FINRA's hierarchy and its use of in-house tribunals violate the Appointments Clause; FINRA no longer functions as a "self" regulatory organization because it is no longer controlled by members of the industry; FINRA is a state actor but fails to adhere to the constitutional principles of due process and right to a trial by jury; and FINRA's mandatory membership requirement violates the First Amendment rights of broker-dealers who do not want to associate with FINRA, but are nonetheless compelled to do so. (<u>Id.</u> at 10-26)

Plaintiffs also contend that the unconstitutional hierarchy and structure of FINRA have harmed their members and investors, including Plaintiffs. (<u>Id.</u> at 26-27) Plaintiffs further complain that FINRA has unfairly targeted entities like them because

App.223

they operate in the microcap market industry. (Id.) Finally, Plaintiffs argue that
because "[t]he claims asserted in this case challenge the constitutionality of FINRA's
structure and operations," Plaintiffs' claims are "collateral to any administrative
proceeding involving Plaintiffs, any administrative review process, and the
administrative review structure set forth in Section 15A of the Exchange Act." (Id. at
7) According to Plaintiffs, "[t]he claims asserting constitutional violations are beyond
the expertise of FINRA and are appropriately before this Court." (Id.)

## II.    MOTION FOR PRELIMINARY INJUNCTION

On May 22, 2023, the Court held a hearing on Alpine's Emergency Motion for
Preliminary Injunction. By way of background, in March 2022, FINRA issued a
decision expelling Alpine from the securities industry after it alleged Alpine engaged
in conduct that harmed its customers and/or investors. (See Dkt. 53-1) Alpine
appealed that decision to FINRA's appellate tribunal, the National Adjudicatory
Council ("NAC"). The appeal is still pending. FINRA's March 2022 decision also
issued a permanent cease and desist order against Alpine, which ordered Alpine to
cease from engaging in the activity that led to its expulsion from the industry. (See
Dkt. 53-1) On April 19, 2023, five days after Axon was decided, FINRA filed an
Expedited Proceeding against Alpine, alleging Alpine had repeatedly violated the
permanent cease and desist order.[2] (Dkt. 53-2) The Expedited Proceeding is scheduled

---

[2] While an appeal to NAC operates as a stay of FINRA's initial decision until NAC issues a final
decision, "any such appeal . . . will not stay a decision, or that part of a decision, that imposes a
permanent cease and desist order." FINRA Rule 9311(b).

4

App.224

for May 31, 2023. (Dkt. 45 at 2) If successful in that Expedited Proceeding, FINRA

would essentially sidestep the NAC appeal and terminate Plaintiffs from membership

in FINRA, rendering them ineligible to continue to operate in the securities field.

While an appeal from the Expedited Proceeding is theoretically possible and could be

requested, FINRA has acknowledged that there is no statutory or regulatory authority

for automatically staying the effect of the expedited process. As such, Alpine seeks a

preliminary injunction to prevent FINRA from conducting the Expedited Proceeding

while the Court considers the constitutional claims raised against FINRA in the

Second Amended Complaint. (See Dkt. 43)

## III.   DISCUSSION

It is well established that a preliminary injunction is an "extraordinary and

drastic" equitable remedy that will only be granted if the moving party clearly shows

that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury

will be suffered unless the injunction issues; (3) the threatened injury to the movant

outweighs whatever damage the proposed injunction may cause the opposing party;

and (4) if issued, the injunction would not be adverse to the public interest." ACLU of

Fla., Inc. v. Miami-Dade County Sch. Bd., 557 F. 3d 1177, 1198 (11th Cir. 2009).

In its Motion for Preliminary Injunction, Alpine asserts that it has satisfied each

prong for injunctive relief. First, Alpine contends that it has a substantial likelihood of

success on the merits of its claims. Second, Alpine argues that it will suffer irreparable

harm absent an injunction because it could face immediate expulsion from the industry

and would be "subject to an unconstitutional administrative proceeding administered

App.225

by an unconstitutional administrative agency." (Id. at 23-24) Third, according to Alpine, FINRA will not suffer harm if an injunction is issued, and the public interest favors injunctive relief. (Id. at 24-25) FINRA also requests that the bond requirement be waived "given the constitutional rights at issue and the unique circumstances of this case." (Id. at 25)

In opposition, FINRA primarily addresses this Court's personal jurisdiction over FINRA. First, FINRA contends that the Court "lacks [specific] personal jurisdiction over FINRA [under Florida's long-arm statute] because there is no connection between Alpine's allegations and FINRA's Florida contacts." (Dkt. 53 at 1, 6-8) Concerning general personal jurisdiction under Florida's long-arm statute, FINRA contends that it is not subject to general personal jurisdiction in Florida because it is a Delaware corporation with its principal place of business in Washington, D.C. (Id. at 5-6) FINRA also argues that Alpine cannot establish that this Court has personal jurisdiction over it under 15 U.S.C. § 78aa because Alpine has not alleged any violations of the Exchange Act; rather, Alpine has only alleged constitutional violations. (Id. at 8-9) FINRA further contends that this Court cannot establish personal jurisdiction over it pursuant to 28 U.S.C. § 1391(e)(2) because FINRA is not "an agency of the United States." (Id. at 9)

Second, FINRA asserts that venue is improper in the Middle District of Florida because, "[u]nder the venue statute, this action should have been brought (if at all) in a judicial district where FINRA resides, 28 U.S.C. § 1391(b)(1), which is where FINRA is subject to personal jurisdiction, id. § 1391(c)(2)." FINRA further argues that

6

App.226

venue cannot be established under 28 U.S.C. § 1391(e)(1) because FINRA "is not an agency of the United States." (Id. at 11)

Third, concerning Alpine's constitutional claims, FINRA argues that all of Alpine's claims fail as a matter of law because FINRA is not a state/government actor subject to the limits of the Constitution. (Id. at 11-16)

Fourth, FINRA contends that Alpine's First Amendment claim, which FINRA believes is premised on the statutory requirement that broker-dealers are required to join a national securities association, fails "because [Alpine] identifies no constitutionally protected associational interest." (Id. at 16-17)

Fifth, FINRA argues that Alpine cannot demonstrate irreparable harm because FINRA's review process contemplates the ability of an aggrieved individual "to appeal any adverse decision to the SEC and seek an immediate stay." (Id. at 18)

Finally, FINRA contends that the equities and public interest favor FINRA because FINRA has a statutory duty to protect investors and the public interest. (Id. at 19-20)

In reply, Alpine argues, in somewhat of an about-face, that the exercise of personal jurisdiction over FINRA is proper because this case "arises under" the Exchange Act as it is both a suit "to enforce any liability or duty" created by the Exchange Act, and the rules and regulations thereunder, and a suit "to enjoin any violation" of the Exchange Act. (Id. at 3) (citing 15 U.S.C. § 78aa(a)) Furthermore, Alpine argues that its claims against FINRA "require the resolution of substantial issues under the Exchange Act." (Id. at 3) Alpine asserts that because FINRA cannot

7

demonstrate that litigation in this Court would be "gravely difficult and inconvenient," any due process concerns are satisfied, and this Court should exercise personal jurisdiction over FINRA pursuant to the Exchange Act. (<u>Id.</u> at 6) (citation omitted) Second, Alpine reasserts that jurisdiction is proper over FINRA pursuant to 28 U.S.C. § 1391(e)(2) because FINRA *is* a state actor, and thus, "an agency of the United States." (<u>Id.</u> at 7) Third, with respect to specific jurisdiction under Florida's long-arm statute, Alpine contends that "there is no requirement that a defendant's forum conduct directly give rise to a plaintiff's claims for specific jurisdiction to attach." (<u>Id.</u> at 8) (citation omitted) Instead, according to Alpine, "the focus is on the relationship among the defendant, the forum, and the litigation." (<u>Id.</u>) (citation omitted) Because FINRA has continuous and significant "unconstitutional" business activities that are directed from and that occur in Florida, Alpine asserts this Court may exercise specific jurisdiction over FINRA as it relates to Alpine's claims against it. (<u>Id.</u>) Fourth, Alpine reiterates that general jurisdiction over FINRA is proper, pursuant to Florida's long-arm statute, because FINRA is "essentially at home" in Florida. (<u>Id.</u> at 12-13)

Fifth, Alpine contends that venue over FINRA can be established under both the Exchange Act and 28 U.S.C. § 1391(e). Sixth, Alpine argues that if the Court finds that it lacks jurisdiction over FINRA, the action should be transferred to the District of Columbia in the interest of justice. (<u>Id.</u> at 14) Finally, Alpine argues that its claims of immediate, irreparable harm are not overstated because there is no certainty that the SEC will grant a stay in the event of an adverse ruling from the Expedited

Proceeding. (<u>Id.</u> at 15) In the interim, Alpine claims its business would be forced to shut down and it will suffer irreparable injury. (<u>Id.</u>)

Before the Court can issue a preliminary injunction, it must find that the exercise of in personam jurisdiction over a defendant is appropriate. <u>See</u> <u>JB Oxford Holdings, Inc. v. Net Trade, Inc.</u>, 76 F. Supp. 2d 1363, 1364 (S.D. Fla. 1999). ("Since it is axiomatic that a court cannot act without jurisdiction, <u>see</u> <u>Posner v. Essex Ins. Co., Ltd.</u>, 178 F.3d 1209, 1214 n. 6 (11th Cir.1999) (citing <u>Read v. Ulmer</u>, 308 F.2d 915, 917 (5th Cir.1962)), the court must first address the jurisdictional dispute").

As described above, Alpine asserts four bases for this Court to exercise personal jurisdiction over FINRA, including: (1) 15 U.S.C. § 78aa, (2) 28 U.S.C. § 1391(e), (3) Florida's long-arm statute under general jurisdiction and (4) Florida's long-arm statute under specific jurisdiction. (<u>See</u> Dkt. 45 at 14-17; Dkt. 59 at 1-13) The Court considers each of these bases in turn.

First, the Court finds that Alpine's claims do not arise under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Rather, by its own admission and by reference to the Second Amended Complaint, Alpine's claims are constitutional claims against the structure and operation of FINRA, collateral to any claims it seeks to bring against FINRA under the Exchange Act. (<u>See</u> Dkts. 43, 45) To the extent Alpine contends in its reply, (<u>see</u> Dkt. 59 at 3-6), and at argument before the Court, that it is raising claims under the Exchange Act, the Court finds those arguments unavailing. Because the district court has no subject matter jurisdiction to hear claims arising under the

App.229

Exchange Act, see Axon Enterprise v. FTC, 143 S. Ct. 890 (2023)[3], the Court need not address whether the Exchange Act confers personal jurisdiction over FINRA.

Second, Alpine has failed to establish the existence of general personal jurisdiction under Florida's long-arm statute. The Court finds that FINRA is not "at home" in the state of Florida. See Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011). FINRA is incorporated in Delaware and headquartered in Washington, D.C. and FINRA's presence in Florida does not constitute an "exceptional case" that can permit this Court to exercise general personal jurisdiction over it. See Waite v. All Acquisition Corp., 901 F.3D 1307, 1317-18 (11th Cir. 2018).

Third, this Court likely has no specific personal jurisdiction over FINRA. Florida's long-arm statute requires a plaintiff to first allege that a defendant has engaged in "any of [the] nine enumerated acts" under the statute. See Fla. Stat. § 48.193(1)(a); see also Skyhop Techs., Inc v. Narra, 58 F.4th 1211, 1223 (11th Cir. 2023). Next, a plaintiff must allege that the Florida statute's "connexity" requirement that at least one of the plaintiff's claims arises out of defendant's alleged improper act or acts has been satisfied. See Skyhop Techs., Inc., 58 F.4th at 1223. Alpine claims that FINRA "[o]perat[es], conduct[s], engage[s] in, or carr[ies] on a business or business venture" in Florida. See Fla. Stat. § 48.193(1)(a)(1). The Court agrees. However,

---

[3] FINRA may bring claims, arising under the Exchange Act or its own rules, against its members pursuant to FINRA's internal administrative review process. See FINRA Rule 9211. After receiving an Initial Decision from FINRA, an individual may seek an internal appeal to NAC, FINRA's internal appellate tribunal. See FINRA Rule 9311. After NAC issues its final decision, an individual may seek review of that decision from the SEC. See FINRA Rule 9370. After the SEC issues its final order, an individual "may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business." 15 U.S.C. § 78y(1).

Alpine's only path to establishing the connexity requirement would be to establish that the constitutional claims are viable and arise out of FINRA's acts in Florida. That would, in the first instance, require the Court to find that FINRA is subject to constitutional restraints – that it is a state/government actor. For the reasons that follow, the Court declines to reach this issue.

In this regard, as a final basis for this Court to exercise personal jurisdiction over FINRA, Alpine asserts that 28 U.S.C. § 1391(e) applies because FINRA is an "agency of the United States" that "resides" in the Middle District of Florida. 28 U.S.C. § 1391(e) states, in relevant part, as follows:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated . . .

28 U.S.C. § 1391(e)(1).

28 U.S.C. § 1391(c)(2), in turn, defines residency and provides that a defendant shall be deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." To determine whether 28 U.S.C. § 1391(e)(1) applies to FINRA, the court must determine the same threshold issue. Again, the Court would need to first determine whether FINRA is "an agency of the United States." 28 U.S.C. § 1391(e). This question, however, goes to the heart of the substantive matter that the Plaintiffs request this Court to decide. Is FINRA a state actor subject to the limits of the Constitution?

11

App.231

Although it is common for courts to resolve challenges to personal jurisdiction before addressing issues concerning venue, it is not mandatory. See Leroy v. Great W. United Corp., 443 U.S. 173 (1979). Instead, district courts may address venue applications at the threshold, "when there is a sound prudential justification for doing so," because "neither personal jurisdiction nor venue is fundamentally preliminary in the sense that subject-matter jurisdiction is." Id. at 180. Moreover, to address a venue challenge does not require a preliminary finding that "the transferring court has personal jurisdiction over the defendants." Goldlawr, Inc. v. Heiman, 369 U.S. 463, 465 (1962).

In Leroy, the Supreme Court found there to be a sound prudential justification to consider venue first because the "question [of] whether personal jurisdiction was properly obtained pursuant to the Texas long-arm statute [was] more difficult." 443 U.S. at 181. Here, the Court likewise finds it appropriate to determine the appropriate venue before deciding the personal jurisdiction question because the issue turns on "a question of constitutional law . . . not heretofore decided" by the Supreme Court or the Eleventh Circuit.[4] See id. As noted, in order to properly determine whether the Court has personal jurisdiction over FINRA in this matter, the Court must decide whether FINRA is a state actor. That question is inextricably interwoven with the merits of this case. Because no party disputes that personal jurisdiction would be

---

[4] Though the issue has been addressed in a few circuit courts, when pressed at the hearing, neither party could point to a reported, binding decision of a circuit court that resolves the issue. FINRA relies principally on unreported decisions or decisions pre-dating the formation of FINRA that address its predecessor, NASD, and decisions related to other private, self-regulatory entities.

appropriate in the District of Columbia, the Court addresses venue first. See Everlast World's Boxing Headquarters Corp. v. Ringside, Inc., 928 F. Supp. 2d 735, 741 (S.D.N.Y. 2013).

Upon examination of the venue issue, the Court finds that the interests of justice weigh in favor of a transfer of venue to the District of Columbia. Pursuant to 28 U.S.C. § 1404(a), the Court may, *sua sponte*, transfer a case to another district court where it might have been brought for the convenience of parties and witnesses and in the interest of justice. "There is a 'long-approved practice of permitting a court to transfer a case *sua sponte* under the doctrine of *forum non conveniens*, as codified at 28 U.S.C. § 1404(a) . . . .'" See Nelson v. Parker, No. 5:18CV264/MCR/MJF, 2019 WL 542115, at *2 (N.D. Fla. Jan. 9, 2019), report and recommendation adopted, No. 5:18CV264-MCR/MJF, 2019 WL 532265 (N.D. Fla. Feb. 11, 2019) (citing Tazoe v. Airbus, S.A.S., 631 F.3d 1321, 1336 (11th Cir. 2011)).[5]

The Eleventh Circuit instructs the Court to consider nine general factors in evaluating whether to transfer under § 1404(a): (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight

---

[5] In this case, all parties have been afforded an opportunity to address transfer, and all have agreed that, if the Court is not inclined to resolve the jurisdiction issue in their favor, they are amenable to being heard on the merits in Washington D.C. (Dkt. 59 at 14)

accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances. <u>Manuel v. Convergys Corp.</u>, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

The purpose of § 1404(a) is to "prevent the waste of time, energy and money to protect litigants, witnesses and the public against unnecessary inconvenience and expense." <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964) (internal quotation marks omitted). "When considering transfer . . . trial judges are afforded considerable discretion in weighing the criteria under 28 U.S.C. § 1404(a)." <u>Huntley v. Chicago Bd. of Options Exch.</u>, 132 F. Supp. 3d 1370, 1372 (N.D. Ga. 2015) (internal quotation marks omitted).

Here, the Court finds that this matter should be transferred to the United States District Court for the District of Columbia. First, as conceded by FINRA at the hearing, there is no question that it is subject to the personal jurisdiction of Washington, D.C. such that venue would lie pursuant to 28 U.S.C. § 1391. Second, all nine factors weigh in favor of transfer.

Plaintiffs challenge the constitutional operation and structure of FINRA. (Dkt. 45) But FINRA was not created in Florida, and FINRA has only one of its four regional offices located in Florida.[6] (Dkt. 59 at 14, n.9) Both parties admit that FINRA was incorporated in Delaware and is headquartered in Washington, D.C. As such, the

---

[6] FINRA's regional office is not located in the Middle District of Florida, but rather in Boca Raton, Fl, which is in the Southern District of Florida. (Dkt. 51 at 15, n.4.)

Court finds that any relevant witnesses or documents are likely to be located in Washington D.C., and the availability of process to compel the attendance of unwilling witnesses is likely to be accomplished more easily in Washington, D.C. See Manuel, 430 F.3d at 1135, n.1. Furthermore, because Washington, D.C., FINRA's principal place of business, is the likely forum where documents related to FINRA's structure and operation are located, it is clear that "the locus of operative facts" is likely to be in Washington, D.C.

While the Court recognizes that a plaintiff's choice of forum is accorded considerable weight in the § 1404(a) balancing test, the Court finds that the choice merits less deference under the facts of the instant case. At the hearing, Alpine could not articulate any injury it suffered in the state of Florida, relying instead on the ancillary injury it would sustain if its co-plaintiff were enjoined in the state of Florida. In that regard, although SCA has an office in Florida, its principal place of business is in Arizona based on the allegations of the Second Amended Complaint, and there are no further details provided concerning its connection with Florida. (See Dkt. 43) Simply put, "the lack of a strong, material connection to this district" prohibits Plaintiffs' choice from shifting the balance of factors in favor of this district. See Everlast World's Boxing Headquarters Corp. v. Ringside, Inc., 928 F. Supp. 2d 735, 748 (S.D.N.Y. March 4, 2013).

Although the Court declines to resolve the jurisdictional issues in this Order, Plaintiffs' admission that Washington, D.C. is an appropriate alternate forum for this matter to be heard also weighs in favor of a finding that transfer is appropriate. The

15

App.235

Court is confident that a district court in Washington, D.C. is more than adequately familiar with the law to hear a constitutional claim concerning the formation and function of FINRA as originally contemplated and as it has morphed over the years. Moreover, given the complexity of the personal jurisdiction issues which are bound up in the merits of this matter, the Court finds it prudent to defer ruling on the request for a preliminary injunction, allowing the primary decisional tribunal to address these questions in the context of a merits analysis. In sum, the Court finds that transfer to the United States District Court for the District of Columbia is appropriate.

## IV.    CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** that pursuant to 28 U.S.C. § 1404(a), this case shall be **TRANSFERRED** to the United States District Court for the District of Columbia for all further proceedings. Thereafter, the Clerk is directed to **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida, this 24th day of May 2023.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

16

1

```
              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA


   * * * * * * * * * * * * * * *
SCOTTSDALE CAPITAL ADVISORS,      )  Civil Action
and ALPINE SECURITIES              )  No. 23-1506
CORPORATION,                       )
     Plaintiffs,                   )
vs.                                )
                                   )
FINANCIAL INDUSTRY                 )  June 1, 2023
REGULATORY AUTHORITY, INC.,        )  2:02 p.m.
     Defendant,                    )  Washington, D.C.
                                   )
UNITED STATES OF AMERICA,          )
     Intervenor Defendant.         )
   * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES:**</u>


FOR SCOTTSDALE and ALPINE:
        MARANDA FRITZ
        521 Fifth Avenue, 17th Floor
        New York, NY 10175
        (646) 584-8231
        Email:  maranda@fritzpc.com

        BRIAN BARNES
        Cooper & Kirk
        1523 New Hampshire Avenue, NW
        Washington, DC 20036
        (202) 220-9600
        Email:  bbarnes@cooperkirk.com

        KEN TURKEL
        DAVID HAYES
        Turkel Cuva Barrios
        100 N. Tampa Street, Suite 1900
        Tampa, FL 33602
        (813) 834-9191
        Email:  kturkel@tcb-law.com


**(APPEARANCES CONTINUED)**

**APPEARANCES** (Continued):


FOR FINRA:       AMIR TAYRANI
                 ALEX GESCH
                 Gibson, Dunn & Crutcher
                 1050 Connecticut Avenue, NW
                 Washington, DC 20036-5306
                 (202) 887-3692
                 Email:  atayrani@gibsondunn.com


FOR INTERVENOR:
                 STEPHEN PEZZI
                 LESLEY FARBY
                 U.S. Department of Justice
                 Civil Division, Federal Programs Branch
                 1100 L Street, NW
                 Washington, DC 20530
                 (202) 305-8576
                 Email:  stephen.pezzi@usdoj.gov

                 CHRISTINE L. COOGLE
                 DOJ-CIV
                 Federal Programs Branch, Civil Division
                 1100 L Street NW
                 Washington, DC 20005
                 (202) 880-0282
                 Email:  christine.l.coogle@usdoj.gov



Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
                 Official Court Reporter
                 Washington, D.C.  20001



           Proceedings reported by machine shorthand.
        Transcript produced by computer-aided transcription.

3

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  Matter before the Court,

3     Civil Action No. 23-1506, Scottsdale Capital Advisors

4     Corporation, et al. versus Financial Industry Regulatory

5     Authority, Inc., United States of America,

6     intervenor-defendant.

7          Counsel, please come forward and state your names

8     for the record, starting with the plaintiffs.

9          MS. FRITZ:  Yes.  Good afternoon, Your Honor.

10          Maranda Fritz of Maranda Fritz, PC, for plaintiffs

11     Alpine and Scottsdale.

12          With me is Brian Barnes of Cooper & Kirk.

13          THE COURT:  Okay.  Good afternoon.

14          MS. FRITZ:  Also, Ken Turkel and David Hayes of

15     Mr. Turkel's firm.

16          THE COURT:  All right.  Welcome.

17          And for FINRA?

18          MR. TAYRANI:  Good afternoon, Your Honor.

19     Amir Tayrani from Gibson, Dunn & Crutcher for defendant

20     FINRA.  I am joined by my colleague Alex Gesch, also from

21     Gibson Dunn & Crutcher.

22          THE COURT:  Okay.  Good afternoon.

23          And for the intervenor?

24          MR. PEZZI:  Good afternoon, Your Honor.

25          Stephen Pezzi from the Department of Justice on

1    behalf of the United States as intervenor.  With me at

2    counsel's table today are Assistant Director Lesley Farby

3    and Christine Coogle.

4            THE COURT:  All right.  But Mr. Pezzi you are

5    going to be doing the speaking for the intervenor?

6            MR. PEZZI:  Yes, Your Honor.

7            THE COURT:  All right.  Good.

8            So let me just start by clearing up one of the

9    motions that's pending in front of me.

10           And just so the record is entirely clear, I did

11   request that the parties submit a proposed scheduling order

12   after conferral on Tuesday.  I was sort of hoping we'd, you

13   know, get sort of a wrapped up, expedited briefing schedule

14   to wrap the whole case up.  I was very much taken with what

15   happened in Judge McFadden's case, if you-all have seen

16   that, which was a similar kind of post-*Axon*.

17           There are only two or three reported decisions

18   post-*Axon*.  But it was one of the post-*Axon* decisions,

19   *Sidak*, where the parties wanted to resolve some of the

20   constitutional claims fairly expeditiously, agreed to an

21   expedited summary judgment schedule.  And so he was able to

22   wrap the whole thing up fairly quickly and not go through a

23   TRO, PI phase, then go through a motion to dismiss phase

24   and, potentially, a motion for summary judgment phase.  He

25   was able to do it.  That's sort of what I had in mind for

1    you-all.  That didn't work.  Maybe I should have been more

2    explicit.

3           But, in any event, I did deny the pending motions

4    that had been transferred here for a motion for a PI, motion

5    to dismiss because all of the briefing to me -- for me was

6    not particularly useful.  And I am far too busy a district

7    court judge to have to do research for parties who are very

8    well staffed, as I can see.

9           I was then confronted, on Tuesday morning, with

10   the plaintiffs' motion for reconsideration docketed at

11   ECF 65, and the renewed motion by plaintiffs for an

12   emergency motion for a preliminary injunction and TRO,

13   docketed at ECF 66, both of which motions are now fully

14   briefed.  And I want to just begin by resolving one of those

15   motions.

16          The motion for reconsideration I am granting so

17   that we can go straight to the merits of the emergency

18   motion for a TRO and PI.

19          I know that FINRA has characterized these motions

20   as transgressing the instructions of the Court's MO.  But

21   that memorandum -- that minute order denying without

22   prejudice the pending motions that were transferred to me

23   from the Middle District of Florida, after sitting on

24   another docket for over three weeks, didn't preclude anybody

25   from filing any motion.  And I did that purposely because

1      you all know the facts of the case and what the exigencies

2      are better than me, at least as of Friday before

3      Memorial Day weekend when I was traveling.

4             In any event, I do appreciate FINRA's comments on

5      the motion for reconsideration about requiring conferral

6      under our local civil rule 7(m).  But given the recent

7      litigation between the parties, I think we would be in

8      precisely the same point even if there had been a short

9      phone call.

10             I am not going to apply a different standard of

11      review on a motion for reconsideration or anything.  That

12      motion is granted.

13             Let's just get to the business in front of us,

14      which is this more substantive motion for injunctive relief.

15             So who is speaking for plaintiff because I have

16      got a few questions.

17             MS. FRITZ:  Thank you very much, Your Honor.

18             What we had hoped to do was, I would like to

19      address issues related to irreparable injury and the

20      underlying proceedings.  In fact, I have been counsel in

21      those underlying proceedings and will be --

22             THE COURT:  You got the afternoon off from the

23      FINRA proceeding today?

24             MS. FRITZ:  I can give the Court an update.

25             At my request, after the Court ordered an

1    emergency hearing, I communicated with FINRA and with the

2    hearing officer; told them that I would be traveling for

3    this hearing, and asked that they continue the hearing.

4    That led to yesterday, and into today, a series of

5    communications where FINRA very much sought to press ahead,

6    but the hearing officer decided to defer since the Court has

7    decided to weigh in on this.

8             The hearing has now been --

9             THE COURT:  I don't have much choice.

10            MS. FRITZ:  But we appreciate it.

11            THE COURT:  I don't know why that would have been

12   persuasive to an ALJ, when -- yeah.

13            MS. FRITZ:  So the hearing officer thought better

14   of pressing ahead with the FINRA proceeding and put it off

15   until Monday.  So that proceeding is still scheduled to go

16   forward on Monday morning.

17            THE COURT:  Okay.  So you are addressing

18   irreparable injury and the current state of the proceedings?

19            MS. FRITZ:  Yes.

20            THE COURT:  Okay.

21            MS. FRITZ:  Mr. Barnes will be addressing issues

22   relating to state action and likelihood of success

23   generally.

24            THE COURT:  Okay.  Well, I have a fairly orderly

25   logical mind, or at least I try to have that.  And for

1   preliminary injunction you have got to prove four factors,

2   likelihood of success on the merits, balance of equities,

3   favoring the preliminary relief, injunction of the public

4   interest, who will likely suffer irreparable harm.

5          So I think I am going to go in an order of

6   likelihood of success on the merits since the D.C. Circuit

7   remains a little bit undecided about whether they totally

8   will let go of the sliding-scale approach versus what most

9   of us view *Winter* is requiring, which is you have to have

10  sufficient proof on all four factors.

11         I don't know what the standard is in the Middle

12  District of Florida where you all were, but we're in a bit

13  of a --

14         MS. FRITZ:  I understand.

15         THE COURT:  -- state here in our circuit because

16  the circuit keeps, like, avoiding the issue of whether there

17  is still a sliding-scale approach on all of the factors

18  here.

19         But it just means that district court judges have

20  to address all of the factors, but likelihood of success on

21  the merits is the main one.  And even the circuit has said

22  if you don't win on that one, you really can't go forward.

23         So let's start with likelihood of success on the

24  merits.

25         MS. FRITZ:  I appreciate that.

9

```
 1              I do look forward, though, to talking with the
 2     Court later about some of the issues that we're up against.
 3              Thank you.
 4              MR. BARNES:  Good afternoon, Your Honor.
 5     I am Brian Barnes for Alpine.
 6              THE COURT:  Okay.  Just so I understand correctly,
 7     the relationship between Scottsdale Capital and Alpine --
 8     they're both subsidiaries of an umbrella company; is that
 9     right?
10              Or what -- are they both members of FINRA or --
11     what's their relationship?
12              MR. BARNES:  Alpine is a member of FINRA.
13              I would need to defer to my co-counsel as to the
14     specific corporate structure.
15              THE COURT:  Yeah.  Who is who here?
16              Yeah.  Go ahead.
17              MS. FRITZ:  Alpine is a clearing firm, a member of
18     FINRA.  Scottsdale is a broker-dealer affiliated through
19     ownership.  Each are owned by holding companies, and they
20     have a common parent above that.
21              THE COURT:  Okay.  But for my purposes, both are
22     members of FINRA?
23              MS. FRITZ:  Correct.
24              THE COURT:  Okay.  All right.
25              MR. BARNES:  Your Honor, I would like to started
```

```
 1    with state action.  I have a few points I would like to
 2    make, but also happy to answer questions at the outset if
 3    the Court --
 4              THE COURT:  Well, can I just start so that -- I
 5    want to make it absolutely clear that my understanding is
 6    correct about what you are seeking in the TRO today.
 7              And what you are seeking, as I understand it, is
 8    you want a delay in what I am calling the expedited
 9    enforcement proceeding.
10              Do I have that right?
11              MR. BARNES:  That's correct, Your Honor.
12              THE COURT:  Okay.  And you want that delayed until
13    when?
14              MR. BARNES:  Until the Court adjudicates the
15    merits of our constitutional claims.
16              THE COURT:  On the merits?
17              MR. BARNES:  That's correct.
18              THE COURT:  Meaning on the motion of dismiss.  And
19    if you survive motion to dismiss, all the way through to
20    summary judgment?
21              MR. BARNES:  That's correct.
22              So one way of thinking about this is we need a
23    TRO, basically, between now and Monday to prevent the
24    business, Alpine's business, from being basically terminated
25    by -- potentially by the expedited proceeding.
```

1          The Court could issue that TRO --

2          THE COURT:  Isn't -- well, excuse me.

3          Isn't that a little bit of hyperbole?

4          Because, as I understand it, from reading, I

5     think, FINRA's brief -- and I am going to get the two

6     arguments made by the government and FINRA confused on --

7     both of them were good, but one of the defendant --

8     defendant-intervenor or FINRA explained that this is hearing

9     that can go on for a number of days, then they're going

10    to -- the hearing officer is going to look at the evidence.

11         My understanding is that whatever decision comes

12    out of the expedited hearing isn't going to be ready for

13    weeks.  So aren't you saying that you only have until Monday

14    to live a little bit hyperbolic?

15         MR. BARNES:  It's not hyperbolic.

16         THE COURT:  Okay.

17         MR. BARNES:  And the reason it's not hyperbolic is

18    because we don't know when the hearing officer will rule.

19    The hearing officer could potentially rule from the bench,

20    in the same way that this Court can rule from the bench

21    today as to our TRO motion.  We just don't know.

22         My understanding is that, as a matter of practice

23    in the usual course, there would be a wait -- I think we

24    said in our brief -- of at least ten days, potentially,

25    somewhat longer than that.  We don't know when the decision

 1    will come.

 2         The problem -- the reason for the exigency is:

 3    When the decision comes, if it comes in the form of a cease

 4    and desist order that forces Alpine to immediately stop its

 5    business, then that is going to irreparably damage its

 6    customer relationships.  And there is not a process in place

 7    like we would have -- you know, if the Court denied our

 8    preliminary injunction motion, we could seek an

 9    administrative stay from the D.C. Circuit.  There is not an

10    analogous procedure with FINRA and the SEC.

11         And so there is no mechanism by which we can,

12    basically, prevent the hearing officer's -- if the hearing

13    officer issues an order that effectively forces Alpine to

14    immediately cease operations, then we're in a position where

15    we can't do anything other than immediately cease

16    operations.  I hope --

17         THE COURT:  I thought that you can appeal that.

18         MR. BARNES:  It's appealable.  But in the interim,

19    while the appeal is pending, we're obliged to comply with

20    the order.

21         THE COURT:  Well, this is one of the things that

22    is a little bit confusing because the original FINRA panel

23    issued a decision, March 22, 2022, as I understand it, that

24    is now on appeal before this body called the National

25    Adjudicatory Council.  And that March 2022 order ordered,

1    due to plaintiffs' found intentional and egregious

2    misconduct with a high likelihood of future violations,

3    expulsion of both plaintiffs from FINRA and a permanent

4    cease and desist order, plus a $4 million fine.  That is on

5    appeal.  That order is not really at issue in this TRO.

6           And what I understand the current expedited

7    proceeding is is to move up some of those penalties that you

8    would nonetheless face if the NAC -- is that what people

9    call it, the N-A-C --

10           MR. BARNES:  I believe so.

11           THE COURT:  -- NAC? -- well, I don't know the

12    lingo -- but the NAC affirms the underlying -- the March

13    2022 decision.

14           So is what is happening here is that if you -- if

15    you don't get this TRO, as soon as the NAC issues its

16    decision we're going to have another fire drill with you

17    running in saying now the NAC, you know, is going to -- has

18    affirmed this expulsion order with a cease and desist order

19    with the fine?

20           Are we going to go through another fire drill?

21           MR. BARNES:  I don't know the answer to that,

22    Your Honor.

23           THE COURT:  And what is confusing to me in terms

24    of -- it sort of bleeds into irreparable harm.  But, you

25    know, the penalty that you fear from the expedited

1    enforcement proceeding that is underway, but postponed until

2    Monday now, is in some ways exactly the same penalty you are

3    facing in the March 2022 order that is now on appeal.

4         MR. BARNES:  It is not in an important way.

5         So let me explain a nuance, as I understand it, of

6    FINRA penalties and procedures.

7         THE COURT:  And we do have a FINRA expert here who

8    can clarify, if necessary.

9         MR. BARNES:  My co-counsel regularly appears

10    before FINRA as well, and so she -- she may be able to

11    provide with more nuance here.

12         But, as I understand it, there is a difference

13    between different types of penalties that a FINRA hearing

14    officer can impose.  Some of those penalties are treated as

15    nonfinal until they are -- if there is an appeal to the NAC,

16    they're treated as nonfinal until the NAC resolves the

17    appeal.  Other of those --

18         THE COURT:  And that's what happened in March of

19    2022?

20         MR. BARNES:  Correct.

21         And other penalties that can be imposed by the

22    hearing officer, namely a cease and desist order,

23    immediately go into effect.  And the cease and desist order

24    that FINRA is seeking in the expedited hearing is a cease

25    and desist order that would immediately require us to give

1    up our registration, to no longer -- let me defer to my

2    co-counsel, if I may.  This really goes to --

3              THE COURT:  All right.  So before -- so perhaps I

4    do need you, Ms. Fritz, to explain this.  Because, as I am

5    looking at this, you have got a penalty that's on appeal

6    right now.  From FINRA's perspective, they issued a

7    permanent cease and desist order while they were also

8    reviewing expulsion.

9              MS. FRITZ:  The entire case --

10             THE COURT:  And as a consequence of what I

11   understand is more than 35,000 violations of the cease and

12   desist order by Alpine, FINRA initiated an expedited hearing

13   to move up the expulsion because the cease and desist order

14   was not being complied with.

15             MS. FRITZ:  And I understand, Your Honor, why --

16   why it could be viewed that way.

17             From Alpine's point of view, we went through a

18   19-day proceeding in the underlying case.  We presented lots

19   of evidence and lots of arguments.  There were very real

20   arguments about the way that FINRA was arguing that certain

21   fees that Alpine charged were unreasonable.  And they took

22   an approach that was very much contrary to any case law that

23   I have ever seen on fair and reasonable fees, including in

24   the utility case.  They really took an incredibly narrow

25   approach of:  If it's not a direct cost, then you can't

1    charge it.

2              So there were some very substantive disagreements

3    in terms of the economics of how a firm in Alpine's position

4    in the microcap sector, which is under extraordinary

5    pressure and scrutiny -- how that firm can properly set a

6    fee schedule that enables it to survive and to recover the

7    extraordinary costs that are associated with that --

8              THE COURT:  Well, I am not getting into the

9    economics of that.  I am not getting into the

10   appropriateness of fee schedules.

11             MS. FRITZ:  Right.

12             THE COURT:  I am not getting into the merits of

13   all of that.

14             Based on what you are telling me, a 19-day

15   hearing, real arguments, substantive ability to present your

16   evidence --

17             MS. FRITZ:  Right.

18             THE COURT:  -- you know, lots of discussion with

19   the ALJ, it makes me do puzzle about why you think you were

20   denied due process there.

21             But putting that aside, all I am looking at is,

22   you know, the beginning statement by Mr. Barnes that you are

23   facing death on Monday, when, in fact, it looks to me like

24   you have been facing death since March 22, 2022.

25             MS. FRITZ:  Theoretically.  But we --

1        THE COURT:  And they've just -- and because, from

2   FINRA's perspective, you haven't complied with the cease and

3   desist order, they're trying to move up the penalty you have

4   been facing for some time.

5        MS. FRITZ:  Okay.  The way that the FINRA's

6   decisions work, though -- the FINRA decision issued by the

7   initial hearing panel is, by definition, nonfinal, unless

8   and until on review it's affirmed.

9        THE COURT:  By NAC?

10        MS. FRITZ:  By the NAC.

11        For better or for worse, FINRA has insulated

12   itself with its own appellate tribunal, but at least there

13   is a review before that occurs, right?

14        We then go forward with the appeal.  On the

15   appeal -- on the underlying case and then on the appeal, we

16   have three panelists, not just a paid FINRA hearing officer.

17   At the underlying hearing, we had a hearing officer and two

18   panelist.  Likewise, on the appeal, we get to have non-FINRA

19   individuals who are hearing our review.

20        And during the course of that review, they were

21   certainly receptive -- certain members of the panel were

22   receptive to arguments that we were making regarding some of

23   the theories that FINRA had used in the underlying case.

24        As that went forward, FINRA was aware that certain

25   other charges were being imposed by Alpine.  And so, in the

1    cease and desist order that was initially issued, there is a

2    proper proportion of it that specifically identifies the

3    prohibited conduct, just like it should.  And so it says:

4    Do not charge the following fees.

5         Alpine did not charge the following fees.  But

6    FINRA was aware because there was testimony in the

7    underlying case that there were other fees --

8         THE COURT:  Okay.  We're getting into the merits

9    here.  I am not an ALJ.

10        MS. FRITZ:  Okay.

11        THE COURT:  So I think this is not helping --

12        MS. FRITZ:  All right.

13        THE COURT:  -- at all.  You're getting way into

14   the weeds of an underlying matter.

15        MS. FRITZ:  Okay.  Let me then --

16        THE COURT:  You haven't budged my perception that

17   you have been facing expulsion and a cease and desist order

18   since March 2022.  From FINRA's perspective, you have not

19   complied with the cease and desist order.  You may dispute

20   that, but that's their perspective.

21        They brought an expedited hearing to move up

22   expulsion because the compliance with -- for the cease and

23   desist order, from FINRA's perspective, hasn't worked.  From

24   FINRA's perspective, unreasonable fees and violations of the

25   Securities Act are being done by Alpine and the other

1    plaintiff and, therefore, they have had to expedite that

2    process.

3              And so it is not on Monday that you face the death

4    penalty -- I'm quoting you -- the corporate death penalty --

5    from your complaint, second amended complaint.

6              From my perspective, you have been facing that

7    since March 2022.

8              Okay.  So let me go back -- let me go back to

9    likelihood of success on the merits.

10             MS. FRITZ:  If I could explain the difference,

11   Your Honor, between the expedited proceeding that they just

12   started against us and why the characteristics of that

13   proceeding are stark and different than anything else that

14   we're facing because that's what happened.

15             We were -- we went forward --

16             THE COURT:  And if you get a different kind of

17   process, you get fewer ALJs, you get a different kind of

18   process at an expedited hearing.  That's also beyond the

19   purview of what I am going to deal with here.

20             MS. FRITZ:  But the reason that why we're -- we're

21   saying that this is the death penalty is:  Unlike any other

22   FINRA decision, if that hearing officer rules on expulsion

23   it is immediately effective.  Alpine will close without

24   having had the opportunity to get a decision on the

25   underlying appeal and without the ability to have that

1    decision reviewed.

2         It is not -- there is not this sort of semblance

3    of process that we have gone through and we're happy to go

4    through, in terms of appealing the underlying decision to

5    the NAC.  This is a very different, accelerated, single

6    hearing officer proceeding where violation of an

7    obey-the-law injunction -- because we didn't violate any

8    specific language -- violation of an obey-the-law provision

9    is going to be used to close the firm.  And we don't think

10   that this is a matter of concern over the actual fees that

11   were being charged.

12        FINRA has been fully aware of --

13        THE COURT:  Once the NAC issues its decision, you

14   can appeal that as well?

15        MS. FRITZ:  Yes.  It will be appealed.

16        THE COURT:  But a stay of the NAC affirmance, is

17   that an automatic stay pending any appeal that you may take

18   from a NAC decision or is that up to NAC, whether to stay

19   the decision or not?

20        MS. FRITZ:  It's not up to the NAC.  It's up to

21   the SEC.  We've talked --

22        THE COURT:  Because the appeals from the NAC go

23   directly to the Securities and Exchange Commission.

24        MS. FRITZ:  Right.  The last time -- when FINRA

25   went against Scottsdale last time, it took five years; but

1    the SEC did finally reverse all of FINRA's findings and

2    decisions against Scottsdale.

3              In the meantime, there was an effort -- an

4    application to stay certain bars [sic] that had been issued

5    by FINRA, affirmed by the NAC.  Ultimately, the commission

6    agreed to a stay, but it took months to get that.  It took

7    months.

8              It then took two more years before the commission

9    reversed every single finding and every single sanction.

10             THE COURT:  All right.  Well, let's go back to

11   you, Mr. Barnes.

12             MR. BARNES:  Your Honor, this is Brian Barnes

13   again, for Alpine.

14             THE COURT:  Yes.

15             MR. BARNES:  Just one thing, quickly, on the

16   colloquy with my colleague.

17             I would encourage the Court to take a look at

18   page 5 of the transfer order from the Middle District of

19   Florida.  There is a sentence in the Middle District of

20   Florida's decision there that says:  While an appeal from

21   the expedited proceeding is theoretically possible and could

22   be requested, FINRA has acknowledged that there is no

23   statutory or regulatory authority for automatically staying

24   the effect of the expedited process.

25             So we're here because if we lose at this hearing,

1    we'll immediately be forced to cease operations.

2                    THE COURT:  Okay.  So let's go to state actor

3    here.  The defendants argue that if I find FINRA is not a

4    state actor and doesn't perform state action during

5    enforcement proceedings, then plaintiffs constitutional

6    claims all fail.

7                    Do you agree with that contention?

8                    MR. BARNES:  Almost.  That's correct, with the

9    exception of the First Amendment claim.

10                    THE COURT:  And could you explain why the

11    First Amendment claim would survive --

12                    MR. BARNES:  Sure.  So --

13                    THE COURT:  -- would survive if you are not a

14    public actor?

15                    And that's because the nature of your claim is

16    that you're forced to belong to FINRA?

17                    MR. BARNES:  That's correct, Your Honor.

18                    The state action there is the provision of the

19    federal -- it's the federal statute that requires us to be a

20    member of FINRA, so that's the state action with respect to

21    the First Amendment claim.

22                    With respect to the other constitutional claims,

23    Your Honor is correct, my friends on the other side are

24    correct, we have got to win on state action in order to

25    prevail.

1          THE COURT:  Okay.  So this is sort of jumping

2     ahead a little bit to *Axon* which, you know, plainly held

3     that if there are constitutional claims to the structure and

4     authority wielded by an administrative enforcement agency,

5     those claims can come to district court.

6          Do you view that First Amendment claim as falling

7     within the scope of *Axon*?

8          I mean, in other words, do you think *Axon* -- are

9     you viewing *Axon* as applying to any and all constitutional

10    claims of any ilk coming to federal district court, first,

11    without any administrative exhaustion?

12         Or do you think that *Axon* is more limited to its

13    facts, at least in the majority opinion -- not talking about

14    the concurrences by Justices Gorsuch or Thomas -- to

15    constitutional claims going to the structure and authority

16    of an administrative agency?

17         MR. BARNES:  I guess what I would say, Your Honor,

18    is the --

19         THE COURT:  And if so -- if it's just a little bit

20    more limited than "any and all constitutional claims," would

21    this First Amendment claim that you are asserting here fall

22    within that?

23         MR. BARNES:  I think that the rule of *Axon* does

24    not apply to all constitutional claims, but I do think it

25    extends to our First Amendment claim.

1              One of the key things under *Thunder Basin* and *Axon*

2       that the Court should consider for purposes of deciding

3       which claims it has jurisdiction over here is whether it's

4       the sort of claim where we would benefit from having

5       exhaustion and, you know, the agency weighing in on the

6       merits of the claim before it's presented to a federal

7       Court.

8              This First Amendment claim -- fundamentally, the

9       First Amendment claim is directed at the constitutionality

10      of a federal statute that requires us to become a member of

11      this organization.  I don't know what we're going to get out

12      of the FINRA administrative process going up through the

13      Securities and Exchange Commission that will help the

14      federal courts adjudicate the merits of that claim.

15             THE COURT:  Okay.  And I have looked at all of the

16      briefs and some of the underlying cases, and I haven't found

17      any case that's held that FINRA is a state actor or any case

18      that's found either the New York Stock Exchange, which is

19      another SRO, or NASD, the predecessor to FINRA, was a state

20      actor.

21             Are there any such cases?

22             MR. BARNES:  There is not, to my knowledge, such a

23      case.  Let me tell you what my best case is --

24             THE COURT:  So you want me to be the first judge

25      in the country at any level to find that FINRA is a state

```
 1    actor?

 2              MR. BARNES:  That FINRA specifically is a state

 3    actor.  But let me -- let me talk about the D.C. Circuit's

 4    opinion in --

 5              THE COURT:  That's a stretch, right?

 6              MR. BARNES:  It's not.  Here is why it's not a

 7    stretch.  I have got three D.C. Circuit opinions that I

 8    think the Court should focus on.  Okay?

 9              So the first -- this is a case that's cited in a

10    footnote of the United States' brief.  I admit we did not

11    address this case in our briefing.

12              THE COURT:  Blount.

13              MR. BARNES:  The Blount case.  I don't -- I don't

14    know if the Court has had an opportunity to look at that

15    case yet.  But that's a case from the D.C. Circuit, 1995,

16    Judge Williams writing for the Court.  It's about the

17    Municipal Securities Rulemaking Board run by FINRA.

18              THE COURT:  Yeah.  But in that case -- it's very

19    different from FINRA.  I mean, the government -- you know,

20    the government agency put people on the board, they

21    controlled it in ways that are really absent here.

22              MR. BARNES:  Well, if we look at the --

23              THE COURT:  I thought that the distinctions that

24    the footnote in the government's brief drew were -- were

25    right on point.
```

1              MR. BARNES:  So a couple of points on that,

2     Your Honor.

3              First, let me try to make a step back and just

4     make an overarching analytical point, which is that it's a

5     mistake for us to focus solely on sort of this *Lebron*

6     framework about whether an entity is the government -- there

7     are two ways that we can have state action -- right? -- one

8     is if it's the government.  If it's the government, then the

9     Constitution applies, that's the end of the analysis, and

10    that's -- that's *Lebron*; the way the Supreme Court has

11    approached *Amtrak* in a couple of cases, also the Supreme

12    Court's decision in *Collins against Yellen.*  They say the

13    FHFA is a federal agency, it just is the government; and

14    they don't walk through the more elaborate state doctrine

15    analysis.  So that's one way that the Constitution can

16    apply.  But another --

17             THE COURT:  And that clearly is not applicable

18    here.

19             MR. BARNES:  There is another way, however,

20    Your Honor.

21             THE COURT:  You would agree that that is clearly

22    not applicable --

23             MR. BARNES:  I think we're -- I want to preserve

24    the argument that it is -- that it is applicable.  But my --

25    admittedly, my stronger argument is the state action

1    doctrine.

2         What the state action doctrine says, and -- you

3    know, a good illustration of this is the D.C. Circuit's

4    opinion in the *Peacock* case.  Xerox Corp is held to be a

5    state actor for purposes of its role in the District of

6    Columbia's administration of the Medicaid program.

7         Because of the role that Xerox Corp had, and

8    specifically because it was acting as an agent of the

9    District, it -- and its actions were subject to the

10   requirements of the Due Process Clause.

11        So if -- Your Honor is correct that the

12   distinctions from *Blount* that the United States points to,

13   that those would be important distinctions if I was only

14   standing only on a *Lebron*-type argument, but my principal

15   submission here is the state action doctrine.

16        I would encourage the Court to -- if you look

17   closely at the D.C. Circuit's opinion in *Blount*,

18   Judge Williams -- you know, he starts off by saying we put

19   to one side the board's questionable assertion that it is a

20   purely private organization because of those structural

21   features of this board that Your Honor referred to.  He says

22   we put those to one side.  And then he talks about my

23   principal argument, the state action doctrine.  And he says:

24   What is critical here is that the MSRB rule operates not as

25   a private compact among brokers and dealers, but as federal

1    law.  And he goes on to explain why that is.

2             It's because of two things about the way this rule

3    that was before the D.C. Circuit in this case operated.

4    One, is that in order to be a broker-dealer in municipal

5    securities, you have to be registered.  And two, he says if

6    you violate one of these MSRB rules, you can lose your

7    registration.

8             So he concludes:  As a government enforced

9    condition to any participation in a municipal securities

10   career, this rule constitutes government action of the

11   purest sort.

12            So the D.C. Circuit's opinion in -- with respect

13   to the MSRB, it doesn't rest on this *Lebron* framework.

14   Judge Williams is very clear; he puts that to one side at

15   the beginning of his discussion with this.  He goes on to

16   address my argument about the state action doctrine.

17            And the features of the MSRB that the D.C. Circuit

18   points to, those are the same as the features that we're

19   complaining about with respect to the FINRA -- the FINRA

20   enforcement proceeding we're talking about here today.

21            THE COURT:  But isn't it also correct that in that

22   case the MPSB [sic] -- if I've got that acronym correctly --

23   had a lot more involvement of hiring -- the government

24   officials, you know, hiring people onto the board, having a

25   lot more control over the board in ways that simply are

1   entirely inapplicable to FINRA, which is -- which doesn't

2   get government money, no government official has any role in

3   the hiring/firing decisions of any part of FINRA, FINRA

4   raises its own money.

5          I mean, I thought the MPSD [sic] was much, much

6   more closely -- here -- much more closely tied to the

7   government officials, which supported the finding there that

8   it, at least in some functions, was operating as a public

9   actor.

10         MR. BARNES:  We don't see those points being made

11  by the D.C. Circuit with respect to the MSRB.  I think the

12  points that the Court is making are really relevant to the

13  *Lebron* analysis, they're not -- but the same points that the

14  Court just made about FINRA could have been made about Xerox

15  Corp.

16         THE COURT:  Also, the MSRB was created by an act

17  of Congress.  I am looking at the footnote, I mean...

18         MR. BARNES:  Right.

19         THE COURT:  You know, FINRA was not created by an

20  act of Congress, which has far -- you know, much broader

21  language about professional associations and how they could

22  assist in setting up standards in complex markets and

23  essentially perceived a role for NASD, now FINRA, the

24  New York Stock Exchange, to help set out those standards,

25  educate people of the standards, enforce professional

1   standards, and then funnel cases that required -- where

2   FINRA has this private organization found violations of the

3   securities laws -- funnel them to the SEC basically the same

4   way that -- you know, we're all lawyers -- bar associations

5   operate, setting out professional standards, setting out

6   professional guidance, educational tools, having grievance

7   committees, regulating the bar.

8           And if, for example, a lawyer embezzles a client's

9   funds, you know, it's not just a violation of professional

10  ethics, but a bar association who finds it out, funnels, or

11  makes a referral -- sort of like an advisory opinion from

12  FINRA -- to the appropriate enforcement authorities.  In

13  that case it would be a criminal enforcement authority.

14          That doesn't make bar associations state actors

15  any more so than it makes FINRA by having -- being a

16  professional organization privately run, privately funded,

17  funneling referrals of more egregious violations of the

18  securities act to the SEC.

19          MR. BARNES:  And, Your Honor, I would submit that

20  the analogy to a bar association actually cuts our way

21  because --

22          THE COURT:  And how so?

23          MR. BARNES:  Well, if the Court thinks about the

24  disciplinary committee of a bar association, and, you know,

25  when the bar association announces an ethics rule and a

1    lawyer is accused of violating that ethics rule, there is a

2    line of Supreme Court precedent.  Think of Williams-Yulee,

3    think of *Sauder*, or about whether a bar association's ethics

4    rule runs afoul of the First Amendment; there is state

5    action there.  If the lawyer is going to be disbarred, the

6    lawyer gets the benefits of due process -- right? -- and

7    that's fundamentally what we're saying here.  They're the

8    same constitutional protections that would apply to a lawyer

9    before he's expelled from the profession; likewise, those

10   same sorts of constitutional protections ought to extend to

11   this situation.

12          So I think the Court is correct that a state bar

13   association is not a state actor for every and all purposes.

14   And that goes back to my point, that there are two ways that

15   we can prevail on the state action issue; one is this *Lebron*

16   path.  And I think the Court is making, you know, some

17   points about why perhaps that path isn't our strongest path

18   to victory.

19          But there is a second path -- right? -- which is

20   the path laid out in cases like *Peacock*, where Xerox Corp --

21   it doesn't have a congressional charter.  It's not funded by

22   the federal government.  It's not writ large controlled by

23   the federal government.  It nevertheless is a state actor

24   when it is acting as an agent of the District of Columbia in

25   its administration of the Medicaid program.

1      And there is -- there is a line of these Supreme

2    Court cases, Your Honor, about entities that everyone would

3    agree, for most purposes, are private -- are private

4    entities or private people but, nevertheless, their conduct

5    can be attributed to the government because they have some

6    connectivity with the administration or execution of the

7    law.

8      THE COURT:  Well, I know the D.C. Circuit hasn't

9    opined directly on whether FINRA is a public actor.  I mean,

10   I do think that in the *Springsteen* case, they referred to it

11   as a private entity.  I mean, they really -- and they,

12   basically, did a backhand to the argument there that it

13   was -- that it was -- you know, I think it was NASD that was

14   involved, or the predecessor to FINRA, was a public actor,

15   basically saying contested issue.  They weren't jumping all

16   over that like, well, that's a good issue we want to reach,

17   which the D.C. Circuit is usually not shy from trying to get

18   to.

19      So the D.C. Circuit hasn't decided this.

20   Jim Robertson, very well respected jurist on this bench, did

21   decide in *Graman v. NASD*, a 1998 case, you know, in a

22   very -- I thought very persuasively reasoned case that NASD

23   was not a state actor for, you know, all the reasons that he

24   sets forth there, that I don't think that the law he relied

25   on there or the factors he relied on there have been

1    modified in any way.  And it that hasn't -- it really hasn't

2    been an issue in this -- you know, that's occurred on this

3    Court.

4           I think post *Axon* -- oh, my goodness, I am waiting

5    for the flood.  This is probably just the beginning of what

6    we're going to be confronting among all the administrative

7    agencies doing -- performing adjudicatory or enforcement

8    actions across multiple federal agencies.  But we'll all get

9    up to speed, and maybe the D.C. Circuit will have many

10   opportunities to opine on all sorts of entities and whether

11   they're state actors or not.

12          But I find *Graman* very persuasive.  Why should I

13   not?  I know it's -- I know it's not binding, but I find it

14   very persuasive.

15          MR. BARNES:  Let me address that case directly.

16   That was a case about arbitration fees that FINRA's

17   predecessors imposed.

18          THE COURT:  Correct.

19          MR. BARNES:  It's a different analysis when we're

20   talking about the thing that is at issue in this TRO, PI

21   proceeding, or hearing, which is an enforcement proceeding.

22          So it's one thing for FINRA or the NASD to, you

23   know, set out a voluntary set of rules or a set of rules for

24   the industry with respect to, you know, arbitration fees

25   that are going to be charged.  But it's very different when

1    what we're talking about is FINRA coming in and, basically,

2    exercising prosecutorial discretion, deciding, you know, who

3    to accuse of violating its rules and then adjudicating a

4    dispute over whether the accused actually did violate the

5    rule.  That's a much -- that comes much closer to the core

6    of what this Court sees all the time in the form of disputes

7    over agency adjudication.  And just -- just in the same way

8    that it's, you know, a regular occurring thing for this

9    Court to hear cases about adjudication before some other

10   agency.  There is an ALJ, the fundamental requirements of

11   the Constitution apply, so too here.  You know, it's a --

12   this is a core exercise of executive power in a way that we

13   didn't have presented in that *Graman* case.

14           There is one another D.C. Circuit finding --

15           THE COURT:  Why do you say that?

16           There's been -- based on what I have read from the

17   briefs -- I mean, I haven't had much time since this has

18   been on my docket for only a couple days.

19           But from -- based on what I have seen in the

20   briefs, regulating these security markets, providing sort

21   of, you know, professional organizations that help enforce

22   standards, ethical rules, and so on is not a traditional

23   governmental function.  This has been a function that was

24   handled privately for years and years and years, perhaps

25   even before the creation of the SEC.

1          So why are you saying -- are you making -- are you

2    disputing that historical argument that both FINRA and the

3    government are relaying to me?

4          MR. BARNES:  I am disputing that, Your Honor.

5          There is another case I want to mention from the

6    D.C. Circuit, but let me talk about the public function

7    first since the Court is addressing that.

8          I think the mistake that the other side is making

9    in its historical analysis is it's focused on --

10          THE COURT:  And it's always dangerous when lawyers

11    do historical analysis.

12          MR. BARNES:  I don't disagree with that,

13    Your Honor.

14          But the mistake that they're making is they're

15    focused on too specific a level of generality.  And the

16    reason that it's a mistake to focus narrowly on the history

17    of, you know, private regulation of broker-dealers and

18    exchanges is because that ultimately turns the historical

19    analysis into really a question begging exercise.

20          Basically what FINRA is saying:  We have been

21    around for a long time doing this specific thing that the

22    plaintiff is challenging and, therefore, it's

23    constitutional.  I think the right --

24          THE COURT:  Let me ask you, just -- do you think

25    the New York Stock Exchange is also a public actor?

1         MR. BARNES:  It's certainly not a public actor

2   today.  The regulatory enforcement authority that the

3   New York Stock Exchange previously had now rests with FINRA.

4         THE COURT:  When the New York Stock Exchange still

5   had that function before it was transferred to FINRA, you

6   would say because it had that function over its members it

7   was a state actor.

8         MR. BARNES:  I would say when the New York Stock

9   Exchange was bringing an enforcement proceeding to expel a

10  member of the exchange for violating federal law, it was a

11  state actor.  It was not a state actor for all purposes --

12  and this goes back to my point that *Lebron* is not --

13        THE COURT:  But any private entity, whether it's,

14  you know, any kind of small business that finds an employee,

15  you know, embezzling or committing a violation of federal

16  law and fires that person and refers that person to law

17  enforcement, that person's acting like a state actor?

18        MR. BARNES:  No.  Obviously not.

19        THE COURT:  Because that -- that's what you are

20  saying.

21        MR. BARNES:  It's not what I am saying,

22  Your Honor, because --

23        THE COURT:  Then how is what you are saying any

24  different from that?

25        MR. BARNES:  Yeah.  The difference is that:

1    Unlike being dismissed by an employer for embezzlement,

2    here, if Alpine is expelled from FINRA, it can't engage in

3    the practice of being a broker-dealer anymore.  There is a

4    federal statute that requires Alpine to be a member of FINRA

5    in order to operate its business, so that's the difference.

6         You know, an employee who gets fired for

7    embezzlement, maybe it violates federal law -- it doesn't

8    matter, the employee can go get another job.  Right?

9         Here, it's not as though Alpine can just go on its

10   merry way, having been expelled from FINRA, and continue in

11   its business.  That's the difference.

12        THE COURT:  Okay.

13        MR. BARNES:  Let me say another word about the

14   public function, if I could, before the Court moves off of

15   that -- which is that the right level of generality to use

16   here is to ask:  Is it a public function to promulgate,

17   exercise -- promulgate rules, exercise prosecutorial

18   enforcement discretion, and adjudicate disputes for

19   violating federal law; that's the level of generality at

20   which the Court ought to be thinking about that public

21   function test.

22        You know, I hasten to add, the public function

23   test does not --

24        THE COURT:  Doesn't FINRA have other rules that

25   are not just federal statutory law but, also, lots of other

1    rules of conduct, rules of -- that it also enforces?

2              It's a far broader -- it has a far broader mandate

3    of enforcement than just violations of the securities law;

4    isn't that correct?

5              MR. BARNES:  Your Honor is right about that.

6              The point I would make in response is that FINRA's

7    rules themselves have the force and effect of federal law.

8              The best case I have for that proposition is an

9    Eleventh Circuit case, the *Bandimere* case; I think it's

10   cited in some of the briefs, where the Eleventh Circuit said

11   that.  And --

12             THE COURT:  And that's why -- that's why you filed

13   this in the Middle District of Florida to begin with,

14   because you wanted the benefit of that Eleventh Circuit law?

15             MR. BARNES:  Your Honor, I actually think that the

16   law in the D.C. Circuit is better.

17             I have got the *Blount* case, and I have got another

18   case I want to mention, if I may, which is the -- *NASD*

19   *versus SEC* case, the 2005 decision from the D.C. Circuit.

20             Your Honor referred, a few minutes ago, to another

21   case in which the D.C. Circuit called the NASD a private

22   entity.  But in *NASD versus SEC* it characterized FINRA's

23   predecessor as a quasi-governmental entity.  And there is

24   some really important language in that opinion that -- I

25   think if you -- if the Court puts that opinion alongside the

1    *Peacock* decision -- and just as a reminder of *Peacock*, in

2    the D.C. Circuit opinion it says agency -- you know, it

3    distills some of these state action cases we have been

4    talking about.

5          And it says:  Agency is one of the ways that you

6    can establish state action.  Xerox is an agent of the

7    District of Columbia, therefore, Xerox is -- when it acts as

8    an agent of the District, it's a state actor.

9          THE COURT:  So let's just -- so if you prevail

10   here, if you get this Court and the D.C. Circuit to agree

11   with you that FINRA is a state actor, what happens next?

12   What happens next?

13         MR. BARNES:  Yeah.  Not a lot.

14         THE COURT:  Oh, you think?  Not a lot?

15         MR. BARNES:  Here is the reason why --

16         THE COURT:  What happens next?

17         Does every single person globally, who is a

18   brokered-dealer member of FINRA, who is facing any kind of

19   enforcement action, hightail it to this court filing some

20   kind of constitutional claim to stop the enforcement

21   proceeding?

22         Is it going to put broker-dealers -- is this going

23   to -- is that going to be like a big flag to broker-dealers?

24   Rules are off?  You can get a delay in enforcement?

25         What happens next?

1    MR. BARNES:  Not at all, Your Honor.  And the

2   reason is because the remedy -- and, you know, I point to

3   *Free Enterprise Fund*, *Collins versus Yellen*.  The remedy for

4   the structural constitutional claims that we're bringing is

5   severance.  It's a ruling that, you know, henceforth the

6   leadership at FINRA is subject to -- you know, can be

7   appointed by the SEC and subject to supervision by --

8    THE COURT:  So it would require much more

9   involvement of the SEC and the executive branch with FINRA

10  to control FINRA?  Is that what you are saying?

11    MR. BARNES:  That's right.

12   And once --

13    THE COURT:  In what way?

14   Would it require government funding then also?

15    MR. BARNES:  Yeah.  So it would depend on which of

16  the claims we prevailed on.  So let's -- let's just take the

17  Appointments Clause claim, for an example.

18    If we prevailed on that claim, then we would get a

19  declaration that -- I suppose we would get a declaration

20  then that the commissioners at the SEC have to select -- or

21  some department, you know, the President, a federal judge,

22  or some head of a department under the Appointments Clause

23  has to --

24    THE COURT:  We are really busy.  We really don't

25  have time to be doing that --

1          MR. BARNES:  Well, under this statutory regime, it

2     would be the commission.  So the commission gets to appoint

3     the leadership at FINRA, the commission gets to appoint the

4     hearing officers at FINRA, that's -- that's the remedy.  And

5     once that remedy is in place, then everything goes forward,

6     right?  So there is not like some permanent disabling of

7     these procedures if we prevail ultimately on a claim.

8          The issue is that until that remedy is in place

9     and there is a hearing officer and FINRA leadership that

10     is -- holds their positions in conformity with the

11     requirements of the Appointments Clause, the hearing offends

12     [sic] the Constitution, and it can't go forward.  So that --

13          THE COURT:  So having the SEC commissioners get

14     much more involved than they currently are in FINRA board

15     management, and so on, that would solve your Appointments

16     Clause constitutional issue, and possibly your separation of

17     powers -- probably your separation of powers claim.

18          But what about your Seventh Amendment and your

19     Fifth Amendment claim?

20          MR. BARNES:  So the Fifth Amendment claim, I

21     think, is totally unproblematic as a practical matter.

22          THE COURT:  Is totally what?

23          MR. BARNES:  Unproblematic.  And the reason is

24     because all that would require is the provision of

25     procedural due process.  You know, I think --

1          THE COURT:  Which you already have ample of since

2     I was just -- Ms. Fritz just described the 19-day hearing

3     with real arguments and evidence presented and substantive

4     differences aired and resolved by a neutral panel.

5          So your Fifth Amendment, you think, once you

6     satisfy your Appointments Clause and your separation of

7     powers clause, that's really already taken care of?

8          MR. BARNES:  Well, I think in the -- in the

9     main -- well, to be honest, Your Honor, I don't know.  I

10     don't know.  You know, I would defer to my co-counsel about

11     the way these FINRA proceedings in practice often operate.

12          One thing I would point out about the

13     expedited procedure --

14          THE COURT:  And what about your Seventh Amendment

15     claim?

16          MR. BARNES:  So the Seventh Amendment claim would

17     mean that FINRA could no longer adjudicate disputes that

18     would be subject to that Seventh Amendment right.  I think

19     that's true --

20          THE COURT:  Right.  Exactly.  No more

21     adjudication.

22          So what happens to all of the adjudications that

23     FINRA does now?

24          MR. BARNES:  It's not no more adjudication,

25     Your Honor.  It's the same amount -- adjudication of the

1    same kinds of claims that an ALJ at the SEC can adjudicate.

2    An ALJ at the SEC can't adjudicate a claim --

3            THE COURT:  So how do you satisfy your right to a

4    civil jury trial?

5            MR. BARNES:  Well, my understanding of this, Your

6    Honor, is there are certain types of claims that can't be

7    adjudicated by an administrative law judge because there's a

8    right to a trial by jury.  So if you have a claim for

9    damages that sounds in fraud -- as I understand it, under

10   Supreme Court precedent, that's a claim that's got to come

11   here to federal court.

12           THE COURT:  So how many of the FINRA enforcement

13   proceedings to your mind, based on your experience, sound in

14   fraud that FINRA would no longer be able to adjudicate and

15   would have to come to federal district court across the

16   country?

17           MR. BARNES:  And to be clear, it's not just --

18   it's not all claims that sound in fraud.  It would be claims

19   that sound in fraud where there is a request for damages, as

20   I understand it.  I'm a little bit --

21           THE COURT:  Yes.  The Constitution says like $20,

22   so I think that's it's pretty much, yes, a civil claim.

23           MR. BARNES:  So an ALJ -- FINRA or an ALJ -- any

24   administrative law judge can hear a claim for fraud as long

25   as there is not a request for damages, right?

1      So, you know, again, if we think about the ALJs

2   and the Securities and Exchange Commission, they're subject

3   to the same kind of handcuffs that we're talking about here

4   that we're asking the Court -- we think the Constitution

5   requires that the Court impose on FINRA.

6          THE COURT:  So one of the consequences, though, if

7   FINRA is found to be a state actor, and they are then

8   subject to the Seventh Amendment restrictions to the --

9   whatever those may be, that some parts -- some kinds of

10  adjudications that they do now could not be done within

11  FINRA?

12         MR. BARNES:  That's correct, Your Honor.

13         THE COURT:  You just -- we don't know clearly what

14  percentage, how many would then flood district courts?

15         MR. BARNES:  My co-counsel may be able to address

16  that.  I simply don't know the answer.

17         I guess one thing I'd note about the statutory

18  regime with respect to the Securities and Exchange

19  Commission and the claims that it adjudicates through its

20  ALJs is, as I understand it, typically the commission has a

21  choice about whether it wants to proceed in federal court or

22  proceed before an ALJ.  Presumably, that choice, in some

23  instances, is dictated by the Seventh Amendment issue that

24  we have been discussing.  I don't think that's an

25  unreasonable burden to impose on this other -- this other

1    aspect of enforcement of the securities laws.

2            THE COURT:  And if I find FINRA to be a state

3    actor, what effect, if any, does it have on your

4    First Amendment claim?

5            MR. BARNES:  I don't think it has any effect on my

6    First Amendment claim.  My First Amendment claim, the state

7    action there is not anything that FINRA did, it's the

8    federal statute that requires Alpine to join -- to join

9    FINRA.

10            If I may, Your Honor, I just want to return

11    briefly to this *NASD versus SEC* case from the D.C. Circuit.

12            The Court there -- the pincite that I just urge

13    the Court to take a look at is pages 806 to 807.  The Court

14    quotes favorably from a Senate report when it's, you know,

15    describing FINRA's overall role.  And it says:  The

16    self-regulatory organizations exercise authorities subject

17    to SEC oversight -- here is the key sentence -- they have no

18    authority to regulate independently of the SEC's control.

19    They have no authority to regulate independently of the

20    SEC's control.

21            Put that description of FINRA's predecessor, the

22    NASD, no authority to regulate apart from the SEC's control,

23    next to the *Peacock* case that says that:  An agency

24    relationship is enough to establish state action.

25            If FINRA is under the SEC's control, as the

1    D.C. Circuit is saying about the NASD in this case, then

2    there is an agency relationship there.  And under *Peacock*,

3    if there is an agency relationship, there is state action.

4            So I just want to be really clear that, at least

5    for purposes of this PI, we're not asking the Court to rule

6    on, sort of, the grand question of -- in everything that

7    FINRA does and every situation, and all of its activities,

8    is it a -- is it the government or not?

9            We're narrowly focused on this expedited

10   proceeding, and at least when there is an enforcement

11   proceeding.  You know, that's what the D.C. Circuit is

12   addressing in this NASD case.

13           When there is an enforcement proceeding, the

14   D.C. Circuit is telling us that FINRA's predecessor is

15   subject to SEC control, that establishes an agency

16   relationship; under *Peacock*, that means there is state

17   action.

18           THE COURT:  I haven't focused on that case, but

19   that is different from how other courts who have looked at

20   the NASD, or FINRA, have viewed the SEC's involvement in its

21   rules and the appeal process where, basically, FINRA gives

22   an advisory recommendation to the SEC, which the SEC does a

23   *de novo* review and can accept or not.  To me, that looks

24   like a funneling of all of the different things that FINRA

25   looks at, in terms of its rules and its regulations,

1    including violations of securities laws to decide which ones

2    need to be referred to the enforcement agency.

3         To me, that's a responsible professional

4    organization, not necessarily a public -- and that

5    cooperation with an enforcement agency, including ensuring

6    that the processes it uses or the rules it's enforcing are

7    of sufficient assistance to the SEC, that the SEC has

8    reviewed them and approved them; it's a symbiotic, you know,

9    relationship between a private entity and the SEC.

10         I haven't looked at *NASD versus SEC*, this case, to

11   see what is there that would change that framework for, I

12   think, how Congress has envisioned FINRA to be operating.

13   And I want a lot more information about the consequences of

14   what you are urging this Court to adopt, which is not before

15   me in any of the briefing papers before I buck unanimous

16   authority -- unanimous authority of every court to have

17   considered this issue and found that both NASD and FINRA are

18   not state actors.

19         Okay.

20         MS. FRITZ:  Your Honor, may I?

21         THE COURT:  Let's -- no.

22         Let me just move on.  I am going to get to you

23   before we get to -- I am looking at the Supreme Court, also,

24   in *Free Enterprise Fund*, which -- there was this line that

25   the defendants pointed out that the plaintiffs did not from

1  *Free Enterprise Fund*, where the Court said that the PCAOB

2  was unlike, quote, the private self-regulatory organizations

3  in the securities industry, such as the New York Stock

4  Exchange, making it clear that they viewed SROs -- a new

5  term I have learned from the briefing in this case, which is

6  FINRA, which is the New York Stock Exchange, which was

7  NASD -- are not public actors.

8          So how do you get around that -- you know, none of

9  it is directly on point, but that's the closest on point

10  statement from the Supreme Court about how these -- these

11  cooperative relationships between incredibly important

12  regulatory -- self-regulatory organizations assist the

13  enforcement agencies --

14          MR. BARNES:  What the Court is --

15          THE COURT:  -- without being converted into state

16  actors.

17          MR. BARNES:  Sure.  And what the Court is talking

18  about when it makes those points in *Free Enterprise Fund* is

19  a *Lebron*-type of categorical analysis.  It's saying:  We

20  don't need to get into the more nuanced questions about

21  entwinement, nexus, public functions with respect to the

22  PCAOB because it just is the government -- right? -- and

23  that's the same type of analysis we see with respect to

24  Amtrak; it's the same type of analysis we see with respect

25  to the FHFA and *Collins versus Yellen*.  That's what the

1    court is saying.

2              The PCAOB just is the government.  Unlike an SRO

3    that has this -- I'm quoting the D.C. Circuit's opinion in

4    NASD -- quasi-governmental status.  You know, that's a 2005

5    opinion by Judge Edwards for the D.C. Circuit.

6    Quasi-governmental is the term that the D.C. Circuit uses to

7    describe FINRA's predecessor.

8              The Supreme Court is saying in *Free Enterprise*

9    *Fund*, unlike these quasi -- you know, perhaps

10   quasi-governmental entities that are SROs, that the PCAOB

11   just is the government and so, you know, they don't need to

12   go down the path -- this other path that I have been talking

13   about this afternoon of these state action doctrine

14   inquiries.

15             THE COURT:  I think saying private self-regulatory

16   organizations in the securities industry, such as the

17   New York Stock Exchange, is pretty clear that they view it

18   as a private actor, not a public actor and a state actor.

19             MR. BARNES:  Your Honor, this issue is clearly not

20   before the Supreme Court in *Free Enterprise Fund*.  I would

21   be shocked if there was a brief before the Court that

22   addressed this in any way.  And so to take that language and

23   rip it out of context and say that that is dispositive of

24   this issue I think is just really wrong.

25             THE COURT:  All right.  Okay.  What else do you

1    want to tell me?

2          MR. BARNES:  I have got one more point,

3    Your Honor, if I may.

4          The Supreme Court's most recent pronouncement on

5    the state action doctrine, *Manhattan Community Access*

6    *against Halleck* at the beginning and, then again, at the end

7    of the discussion of the various tests and standards that

8    the Supreme Court has used about state action over the

9    years, the Court identifies -- it takes a step back and it

10   asks:  What is the point of the line that we're drawing here

11   in trying to denominate some things as state action and some

12   things as not?

13         And what the Court says is the overarching purpose

14   of this doctrine is to protect individual liberty and to

15   protect free enterprise.  And the court says:  We don't want

16   to attribute state action to too many entities; we don't

17   want to go too far of expanding the scope of when the

18   Constitution applies because that would trample upon

19   individual liberty and free enterprise, the ability of

20   people to get together and organize themselves how they want

21   and do what they want, even if the Constitution wouldn't

22   otherwise permit it, if it was the government doing it.

23         And if we think about that overarching purpose of

24   this line-drawing exercise that we're engaged in -- you

25   know, individual liberty, look at what the other said says

1      in response to our first amendment defense.

2            They say:  We are not engaged in any expressive

3      activity, we don't -- you know, we're not out there speaking

4      on the issues of the day.  So, you know, forcing somebody to

5      be a member of our organization doesn't offend the First

6      Amendment.

7            But that same argument, if we think about it

8      through the prism of the state action doctrine -- you know,

9      how does it offend individual liberty to attribute FINRA's

10     actions to the government?  It doesn't.

11           So too with respect to *Free Enterprise.*  If we

12     think about the other side's response on our private

13     nondelegation argument.  They say, you know, look at all of

14     the stuff that the SEC does to control what FINRA does; it

15     has the authority to amend FINRA's rules; it reviews

16     *de novo*, the enforcement actions FINRA brings.  You know,

17     this is just a shadow Securities and Exchange Commission

18     that is doing what the Commission wants it to do.

19           You know, that's all well and good as a defense to

20     our private nondelegation argument.  But, again, if we think

21     about it through the prism of what the Supreme Court is

22     telling us in *Halleck*, this whole state action doctrine

23     line-drawing exercise is about, how does it promote free

24     enterprise to, you know, not treat FINRA as a state actor

25     when FINRA, you know, by the defendant's own submission is,

1    you know, doing the things that it does with all of this

2    oversight under -- per the D.C. Circuit under the control of

3    the SEC?

4         So I guess that's -- that's the last point I want

5    to make, Your Honor.  The office of this doctrine, according

6    to the Supreme Court's most recent pronouncement on the

7    state action doctrine -- the underlying purpose of the

8    line-drawing exercise -- it's not furthered by not treating

9    FINRA the same way we would treat an ALJ in the -- in the

10   Securities and Exchange Commission or an ALJ in any other

11   federal administrative agency.

12        And so that -- that's my last pitch, Your Honor,

13   for why we think there is state action here.  I am happy to

14   answer any other questions that the Court has for me.

15        THE COURT:  No.  I think I am going to move on to

16   the irreparable harm.

17        MS. FRITZ:  Thank you, Your Honor.

18        I wanted to just step back for a moment.

19        The Court, in the last few minutes, has used the

20   words "funneling" and "referral" in relation to activities

21   of FINRA, and I am very struck by that.  I have been doing

22   this work now since -- I was a prosecutor in New York in the

23   '90s and then, since then, have been essentially doing this

24   work.

25        When I first began to interact with the NASD, it

1    was a collaborative organization.  It worked closely with

2    the members of the industry.  As a matter of fact, its motto

3    was:  Protecting the interest of its members; and that was a

4    very different organization than now exists in the last 20

5    years.

6           Your Honor seems to be assuming that if FINRA sees

7    a violation of the federal securities laws, for example,

8    that it would refer that.  And that would make perfect

9    sense, and that would be an appropriate, sort of, respect

10   for the agency itself that is responsible for the

11   enforcement of the securities laws, but that's not what

12   happens anymore.

13          In the underlying Scottsdale case, the entire case

14   had to do with the argument made by FINRA that Scottsdale

15   had violated Section 5 and the registration requirements,

16   and that case illustrates the problem.  It took five years;

17   but the SEC, when it finally reviewed the case, said to

18   FINRA and the NAC:  You don't even have the right standard.

19   You are not employing proper Section 5 standards.

20          They, FINRA, have taken on the mantle.  It's in

21   their website -- it is all over the place -- that they are

22   aggressively enforcing --

23          THE COURT:  I'm sorry.  But what difference does

24   that make?

25          I mean, all that means is the SEC said:  You are

1    referring this matter to us and we don't agree with your

2    recommendation, and there you go.

3              MS. FRITZ:  It's a very different --

4              THE COURT:  I am not sure what your point is.

5              MS. FRITZ:  Because FINRA now believes that it can

6    enforce the federal securities laws just as -- and we put

7    this in the complaint, former commissioners are saying:

8    FINRA is now a deputy SEC.  That is what it is.

9              So why can it do what the SEC cannot do?

10             The SEC cannot deprive individuals of liberty or

11   property without due process.  The SEC could not shut down

12   this firm without abiding by the Constitution, whether it's

13   the way their ALJs are appointed or basic procedures

14   involved in that process.

15             FINRA can only act based on delegated authority

16   from the SEC.  If the SEC cannot do it, how then can FINRA

17   deprive individuals of the rights they would have if the

18   exact same Section 5 claim were made by the SEC.  We would

19   have actual rights.

20             That brings me to the difference between the

21   proceeding that we have been involved with at Alpine and the

22   one that we are facing next week.

23             THE COURT:  How is it that you -- how is it that

24   you say that FINRA has delegated authority from the SEC?

25             MS. FRITZ:  So FINRA acts only pursuant to

1    authority delegated to it by the SEC.

2            The SEC could not say out loud that:  While we

3    can't prosecute or pursue a Section 5 violation without

4    adherence to the U.S. Constitution -- right? -- you can do

5    that.

6            They cannot confer on FINRA power that they don't

7    have and they don't have the power to simply look at us in

8    every proceeding, every day, and say:  We don't have to

9    abide by the Constitution.

10            It's a very, very troubling thing to hear that,

11    Your Honor, in these proceedings over and over again.

12            I don't see why --

13            THE COURT:  Let me go back to timing here, I mean,

14    because either you or Mr. Barnes said this hearing officer

15    on the expedited hearing can issue an oral decision and he

16    doesn't have to make a recommendation to the NAC.

17            I understand from FINRA's briefing that the

18    hearing officer has 21 days from the final day of the

19    hearing to draft a proposed decision citing a FINRA rule;

20    then that proposed decision has to go to FINRA's NAC, which

21    has 21 days from when it receives the hearing officer's

22    proposal to decide whether to call for review of the case.

23    And if there is no review, the hearing officer can then

24    issue the decision immediately.

25            And if -- it says a "subcommittee," but maybe it

1    means the NAC, chooses to review, then it has 60 days to

2    make a recommendation to the NAC from the call for review.

3              Isn't that the expedited process you are involved

4    in now?

5              MS. FRITZ:  It is.  I can tell you what the actual

6    reality is.

7              The reality is the hearing officer can take as

8    long as 21 days to issue a decision, but can do it as

9    quickly as he pleases.  The NAC --

10             THE COURT:  And then, once the hearing officer

11   issues a decision, isn't that just a proposed decision that

12   has to go to the review subcommittee of the NAC?

13             MS. FRITZ:  The NAC subcommittee simply looks at

14   it and says yea or nay, are we calling it for review?  And

15   that can occur in any --

16             THE COURT:  Okay.  So the hearing officer doesn't

17   just issue a decision that goes into effect immediately when

18   given orally on the last day of the hearing.  It has to be a

19   proposed decision that goes to a review subcommittee of

20   FINRA's NAC.

21             MS. FRITZ:  And this idea of the NAC calling it

22   for review, this is not something that actually occurs.  The

23   NAC -- it is a theoretically -- again, as Judge Scriven

24   realized down in Florida, there is a

25   theoretical possibility --

1          THE COURT:  I know you wanted to stay down there.

2          MS. FRITZ:  Down there?

3          THE COURT:  In Florida.

4          MS. FRITZ:  Yeah.  Actually, I wanted to initially

5     file the case in D.C., and I communicated that.  Because I

6     agree with Mr. Barnes, I think the law is more favorable --

7     I think there is more of a sense in the D.C. Circuit of

8     issues that come from agency overreach and what the problems

9     are.

10          But what we're up against next week -- just to be

11     clear, we didn't come whining to the Court when we were

12     initially the subject of the FINRA proceeding, right?

13          THE COURT:  Or the March 2022 decision.

14          MS. FRITZ:  Right, or when we then filed the

15     appeal.  We are perfectly prepared to continue that

16     appellate process.

17          But on April 19th FINRA decided, for reasons that

18     sure are very concerning to me, that it was going to bring

19     in a guillotine; it was not going to allow the NAC appeal to

20     be decided.  It was going to bring in its nuclear weapon,

21     its expedited proceeding.

22          Again, the SEC, if it came into this court and

23     made the argument that Alpine has violated an "obey-the-law"

24     injunction, I would have a legion -- a whole array of cases

25     where I could talk about the notice and due process

1    considerations that the courts have focused on in trying to

2    penalize someone in a contempt-like proceeding for violating

3    an obey-the-law injunction.

4        Your Honor, next week I don't get to make those

5    arguments.  They don't have to provide me with due process,

6    and they say it over and over.  Why?

7        Why can the SEC not make that argument in a

8    courtroom but FINRA can shut me down for violating a

9    generalized obey-the-law injunction?

10        Because, please, Your Honor, bear in mind, we did

11    not violate the specific provisions of any cease and desist

12    order.  They are relying on a later portion of the order

13    that is a simple obey the law.  They have come up in the

14    last year with new arguments not made during the underlying

15    case about what we're doing wrong.

16        Why didn't they make them in the underlying case?

17        Why weren't these issues considered in a specific,

18    clear, and unambiguous order?

19        There is -- the guillotine that we face now I

20    think is striking in terms of its --

21        THE COURT:  I know you are trying to make it seem

22    that what is going on right now is so unfair to you that has

23    nothing to do, quite frankly, with whether the plaintiffs

24    are a state actor or not.

25        I have to -- so, you know, from FINRA's

1    perspective, you violated a cease and desist order.  They

2    have no other way to ensure compliance with its own cease

3    and desist order.

4          MS. FRITZ:  No, Your Honor.

5          THE COURT:  So what the merits of that are are now

6    being decided within FINRA, within their hearing officer,

7    that is sort of not -- it's really not the issue in front of

8    me.

9          MS. FRITZ:  Your Honor, you just indicated there

10    was no other way.  There is a process called a Notice of

11    Cancellation that is in FINRA's rules.

12          If there is a violation of a cease and desist

13    order, they are to give -- they are to issue a notice of

14    cancellation which provides --

15          THE COURT:  One of the things you say in your

16    brief, or the plaintiffs say in their brief is -- they make

17    this connection, almost, that the enforcement proceeding --

18    this expedited enforcement proceeding was scheduled within

19    days after the Supreme Court issued its ruling in *Axon* as if

20    there was a connection between these two events.  And if you

21    are trying to imply that there was a connection between the

22    two events, I am telling you now it went over my head.

23          What are you trying to imply in that?  It sounded

24    nefarious, but I have no idea what point it is you are

25    trying to make.

1        MS. FRITZ:  There really are two things.  This

2    issue has been on FINRA's plate for a year, so we know that,

3    prior to the April 19th filing.  This has been a continuous

4    back-and-forth between FINRA and Alpine since very soon

5    after the underlying March --

6        THE COURT:  So what are you implying about -- what

7    does *Axon* have to do with them -- the timing of them

8    bringing an expedited hearing?

9        I don't think the defendants want to be in front

10    of me.  In that -- so I think that they would prefer just to

11    be minding their own business, going about their business in

12    other matters and having the FINRA hearing officer do its

13    job with all of the normal processes within FINRA and not be

14    here.

15        MS. FRITZ:  Right.

16        THE COURT:  So *Axon* is why you are here.

17        MS. FRITZ:  Okay.

18        THE COURT:  How can -- what are you trying to

19    imply with that?

20        MS. FRITZ:  Look, I can hardly -- I can't

21    attribute motive.  I can tell you what it looks like.

22        Alpine has been a thorn in FINRA's side.  There

23    has been litigation back and forth, Alpine seeks to --

24        THE COURT:  I have read seven different claims,

25    seven different lawsuits filed by the plaintiffs against

1    FINRA.

2             MS. FRITZ:  Right.  Alpine seeks to defend itself.

3    And Alpine is one of the few firms that has the resources to

4    come here to do this kind of proceeding, to survive the five

5    years it took to get the FINRA decision.  Most firms go out

6    of business at that point.

7             THE COURT:  What does that have to do with *Axon*?

8             MS. FRITZ:  *Axon* comes down.  And for the first

9    time we have a clear pathway to come to a federal court to

10   get out of the FINRA world in which we are forced to live

11   from the beginning of a proceeding or investigation all the

12   way through years later.  For the first time we have the

13   chance to do that.

14             Why would they then want to come after Alpine with

15   a guillotine?  Because, arguably, we are among the few firms

16   that would avail themselves of that opportunity, that would

17   seek to have these issues considered in a federal court.

18             So do they want Alpine closed?  Absolutely.

19             Is it an investor protection issue?

20             Your Honor references over and over the 35,000

21   violations.  They watched for a year while those were being

22   charged.  They issued a notice of cancellation last June

23   knowing that we were charging those fees, didn't mention

24   word one about it.

25             There is, to this chronology, something very

1    concerning, and it very much has to do with the fact that

2    Alpine does defend itself and Alpine does aggressively try

3    to assert that it has some rights.

4         THE COURT:  Okay.  So *Axon* is one of the main

5    things that plaintiffs rely on for its irreparable harm

6    showing for its TRO.

7         And *Axon*, on its face, plainly held that parties

8    in administrative enforcement actions can bring their

9    constitutional challenges to agency authority and structure,

10   fundamental issues in district court without

11   administratively exhausting those constitutional challenges

12   and that by -- can exercise subject matter jurisdiction over

13   those claims.

14        What *Axon* isn't as clear on is while those --

15   although -- I don't know, it says some things, and that's

16   what I want to clarify.  When I'm hearing those

17   constitutional claims, *Axon* doesn't actually say that the

18   enforcement proceedings have to stop pending resolution of

19   the constitutional challenges or, in your view, does it?

20        MS. FRITZ:  What Justice Kagan said is -- and it's

21   very strong language -- that having to undergo a proceeding

22   that is unconstitutional in some way, whether it's by virtue

23   of the appointment of the hearing officer or whether it's by

24   virtue of procedures that would allow a single FINRA hearing

25   officer to sidestep an entire NAC appeal and shut us down --

1    that it is a here-and-now injury.  And Justice Kagan

2    emphasizes that is the irreparable harm, and it's a very

3    interesting discussion saying they're not making the

4    argument that the penalty will be the irreparable harm.  It

5    is having to undergo a proceeding by an agency that is

6    operating in an unconstitutional fashion.

7           THE COURT:  So you think the here-and-now injury

8    that is mentioned a few times in *Axon* is, basically, the

9    Supreme Court putting its thumb on the scale among the

10   preliminary injunctive factors for irreparable harm saying:

11   This factor you can check off as met?

12          MS. FRITZ:  I absolutely do.  I thought the

13   language was very strong.

14          THE COURT:  Well, it's sort of peculiar because a

15   lot of civil litigators like you-all are so hyped you don't

16   see what happens in other contexts.  And I hear criminal

17   cases regularly with defendants who are sitting in pretrial

18   detention in D.C. jail, and they're raising constitutional

19   claims.  They want to suppress the evidence; they have got

20   all sorts of constitutional claims.  And while they're

21   litigating their constitutional claims, they sit in D.C.

22   jail.  They don't -- the enforcement proceeding against them

23   doesn't stop; it's not halted.  It's -- they're still held.

24          Why is it that for -- in these specific types of

25   constitutional challenges to an administrative enforcement

1    proceeding over money, basically, the enforcement proceeding

2    has to stop for the constitutional challenges to be

3    litigated?

4         MS. FRITZ:  First of all, I was a prosecutor for

5    many years in New York, and I regret the fact of the

6    circumstance that you have just described.  And I think

7    there have been some improvements -- some criminal justice

8    improvements in terms of making sure that people don't sit

9    behind bars while certain substantive issues are considered.

10         I would love to see --

11         THE COURT:  Are you saying every time a Fourth

12    Amendment suppression motion is filed we should just say:

13    Okay, out of jail free card while we're litigating that?

14         MS. FRITZ:  We have changed bail.  We have changed

15    the extent to which bail can be imposed and under what

16    circumstances as opposed to release.  So I do think during

17    the period I have been practicing that issue really has

18    improved.

19         But having said that, what we're looking at here

20    is a request to Your Honor to simply preserve the status

21    quo.  For over a year FINRA has been watching as Alpine has

22    engaged in the conduct that it's accused of.

23         There is nothing, no reason why this -- these

24    issues can't continue to await consideration by this Court.

25    They waited nine months to bring the case.  They spent six

1    months preparing the case, but it's an accelerated case so I

2    have all of three weeks to respond.

3            There is no urgency.  So when you balance it,

4    destruction of Alpine versus a delay while the Court allows

5    this issue to be developed --

6            THE COURT:  But isn't from FINRA's perspective,

7    from what I have seen, they're looking at plaintiffs who

8    aren't complying with a cease and desist order?  They have

9    thrown around:  Over 35,000 times they have engaged in

10   transactions or conduct that is violative of cease and

11   desist order with the concomitant harm to investors, either

12   the plaintiffs or a more general marketplace, so why isn't

13   FINRA doing its job by saying --

14           MS. FRITZ:  That's what --

15           THE COURT:  -- we have been seeing these

16   transactions, as you said, for nine months, it's time to

17   stop?

18           MS. FRITZ:  Like --

19           THE COURT:  And the plaintiffs may have this

20   irreparable harm of having to be engaged in a process that

21   they believe is unconstitutional with a lot of hearing

22   officers and a lot of evidence and a lot of arguments, and

23   so on, they're able to present.

24           And on the other side I have got FINRA trying to

25   protect the marketplace and investors since I think the

1    entire investigation against plaintiffs was initiated

2    because of customer complaints about their interactions with

3    plaintiffs, without getting into detail; and that's about

4    the 30,000-foot level that I am at.

5           So why should the public interest here weigh in

6    the equitable relief you're requesting?

7           MS. FRITZ:  Just taking a second to address

8    investor harm issues.  As soon as these issues arose back in

9    2019, Alpine worked with regulators, primarily the Utah

10   Department of Securities, and reversed everything.  No

11   customer was harmed; everything was reversed.

12          We then negotiated with FINRA a temporary cease

13   and desist order pursuant to which Alpine has operated ever

14   since then.

15          So this customer -- this investor protection issue

16   isn't what FINRA says.  Yes.  Do they want to use that

17   35,000-violation figure?  Of course they do.

18          If there is anything hyperbolic that Your Honor is

19   hearing, it's that.  Again, last June these issues were

20   aired between FINRA and Alpine.  FINRA then took the step

21   under its rules that it should take in connection with the

22   violation of an order, which is, it issued a notice to

23   Alpine that says:  You are violating the order, either stop

24   or we will shutter you.

25          That notice of cancellation only referred to one

1    action that Alpine was considering at the time having to do

2    with a transfer of accounts.  Alpine immediately reversed it

3    as soon as FINRA issued the notice.

4            They didn't reference these fees in that notice.

5            This idea that this is about investor protection,

6    Your Honor, is a fiction.  They have sat for nine months

7    putting together these elaborate analyses so that -- of

8    market-making issues never presented to the underlying -- in

9    the underlying hearing.  I now have three weeks, as I said,

10   to respond to these entirely new theories that have nothing

11   to do with the order.  So that is what we're talking about.

12           It's not -- there is not a purity to it in terms

13   of what the goals are here.  There was a delay, it was

14   considerable.

15           They weren't concerned about even sending a notice

16   over to us.  And that doesn't sound particularly difficult,

17   right?  Just a notice:  Stop doing this.  They never did

18   that until five days after *Axon*.  And then, here we are

19   teetering on the brink staring this potential decision right

20   in the face.

21           Last thing I would like to say, I did make

22   comments about the underlying theory that there were three

23   individuals that oversee it; one hearing officer, for

24   example, two panelists.  Yes, there were attributes of that

25   underlying proceeding that indicated process being provided.

1          THE COURT:  Ample process I'd say.

2          MS. FRITZ:  Please understand what we're facing

3     next week is the opposite.  It is the opposite in every

4     respect.  None of the rules that would even appear to be in

5     process are going to apply to us next week.

6          THE COURT:  All right.  Let's hear from -- I guess

7     I will start with FINRA.

8          MR. TAYRANI:  Good afternoon.

9          THE COURT:  Do you really want me to be making a

10    ruling on whether or not FINRA is a state actor on the basis

11    of a TRO?

12          I mean, you have -- you, FINRA, have the ability

13    to give me more time to decide that; postpone the hearing

14    now a couple of days.  Why can't you give me a little bit

15    more time, or is this not such an important issue to you?

16          MR. TAYRANI:  May it please the Court.

17          Amir Tayrani for FINRA.

18          Yes, Your Honor, it certainly is an important

19    issue for us.  We don't have the ability to unilaterally

20    postpone the hearing because the Office of Hearing Officers

21    is independent from the rest of FINRA.

22          Certainly, Alpine could make another request to

23    postpone the hearing further.  But we believe that the law

24    is clear, that there is a uniform and unbroken body of

25    precedent establishing that oath.  FINRA --

1          THE COURT:  So has NASD, the predecessor to FINRA,

2     been called a quasigovernmental actor or quasigovernmental

3     entity in NASD v. SEC?

4          MR. TAYRANI:  That language appears in the

5     opinion, Your Honor.  But FINRA and its predecessor have

6     also been called private self-regulatory organizations by

7     the D.C. Circuit.  As recently --

8          THE COURT:  Also, by the Supreme Court in *Free*

9     *Enterprise.*  But -- at least with respect to the New York

10    Stock Exchange, but it had a more broad descriptor there.

11         MR. TAYRANI:  Your Honor, in NASD versus SEC, I

12    believe what the Court is talking about there is the fact

13    that NASD was regulated closely by the SEC; and we don't

14    dispute that.  That is the language that Mr. Barnes was

15    referring to, that there is control by the SEC over the

16    NASD.

17         We wouldn't use the word "control."  But I think

18    what the Court is getting at there is the fact that NASD,

19    and now FINRA, operate subject to SEC oversight.

20         The Supreme Court, however --

21         THE COURT:  And SEC has to approve all of the

22    rules and defend the regulations.  I mean, this is -- this

23    is getting pretty -- it's getting to be a little more of a

24    closer call here, would you say?

25         MR. TAYRANI:  I don't disagree with that, Your

1     Honor.

2          In 2019, in *Manhattan Community Access versus*

3     *Halleck*, which is another case that Mr. Barnes mentioned,

4     the Supreme Court reiterated that being closely regulated

5     does not make a private party a state actor.  If it did,

6     utility companies would be state actors; airlines would be

7     state actors, and large swaths of the private economy would

8     be required to comply with constitutional requirements.

9          THE COURT:  Well, in *Brentwood Academy*, which the

10    government has also described, the government says that:

11    The relationship between FINRA and the SEC is not "pervasive

12    entwinement to the point of largely overlapping identity."

13    And it goes on to describe FINRA's structure as making FINRA

14    subject to ultimate SEC control with no governmentally

15    derived authority to act independently of SEC oversight.

16    The government describes that in its opposition docketed at

17    68, at pages 1 through 2.

18         So the government goes on to describe that:  The

19    SEC may limit FINRA's activities and operations or suspend

20    FINRA's registration if FINRA violates the applicable

21    statutory provisions or SEC regulations, and the SEC may

22    remove a FINRA officer that willfully violated the rules.

23    That's a lot of control of FINRA by the SEC.

24         So why isn't that sufficient entwinement under

25    *Brentwood*?

1          MR. TAYRANI:  It's not pervasive entwinement, Your

2     Honor, because there are no salient similarities between

3     FINRA and the secondary school athletic association at issue

4     in *Brentwood Academy*.

5          That association had membership that was made up

6     of 84 percent public schools; it was those public school

7     officials who selected the board of the association, who

8     funded the association and who served on the board.  The

9     board was comprised completely of public school

10     administrators.

11          In addition, the state board of education

12     appointed X officio members of the board.  FINRA has none of

13     those hallmarks.  FINRA's board is selected by FINRA's

14     members who are private entities.  FINRA is funded by fees

15     and other dues from its private members.

16          And FINRA employees, unlike the employees of the

17     athletic association in *Brentwood*, are private employees.

18     So there are no relevant similarities between that school

19     association and FINRA.

20          THE COURT:  I know that those are -- I know that

21     those are clearly the distinctions that are made, but I just

22     look at the words "pervasive entwinement to the point of

23     largely overlapping identity."  And that -- you know, is it

24     enough for a private -- for a private entity to choose its

25     own members and get its funding independently if it

1    otherwise, in all of its operations, has to get the approval

2    of a government agency?

3          MR. TAYRANI:  Yes.  That is enough to establish

4    that the private entity is not a state actor.

5          I would refer the Court to page 1932 of the

6    *Halleck* decision that we were just discussing where the

7    Court states, quote:  Put simply, being regulated by the

8    state does not make one a state actor.  And then there is a

9    string cite to five or six Supreme Court decisions

10   establishing that point.

11         The Court then goes on and says:  As the court's

12   cases have explained, that being heavily regulated makes you

13   a state actor.  Theory of state action is entirely circular

14   and would significantly endanger individual liberty and

15   private enterprise, close quote.

16         What the Court is referring to here as potential

17   indicia of "pervasive entwinement" is, in fact, an

18   indication of regulation.

19         The SEC regulates FINRA absolutely.  The SEC must

20   approve FINRA's proposed rules.  And the SEC has the ability

21   to review FINRA's disciplinary proceedings *de novo*.  But

22   that is regulation, it is not entwinement.  And that's the

23   reason why every court that has addressed this issue has

24   concluded that FINRA, or its predecessor, the NASD, is not a

25   state actor.  That includes published opinions from the

1    Second, the Third, the Fourth and the Ninth Circuit.  It

2    includes six opinions from judges in this District.  It

3    includes the language that this Court referred to from *Free*

4    *Enterprise Fund* which while not a holding, I would

5    acknowledge, certainly signals the Supreme Court's view on

6    this issue.

7            THE COURT:  So what are the consequences if FINRA

8    is held to be a state actor?

9            MR. TAYRANI:  Then FINRA would arguably be

10   required to --

11           THE COURT:  And also -- you know, I am just on a

12   TRO stage; it's just the likelihood of whether or not

13   they're going to succeed on the merits on that.

14           So how many shock waves would it send on a TRO,

15   likelihood -- not actually making a final formal finding,

16   but I have got a TRO in front of me with a hearing that's

17   now been postponed until Monday so I have got to make a

18   decision right now.

19           So what are the consequences going to be?

20           MR. TAYRANI:  Your Honor, there are going to be

21   two sets of consequences.

22           THE COURT:  Sure.

23           MR. TAYRANI:  One would be for Alpine's customers

24   who would continue to be victimized by Alpine's excessive,

25   unlawful, and inequitable fees, which is precisely the

1   reason that FINRA is moving forward with this expedited

2   proceeding.  And then, more broadly, that would be a seismic

3   shift in state action jurisprudence that would call into

4   question whether the Nasdaq stock market, whether the

5   New York Stock Exchange, whether other self-regulatory

6   entities are state actors, and potentially whether other

7   closely regulated industries, such as utilities, oil and gas

8   companies, airlines are also subject to constitutional

9   constraints.

10          The plaintiff has an extraordinarily heavy burden

11   here because it's asking for extraordinary and drastic

12   relief, and its burden is a heavy one to clearly establish a

13   substantial likelihood of success on the merits.

14          We would --

15          THE COURT:  And what would happen to the

16   enforcement actions and the structure and operation of

17   FINRA?

18          MR. TAYRANI:  Well, the enforcement action

19   presumably would not be able to go forward, Your Honor, if

20   you were to issue a temporary restraining order to the

21   extent that --

22          THE COURT:  Well, if I find -- I am just sticking

23   with if I find that FINRA is a state actor.

24          MR. TAYRANI:  If you find that FINRA is a state

25   actor, then we would dispute Alpine's position that FINRA

1   violates the constitutional provisions that they have

2   identified.

3            For example, if the Fifth Amendment were to apply

4   here, we believe that there is substantial process that is

5   provided in FINRA disciplinary proceedings that would

6   comport with due process.

7            As to the Appointments Clause, we don't believe

8   that FINRA board members are principal officers of the

9   United States who would need to be appointed by the

10  President.  So there are second-line arguments available to

11  us in the event that the courts were to make a finding of

12  state action; but we believe that that finding would be in

13  error and it would not be consistent with the undisputed

14  facts about the features of FINRA, and it would not be

15  consistent --

16           THE COURT:  Well, the plaintiffs have said that

17  there might have been ample process leading to the March

18  2022 decision but not ample process in this expedited

19  hearing which is different.

20           MR. TAYRANI:  There was substantial process that

21  led up to the hearing.

22           To provide some context for the timing, the

23  hearing was preceded by an eight-month investigation by

24  FINRA's enforcement staff that involved eight interviews of

25  Alpine employees; it involved more than a dozen requests for

1    documents directed at Alpine.  And once that investigation

2    had run its course, once a record of violations had been

3    built, that led to the initiation of this enforcement

4    action.

5         The proceeding is expected to last for four or

6    five days.  And Alpine will have the opportunity to defend

7    itself during that hearing, to cross-examine witnesses, to

8    present its own evidence and witnesses.  And if we ever got

9    to the point in this case where we needed to defend that

10   process from a due process standpoint, we believe that it

11   would comport with fundamental fairness and due process.

12        The rules pursuant to which the hearing is being

13   conducted or proposed by FINRA to the SEC, they were

14   approved by the SEC as consistent with the Exchange Act, and

15   that builds in a measure of protection for respondents in

16   those proceedings.

17        We don't believe, however, that the constitutional

18   requirements of due process would apply to the proceeding or

19   to any other conduct that FINRA undertakes.

20        THE COURT:  All right.  So plaintiffs say that if

21   FINRA is found to be a private entity, not a state actor,

22   their constitutional claims fall away except for the First

23   Amendment.

24        Do you agree with that?

25        MR. TAYRANI:  We do agree, Your Honor.

1          There is a federal statute that requires broker

2     dealers to join a registered national securities

3     association.  FINRA is the only such association, so there

4     is a challenge through that First Amendment claim to the

5     statutory requirement to join FINRA.  However, that claim

6     fails as a matter of law because Alpine has not identified

7     any political or ideological activity in which FINRA is

8     engaged that is not germane to its underlying purpose.

9     Those are the only circumstances in which the Supreme Court

10    has recognized that regulated professionals can challenge a

11    supervisory body, such as a state bar association or a

12    registered national securities association.

13          What Alpine is challenging here is the way in

14    which FINRA makes regulatory decisions, FINRA's regulatory

15    priorities, and the salaries and hiring decisions that FINRA

16    has made.  That is not a challenge to political or

17    ideological activity by FINRA, and it's certainly not a

18    challenge to activities that are not germane to FINRA's

19    purpose --

20          THE COURT:  I understood plaintiff's First

21    Amendment challenge to be that they're forced to belong.

22    It's not really right of expression, it's the right of

23    association; that they're forced to belong to FINRA.

24          MR. TAYRANI:  Correct.  That is their challenge,

25    Your Honor.  But it fails because in order to state a First

1    Amendment claim in this setting Alpine needs to identify a

2    right of expressive association that has been infringed.

3            So if a lawyer were challenging a bar

4    association's decision to spend membership dues on

5    antinuclear weapons lobbying activity, that would

6    potentially infringe on the lawyer's First Amendment

7    associational rights because they're being compelled to fund

8    that political activity with which they may disagree.

9            Here there is no challenge to any ideological

10   activity, any political activity.  They're simply

11   challenging the fact that they're required to join FINRA,

12   and that doesn't trigger any associational interests.

13           THE COURT:  Okay.  So FINRA's opposition states,

14   and I quote:  Nothing in *Axon*, a case about federal subject

15   matter jurisdiction not state action otherwise affects the

16   preliminary injunction analysis.

17           And that does seem to overlook the here-and-now

18   injury phrase that Justice Kagan references several times in

19   the *Axon* decision, a concurrent -- both concurrences talk

20   about that here-and-now injury.  So why isn't that

21   here-and-now injury being subjected to an allegedly

22   unconstitutional proceeding before an unconstitutional

23   entity?

24           Why isn't that a sufficient injury to satisfy the

25   preliminary injunction analysis?

1    How can you say that *Axon* doesn't otherwise affect

2    the preliminary injunction analysis?

3        MR. TAYRANI:  Because to obtain a preliminary

4    injunction Alpine needs to demonstrate that it is actually

5    suffering an irreparable harm, that it is suffering that

6    here-and-now injury, which then would require it to

7    establish that but for a preliminary injunction it would be

8    required to appear before an unconstitutional body and its

9    constitutional rights would be infringed or, in this

10   setting, that it has a substantial likelihood of showing

11   that its constitutional rights are being infringed.

12       The reason that there is no irreparable harm and

13   the reason that Justice Kagan's statement is irrelevant here

14   is that Alpine has not established that there are any

15   constitutional deficiencies in this FINRA proceeding or that

16   FINRA otherwise is subject to constitutional requirement.

17   So there are no cognizable constitutional injuries that

18   Alpine would suffer from being required to appear before

19   FINRA when the hearing resumes on Monday.

20       THE COURT:  Because FINRA is not a state actor?

21   It's all premised on that.

22       MR. TAYRANI:  Exactly, Your Honor.  It does come

23   back to the merits.

24       To the extent that this Court were to disagree

25   with my position on state action and on the underlying

1    constitutional claims, then, yes, there would be irreparable

2    harm from being required to appear before an

3    unconstitutional body.  But we submit that there is no

4    constitutional injury because FINRA is not a state actor

5    subject to constitutional requirements and the

6    constitutional claims here that do not turn on state

7    action -- for example, the First Amendment claim that we

8    have been discussing -- also fail.  So it's not the case

9    that requiring Alpine to appear at the hearing is going to

10   impair any constitutional rights or interests that it might

11   have.

12            THE COURT:  All right.  FINRA does appear to

13   accuse -- plaintiffs do appear to accuse FINRA of

14   retaliating against them somehow by bringing this expedited

15   hearing within a week of the Supreme Court deciding *Axon*.

16            Do you want to respond to that?

17            It was sort of buried in their briefing, but it

18   was said a couple of times.  So I just wanted to give you an

19   opportunity to respond.

20            MR. TAYRANI:  Well, I appreciate that opportunity,

21   Your Honor.

22            That was the reason that I was trying to provide a

23   bit more context for why FINRA initiated the expedited

24   hearing when it did.  It was the culmination of a

25   months-long investigation that encompassed multiple

1    interviews of Alpine employees, that encompassed multiple

2    requests for documents from Alpine.  There were substantial

3    delays in Alpine's compliance with those document demands.

4    There were substantial scheduling delays in getting --

5    affording FINRA the opportunity to interview Alpine

6    employees.

7         So the process ultimately took eight months for

8    the FINRA enforcement staff to be in a position to initiate

9    this expedited proceeding because it is a momentous step

10   that FINRA is taking, absolutely.  It's not a step that they

11   would take lightly.  They are moving to expel Alpine on an

12   expedited basis.

13        THE COURT:  Just Alpine?  Not the other plaintiff,

14   Scottsdale Capital Advisors?  Just Alpine is subject to

15   expulsion in this expedited hearing?

16        MR. TAYRANI:  That's correct.  And for that

17   reason, Alpine is the only party that is moving for the --

18        THE COURT:  The TRO?

19        MR. TAYRANI:  Correct.

20        THE COURT:  All right.  Let me hear from the

21   government, unless there is something else you want to --

22        MR. TAYRANI:  No.  Thank you, Your Honor.

23        MR. PEZZI:  Good afternoon.

24        THE COURT:  Is there anything else that the

25   government would like to add?

1           MR. PEZZI:  Briefly, Your Honor.

2           I wanted to, in addition to addressing any

3   questions Your Honor has, speak to a few points that came up

4   during plaintiffs' presentation as well as FINRA's.

5           Just for the record, Stephen Pezzi, for the

6   Department of Justice, on behalf of the United States as

7   intervenor.

8           I would like to start with Mr. Barnes's comments

9   regarding the *Lebron* decision.  I read their papers, both in

10  D.C. and Florida, to suggest, on Page 8 in particular, of

11  their Monday filing, that *Lebron* provides the applicable

12  standard for determining whether a -- what is otherwise a

13  nominally private entity should be considered part of the

14  government for constitutional purposes.

15          And I think this afternoon Mr. Barnes came quite

16  close to conceding that point and noting that it was simply

17  being preserved for further review.  We obviously have no

18  disagreement with the bottom-line conclusion implicit in

19  that approach.

20          And so unless Your Honor has questions about it, I

21  will focus on what Mr. Barnes spoke to as -- I think what he

22  describes as a second and fully independent pathway for

23  plaintiffs to prevail not just on the state action issue but

24  also on the merits entirely.

25          I think both the reply brief and Mr. Barnes this

1    afternoon suggested that:  Were the Court to determine that

2    FINRA is a state actor, either for purposes of this

3    particular proceeding or maybe more generally, that that

4    would be sufficient to find either a constitutional

5    violation or a likelihood of success on the merits of their

6    claims.  Respectfully, I think that's incorrect in some

7    important ways.

8            To make that point, I direct Your Honor's

9    attention to the D.C. Circuit's opinion in *Peacock* that

10   Mr. Barnes was speaking about, in which the D.C. Circuit

11   concludes for case-specific reasons that don't have a lot of

12   overlap with this case that, in that circumstance, the

13   private corporation Xerox was acting as a state actor

14   because of its relationship with the District of Columbia

15   government.

16           I think the D.C. Circuit would be quite surprised

17   to hear that in reaching that conclusion they had

18   necessarily suggested, for example, that the Appointments

19   Clause applies to Xerox or that the CEO of Xerox, or its

20   board of directors, needed to be nominated by the President,

21   confirmed by Senate and, presumably, they are not.

22           I think what that shows is although state action

23   is an important threshold question for several of the

24   plaintiffs' claims, there is more work to be done than that

25   for plaintiffs to show a likelihood of success on the merits

1       for any of their claims.

2               I would also -- I would also note that there is --

3       in the way the regulatory scheme has been described, it

4       sounds like Your Honor is quite familiar.  There is an

5       extensive body of case law that has primarily arisen in the

6       context of the private nondelegation doctrine which

7       plaintiffs here present as an alternative argument to their

8       primary submission that FINRA is the government and such

9       that the private nondelegation question only comes at the

10      end.

11              Now, again, setting aside whether that is

12      consistent with today's presentation about taking the *Lebron*

13      issue off the table, I think it is important to note that

14      the animated premise of that case law over a period of many

15      decades, originally with respect to the NASD and now with

16      respect to FINRA, the entire purpose of the analysis

17      conducted by the Second, Third, Ninth Circuit, even by Judge

18      Friendly himself, I believe, in the Second Circuit, is about

19      whether a constitutional restraint has been violated because

20      of a delegation of government authority to a private entity.

21              And of course we think the constitutional

22      restrictions that apply in that context for the reasons in

23      our papers, we don't think those principles are violated

24      here.  But the entire purpose of the analysis is to ask

25      whether a private entity participating -- or taking some

1  particular action that Congress has permitted, whether that

2  violates the Constitution for that private entity to do so.

3       So I think if plaintiffs were correct on their

4  theory of state action and if plaintiffs were correct that

5  FINRA should be considered a state actor either for the

6  narrow purpose of this proceeding or more generally, then

7  Judge Friendly and all of those courts, over a period of

8  many decades, were asking the entirely wrong question.

9  Because if this -- if FINRA or the NASD before it were a

10  government agency that would be an odd question to focus on.

11  In fact, it wouldn't matter at all, whether the Supreme

12  Court's opinion in *Carter Coal*, or *Adkins* controlled.

13       So while we haven't spent a lot of time on the

14  private nondelegation issue today and while it's the last

15  merits argument in plaintiffs' brief, I think it's important

16  to keep that in mind when analyzing constitutional claims.

17       Unless Your Honor has questions, there is one more

18  feature about the regulatory scheme that I just wanted to

19  make sure didn't go unrebutted.

20       Obviously, the United States has intervened for a

21  limited purpose here and our interest primarily lies with

22  defending the federal statutes that are challenged in

23  plaintiffs' complaint.  But, as a result of that, I have

24  some familiarity with the statute itself, as well as the

25  regulations that the SEC has issued, and how the SEC's

1    relationship with FINRA works.

2            There have been suggestions both in the papers, in

3    the court in Florida last week and in court today, that

4    somehow FINRA is -- that Alpine is facing imminent expulsion

5    from this industry without any opportunity for review by the

6    SEC.  And I have a hard time understanding how that can be

7    the case.

8            We -- in Footnote 2 of our brief, on page 4, we

9    cite the statutory provision as well as the C.F.R. citation

10   from the SEC regulations about when a party may seek a stay

11   from the SEC when faced with a FINRA order that would

12   otherwise take effect immediately.

13           I have no quibble with plaintiffs' description

14   about -- and counsel for FINRA's description about some of

15   these orders take effect more quickly than others; but all

16   of them are subject to review by the SEC including -- there

17   is a procedure in place to seek a stay.  That stay request

18   is governed by the same four-factor test that governs the

19   proceedings today.  And ultimately if dissatisfied with how

20   the SEC approaches those issues, there is an opportunity for

21   review in the Court of Appeals.

22           Now, I really take plaintiffs' concern to be that

23   they're worried that that will move too slowly or that the

24   SEC might take too long.  And of course I, as much as

25   anyone, sympathizes with -- no one likes to be facing these

1    time-sensitive proceedings, but there is nothing at all

2    unique about that circumstance here.

3            Litigants in federal court and elsewhere, with or

4    without interactions with administrative agencies, there are

5    times when they are forced to seek time-sensitive injunctive

6    relief.

7            Of course, I can't say anything about what FINRA

8    or the SEC or what the relevant Court of Appeals would do

9    with a request for some sort of a time-sensitive motion for

10   a stay, that -- I mean, that opportunity is available, it's

11   provided in the statute, and it is provided in the

12   regulations.  So I think at least some of the concerns can

13   be mitigated by procedures that are already available as I

14   understand it.

15           THE COURT:  All right.  And let me just go back

16   for a second to *Axon* with you.

17           In this fairly extraordinary section of *Axon* where

18   Justice Kagan seems to go out of her way to address the

19   timing of when a constitutional claim must be decided and

20   seems to give it some priority in saying that the

21   collateralism factor, basically echoing the collateral

22   review order doctrine, favors the party challenging the

23   enforcement proceeding because they're challenging the

24   commission's power to proceed at all rather than actions

25   taken in the agency proceedings.  And it goes on to say that

1    the inquiry contemplates, as our collateral order doctrine

2    also does, that even when a proceeding is pending an

3    occasional claim may get immediate review in part because it

4    involves something discrete.  That's *Axon* at 143 S Court, at

5    905.

6          It keeps mentioning and analogizing this rule

7    they're developing about when the timing of review of the

8    constitutional claims versus when it's challenging this

9    fundamental constitutionality of the proceeding as basically

10   saying that the constitutional challenge has to be decided

11   first, even though there is also language that Justice Kagan

12   adds saying:  Nothing we say today portends newfound

13   enthusiasm for interlocutory review.  But, at the same time,

14   sort of sets a foundation for almost an automatic -- as in

15   the collateral order review doctrine context, almost an

16   automatic stay of proceedings, enforcement proceedings,

17   where there is a constitutional challenge to the forum

18   holding those proceedings.

19          What do you make of that language?

20          MR. PEZZI:  Certainly.

21          THE COURT:  Because the majority opinion certainly

22   doesn't talk about preliminary injunction factors, even

23   though it mentions, again and again, the here-and-now harm

24   from being subject to a potentially unconstitutional

25   proceeding in context.

89

1          But do you think that -- what do you make of all

2     of that language?

3          MR. PEZZI:  Certainly, Your Honor.

4          THE COURT:  Should I be reading it -- reading

5     between the lines that there should be almost an automatic

6     stay here until I can really read all of these cases and

7     digest them in the middle of my two trials that I have

8     scheduled back to back next week?

9          MR. TAYRANI:  I will answer Your Honor's question.

10    Before I do, I just need to be careful to emphasize the

11    limited nature of our intervention.

12          So we haven't taken a position, for example, on

13    the PI factors other than likelihood of success on the

14    merits because our interest is limited to the merits.

15          MR. PEZZI:  I will say --

16          THE COURT:  And I'm pushing you to take -- to help

17    me understand what this large section of *Axon* is trying to

18    signal to us poor district court judges trying to apply it.

19          MR. PEZZI:  Certainly, Your Honor.

20          I mean, I can say, at a high level of generality,

21    I do not read anything in *Axon* to provide for something like

22    an automatic stay.  I do not read anything in *Axon* to

23    displace the four preliminary injunction factors that are

24    required to be shown under *Winter,* with the caveat of

25    acknowledging the potential confusion in the Circuit about

App.325

1    that.

2         I don't really read it as a preliminary injunction

3    opinion at all.  And I think it would have been an odd thing

4    to smuggle into that opinion if it were to be read to

5    automatically establish irreparable harm in any structural

6    constitutional claim.

7         THE COURT:  Well, wasn't it sort of an

8    extraordinary thing to smuggle, to use your word, into this

9    opinion a whole lengthy discussion about the timing of when

10   to address the constitutional issue when there is an ongoing

11   enforcement proceeding?

12        MR. PEZZI:  So, I mean, the here-and-now injury

13   language I think originated in *Free Enterprise Fund* in the

14   context of a discussion about Article III standing.  So, I

15   mean, importantly certainly not the United States but I

16   don't think even FINRA has ever disputed that -- at least

17   with respect to the second amended complaint -- has never

18   disputed that there is Article III standing, and neither the

19   United States nor FINRA has argued that the *Thunder Basin*

20   challenge argument that was rejected in *Axon* deprives this

21   Court of subject matter jurisdiction.  But I don't think

22   that answers the question of whether a TRO or a preliminary

23   injunction is appropriate.

24        Either way, regardless of the showing on the other

25   factors, I think Your Honor is correct.  And I think this

```
1    is -- in the D.C. Circuit there is little doubt about this,

2    which is that if plaintiffs cannot show a likelihood of

3    success on the merits then there is no basis for a TRO or a

4    preliminary injunction.  We don't think they can make that

5    showing for the reasons in our papers.

6          I am more than happy to answer any other questions

7    Your Honor may have, but other than that --

8          THE COURT:  No.  Thank you.

9          MR. PEZZI:  Thank you.

10         (Whereupon, the Court and staff confer.)

11         MR. BARNES:  I can be brief, Your Honor.

12         THE COURT:  Okay.  Be brief.

13         MR. BARNES:  So, first, with respect to

14   entwinement, at the beginning of the Brentwood discussion of

15   that issue, Justice Souter, writing for the court, says the

16   State Athletic Association, quote:  Has historically been

17   seen to regulate in lieu of the State Board of Education's

18   exercise of its own authority; that's how he describes this

19   athletic association at the outset.

20         D.C. Circuit's opinion in the NASD case, pincite

21   page 806, quote:  NASD's disciplinary process essentially

22   supplants a disciplinary action that might otherwise start

23   with a hearing before an ALJ; that's an important parallel.

24   Counsel for FINRA identified some factual differences

25   between this case and Brentwood; that's an important
```

1    parallel.

2              Another point relevant to entwinement, Your

3    Honor -- I think, at a few points along the way, there was

4    discussion of the SEC's authority to review FINRA rules.  I

5    want to point out that it also has the authority to amend

6    FINRA rules.  It writes the rules it wants.  So that shows

7    that there is a great deal of nexus, symbiotic relationship.

8              It's a little bit of a word salad, these state

9    action doctrine cases from the Supreme Court.  But whatever

10   we can distill from them, I think it's clear that we have

11   satisfied that entwinement test.

12             THE COURT:  Well, I would like from you a

13   submission tomorrow that tells me all the consequences

14   should FINRA, with all of the attributes that you are

15   pointing to, is considered a state actor.

16             I want that absolutely clear on this record, both

17   for FINRA, for other entities.

18             I am going to ask the same thing from FINRA.  You

19   have mentioned public utilities, and so on.  I would like to

20   understand what are you asking of this Court.

21             MR. BARNES:  We'll be happy to address that in a

22   supplemental --

23             THE COURT:  By 5 p.m. tomorrow.

24             MR. BARNES:  Very well, Your Honor.

25             THE COURT:  What are the consequences? -- not just

1    nor FINRA, but for other entities that share these

2    attributes?

3              The "entwinement" word is both descriptive but

4    also very broad.

5              MR. BARNES:  It is very broad.  Let me hasten to

6    emphasize that for purposes of the TRO and the PI, we are

7    just focused on single enforcement proceeding.  There is

8    kind of a million dollar question about whether FINRA and

9    all of its activities should be treated as a state actor.

10             But what we're focused on here is specifically

11   when FINRA brings an enforcement proceeding against one of

12   its members threatening to expel a member from the industry;

13   is there entwinement in that specific context?

14             We'll address this more at five o'clock

15   tomorrow --

16             THE COURT:  I know you want to focus on that.  But

17   this is -- to quote the FINRA lawyer, this is a seismic

18   request that you are making and that you have a right to

19   make now after *Axon* in this court.

20             I don't know whether on your list to respond to

21   you are going to respond to the First Amendment flaw that

22   FINRA has said sits with your First Amendment claim which

23   might survive even if FINRA is found not to be a state

24   actor, if you want to respond to that as well.

25             MR. BARNES:  I can try, Your Honor.

1          I think the *Janus* case obviously is an important

2      precedent in this area now.  I do think that this compelled

3      submission to being a member of this organization in

4      order -- as a condition of participating in economic

5      activity is problematic under the First Amendment.  It's a

6      little bit two sides of the same coin with some of the

7      separation of powers arguments or the state action arguments

8      we're making in the sense that -- as I tried to suggest

9      earlier, the fact that -- the defendants are saying -- we

10     are not engaged in any kind of expressive activity.  It sort

11     of gives the lie to an analogy to some private voluntary

12     association club of people that get together and want to

13     express some point of view, and now the First Amendment is

14     coming in preventing them from doing that because they're

15     being treated as a state actor.  That's not this case,

16     right? -- or at least the defendant -- FINRA's defense kind

17     of underscores that that's not this case.  Its defense is as

18     to the First Amendment, so I think it pushes us in the

19     direction of treating FINRA as a state actor.

20          Let me also address -- my colleague from FINRA

21     suggested that an implication of our position is that every

22     closely regulated entity necessarily will be a state actor

23     if we prevail in this case; that's not what we're saying at

24     all.

25          THE COURT:  Isn't it?

1          MR. BARNES:  It's not because normally closely

2     regulated entities can't bring enforcement actions to

3     enforce federal law on pain of being expelled from

4     participation in an industry.  That's not -- you know,

5     that's not how a normal -- a chemical company that's subject

6     to some elaborate set of rules that come from a federal

7     agency, it can't bar another company from participating in

8     the industry.  It doesn't conduct an ALJ-like enforcement

9     proceeding that the D.C. Circuit itself, in the *NASD* case,

10    is saying is directly analogous to an ALJ proceeding before

11    the commission.  I mean, that's a really big difference,

12    right?

13         We're not going to fall all the way down that

14    slippery slope of just saying every regulated entity is a

15    state actor if the Court includes -- in the context of a

16    FINRA enforcement action that looks an awful lot like every

17    other agency adjudication that this Court sees every day --

18    that that FINRA enforcement action constitutes state action.

19    So that's the line that I would draw there.

20         With respect to *Axon*, just one feature of the --

21    Justice Kagan's opinion that I wanted to identify for the

22    Court that hasn't been mentioned.

23         The Court there analogizes the structural

24    constitutional right at stake in the kind of case that we

25    have got before Your Honor to the right to qualified

1   immunity.  So it's a right not just in the end to prevail in

2   the case, it's a right not to be subjected to the process.

3   You know, I think that's in harmony with what the Court was

4   talking about with respect to the collateral --

5            THE COURT:  Well, I know.  It's not just qualified

6   immunity, it's any immunity including sovereign immunity.

7   And there are these allusions to these -- to prioritizing

8   complete resolution not just on a TRO -- not as a likelihood

9   of success or not, but resolving the issues before the

10  enforcement proceeding can go on.  And it's a little bit of

11  a puzzle.

12            MR. BARNES:  My colleague --

13            THE COURT:  But you are not taking the position

14  that that is an automatic -- that's not how you are reading

15  *Axon* either?

16            MR. BARNES:  We don't read *Axon* to require an

17  automatic stay --

18            THE COURT:  And that, instead, you have to use the

19  procedural device of asking for injunctive relief of some

20  kind to stop or enjoin another proceeding from going on.

21  It's not an automatic process as it is under the collateral

22  order review doctrine or in the immunity context where that

23  has to be resolved before you move on.

24            MR. BARNES:  We acknowledge that the four-factor

25  test applies.  We have got to show a likelihood of success

1    on the merits.  I do think that that discussion is largely

2    dispositive.

3            On the question of irreparable harm, I hasten to

4    point out as well that counsel for FINRA, when he was at the

5    podium, conceded that if we can demonstrate a likelihood of

6    success on the merits that it will necessarily follow from

7    that.  We have made the necessary showing for irreparable

8    harm.  That's not so unusual in constitutional litigation,

9    Your Honor, the irreparable harm prong can collapse into

10   questions around whether there is a likelihood of success on

11   the merits.  So I think the place to focus ultimately is

12   this likelihood of success question.

13            I guess one other just sort of housekeeping item.

14            I obviously don't know how the Court will rule or

15   when it will rule, the D.C. Circuit -- we were thinking --

16   we hope that the Court will grant the relief we're seeking.

17   But if it's denied there is a preference on the D.C.

18   Circuit's part for litigants, when they seek emergency

19   injunctive relief, such as an injunction pending appeal, to

20   first make that request to the District Court before taking

21   it to the D.C. Circuit.  I don't think it's a strict rule,

22   but that's the Court of Appeals' preference.

23            I am making that request.  I am at least putting

24   it on the record that:  Should the Court deny our

25   preliminary injunction motion, Alpine is likely to seek

1    further relief from the Court of Appeals.  And we would

2    respectfully request an injunction pending appeal.

3                THE COURT:  You can make that in writing.

4                MR. BARNES:  Yes, Your Honor.

5                THE COURT:  All right.

6                Anything further from the plaintiffs?

7                MR. BARNES:  Nothing further.

8                I'm sorry, Your Honor.

9                MS. FRITZ:  Just two comments that I wanted to

10    make.

11                The Court has talked a lot about the *Graman* case.

12    I would just note -- and also about the implications and

13    consequences of what we're asking the Court to do.  I would

14    sort of put that together.

15                *Graman* was 1998 --

16                THE COURT:  I am aware of that.

17                MS. FRITZ:  Our complaint puts out for the Court

18    commentary from SEC commissioners and many, many

19    commentators talking about the changes that have occurred in

20    the last 25 years.

21                So what is our ask?

22                And I think those changes are profound, and I

23    think we have alleged that in the complaint; that what used

24    to be a professional organization dealing with conduct has

25    become an enforcement arm of the SEC and that the issue now

1  that courts are going to have to confront is:  Can the SEC

2  have an enforcement arm?  Can it essentially outsource

3  enforcement of the securities laws to an entity that lacks

4  any obligation to adhere to the Constitution?

5           Every day this is going on across the country.

6  It's a deeply impactful issue about whether the SEC can

7  outsource that authority to those who do not have to

8  provide --

9           THE COURT:  And wouldn't it be nice if I had more

10  than a few days to decide the issue?

11           MS. FRITZ:  So this is my ask, Your Honor.  You

12  are asking what is the consequence --

13           THE COURT:  So maybe -- I mean, FINRA seems

14  incapable of working out with the parties a briefing

15  schedule that will really bring these issues to my attention

16  in a way that I can read all of the cases, think about it,

17  and so on --

18           MS. FRITZ:  Judge --

19           THE COURT:  -- and it's a little -- it's a little

20  frustrating.

21           MS. FRITZ:  That's what we're asking you to do.

22           There are so many of these cases where the issue

23  is given short shrift -- there is not the sort of in-depth

24  analysis of the legal standards that apply on the one hand

25  and the reality of FINRA on the other hand.

1       And so what would be the consequence, you asked,

2   of the Court staying the enforcement proceeding while we

3   delve into these issues?  I would argue, Your Honor --

4       THE COURT:  Why haven't you asked the hearing

5   officer to postpone the hearing until after I have resolved

6   this?

7       MS. FRITZ:  I have.

8       THE COURT:  And the hearing officer said:  Too

9   bad, so sad for you?

10      MS. FRITZ:  Absent a --

11      THE COURT:  Too bad, so sad for the District Court

12  judge?  Too bad, so sad, I am going to resume on Monday.

13      MS. FRITZ:  Absent a directive from the District

14  Court we will resume on Monday.

15      And so what do I think the consequence would be of

16  that decision?

17      If the Court simply says this issue is worthy of

18  further consideration, and I am going to do it -- I am going

19  to take a look at the issue, and I am going to stay the

20  underlying proceeding, which FINRA acknowledges was the

21  product of eight months of interviews, analysis, whatever --

22  I think the consequence of that would be extraordinary

23  appreciation, that someone is going to take the time to look

24  at an issue that affects industry members every day across

25  this country.

1          THE COURT:  All right.  You are all excused.

2          I am reserving decision.

3          (Whereupon, the proceeding concludes, 4:27 p.m.)

4                        *  *  *  *  *

5                        **CERTIFICATE**

6

7          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

8    certify that the foregoing constitutes a true and accurate

9    transcript of my stenographic notes, and is a full, true,

10   and complete transcript of the proceedings to the best of my

11   ability.

12          This certificate shall be considered null and void

13   if the transcript is disassembled and/or photocopied in any

14   manner by any party without authorization of the signatory

15   below.

16

17

18          Dated this 5th day of June, 2023.

19          /s/ Elizabeth Saint-Loth, RPR, FCRR
            Official Court Reporter
20

21

22

23

24

25

**$**

**$20** [1] - 43:21

**'**

**'90s** [1] - 52:23

**/**

**/s** [1] - 101:19

**1**

**1** [2] - 1:6, 70:17
**100** [1] - 1:22
**10175** [1] - 1:15
**1050** [1] - 2:4
**1100** [2] - 2:9, 2:13
**143** [1] - 88:4
**1523** [1] - 1:18
**17th** [1] - 1:14
**19-day** [3] - 15:18, 16:14, 42:2
**1900** [1] - 1:22
**1932** [1] - 72:5
**1995** [1] - 25:15
**1998** [2] - 32:21, 98:15
**19th** [2] - 57:17, 60:3

**2**

**2** [2] - 70:17, 86:8
**20** [1] - 53:4
**20001** [1] - 2:18
**20005** [2] - 2:14
**20036** [1] - 1:18
**20036-5306** [1] - 2:4
**2005** [2] - 38:19, 49:4
**2019** [2] - 66:9, 70:2
**202** [4] - 1:19, 2:5, 2:10, 2:14
**2022** [10] - 12:23, 12:25, 13:13, 14:3, 14:19, 16:24, 18:18, 19:7, 57:13, 75:18
**2023** [2] - 1:6, 101:18
**20530** [1] - 2:10
**21** [3] - 55:18, 55:21, 56:8
**22** [2] - 12:23, 16:24
**220-9600** [1] - 1:19
**23-1506** [2] - 1:3, 3:3
**25** [1] - 98:20
**2:02** [1] - 1:6

**3**

**30,000-foot** [1] - 66:4
**305-8576** [1] - 2:10

**33602** [1] - 1:22
**35,000** [3] - 15:11, 61:20, 65:9
**35,000-violation** [1] - 66:17

**4**

**4** [2] - 13:4, 86:8
**4:27** [1] - 101:3

**5**

**5** [6] - 21:18, 53:15, 53:19, 54:18, 55:3, 92:23
**521** [1] - 1:14
**584-8231** [1] - 1:15
**5th** [1] - 101:18

**6**

**60** [1] - 56:1
**646** [1] - 1:15
**65** [1] - 5:11
**66** [1] - 5:13
**68** [2] - 70:17

**7**

**7(m)** [1] - 6:6

**8**

**8** [1] - 82:10
**806** [2] - 45:13, 91:21
**807** [1] - 45:13
**813** [1] - 1:23
**834-9191** [1] - 1:23
**84** [1] - 71:6
**880-0282** [1] - 2:14
**887-3692** [1] - 2:5

**9**

**905** [1] - 88:5

**A**

**abide** [1] - 55:9
**abiding** [1] - 54:12
**ability** [7] - 16:15, 19:25, 50:19, 68:12, 68:19, 72:20, 101:11
**able** [7] - 4:21, 4:25, 14:10, 43:14, 44:15, 65:23, 74:19
**absent** [3] - 25:21, 100:10, 100:13
**absolutely** [6] - 10:5,

61:18, 63:12, 72:19, 81:10, 92:16
**Academy** [2] - 70:9, 71:4
**accelerated** [2] - 20:5, 65:1
**accept** [1] - 46:23
**Access** [2] - 50:5, 70:2
**according** [1] - 52:5
**accounts** [1] - 67:2
**accurate** [1] - 101:8
**accuse** [3] - 34:3, 80:13
**accused** [3] - 31:1, 34:4, 64:22
**acknowledge** [2] - 73:5, 96:24
**acknowledged** [1] - 21:22
**acknowledges** [1] - 100:20
**acknowledging** [1] - 89:25
**acronym** [1] - 28:22
**Act** [2] - 18:25, 76:14
**act** [5] - 29:16, 29:20, 30:18, 54:15, 70:15
**acting** [4] - 27:8, 31:24, 36:17, 83:13
**Action** [2] - 1:3, 3:3
**action** [50] - 7:22, 10:1, 22:4, 22:18, 22:20, 22:24, 26:7, 26:25, 27:2, 27:15, 27:23, 28:10, 28:16, 31:5, 31:15, 39:3, 39:6, 39:19, 45:7, 45:24, 46:3, 46:17, 49:13, 50:5, 50:8, 50:11, 50:16, 51:8, 51:22, 52:7, 52:13, 67:1, 72:13, 74:3, 74:18, 75:12, 76:4, 78:15, 79:25, 80:7, 82:23, 83:22, 85:1, 85:4, 91:22, 92:9, 94:7, 95:16, 95:18
**actions** [8] - 27:9, 33:8, 51:10, 51:16, 62:8, 74:16, 87:24, 95:2
**activities** [5] - 46:7, 52:20, 70:19, 77:18, 93:9
**activity** [9] - 51:3, 77:7, 77:17, 78:5, 78:8, 78:10, 94:5, 94:10
**actor** [52] - 22:2, 22:4, 22:14, 24:17, 24:20,

25:1, 25:3, 27:5, 29:9, 31:13, 31:23, 32:9, 32:14, 32:23, 35:25, 36:1, 36:7, 36:11, 36:17, 39:8, 39:11, 44:7, 45:3, 49:18, 51:24, 58:24, 68:10, 69:2, 70:5, 72:4, 72:8, 72:13, 72:25, 73:8, 74:23, 74:25, 76:21, 79:20, 80:4, 83:2, 83:13, 85:5, 92:15, 93:9, 93:24, 94:15, 94:19, 94:22, 95:15
**actors** [8] - 30:14, 33:11, 47:18, 48:7, 48:16, 70:6, 70:7, 74:6
**acts** [2] - 39:7, 54:25
**actual** [3] - 20:10, 54:19, 56:5
**add** [2] - 37:22, 81:25
**addition** [2] - 71:11, 82:2
**address** [12] - 6:19, 8:20, 25:11, 28:16, 33:15, 44:15, 66:7, 87:18, 90:10, 92:21, 93:14, 94:20
**addressed** [2] - 49:22, 72:23
**addressing** [5] - 7:17, 7:21, 35:7, 46:12, 82:2
**adds** [1] - 88:12
**adhere** [1] - 99:4
**adherence** [1] - 55:4
**adjudicate** [6] - 24:14, 37:18, 42:17, 43:1, 43:2, 43:14
**adjudicated** [1] - 43:7
**adjudicates** [2] - 10:14, 44:19
**adjudicating** [1] - 34:3
**adjudication** [6] - 34:7, 34:9, 42:21, 42:24, 42:25, 95:17
**adjudications** [2] - 42:22, 44:10
**Adjudicatory** [1] - 12:25
**adjudicatory** [1] - 33:7
**Adkins** [1] - 85:12
**administration** [3] - 27:6, 31:25, 32:6
**administrative** [12] - 12:9, 23:4, 23:11, 23:16, 24:12, 33:6, 43:7, 43:24, 52:11,

62:8, 63:25, 87:4
**administratively** [1] - 62:11
**administrators** [1] - 71:10
**admit** [1] - 25:10
**admittedly** [1] - 26:25
**adopt** [1] - 47:14
**Advisors** [2] - 3:3, 81:14
**ADVISORS** [1] - 1:3
**advisory** [2] - 30:11, 46:22
**affect** [1] - 79:1
**affects** [2] - 78:15, 100:24
**affiliated** [1] - 9:18
**affirmation** [1] - 20:16
**affirmed** [3] - 13:18, 17:8, 21:5
**affirms** [1] - 13:12
**affording** [1] - 81:5
**afoul** [1] - 31:4
**afternoon** [12] - 3:9, 3:13, 3:18, 3:22, 3:24, 6:22, 9:4, 49:13, 68:8, 81:23, 82:15, 83:1
**agencies** [4] - 33:7, 33:8, 48:13, 87:4
**agency** [25] - 23:4, 23:16, 24:5, 25:20, 26:13, 34:7, 34:10, 39:2, 39:5, 45:23, 46:2, 46:3, 46:15, 47:2, 47:5, 52:11, 53:10, 57:8, 62:9, 63:5, 72:2, 85:10, 87:25, 95:7, 95:17
**agent** [4] - 27:8, 31:24, 39:6, 39:8
**aggressively** [2] - 53:22, 62:2
**ago** [1] - 38:20
**agree** [8] - 22:7, 26:21, 32:3, 39:10, 54:1, 57:6, 76:24, 76:25
**agreed** [2] - 4:20, 21:6
**ahead** [4] - 7:5, 7:14, 9:16, 23:2
**aided** [1] - 2:20
**aired** [2] - 42:4, 66:20
**airlines** [2] - 70:6, 74:8
**al** [1] - 3:4
**ALEX** [1] - 2:3
**Alex** [1] - 3:20
**ALJ** [14] - 7:12, 16:19, 18:9, 34:10, 43:1,

43:2, 43:23, 44:22, 52:9, 52:10, 91:23, 95:8, 95:10
**ALJ-like** [1] - 95:8
**ALJs** [4] - 19:17, 44:1, 44:20, 54:13
**alleged** [1] - 98:23
**allegedly** [1] - 78:21
**allow** [2] - 57:19, 62:24
**allows** [1] - 65:4
**allusions** [1] - 96:7
**almost** [5] - 22:8, 59:17, 88:14, 88:15, 89:5
**alongside** [1] - 38:25
**Alpine** [55] - 3:11, 9:5, 9:7, 12:4, 12:13, 15:12, 15:21, 17:25, 18:5, 18:25, 19:23, 21:13, 37:2, 37:4, 37:9, 45:8, 54:21, 57:23, 60:4, 60:22, 60:23, 61:2, 61:3, 61:14, 61:18, 62:2, 64:21, 65:4, 66:9, 66:13, 66:20, 66:23, 67:1, 67:2, 68:22, 75:25, 76:1, 76:6, 77:6, 77:13, 78:1, 79:4, 79:14, 79:18, 80:9, 81:1, 81:2, 81:5, 81:11, 81:13, 81:14, 81:17, 86:4, 97:25
**alpine** [2] - 9:12, 9:17
**ALPINE** [2] - 1:3, 1:13
**Alpine's** [7] - 10:24, 15:17, 16:3, 73:23, 73:24, 74:25, 81:3
**alternative** [1] - 84:7
**amend** [2] - 51:15, 92:5
**amended** [2] - 19:5, 90:17
**Amendment** [35] - 22:9, 22:11, 22:21, 23:6, 23:21, 23:25, 24:8, 24:9, 31:4, 41:18, 41:19, 41:20, 42:5, 42:14, 42:16, 42:18, 44:8, 44:23, 45:4, 45:6, 51:6, 64:12, 75:3, 76:23, 77:4, 77:21, 78:1, 78:6, 80:7, 93:21, 93:22, 94:5, 94:13, 94:18
**amendment** [1] - 51:1
**AMERICA** [1] - 1:8

**America** [1] - 3:5
**AMIR** [1] - 2:2
**amir** [2] - 3:19, 68:17
**amount** [1] - 42:25
**ample** [4] - 42:1, 68:1, 75:17, 75:18
**Amtrak** [2] - 26:11, 48:24
**analogizes** [1] - 95:23
**analogizing** [1] - 88:6
**analogous** [2] - 12:10, 95:10
**analogy** [2] - 30:20, 94:11
**analyses** [1] - 67:7
**analysis** [17] - 26:9, 26:15, 29:13, 33:19, 35:9, 35:11, 35:19, 48:19, 48:23, 48:24, 78:16, 78:25, 79:2, 84:16, 84:24, 99:24, 100:21
**analytical** [1] - 26:4
**analyzing** [1] - 85:16
**animated** [1] - 84:14
**announces** [1] - 30:25
**answer** [6] - 10:2, 13:21, 44:16, 52:14, 89:9, 91:6
**answers** [1] - 90:22
**antinuclear** [1] - 78:5
**apart** [1] - 45:22
**appeal** [22] - 12:17, 12:19, 12:24, 13:5, 14:3, 14:15, 14:17, 15:5, 17:14, 17:15, 17:18, 19:25, 20:14, 20:17, 21:20, 46:21, 57:15, 57:19, 62:25, 97:19, 98:2
**appealable** [1] - 12:18
**appealed** [1] - 20:15
**appealing** [1] - 20:4
**Appeals** [3] - 86:21, 87:8, 98:1
**appeals** [1] - 20:22
**Appeals'** [1] - 97:22
**appear** [7] - 68:4, 79:8, 79:18, 80:2, 80:9, 80:12, 80:13
**APPEARANCES** [3] - 1:12, 1:25, 2:1
**appellate** [2] - 17:12, 57:16
**applicable** [5] - 26:17, 26:22, 26:24, 70:20, 82:11
**application** [1] - 21:4
**applies** [4] - 26:9, 50:18, 83:19, 96:25

**apply** [11] - 6:10, 23:24, 26:16, 31:8, 34:11, 68:5, 75:3, 76:18, 84:22, 89:18, 99:24
**applying** [1] - 23:9
**appoint** [2] - 41:2, 41:3
**appointed** [4] - 40:7, 54:13, 71:12, 75:9
**appointment** [1] - 62:23
**Appointments** [7] - 40:17, 40:22, 41:11, 41:15, 42:6, 75:7, 83:18
**appreciate** [4] - 6:4, 7:10, 8:25, 80:20
**appreciation** [1] - 100:23
**approach** [5] - 8:8, 8:17, 15:22, 15:25, 82:19
**approached** [1] - 26:11
**approaches** [1] - 86:20
**appropriate** [3] - 30:12, 53:9, 90:23
**appropriateness** [1] - 16:10
**approval** [1] - 72:1
**approve** [2] - 69:21, 72:20
**approved** [2] - 47:8, 76:14
**April** [2] - 57:17, 60:3
**arbitration** [2] - 33:16, 33:24
**area** [1] - 94:2
**arguably** [2] - 61:15, 73:9
**argue** [2] - 22:3, 100:3
**argued** [1] - 90:19
**arguing** [1] - 15:20
**argument** [17] - 26:24, 26:25, 27:14, 27:23, 28:16, 32:12, 35:2, 51:7, 51:13, 51:20, 53:14, 57:23, 58:7, 63:4, 84:7, 85:15, 90:20
**arguments** [12] - 11:6, 15:19, 15:20, 16:15, 17:22, 42:3, 58:5, 58:14, 65:22, 75:10, 94:7
**arisen** [1] - 84:5
**arm** [2] - 98:25, 99:2
**arose** [1] - 66:8

**array** [1] - 57:24
**Article** [2] - 90:14, 90:18
**aside** [2] - 16:21, 84:11
**aspect** [1] - 45:1
**assert** [1] - 62:3
**asserting** [1] - 23:21
**assertion** [1] - 27:19
**assist** [2] - 29:22, 48:12
**assistance** [1] - 47:7
**Assistant** [1] - 4:2
**associated** [1] - 16:7
**Association** [1] - 91:16
**association** [19] - 30:10, 30:20, 30:24, 30:25, 31:13, 71:3, 71:5, 71:7, 71:8, 71:17, 71:19, 77:3, 77:11, 77:12, 77:23, 78:2, 91:19, 94:12
**association's** [2] - 31:3, 78:4
**associational** [2] - 78:7, 78:12
**associations** [3] - 29:21, 30:4, 30:14
**assuming** [1] - 53:6
**atayrani@ gibsondunn.com** [1] - 2:5
**Athletic** [1] - 91:16
**athletic** [3] - 71:3, 71:17, 91:19
**attention** [1] - 83:9, 99:15
**attribute** [3] - 50:16, 51:9, 60:21
**attributed** [1] - 32:5
**attributes** [3] - 67:24, 92:14, 93:2
**authorities** [2] - 30:12, 45:16
**AUTHORITY** [1] - 1:6
**Authority** [1] - 3:5
**authority** [21] - 21:23, 23:4, 23:15, 30:13, 36:2, 45:18, 45:19, 45:22, 47:16, 51:15, 54:15, 54:24, 55:1, 62:9, 70:15, 84:20, 91:18, 92:4, 92:5, 99:7
**authorization** [1] - 101:14
**automatic** [8] - 20:17, 88:14, 88:16, 89:5, 89:22, 96:14, 96:17,

96:21
**automatically** [2] - 21:23, 90:5
**avail** [1] - 61:16
**available** [3] - 75:10, 87:10, 87:13
**Avenue** [3] - 1:14, 1:18, 2:4
**avoiding** [1] - 8:16
**await** [1] - 64:24
**aware** [4] - 17:24, 18:6, 20:12, 98:16
**awful** [1] - 95:16
**Axon** [37] - 4:16, 4:18, 23:2, 23:7, 23:8, 23:9, 23:12, 23:23, 24:1, 33:4, 59:19, 60:7, 60:16, 61:7, 61:8, 62:4, 62:7, 62:14, 62:17, 63:8, 67:18, 78:14, 78:19, 79:1, 80:15, 87:16, 87:17, 88:4, 89:17, 89:21, 89:22, 90:20, 93:19, 95:20, 96:15, 96:16

**B**

**back-and-forth** [1] - 60:4
**backhand** [1] - 32:12
**bad** [3] - 100:9, 100:11, 100:12
**bail** [2] - 64:14, 64:15
**balance** [2] - 8:2, 65:3
**Bandimere** [1] - 38:9
**bar** [12] - 30:4, 30:7, 30:10, 30:14, 30:20, 30:24, 30:25, 31:3, 31:12, 77:11, 78:3, 95:7
**BARNES** [80] - 1:17, 9:4, 9:12, 9:25, 10:11, 10:14, 10:17, 10:21, 11:15, 11:17, 12:18, 13:10, 13:21, 14:4, 14:9, 14:20, 21:12, 21:15, 22:8, 22:12, 22:17, 23:17, 23:23, 24:22, 25:2, 25:6, 25:13, 25:22, 26:1, 26:19, 26:23, 29:10, 29:18, 30:19, 30:23, 33:15, 33:19, 35:4, 35:12, 36:1, 36:8, 36:18, 36:21, 36:25, 37:13, 38:5, 38:15, 39:13, 39:15, 40:1, 40:11, 40:15,

41:1, 41:20, 41:23, 42:8, 42:16, 42:24, 43:5, 43:17, 43:23, 44:12, 44:15, 45:5, 48:14, 48:17, 49:19, 50:2, 91:11, 91:13, 92:21, 92:24, 93:5, 93:25, 95:1, 96:12, 96:16, 96:24, 98:4, 98:7
**Barnes** [14] - 3:12, 7:21, 9:5, 16:22, 21:11, 21:12, 55:14, 57:6, 69:14, 70:3, 82:15, 82:21, 82:25, 83:10
**Barnes's** [1] - 82:8
**Barrios** [1] - 1:21
**bars** [2] - 21:4, 64:9
**based** [5] - 16:14, 34:16, 34:19, 43:13, 54:15
**basic** [1] - 54:13
**Basin** [2] - 24:1, 90:19
**basis** [3] - 68:10, 81:12, 91:3
**bbarnes@ cooperkirk.com** [1] - 1:19
**bear** [1] - 58:10
**become** [2] - 24:10, 98:25
**BEFORE** [1] - 1:10
**began** [1] - 52:25
**begging** [1] - 35:19
**begin** [2] - 5:14, 38:13
**beginning** [6] - 16:22, 28:15, 33:5, 50:6, 61:11, 91:14
**behalf** [2] - 4:1, 82:6
**behind** [1] - 64:9
**believes** [1] - 54:5
**belong** [2] - 22:16, 77:21, 77:23
**below** [1] - 101:15
**bench** [3] - 11:19, 11:20, 32:20
**benefit** [2] - 24:4, 38:14
**benefits** [1] - 31:6
**BERYL** [1] - 1:10
**best** [3] - 24:23, 38:8, 101:10
**better** [4] - 6:2, 7:13, 17:11, 38:16
**between** [17] - 6:7, 9:7, 10:23, 14:13, 19:11, 47:9, 48:11, 54:20, 59:20, 59:21, 60:4, 66:20, 70:11,

71:2, 71:18, 89:5, 91:25
**beyond** [1] - 19:18
**big** [2] - 39:23, 95:11
**binding** [1] - 33:13
**bit** [13] - 8:7, 8:12, 11:3, 11:14, 12:22, 23:2, 23:19, 43:20, 68:14, 80:23, 92:8, 94:6, 96:10
**bleeds** [1] - 13:24
**Blount** [5] - 25:12, 25:13, 27:12, 27:17, 38:17
**Board** [2] - 25:17, 91:17
**board** [13] - 25:20, 27:21, 28:24, 28:25, 41:14, 71:7, 71:8, 71:9, 71:11, 71:12, 71:13, 75:8, 83:20
**board's** [1] - 27:19
**body** [6] - 12:24, 68:24, 77:11, 79:8, 80:3, 84:5
**bottom** [1] - 82:18
**bottom-line** [1] - 82:18
**Branch** [2] - 2:9, 2:13
**branch** [1] - 40:9
**Brentwood** [6] - 70:9, 70:25, 71:4, 71:17, 91:14, 91:25
**Brian** [3] - 3:12, 9:5, 21:12
**BRIAN** [1] - 1:17
**brief** [12] - 11:5, 11:24, 25:10, 25:24, 49:21, 59:16, 82:25, 85:15, 86:8, 91:11, 91:12
**briefed** [1] - 5:14
**briefing** [8] - 4:13, 5:5, 25:11, 47:15, 48:5, 55:17, 80:17, 99:14
**briefly** [2] - 45:11, 82:1
**briefs** [4] - 24:16, 34:17, 34:20, 38:10
**bring** [6] - 57:18, 57:20, 62:8, 64:25, 95:2, 99:15
**bringing** [4] - 36:9, 40:4, 60:8, 80:14
**brings** [3] - 51:16, 54:20, 93:11
**brink** [1] - 67:19
**broad** [3] - 69:10, 93:4, 93:5
**broader** [2] - 29:20, 38:2

**broadly** [1] - 74:2
**broker** [7] - 9:18, 28:4, 35:17, 37:3, 39:22, 39:23, 77:1
**broker-dealer** [3] - 9:18, 28:4, 37:3
**broker-dealers** [3] - 35:17, 39:22, 39:23
**brokered** [1] - 39:18
**brokered-dealer** [1] - 39:18
**brokers** [1] - 27:25
**brought** [1] - 18:21
**buck** [1] - 47:15
**budged** [1] - 18:16
**builds** [1] - 76:15
**built** [1] - 76:3
**burden** [3] - 44:25, 74:10, 74:12
**buried** [1] - 80:17
**business** [6] - 6:13, 10:24, 12:5, 36:14, 37:5, 37:11, 60:11, 61:6
**busy** [2] - 5:6, 40:24

### C

**C.F.R** [1] - 86:9
**Cancellation** [1] - 59:11
**cancellation** [3] - 59:14, 61:22, 66:25
**cannot** [5] - 54:9, 54:10, 54:16, 55:6, 91:2
**CAPITAL** [1] - 1:3
**Capital** [3] - 3:3, 9:7, 81:14
**card** [1] - 64:13
**care** [1] - 42:7
**career** [1] - 28:10
**careful** [1] - 89:10
**Carter** [1] - 85:12
**case** [75] - 4:14, 4:15, 6:1, 15:9, 15:18, 15:22, 15:24, 17:15, 17:23, 18:7, 24:17, 24:23, 25:9, 25:11, 25:13, 25:15, 25:18, 27:4, 28:3, 28:22, 30:13, 32:10, 32:21, 32:22, 33:15, 33:16, 34:13, 35:5, 38:8, 38:9, 38:17, 38:18, 38:19, 38:21, 45:11, 45:23, 46:1, 46:12, 46:18, 47:10, 48:5, 53:13, 53:16, 53:17, 55:22, 57:5, 58:15,

58:16, 64:25, 65:1, 70:3, 76:9, 78:14, 80:8, 83:11, 83:12, 84:5, 84:14, 86:7, 91:20, 91:25, 94:1, 94:15, 94:17, 94:23, 95:9, 95:24, 96:2, 98:11
**case-specific** [1] - 83:11
**cases** [15] - 24:16, 24:21, 26:11, 30:1, 31:20, 32:2, 34:9, 39:3, 57:24, 63:17, 72:12, 89:6, 92:9, 99:16, 99:22
**categorical** [1] - 48:19
**caveat** [1] - 89:24
**cease** [24] - 12:3, 12:14, 12:15, 13:4, 13:18, 14:22, 14:23, 14:24, 15:7, 15:11, 15:13, 17:2, 18:1, 18:17, 18:19, 18:22, 22:1, 58:11, 59:1, 59:2, 59:12, 65:8, 65:10, 66:12
**CEO** [1] - 83:19
**certain** [6] - 15:20, 17:21, 17:24, 21:4, 43:6, 64:9
**certainly** [11] - 17:21, 36:1, 68:18, 68:22, 73:5, 77:17, 88:20, 88:21, 89:3, 89:19, 90:15
**CERTIFICATE** [1] - 101:5
**certificate** [2] - 101:12
**certify** [1] - 101:8
**challenge** [10] - 77:4, 77:10, 77:16, 77:18, 77:21, 77:24, 78:9, 88:10, 88:17, 90:20
**challenged** [1] - 85:22
**challenges** [5] - 62:9, 62:11, 62:19, 63:25, 64:2
**challenging** [7] - 35:22, 77:13, 78:3, 78:11, 87:22, 87:23, 88:8
**chance** [1] - 61:13
**change** [1] - 47:11
**changed** [2] - 64:14
**changes** [2] - 98:19, 98:22
**characteristics** [1] - 19:12
**characterized** [2] -

5:19, 38:22
**charge** [3] - 16:1, 18:4, 18:5
**charged** [4] - 15:21, 20:11, 33:25, 61:22
**charges** [1] - 17:25
**charging** [1] - 61:23
**charter** [1] - 31:21
**check** [1] - 63:11
**chemical** [1] - 95:5
**choice** [3] - 7:9, 44:21, 44:22
**choose** [1] - 71:24
**chooses** [1] - 56:1
**Christine** [1] - 4:3
**CHRISTINE** [1] - 2:12
**christine.l.coogle@ usdoj.gov** [1] - 2:15
**chronology** [1] - 61:25
**Circuit** [40] - 8:6, 12:9, 25:7, 25:15, 28:3, 28:17, 29:11, 32:8, 32:17, 32:19, 33:9, 34:14, 35:6, 38:9, 38:10, 38:14, 38:16, 38:19, 38:21, 39:2, 39:10, 45:11, 46:1, 46:11, 46:14, 49:5, 49:6, 52:2, 57:7, 69:7, 73:1, 83:10, 83:16, 84:17, 84:18, 89:25, 91:1, 95:9, 97:15, 97:21
**circuit** [3] - 8:15, 8:16, 8:21
**Circuit's** [8] - 25:3, 27:3, 27:17, 28:12, 49:3, 83:9, 91:20, 97:18
**circular** [1] - 72:13
**circumstance** [3] - 64:6, 83:12, 87:2
**circumstances** [2] - 64:16, 77:9
**citation** [1] - 86:9
**cite** [2] - 72:9, 86:9
**cited** [2] - 25:9, 38:10
**citing** [1] - 55:19
**CIV** [1] - 2:12
**civil** [4] - 6:6, 43:4, 43:22, 63:15
**Civil** [4] - 1:3, 2:9, 2:13, 3:3
**claim** [38] - 22:9, 22:11, 22:15, 22:21, 23:6, 23:21, 23:25, 24:4, 24:6, 24:8, 24:9, 24:14, 39:20, 40:17, 40:18, 41:7,

41:17, 41:19, 41:20,
42:15, 42:16, 43:2,
43:8, 43:10, 43:22,
43:24, 45:4, 45:6,
54:18, 77:4, 77:5,
78:1, 80:7, 87:19,
88:3, 90:6, 93:22
**claims** [32] - 4:20,
10:15, 22:6, 22:22,
23:3, 23:5, 23:10,
23:15, 23:20, 23:24,
24:3, 40:4, 40:16,
43:1, 43:6, 43:18,
44:19, 60:24, 62:13,
62:17, 63:19, 63:20,
63:21, 76:22, 80:1,
80:6, 83:6, 83:24,
84:1, 85:16, 88:8
**clarify** [2] - 14:8, 62:16
**clause** [1] - 42:7
**Clause** [8] - 27:10,
40:17, 40:22, 41:11,
41:16, 42:6, 75:7,
83:19
**clear** [14] - 4:10, 10:5,
28:14, 43:17, 46:4,
48:4, 49:17, 57:11,
58:18, 61:9, 62:14,
68:24, 92:10, 92:16
**clearing** [2] - 4:8, 9:17
**clearly** [6] - 26:17,
26:21, 44:13, 49:19,
71:21, 74:12
**client's** [1] - 30:8
**close** [4] - 19:23, 20:9,
72:15, 82:16
**closed** [1] - 61:18
**closely** [9] - 27:17,
29:6, 53:1, 69:13,
70:4, 74:7, 94:22,
95:1
**closer** [2] - 34:5,
69:24
**closest** [1] - 48:9
**club** [1] - 94:12
**co** [5] - 9:13, 14:9,
15:2, 42:10, 44:15
**co-counsel** [5] - 9:13,
14:9, 15:2, 42:10,
44:15
**Coal** [1] - 85:12
**cognizable** [1] - 79:17
**coin** [1] - 94:6
**collaborative** [1] -
53:1
**collapse** [1] - 97:9
**collateral** [5] - 87:21,
88:1, 88:15, 96:4,
96:21
**collateralism** [1] -

87:21
**colleague** [4] - 3:20,
21:16, 94:20, 96:12
**Collins** [3] - 26:12,
40:3, 48:25
**colloquy** [1] - 21:16
**Columbia** [3] - 31:24,
39:7, 83:14
**COLUMBIA** [1] - 1:1
**Columbia's** [1] - 27:6
**coming** [3] - 23:10,
34:1, 94:14
**commentary** [1] -
98:18
**commentators** [1] -
98:19
**comments** [4] - 6:4,
67:22, 82:8, 98:9
**Commission** [7] -
20:23, 24:13, 44:2,
44:19, 51:17, 51:18,
52:10
**commission** [7] -
21:5, 21:8, 41:2,
41:3, 44:20, 95:11
**commission's** [1] -
87:24
**commissioners** [4] -
40:20, 41:13, 54:7,
98:18
**committee** [1] - 30:24
**committees** [1] - 30:7
**committing** [1] - 36:15
**common** [1] - 9:20
**communicated** [2] -
7:1, 57:5
**communications** [1] -
7:5
**Community** [2] - 50:5,
70:2
**compact** [1] - 27:25
**companies** [3] - 9:19,
70:6, 74:8
**company** [3] - 9:8,
95:5, 95:7
**compelled** [2] - 78:7,
94:2
**complaining** [1] -
28:19
**complaint** [7] - 19:5,
54:7, 85:23, 90:17,
98:17, 98:23
**complaints** [1] - 66:2
**complete** [2] - 96:8,
101:10
**completely** [1] - 71:9
**complex** [1] - 29:22
**compliance** [3] -
18:22, 59:2, 81:3
**complied** [3] - 15:14,

17:2, 18:19
**comply** [2] - 12:19,
70:8
**complying** [1] - 65:8
**comport** [2] - 75:6,
76:11
**comprised** [1] - 71:9
**computer** [1] - 2:20
**computer-aided** [1] -
2:20
**conceded** [1] - 97:5
**conceding** [1] - 82:16
**concern** [2] - 20:10,
86:22
**concerned** [1] - 67:15
**concerning** [2] -
57:18, 62:1
**concerns** [1] - 87:12
**concluded** [1] - 72:24
**concludes** [3] - 28:8,
83:11, 101:3
**conclusion** [2] -
82:18, 83:17
**concomitant** [1] -
65:11
**concurrences** [2] -
23:14, 78:19
**concurrent** [1] - 78:19
**condition** [2] - 28:9,
94:4
**conduct** [8] - 18:3,
32:4, 38:1, 64:22,
65:10, 76:19, 95:8,
98:24
**conducted** [2] - 76:13,
84:17
**confer** [2] - 55:6,
91:10
**conferral** [2] - 4:12,
6:5
**confirmed** [1] - 83:21
**conformity** [1] - 41:10
**confront** [1] - 99:1
**confronted** [1] - 5:9
**confronting** [1] - 33:6
**confused** [1] - 11:6
**confusing** [2] - 12:22,
13:23
**confusion** [1] - 89:25
**Congress** [4] - 29:17,
29:20, 47:12, 85:1
**congressional** [1] -
31:21
**Connecticut** [1] - 2:4
**connection** [4] -
59:17, 59:20, 59:21,
66:21
**connectivity** [1] - 32:6
**consequence** [5] -
15:10, 99:12, 100:1,

100:15, 100:22
**consequences** [8] -
44:6, 47:13, 73:7,
73:19, 73:21, 92:13,
92:25, 98:13
**consider** [1] - 24:2
**considerable** [1] -
67:14
**consideration** [2] -
64:24, 100:18
**considerations** [1] -
58:1
**considered** [8] -
47:17, 58:17, 61:17,
64:9, 82:13, 85:5,
92:15, 101:12
**considering** [1] - 67:1
**consistent** [4] - 75:13,
75:15, 76:14, 84:12
**constitutes** [3] -
28:10, 95:18, 101:8
**Constitution** [13] -
26:9, 26:15, 34:11,
41:12, 43:21, 44:4,
50:18, 50:21, 54:12,
55:4, 55:9, 85:2,
99:4
**constitutional** [52] -
4:20, 10:15, 22:5,
22:22, 23:3, 23:9,
23:15, 23:20, 23:24,
31:8, 31:10, 35:23,
39:20, 40:4, 41:16,
62:9, 62:11, 62:17,
62:19, 63:18, 63:20,
63:21, 63:25, 64:2,
70:8, 74:8, 75:1,
76:17, 76:22, 79:9,
79:11, 79:15, 79:16,
79:17, 80:1, 80:4,
80:5, 80:6, 80:10,
82:14, 83:4, 84:19,
84:21, 85:16, 87:19,
88:8, 88:10, 88:17,
90:6, 90:10, 95:24,
97:8
**constitutionality** [2] -
24:9, 88:9
**constraints** [1] - 74:9
**contemplates** [1] -
88:1
**contempt** [1] - 58:2
**contempt-like** [1] -
58:2
**contention** [1] - 22:7
**contested** [1] - 32:15
**context** [11] - 49:23,
75:22, 80:23, 84:6,
84:22, 88:15, 88:25,
90:14, 93:13, 95:15,

96:22
**contexts** [1] - 63:16
**continue** [5] - 7:3,
37:10, 57:15, 64:24,
73:24
**CONTINUED** [1] - 1:25
**Continued** [1] - 2:1
**continuous** [1] - 60:3
**contrary** [1] - 15:22
**control** [13] - 28:25,
40:10, 45:18, 45:20,
45:22, 45:25, 46:15,
51:14, 52:2, 69:15,
69:17, 70:14, 70:23
**controlled** [3] - 25:21,
31:22, 85:12
**converted** [1] - 48:15
**Coogle** [1] - 4:3
**COOGLE** [1] - 2:12
**Cooper** [2] - 1:17,
3:12
**cooperation** [1] - 47:5
**cooperative** [1] -
48:11
**core** [2] - 34:5, 34:12
**Corp** [4] - 27:4, 27:7,
29:15, 31:20
**corporate** [2] - 9:14,
19:4
**Corporation** [1] - 3:4
**CORPORATION** [1] -
1:4
**corporation** [1] -
83:13
**correct** [2] - 9:23,
10:6, 10:11, 10:17,
10:21, 14:20, 22:8,
22:17, 22:23, 22:24,
27:11, 28:21, 31:12,
33:18, 38:4, 44:12,
77:24, 81:16, 81:19,
85:3, 85:4, 90:25
**correctly** [2] - 9:6,
28:22
**cost** [1] - 15:25
**costs** [1] - 16:7
**Council** [1] - 12:25
**counsel** [10] - 3:7,
6:20, 9:13, 14:9,
15:2, 42:10, 44:15,
86:14, 91:24, 97:4
**counsel's** [1] - 4:2
**country** [4] - 24:25,
43:16, 99:5, 100:25
**couple** [5] - 26:1,
26:11, 34:18, 68:14,
80:18
**course** [7] - 11:23,
17:20, 66:17, 76:2,
84:21, 86:24, 87:7

**Court** [104] - 2:17,
2:17, 3:2, 6:24, 6:25,
7:6, 9:2, 10:3, 10:14,
11:1, 11:20, 12:7,
21:17, 24:2, 24:7,
25:8, 25:14, 25:16,
26:10, 27:16, 29:12,
29:14, 30:23, 31:2,
31:12, 31:16, 32:2,
33:3, 34:6, 34:9,
35:7, 37:14, 37:20,
38:25, 39:10, 43:10,
44:4, 44:5, 45:12,
45:13, 46:5, 47:14,
47:23, 48:1, 48:10,
48:14, 48:17, 49:8,
49:20, 49:21, 50:8,
50:9, 50:13, 51:21,
52:14, 52:19, 57:11,
59:19, 63:9, 64:24,
65:4, 68:16, 69:8,
69:12, 69:18, 69:20,
70:4, 72:5, 72:7,
72:9, 72:11, 72:16,
73:3, 77:9, 79:24,
80:15, 83:1, 86:21,
87:8, 88:4, 90:21,
91:10, 92:9, 92:20,
95:15, 95:17, 95:22,
95:23, 96:3, 97:14,
97:16, 97:20, 97:22,
97:24, 98:1, 98:11,
98:13, 98:17, 100:2,
100:11, 100:14,
100:17, 101:19
**court** [22] - 5:7, 8:19,
23:5, 23:10, 39:19,
43:11, 43:15, 44:21,
47:16, 49:1, 50:15,
57:22, 61:9, 61:17,
62:10, 72:23, 86:3,
87:3, 89:18, 91:15,
93:19
**COURT** [171] - 1:1,
1:11, 3:13, 3:16,
3:22, 4:4, 4:7, 6:22,
7:9, 7:11, 7:17, 7:20,
7:24, 8:15, 9:6, 9:15,
9:21, 9:24, 10:4,
10:12, 10:16, 10:18,
11:2, 11:16, 12:17,
12:21, 13:11, 13:23,
14:7, 14:18, 15:3,
15:10, 16:8, 16:12,
16:18, 17:1, 17:9,
18:8, 18:11, 18:13,
18:16, 19:16, 20:13,
20:16, 20:22, 21:10,
21:14, 22:2, 22:10,
22:13, 23:1, 23:19,
24:15, 24:24, 25:5,

25:12, 25:18, 25:23,
26:17, 26:21, 28:21,
29:16, 29:19, 30:22,
32:8, 33:18, 34:15,
35:10, 35:24, 36:4,
36:13, 36:19, 36:23,
37:12, 37:24, 38:12,
39:9, 39:14, 39:16,
40:8, 40:13, 40:24,
41:13, 41:22, 42:1,
42:14, 42:20, 43:3,
43:12, 43:21, 44:6,
44:13, 45:2, 46:18,
47:21, 48:15, 49:15,
49:25, 52:15, 53:23,
54:4, 54:23, 55:13,
56:10, 56:16, 57:1,
57:3, 57:13, 58:21,
59:5, 59:15, 60:6,
60:16, 60:18, 60:24,
61:7, 62:4, 63:7,
63:14, 64:11, 65:6,
65:15, 65:19, 68:1,
68:6, 68:9, 69:1,
69:8, 69:21, 70:9,
71:20, 73:7, 73:11,
73:22, 74:15, 74:22,
75:16, 76:20, 77:20,
78:13, 79:20, 80:12,
81:13, 81:18, 81:20,
81:24, 87:15, 88:21,
89:4, 89:16, 90:7,
91:8, 91:12, 92:12,
92:23, 92:25, 93:16,
94:25, 96:5, 96:13,
96:18, 98:3, 98:5,
98:16, 99:9, 99:13,
99:19, 100:4, 100:8,
100:11, 101:1
**court's** [1] - 72:11
**Court's** [6] - 5:20,
26:12, 50:4, 52:6,
73:5, 85:12
**courtroom** [1] - 58:8
**COURTROOM** [1] -
3:2
**courts** [7] - 24:14,
44:14, 46:19, 58:1,
75:11, 85:7, 99:1
**created** [2] - 29:16,
29:19
**creation** [1] - 34:25
**criminal** [3] - 30:13,
63:16, 64:7
**critical** [1] - 27:24
**cross** [1] - 76:7
**cross-examine** [1] -
76:7
**Crutcher** [3] - 2:3,
3:19, 3:21

**culmination** [1] -
80:24
**current** [2] - 7:18, 13:6
**customer** [4] - 12:6,
66:2, 66:11, 66:15
**customers** [1] - 73:23
**cuts** [1] - 30:20
**Cuva** [1] - 1:21

## D

**D.C** [47] - 1:7, 2:18,
8:6, 12:9, 25:3, 25:7,
25:15, 27:3, 27:17,
28:3, 28:12, 28:17,
29:11, 32:8, 32:17,
32:19, 33:9, 34:14,
35:6, 38:16, 38:19,
38:21, 39:2, 39:10,
45:11, 46:1, 46:11,
46:14, 49:3, 49:5,
49:6, 52:2, 57:5,
57:7, 63:18, 63:21,
69:7, 82:10, 83:9,
83:10, 83:16, 91:1,
91:20, 95:9, 97:15,
97:17, 97:21
**damage** [1] - 12:5
**damages** [3] - 43:9,
43:19, 43:25
**dangerous** [1] - 35:10
**Dated** [1] - 101:18
**David** [1] - 3:14
**DAVID** [1] - 1:21
**days** [12] - 11:9,
11:24, 34:18, 55:18,
55:21, 56:1, 56:8,
59:19, 67:18, 68:14,
76:6, 99:10
**DC** [4] - 1:18, 2:4,
2:10, 2:14
**de** [3] - 46:23, 51:16,
72:21
**deal** [2] - 19:19, 92:7
**dealer** [4] - 9:18, 28:4,
37:3, 39:18
**dealers** [5] - 27:25,
35:17, 39:22, 39:23,
77:2
**dealing** [1] - 98:24
**death** [5] - 16:23,
16:24, 19:3, 19:4,
19:21
**decades** [2] - 84:15,
85:8
**decide** [5] - 32:21,
47:1, 55:22, 68:13,
99:10
**decided** [8] - 7:6, 7:7,
32:19, 57:17, 57:20,

59:6, 87:19, 88:10
**deciding** [3] - 24:2,
34:2, 80:15
**decision** [38] - 11:11,
11:25, 12:3, 12:23,
13:13, 13:16, 17:6,
19:22, 19:24, 20:1,
20:4, 20:13, 20:18,
20:19, 21:20, 26:12,
38:19, 39:1, 55:15,
55:19, 55:20, 55:24,
56:8, 56:11, 56:17,
56:19, 57:13, 61:5,
67:19, 72:6, 73:18,
75:18, 78:4, 78:19,
82:9, 100:16, 101:2
**decisions** [8] - 4:17,
4:18, 17:6, 21:2,
29:3, 72:9, 77:14,
77:15
**declaration** [2] - 40:19
**deeply** [1] - 99:6
**defend** [5] - 61:2,
62:2, 69:22, 76:6,
76:9
**defendant** [5] - 3:6,
3:19, 11:7, 11:8,
94:16
**Defendant** [2] - 1:7,
1:8
**defendant's** [1] -
51:25
**defendant-**
**intervenor** [1] - 11:8
**defendants** [5] - 22:3,
47:25, 60:9, 63:17,
94:9
**defending** [1] - 85:22
**defense** [4] - 51:1,
51:19, 94:16, 94:17
**defer** [4] - 7:6, 9:13,
15:1, 42:10
**deficiencies** [1] -
79:15
**definition** [1] - 17:7
**delay** [4] - 10:8, 39:24,
65:4, 67:13
**delayed** [1] - 10:12
**delays** [2] - 81:3, 81:4
**delegated** [3] - 54:15,
54:24, 55:1
**delegation** [1] - 84:20
**delve** [1] - 100:3
**demands** [1] - 81:3
**demonstrate** [2] -
79:4, 97:5
**denied** [3] - 12:7,
16:20, 97:17
**denominate** [1] -
50:11

**deny** [2] - 5:3, 97:24
**denying** [1] - 5:21
**department** [2] -
40:21, 40:22
**Department** [4] - 2:8,
3:25, 66:10, 82:6
**deprive** [2] - 54:10,
54:17
**deprives** [1] - 90:20
**depth** [1] - 99:23
**DEPUTY** [1] - 3:2
**deputy** [1] - 54:8
**derived** [1] - 70:15
**describe** [3] - 49:7,
70:13, 70:18
**described** [4] - 42:2,
64:6, 70:10, 84:3
**describes** [3] - 70:16,
82:22, 91:18
**describing** [1] - 45:15
**description** [3] -
45:21, 86:13, 86:14
**descriptive** [1] - 93:3
**descriptor** [1] - 69:10
**desist** [21] - 12:4,
13:4, 13:18, 14:22,
14:23, 14:25, 15:7,
15:12, 15:13, 17:3,
18:1, 18:17, 18:19,
18:23, 58:11, 59:1,
59:3, 59:12, 65:8,
65:11, 66:13
**destruction** [1] - 65:4
**detail** [1] - 66:3
**detention** [1] - 63:18
**determine** [1] - 83:1
**determining** [1] -
82:12
**developed** [1] - 65:5
**developing** [1] - 88:7
**device** [1] - 96:19
**dictated** [1] - 44:23
**difference** [8] - 14:12,
19:10, 36:25, 37:5,
37:11, 53:23, 54:20,
95:11
**differences** [2] - 42:4,
91:24
**different** [17] - 6:10,
14:13, 19:13, 19:16,
19:17, 20:5, 25:19,
33:19, 33:25, 36:24,
46:19, 46:24, 53:4,
54:3, 60:24, 60:25,
75:19
**difficult** [1] - 67:16
**digest** [1] - 89:7
**direct** [2] - 15:25, 83:8
**directed** [2] - 24:9,
76:1

**direction** [1] - 94:19
**directive** [1] - 100:13
**directly** [5] - 20:23, 32:9, 33:15, 48:9, 95:10
**Director** [1] - 4:2
**directors** [1] - 83:20
**disabling** [1] - 41:6
**disagree** [4] - 35:12, 69:25, 78:8, 79:24
**disagreement** [1] - 82:18
**disagreements** [1] - 16:2
**disassembled** [1] - 101:13
**disbarred** [1] - 31:5
**disciplinary** [5] - 30:24, 72:21, 75:5, 91:21, 91:22
**discrete** [1] - 88:4
**discretion** [2] - 34:2, 37:18
**discussing** [3] - 44:24, 72:6, 80:8
**discussion** [9] - 16:18, 28:15, 50:7, 63:3, 90:9, 90:14, 91:14, 92:4, 97:1
**dismiss** [4] - 4:23, 5:5, 10:18, 10:19
**dismissed** [1] - 37:1
**displace** [1] - 89:23
**dispositive** [2] - 49:23, 97:2
**dispute** [4] - 18:19, 34:4, 69:14, 74:25
**disputed** [2] - 90:16, 90:18
**disputes** [3] - 34:6, 37:18, 42:17
**disputing** [2] - 35:2, 35:4
**dissatisfied** [1] - 86:19
**distill** [1] - 92:10
**distills** [1] - 39:3
**distinctions** [4] - 25:23, 27:12, 27:13, 71:21
**district** [8] - 5:6, 8:19, 23:5, 23:10, 43:15, 44:14, 62:10, 89:18
**DISTRICT** [3] - 1:1, 1:1, 1:11
**District** [15] - 5:23, 8:12, 21:18, 21:19, 27:5, 27:9, 31:24, 38:13, 39:7, 39:8, 73:2, 83:14, 97:20,

100:11, 100:13
**Division** [2] - 2:9, 2:13
**docket** [2] - 5:24, 34:18
**docketed** [3] - 5:10, 5:13, 70:16
**doctrine** [19] - 26:14, 27:1, 27:2, 27:15, 27:23, 28:16, 49:13, 50:5, 50:14, 51:8, 51:22, 52:5, 52:7, 84:6, 87:22, 88:1, 88:15, 92:9, 96:22
**document** [1] - 81:3
**documents** [2] - 76:1, 81:2
**DOJ** [1] - 2:12
**DOJ-CIV** [1] - 2:12
**dollar** [1] - 93:8
**done** [3] - 18:25, 44:10, 83:24
**doubt** [1] - 91:1
**down** [9] - 49:12, 54:11, 56:24, 57:1, 57:2, 58:8, 61:8, 62:25, 95:13
**dozen** [1] - 75:25
**draft** [1] - 55:19
**drastic** [1] - 74:11
**draw** [1] - 95:19
**drawing** [4] - 50:10, 50:24, 51:23, 52:8
**drew** [1] - 25:24
**drill** [2] - 13:16, 13:20
**Due** [1] - 27:10
**due** [11] - 13:1, 16:20, 31:6, 41:25, 54:11, 57:25, 58:5, 75:6, 76:10, 76:11, 76:18
**dues** [2] - 71:15, 78:4
**Dunn** [3] - 2:3, 3:19, 3:21
**during** [6] - 17:20, 22:4, 58:14, 64:16, 76:7, 82:4

**E**

**ECF** [2] - 5:11, 5:13
**echoing** [1] - 87:21
**economic** [1] - 94:4
**economics** [2] - 16:3, 16:9
**economy** [1] - 70:7
**educate** [1] - 29:25
**education** [1] - 71:11
**Education's** [1] - 91:17
**educational** [1] - 30:6
**Edwards** [1] - 49:5

**effect** [8] - 14:23, 21:24, 38:7, 45:3, 45:5, 56:17, 86:12, 86:15
**effective** [1] - 19:23
**effectively** [1] - 12:13
**effort** [1] - 21:3
**egregious** [2] - 13:1, 30:17
**eight** [4] - 75:23, 75:24, 81:7, 100:21
**eight-month** [1] - 75:23
**either** [9] - 24:18, 55:14, 65:11, 66:23, 83:2, 83:4, 85:5, 90:24, 96:15
**elaborate** [3] - 26:14, 67:7, 95:6
**Eleventh** [3] - 38:9, 38:10, 38:14
**ELIZABETH** [1] - 101:7
**Elizabeth** [2] - 2:17, 101:19
**elsewhere** [1] - 87:3
**Email** [6] - 1:16, 1:19, 1:23, 2:5, 2:11, 2:15
**embezzlement** [2] - 37:1, 37:7
**embezzles** [1] - 30:8
**embezzling** [1] - 36:15
**emergency** [4] - 5:12, 5:17, 7:1, 97:18
**emphasize** [2] - 89:10, 93:6
**emphasizes** [1] - 63:2
**employee** [3] - 36:14, 37:6, 37:8
**employees** [6] - 71:16, 71:17, 75:25, 81:1, 81:6
**employer** [1] - 37:1
**employing** [1] - 53:19
**enables** [1] - 16:6
**encompassed** [2] - 80:25, 81:1
**encourage** [2] - 21:17, 27:16
**end** [4] - 26:9, 50:6, 84:10, 96:1
**endanger** [1] - 72:14
**enforce** [4] - 29:25, 34:21, 54:6, 95:3
**enforced** [1] - 28:8
**enforcement** [52] - 10:9, 14:1, 22:5, 23:4, 28:20, 30:12, 30:13, 33:7, 33:21, 36:2, 36:9, 36:17,

37:18, 38:3, 39:19, 39:20, 39:24, 43:12, 45:1, 46:10, 46:13, 47:2, 47:5, 48:13, 51:16, 53:11, 59:17, 59:18, 62:8, 62:18, 63:22, 63:25, 64:1, 74:16, 74:18, 75:24, 76:3, 81:8, 87:23, 88:16, 90:11, 93:7, 93:11, 95:2, 95:8, 95:16, 95:18, 96:10, 98:25, 99:2, 99:3, 100:2
**enforces** [1] - 38:1
**enforcing** [2] - 47:6, 53:22
**engage** [1] - 37:2
**engaged** [7] - 50:24, 51:2, 64:22, 65:9, 65:20, 77:8, 94:10
**enjoin** [1] - 96:20
**ensure** [1] - 59:2
**ensuring** [1] - 47:5
**Enterprise** [10] - 40:3, 47:24, 48:1, 48:18, 49:8, 49:20, 51:11, 69:9, 73:4, 90:13
**enterprise** [4] - 50:15, 50:19, 51:24, 72:15
**enthusiasm** [1] - 88:13
**entire** [6] - 15:9, 53:13, 62:25, 66:1, 84:16, 84:24
**entirely** [6] - 4:10, 29:1, 67:10, 72:13, 82:24, 85:8
**entities** [10] - 32:2, 32:4, 33:10, 49:10, 50:16, 71:14, 74:6, 92:17, 93:1, 95:2
**entity** [18] - 26:6, 32:11, 36:13, 38:22, 38:23, 47:9, 69:3, 71:24, 72:4, 76:21, 78:23, 82:13, 84:20, 84:25, 85:2, 94:22, 95:14, 99:3
**entwinement** [12] - 48:21, 70:12, 70:24, 71:1, 71:22, 72:17, 72:22, 91:14, 92:2, 92:11, 93:3, 93:13
**envisioned** [1] - 47:12
**equitable** [1] - 66:6
**equities** [1] - 8:2
**error** [1] - 75:13
**essentially** [4] - 29:23, 52:23, 91:21, 99:2

**establish** [6] - 39:6, 45:24, 72:3, 74:12, 79:7, 90:5
**established** [1] - 79:14
**establishes** [1] - 46:15
**establishing** [2] - 68:25, 72:10
**et** [1] - 3:4
**ethical** [1] - 34:22
**ethics** [4] - 30:10, 30:25, 31:1, 31:3
**event** [3] - 5:3, 6:4, 75:11
**events** [2] - 59:20, 59:22
**evidence** [7] - 11:10, 15:19, 16:16, 42:3, 63:19, 65:22, 76:8
**exact** [1] - 54:18
**exactly** [3] - 14:2, 42:20, 79:22
**examine** [1] - 76:7
**example** [8] - 30:8, 40:17, 53:7, 67:24, 75:3, 80:7, 83:18, 89:12
**except** [1] - 76:22
**exception** [1] - 22:9
**excessive** [1] - 74:23
**exchange** [1] - 36:10
**Exchange** [18] - 20:23, 24:13, 24:18, 29:24, 35:25, 36:3, 36:4, 36:9, 44:2, 44:18, 48:4, 48:6, 49:17, 51:17, 52:10, 69:10, 74:5, 76:14
**exchanges** [1] - 35:18
**excuse** [1] - 11:2
**excused** [1] - 101:1
**execution** [1] - 32:6
**executive** [2] - 34:12, 40:9
**exercise** [10] - 34:12, 35:19, 37:17, 45:16, 50:24, 51:23, 52:8, 62:12, 91:18
**exercising** [1] - 34:2
**exhausting** [1] - 62:11
**exhaustion** [2] - 23:11, 24:5
**exigencies** [1] - 6:1
**exigency** [1] - 12:2
**exists** [1] - 53:4
**expanding** [1] - 50:17
**expected** [1] - 76:5
**expedite** [1] - 19:1
**expedited** [28] - 4:13,

4:21, 10:8, 10:25, 11:12, 13:6, 13:25, 14:24, 15:12, 18:21, 19:11, 19:18, 21:21, 21:24, 42:13, 46:9, 55:15, 56:3, 57:21, 59:18, 60:8, 74:1, 75:18, 80:14, 80:23, 81:9, 81:12, 81:15
**expeditiously** [1] - 4:20
**expel** [3] - 36:9, 81:11, 93:12
**expelled** [4] - 31:9, 37:2, 37:10, 95:3
**experience** [1] - 43:13
**expert** [1] - 14:7
**explain** [5] - 14:5, 15:4, 19:10, 22:10, 28:1
**explained** [2] - 11:8, 72:12
**explicit** [1] - 5:2
**express** [1] - 94:13
**expression** [1] - 77:22
**expressive** [3] - 51:2, 78:2, 94:10
**expulsion** [9] - 13:3, 13:18, 15:8, 15:13, 18:17, 18:22, 19:22, 81:15, 86:4
**extend** [1] - 31:10
**extends** [1] - 23:25
**extensive** [1] - 84:5
**extent** [3] - 64:15, 74:21, 79:24
**extraordinarily** [1] - 74:10
**extraordinary** [6] - 16:4, 16:7, 74:11, 87:17, 90:8, 100:22

**F**

**face** [5] - 13:8, 19:3, 58:19, 62:7, 67:20
**faced** [1] - 86:11
**facing** [12] - 14:3, 16:23, 16:24, 17:4, 18:17, 19:6, 19:14, 39:18, 54:22, 68:2, 86:4, 86:25
**fact** [11] - 6:20, 16:23, 53:2, 62:1, 64:5, 69:12, 69:18, 72:17, 78:11, 85:11, 94:9
**factor** [4] - 63:11, 86:18, 87:21, 96:24
**factors** [10] - 8:1, 8:10, 8:17, 8:20, 32:25,

63:10, 88:22, 89:13, 89:23, 90:25
**facts** [3] - 6:1, 23:13, 75:14
**factual** [1] - 91:24
**fail** [2] - 22:6, 80:8
**fails** [2] - 77:6, 77:25
**fair** [1] - 15:23
**fairly** [4] - 4:20, 4:22, 7:24, 87:17
**fairness** [1] - 76:11
**fall** [3] - 23:21, 76:22, 95:13
**falling** [1] - 23:6
**familiar** [1] - 84:4
**familiarity** [1] - 85:24
**far** [5] - 5:6, 29:20, 38:2, 50:17
**Farby** [1] - 4:2
**FARBY** [1] - 2:8
**fashion** [1] - 63:6
**favorable** [1] - 57:6
**favorably** [1] - 45:14
**favoring** [1] - 8:3
**favors** [1] - 87:22
**FCRR** [3] - 2:17, 101:7, 101:19
**fear** [1] - 13:25
**feature** [2] - 85:18, 95:20
**features** [4] - 27:21, 28:17, 28:18, 75:14
**federal** [34] - 22:19, 23:10, 24:6, 24:10, 24:14, 26:13, 27:25, 31:22, 31:23, 33:8, 36:10, 36:15, 37:4, 37:7, 37:19, 37:25, 38:7, 40:21, 43:11, 43:15, 44:21, 45:8, 52:11, 53:7, 54:6, 61:9, 61:17, 77:1, 78:14, 85:22, 87:3, 95:3, 95:6
**Federal** [2] - 2:9, 2:13
**fee** [2] - 16:6, 16:10
**fees** [13] - 15:21, 15:23, 18:4, 18:5, 18:7, 18:24, 20:10, 33:16, 33:24, 61:23, 67:4, 71:14, 73:25
**few** [10] - 6:16, 10:1, 38:20, 52:19, 61:3, 61:15, 63:8, 82:3, 92:3, 99:10
**fewer** [1] - 19:17
**FHFA** [2] - 26:13, 48:25
**fiction** [1] - 67:6
**Fifth** [5] - 1:14, 41:19,

41:20, 42:5, 75:3
**figure** [1] - 66:17
**file** [1] - 57:5
**filed** [4] - 38:12, 57:14, 60:25, 64:12
**filing** [4] - 5:25, 39:19, 60:3, 82:11
**final** [2] - 55:18, 73:15
**finally** [2] - 21:1, 53:17
**Financial** [1] - 3:4
**FINANCIAL** [1] - 1:6
**findings** [1] - 21:1
**fine** [2] - 13:4, 13:19
**FINRA** [219] - 2:2, 3:17, 3:20, 5:19, 6:23, 7:1, 7:5, 7:14, 9:10, 9:12, 9:18, 9:22, 11:6, 11:8, 12:10, 12:22, 13:3, 14:6, 14:7, 14:10, 14:13, 14:24, 15:12, 15:20, 17:6, 17:11, 17:16, 17:18, 17:23, 17:24, 18:6, 19:22, 20:12, 20:24, 21:5, 21:22, 22:3, 22:16, 22:20, 24:12, 24:17, 24:19, 24:25, 25:2, 25:17, 25:19, 28:19, 29:1, 29:3, 29:14, 29:19, 29:23, 30:2, 30:12, 30:15, 32:9, 32:14, 33:2, 34:1, 35:2, 35:20, 36:3, 36:5, 37:2, 37:4, 37:10, 37:24, 39:11, 39:18, 40:6, 40:9, 40:10, 41:3, 41:4, 41:9, 41:14, 42:11, 42:17, 42:23, 43:12, 43:14, 43:23, 44:5, 44:7, 44:11, 45:2, 45:7, 45:9, 45:25, 46:7, 46:20, 46:21, 46:24, 47:12, 47:17, 48:6, 51:14, 51:16, 51:24, 51:25, 52:9, 52:21, 53:6, 53:14, 53:18, 53:20, 54:5, 54:8, 54:15, 54:16, 54:24, 54:25, 55:6, 55:19, 57:12, 57:17, 58:8, 59:6, 60:4, 60:12, 60:13, 61:1, 61:5, 61:10, 62:24, 64:21, 65:13, 65:24, 66:12, 66:16, 66:20, 67:3, 68:7, 68:10, 68:12, 68:17, 68:21, 68:25, 69:1, 69:5,

69:19, 70:11, 70:13, 70:20, 70:22, 70:23, 71:3, 71:12, 71:14, 71:16, 71:19, 72:19, 72:24, 73:7, 73:9, 74:1, 74:17, 74:23, 74:24, 74:25, 75:5, 75:8, 75:14, 76:13, 76:19, 76:21, 77:3, 77:5, 77:7, 77:14, 77:15, 77:17, 77:23, 78:11, 79:15, 79:16, 79:19, 79:20, 80:4, 80:12, 80:13, 80:23, 81:5, 81:8, 81:10, 83:2, 84:8, 84:16, 85:5, 85:9, 86:1, 86:4, 86:11, 87:7, 90:16, 90:19, 91:24, 92:4, 92:6, 92:14, 92:17, 92:18, 93:1, 93:8, 93:11, 93:17, 93:22, 93:23, 94:19, 94:20, 95:16, 95:18, 97:4, 99:13, 99:25, 100:20
**FINRA's** [40] - 6:4, 11:5, 15:6, 17:2, 17:5, 18:18, 18:23, 18:24, 21:1, 33:16, 38:6, 38:22, 45:15, 45:21, 46:14, 49:7, 51:9, 51:15, 55:17, 55:20, 56:20, 58:25, 59:11, 60:2, 60:22, 65:6, 70:13, 70:19, 70:20, 71:13, 72:20, 72:21, 75:24, 77:14, 77:18, 78:13, 82:4, 86:14, 94:16
**fire** [2] - 13:16, 13:20
**fired** [1] - 37:6
**fires** [1] - 36:16
**firm** [6] - 3:15, 9:17, 16:3, 16:5, 20:9, 54:12
**firms** [3] - 61:3, 61:5, 61:15
**First** [24] - 22:9, 22:11, 22:21, 23:6, 23:21, 23:25, 24:8, 24:9, 31:4, 45:4, 45:6, 51:5, 76:22, 77:4, 77:20, 77:25, 78:6, 80:7, 93:21, 93:22, 94:5, 94:13, 94:18
**first** [3] - 23:10, 24:24, 25:9, 26:3, 35:7, 51:1, 52:25, 61:8, 61:12, 64:4,

88:11, 91:13, 97:20
**five** [7] - 20:25, 53:16, 61:4, 67:18, 72:9, 76:6, 93:14
**FL** [1] - 1:22
**flag** [1] - 39:23
**flaw** [1] - 93:21
**flood** [2] - 33:5, 44:14
**Floor** [1] - 1:14
**Florida** [8] - 5:23, 8:12, 21:19, 38:13, 56:24, 57:3, 82:10, 86:3
**Florida's** [1] - 21:20
**focus** [7] - 25:8, 26:5, 35:16, 82:21, 85:10, 93:16, 97:11
**focused** [7] - 35:9, 35:15, 46:9, 46:18, 58:1, 93:7, 93:10
**follow** [1] - 97:6
**following** [2] - 18:4, 18:5
**Footnote** [1] - 86:8
**footnote** [3] - 25:10, 25:24, 29:17
**FOR** [4] - 1:1, 1:13, 2:2, 2:7
**force** [1] - 38:7
**forced** [6] - 22:1, 22:16, 61:10, 77:21, 77:23, 87:5
**forces** [2] - 12:4, 12:13
**forcing** [1] - 51:4
**foregoing** [1] - 101:8
**form** [2] - 12:3, 34:6
**formal** [1] - 73:15
**former** [1] - 54:7
**forth** [3] - 32:24, 60:4, 60:23
**forum** [1] - 88:17
**forward** [11] - 3:7, 7:16, 8:22, 9:1, 17:14, 17:24, 19:15, 41:5, 41:12, 74:1, 74:19
**foundation** [1] - 88:14
**four** [6] - 8:1, 8:10, 76:5, 86:18, 89:23, 96:24
**four-factor** [2] - 86:18, 96:24
**Fourth** [2] - 64:11, 73:1
**framework** [3] - 26:6, 28:13, 47:11
**frankly** [1] - 58:23
**fraud** [5] - 43:9, 43:14, 43:18, 43:19, 43:24

**free** [4] - 50:15, 50:19, 51:23, 64:13
**Free** [10] - 40:3, 47:24, 48:1, 48:18, 49:8, 49:20, 51:11, 69:8, 73:3, 90:13
**Friday** [1] - 6:2
**Friendly** [2] - 84:18, 85:7
**friends** [1] - 22:23
**FRITZ** [63] - 1:14, 3:9, 3:14, 6:17, 6:24, 7:10, 7:13, 7:19, 7:21, 8:14, 8:25, 9:17, 9:23, 15:9, 15:15, 16:11, 16:17, 16:25, 17:5, 17:10, 18:10, 18:12, 18:15, 19:10, 19:20, 20:15, 20:20, 20:24, 47:20, 52:17, 54:3, 54:5, 54:25, 56:5, 56:13, 56:21, 57:2, 57:4, 57:14, 59:4, 59:9, 60:1, 60:15, 60:17, 60:20, 61:2, 61:8, 62:20, 63:12, 64:4, 64:14, 65:14, 65:18, 66:7, 68:2, 98:9, 98:17, 99:11, 99:18, 99:21, 100:7, 100:10, 100:13
**Fritz** [4] - 3:10, 15:4, 42:2
**front** [5] - 4:9, 6:13, 59:7, 60:9, 73:16
**frustrating** [1] - 99:20
**full** [1] - 101:9
**fully** [3] - 5:13, 20:12, 82:22
**function** [9] - 34:23, 35:6, 36:5, 36:6, 37:14, 37:16, 37:21, 37:22
**functions** [2] - 29:8, 48:21
**fund** [1] - 78:7
**Fund** [8] - 40:3, 47:24, 48:1, 48:18, 49:9, 49:20, 73:4, 90:13
**fundamental** [4] - 34:10, 62:10, 76:11, 88:9
**fundamentally** [2] - 24:8, 31:7
**funded** [4] - 30:16, 31:21, 71:8, 71:14
**funding** [2] - 40:14, 71:25
**funds** [1] - 30:9

**funnel** [2] - 30:1, 30:3
**funneling** [3] - 30:17, 46:24, 52:20
**funnels** [1] - 30:10
**furthered** [1] - 52:8
**future** [1] - 13:2

**G**

**gas** [1] - 74:7
**general** [1] - 65:12
**generality** [4] - 35:15, 37:15, 37:19, 89:20
**generalized** [1] - 58:9
**generally** [3] - 7:23, 83:3, 85:6
**germane** [2] - 77:8, 77:18
**GESCH** [1] - 2:3
**Gesch** [1] - 3:20
**Gibson** [3] - 2:3, 3:19, 3:21
**given** [3] - 6:6, 56:18, 99:23
**globally** [1] - 39:17
**goals** [1] - 67:13
**goodness** [1] - 33:4
**Gorsuch** [1] - 23:14
**governed** [1] - 86:18
**government** [36] - 11:6, 25:19, 25:20, 26:6, 26:8, 26:13, 28:8, 28:10, 28:23, 29:2, 29:7, 31:22, 31:23, 32:5, 35:3, 40:14, 46:8, 48:22, 49:2, 49:11, 50:22, 51:10, 70:10, 70:16, 70:18, 72:2, 81:21, 81:25, 82:14, 83:15, 84:8, 84:20, 85:10
**government's** [1] - 25:24
**governmental** [5] - 34:23, 38:23, 49:4, 49:6, 49:10
**governmentally** [1] - 70:14
**governs** [1] - 86:18
**Graman** [5] - 32:21, 33:12, 34:13, 98:11, 98:15
**grand** [1] - 46:6
**grant** [1] - 97:16
**granted** [1] - 6:12
**granting** [1] - 5:16
**great** [1] - 92:7
**grievance** [1] - 30:6
**guess** [5] - 23:17, 44:17, 52:4, 68:6,

97:13
**guidance** [1] - 30:6
**guillotine** [3] - 57:19, 58:19, 61:15

**H**

**Halleck** [4] - 50:6, 51:22, 70:3, 72:6
**hallmarks** [1] - 71:13
**halted** [1] - 63:23
**Hampshire** [1] - 1:18
**hand** [2] - 99:24, 99:25
**handcuffs** [1] - 44:3
**handled** [1] - 34:24
**happy** [5] - 10:2, 20:3, 52:13, 91:6, 92:21
**hard** [1] - 86:6
**hardly** [1] - 60:20
**harm** [18] - 8:4, 13:24, 52:16, 62:5, 63:2, 63:4, 63:10, 65:11, 65:20, 66:8, 79:5, 79:12, 80:2, 88:23, 90:5, 97:3, 97:8, 97:9
**harmed** [1] - 66:11
**harmony** [1] - 96:3
**hasten** [3] - 37:22, 93:5, 97:3
**HAYES** [1] - 1:21
**Hayes** [1] - 3:14
**head** [2] - 40:22, 59:22
**hear** [7] - 34:9, 43:24, 55:10, 63:16, 68:6, 81:20, 83:17
**Hearing** [1] - 68:20
**hearing** [72] - 7:1, 7:2, 7:3, 7:6, 7:8, 7:13, 11:8, 11:10, 11:12, 11:18, 11:19, 12:12, 14:13, 14:22, 14:24, 15:12, 16:15, 17:7, 17:16, 17:17, 17:19, 18:21, 19:18, 19:22, 20:6, 21:25, 33:21, 41:4, 41:9, 41:11, 42:2, 55:14, 55:15, 55:18, 55:19, 55:21, 55:23, 56:7, 56:10, 56:16, 56:18, 59:6, 60:8, 60:12, 62:16, 62:23, 62:24, 65:21, 66:19, 67:9, 67:23, 68:13, 68:20, 68:23, 73:16, 75:19, 75:21, 75:23, 76:7, 76:12, 79:19, 80:9, 80:15, 80:24, 81:15, 91:23,

100:4, 100:5, 100:8
**HEARING** [1] - 1:10
**heavily** [1] - 72:12
**heavy** [2] - 74:10, 74:12
**held** [6] - 23:2, 24:17, 27:4, 62:7, 63:23, 73:8
**help** [4] - 24:13, 29:24, 34:21, 89:16
**helping** [1] - 18:11
**henceforth** [1] - 40:5
**here-and-now** [8] - 63:1, 63:7, 78:17, 78:20, 78:21, 79:6, 88:23, 90:12
**hereby** [1] - 101:7
**high** [2] - 13:2, 89:20
**hightail** [1] - 39:19
**himself** [1] - 84:18
**hiring** [3] - 28:23, 28:24, 77:15
**hiring/firing** [1] - 29:3
**historical** [4] - 35:2, 35:9, 35:11, 35:18
**historically** [1] - 91:16
**history** [1] - 35:16
**holding** [3] - 9:19, 73:4, 88:18
**holds** [1] - 41:10
**honest** [1] - 42:9
**Honor** [80] - 3:9, 3:18, 3:24, 4:6, 6:17, 9:4, 9:25, 10:11, 13:22, 15:15, 19:11, 21:12, 22:17, 22:23, 23:17, 26:2, 26:20, 27:11, 27:21, 30:19, 32:2, 35:4, 35:13, 36:22, 38:5, 38:15, 38:20, 40:1, 42:9, 42:25, 43:6, 44:12, 45:10, 47:20, 49:19, 50:3, 52:5, 52:12, 52:17, 53:6, 55:11, 58:4, 58:10, 59:4, 59:9, 61:20, 64:20, 66:18, 67:6, 68:18, 69:5, 69:11, 70:1, 71:2, 73:20, 74:19, 76:25, 77:25, 79:22, 80:21, 81:22, 82:1, 82:3, 82:20, 84:4, 85:17, 89:3, 89:19, 90:25, 91:7, 91:11, 92:3, 92:24, 93:25, 95:25, 97:9, 98:4, 98:8, 99:11, 100:3
**Honor's** [2] - 83:8, 89:9

**HONORABLE** [1] - 1:10
**hope** [2] - 12:16, 97:16
**hoped** [1] - 6:18
**hoping** [1] - 4:12
**housekeeping** [1] - 97:13
**HOWELL** [1] - 1:10
**hyped** [1] - 63:15
**hyperbole** [1] - 11:3
**hyperbolic** [4] - 11:14, 11:15, 11:17, 66:18

**I**

**idea** [3] - 56:21, 59:24, 67:5
**identified** [3] - 75:2, 77:6, 91:24
**identifies** [2] - 18:2, 50:9
**identify** [2] - 78:1, 95:21
**identity** [2] - 70:12, 71:23
**ideological** [3] - 77:7, 77:17, 78:9
**III** [2] - 90:14, 90:18
**ilk** [1] - 23:10
**illustrates** [1] - 53:16
**illustration** [1] - 27:3
**immediate** [1] - 88:3
**immediately** [11] - 12:4, 12:14, 12:15, 14:23, 14:25, 19:23, 22:1, 55:24, 56:17, 67:2, 86:12
**imminent** [1] - 86:4
**immunity** [5] - 96:1, 96:6, 96:22
**impactful** [1] - 99:6
**impair** [1] - 80:10
**implication** [1] - 94:21
**implications** [1] - 98:12
**implicit** [1] - 82:18
**imply** [3] - 59:21, 59:23, 60:19
**implying** [1] - 60:6
**important** [13] - 14:4, 27:13, 38:24, 48:11, 68:15, 68:18, 83:7, 83:23, 84:13, 85:15, 91:23, 91:25, 94:1
**importantly** [1] - 90:15
**impose** [3] - 14:14, 44:5, 44:25
**imposed** [4] - 14:21, 17:25, 33:17, 64:15

**improved** [1] - 64:18
**improvements** [2] - 64:7, 64:8
**in-depth** [1] - 99:23
**inapplicable** [1] - 29:1
**INC** [1] - 1:6
**Inc** [1] - 3:5
**incapable** [1] - 99:14
**includes** [4] - 72:25, 73:2, 73:3, 95:15
**including** [5] - 15:23, 47:1, 47:5, 86:16, 96:6
**incorrect** [1] - 83:6
**incredibly** [2] - 15:24, 48:11
**independent** [2] - 68:21, 82:22
**independently** [4] - 45:18, 45:19, 70:15, 71:25
**indicated** [2] - 59:9, 67:25
**indication** [1] - 72:18
**indicia** [1] - 72:17
**individual** [5] - 50:14, 50:19, 50:25, 51:9, 72:14
**individuals** [4] - 17:19, 54:10, 54:17, 67:23
**industries** [1] - 74:7
**INDUSTRY** [1] - 1:6
**Industry** [1] - 3:4
**industry** [9] - 33:24, 48:3, 49:16, 53:2, 86:5, 93:12, 95:4, 95:8, 100:24
**inequitable** [1] - 73:25
**information** [1] - 47:13
**infringe** [1] - 78:6
**infringed** [1] - 78:2, 79:9, 79:11
**initial** [1] - 17:7
**initiate** [1] - 81:8
**initiated** [3] - 15:12, 66:1, 80:23
**initiation** [1] - 76:3
**injunction** [21] - 5:12, 8:1, 8:3, 12:8, 20:7, 57:24, 58:3, 58:9, 78:16, 78:25, 79:2, 79:4, 79:7, 88:22, 89:23, 90:2, 90:23, 91:4, 97:19, 97:25, 98:2
**injunctive** [5] - 6:14, 63:10, 87:5, 96:19, 97:19

**injuries** [1] - 79:17
**injury** [11] - 6:19, 7:18, 63:1, 63:7, 78:18, 78:20, 78:21, 78:24, 79:6, 80:4, 90:12
**inquiries** [1] - 49:14
**inquiry** [1] - 88:1
**instances** [1] - 44:23
**instead** [1] - 96:18
**instructions** [1] - 5:20
**insulated** [1] - 17:11
**intentional** [1] - 13:1
**interact** [1] - 52:25
**interactions** [2] - 66:2, 87:4
**interest** [5] - 8:4, 53:3, 66:5, 85:21, 89:14
**interesting** [1] - 63:3
**interests** [2] - 78:12, 80:10
**interim** [1] - 12:18
**interlocutory** [1] - 88:13
**intervened** [1] - 85:20
**INTERVENOR** [1] - 2:7
**Intervenor** [1] - 1:8
**intervenor** [6] - 3:6, 3:23, 4:1, 4:5, 11:8, 82:7
**intervenor-defendant** [1] - 3:6
**intervention** [1] - 89:11
**interview** [1] - 81:5
**interviews** [3] - 75:24, 81:1, 100:21
**investigation** [5] - 61:11, 66:1, 75:23, 76:1, 80:25
**investor** [4] - 61:19, 66:8, 66:15, 67:5
**investors** [2] - 65:11, 65:25
**involved** [7] - 32:14, 41:14, 54:14, 54:21, 56:3, 75:24, 75:25
**involvement** [3] - 28:23, 40:9, 46:20
**involves** [1] - 88:4
**irrelevant** [1] - 79:13
**irreparable** [17] - 6:19, 7:18, 8:4, 13:24, 52:16, 62:5, 63:2, 63:4, 63:10, 65:20, 79:5, 79:12, 80:1, 90:5, 97:3, 97:7, 97:9
**irreparably** [1] - 12:5
**issue** [43] - 8:16, 11:1,

13:5, 31:15, 32:15, 32:16, 33:2, 33:20, 41:8, 41:16, 44:23, 47:17, 49:19, 49:24, 55:15, 55:24, 56:8, 56:17, 59:7, 59:13, 60:2, 61:19, 64:17, 65:5, 66:15, 68:15, 68:19, 71:3, 72:23, 73:6, 74:20, 82:23, 84:13, 85:14, 90:10, 91:15, 98:25, 99:6, 99:10, 99:22, 100:17, 100:19, 100:24
**issued** [10] - 12:23, 15:6, 17:6, 18:1, 21:4, 59:19, 61:22, 66:22, 67:3, 85:25
**issues** [22] - 6:19, 7:21, 9:2, 12:13, 13:15, 20:13, 51:4, 56:11, 57:8, 58:17, 61:17, 62:10, 64:9, 64:24, 66:8, 66:19, 67:8, 86:20, 96:9, 99:15, 100:3
**item** [1] - 97:13
**itself** [7] - 17:12, 53:10, 61:2, 62:2, 76:7, 85:24, 95:9

**J**

**jail** [3] - 63:18, 63:22, 64:13
**Janus** [1] - 94:1
**Jim** [1] - 32:20
**job** [3] - 37:8, 60:13, 65:13
**join** [5] - 45:8, 77:2, 77:5, 78:11
**joined** [3] - 3:20
**JUDGE** [1] - 1:11
**judge** [7] - 5:7, 24:24, 40:21, 43:7, 43:24, 99:18, 100:12
**Judge** [8] - 4:15, 25:16, 27:18, 28:14, 49:5, 56:23, 84:17, 85:7
**judges** [3] - 8:19, 73:2, 89:18
**judgment** [3] - 4:21, 4:24, 10:20
**jumping** [2] - 23:1, 32:15
**June** [4] - 1:6, 61:22, 66:19, 101:18
**jurisdiction** [4] - 24:3,

62:12, 78:15, 90:21
**jurisprudence** [1] - 74:3
**jurist** [1] - 32:20
**jury** [2] - 43:4, 43:8
**justice** [1] - 64:7
**Justice** [11] - 2:8, 3:25, 62:20, 63:1, 78:18, 79:13, 82:6, 87:18, 88:11, 91:15, 95:21
**Justices** [1] - 23:14

**K**

**Kagan** [5] - 62:20, 63:1, 78:18, 87:18, 88:11
**Kagan's** [1] - 79:13, 95:21
**keep** [1] - 85:16
**keeps** [2] - 8:16, 88:6
**KEN** [1] - 1:20
**Ken** [1] - 3:14
**key** [2] - 24:1, 45:17
**kind** [13] - 4:16, 19:16, 19:17, 36:14, 39:18, 39:20, 44:3, 61:4, 93:8, 94:10, 94:16, 95:24, 96:20
**kinds** [2] - 43:1, 44:9
**Kirk** [2] - 1:17, 3:12
**knowing** [1] - 61:23
**knowledge** [1] - 24:22
**kturkel@tcb** [1] - 1:23
**kturkel@tcb-law.
com** [1] - 1:23

**L**

**lacks** [1] - 99:3
**laid** [1] - 31:20
**language** [13] - 20:8, 29:21, 38:24, 49:22, 62:21, 63:13, 69:4, 69:14, 73:3, 88:11, 88:19, 89:2, 90:13
**large** [3] - 31:22, 70:7, 89:17
**largely** [3] - 70:12, 71:23, 97:1
**last** [15] - 20:24, 20:25, 52:4, 52:12, 52:19, 53:4, 56:18, 58:14, 61:22, 66:19, 67:21, 76:5, 85:14, 86:3, 98:20
**law** [28] - 15:22, 20:7, 20:8, 28:1, 32:7, 32:24, 36:10, 36:16,

37:7, 37:19, 37:25, 38:3, 38:7, 38:14, 38:16, 43:7, 43:24, 57:6, 57:23, 58:3, 58:9, 58:13, 68:23, 77:6, 84:5, 84:14, 95:3
**law.com** [1] - 1:23
**laws** [7] - 30:3, 45:1, 47:1, 53:7, 53:11, 54:6, 99:3
**lawsuits** [1] - 60:25
**lawyer** [7] - 30:8, 31:1, 31:5, 31:6, 31:8, 78:3, 93:17
**lawyer's** [1] - 78:6
**lawyers** [2] - 30:4, 35:10
**leadership** [3] - 40:6, 41:3, 41:9
**leading** [1] - 75:17
**learned** [1] - 48:5
**least** [13] - 6:2, 7:25, 11:24, 17:12, 23:13, 29:8, 46:4, 46:10, 69:9, 87:12, 90:16, 94:16, 97:23
**Lebron** [11] - 26:5, 26:10, 27:14, 28:13, 29:13, 31:15, 36:12, 48:19, 82:9, 82:11, 84:12
**Lebron-type** [2] - 27:14, 48:19
**led** [3] - 7:4, 75:21, 76:3
**legal** [1] - 99:24
**legion** [1] - 57:24
**lengthy** [1] - 90:9
**LESLEY** [1] - 2:8
**Lesley** [1] - 4:2
**level** [6] - 24:25, 35:15, 37:15, 37:19, 66:4, 89:20
**liberty** [6] - 50:14, 50:19, 50:25, 51:9, 54:10, 72:14
**lie** [1] - 94:11
**lies** [1] - 85:21
**lieu** [1] - 91:17
**lightly** [1] - 81:11
**likelihood** [20] - 7:22, 8:2, 8:6, 8:20, 8:23, 13:2, 19:9, 73:12, 73:15, 74:13, 79:10, 83:5, 83:25, 89:13, 91:2, 96:8, 96:25, 97:5, 97:10, 97:12
**likely** [2] - 8:4, 97:25
**likewise** [2] - 17:18,

31:9
**limit** [1] - 70:19
**limited** [5] - 23:12, 23:20, 85:21, 89:11, 89:14
**line** [10] - 31:2, 32:1, 47:24, 50:10, 50:24, 51:23, 52:8, 75:10, 82:18, 95:19
**line-drawing** [3] - 50:24, 51:23, 52:8
**lines** [1] - 89:5
**lingo** [1] - 13:12
**list** [1] - 93:20
**litigants** [2] - 87:3, 97:18
**litigated** [1] - 64:3
**litigating** [2] - 63:21, 64:13
**litigation** [3] - 6:7, 60:23, 97:8
**litigators** [1] - 63:15
**live** [2] - 11:14, 61:10
**lobbying** [1] - 78:5
**local** [1] - 6:6
**logical** [1] - 7:25
**look** [14] - 9:1, 11:10, 21:17, 25:14, 25:22, 27:16, 45:13, 50:25, 51:13, 55:7, 60:20, 71:22, 100:19, 100:23
**looked** [3] - 24:15, 46:19, 47:10
**looking** [6] - 15:5, 16:21, 29:17, 47:23, 64:19, 65:7
**looks** [6] - 16:23, 46:23, 46:25, 56:13, 60:21, 95:16
**lose** [2] - 21:25, 28:6
**LOTH** [1] - 101:7
**Loth** [2] - 2:17, 101:19
**loud** [1] - 55:2
**love** [1] - 64:10

### M

**machine** [1] - 2:20
**main** [3] - 8:21, 42:9, 62:4
**majority** [2] - 23:13, 88:21
**management** [1] - 41:15
**mandate** [1] - 38:2
**Manhattan** [2] - 50:5, 70:2
**manner** [1] - 101:14
**mantle** [1] - 53:20

**Maranda** [2] - 3:10
**MARANDA** [1] - 1:14
**maranda@fritzpc. com** [1] - 1:16
**March** [11] - 12:23, 12:25, 13:12, 14:3, 14:18, 16:24, 18:18, 19:7, 57:13, 60:5, 75:17
**market** [2] - 67:8, 74:4
**market-making** [1] - 67:8
**marketplace** [2] - 65:12, 65:25
**markets** [2] - 29:22, 34:20
**matter** [13] - 3:2, 11:22, 18:14, 20:10, 37:8, 41:21, 53:2, 54:1, 62:12, 77:6, 78:15, 85:11, 90:21
**matters** [1] - 60:12
**McFadden's** [1] - 4:15
**mean** [17] - 23:8, 25:19, 29:5, 32:9, 32:11, 34:17, 42:17, 53:25, 55:13, 68:12, 69:22, 87:10, 89:20, 90:12, 90:15, 95:11, 99:13
**mean..** [1] - 29:17
**meaning** [1] - 10:18
**means** [4] - 8:19, 46:16, 53:25, 56:1
**meantime** [1] - 21:3
**measure** [1] - 76:15
**mechanism** [1] - 12:11
**Medicaid** [2] - 27:6, 31:25
**member** [10] - 9:12, 9:17, 22:20, 24:10, 36:10, 37:4, 39:18, 51:5, 93:12, 94:3
**members** [13] - 9:10, 9:22, 17:21, 36:6, 53:2, 53:3, 71:12, 71:14, 71:15, 71:25, 75:8, 93:12, 100:24
**membership** [2] - 71:5, 78:4
**memorandum** [1] - 5:21
**Memorial** [1] - 6:3
**mention** [3] - 35:5, 38:18, 61:23
**mentioned** [4] - 63:8, 70:3, 92:19, 95:22
**mentioning** [1] - 88:6
**mentions** [1] - 88:23

**merits** [26] - 5:17, 8:2, 8:6, 8:21, 8:24, 10:15, 10:16, 16:12, 18:8, 19:9, 24:6, 24:14, 59:5, 73:13, 74:13, 79:23, 82:24, 83:5, 83:25, 85:15, 89:14, 91:3, 97:1, 97:6, 97:11
**merry** [1] - 37:10
**met** [1] - 63:11
**microcap** [1] - 16:4
**Middle** [5] - 5:23, 8:11, 21:18, 21:19, 38:13
**middle** [1] - 89:7
**might** [5] - 75:17, 80:10, 86:24, 91:22, 93:23
**million** [2] - 13:4, 93:8
**mind** [5] - 4:25, 7:25, 43:13, 58:10, 85:16
**minding** [1] - 60:11
**minute** [1] - 5:20
**minutes** [2] - 38:20, 52:19
**misconduct** [1] - 13:2
**mistake** [4] - 26:5, 35:8, 35:14, 35:16
**mitigated** [1] - 87:13
**MO** [1] - 5:20
**modified** [1] - 33:1
**moment** [1] - 52:18
**momentous** [1] - 81:9
**Monday** [12] - 7:15, 7:16, 10:23, 11:13, 14:2, 16:23, 19:3, 73:17, 79:19, 82:11, 100:12, 100:14
**money** [3] - 29:2, 29:4, 64:1
**month** [1] - 75:23
**months** [9] - 21:6, 21:7, 64:25, 65:1, 65:16, 67:6, 80:25, 81:7, 100:21
**months-long** [1] - 80:25
**morning** [2] - 5:9, 7:16
**most** [5] - 8:8, 32:3, 50:4, 52:6, 61:5
**MOTION** [1] - 1:10
**motion** [21] - 4:23, 4:24, 5:4, 5:10, 5:11, 5:12, 5:16, 5:18, 5:25, 6:5, 6:11, 6:12, 6:14, 10:18, 10:19, 11:21, 12:8, 64:12, 87:9, 97:25
**motions** [6] - 4:9, 5:3, 5:13, 5:15, 5:19,

5:22
**motive** [1] - 60:21
**motto** [1] - 53:2
**move** [8] - 13:7, 15:13, 17:3, 18:21, 47:22, 52:15, 86:23, 96:23
**moves** [1] - 37:14
**moving** [3] - 74:1, 81:11, 81:17
**MPSB** [1] - 28:22
**MPSD** [1] - 29:5
**MR** [112] - 3:18, 3:24, 4:6, 9:4, 9:12, 9:25, 10:11, 10:14, 10:17, 10:21, 11:15, 11:17, 12:18, 13:10, 13:21, 14:4, 14:9, 14:20, 21:12, 21:15, 22:8, 22:12, 22:17, 23:17, 23:23, 24:22, 25:2, 25:6, 25:13, 25:22, 26:1, 26:19, 26:23, 29:10, 29:18, 30:19, 30:23, 33:15, 33:19, 35:4, 35:12, 36:1, 36:8, 36:18, 36:21, 36:25, 37:13, 38:5, 38:15, 39:13, 39:15, 40:1, 40:11, 40:15, 41:1, 41:20, 41:23, 42:8, 42:16, 42:24, 43:5, 43:17, 43:23, 44:12, 44:15, 45:5, 48:14, 48:17, 49:19, 50:2, 68:8, 68:16, 69:4, 69:11, 69:25, 71:1, 72:3, 73:9, 73:20, 73:23, 74:18, 74:24, 75:20, 76:25, 77:24, 79:3, 79:22, 80:20, 81:16, 81:19, 81:22, 81:23, 82:1, 88:20, 89:3, 89:9, 89:15, 89:19, 90:12, 91:9, 91:11, 91:13, 92:21, 92:24, 93:5, 93:25, 95:1, 96:12, 96:16, 96:24, 98:4, 98:7
**MS** [62] - 3:9, 3:14, 6:17, 6:24, 7:10, 7:13, 7:19, 7:21, 8:14, 8:25, 9:17, 9:23, 15:9, 15:15, 16:11, 16:17, 16:25, 17:5, 17:10, 18:10, 18:12, 18:15, 19:10, 19:20, 20:15, 20:20, 20:24, 47:20, 52:17, 54:3, 54:5, 54:25,

56:5, 56:13, 56:21, 57:2, 57:4, 57:14, 59:4, 59:9, 60:1, 60:15, 60:17, 60:20, 61:2, 61:8, 62:20, 63:12, 64:4, 64:14, 65:14, 65:18, 66:7, 68:2, 98:9, 98:17, 99:11, 99:18, 99:21, 100:7, 100:10, 100:13
**MSRB** [6] - 27:24, 28:6, 28:13, 28:17, 29:11, 29:16
**multiple** [3] - 33:8, 80:25, 81:1
**Municipal** [1] - 25:17
**municipal** [2] - 28:4, 28:9
**must** [2] - 72:19, 87:19

### N

**NAC** [31] - 13:8, 13:9, 13:11, 13:12, 13:15, 13:17, 14:15, 14:16, 17:9, 17:10, 20:5, 20:13, 20:16, 20:18, 20:20, 20:22, 21:5, 53:18, 55:16, 55:20, 56:1, 56:2, 56:9, 56:12, 56:13, 56:20, 56:21, 56:23, 57:19, 62:25
**namely** [1] - 14:22
**names** [1] - 3:7
**narrow** [2] - 15:24, 85:6
**narrowly** [2] - 35:16, 46:9
**NASD** [30] - 24:19, 29:23, 32:13, 32:21, 32:22, 33:22, 38:18, 38:21, 38:22, 45:11, 45:22, 46:1, 46:12, 46:20, 47:10, 47:17, 48:7, 49:4, 52:25, 69:1, 69:3, 69:11, 69:13, 69:16, 69:18, 72:24, 84:15, 85:9, 91:20, 95:9
**NASD's** [1] - 91:21
**Nasdaq** [1] - 74:4
**national** [2] - 77:2, 77:12
**National** [1] - 12:24
**nature** [2] - 22:15, 89:11
**nay** [1] - 56:14

**necessarily** [4] - 47:4, 83:18, 94:22, 97:6
**necessary** [2] - 14:8, 97:7
**need** [8] - 9:13, 10:22, 15:4, 47:2, 48:20, 49:11, 75:9, 89:10
**needed** [2] - 76:9, 83:20
**needs** [2] - 78:1, 79:4
**nefarious** [1] - 59:24
**negotiated** [1] - 66:12
**neutral** [1] - 42:4
**never** [3] - 67:8, 67:17, 90:17
**nevertheless** [2] - 31:23, 32:4
**new** [3] - 48:4, 58:14, 67:10
**New** [15] - 1:15, 1:18, 24:18, 29:24, 35:25, 36:3, 36:4, 36:8, 48:3, 48:6, 49:17, 52:22, 64:5, 69:9, 74:5
**newfound** [1] - 88:12
**next** [11] - 39:11, 39:12, 39:16, 39:25, 45:23, 54:22, 57:10, 58:4, 68:3, 68:5, 89:8
**nexus** [2] - 48:21, 92:7
**nice** [1] - 99:9
**nine** [3] - 64:25, 65:16, 67:6
**Ninth** [2] - 73:1, 84:17
**nominally** [1] - 82:13
**nominated** [1] - 83:20
**non** [1] - 17:18
**non-FINRA** [1] - 17:18
**nondelegation** [5] - 51:13, 51:20, 84:6, 84:9, 85:14
**none** [3] - 48:8, 68:4, 71:12
**nonetheless** [1] - 13:8
**nonfinal** [3] - 14:15, 14:16, 17:7
**normal** [2] - 60:13, 95:5
**normally** [1] - 95:1
**note** [4] - 44:17, 84:2, 84:13, 98:12
**notes** [1] - 101:9
**Nothing** [1] - 78:14
**nothing** [6] - 58:23, 64:23, 67:10, 87:1, 88:12, 98:7
**notice** [9] - 57:25, 59:13, 61:22, 66:22,

66:25, 67:3, 67:4, 67:15, 67:17
**Notice** [1] - 59:10
**noting** [1] - 82:16
**novo** [3] - 46:23, 51:16, 72:21
**nuance** [2] - 14:5, 14:11
**nuanced** [1] - 48:20
**nuclear** [1] - 57:20
**null** [1] - 101:12
**number** [1] - 11:9
**NW** [4] - 1:18, 2:4, 2:9, 2:13
**NY** [1] - 1:15

**O**

**o'clock** [1] - 93:14
**oath** [1] - 68:25
**obey** [6] - 20:7, 20:8, 57:23, 58:3, 58:9, 58:13
**obey-the-law** [5] - 20:7, 20:8, 57:23, 58:3, 58:9
**obligation** [1] - 99:4
**obliged** [1] - 12:19
**obtain** [1] - 79:3
**obviously** [5] - 36:18, 82:17, 85:20, 94:1, 97:14
**occasional** [1] - 88:3
**occur** [1] - 56:15
**occurred** [2] - 33:2, 98:19
**occurring** [1] - 34:8
**occurs** [2] - 17:13, 56:22
**odd** [2] - 85:10, 90:3
**OF** [3] - 1:1, 1:8, 1:10
**offend** [2] - 51:5, 51:9
**offends** [1] - 41:11
**Office** [1] - 68:20
**office** [1] - 52:5
**officer** [28] - 7:2, 7:6, 7:13, 11:10, 11:18, 11:19, 12:13, 14:14, 14:22, 17:16, 17:17, 19:22, 20:6, 41:9, 55:14, 55:18, 55:23, 56:7, 56:10, 56:16, 59:6, 60:12, 62:23, 62:25, 67:23, 70:22, 100:5, 100:8
**officer's** [2] - 12:12, 55:21
**officers** [3] - 41:4, 65:22, 75:8
**Officers** [1] - 68:20

**official** [2] - 29:2, 101:19
**Official** [1] - 2:17
**officials** [3] - 28:24, 29:7, 71:7
**officio** [1] - 71:12
**often** [1] - 42:11
**oil** [1] - 74:7
**once** [7] - 20:13, 40:12, 41:5, 42:5, 56:10, 76:1, 76:2
**one** [41] - 4:8, 4:18, 5:14, 8:21, 8:22, 10:22, 11:7, 12:21, 21:15, 24:1, 26:7, 26:15, 27:19, 27:22, 28:4, 28:6, 28:14, 31:15, 33:22, 34:14, 39:5, 42:12, 44:6, 44:17, 50:2, 54:22, 59:15, 61:3, 61:24, 62:4, 66:25, 67:23, 72:8, 73:23, 74:12, 85:17, 86:25, 93:11, 95:20, 97:13, 99:24
**ones** [1] - 47:1
**ongoing** [1] - 90:10
**operate** [4] - 30:5, 37:5, 42:11, 69:19
**operated** [2] - 28:3, 66:13
**operates** [1] - 27:24
**operating** [3] - 29:8, 47:12, 63:6
**operation** [1] - 74:16
**operations** [5] - 12:14, 12:16, 22:1, 70:19, 72:1
**opine** [1] - 33:10
**opined** [1] - 32:9
**opinion** [20] - 23:13, 25:4, 27:4, 27:17, 28:12, 30:11, 38:24, 38:25, 39:2, 49:3, 49:5, 69:5, 83:9, 85:12, 88:21, 90:3, 90:4, 90:9, 91:20, 95:21
**opinions** [3] - 25:7, 72:25, 73:2
**opportunities** [1] - 33:10
**opportunity** [10] - 19:24, 25:14, 61:16, 76:6, 80:19, 80:20, 81:5, 86:5, 86:20, 87:10
**opposed** [1] - 64:16
**opposite** [1] - 68:3
**opposition** [2] - 70:16,

78:13
**oral** [1] - 55:15
**orally** [1] - 56:18
**order** [47] - 4:11, 5:21, 8:5, 12:4, 12:13, 12:20, 12:25, 13:4, 13:5, 13:18, 14:3, 14:22, 14:23, 14:25, 15:7, 15:12, 15:13, 17:3, 18:1, 18:17, 18:19, 18:23, 21:18, 22:24, 28:4, 37:5, 58:12, 58:18, 59:1, 59:3, 59:13, 65:8, 65:11, 66:13, 66:22, 66:23, 67:11, 74:20, 77:25, 86:11, 87:22, 88:1, 88:15, 94:4, 96:22
**ordered** [2] - 6:25, 12:25
**orderly** [1] - 7:24
**orders** [1] - 86:15
**organization** [10] - 24:11, 27:20, 30:2, 30:16, 47:4, 51:5, 53:1, 53:4, 94:3, 98:24
**organizations** [6] - 34:21, 45:16, 48:2, 48:12, 49:16, 69:6
**organize** [1] - 50:20
**original** [1] - 12:22
**originally** [1] - 84:15
**originated** [1] - 90:13
**otherwise** [8] - 50:22, 72:1, 78:15, 79:1, 79:16, 82:12, 86:12, 91:22
**ought** [2] - 31:10, 37:20
**outset** [2] - 10:2, 91:19
**outsource** [2] - 99:2, 99:7
**overall** [1] - 45:15
**overarching** [3] - 26:4, 50:13, 50:23
**overlap** [1] - 83:12
**overlapping** [2] - 70:12, 71:23
**overlook** [1] - 78:17
**overreach** [1] - 57:8
**oversee** [1] - 67:23
**oversight** [4] - 45:17, 52:2, 69:19, 70:15
**own** [8] - 17:12, 29:4, 51:25, 59:2, 60:11, 71:25, 76:8, 91:18
**owned** [1] - 9:19

**ownership** [1] - 9:19

**P**

**p.m** [3] - 1:6, 92:23, 101:3
**Page** [1] - 82:10
**page** [4] - 21:18, 72:5, 86:8, 91:21
**pages** [2] - 45:13, 70:17
**paid** [1] - 17:16
**pain** [1] - 95:3
**panel** [4] - 12:22, 17:7, 17:21, 42:4
**panelist** [1] - 17:18
**panelists** [2] - 17:16, 67:24
**papers** [5] - 47:15, 82:9, 84:23, 86:2, 91:5
**parallel** [2] - 91:23, 92:1
**parent** [1] - 9:20
**part** [4] - 29:3, 82:13, 88:3, 97:18
**participating** [3] - 84:25, 94:4, 95:7
**participation** [2] - 28:9, 95:4
**particular** [3] - 82:10, 83:3, 85:1
**particularly** [2] - 5:6, 67:16
**parties** [6] - 4:11, 4:19, 5:7, 6:7, 62:7, 99:14
**parts** [1] - 44:9
**party** [5] - 70:5, 81:17, 86:10, 87:22, 101:14
**path** [7] - 31:16, 31:17, 31:19, 31:20, 49:12
**pathway** [2] - 61:9, 82:22
**PC** [1] - 3:10
**PCAOB** [4] - 48:1, 48:22, 49:2, 49:10
**Peacock** [8] - 27:4, 31:20, 39:1, 45:23, 46:2, 46:16, 83:9
**peculiar** [1] - 63:14
**penalize** [1] - 58:2
**penalties** [5] - 13:7, 14:6, 14:13, 14:14, 14:21
**penalty** [8] - 13:25, 14:2, 15:5, 17:3, 19:4, 19:21, 63:4
**pending** [9] - 4:9, 5:3,

12

5:22, 12:19, 20:17, 62:18, 88:2, 97:19, 98:2

**people** [8] - 13:8, 25:20, 28:24, 29:25, 32:4, 50:20, 64:8, 94:12

**per** [1] - 52:2

**perceived** [1] - 29:23

**percent** [1] - 71:6

**percentage** [1] - 44:14

**perception** [1] - 18:16

**perfect** [1] - 53:8

**perfectly** [1] - 57:15

**perform** [1] - 22:4

**performing** [1] - 33:7

**perhaps** [4] - 15:3, 31:17, 34:24, 49:9

**period** [3] - 64:17, 84:14, 85:7

**permanent** [3] - 13:3, 15:7, 41:6

**permit** [1] - 50:22

**permitted** [1] - 85:1

**person** [3] - 36:16, 39:17

**person's** [1] - 36:17

**perspective** [9] - 15:6, 17:2, 18:18, 18:20, 18:23, 18:24, 19:6, 59:1, 65:6

**persuasive** [3] - 7:12, 33:12, 33:14

**persuasively** [1] - 32:22

**pervasive** [4] - 70:11, 71:1, 71:22, 72:17

**Pezzi** [3] - 3:25, 4:4, 82:5

**PEZZI** [11] - 2:7, 3:24, 4:6, 81:23, 82:1, 88:20, 89:3, 89:15, 89:19, 90:12, 91:9

**phase** [3] - 4:23, 4:24

**phone** [1] - 6:9

**photocopied** [1] - 101:13

**phrase** [1] - 78:18

**PI** [7] - 4:23, 5:4, 5:18, 33:20, 46:5, 89:13, 93:6

**pincite** [2] - 45:12, 91:20

**pitch** [1] - 52:12

**place** [6] - 12:6, 41:5, 41:8, 53:21, 86:17, 97:11

**plainly** [2] - 23:2, 62:7

**plaintiff** [5] - 6:15, 19:1, 35:22, 74:10,

81:13

**plaintiff's** [1] - 77:20

**plaintiffs** [25] - 3:8, 3:10, 5:11, 13:3, 22:5, 47:25, 58:23, 59:16, 60:25, 62:5, 65:7, 65:12, 65:19, 66:1, 66:3, 75:16, 76:20, 80:13, 82:23, 83:25, 84:7, 85:3, 85:4, 91:2, 98:6

**Plaintiffs** [1] - 1:4

**plaintiffs'** [8] - 5:10, 13:1, 82:4, 83:24, 85:15, 85:23, 86:13, 86:22

**plate** [1] - 60:2

**pleases** [1] - 56:9

**plus** [1] - 13:4

**podium** [1] - 97:5

**point** [27] - 6:8, 15:17, 25:25, 26:4, 31:14, 36:12, 38:6, 40:2, 42:12, 48:9, 50:2, 50:10, 52:4, 54:4, 59:24, 61:6, 70:12, 71:22, 72:10, 76:9, 82:16, 83:8, 92:2, 92:5, 94:13, 97:4

**pointed** [1] - 47:25

**pointing** [1] - 92:15

**points** [11] - 10:1, 26:1, 27:12, 28:18, 29:10, 29:12, 29:13, 31:17, 48:18, 82:3, 92:3

**political** [4] - 77:7, 77:16, 78:8, 78:10

**poor** [1] - 89:18

**portends** [1] - 88:12

**portion** [1] - 58:12

**position** [8] - 12:14, 16:3, 74:25, 79:25, 81:8, 89:12, 94:21, 96:13

**positions** [1] - 41:10

**possibility** [1] - 56:25

**possible** [1] - 21:21

**possibly** [1] - 41:16

**post** [4] - 4:16, 4:18, 33:4

**post-Axon** [3] - 4:16, 4:18

**postpone** [4] - 68:13, 68:20, 68:23, 100:5

**postponed** [2] - 14:1, 73:17

**potential** [3] - 67:19, 72:16, 89:25

**potentially** [7] - 4:24,

10:25, 11:19, 11:24, 74:6, 78:6, 88:24

**power** [4] - 34:12, 55:6, 55:7, 87:24

**powers** [4] - 41:17, 42:7, 94:7

**practical** [1] - 41:21

**practice** [3] - 11:22, 37:3, 42:11

**practicing** [1] - 64:17

**preceded** [1] - 75:23

**precedent** [4] - 31:2, 43:10, 68:25, 94:2

**precisely** [2] - 6:8, 73:25

**preclude** [1] - 5:24

**predecessor** [9] - 24:19, 32:14, 38:23, 45:21, 46:14, 49:7, 69:1, 69:5, 72:24

**predecessors** [1] - 33:17

**prefer** [1] - 60:10

**preference** [2] - 97:17, 97:22

**prejudice** [1] - 5:22

**preliminary** [16] - 5:12, 8:1, 8:3, 12:8, 63:10, 78:16, 78:25, 79:2, 79:3, 79:7, 88:22, 89:23, 90:2, 90:22, 91:4, 97:25

**premise** [1] - 84:14

**premised** [1] - 79:21

**prepared** [1] - 57:15

**preparing** [1] - 65:1

**present** [4] - 16:15, 65:23, 76:8, 84:7

**presentation** [2] - 82:4, 84:12

**presented** [5] - 15:18, 24:6, 34:13, 42:3, 67:8

**preserve** [2] - 26:23, 64:20

**preserved** [1] - 82:17

**President** [3] - 40:21, 75:10, 83:20

**press** [1] - 7:5

**pressing** [1] - 7:14

**pressure** [1] - 16:5

**presumably** [3] - 44:22, 74:19, 83:21

**pretrial** [1] - 63:17

**pretty** [3] - 43:22, 49:17, 69:23

**prevail** [7] - 22:25, 31:15, 39:9, 41:7, 82:23, 94:23, 96:1

**prevailed** [2] - 40:16,

40:18

**prevent** [2] - 10:23, 12:12

**preventing** [1] - 94:14

**previously** [1] - 36:3

**primarily** [2] - 66:9, 84:5, 85:21

**primary** [1] - 84:8

**principal** [3] - 27:14, 27:23, 75:8

**principles** [1] - 84:23

**priorities** [1] - 77:15

**prioritizing** [1] - 96:7

**priority** [1] - 87:20

**prism** [2] - 51:8, 51:21

**private** [36] - 27:20, 27:25, 30:2, 32:3, 32:4, 32:11, 35:17, 36:13, 38:21, 47:9, 48:2, 49:15, 49:18, 51:12, 51:20, 69:6, 70:5, 70:7, 71:14, 71:15, 71:17, 71:24, 72:4, 72:15, 76:21, 82:13, 83:13, 84:6, 84:9, 84:20, 84:25, 85:2, 85:14, 94:11

**privately** [3] - 30:16, 34:24

**problem** [2] - 12:2, 53:16

**problematic** [1] - 94:5

**problems** [1] - 57:8

**procedural** [2] - 41:25, 96:19

**procedure** [3] - 12:10, 42:13, 86:17

**procedures** [5] - 14:6, 41:7, 54:13, 62:24, 87:13

**proceed** [3] - 44:21, 44:22, 87:24

**proceeding** [57] - 6:23, 7:14, 7:15, 10:9, 10:25, 13:7, 14:1, 15:18, 19:11, 19:13, 20:6, 21:21, 28:20, 33:21, 36:9, 39:21, 46:10, 46:11, 46:13, 54:21, 55:8, 57:12, 57:21, 58:2, 59:17, 59:18, 61:4, 61:11, 62:21, 63:5, 63:22, 64:1, 67:25, 74:2, 76:5, 76:18, 78:22, 79:15, 81:9, 83:3, 85:6, 87:23, 88:2, 88:9, 88:25, 90:11, 93:7, 93:11, 95:9, 95:10, 96:10,

96:20, 100:2, 100:20, 101:3

**Proceedings** [1] - 2:20

**proceedings** [18] - 6:20, 6:21, 7:18, 22:5, 42:11, 43:13, 55:11, 62:18, 72:21, 75:5, 76:16, 86:19, 87:1, 87:25, 88:16, 88:18, 101:10

**process** [35] - 12:6, 16:20, 19:2, 19:17, 19:18, 20:3, 21:24, 24:12, 31:6, 41:25, 46:21, 54:11, 54:14, 56:3, 57:16, 57:25, 58:5, 59:10, 65:20, 67:25, 68:1, 68:5, 75:4, 75:6, 75:17, 75:18, 75:20, 76:10, 76:11, 76:18, 81:7, 91:21, 96:2, 96:21

**Process** [1] - 27:10

**processes** [2] - 47:6, 60:13

**produced** [1] - 2:20

**product** [1] - 100:21

**profession** [1] - 31:9

**professional** [9] - 29:21, 29:25, 30:5, 30:6, 30:9, 30:16, 34:21, 47:3, 98:24

**professionals** [1] - 77:10

**profound** [1] - 98:22

**program** [2] - 27:6, 31:25

**Programs** [2] - 2:9, 2:13

**prohibited** [1] - 18:3

**promote** [1] - 51:23

**promulgate** [2] - 37:16, 37:17

**prong** [1] - 97:9

**pronouncement** [2] - 50:4, 52:6

**proof** [1] - 8:10

**proper** [2] - 18:2, 53:19

**properly** [1] - 16:5

**property** [1] - 54:11

**proportion** [1] - 18:2

**proposal** [1] - 55:22

**proposed** [7] - 4:11, 55:19, 55:20, 56:11, 56:19, 72:20, 76:13

**proposition** [1] - 38:8

**prosecute** [1] - 55:3

**prosecutor** [2] -

App.349

52:22, 64:4
**prosecutorial** [2] - 34:2, 37:17
**protect** [3] - 50:14, 50:15, 65:25
**protecting** [1] - 53:3
**protection** [4] - 61:19, 66:15, 67:5, 76:15
**protections** [2] - 31:8, 31:10
**prove** [1] - 8:1
**provide** [6] - 14:11, 58:5, 75:22, 80:22, 89:21, 99:8
**provided** [4] - 67:25, 75:5, 87:11
**provides** [2] - 59:14, 82:11
**providing** [1] - 34:20
**provision** [4] - 20:8, 22:18, 41:24, 86:9
**provisions** [3] - 58:11, 70:21, 75:1
**public** [21] - 8:3, 22:14, 29:8, 32:9, 32:14, 35:6, 35:25, 36:1, 37:14, 37:16, 37:20, 37:22, 47:4, 48:7, 48:21, 49:18, 66:5, 71:6, 71:9, 92:19
**published** [1] - 72:25
**purely** [1] - 27:20
**purest** [1] - 28:11
**purity** [1] - 67:12
**purpose** [9] - 50:13, 50:23, 52:7, 77:8, 77:19, 84:16, 84:24, 85:6, 85:21
**purposely** [1] - 5:25
**purposes** [10] - 9:21, 24:2, 27:5, 31:13, 32:3, 36:11, 46:5, 82:14, 83:2, 93:6
**pursuant** [3] - 54:25, 66:13, 76:12
**pursue** [1] - 55:3
**purview** [1] - 19:19
**pushes** [1] - 94:18
**pushing** [1] - 89:16
**put** [9] - 7:14, 25:20, 27:18, 27:22, 39:22, 45:21, 54:6, 72:7, 98:14
**puts** [3] - 28:14, 38:25, 98:17
**putting** [4] - 16:21, 63:9, 67:7, 97:23
**puzzle** [2] - 16:19, 96:11

## Q

**qualified** [2] - 95:25, 96:5
**quasi** [5] - 38:23, 49:4, 49:6, 49:9, 49:10
**quasi-governmental** [4] - 38:23, 49:4, 49:6, 49:10
**quasigovernmental** [2] - 69:2
**questionable** [1] - 27:19
**questions** [9] - 6:16, 10:2, 48:20, 52:14, 82:3, 82:20, 85:17, 91:6, 97:10
**quibble** [1] - 86:13
**quickly** [4] - 4:22, 21:15, 56:9, 86:15
**quite** [4] - 58:23, 82:15, 83:16, 84:4
**quo** [1] - 64:21
**quote** [7] - 48:2, 72:7, 72:15, 78:14, 91:16, 91:21, 93:17
**quotes** [1] - 45:14
**quoting** [2] - 19:4, 49:3

## R

**raises** [1] - 29:4
**raising** [1] - 63:18
**rather** [1] - 87:24
**reach** [1] - 32:16
**reaching** [1] - 83:17
**read** [10] - 34:16, 60:24, 82:9, 89:6, 89:21, 89:22, 90:2, 90:4, 96:16, 99:16
**reading** [4] - 11:4, 89:4, 96:14
**ready** [1] - 11:12
**real** [3] - 15:19, 16:15, 42:3
**reality** [3] - 56:6, 56:7, 99:25
**realized** [1] - 56:24
**really** [25] - 8:22, 13:5, 15:2, 15:24, 25:21, 29:12, 32:11, 33:1, 35:19, 38:24, 40:24, 42:7, 46:4, 49:24, 59:7, 60:1, 64:17, 68:9, 77:22, 86:22, 89:6, 90:2, 95:11, 99:15
**reason** [14] - 11:17, 12:2, 19:20, 35:16,

39:15, 40:2, 41:23, 64:23, 72:23, 74:1, 79:12, 79:13, 80:22, 81:17
**reasonable** [1] - 15:23
**reasoned** [1] - 32:22
**reasons** [5] - 32:23, 57:17, 83:11, 84:22, 91:5
**receives** [1] - 55:21
**recent** [3] - 6:6, 50:4, 52:6
**recently** [1] - 69:7
**receptive** [2] - 17:21, 17:22
**recognized** [1] - 77:10
**recommendation** [4] - 46:22, 54:2, 55:16, 56:2
**reconsideration** [4] - 5:10, 5:16, 6:5, 6:11
**record** [6] - 3:8, 4:10, 76:2, 82:5, 92:16, 97:24
**recover** [1] - 16:6
**refer** [2] - 53:8, 72:5
**reference** [1] - 67:4
**references** [2] - 61:20, 78:18
**referral** [2] - 30:11, 52:20
**referrals** [1] - 30:17
**referred** [6] - 27:21, 32:10, 38:20, 47:2, 66:25, 73:3
**referring** [3] - 54:1, 69:15, 72:16
**refers** [1] - 36:16
**regarding** [2] - 17:22, 82:9
**regardless** [1] - 90:24
**regime** [2] - 41:1, 44:18
**registered** [3] - 28:5, 77:2, 77:12
**registration** [4] - 15:1, 28:7, 53:15, 70:20
**regret** [1] - 64:5
**regular** [1] - 34:8
**regularly** [2] - 14:9, 63:17
**regulate** [4] - 45:18, 45:19, 45:22, 91:17
**regulated** [5] - 69:13, 70:4, 72:7, 72:12, 74:7, 77:10, 94:22, 95:2, 95:14
**regulates** [1] - 72:19
**regulating** [2] - 30:7, 34:20

**regulation** [3] - 35:17, 72:18, 72:22
**regulations** [6] - 46:25, 69:22, 70:21, 85:25, 86:10, 87:12
**regulators** [1] - 66:9
**regulatory** [13] - 21:23, 36:2, 45:16, 48:2, 48:12, 49:15, 69:6, 74:5, 77:14, 84:3, 85:18
**Regulatory** [1] - 3:4
**REGULATORY** [1] - 1:6
**reiterated** [1] - 70:4
**rejected** [1] - 90:20
**related** [1] - 6:19
**relating** [1] - 7:22
**relation** [1] - 52:20
**relationship** [11] - 9:7, 9:11, 45:24, 46:2, 46:3, 46:16, 47:9, 70:11, 83:14, 86:1, 92:7
**relationships** [2] - 12:6, 48:11
**relaying** [1] - 35:3
**release** [1] - 64:16
**relevant** [4] - 29:12, 71:18, 87:8, 92:2
**relied** [2] - 32:24, 32:25
**relief** [9] - 6:14, 8:3, 66:6, 74:12, 87:6, 96:19, 97:16, 97:19, 98:1
**rely** [1] - 62:5
**relying** [1] - 58:12
**remains** [1] - 8:7
**remedy** [5] - 40:2, 40:3, 41:4, 41:5, 41:8
**reminder** [1] - 39:1
**remove** [1] - 70:22
**renewed** [1] - 5:11
**reply** [1] - 82:25
**report** [1] - 45:14
**reported** [2] - 2:20, 4:17
**Reporter** [3] - 2:17, 2:17, 101:19
**request** [12] - 4:11, 6:25, 43:19, 43:25, 64:20, 68:22, 86:17, 87:9, 93:18, 97:20, 97:23, 98:2
**requested** [1] - 21:22
**requesting** [1] - 66:6
**requests** [2] - 75:25, 81:2

**require** [6] - 14:25, 40:8, 40:14, 41:24, 79:6, 96:16
**required** [8] - 30:1, 70:8, 73:10, 78:11, 79:8, 79:18, 80:2, 89:24
**requirement** [2] - 77:5, 79:16
**requirements** [7] - 27:10, 34:10, 41:11, 53:15, 70:8, 76:18, 80:5
**requires** [6] - 22:19, 24:10, 37:4, 44:5, 45:8, 77:1
**requiring** [3] - 6:5, 8:9, 80:9
**research** [1] - 5:7
**reserving** [1] - 101:2
**resolution** [2] - 62:18, 96:8
**resolve** [1] - 4:19
**resolved** [3] - 42:4, 96:23, 100:5
**resolves** [1] - 14:16
**resolving** [2] - 5:14, 96:9
**resources** [1] - 61:3
**respect** [20] - 22:20, 22:22, 28:12, 28:19, 29:11, 33:24, 44:18, 48:21, 48:23, 48:24, 51:11, 53:9, 68:4, 69:9, 84:15, 84:16, 90:17, 91:13, 95:20, 96:4
**respected** [1] - 32:20
**respectfully** [2] - 83:6, 98:2
**respond** [7] - 65:2, 67:10, 80:16, 80:19, 93:20, 93:21, 93:24
**respondents** [1] - 76:15
**response** [3] - 38:6, 51:1, 51:12
**responsible** [2] - 47:3, 53:10
**rest** [2] - 28:13, 68:21
**restraining** [1] - 74:20
**restraint** [1] - 84:19
**restrictions** [2] - 44:8, 84:22
**rests** [1] - 36:3
**result** [1] - 85:23
**resume** [2] - 100:12, 100:14
**resumes** [1] - 79:19
**retaliating** [1] - 80:14

**return** [1] - 45:10
**reverse** [1] - 21:1
**reversed** [4] - 21:9, 66:10, 66:11, 67:2
**review** [26] - 6:11, 17:8, 17:13, 17:19, 17:20, 46:23, 55:22, 55:23, 56:1, 56:2, 56:12, 56:14, 56:19, 56:22, 72:21, 82:17, 86:5, 86:16, 86:21, 87:22, 88:3, 88:7, 88:13, 88:15, 92:4, 96:22
**reviewed** [3] - 20:1, 47:8, 53:17
**reviewing** [1] - 15:8
**reviews** [1] - 51:15
**rights** [7] - 54:17, 54:19, 62:3, 78:7, 79:9, 79:11, 80:10
**rip** [1] - 49:23
**Robertson** [1] - 32:20
**role** [5] - 27:5, 27:7, 29:2, 29:23, 45:15
**RPR** [3] - 2:17, 101:7, 101:19
**rule** [18] - 6:6, 11:18, 11:19, 11:20, 23:23, 27:24, 28:2, 28:10, 30:25, 31:1, 31:4, 34:5, 46:5, 55:19, 88:6, 97:14, 97:15, 97:21
**Rulemaking** [1] - 25:17
**rules** [27] - 19:22, 28:6, 33:23, 34:3, 34:22, 37:17, 37:24, 38:1, 38:7, 39:24, 46:21, 46:25, 47:6, 51:15, 59:11, 66:21, 68:4, 69:22, 70:22, 72:20, 76:12, 92:4, 92:6, 95:6
**ruling** [3] - 40:5, 59:19, 68:10
**run** [3] - 25:17, 30:16, 76:2
**running** [1] - 13:17
**runs** [1] - 31:4

**S**

**sad** [3] - 100:9, 100:11, 100:12
**Saint** [2] - 2:17, 101:19
**SAINT** [1] - 101:7
**Saint-Loth** [2] - 2:17,

101:19
**SAINT-LOTH** [1] - 101:7
**salad** [1] - 92:8
**salaries** [1] - 77:15
**salient** [1] - 71:2
**sanction** [1] - 21:9
**sat** [1] - 67:6
**satisfied** [1] - 92:11
**satisfy** [3] - 42:6, 43:3, 78:24
**Sauder** [1] - 31:3
**scale** [3] - 8:8, 8:17, 63:9
**schedule** [4] - 4:13, 4:21, 16:6, 99:15
**scheduled** [3] - 7:15, 59:18, 89:8
**schedules** [1] - 16:10
**scheduling** [2] - 4:11, 81:4
**scheme** [2] - 84:3, 85:18
**school** [4] - 71:3, 71:6, 71:9, 71:18
**schools** [1] - 71:6
**scope** [2] - 23:7, 50:17
**SCOTTSDALE** [2] - 1:3, 1:13
**Scottsdale** [9] - 3:3, 3:11, 9:7, 9:18, 20:25, 21:2, 53:13, 53:14, 81:14
**Scriven** [1] - 56:23
**scrutiny** [1] - 16:5
**SEC** [69] - 12:10, 20:21, 21:1, 30:3, 30:18, 34:25, 38:19, 38:22, 40:7, 40:9, 40:20, 41:13, 43:1, 43:2, 45:11, 45:17, 46:15, 46:22, 47:7, 47:9, 47:10, 51:14, 52:3, 53:17, 53:25, 54:8, 54:9, 54:10, 54:11, 54:16, 54:18, 54:24, 55:1, 55:2, 57:22, 58:7, 69:3, 69:11, 69:13, 69:15, 69:19, 69:21, 70:11, 70:15, 70:19, 70:21, 70:23, 72:19, 72:20, 76:13, 76:14, 85:25, 86:6, 86:10, 86:11, 86:16, 86:20, 86:24, 87:8, 98:18, 98:25, 99:1, 99:6
**SEC's** [7] - 45:18, 45:20, 45:22, 45:25, 46:20, 85:25, 92:4

**second** [7] - 19:5, 31:19, 66:7, 75:10, 82:22, 87:16, 90:17
**Second** [3] - 73:1, 84:17, 84:18
**second-line** [1] - 75:10
**secondary** [1] - 71:3
**section** [2] - 87:17, 89:17
**Section** [4] - 53:15, 53:19, 54:18, 55:3
**sector** [1] - 16:4
**securities** [15] - 28:5, 28:9, 30:3, 30:18, 38:3, 45:1, 47:1, 48:3, 49:16, 53:7, 53:11, 54:6, 77:2, 77:12, 99:3
**Securities** [9] - 18:25, 20:23, 24:13, 25:17, 44:2, 44:18, 51:17, 52:10, 66:10
**SECURITIES** [1] - 1:3
**security** [1] - 34:20
**see** [8] - 5:8, 29:10, 47:11, 48:23, 48:24, 55:12, 63:16, 64:10
**seeing** [1] - 65:15
**seek** [7] - 12:8, 61:17, 86:10, 86:17, 87:5, 97:18, 97:25
**seeking** [4] - 10:6, 10:7, 14:24, 97:16
**seeks** [2] - 60:23, 61:2
**seem** [2] - 58:21, 78:17
**sees** [3] - 34:6, 53:6, 95:17
**seismic** [2] - 74:2, 93:17
**select** [1] - 40:20
**selected** [2] - 71:7, 71:13
**self** [6] - 45:16, 48:2, 48:12, 49:15, 69:6, 74:5
**self-regulatory** [6] - 45:16, 48:2, 48:12, 49:15, 69:6, 74:5
**semblance** [1] - 20:2
**Senate** [2] - 45:14, 83:21
**send** [1] - 73:14
**sending** [1] - 67:15
**sense** [3] - 53:9, 57:7, 94:8
**sensitive** [3] - 87:1, 87:5, 87:9
**sentence** [2] - 21:19,

45:17
**separation** [4] - 41:16, 41:17, 42:6, 94:7
**series** [1] - 7:4
**served** [1] - 71:8
**set** [6] - 16:5, 29:24, 33:23, 95:6
**sets** [3] - 32:24, 73:21, 88:14
**setting** [6] - 29:22, 30:5, 78:1, 79:10, 84:11
**seven** [2] - 60:24, 60:25
**Seventh** [6] - 41:18, 42:14, 42:16, 42:18, 44:8, 44:23
**several** [2] - 78:18, 83:23
**severance** [1] - 40:5
**shadow** [1] - 51:17
**shall** [1] - 101:12
**share** [1] - 93:1
**shift** [1] - 74:3
**shock** [1] - 73:14
**shocked** [1] - 49:21
**short** [2] - 6:8, 99:23
**shorthand** [1] - 2:20
**show** [3] - 83:25, 91:2, 96:25
**showing** [5] - 62:6, 79:10, 90:24, 91:5, 97:7
**shown** [1] - 89:24
**shows** [2] - 83:22, 92:6
**shrift** [1] - 99:23
**shut** [3] - 54:11, 58:8, 62:25
**shutter** [1] - 66:24
**shy** [1] - 32:17
**sic** [4] - 21:4, 28:22, 29:5, 41:12
**Sidak** [1] - 4:19
**side** [7] - 22:23, 27:19, 27:22, 28:14, 35:8, 60:22, 65:24
**side's** [1] - 51:12
**sides** [1] - 94:6
**sidestep** [1] - 62:25
**signal** [1] - 89:18
**signals** [1] - 73:5
**signatory** [1] - 101:14
**significantly** [1] - 72:14
**similar** [1] - 4:16
**similarities** [2] - 71:2, 71:18
**simple** [1] - 58:13
**simply** [9] - 28:25,

44:16, 55:7, 56:13, 64:20, 72:7, 78:10, 82:16, 100:17
**single** [6] - 20:5, 21:9, 39:17, 62:24, 93:7
**sit** [2] - 63:21, 64:8
**sits** [1] - 93:22
**sitting** [2] - 5:23, 63:17
**situation** [2] - 31:11, 46:7
**six** [3] - 64:25, 72:9, 73:2
**sliding** [2] - 8:8, 8:17
**sliding-scale** [2] - 8:8, 8:17
**slippery** [1] - 95:14
**slope** [1] - 95:14
**slowly** [1] - 86:23
**small** [1] - 36:14
**smuggle** [2] - 90:4, 90:8
**solely** [1] - 26:5
**solve** [1] - 41:15
**someone** [2] - 58:2, 100:23
**somewhat** [1] - 11:25
**soon** [4] - 13:15, 60:4, 66:8, 67:3
**sorry** [2] - 53:23, 98:8
**sort** [23] - 4:12, 4:13, 4:25, 13:24, 20:2, 23:1, 24:4, 26:5, 28:11, 30:11, 34:20, 46:6, 53:9, 59:7, 63:14, 80:17, 87:9, 88:14, 90:7, 94:10, 97:13, 98:14, 99:23
**sorts** [3] - 31:10, 33:10, 63:20
**sought** [1] - 7:5
**sound** [4] - 43:13, 43:18, 43:19, 67:16
**sounded** [1] - 59:23
**sounds** [2] - 43:9, 84:4
**Souter** [1] - 91:15
**sovereign** [1] - 96:6
**speaking** [4] - 4:5, 6:15, 51:3, 83:10
**specific** [9] - 9:14, 20:8, 35:15, 35:21, 58:11, 58:17, 63:24, 83:11, 93:13
**specifically** [4] - 18:2, 25:2, 27:8, 93:10
**speed** [1] - 33:9
**spend** [1] - 78:4
**spent** [2] - 64:25, 85:13

**Springsteen** [1] - 32:10
**SRO** [2] - 24:19, 49:2
**SROs** [2] - 48:4, 49:10
**staff** [3] - 75:24, 81:8, 91:10
**staffed** [1] - 5:8
**stage** [1] - 73:12
**stake** [1] - 95:24
**standard** [4] - 6:10, 8:11, 53:18, 82:12
**standards** [9] - 29:22, 29:24, 29:25, 30:1, 30:5, 34:22, 50:7, 53:19, 99:24
**standing** [3] - 27:14, 90:14, 90:18
**standpoint** [1] - 76:10
**staring** [1] - 67:19
**stark** [1] - 19:13
**start** [6] - 4:8, 8:23, 10:4, 68:7, 82:8, 91:22
**started** [2] - 9:25, 19:12
**starting** [1] - 3:8
**starts** [1] - 27:18
**State** [2] - 91:16, 91:17
**state** [100] - 3:7, 7:18, 7:22, 8:15, 10:1, 22:2, 22:4, 22:18, 22:20, 22:24, 24:17, 24:19, 24:25, 25:2, 26:7, 26:14, 26:25, 27:2, 27:5, 27:15, 27:23, 28:16, 30:14, 31:4, 31:12, 31:13, 31:15, 31:23, 32:23, 33:11, 36:7, 36:11, 36:17, 39:3, 39:6, 39:8, 39:11, 44:7, 45:2, 45:6, 45:24, 46:3, 46:16, 47:18, 48:15, 49:13, 49:18, 50:5, 50:8, 50:11, 50:16, 51:8, 51:22, 51:24, 52:7, 52:13, 58:24, 68:10, 70:5, 70:6, 70:7, 71:11, 72:4, 72:8, 72:13, 72:25, 73:8, 74:3, 74:6, 74:23, 74:24, 75:12, 76:21, 77:11, 77:25, 78:15, 79:20, 79:25, 80:4, 80:6, 82:23, 83:2, 83:13, 83:22, 85:4, 85:5, 92:8, 92:15, 93:9, 93:23, 94:7, 94:15,

94:19, 94:22, 95:15, 95:18
**statement** [3] - 16:22, 48:10, 79:13
**STATES** [3] - 1:1, 1:8, 1:11
**States** [8] - 3:5, 4:1, 27:12, 75:9, 82:6, 85:20, 90:15, 90:19
**states** [2] - 72:7, 78:13
**States'** [1] - 25:10
**status** [2] - 49:4, 64:20
**statute** [7] - 22:19, 24:10, 37:4, 45:8, 77:1, 85:24, 87:11
**statutes** [1] - 85:22
**statutory** [7] - 21:23, 37:25, 41:1, 44:17, 70:21, 77:5, 86:9
**stay** [16] - 12:9, 20:16, 20:17, 20:18, 21:4, 21:6, 57:1, 86:10, 86:17, 87:10, 88:16, 89:6, 89:22, 96:17, 100:19
**staying** [2] - 21:23, 100:2
**stenographic** [1] - 101:9
**step** [6] - 26:3, 50:9, 52:18, 66:20, 81:9, 81:10
**STEPHEN** [1] - 2:7
**Stephen** [2] - 3:25, 82:5
**stephen.pezzi@ usdoj.gov** [1] - 2:11
**sticking** [1] - 74:22
**still** [4] - 7:15, 8:17, 36:4, 63:23
**Stock** [11] - 24:18, 29:24, 35:25, 36:3, 36:4, 36:8, 48:3, 48:6, 49:17, 69:10, 74:5
**stock** [1] - 74:4
**stop** [9] - 12:4, 39:20, 62:18, 63:23, 64:2, 65:17, 66:23, 67:17, 96:20
**straight** [1] - 5:17
**Street** [3] - 1:22, 2:9, 2:13
**stretch** [2] - 25:5, 25:7
**strict** [1] - 97:21
**striking** [1] - 58:20
**string** [1] - 72:9
**strong** [2] - 62:21, 63:13

**stronger** [1] - 26:25
**strongest** [1] - 31:17
**struck** [1] - 52:21
**structural** [4] - 27:20, 40:4, 90:5, 95:23
**structure** [6] - 9:14, 23:3, 23:15, 62:9, 70:13, 74:16
**stuff** [1] - 51:14
**subcommittee** [4] - 55:25, 56:12, 56:13, 56:19
**subject** [21] - 27:9, 40:6, 40:7, 42:18, 44:2, 44:8, 45:16, 46:15, 57:12, 62:12, 69:19, 70:14, 74:8, 78:14, 79:16, 80:5, 81:14, 86:16, 88:24, 90:21, 95:5
**subjected** [2] - 78:21, 96:2
**submission** [5] - 27:15, 51:25, 84:8, 92:13, 94:3
**submit** [3] - 4:11, 30:19, 80:3
**subsidiaries** [1] - 9:8
**substantial** [6] - 74:13, 75:4, 75:20, 79:10, 81:2, 81:4
**substantive** [5] - 6:14, 16:2, 16:15, 42:3, 64:9
**succeed** [1] - 73:13
**success** [16] - 7:22, 8:2, 8:6, 8:20, 8:23, 19:9, 74:13, 83:5, 83:25, 89:13, 91:3, 96:9, 96:25, 97:6, 97:10, 97:12
**suffer** [2] - 8:4, 79:18
**suffering** [2] - 79:5
**sufficient** [5] - 8:10, 47:7, 70:24, 78:24, 83:4
**suggest** [2] - 82:10, 94:8
**suggested** [3] - 83:1, 83:18, 94:21
**suggestions** [1] - 86:2
**Suite** [1] - 1:22
**summary** [3] - 4:21, 4:24, 10:20
**supervision** [1] - 40:7
**supervisory** [1] - 77:11
**supplants** [1] - 91:22
**supplemental** [1] - 92:22

**supported** [1] - 29:7
**suppose** [1] - 40:19
**suppress** [1] - 63:19
**suppression** [1] - 64:12
**Supreme** [24] - 26:10, 26:11, 31:2, 32:1, 43:10, 47:23, 48:10, 49:8, 49:20, 50:4, 50:8, 51:21, 52:6, 59:19, 63:9, 69:8, 69:20, 70:4, 72:9, 73:5, 77:9, 80:15, 85:11, 92:9
**surprised** [1] - 83:16
**survive** [6] - 10:19, 16:6, 22:11, 22:13, 61:4, 93:23
**suspend** [1] - 70:19
**swaths** [1] - 70:7
**symbiotic** [2] - 47:8, 92:7
**sympathizes** [1] - 86:25

**T**

**table** [2] - 4:2, 84:13
**talks** [1] - 27:22
**Tampa** [2] - 1:22, 1:22
**Tayrani** [2] - 3:19, 68:17
**TAYRANI** [24] - 2:2, 3:18, 68:8, 68:16, 69:4, 69:11, 69:25, 71:1, 72:3, 73:9, 73:20, 73:23, 74:18, 74:24, 75:20, 76:25, 77:24, 79:3, 79:22, 80:20, 81:16, 81:19, 81:22, 89:9
**teetering** [1] - 67:19
**temporary** [2] - 66:12, 74:20
**ten** [1] - 11:24
**term** [2] - 48:5, 49:6
**terminated** [1] - 10:24
**terms** [7] - 13:23, 16:3, 20:4, 46:25, 58:20, 64:8, 67:12
**test** [5] - 37:21, 37:23, 86:18, 92:11, 96:25
**testimony** [1] - 18:6
**tests** [1] - 50:7
**THE** [172] - 1:1, 1:10, 3:2, 3:13, 3:16, 3:22, 4:4, 4:7, 6:22, 7:9, 7:11, 7:17, 7:20, 7:24, 8:15, 9:6, 9:15, 9:21, 9:24, 10:4,

10:12, 10:16, 10:18, 11:2, 11:16, 12:17, 12:21, 13:11, 13:23, 14:7, 14:18, 15:3, 15:10, 16:8, 16:12, 16:18, 17:1, 17:9, 18:8, 18:11, 18:13, 18:16, 19:16, 20:13, 20:16, 20:22, 21:10, 21:14, 22:2, 22:10, 22:13, 23:1, 23:19, 24:15, 24:24, 25:5, 25:12, 25:18, 25:23, 26:17, 26:21, 28:21, 29:16, 29:19, 30:22, 32:8, 33:18, 34:15, 35:10, 35:24, 36:4, 36:13, 36:19, 36:23, 37:12, 37:24, 38:12, 39:9, 39:14, 39:16, 40:8, 40:13, 40:24, 41:13, 41:22, 42:1, 42:14, 42:20, 43:3, 43:12, 43:21, 44:6, 44:13, 45:2, 46:18, 47:21, 48:15, 49:15, 49:25, 52:15, 53:23, 54:4, 54:23, 55:13, 56:10, 56:16, 57:1, 57:3, 57:13, 58:21, 59:5, 59:15, 60:6, 60:16, 60:18, 60:24, 61:7, 62:4, 63:7, 63:14, 64:11, 65:6, 65:15, 65:19, 68:1, 68:6, 68:9, 69:1, 69:8, 69:21, 70:9, 71:20, 73:7, 73:11, 73:22, 74:15, 74:22, 75:16, 76:20, 77:20, 78:13, 79:20, 80:12, 81:13, 81:18, 81:20, 81:24, 87:15, 88:21, 89:4, 89:16, 90:7, 91:8, 91:12, 92:12, 92:23, 92:25, 93:16, 94:25, 96:5, 96:13, 96:18, 98:3, 98:5, 98:16, 99:9, 99:13, 99:19, 100:4, 100:8, 100:11, 101:1
**themselves** [3] - 38:7, 50:20, 61:16
**theoretical** [1] - 56:25
**theoretically** [3] - 16:25, 21:21, 56:23
**theories** [2] - 17:23, 67:10
**theory** [3] - 67:22, 72:13, 85:4

**therefore** [3] - 19:1, 35:22, 39:7
**they've** [1] - 17:1
**thinking** [3] - 10:22, 37:20, 97:15
**thinks** [1] - 30:23
**Third** [2] - 73:1, 84:17
**Thomas** [1] - 23:14
**thorn** [1] - 60:22
**threatening** [1] - 93:12
**three** [7] - 4:17, 5:24, 17:16, 25:7, 65:2, 67:9, 67:22
**threshold** [1] - 83:23
**thrown** [1] - 65:9
**thumb** [1] - 63:9
**Thunder** [2] - 24:1, 90:19
**tied** [1] - 29:6
**time-sensitive** [3] - 87:1, 87:5, 87:9
**timing** [6] - 55:13, 60:7, 75:22, 87:19, 88:7, 90:9
**today** [11] - 4:2, 6:23, 7:4, 10:6, 11:21, 28:20, 36:2, 85:14, 86:3, 86:19, 88:12
**today's** [1] - 84:12
**together** [4] - 50:20, 67:7, 94:12, 98:14
**tomorrow** [3] - 92:13, 92:23, 93:15
**took** [10] - 15:21, 15:24, 20:25, 21:6, 21:8, 53:16, 61:5, 66:20, 81:7
**tools** [1] - 30:6
**totally** [3] - 8:7, 41:21, 41:22
**traditional** [1] - 34:22
**trample** [1] - 50:18
**transactions** [2] - 65:10, 65:16
**transcript** [3] - 101:9, 101:10, 101:13
**TRANSCRIPT** [1] - 1:10
**Transcript** [1] - 2:20
**transcription** [1] - 2:20
**transfer** [2] - 21:18, 67:2
**transferred** [3] - 5:4, 5:22, 36:5
**transgressing** [1] - 5:20
**traveling** [2] - 6:3, 7:12
**treat** [2] - 51:24, 52:9

**treated** [4] - 14:14, 14:16, 93:9, 94:15
**treating** [2] - 52:8, 94:19
**trial** [2] - 43:4, 43:8
**trials** [1] - 89:7
**tribunal** [1] - 17:12
**tried** [1] - 94:8
**trigger** [1] - 78:12
**TRO** [20] - 4:23, 5:12, 5:18, 10:6, 10:23, 11:1, 11:21, 13:5, 13:15, 33:20, 62:6, 68:11, 73:12, 73:14, 73:16, 81:18, 90:22, 91:3, 93:6, 96:8
**troubling** [1] - 55:10
**true** [3] - 42:19, 101:8, 101:9
**try** [4] - 7:25, 26:3, 62:2, 93:25
**trying** [13] - 17:3, 32:17, 50:11, 58:1, 58:21, 59:21, 59:23, 59:25, 60:18, 65:24, 80:22, 89:17, 89:18
**Tuesday** [2] - 4:12, 5:9
**TURKEL** [1] - 1:20
**Turkel** [2] - 1:21, 3:14
**Turkel's** [1] - 3:15
**turn** [1] - 80:6
**turns** [1] - 35:18
**two** [16] - 4:17, 11:5, 17:17, 21:8, 26:7, 28:2, 28:5, 31:14, 59:20, 59:22, 60:1, 67:24, 73:21, 89:7, 94:6, 98:9
**type** [4] - 27:14, 48:19, 48:23, 48:24
**types** [3] - 14:13, 43:6, 63:24
**typically** [1] - 44:20

**U**

**U.S** [2] - 2:8, 55:4
**ultimate** [1] - 70:14
**ultimately** [6] - 21:5, 35:18, 41:7, 81:7, 86:19, 97:11
**umbrella** [1] - 9:8
**unambiguous** [1] - 58:18
**unanimous** [2] - 47:15, 47:16
**unbroken** [1] - 68:24
**unconstitutional** [8] - 62:22, 63:6, 65:21, 78:22, 79:8, 80:3,

88:24
**undecided** [1] - 8:7
**under** [17] - 6:6, 16:4, 24:1, 40:22, 41:1, 43:9, 45:25, 46:2, 46:16, 52:2, 64:15, 66:21, 70:24, 89:24, 94:5, 96:21
**undergo** [2] - 62:21, 63:5
**underlying** [24] - 6:20, 6:21, 13:12, 15:18, 17:15, 17:17, 17:23, 18:7, 18:14, 19:25, 20:4, 24:16, 52:7, 53:13, 58:14, 58:16, 60:5, 67:8, 67:9, 67:22, 67:25, 77:8, 79:25, 100:20
**underscores** [1] - 94:17
**understood** [1] - 77:20
**undertakes** [1] - 76:19
**underway** [1] - 14:1
**undisputed** [1] - 75:13
**unfair** [1] - 58:22
**uniform** [1] - 68:24
**unilaterally** [1] - 68:19
**unique** [1] - 87:2
**UNITED** [3] - 1:1, 1:8, 1:11
**United** [9] - 3:5, 4:1, 25:10, 27:12, 75:9, 82:6, 85:20, 90:15, 90:19
**unlawful** [1] - 73:25
**unless** [4] - 17:7, 81:21, 82:20, 85:17
**unlike** [6] - 19:21, 37:1, 48:2, 49:2, 49:9, 71:16
**unproblematic** [2] - 41:21, 41:23
**unreasonable** [3] - 15:21, 18:24, 44:25
**unrebutted** [1] - 85:19
**unusual** [1] - 97:8
**up** [21] - 4:8, 4:13, 4:14, 4:22, 9:2, 13:7, 15:1, 15:13, 17:3, 18:21, 20:18, 20:20, 24:12, 29:22, 33:9, 57:10, 58:13, 71:5, 75:21, 82:3
**update** [1] - 6:24
**urge** [1] - 45:12
**urgency** [1] - 65:3
**urging** [1] - 47:14
**useful** [1] - 5:6

**uses** [2] - 47:6, 49:6
**usual** [1] - 11:23
**Utah** [1] - 66:9
**utilities** [2] - 74:7, 92:19
**utility** [2] - 15:24, 70:6

**V**

**various** [1] - 50:7
**versus** [12] - 3:4, 8:8, 38:19, 38:22, 40:3, 45:11, 47:10, 48:25, 65:4, 69:11, 70:2, 88:8
**victimized** [1] - 73:24
**victory** [1] - 31:18
**view** [7] - 8:9, 15:17, 23:6, 49:17, 62:19, 73:5, 94:13
**viewed** [3] - 15:16, 46:20, 48:4
**viewing** [1] - 23:9
**violate** [4] - 20:7, 28:6, 34:4, 58:11
**violated** [6] - 53:15, 57:23, 59:1, 70:22, 84:19, 84:23
**violates** [4] - 37:7, 70:20, 75:1, 85:2
**violating** [7] - 31:1, 34:3, 36:10, 37:19, 58:2, 58:8, 66:23
**violation** [9] - 20:6, 20:8, 30:9, 36:15, 53:7, 55:3, 59:12, 66:22, 83:5
**violations** [9] - 13:2, 15:11, 18:24, 30:2, 30:17, 38:3, 47:1, 61:21, 76:2
**violative** [1] - 65:10
**virtue** [2] - 62:22, 62:24
**void** [1] - 101:12
**voluntary** [2] - 33:23, 94:11
**vs** [1] - 1:5

**W**

**wait** [1] - 11:23
**waited** [1] - 64:25
**waiting** [1] - 33:4
**walk** [1] - 26:14
**wants** [3] - 44:21, 51:18, 92:6
**Washington** [6] - 1:7, 1:18, 2:4, 2:10, 2:14, 2:18

**watched** [1] - 61:21
**watching** [1] - 64:21
**waves** [1] - 73:14
**ways** [7] - 14:2, 25:21, 26:7, 28:25, 31:14, 39:5, 83:7
**weapon** [1] - 57:20
**weapons** [1] - 78:5
**website** [1] - 53:21
**weeds** [1] - 18:14
**week** [8] - 54:22, 57:10, 58:4, 68:3, 68:5, 80:15, 86:3, 89:8
**weekend** [1] - 6:3
**weeks** [4] - 5:24, 11:13, 65:2, 67:9
**weigh** [2] - 7:7, 66:5
**weighing** [1] - 24:5
**welcome** [1] - 3:16
**whining** [1] - 57:11
**whole** [5] - 4:14, 4:22, 51:22, 57:24, 90:9
**wielded** [1] - 23:4
**willfully** [1] - 70:22
**Williams** [4] - 25:16, 27:18, 28:14, 31:2
**Williams-Yulee** [1] - 31:2
**win** [2] - 8:22, 22:24
**Winter** [2] - 8:9, 89:24
**witnesses** [2] - 76:7, 76:8
**word** [6] - 37:13, 61:24, 69:17, 90:8, 92:8, 93:3
**words** [3] - 23:8, 52:20, 71:22
**works** [1] - 86:1
**world** [1] - 61:10
**worried** [1] - 86:23
**worse** [1] - 17:11
**worthy** [1] - 100:17
**wrap** [2] - 4:14, 4:22
**wrapped** [1] - 4:13
**writ** [1] - 31:22
**writes** [1] - 92:6
**writing** [3] - 25:16, 91:15, 98:3

**X**

**Xerox** [9] - 27:4, 27:7, 29:14, 31:20, 39:6, 39:7, 83:13, 83:19

**Y**

**year** [4] - 58:14, 60:2, 61:21, 64:21

**years** [12] - 20:25,
  21:8, 34:24, 50:9,
  53:5, 53:16, 61:5,
  61:12, 64:5, 98:20
**Yellen** [3] - 26:12,
  40:3, 48:25
**yesterday** [1] - 7:4
**York** [14] - 1:15, 24:18,
  29:24, 35:25, 36:3,
  36:4, 36:8, 48:3,
  48:6, 49:17, 52:22,
  64:5, 69:9, 74:5
**you-all** [3] - 4:15, 5:1,
  63:15
**Yulee** [1] - 31:2